UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

LEE E. BUCHWALD, as Chapter 7 Trustee for
Magnesium Corporation of America and Related
Debtor Renco Metals, Inc.,

                Plaintiff,

      -against-

THE RENCO GROUP, INC., et al.,

                Defendants.

No. 13 Civ. 7948 (AJN)

---

## **DEFENDANTS' TRIAL MEMORANDUM**

KAYE SCHOLER LLP
250 West 55th Street
New York, New York  10019-9710
(212) 836-8000
peter.haveles@kayescholer.com

PARK JENSEN BENNETT LLP
40 Wall Street
New York, New York  10005
(646) 200-6300
tpark@parkjensen.com

Attorneys for Defendants

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT ........................................................................................................................ 4

POINT I  THE TRUSTEE CANNOT ESTABLISH THAT RENCO METALS
    AND MAGCORP WERE INSOLVENT ............................................... 4
 A. The Trustee's Claims All Require the Trustee to Establish Insolvency ................ 4
 B. The Test for Insolvency ............................................................................ 5
 C. The Trustee Bears the Burden of Proof ....................................................... 5
 D. The Trustee Cannot Establish that There Was No Reasonably
   Equivalent Value for the Transfers to the Magcorp Officers ............................ 8
 E. The Trustee Cannot Establish a Subsequent Transferee Claim against
   Ira Rennert or the Rennert Family Trusts ..................................................... 9
 F. The Trustee Has No Claim for Aiding and Abetting a Fraudulent
   Conveyance .......................................................................................... 10

POINT II  THE TRUSTEE CANNOT MEET HIS BURDEN OF PROOF
    REGARDING CONTINGENT LIABILITIES ..................................... 11

POINT III  RENCO METALS AND MAGCORP HAD ADEQUATE CAPITAL ............... 15

POINT IV  THE TRUSTEE CANNOT ESTABLISH THAT RENCO METALS
    PAID DIVIDENDS IN VIOLATION OF DELAWARE LAW........................... 18

POINT V  THE TRUSTEE CANNOT ESTABLISH HIS BREACH OF
    FIDUCIARY DUTY CLAIMS........................................................... 20
 A. The Trustee Has No Claim for Breach of Fiduciary Duty.................................... 20
 B. The Trustee Has No Claim for Aiding and Abetting a Breach of
   Fiduciary Duty ....................................................................................... 24

POINT VI  THE TRUSTEE CANNOT ESTABLISH HIS UNJUST
    ENRICHMENT CLAIMS ................................................................ 24

CONCLUSION................................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

CASES

Baldi v. Samuel Son & Co.,
    548 F.3d 579 (7th Cir. 2008) ............................................................................14

Brenner v. Brenner,
    821 F. Supp. 2d 533 (E.D.N.Y. 2011) ............................................................25

Buchwald v. The Renco Group,
    399 B.R. 722 (Bankr. S.D.N.Y. 2009)............................................................20

Cilco Cement Corp. v. White,
    55 A.D.2d 668, 390 N.Y.S.2d 178 (2d Dep't 1976) ........................................9

Covey v. Commercial National Bank,
    960 F.2d 657 (7th Cir. 1992) ..........................................................................12

Excelsior Capital LLC v. Allen,
    No. 11 Civ. 7373 (CM), 2012 WL 4471262 (S.D.N.Y. Sept. 26, 2012) ..........10

Federal Deposit Insurance Corp. v. Bell,
    106 F.3d 258 (8th Cir. 1997) ....................................................................13, 14

Furniture Manufacturers Sales, Inc. v. Deamer,
    680 P.2d 398, 399 (Utah 1984) ........................................................................6

Georgia Malone & Co. v. Rieder,
    19 N.Y.3d 511, 973 N.E.2d 743 (2012)..........................................................25

Heller v. Boylan,
    29 N.Y.S.2d 653, 668 (N.Y. Sup. Ct. 1941)…………………………..................9

In re Color Tile, Inc.,
    Nos. 96–76 (HSB), 96–80 (HSB), Civ.A. 98–358–SLR, A–98–90, 96–77 (HSB), 96–
    78 (HSB), 96–79 (HSB), 2000 WL 152129 (D. Del. Feb. 9, 2000) ..................18, 19

In re Davis,
    169 B.R. 285 (E.D.N.Y. 1994) ......................................................................12

In re Direct Response Media, Inc.,
    466 B.R. 626 (Bankr. D. Del. 2012) ...............................................................21

In re Fidelity Bond & Mortgage Co.,
    340 B.R. 266 (Bankr. E.D.Pa. 2006), aff'd sub nom Fidelity Bond & Mortgage Co. v.
    Brand, 371 B.R. 708 (E.D.Pa. 2007) ...........................................................................17

In re Furs by Albert & Marc Kaufman, Inc.,
    No. 03-41301, 2006 WL 3735621 (Bankr. S.D.N.Y. Dec. 14, 2006) ...................................10

In re Hechinger Investment Co. of Delaware,
    327 B.R. 537 (D. Del. 2005)..........................................................................................7

In re Hydrogen LLC,
    431 B.R. 337 (Bankr. S.D.N.Y. 2010).............................................................................4

In re Iridium Operating LLC,
    373 B.R. 283 (Bankr. S.D.N.Y. 2007)....................................................................... passim

In re Joy Recovery Technology Corp.,
    286 B.R. 54 (Bankr. N.D. Ill. 2002) ..............................................................................17

In re Ohio Corrugating Co.,
    91 B.R. 430 (N.D. Ohio 1988)......................................................................................13

In re Scott Acquisition Corp.,
    344 B.R. 283 (Bankr. D. Del. 2006) ..............................................................................21

In re Sharp International Corp.,
    403 F.3d 43 (2d Cir. 2005)...........................................................................................24

In re TC Liquidations LLC,
    463 B.R. 257 (Bankr. E.D.N.Y. 2011)...........................................................................6, 9

In re Trinsum Group, Inc.,
    460 B.R. 379 (Bankr. S.D.N.Y. 2011)..........................................................................4, 5

In re Tronox Inc.,
    429 B.R. 73 (Bankr. S.D.N.Y. 2010).............................................................................12

In re Wallace's Bookstores, Inc.,
    316 B.R. 254 (Bankr. E.D. Ky. 2004)............................................................................14

In re Xonics Photochemical, Inc.,
    841 F.2d 198 (7th Cir. 1988) (Posner, J.) ...............................................................11, 12, 13

Indyk v. Habib Bank Ltd.,
    694 F.2d 54 (2d Cir.1982)............................................................................................24

Jaffe v. Capital One Bank,
    No. 09 Civ. 4106 (PEG), 2010 WL 691639 (S.D.N.Y. Mar. 1, 2010) ...................................24

Kaye v. Grossman,
202 F.3d 611 (2d Cir. 2000)......................................................................................25

King County, Washington v. IKB Deutsche Industriebank AG, IKB,
863 F. Supp. 2d 288 (S.D.N.Y. 2012)......................................................................10

Klang v. Smith's Food & Drug Centers, Inc.,
702 A.2d 150 (Del. 1997) .........................................................................................19

LaSalle National Bank v. Perelman,
82 F. Supp. 2d 279 (D. Del. 2000)............................................................................22

Lippe v. Bairnco Corp.,
249 F. Supp. 2d 357 (S.D.N.Y. 2003)................................................................12, 24

M&J Savitt, Inc. v. Savitt,
No. 08 Civ. 8535(DLC), 2009 WL 691278 (S.D.N.Y. Mar. 17, 2009)...................25

Magnesium Corp. of America,
399 B.R. at 773 .........................................................................................................21

Marini v. Adamo,
No. 08-CV-3995 JFB ETB, 2014 WL 1426028 (E.D.N.Y. Apr. 15, 2014) ............24

Mazzeo v. United States,
131 F.3d 295 (2d Cir. 1997).....................................................................................11

Metlyn Realty Corp. v. Esmark, Inc.,
763 F.2d 826 (7th Cir. 1985) .....................................................................................8

MFS/Sun Life Trust High Yield Series,
910 F. Supp. 913, 939 (S.D.N.Y. 1995)........................................................... passim

Moody v. Security Pacific Business Credit, Inc.,
971 F.2d 1056 (3d Cir. 1992)..............................................................15, 16, 17, 18

Morris v. Standard Gas & Electric Co.,
63 A.2d 577 (Del. Ch. 1949).....................................................................................19

Nemec v. Schrader,
991 A.2d 1120 (Del. 2010) .......................................................................................23

North American Catholic Educational Programming Foundation, Inc. v. Gheewalla,
930 A.2d 92 (Del. 2007) ...........................................................................................21

Paloian v. LaSalle Bank, N.A.,
619 F.3d 688 (7th Cir. 2010) ....................................................................................12

Peltz v. Hatten,
    279 B.R. 710 (D. Del. 2002), aff'd sub nom In re USN Communications, Inc., 60 F.
    App'x 401 (3d Cir. 2003)..........................................................................................7

Trenwick America Litigation Trust v. Ernst & Young LLP,
    906 A.2d 168 (Del. Ch. 2006)...........................................................................21, 22

United States v. Magnesium Corp. of America,
    616 F.3d 1129 (10th Cir. 2010) .............................................................................15

VFB LLC v. Campbell Soup Co.,
    482 F.3d 624 (3d Cir. 2002)....................................................................................8

VFB LLC v. Campbell Soup Co.,
    No. Civ. A. 02-137 (KAJ), 2005 WL 2234606 (D. Del. Sept. 13, 2005), aff'd, 482
    F.3d 624 (3d Cir. 2007)...........................................................................................7

Waste Management, Inc. v. Danis Industries Corp.,
    No. 3:00cv256, 2009 WL 347773 (S.D. Ohio Feb. 10, 2009)................................13

WRT Energy Corp.,
    282 B.R. 343, 411 (Bankr. W.D. La. 2001) ..........................................................16

Zell & Ettinger v. Berglas,
    261 A.D.2d 613, 690 N.Y.S.2d 721 (2d Dep't 1999).............................................25

STATUTES

11 U.S.C. § 548(a)(1)(B) ..............................................................................................4, 15

11 U.S.C. § 547..................................................................................................................4

11 U.S.C. § 550...............................................................................................................4, 9

DCL § 275..........................................................................................................................4

DCL §§ 273-75 ..................................................................................................................4

Delaware General Corporation Law § 102(b) .................................................................24

Delaware General Corporation Law § 170 ................................................................18, 19

Delaware General Corporation Law § 174 .....................................................................18

Defendants submit this trial memorandum of law in connection with their defense against each of the claims asserted in this action by plaintiff Lee E. Buchwald (the "Trustee"), Chapter 7 Trustee for Magnesium Corporation of America ("Magcorp") and Renco Metals, Inc. ("Renco Metals").  In light of the substantial differences between the proposed jury instructions submitted by the parties, defendants respectfully request that the Court expressly adopt the legal principles set forth herein so that the parties may prepare for trial accordingly.[1]

## PRELIMINARY STATEMENT

The Trustee commenced this action against defendants on the ground that Renco received from Magcorp and Renco Metals approximately $120 million over three years while each of those companies was purportedly insolvent.  The Trustee's claims, however, are based on a concocted story that bears no resemblance to reality.

The Trustee will attempt to paint a picture of avarice at the expense of the creditors of Magcorp and Renco Metals, when in fact the story is about a successful American entrepreneur and investor exercising his fundamental rights of ownership.  Owners of companies, be they entrepreneurs or regular shareholders, are entitled to receive their business' profits and appreciation.  That is precisely what happened here during a time when Magcorp and Renco Metals were financially healthy.  The evidence of the financial condition of each company is unambiguous.  Magcorp was a productive business, generating substantial cash flow, even after paying dividends, debt service and annual budgeted capital expenditures for new technology and other plant upgrades.  Magcorp paid its bills.  There are no indicia that Magcorp or Renco

---

[1]     As the Court is aware, currently pending is defendants' application to have the fraudulent conveyance claims tried to the Court and not the jury. The legal principles described herein would be applicable whether the claim in question is decided by the Court or the jury.  Inasmuch as the Court has not yet ruled on the application, for convenience, this Trial Memorandum refers throughout to jury instructions without regard to the claim at issue.

Metals, its parent, was insolvent. The fact that the companies filed for bankruptcy five years after more than 80 percent of the transfers occurred does not alter those facts.

The Trustee's case is based on two artificial attempts to create a false picture of insolvency. First, the Trustee relies on the unreliable expert opinion of Jason Frank, and this Court is familiar with the defects in that testimony from the <u>Daubert</u> motion addressed earlier this year. Indeed, absent Frank's use of a massive and unjustified company specific risk premium, both Frank and the Trustee would have to conclude that the companies were solvent.

Second, the Trustee has contrived a massive contingent liability for purported violation of environmental laws in the amount of approximately $250 million. As this Court knows from granting in part defendants' <u>Daubert</u> motion, the Trustee cannot present any expert opinion to support this ridiculously inflated number. Moreover, between 1992 and today, Magcorp paid a fine of 0nly $2,500 in connection with settling claims brought by the Utah Department of Environmental Quality for violations of RCRA in the mid-1990s, and US Magnesium LLC, the present owner and operator of the Rowley facility, has paid no fines. The United States has yet to obtain a judgment in its 2001 RCRA action and, indeed, the District Court made critical findings of undisputed fact in favor of US Magnesium LLC on a summary judgment motion that remain unchallenged. Although the Tenth Circuit reversed the grant of summary judgment on the basis that the EPA may "change its mind" about its interpretation of the Bevill Amendment as applied to Magcorp, on remand, if the government prosecuted the action, it would be proven that the EPA's action was arbitrary and capricious as well as a violation of due process. Moreover, the action has not been resolved, and the District Court

entered an administrative order closing that case as against all parties earlier this Fall.[2]  And as for the Trustee's claims regarding CERCLA, other than pursuing a study in accordance with a consent order, there have been no costs assessed, and there has been no finding or determination that there is contaminated ground that requires remediation.

When the Trustee's claims are measured against the law and these indisputable facts, the trier of fact should conclude that each of the Trustee's claims is baseless and should be rejected.

What follows is a brief legal discussion of each of the Trustee's claims.  In that regard, it is important to note what claims the Trustee has not asserted.  The Trustee has not asserted a claim under RCRA, and yet he devotes no less than 14 pages of his proposed jury instructions to RCRA law.  It would appear that he intends a full blown trial of the RCRA litigation that has long been pending in Utah, despite the fact that Magcorp and the United States signed a stipulation and order that it would be tried in Utah.  Suffice it to say, the Trustee is not entitled in this trial to seek a jury determination that Magcorp is liable under RCRA.  Similarly, the Trustee has asserted no claim for actual fraud/fraudulent conveyance under either Utah or New York law.  Yet, his proposed jury instructions would ask the jury to conclude defendants engaged in actual fraud.  The Trustee cannot now assert such a claim.  Moreover, the Trustee is submitting jury instructions on his claims for violation of fiduciary duty and unjust enrichment that appear to be wholly independent of a finding of insolvency, contrary to his Complaint, and any instruction to the jury must make that point clear.

---

[2]       Indeed, US Magnesium LLC, continues to operate the Rowley facility many years later, with the same waste streams (and seemingly the same alleged RCRA violations), and any purported violation of RCRA must be relatively benign if they have been allowed to continue for so long.

## ARGUMENT

### POINT I

### THE TRUSTEE CANNOT ESTABLISH THAT
### RENCO METALS AND MAGCORP WERE INSOLVENT

The Trustee's fraudulent conveyance claim involves a two-step set of transfers. For each of the challenged dividend payments, Magcorp made a transfer to Renco Metals, and Renco Metals thereafter made a subsequent transfer to defendant The Renco Group, Inc. ("Renco"). Consequently, it is necessary to examine and evaluate the transfers that Renco Metals made as subsequent transfers subject to Section 550 of the Bankruptcy Code. There is only one transfer that is not subject to this two-step analysis. In connection with Renco Metals' 1996 bond offering, Renco Metals used a portion of those proceeds to redeem preferred stock that Renco held in Renco Metals.

#### A.      The Trustee's Claims All Require the Trustee to Establish Insolvency

The Trustee's claims all depend on his assertion that Magcorp and Renco Metals were insolvent. Because the Trustee cannot establish solvency, his claims must be rejected.

Counts 29, 37, 42, 46 and 48 allege that the transfers were constructive fraudulent conveyances under Sections 548(a) and 550 of the Bankruptcy Code and Section 273 of New York's Debtor and Creditor Law ("DCL") because Magcorp and Renco Metals were insolvent as of, or because of, the transfers. See Amended Complaint ¶¶ 529, 582-83, 611, 640, 658. All of those claims must be rejected unless the Trustee can establish insolvency. See In re Trinsum Group, Inc., 460 B.R. 379, 387-88, 390 (Bankr. S.D.N.Y. 2011); DCL §§ 273-75.

Counts 43 and 44 of the Amended Complaint allege that the transfers are preferential transfers under Section 547 of the Bankruptcy Code, and are also predicated on

establishing insolvency.  <u>See</u> Amended Complaint ¶¶ 619, 628.  Proof of insolvency is thus essential.  <u>See</u> <u>In re Hydrogen LLC</u>, 431 B.R. 337, 355 (Bankr. S.D.N.Y. 2010).

The remaining counts are all predicated on the Trustee's allegation of insolvency. <u>See</u> Amended Complaint ¶¶ 536, 541, 560-61, 569-70, 595, 598-600, 634-36, 651.  Thus, if the Trustee fails to prove solvency, each of his derivative claims must be rejected.

### B.    The Test for Insolvency

The Trustee must prove that Magcorp's and Renco Metals' debts exceeded the value of their assets at a fair valuation.  <u>See</u> <u>In re Iridium Operating LLC</u>, 373 B.R. 283, 344 (Bankr. S.D.N.Y. 2007).  The means to assess solvency is to examine fair market value.  <u>See</u> <u>id.</u> at 344; <u>MFS/Sun Life Trust High Yield Series</u>, 910 F. Supp. 913, 939 (S.D.N.Y. 1995). Accordingly, there must be "an evaluation of the market value of the assets at the time the transfers took place." <u>Trinsum Group</u>, 460 B.R. at 392.

"No rigid approach should be taken regarding the fair valuation of a company within the context of solvency analysis, but rather courts should consider the totality of the circumstances." <u>Iridium</u>, 373 B.R. at 344.  "When a business is a going concern, fair value 'is determined by the fair market price of the debtor's assets that could be obtained if sold in a prudent manner within a reasonable period of time to pay the debtor's debts.'" <u>Id.</u>  Courts generally "look at a combination of valuation methodologies to determine valuation, including: (a) actual sale price, (b) discounted cash flow method, commonly referred to as DCF, (c) adjusted balance sheet method, (d) market multiple approach, (e) comparable transactions analysis, and (f) market capitalization." <u>Id.</u>

### C.    The Trustee Bears the Burden of Proof

The Trustee has the burden of proof.  "As the party seeking to avoid transfers during this time period, the Committee must establish each element of its fraudulent transfer and

preference claims, including Iridium's insolvency or the inadequacy of its capital." Iridium, 373 B.R. at 342.

Under Utah law, the Trustee has the burden of proof in all respects. See Furniture Manufacturers Sales, Inc. v. Deamer, 680 P.2d 398, 399 (Utah 1984). Under New York law, to the extent that it may apply, the Trustee has the burden of proof when the issue is presented to the jury. Under New York Debtor Creditor Law, "if the debtor did not receive fair consideration, then it is presumed that the transfer made the debtor insolvent, and the burden is on the defendant to rebut this presumption." In re TC Liquidations LLC, 463 B.R. 257, 267 (Bankr. E.D.N.Y. 2011). Yet, as long as the defendant "come[s] forward with some evidence of [the debtor's] solvency, then the burden shifts back to the plaintiff to prove that the debtor was insolvent and that the transfer was therefore a fraudulent conveyance." Id. at 268. Defendants will readily satisfy that requirement, and the Trustee will bear the ultimate burden of proof at trial.

Courts have held that such evidence may include solvency opinions issued by valuation experts contemporaneously to the transfers at issue, as well as reports from after-the-fact expert witnesses who analyze the company's financial condition. For instance, in MFS/Sun Life Trust, 910 F. Supp. at 938, the court held: "[T]he defendants have presented some proof of [debtor's] solvency through, among other things, the Houlihan Lokey letter and the reports of their expert witnesses and have thus satisfied their burden of production. The burden of persuasion remains with the plaintiffs."

Magcorp and Renco Metals obtained a solvency opinion from Houlihan Lokey in connection with the 1996 Bond Offering. Houlihan Lokey employed both income and market based valuation methods, and determined that Renco Metals had an equity cushion of $70.9 million, or 31.5% total invested capital. Defendants' valuation expert, Roger Grabowski, used

the same methods and determined that the companies' equity cushion never sank (i) below \$63 million (30% of total assets) under the income approach; or (ii) below \$101 million (40% of total assets) under the market approach.  See MFS/Sun Life Trust, 910 F. Supp. at 926, 929.

Because of the potential taint associated with "post-hoc litigation interests," courts recognize "the advantage of contemporaneous market evidence" in assessing the solvency of a company in the context of a fraudulent conveyance claim.  Iridium, 373 B.R. at 346 (citing VFB LLC v. Campbell Soup Co., No. Civ. A. 02-137 (KAJ), 2005 WL 2234606, at *22 (D. Del. Sept. 13, 2005), aff'd, 482 F.3d 624 (3d Cir. 2007) ("it [is] important to consider the company's stock price and the opinions regarding value of other contemporaneous market participants"); In re Hechinger Investment Co. of Delaware, 327 B.R. 537, 548 (D. Del. 2005) ("because valuation is, to a great extent, a subjective exercise, the court will give deference to prevailing marketplace values rather than to values created with the benefit of hindsight for the purpose of litigation.").  The contemporaneous marketplace evidence is all consistent and uncontradicted.

First, separate from the independent solvency opinion that Renco Metals and Magcorp obtained from Houlihan Lokey, DLJ agreed to underwrite the 1996 Bond Offering.  Neither firm had an issue with solvency, and such valuations are entitled to "great deference".  The court observed in Iridium:

> Sophisticated Wall Street firms, such as Merrill Lynch and Solomon Smith Barney, were underwriters of Iridium's equity and debt offerings.  In addition, the DCF and comparables analyses performed or endorsed by the underwriters and analysts at the time attributed large positive values to Iridium.  These are the types of valuations to which Courts have given great deference.

373 B.R. at 349.  Accord Peltz v. Hatten, 279 B.R. 710, 740 (D. Del. 2002) (deferring to the "informed and sophisticated" investment bankers), aff'd sub nom In re USN Communications, Inc., 60 F. App'x 401 (3d Cir. 2003).  Indeed, Houlihan Lokey arrived at its valuation after

7

stress-testing Magcorp's forecasts and creating down-side cases. The <u>Iridium</u> court credited this type of analysis. 373 B.R. at 294 n.2 (Coopers & Lybrand "stress tested the [debtor's] projections, prepared a more conservative set of projections that assumed a downside case for future company performance" and gave their "green light" for a $1 billion credit facility).

Second, during the two year period after the 1996 Bond Offering, the 1996 Notes always traded in the secondary market above par. "The price at which people actually buy and sell, putting their money where their mouths are, is apt to be more accurate than the conclusions of any one analyst." <u>Metlyn Realty Corp. v. Esmark, Inc.</u>, 763 F.2d 826, 835 (7th Cir. 1985). Courts have therefore recognized such trades as just such an indicator. <u>See</u> <u>VFB LLC v. Campbell Soup Co.</u>, 482 F.3d 624, 636 (3d Cir. 2002) (the debt at issue "continued to sell at par value [for 2 years after it was issued], indicating that until that point VFI's creditors believed that VFI would pay its unsecured debt as it came due."); <u>Iridium</u>, 373 B.R. at 332.

In contrast, the Trustee's only proffer of evidence to establish insolvency is Jason Frank's expert opinion. Frank's opinion, however, is predicated on numerous significant flaws that render it unreliable and will prevent the Trustee from meeting his burden of proof. <u>See</u> Dkt. 14 (Defendants' Memo in Support of their Daubert Motion as against Jason Frank) at 21, 26-27, 29, 33-34; this Court's Order, dated Aug. 21, 2014, at 10-16, 18--21, 24, 25.[3]

### D. The Trustee Cannot Establish that There Was No Reasonably Equivalent Value for the Transfers to the Magcorp Officers

The Trustee must also prove that there was no reasonably equivalent value for the transfers. Yet, each of the transfers that Magcorp made to the Magcorp Officer Defendants, <u>i.e.</u>,

---

[3]  In this Trial Memorandum, we describe defendants' contentions in summary form. These descriptions, however, are not intended to be comprehensive of the positions that defendants will take during trial.

Messrs. Legge, Thayer, Ogaard, Kaplan and Brown, were made in accordance with ancillary employment agreements that each of them had had with the company for several years. Those agreements provided, as part of the compensation to be paid to those individuals, that they would receive payments whenever Magcorp made a dividend payment to Renco Metals.

Those individuals each provided reasonably equivalent value for those payments. In order for there to have been reasonably equivalent value to the services exchanged for those transfers, the Trustee must prove that there is no reasonable relationship between the payments and the services that the individuals provided to Magcorp. See In re TC Liquidations LLC, 463 B.R. at 268-69; Cilco Cement Corp. v. White, 55 A.D.2d 668, 390 N.Y.S.2d 178 (2d Dep't 1976). In asserting such a claim, the jury will be entitled to consider each individual's background, skills and expertise and to exhibit how each individual compared against his job responsibilities, including such things as workload, business travel, the number of employees managed, the services and time devoted to the company. See In re TC Liquidations LLC, 463 B.R. at 268-69; Heller v. Boylan, 29 N.Y.S.2d 653, 668 (N.Y. Sup. Ct. 1941). In addition, the jury will have to consider the number and complexity of areas within the individual's responsibility, including the difficulties and burdens of those responsibilities, and consider whether each individual accomplished their jobs. See id.

The Trustee will be unable to establish that any of the transfers to each of those Magcorp Officers was not for reasonably equivalent value.

### E. The Trustee Cannot Establish a Subsequent Transferee Claim against Ira Rennert or the Rennert Family Trusts

The Trustee has also asserted claims against Mr. Rennert and the Rennert family trusts, asserting that Renco Metals made transfers of the fraudulent conveyances to each of them.

Under Section 550 of the Bankruptcy Code, the Trustee is entitled to recover property that is transferred by the initial transferee of a fraudulent conveyance to any subsequent transferee.  The Trustee must prove that Renco received a fraudulent conveyance and then transferred what it had received from Renco Metals to Mr. Rennert or the Rennert family trusts. It is not enough for the Trustee to prove that either of them received a benefit from the property or had the use of the property – it is necessary for the subsequent recipient to have received ownership or possession of the actual property.  See In re Furs by Albert & Marc Kaufman, Inc., No. 03-41301, 2006 WL 3735621 (Bankr. S.D.N.Y. Dec. 14, 2006).

Here, separate and apart from whether there were fraudulent transfers to Renco Metals, the evidence is undisputed that Renco never transferred any of the funds received from Magcorp and Renco Metals to either Mr. Rennert or the Rennert family trusts.  Since there were no transfers, the Trustee cannot meet his burden of proof regarding his subsequent claim.

### F.    The Trustee Has No Claim for Aiding and Abetting a Fraudulent Conveyance

In Count 30, the Trustee asserts a claim for aiding and abetting a fraudulent conveyance against Mr. Rennert.

"When proceeding under an aiding and abetting theory of liability under New York law, a plaintiff must show (1) the existence . . . of a violation by the primary (as opposed to the aiding and abetting) party. . . ."  King County, Washington v. IKB Deutsche Industriebank AG, IKB, 863 F. Supp. 2d 288, 299-300 (S.D.N.Y. 2012) (ellipsis in original).  As a matter of law, the Trustee cannot establish that element of the claim, which is contingent on establishing a fraudulent conveyance.  See Amended Complaint ¶ 536.  Thus, the inability of the Trustee to do so requires rejection of his derivative aiding and abetting claim.  See Excelsior Capital LLC v. Allen, No. 11 Civ. 7373 (CM), 2012 WL 4471262, at *14 (S.D.N.Y. Sept. 26, 2012).

10

POINT II

**THE TRUSTEE CANNOT MEET HIS BURDEN**
**OF PROOF REGARDING CONTINGENT LIABILITIES**

To the extent that Magcorp and Renco Metals had a positive net worth (after deduction of actual liabilities), the Trustee contends that that net worth is eliminated by certain environmental contingent liabilities. The Trustee was to present this assertion through its environmental expert Allen, who estimated that Magcorp faced potential environmental liabilities of at least approximately $250 million. This Court, however, has precluded any testimony from Allen regarding the amount of penalties for any claims under RCRA as speculative and unreliable, see this Court's Order, dated August 21, 2014, at 30, and the Trustee will be unable to come forward with any evidence to support that contention.[4]

It is well-settled law that, for purposes of determining insolvency, contingent liabilities must be included in determining indebtedness. However, by definition, "a contingent liability is not certain -- and often is highly unlikely -- ever to become an actual liability. To value the contingent liability it is necessary to discount it by the probability that the contingency will occur and the liability will become real."[5] In re Xonics Photochemical, Inc., 841 F.2d 198, 200 (7th Cir. 1988) (Posner, J.). Thus, the contingent liability "must be reduced to its present, or expected, value before a determination can be made whether the firm's assets exceeds its

---

[4]     Without any independent analysis, Frank incorporated Allen's estimate into his valuation and increased his negative valuation of Renco Metals' to $295.5 million for 1996, to $322.3 million for 1997 and to $318.2 million for 1998. Frank made no adjustment to Allen's figure. Nor has the Trustee supplemented Frank's expert report to disclose that there is any basis for the contingent liability figure in Frank's report other than Allen's precluded opinion, notwithstanding his duty to supplement any expert report under Rule 26.

[5]     The Second Circuit has defined a contingent liability as "one which the debtor will be called upon to pay only upon the occurrence or happening of an extrinsic event." Mazzeo v. United States, 131 F.3d 295, 303 (2d Cir. 1997).

11

liabilities." Id. Judge Easterbrook reaffirmed this requirement in Covey v. Commercial National Bank, 960 F.2d 657 (7th Cir. 1992), explaining:

> Xonics shows that to find the value of a contingent liability a court must determine the likelihood that the contingency will occur. To disregard the probability that the firm will not be called on to pay is to regard all firms as insolvent all of the time, for all firms face some (remote) contingencies exceeding the value of their assets. A firm's product might prove dangerous, maiming hundreds of customers; all of an air carrier's planes might fall out of the sky, or one of an electric utility's nuclear stations melt down, creating stupendous liabilities; all of an insurer's policyholders might die in the same year, generating obligations that exceed its assets. The probability of such occurrences is low, however, and it therefore makes sense to treat the firms as solvent.

Id. at 659.   In Paloian v. LaSalle Bank, N.A., 619 F.3d 688, 693 (7th Cir. 2010), Judge Easterbrook deemed it a "glaring error" for the bankruptcy court to have incorporated into its assessment of a hospital's solvency the full value of a contingent liability, even though it was realized three years later.   "Hindsight is wonderfully clear, but in determining the Hospital's solvency in mid-1997 it was necessary to determine the expected value of this liability as of mid-1997, not the actual value as of 1999 or 2000."   Id.

Xonics has been adopted by the courts in the Second Circuit.   See Lippe v. Bairnco Corp., 249 F. Supp. 2d 357, 376 (S.D.N.Y. 2003) (requiring proof of the probability of debtor's contingent environmental liabilities because "[a] person is considered insolvent . . . when (i) the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured." (ellipsis in original)); In re Davis, 169 B.R. 285, 302 (E.D.N.Y. 1994).

A company's future costs from environmental violations fall within the category of contingent liabilities that should be considered, after being adjusted for probability and discounted to present value.   See In re Tronox Inc., 429 B.R. 73, 98 n.15 (Bankr. S.D.N.Y.

2010); In re Ohio Corrugating Co., 91 B.R. 430, 439 (N.D. Ohio 1988) ("Finally, speculation concerning uncertain and indeterminate liability resulting from possible environmental violations must be discounted."); Waste Management, Inc. v. Danis Industries Corp., No. 3:00cv256, 2009 WL 347773, at *15-16, 22 (S.D. Ohio Feb. 10, 2009).

The Trustee bears the affirmative duty of proving probability.   In Federal Deposit Insurance Corp. v. Bell, 106 F.3d 258 (8th Cir. 1997), the issue of a contingent liability came up in that case in a different way.  Appealing from the grant of summary judgment against her, the defendant argued that the value of the asset transfer to her should be reduced because of a contingent liability attached to the asset.  Id. at 263-64.  The Eighth Circuit rejected that argument because the defendant had failed to proffer any evidence concerning the probability adjustment.  The Eighth Circuit first noted the nonmovant's burden:  "Mere arguments or allegations are insufficient to defeat a properly supported motion for summary judgment; a nonmovant must present more than a scintilla of evidence and must advance specific facts to create a genuine issue of material fact for trial."   Id. at 263 (citation omitted).  After quoting Judge Posner's holding in Xonics that "[t]o correctly value the contingent liability it is necessary to discount it by the probability that the contingency will occur and the liability becomes real," Bell, 106 F.3d at 263, the court stated:

> In this case, Darlene Bell and Bell Equities have never submitted any evidence regarding the likelihood that the $1.85 million contingent liability associated with Red Apple Enterprises would ever materialize.
>
> *          *          *
>
> Without such evidence, there was no rational means for the district court to assign a value to the contingent liability.  Because Darlene Bell and Bell Equities have failed to meet the burden placed on a nonmoving party to present evidence demonstrating that a material question of fact exists, the district court properly granted partial summary judgment.

13

Id. at 264-65 (citation omitted).

In Baldi v. Samuel Son & Co., 548 F.3d 579 (7th Cir. 2008), Judge Posner followed Bell's holding. The Trustee's evidence regarding insolvency came from his expert. Id. at 582. The bankruptcy court and district court held that this evidence was "radically unconvincing". Id. at 583. The Seventh Circuit concurred because the expert had "treated [the company's] contingent liabilities as certainties. That invalidated his expert opinion." Id. at 582; see In re Wallace's Bookstores, Inc., 316 B.R. 254, 260-62 (Bankr. E.D. Ky. 2004) (the court excluded business valuation experts in part because their consideration of contingent liabilities failed to account for their probability).

The Trustee's own expert has conceded that the environmental liabilities are contingent. Yet, the Trustee will not present any evidence regarding the probability of such a liability. In all his submissions to date, despite defendants' express challenge that he do so, the Trustee has failed to proffer evidence regarding the probability that the contingent liabilities would become actual ones or to state what the probability is. Further, his experts have expressly declined to opine as to probability (and are thus precluded from doing so at trial).

The obligation to make a probability assessment is especially critical here. The Rowley Facility still operates, and the issue of financial liability under RCRA and CERCLA as to that facility remains open and unresolved. In February 2015, some 19 years after the bond offering, when the trial in this action commences, all the purported environmental liabilities remain contingent. As of today, neither Magcorp nor US Magnesium LLC has incurred any of the environmental obligations underlying Allen's estimate of the cost of remediation and compliance. The only penalty paid in connection with any environmental complaint was the $2,500 in settlement of the Utah Department of Environmental Quality notice of violation. As of today, not only has there been no resolution of the United States' RCRA action against Magcorp

14

or US Magnesium LLC, except that the District Court issued an administrative order earlier in 2014 closing the case because of the lack of activity.[6]  Likewise, liability under CERCLA remains unknown.  The EPA did not propose to put the Rowley Plant on the Superfund priority list until 2008, and determination of any remediation liabilities are presently years away.

## POINT III

## RENCO METALS AND MAGCORP HAD ADEQUATE CAPITAL

Alternatively, a company can be liable for a fraudulent conveyance if the transaction at issue leaves the company with inadequate working capital.  11 U.S.C. § 548(a)(1)(B); see Iridium, 373 B.R. at 345.  "The test is aimed at transferees that leave the transferor technically solvent but doomed to fail."  MFS/Sun Life Trust, 910 F. Supp. at 944.  In other words, did the transfer in question leave the debtors with an "inability to generate sufficient profits to sustain operations?"  Moody v. Security Pacific Business Credit, Inc., 971 F.2d 1056, 1070 (3d Cir. 1992).

"While a company must be adequately capitalized, it does not need resources sufficient to withstand any and all setbacks."  MFS/Sun Life Trust, 910 F. Supp. at 944.  A company needs to be adequately capitalized only for a reasonable period of time following the transfer.  Id.  In addition to looking at working capital, it is necessary to consider the "reasonableness of the company's projections, not with hindsight, but with respect to whether

---

[6]    Although the Tenth Circuit vacated the District Court's grant of summary judgment in favor of defendants in the RCRA Action, the Tenth Circuit ruled only as to a specific issue under the Administrative Procedure Act, i.e., whether the EPA could change its interpretation of the Bevill exemption under RCRA without going through its notice and comment obligations.  See United States v. Magnesium Corp. of America, 616 F.3d 1129, 1143-44 (10th Cir. 2010).  Indeed, the Tenth Circuit remanded the action to the District Court for further determination as it saw fit, explicitly stating that the defendants had the defense that the government's change in interpretation was arbitrary and capricious and in violation of the defendants' due process rights. Id. at 1144.  There is substantial evidence in support of that defense, thereby giving rise to a strong basis that the probability of a liability under RCRA is very low, at best.

they were prudent when made." Id.  The projections should be "tested by an objective standard anchored in the company's actual performance.  Among the relevant data are cash flow, net sales, gross profit margins, and net profits and losses." Moody, 971 F.2d at 1073; see MFS/Sun Life Trust, 910 F. Supp. at 944; WRT Energy Corp., 282 B.R. 343, 411 (Bankr. W.D. La. 2001) ("courts generally examine cash flow, focusing on whether the debtor was left in a position in which it was unable after the transfer to generate sufficient profits to sustain operations.").[7]

The following undisputed evidence will establish that Magcorp, and therefore Renco Metals as well, was adequately capitalized after the transfers at issue.[8]

- Magcorp had an established practice of making projections, and they had a strong track record of being reasonable.

- Magcorp had access to a substantial amount of cash, amounting to between $15 and $20 million (net of dividends and accrued interest).

- Magcorp had a committed line of credit, raising its total working capital between $20 and $40 million (net of dividends and accrued interest).

- Magcorp generated cash flow during 1996 to 1998 -- generally greater than $40 million and as high as $60 million.  These amounts exceeded the interest expense for the 1996 Notes and other obligations.

---

[7]     In WRT, the court held that there was adequate capital because "[a]ll of these projections, including even the disaster and pessimistic cases, indicated that WRT would be able to pay its debts, develop its properties and sustain its operations." Id. at 412.  The critical inquiry is the "reasonableness of the company's projections, not with hindsight, but with respect to whether they were prudent when made." MFS/Sun Life Trust, 910 F. Supp. at 944.

[8]     The adequate capital issue effectively applies only to Magcorp.  Renco Metals was merely a holding company, and it received payments from Magcorp to pay debt service on the 1996 bonds.

- Magcorp's actual cash and positive cash flow were sufficient to finance its capital improvement programs.

Further, the Trustee's expert, Jason Frank, admitted in his report that there was adequate capital. Frank stated that he "considered the ability of Renco [Metals] to pay its long-term debt obligations as they become due," and concluded that "Hilco projects that Renco [Metals] will have the cash, or the ability to borrow the cash, necessary to pay these obligations."

Under similar circumstances, the courts have held that a company had adequate capital. In MFS/Sun Life Trust, the company was still a going concern eight months after the LBO transaction alleged to be a fraudulent conveyance. "That the company remained viable so long after the LBO strongly suggests that its ultimate failure cannot be attributed to inadequacy of capital as of the date of the buyout." 910 F. Supp. at 944. Accord In re Fidelity Bond & Mortgage Co., 340 B.R. 266, 299 (Bankr. E.D. Pa. 2006) (the debtor filed for bankruptcy fourteen months after the disputed transaction, and it had a "positive cash balance at the end of each month" for eight of those months), aff'd sub nom Fidelity Bond & Mortgage Co. v. Brand, 371 B.R. 708 (E.D. Pa. 2007); In re Joy Recovery Technology Corp., 286 B.R. 54, 76 (Bankr. N.D. Ill. 2002) (the LBO closed over two years before bankruptcy filing -- "courts will not find that a company had unreasonably low capital if [it] survives for an extended period after the subject transaction.").

For instance, in Moody, the Third Circuit held that there was ample evidence that the company was adequately capitalized. The company's financial projections were reasonable because, "during the five months following" the transaction, the company's "cash flow tracked the projections" contained in the business plan. 971 F.2d at 1073-74. Further, the company had been "profitable for many years" and had "projected a continuation of this trend." Id. at 1074.

The company's "actual performance" after the transaction at issue "support[ed] the district court's finding that the parties' projections were reasonable" because "in the five months following" the transaction, the company had "a positive cash flow and realized $6 million in gross profits." Id. Also, during that time period, the company's "net sales exceeded $31 million," id. at 1074 n.29, and it maintained a positive "revolving line of credit" that was never exhausted. Id. at 1074 n.30. Indeed, the fact that the company's "sole source of operating capital was its line of credit" did not mean it was not adequately capitalized because "the ability to borrow money has considerable value in the commercial world." Id. at 1072-73.

## POINT IV

### THE TRUSTEE CANNOT ESTABLISH THAT RENCO METALS PAID DIVIDENDS IN VIOLATION OF DELAWARE LAW

Counts 34 and 51 assert claims for unlawful payment of dividends, or for unlawful stock redemption, under Sections 170 and 174 of the Delaware General Corporation Law. As a matter of law, these claims must be rejected.

First, these claims are premised on Renco Metals having been insolvent. See Amended Complaint ¶¶ 560, 561. As set forth above, as a matter of law, Renco Metals was not insolvent at the time of the Transfers. Contrary to his proposed jury instructions, when the Trustee fails to prove insolvency, this claim will fail as a matter of law.

Second, the Trustee relies on Renco Metals' book value at the time of the transfers in order to contend that the dividends were paid unlawfully. See Amended Complaint ¶ 560. Under Sections 170 and 174, a company's book value is not the measure.

The plaintiff "first must prove that the corporation depleted its surplus in paying the dividend." In re Color Tile, Inc., Nos. 96–76 (HSB), 96–80 (HSB), Civ. A. 98–358–SLR, A–98–90, 96–77 (HSB), 96–78 (HSB), 96–79 (HSB), 2000 WL 152129, at *3 (D. Del. Feb. 9,

2000).  The Delaware Supreme Court rejected an attempt to establish liability based on book value.

> We understand that the books of a corporation do not necessarily reflect the current values of its assets and liabilities.  Among other factors, unrealized appreciation or depreciation can render book numbers inaccurate.  It is unrealistic to hold that a corporation is bound by its balance sheets for purposes of determining compliance with [DGCL] Section 160.

Klang v. Smith's Food & Drug Centers, Inc., 702 A.2d 150, 154 (Del. 1997).   "Allowing corporations to revalue assets and liabilities to reflect current realities complies with the statute and serves well the policies behind this statute."  Id.  The directors:

> have almost unfettered discretion in defining the extent of the corporation's surplus.  The Delaware Code defines surplus as the value of net assets over the par value of the stock.  In determining the value of net assets, the directors are not tied to any formal financial appraisal of their assets.  They need only "evaluate the assets on the basis of acceptable data and by standards which they are entitled to believe reasonably reflect present 'values'."

Id. (citing Morris v. Standard Gas & Electric Co., 63 A.2d 577, 582 (Del. Ch. 1949)).

A company may "revalue properly its assets and liabilities" to "reasonably reflect present values" by obtaining a solvency opinion.  For instance, in Klang, the court rejected the plaintiff's argument that the "Board was not entitled to rely on the solvency opinion of Houlihan, which showed that the transactions would not impair [debtor's] capital given a revaluation of corporate assets."  Id. at 54-55; accord Color Tile, 2000 WL 152129, at *3 ("[D]irectors can easily insulate themselves from liability under § 170 of the DGCL by demonstrating that they relied on the reports of employees, committees of the board, or experts selected with reasonable care by or on behalf of the corporation. . . .").

Likewise here, even if the Trustee were to prove insolvency, Mr. Rennert cannot be held liable for violations of Delaware law in light of the careful processes that Renco Metals

undertook to ensure adequate surplus.  Among other things, Renco Metals retained Houlihan Lokey to evaluate Renco Metals' and Magcorp's solvency, and relied on its expert opinion that they would be solvent.  Houlihan Lokey is a nationally recognized investment banking boutique that provides solvency opinions.  Senior management of Renco Metals reviewed that opinion, and gave careful consideration to it.  After doing so, management advised Mr. Rennert, the chair of the Board of Renco Metals, that Renco Metals was entitled to issue dividends.  Further, Magcorp and Renco Metals' respective vice presidents of finance reviewed the financial condition of Magcorp each time that a dividend was paid by Magcorp to Renco Metals and thereafter to Renco to ensure compliance with Renco Metals' obligations under both the 1996 bond indenture and the credit agreement that Magcorp had with its lending institution.

**POINT V**

**THE TRUSTEE CANNOT ESTABLISH HIS
BREACH OF FIDUCIARY DUTY CLAIMS**

### A.      The Trustee Has No Claim for Breach of Fiduciary Duty

Counts 31 and 39 for breach of fiduciary duty against each of the individual defendants should be dismissed.

First, the premise underlying these claims is that the defendants caused or permitted fraudulent conveyances.  See Amended Complaint ¶¶ 541, 595; see also Buchwald v. The Renco Group, 399 B.R. 722, 759 n.122 (Bankr. S.D.N.Y. 2009).  Thus, because the fraudulent conveyance claims, premised on a finding of insolvency will fail, the breach of fiduciary duty claims must also fail as a matter of law.  Again, the Trustee's proposed jury instructions ignore the derivative nature of his fiduciary duty claims.

Second, under Delaware law, Mr. Rennert and the Officer/Director Defendants owed no fiduciary duties to Renco Metals or Magcorp unless those companies were insolvent at

20

the time of the alleged breach.  See In re Direct Response Media, Inc., 466 B.R. 626, 649 (Bankr.

D. Del. 2012); In re Scott Acquisition Corp., 344 B.R. 283, 286 (Bankr. D. Del. 2006).  The

Bankruptcy Court recognized as much in its motion to dismiss decision, when it stated:

> the legal principle that while officers and directors of subsidiaries
> may legitimately advance the interests of the corporate parent
> when the subsidiaries are not insolvent, they may no longer do so
> when the subsidiaries are insolvent, or would be rendered insolvent
> by the contemplated action.

Magnesium Corp. of America, 399 B.R. at 773.

The Trustee's attempt to assert that they owed a duty to other parties even if the

companies were solvent is wrong.  In North American Catholic Educational Programming

Foundation, Inc. v. Gheewalla, 930 A.2d 92, 99 (Del. 2007), the Delaware Supreme Court stated

that: "Delaware courts have traditionally been reluctant to expand existing fiduciary duties," and

went on to hold that creditors do not have a direct right to challenge directors' exercise of

business judgments as breaches of fiduciary duties owed to them."  Id. at 99-100.  "When a

solvent corporation is navigating in the zone of insolvency, the focus for Delaware directors does

not change: directors must continue to discharge their fiduciary duties to the corporation and its

shareholders by exercising their business judgment in the best interests of the corporation for the

benefit of its shareholder owners."  Id. at 101 (emphasis added).  Here, of course, the sole

shareholder was The Renco Group.

Trenwick America Litigation Trust v. Ernst & Young LLP, 906 A.2d 168 (Del.

Ch. 2006), is instructive – it makes plain that the officers and directors owed their fiduciary duty

only to the parent.  A public investor brought a double derivative action against the company's

subsidiary for breach of fiduciary duty by the subsidiary's directors, and the court held that those

directors did not owe a duty to second-guess the business judgment of the parent corporation.  Id.

The subsidiary's board did not owe a duty to exercise their independent, disinterested business

judgment separate from the interests of the parent: "There is no sound basis to hold that the boards of wholly-owned subsidiaries must engage in their own parallel merger consideration process." Id. at 201. In absence of any indication that it would be causing the subsidiary to violate legal obligations owed to others, the subsidiary's board was free to take action in aid of its parent's business strategy. Id. ("Delaware law does not embrace the concept that a director of a wholly-owned subsidiary owes a duty to second-guess the business judgment of its parent corporation when following and supporting the parent's strategy would not violate any legal obligation the subsidiary owes to another."). The court held that the subsidiary's board was "obligated to manage [the subsidiary] with loyalty to [the parent], the company's sole shareholder. To the extent that the [subsidiary's] directors acceded to their parent's wishes and lent support to its business strategy, there is no basis to fault them." Id. This conclusion is valid even if the subsidiary board took actions that made the subsidiary less valuable as an entity. Id. ("If the [subsidiary board] authorized the subsidiary to provide (as it appears to have done) guarantees to [the parent's] creditors that supported [the parent's] overall business, they would have been managing the subsidiary to benefit its parent: a proper goal."). The court stated:

> The payment of a dividend from a subsidiary to a parent does the same thing. If the dividend remains in the subsidiary, the subsidiary is better able to satisfy the future claims of creditors and to conduct its own operations. In pondering whether to pay a dividend, however, a subsidiary board is permitted to act to benefit its parent, not simply the subsidiary itself, for the obvious reason that wholly-owned subsidiaries are formed by parents to benefit the parents, and not for their own sake.

Id. at 202; accord LaSalle National Bank v. Perelman, 82 F. Supp. 2d 279, 290-92 (D. Del. 2000) (dismissing breach of fiduciary duty claims against officers and directors who permitted upstream dividends because there was "no genuine issue of material fact" as to the subsidiary's

solvency at the time, and thus they "did not owe a fiduciary duty to [the subsidiary] and the other noteholders when they made dividends to the Parent Companies.").

As a matter of law, Magcorp's and Renco Metals' corporate charters, as well as Section 102(b) of the Delaware General Corporation Law, bar the assertion of any duty of care claim. Further, any duty relating to the payment of dividends has been limited by and is subject only to the contractual terms governing the companies' right to pay dividends in Magcorp's loan agreement and the 1996 bond indenture. See Nemec v. Schrader, 991 A.2d 1120 (Del. 2010).

Finally, the Trustee is unable to establish that any of the individual officers caused the payment of any dividends to Renco Metals or that they had any role in the decision to pay them. That decision was made exclusively by the Board of Directors of Magcorp and Renco Metals. At all such times, the Board of each company had only one director, Ira Rennert. None of the other individuals named in this action, i.e., Messrs. Legge, Thayer, Ogaard, Kaplan, Brown, Fay, D'Atri, Ryan or Sadlowski, were Board members, and they therefore could have had no role in the decision to pay those dividends.[9] Consequently, regardless of whatever duty that any of them may have owed, they could not have breached such a duty.[10]

---

[9] For instance, D'Atri, Sadlowski and Ryan, who were lawyers, were merely the secretary or assistant secretary to the company.

[10] Further, in the Joint Pre-Trial Report, the Trustee has admitted that Messrs. Ryan and Sadlowski did not become officers until September 1998, only weeks before the last transfer at issue in this case. It is undisputed that they were not officers for any of the transfers that occurred prior to October 1998.

**B.      The Trustee Has No Claim for Aiding and Abetting a Breach of Fiduciary Duty**

The Trustee asserts claims in Counts 35, 40 and 45 for aiding and abetting a breach of fiduciary duty and for corporate misconduct under Section 720 of New York Business Corporation Law.

Those claims are each predicated on the Trustee's breach of fiduciary duty claims. See Amended Complaint ¶¶ 569-70, 598-600, 634-36.  Because the Trustee's breach of fiduciary duty claims are not viable, these derivative claims fail as well.  See In re Sharp International Corp., 403 F.3d 43, 49 (2d Cir. 2005); Lippe, 99 F. App'x at 284.

## POINT VI

## THE TRUSTEE CANNOT ESTABLISH HIS UNJUST ENRICHMENT CLAIMS

The Trustee asserts claims in Count 47 for unjust enrichment against Ira Rennert and the Rennert family trusts.

First, in order to establish such a claim against either Mr. Rennert or the Rennert family trusts, the Trustee must prove that the transfers made to Renco were fraudulent conveyances.  He is unable to do so, and thus this unjust enrichment claim too fails as a matter of law. The Trustee's proposed jury instruction wrongly ignores the claim's necessary dependence on the solvency question.

Second, the Trustee must prove that the alleged fraudulent transfers directly enriched Mr. Rennert and the Rennert family trusts.  See Marini v. Adamo, No. 08-CV-3995 JFB ETB, 2014 WL 1426028, at *3 (E.D.N.Y. Apr. 15, 2014) ("[O]n a theory of unjust enrichment, there must first be enrichment.") (quoting Indyk v. Habib Bank Ltd., 694 F.2d 54, 57 (2d Cir.1982)); see also Jaffe v. Capital One Bank, No. 09 Civ. 4106 (PEG), 2010 WL 691639, at *8 (S.D.N.Y. Mar. 1, 2010) (noting "[t]he absence of an allegation that Defendants tangibly benefitted at Jaffe's

expense"). Courts have held enrichment to constitute the possession of funds or obtaining of a benefit. Zell & Ettinger v. Berglas, 261 A.D.2d 613, 613, 690 N.Y.S.2d 721, 721 (2d Dep't 1999) (dismissing unjust enrichment claim on summary judgment as the defendant "established that he did not exercise dominion or control over the misappropriated funds, and there was no showing that he obtained any benefit that in equity and good conscience he should not have obtained"). "It is not sufficient for defendant to receive some indirect benefit -- the benefit received must be 'specific and direct' to support an unjust enrichment claim." M&J Savitt, Inc. v. Savitt, No. 08 Civ. 8535(DLC), 2009 WL 691278, at *10 (S.D.N.Y. Mar. 17, 2009) (citing Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir. 2000) ("While this testimony may suggest that [defendant] received some indirect benefit from the loan, however, it does not establish the specific and direct benefit necessary to support an unjust enrichment claim."); Brenner v. Brenner, 821 F. Supp. 2d 533, 540-41 (E.D.N.Y. 2011); see also Georgia Malone & Co. v. Rieder, 19 N.Y.3d 511, 518, 973 N.E.2d 743, 747 (2012).[11]

The Trustee is unable to come forward with any evidence that either Mr. Rennert or the Rennert family trust received any direct benefit from the transfers made to Renco.

## CONCLUSION

For the foregoing reasons, each of the Trustee's claims should be rejected in their entirety.

Dated: New York, New York
December 15, 2014

---

[11]   In Georgia Malone, the plaintiff alleged that a rival company was unjustly enriched by receiving a report created by the plaintiff that related to a project for which the defendant later received a commission. 19 N.Y.3d at 513, 973 N.E.2d at 744. The court held that "the relationship between [the two companies] is too attenuated because they simply had no dealings with each other." Id. at 517-18, 973 N.E. 2d at 747.

KAYE SCHOLER LLP

By: _____

H. Peter Haveles, Jr.
Jeffrey A. Fuisz
250 West 55th Street
New York, New York  10019-9710
(212) 836-8000
peter.haveles@kayescholer.com

PARK JENSEN BENNETT LLP

By: _____

Tai H. Park
Steven C. Bennett
40 Wall Street, 41st Floor
New York, New York  10005
Telephone:  (646) 200-6300
Fax:  (646) 200-6301
tpark@parkjensen.com

Attorneys for Defendants