F22MBUC1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   LEE E. BUCHWALD, as Chapter 7
     Trustee for Magnesium
 4   Corporation of America and
     Related Debtor, Renco Metals,
 5   Inc.,

 6              Plaintiff,

 7        v.                           13 CV 7948 (AJN)
                                       Trial
 8

 9   THE RENCO GROUP, INC., a
     Delaware corporation, et al.,

10              Defendants.

11   ------------------------------x
                                       New York, N.Y.
12                                     February 2, 2015
                                       9:00 a.m.
13

14   Before:

                        HON. ALISON J. NATHAN,
15
                                            District Judge
16
                            APPEARANCES
17
     BEUS GILBERT, PLLC
18        Attorneys for Plaintiff
     BY:  LEO R. BEUS
19        SCOT C. STIRLING
          ROBERT STIRLING
20        MALCOLM LOEB

21   KAYE SCHOLER LLP
          Attorneys for Defendants
22   BY:  H. PETER HAVELES, JR.
          JEFFREY A. FUISZ
23        -and-
     PARK JENSEN BENNETT LLP
24   BY:  TAI H. PARK
          STEVEN C. BENNETT
25
```

1          (Trial commenced)

2          MR. BEUS:  Leo Beus, Scott Stirling, Rob Stirling.

3    Good morning, your Honor.

4          THE COURT:  Good morning.

5          For the defendant.

6          MR. HAVELES:  Your Honor, Pete Haveles of Kaye Scholer

7    LLP.  To my left are Tai Park and Steven Bennett of Park Jensen

8    Bennett, and to the far left is Michael C. Ryan, vice-chairman

9    and general counsel of The Renco Group.

10         THE COURT:  Good morning, everyone.  It's a good

11   morning, especially if you're a Patriots fan.  I think the only

12   time I have not received filings in this case in the last month

13   was in the hours between 6:30 and 9:30 last night.

14         We are here to commence trial in this matter.  I'll

15   take remaining preliminary matters that we can address before

16   we get our jury pool.  I have had my clerk handed out a few

17   moments ago what I intend to use as the basis of my voir dire.

18   I will give you a few additional minutes to look at that and

19   let me know if there are any glaring problems or objections.

20         Before we turn to that, let me ask for outstanding

21   issues to be addressed.

22         MR. BEUS:  Mr. Haveles and I worked out the

23   modifications to the slides you objected to.  We don't have

24   anything else.

25         THE COURT:  I'm sure we will repeat that request, but

F22MBUC1

1     please do what you can to always have a mic in front of you.

2     Hopefully, that's operational.  Is it not?

3              MR. HAVELES:  It is, your Honor.  The cord is a little

4     tight so I have to yank it closer and lean forward.

5              THE COURT:  It will be good for your posture.

6              MR. HAVELES:  I'm still celebrating from last night,

7     your Honor.

8              Your Honor, with respect to the various slides that

9     were addressed in the letter that we submitted yesterday

10    morning, your Honor's ruling addressed all but one of them.

11             THE COURT:  That was the newspaper article?

12             MR. HAVELES:  Slide 45, yes, your Honor.

13             THE COURT:  I'll hear from plaintiff.

14             MR. S. STIRLING:  Your Honor, the newspaper article

15    was attached to a memorandum.  It was attached to a memorandum

16    provided to at least a couple of the --

17             THE COURT:  You're taller than that mic, I'm afraid.

18             MR. S. STIRLING:  I'll try again.  Thank you.

19             Your Honor, as you can see, we have put it up on the

20    screen.  This is the exhibit in which that article appears.  It

21    is a memorandum to Mr. Ryan, among others, and attached is a

22    memorandum to Mike Legge from Howard Kaplan, all defendants in

23    the case, dated 22 May 1996, and it is referring to what is

24    happening with magnesium prices.

25             One of the attachments to this memorandum that they

F22MBUC1

1    wrote and that Mr. Kaplan called to the attention of the other

2    defendants is this article.  The entire exhibit including that

3    article was on our exhibit list in August of last year.  There

4    is no objection to the exhibit.

5              And I think to raise an untimely objection to a page

6    in an exhibit that they have had in front of them since the

7    deposition was taken, I think, of Mr. Kaplan about this

8    memorandum, I think it is untimely.  They did not object.

9              THE COURT:  Mr. Haveles, you did not object to the

10   exhibit?

11             MR. HAVELES:  We do not object to the exhibit, your

12   Honor.  I will acknowledge that our oversight was, we focused

13   on the underlying memo, which is admissible and to which we

14   don't object, and we overlooked the fact that there was a

15   newspaper article at the time, and we did not express an

16   objection in connection with the pretrial report that was

17   submitted last August.

18             THE COURT:  Overruled.

19             Any other matters?

20             MR. HAVELES:  That was the only slide that was left,

21   your Honor.

22             THE COURT:  Thank you.

23             A few other preliminary matters to note.  I have the

24   agreed-upon charge.  We have time to sort this out.  I don't

25   think you indicated when you want me to direct the jury as to

F22MBUC1

 1    the absence of defendants during the course of the trial.  Do

 2    you have a request in that regard?

 3                MR. HAVELES:  Your Honor, after the opening statements

 4    is probably the best time, we think.

 5                THE COURT:  I will ask you to remind me if it looks as

 6    though I'm forgetting.

 7                MR. HAVELES:  Yes, your Honor.  Thank you.

 8                THE COURT:  Along those lines, if there are other,

 9    through the course of the trial, limiting instructions that are

10    requested, then it's on you to make the request in the moment

11    or raise it in advance so that I can have language in front of

12    me and the benefit of your request as to timing.  So even if

13    I've indicated I'm going to give a limiting instruction of some

14    kind, you must make a specific request in the moment.

15                There are stipulations that we dealt with over the

16    weekend.  I overruled the objections.  You otherwise worked out

17    the language.  Stipulations are for you to present to the jury.

18    So when you decide you want them read to the jury, you should

19    meet and confer so the other side knows it's coming, but simply

20    indicate to the jury that these are stipulations agreed to

21    between the parties and read them at the time that you propose.

22                MR. HAVELES:  Your Honor, there are a number of

23    stipulations that the parties agreed to in the joint pretrial

24    report which are basically, I believe, designed and intended to

25    deal with some common basic background issues.  And I would

F22MBUC1

respectfully submit right after the opening statements and

before evidence starts that the pretrial report stipulation be

read to the jury since the whole purpose of them was to get

issues out of the way before evidence started.

            MR. S. STIRLING:  That's fine with us, your Honor.

            THE COURT:  Sort it out.  One of you or both of you

will read the stips and just indicate to the jury that these

are facts agreed to by the parties coming in as stipulations.

And in my final instructions to the jury there will be an

explanation of stipulations of fact.  But just read those in as

you agree and at the time that you propose.

            Other preliminary matters.

            MR. HAVELES:  Your Honor, we will read the voir dire,

but starting yesterday there was publicity about this case

starting to appear, primarily in business press, as opposed to

anything else.  But we want to confer, but we may ask the Court

to add a question to the voir dire as to whether anyone has

seen any of the publicity that started over the weekend with

respect to this case.  Dow Jones ran a story on its wire

service on Saturday.  A couple of the periodicals had an

article online and in print today.

            We just think that may be an issue that has to be

addressed.  After we read once more the voir dire, we will

advise your Honor about whether we think asking about awareness

of the lawsuit is prudent.

F22MBUC1

1          THE COURT:  Okay.

2          Anything else?

3          MR. BEUS:  Just one item.  You indicated you did not

4     want birth defects.  The document I am going to use would you

5     prefer blocked out or can I just pull it out to begin with so

6     you can't read the other.  I want to make sure I don't do

7     anything improper.  Are you okay with me redacting that portion

8     from the document, just making it blank?

9          THE COURT:  Mr. Haveles?

10         MR. HAVELES:  For whatever reason, spatially I'm not

11    understanding what Mr. Beus has in mind.  If he shows it to me,

12    if it's okay with me, I'll let him know.

13         THE COURT:  Show it to Mr. Haveles.

14         MR. BEUS:  There it is.  We redacted it.  That's what

15    we have done, if that's appropriate.

16         MR. HAVELES:  I think just maybe without the word

17    redacted.  Just the white space is probably better, your Honor.

18         MR. BEUS:  We will do it however.  We don't care.

19         THE COURT:  With agreement, you'll redact redacted.

20         MR. BEUS:  My technical people say they may not be

21    able to get the word redacted off, but we will try.

22         THE COURT:  We are not priority for jury pools this

23    morning because of criminal cases ahead of us.  We are hoping

24    to get our pool by 11:15, which is too bad.

25         Other matters to take up?  Why don't I step down and

F22MBUC1

1    let you come to agreement hopefully on the document you just

2    showed me, take a look at the questionnaire, and I'll take some

3    final suggestions, which I've already printed these.  Unless

4    there is anything in here that's problematic, I'll just do

5    additional questions orally.

6            It's 9:14.  I'll return at 9:30.  Thank you.

7            (Recess)

8            THE COURT:  Counsel.

9            MR. HAVELES:  Your Honor, Mr. Stirling and I and Mr.

10   Beus have conferred on the proposed voir dire and we have a few

11   comments, if we may.

12           On page 3, in subsection E, case-specific questions,

13   you start to ask about the case, but there is not an indication

14   when you would be reading the case summary that the parties

15   stipulated to.

16           THE COURT:  I do that before we turn to the

17   questionnaire, and I will read what you submitted to me.

18           MR. HAVELES:  Thank you.

19           Second, after question No. 9 in that section it is

20   there that we recommend that your Honor ask if anybody in the

21   jury box or in the panel or the pool has seen any newspaper

22   reports or articles either in print or online regarding the

23   trial and the dispute between the parties.

24           THE COURT:  Mr. Stirling.

25           MR. S. STIRLING:  We agree with that, Judge.

F22MBUC1

1            MR. HAVELES:  The last comment, your Honor, on page 4,

2      question No. 15.  As an introductory note, I will note that

3      question No. 15 is intended.

4            THE COURT:  Going back to the prior request, following

5      question No. 10, have you heard anything about this case

6      through the media, the Internet or through any other source?

7      Doesn't that cover it?

8            MR. HAVELES:  It may be imprecise.  Maybe we should

9      just say, have you heard or read, your Honor.

10           THE COURT:  I will add read.

11           MR. HAVELES:  Thank you, your Honor.  I apologize for

12     not having caught that.

13           THE COURT:  I am not going to add an additional

14     question.  When I read this question I will say, have you heard

15     or read anything about this case through the media, the

16     Internet, or through any other source.

17           MR. HAVELES:  Could I ask that it also say this case

18     or the trial.  Because the articles that appeared over the

19     weekend were specifically about this trial.

20           THE COURT:  I think that's covered within the case.

21     The danger is that you pique people's curiosity.

22           MR. HAVELES:  I'm sorry, your Honor.  Question 15 on

23     page 4.  It was intended, and it may have been our fault in

24     presenting it to you, to parallel question 13.  In 13 we say

25     manufacturing or mining of metals, and in question 15 it just

SOUTHERN DISTRICT REPORTERS, P.C.            (212) 805-0300

F22MBUC1

1    says manufacturing before the dash.  We would ask before the

2    dash you insert the phrase, or mining of metals or other

3    natural resources so that the two parallel each other.  And I

4    have reviewed that with Mr. Stirling.

5              THE COURT:  Again, I don't see a need to reprint the

6    questionnaire.  I will read that when I read the question

7    orally.

8              MR. HAVELES:  Those are our only comments on the

9    proposed voir dire, your Honor.

10             THE COURT:  Mr. Stirling.

11             MR. S. STIRLING:  We have none, your Honor.

12             THE COURT:  Thank you.

13             Other matters to take up, gentlemen?

14             MR. HAVELES:  Defendants are not aware of any at this

15   time before we begin jury selection, your Honor.

16             THE COURT:  In terms of schedule, we will keep pushing

17   to get the jury here as soon as we can.  I will suspect I will

18   let all of us break for lunch around 12:45, 1:00.  I'll give

19   preliminary instructions to the full panel at that point

20   regarding no communication or seeking of information about the

21   case.

22             I think it will be close as to whether or not I can

23   get the jury selected today, given the time that I'm getting

24   the panel, but it may be close.  I will probably indicate that

25   I'll let them go no later than 5:30.  I hope to get everybody

F22MBUC1

1  out by 5.  But if we are close to being finished it will be

2  worth pushing through a bit longer so as not to bring everybody

3  back tomorrow.  But I won't keep anyone here later than 5:30.

4  We will see how it goes.

5       Let me ask, in terms of when I read from what you

6  proposed regarding the parties and counsel, are all individuals

7  who are here and at counsel's table covered in this list?

8       MR. HAVELES:  Your Honor, there will be one person

9  whom we request you add to the list, and she will be sitting at

10  counsel table with us to assist us.  Her name is Julie

11  Blackman.  That's the only person whom defendants would request

12  be added to the list, your Honor.

13       THE COURT:  And she is an attorney at Kaye Scholer?

14       MR. HAVELES:  She is not an attorney at Kaye Scholer.

15  She is someone who we retained to assist us, your Honor.

16       THE COURT:  Is she affiliated with a firm?

17       MR. HAVELES:  She is not affiliated with a law firm,

18  your Honor.  She is affiliated with a legal support firm.

19       MR. S. STIRLING:  Your Honor, on the plaintiff's side

20  we have Mr. Dewey here with us.  In order to have a backup, in

21  case he is unable to be here at any time, we would suggest

22  adding Taiba Velic.  And she is a paralegal with our law firm

23  and would also be assisting with the technology here at

24  counsel's table.

25       THE COURT:  I'm sorry.  The person you mentioned

SOUTHERN DISTRICT REPORTERS, P.C.    (212) 805-0300

F22MBUC1

 1    earlier is on this list that you provided?

 2              MR. S. STIRLING:  I'm not certain, your Honor.  I'm

 3    sorry.  Bart Dewey.  I understand he is not on that list, your

 4    Honor.

 5              THE COURT:  For Beus Gilbert PLLC, I have Leo Beus,

 6    Scott Stirling, Malcolm Loeb, Robert Stirling, and you want me

 7    to add -- give me the names again.

 8              MR. S. STIRLING:  Bart Dewey and Taiba Velic.

 9              THE COURT:  Paralegals working with your firm.

10              MR. S. STIRLING:  The last two, yes.

11              THE COURT:  Mr. Haveles, for you I have you, Jeffrey

12    Fuisz, and Julie Blackman.

13              MR. HAVELES:  And then Mr. Park.

14              THE COURT:  And Mr. Park.

15              MR. HAVELES:  Mr. Bennett.

16              THE COURT:  Tai Park, Steven Bennett from Park

17    Bennett.

18              MR. HAVELES:  Right.

19              THE COURT:  Anything else?

20              MR. HAVELES:  That's it for counsel, your Honor.

21              THE COURT:  If there is nothing else.

22              MR. S. STIRLING:  Your Honor, I was just reminded, I

23    believe the list that you have also does not include an

24    associate in our firm who has been admitted pro hac more

25    recently, Nishan Wilde, an attorney with Beus Gilbert.

F22MBUC1

1          MR. HAVELES:  Your Honor, just for the point of candor

2     with the Court, colleagues of mine from Kaye Scholer will be in

3     the courtroom sitting in the benches back and forth through the

4     course of the trial, but not always at all times to assist.

5     They won't be at counsel table.  The question is whether your

6     Honor would like their names for the purposes of the reading

7     since they won't be at counsel table.

8          THE COURT:  How many people?

9          MR. HAVELES:  I'm talking four additional associates,

10     your Honor.  Actually, one may sit at counsel table from time

11     to time, so it's probably prudent to add his name.

12          THE COURT:  Go ahead.

13          MR. HAVELES:  His name is John Scott.  The other

14     associates will be in the back on the benches from time to time

15     during the course of trial, but not at all times.

16          THE COURT:  I think we will pick up anyone who knows

17     anyone at Kaye Scholer.  Given that we are naming specifically

18     those who will be at counsel table and otherwise naming the

19     firm, I think we are covered.

20          Anything else?

21          I will give you time to relax.  Stay close.  As I say,

22     we will keep pushing.  I do not want to have any idle time once

23     we have word we have our panel.  Be close and I'll plan to come

24     back to the bench at about let's say 10:30 so as to address any

25     other matters that you can think of that will expedite our

F22MBUC1

1    process.  Thank you.

2            (Recess)

3            THE COURT:  I wanted to confirm for the court

4    reporter's schedule that typical practice in civil cases is not

5    to have the court reporter during the voir dire itself.  I

6    would instruct the court reporter to come back for the

7    beginning of the process and set of initial instructions, but

8    once we begin the voir dire process to let them go.

9            MR. HAVELES:  We understood that from our discussion

10   back on the 20th.

11           (Recess)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F224buc2

1          THE COURT:  Matters to take up, counsel?  Anything

2     emerge?

3          No?

4          MR. HAVELES:  Your Honor, we will just report that

5     Mr. Stirling and I had conferred two breaks ago about the

6     stipulated facts, and we both thought that it made sense for

7     the entirety of them to be read right after opening statements

8     and before the start of evidence.

9          THE COURT:  Okay.

10          MR. HAVELES:  More likely than not, Mr. Stirling will

11     just read everything because we thought, if we alternate back

12     and forth, it would distract people from listening as opposed

13     to watching the performance.

14          THE COURT:  That's fine.  Anything else?

15          MR. SCOT STIRLING:  Nothing.

16          THE COURT:  We don't have our jury pool yet, and

17     things are slow, apparently, I guess because of the weather.

18     So we're still pressing to get our people as soon as we can,

19     and we will report back when we have more information.

20          I will just do some rearranging of folks.  There is

21     plenty of room for everybody in the courtroom, but I will ask

22     my deputy to do some rearranging temporarily, so that we have

23     all of our potential jurors in one area, and spectators are

24     welcome in another area.  So please just follow those

25     instructions.

F224buc2

1           I did want to note, I know a number of people have

2    phones here, on my reluctant authorization.  Make sure they're

3    off.  Some of my colleagues, if a phone rings during a

4    proceeding, confiscate it for the remainder of the proceeding.

5    I'm considering that option.  Consider that fair warning.  But

6    our jurors will be here without their phones, without the

7    ability to check their email and the like, and so the last

8    thing I would like to see happen is for it to be readily

9    brought to their attention that there are some number of you

10   here with devices.  Obviously, there are things you need for

11   purposes of presentation at trial, but I'm certain all of those

12   phones are not among them, so you are warned.

13           All right.  If there is nothing else, I will step off

14   again and ask that you stay close, so that as soon as we get

15   word from the jury department, we can proceed.

16           Thank you.

17           (Recess)

18           THE COURT:  I have bad news and no good news.  Some

19   large number of folks didn't turn up today.  So with the pools

20   that have gone out to the criminal trials, there are only now

21   about 40 potential members available.  That number will

22   increase as time goes by.  The people returning will be the

23   people eliminated from the other trials, so our chances of them

24   being available diminishes somewhat.  I think the thing to do

25   is -- though it will build inefficiency in -- is to bring the

SOUTHERN DISTRICT REPORTERS, P.C.            (212) 805-0300

F224buc2

1    40 people over, start, and see how far we can get, and then I

2    will have to go through the questionnaire again when we get an

3    influx of pool members in the event that I can't find 16

4    qualified people in the 40.  That's my suggestion.

5            The other alternative is to wait basically until after

6    lunch when I think we might be able to get up to 60 people.

7    But as I say, although the number will be increased, that pool

8    is of diminished likelihood of success.  By the time we can get

9    everybody back from lunch and the like, it probably wouldn't be

10   until, realistically, 1:30 or 2:00 before we get started.

11           If you have a different view, I'm happy to hear it.  I

12   think the thing to do is to get started with 40 and see how we

13   do.

14           MR. BEUS:  Your Honor, you're the boss.  We will do

15   whatever you want.

16           THE COURT:  If only the Jury Department had felt the

17   same way.

18           MR. BEUS:  You're not completely the boss, then.

19   Sorry.

20           THE COURT:  What do you think, Mr. Haveles?

21           MR. HAVELES:  Your Honor, obviously, it would be

22   time-consuming to have to repeat, but we think 40 is probably

23   enough to get started, and we may not have that much left to

24   do.  Let's take advantage of the time rather than waiting.  If

25   we don't get started until 2:00, there is a good shot jury

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

F224buc2

1   selection continues into tomorrow.

2           THE COURT:  I think there is a decent shot of that, in

3   any event.  I only have 24 people to lose.  For the length of

4   trial, that could well happen.  We will see, but we will bring

5   the 40 available folks over.  We will get started.  I will

6   break in about an hour and change for lunch, and we will see

7   what we can get done.  All right?

8           Why doesn't everybody take five minutes, but just take

9   five minutes, use the facilities, come back, and we'll get

10  started.

11          (Recess)

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

F22MBUC3

1          THE COURT:  Ladies and gentlemen, thank you so much

2     for your patience.  I appreciate it.  We are prepared to

3     announce the members of the jury.  So what we are going to do,

4     my deputy is going to read the names of the ten folks who have

5     been selected and we will ask that you kind of do, I like to

6     call it the jury shuffle where the folks whose names are called

7     take the seats that we designate and those whose names are

8     passed over, if you could just step out of the box and move

9     into the well of the courtroom.

10         As soon as we do that and have our ten individuals who

11    have been selected seated, I am going to ask for everyone's

12    patience for just a few moments longer, I'll check that our

13    process is done, and anyone who has not been selected, you'll

14    get your cards from Ms. Nunez and return to the jury assembly

15    room.

16         I will now ask Ms. Nunez to read names of our jurors.

17         THE DEPUTY CLERK:  Juror number 1, Robert Barnett;

18    juror number 2, Bonnie Conklin.

19         THE COURT:  If the folks between Mr. Barnett and

20    Ms. Conklin can just move out to the well of the courtroom,

21    please.

22         THE DEPUTY CLERK:  Juror number 3, Eduardo Sullano;

23    juror number 4, Jose Marrero; juror number 5, Emmanuel

24    Omoregie.

25         THE COURT:  We will have the next juror sit in the

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

F22MBUC3

 1  second row, first seat.

 2          THE DEPUTY CLERK:  Juror number 6, Eugene Casiano.  If

 3  you wouldn't mind, sir, moving to the first seat in that row;

 4  juror number 7, Dorota Gonera; juror number 8, Sufiyan Qureshi;

 5  juror number 9, Josefina Reyes; and juror number 10, Patrick

 6  Milando.

 7          THE COURT:  The folks whose names have not been

 8  called, if you could just step back to the courtroom for a

 9  moment.  I will meet counsel at the side for a moment.

10          (At the side bar)

11          THE COURT:  Counsel, any further objections or

12  concerns to be expressed?

13          MR. BEUS:  We have gone through all the slides.  I

14  don't think there will be any surprises.

15          THE COURT:  For the jury selection, before I let

16  everyone go, plaintiff is okay?

17          MR. BEUS:  Almost.  But you're the boss.

18          THE COURT:  No objections?

19          MR. BEUS:  No objections.

20          MR. PARK:  No objections.

21          THE COURT:  Why don't I give you a few moments to set

22  up and let Sayra deal with the logistics of getting everybody

23  out.  We will start in about five minutes.

24          MR. BEUS:  I would like to use two easels.  Do you

25  have a preference of where they go?  I have copies for

F22MBUC3

1    everybody and they will also show up.

2              THE COURT:  Where do you want to put them?

3              MR. BEUS:  I was going to move the Elmo and put it

4    right there where it's easier for them to see, and I was going

5    to put the other one next to it.

6              THE COURT:  That's fine.

7              MR. BEUS:  Thank you.

8              (In open court)

9              THE COURT:  To the members of the jury I thank you

10   very much.  I am going to speak with you in just a few moments

11   about instructions, and the schedule that will get us out of

12   there certainly by 5:00 or earlier today.

13             To the folks who have not been selected, we couldn't

14   do this process without you, so I'm grateful for your

15   participation.  You will get your cards from Ms. Nunez and you

16   will return to the jury assembly room for further instruction.

17   I'm thankful.  The appreciation of the Court and the parties.

18   If you have not been selected, you are excused.

19             Members of the jury, we are going to take about five

20   minutes for the lawyers to get set up.  I am going to give you

21   a few moments of preliminary instructions.  We are going to

22   hear one set of opening statements and then we will be done for

23   the day.

24             Five minutes and then we will get everyone.  Thank

25   you.

F22MBUC3

         1    (Recess)

         2         THE COURT:  Counsel, I'd like to proceed with my

         3    preliminary instructions to the jury.  Okay for plaintiff?

         4         MR. BEUS:  Yes.  Thank you, your Honor.

         5         THE COURT:  Ladies and gentlemen, you have been

         6    selected as the jury to hear this case.  The first order of

         7    business is that I will ask my deputy to swear you in as

         8    members of our jury.

         9         (A jury of 10 impaneled and sworn)

        10         THE COURT:  Good afternoon, members of the jury.  This

        11    case is now officially on trial.  As I stated earlier, the

        12    trial is scheduled to last about three to four weeks.  I will

        13    keep things moving efficiently and I will stick to the schedule

        14    that I set so that you can plan around that schedule.

        15         Most mornings we are going to begin at about 9:30.

        16    Each day I'll let you know if there is a slight variation from

        17    that.  It will be later and not earlier.

        18         To help ensure that we can start on time, I will ask

        19    that you try to get to the jury room a little bit early.  And

        20    as enticement to that, beginning at about 9:15 each day I have

        21    arranged to have some breakfast and coffee for you in the jury

        22    room, which you can help yourself to actually beginning about 9

        23    each day.  If you could get to the jury room a few minutes

        24    before 9:30 for sure so we can start on time.  We can't begin

        25    until everyone is here.  And so we will be waiting for folks

F22MBUC3

1    and hope to begin promptly each day usually at 9:30 or a time I

2    tell you before.

3            We will take a midmorning break for restrooms and sort

4    of refreshments and a midafternoon break for some restroom and

5    refreshments and about an hour each day for lunch, usually

6    beginning around 12:30, 12:45.  We will end each day at 5 or

7    earlier.  I promise not to keep you any later than that.

8            Now that you have been sworn let me give you some

9    instructions about your duties as jurors.  At the end of the

10   trial I will give you more detailed instructions and those

11   instructions will control your deliberations in this case.  For

12   now let me tell you a little bit about how the trial will

13   proceed.

14           The first step in the trial will be opening

15   statements.  And first the plaintiff's attorney will make an

16   opening statement, which is simply an outline to help you

17   understand the evidence as it's presented.  We will get through

18   that today.

19           Next, the attorneys for the defendants will make an

20   opening statement, and we are likely to pick up with the

21   defendant's opening statement in the morning tomorrow.  Opening

22   statements are neither evidence nor will they be legal

23   argument, but a summary of what counsel, an outline to help you

24   understand the evidence that they anticipate will be presented

25   at trial.

1          After opening statements the plaintiff will present

2     its evidence, their evidence.  The plaintiff's evidence will

3     consist of the testimony of witnesses as well as documents and

4     other exhibits.  There may also be stipulations of fact, facts

5     that the lawyers for both sides have agreed to which will be

6     read to you as stipulations of fact.

7          In the presentation of evidence the plaintiff's

8     attorneys will examine witnesses and then attorneys for the

9     defendants may also cross-examine them.  Following the

10    plaintiff's case the defendant will have additional witnesses

11    and seek to introduce additional documents and exhibits.  And

12    counsel for the plaintiff will also have the opportunity to

13    cross-examine any witnesses called by the defendants.

14         After the presentation of evidence is completed, the

15    attorneys will deliver their closing arguments to summarize and

16    interpret the evidence.  Just as the lawyers' opening

17    statements are not evidence, their closing arguments are not

18    evidence either.

19         Following closing arguments I'll instruct you on the

20    law and then you'll retire to deliberate on your verdict, which

21    must be unanimous and must be based on the evidence presented

22    at trial.  Your deliberations are secret.

23         It is important to remember that this is a civil case.

24    You may have heard of the notion of beyond a reasonable doubt.

25    That is the standard in criminal cases.  That requirement

F22MBUC3

doesn't apply to a civil case and you should put it out of your

mind.  In civil cases the burden is different and it is called

proof by a preponderance of the evidence.  To establish facts

by a preponderance of the evidence means to prove that the

facts are more likely true than not.  I will, however, instruct

you fully on the burden of proof after all of the evidence has

been received.

         Let me explain the jobs that you and I perform during

trial.  I'll decide which rules of law to apply to this case.

I'll decide this by making legal rulings during the

presentation of the evidence; also, as I told you, in giving

the final instructions to you after the evidence and arguments

are completed.

         In order to do my job I may have to interrupt the

proceedings from time to time to confer with the attorneys

about the rules of law that should apply here.  Sometimes we

will talk over here at the bench, outside of your hearing.  I

will keep this as limited as possible.  But some of these

conferences are necessary.  I think that the conferences might

take some amount of time.  As a convenience to you, I may

excuse you from the courtroom so that you don't have to sit

idly in the box, and you can take a break and stretch.  But I

will try to avoid such interruptions as much as possible.  The

attorneys and I are working hard to make the presentation of

evidence as smooth and as efficient as possible.  But sometimes

1     it may be necessary.  If that's the case, please be patient and

2     understand that these conferences are sometimes necessary to

3     ensure the fairness of trial and often to make the trial move

4     faster.

5            While I decide the law that applies to this case, you,

6     members of the jury, are the triers of fact.  You will weigh

7     the evidence presented and decide whether the plaintiff has

8     proved by a preponderance of the evidence the matters that the

9     plaintiff is seeking to establish.

10           You must pay close attention to all of the evidence

11    presented and you must base your decision only on the evidence

12    in the case and my instructions about the law.

13           What is evidence?  Evidence consists of the testimony

14    of witnesses, documents and other things admitted in front of

15    you here as evidence by me, or stipulations agreed to by the

16    attorneys.  Some of you may have heard the term circumstantial

17    evidence and direct evidence.  Don't be concerned with those

18    terms.  You are to consider all of the evidence given at trial.

19    And I'll provide further instruction on that at end of the

20    proceedings.

21           Certain things, though, you should bear in mind now

22    are not evidence.  And here is a list of things that are not

23    evidence:  First, arguments, statements and questions by

24    lawyers are not evidence, nor are statements I make or

25    questions I may ask of a witness.

F22MBUC3

1          Second, objections to questions are not evidence.

2     Lawyers do have an obligation to make an objection when they

3     believe evidence being offered is improper under the rules of

4     evidence.  You shouldn't be influenced by the objection or my

5     rulings on them.  If the objection is sustained, ignore the

6     question and any answer that may have been given.  If I

7     overrule the objection, treat the answer like any other.  If

8     you're instructed that some item of evidence is received for a

9     limited purpose only, you must follow that instruction.

10          Third, testimony that I have excluded or told you to

11     disregard is not evidence and shouldn't be considered by you.

12          Fourth, anything you may have seen or heard or may see

13     or hear outside the courtroom is not evidence and must be

14     disregarded.  You are to decide the case solely on the evidence

15     presented here in this courtroom.

16          There is no formula to evaluate testimony or exhibits.

17     For now, suffice it to say that you bring with you into this

18     courtroom your experience and background of your lives.  Don't

19     leave your common sense outside the courtroom.  The same types

20     of tests that you use in your everyday dealings are the tests

21     that you should apply in deciding how much weight, if any, to

22     give evidence in this case.

23          The law does not require you to accept all of the

24     evidence admitted at trial.  In determining what evidence you

25     accept, you should make your own evaluation of the testimony

F22MBUC3

from each of the witnesses and exhibits that are received in

evidence.  It is essential, however, that you keep an open mind

until you have heard all of the evidence in the case.  A case

can be presented only step by step, witness by witness, piece

of evidence by piece of evidence before all of the evidence is

before you.

          As you know from your experience, you can hear one

person give his or her version of the event, think it sounds

very impressive or compelling and, yet, upon hearing another

person's version of the same event, or even the same person

cross-examined with respect to the event, things may seem very

different.  In other words, there may be another side to any

witness' story.  You should use your common sense and good

judgment to evaluate each witness' testimony based on all of

the circumstances.  Again, I want to emphasize, keep an open

mind until the trial is over.  You shouldn't reach any

conclusions until you have all of the evidence before you and

my instructions to you.

          Finally, let me caution you about certain rules and

principles governing your conduct as jurors in this case.

First, you must not talk to each other about this case or about

anyone who has anything to do with the case until the end of

the case, when you go to the jury room to decide on your

verdict.  The reason for this requirement is that you must not

reach any conclusion on the claims or defenses, as I said,

1    until all of the evidence is in.  You are going to keep an open

2    mind until you start your deliberations together at the end of

3    the case.

4         Second, don't communicate with anyone else about this

5    case or with anyone who has anything to do with it until the

6    trial has ended and you have been discharged as jurors.  Anyone

7    else includes members of your family and your friends, so don't

8    communicate about the case on Facebook, Twitter, Google, blogs,

9    you name it.  You can tell, of course, your family and friends

10   that you are a juror in a civil case and the schedule for the

11   case, but please don't tell them anything else about it until

12   you've been discharged by me.

13        Third, don't let anyone talk to you about the case or

14   about anyone who has anything to do with the case.  If any

15   person should attempt to communicate with you about this case

16   at any time throughout the trial, through any means, either in

17   or out of the courthouse, you must immediately report that to

18   me by telling my deputy, Ms. Nunez, and no one else.  When I

19   say report that communication to no one else, I mean you

20   shouldn't tell anyone, including your fellow jurors.  Just let

21   Ms. Nunez know and she will convey the information to me.

22        To minimize the probability of any such improper

23   communication it is important that when you come into the

24   courthouse each morning you'll go straight to the jury room

25   which Ms. Nunez will show you at the end of the day.  Just come

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

F22MBUC3

1   straight into the jury room for the duration of the trial.  And

2   she will show you what that bathroom facilities to use and get

3   you everything you need to be situated this that room for

4   coming in and out of the courthouse.

5           As you were already probably told, you may not use the

6   cafeteria in the building and you shouldn't linger in the

7   public areas of this courthouse on the floor or elsewhere.  We

8   will get you everything you need in the jury room and please

9   just come straight there.

10          Fourth, once again, do not do any research or any

11  investigation about the case or anyone who has anything to do

12  with this case on your own.  No visiting places described in

13  the trial, don't read or listen or watch any news reports about

14  the case on TV or in newspapers or on online, or anywhere.

15  Don't go on the Internet and don't use digital or communication

16  devices to see what you can learn about the case yourself.

17  This is because your decision in this case must be made solely

18  on the evidence that I receive at trial, that's presented to

19  you at trial.  Everything you need to know will be presented

20  here in open court by very capable counsel who represent the

21  parties.  I do expect you to inform me immediately, again,

22  through Ms. Nunez, if you become aware of another juror's

23  violation of these instructions.  This will make the trial fair

24  and it will ensure that we have no delays in finishing our work

25  here.

1          Finally, each of you has been given a notebook and a

2     pen.  I do permit jurors to take notes.  You may take notes,

3     but you don't have to take notes.  Notes are just an aid to

4     your own recollection.

5          The court reporters in this case will record

6     everything that's said in the courtroom and any portion of the

7     testimony can be read back to you during your deliberations.

8     If you do take notes, be aware that note taking may distract

9     you from something important that's happening on the witness

10    stand.  And whether or not you take notes, rely on your own

11    recollections and don't be influenced by the fact that another

12    juror has taken notes.  If you do take notes, all notes must be

13    left each day in the jury room.  Ms. Nunez will make sure that

14    they are secure.

15         From this point until the point when you retire to

16    deliberate it is your duty not to discuss this case, not to

17    remain in the presence of other persons who may be discussing

18    this case.  In that regard please understand that the parties

19    and counsel in this case have been instructed by me to have no

20    contact with any of you.  If you happen to see any of them

21    outside the courtroom and they don't acknowledge you, make any

22    kind of small talk, even say hello, please take no offense.

23    They are not being rude.  They are following my instructions.

24         That concludes my preliminary instructions to you and

25    now we will begin with the initial stage of the case, which, as

F22MBUC3

1  I said to you, is opening statements.  We are going to begin

2  with the plaintiffs.  At this time I am going to ask all of you

3  to give your undivided attention to Mr. Beus, who will make the

4  opening statement on behalf of the plaintiff.

5          MR. BEUS:  Thank you, your Honor.

6          THE COURT:  Thank you.

7          MR. BEUS:  Thank you for being jurors in this case.

8  We will do our best and move it along.  We will attempt to try

9  to make it interesting.

10          Would you put up C for me, Bart.

11          This is what we are talking about.  This is the

12  facility on the south end of the Great Salt Lake outside of

13  Salt Lake City, Utah.

14          Would you blow that up for me one time.

15          Here is the plant we are talking about.

16          Would you put up B for me, please.

17          Let me just get you oriented here.  Here is a shot

18  from the top.  What you see there, we are going to be talking

19  about a lot in this lawsuit, are some ditches.  You'll see that

20  ditch, you'll see that ditch, you'll see that ditch.  Then

21  you'll see here at the top what you call the Red River.  That's

22  where we say and the testing shows that there are environmental

23  contamination.  Environmental contamination is not the only

24  thing this case is about.  Let me start with who the plaintiff

25  is.

1            Would you put up No. 1 for me, please.

2            Who is Lee Buchwald.  He was appointed by a federal

3     judge, a bankruptcy judge right here in New York, as the

4     trustee of Renco Metals and MagCorp.  The creditors petitioned

5     to appoint a trustee.  What you are going to hear in this case

6     is that there are a lot of creditors who are owed a lot of

7     money that was never paid by MagCorp or Renco Metals.  There is

8     an argument about how much, but it is in the hundreds of

9     millions of dollars.

10            Mr. Buchwald seeks –– after he was appointed he did

11     his investigation to determine whether or not claims should be

12     brought.  We seek the return of $118 million that was taken by

13     Mr. Rennert and Renco Group from this company when we claim

14     they didn't have adequate capital or they were insolvent.

15     That's what this case is really about.

16            On the right you see that schematic Renco Group is the

17     holding company.  It means they own all of the stock in Renco

18     Metals.  Renco Metals owns all of the stock in a company we

19     called MagCorp, and that's all you have to do.  We are going to

20     call Renco Metals and MagCorp just MagCorp.  They both went

21     into bankruptcy in 2002.

22            Put up No. 2, please.

23            Who was the defendant, Ira Rennert?  He's a very smart

24     man.  He did a doctoral dissertation in finance at NYU.  He

25     received a master's of business administration from NYU.  He is

F22MBUC3                          Opening - Mr. Beus

1     the controller of Renco Group, the chairman of Renco Group at

2     the time.  Before bankruptcy he was the chairman of Renco

3     Metals.  He was also the chairman of MagCorp.

4              You see the word Sabel.  That was another small entity

5     that was owned by Renco Metals in Alabama.  It was sold in 2000

6     and we will talk about that in a few minutes.  Doesn't play

7     much of a role, but a little bit.

8              Mr. Rennert owns 95.8 percent of the Renco Group.  The

9     rest are owned by others closely associated with them.  There

10    is not really a dispute in this case that Mr. Rennert was the

11    sole decision maker of Renco Group, Renco Metals, and MagCorp

12    through all of the time we are talking about here.

13             Put up 3, please.

14             Who is MagCorp?  It was a company, a Delaware company

15    that was formed in 1989 to buy a company called AMAX.  The

16    facility I showed you was not built by Renco, MagCorp, or any

17    of those companies.  It was built in 1972 by a company called

18    NL Industries.  They had a lot of problems.  They eventually

19    sold it to AMAX.  And AMAX was sold to MagCorp  MagCorp was

20    formed in order to buy AMAX.

21             We have talked about the bankruptcy.  What this plant

22    does is, it takes brine out of the Great Salt Lake which is

23    full of magnesium.  The problem with this, and I want you to

24    remember this, and there is really not a dispute, with that

25    brine are a lot of other minerals -- iron, sulfur, boron, and

                SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

1    lithium -- and it created all kinds of problems to make this

2    plant ever work.

3             Next, please.

4             Who are the New York defendants.  Mr. Fay, who was the

5    chief financial officer of Renco Metals; Mr. D'Atri,

6    Mr. Sadlowski, and Mr. Ryan, lawyers.  They worked together to

7    put together $150 million of debt on MagCorp, and they could

8    never get out from under that $150 million of debt.  That $150

9    million of cash where they borrowed the money came into MagCorp

10   and then $118 million of it was taken.  I'll take you through

11   the detail of that in a few minutes.

12            When that 150 million -- actually, long before that,

13   in fact -- MagCorp was doomed to failure.  It didn't have the

14   equipment that could process these contaminated brines out of

15   the Great Salt Lake.  Nobody had ever really been successful

16   with that plant.  NL Industries wasn't, AMAX really wasn't, and

17   when purchased by MagCorp, it didn't do well either.

18            Next.

19            Who are the Utah defendants.  Those are the officers

20   of MagCorp that ran the company and there was a unique set-up

21   that occurred.  Mr. Rennert in 1993 decided to give what's

22   called net worth appreciation payments to these officers, each

23   of the names you see up there.  Mr. Legge was the CEO.

24   Mr. Rennert was the chairman.  The other folks were

25   vice-presidents and you will come to know their roles more

1    thoroughly in this trial.

2          But the net worth appreciation payments were payments

3    that said, if we declare a dividend and send the dividend up to

4    Renco Group, you will get a percentage of that dividend.

5    Mr. Rennert, for example, got 3 percent.  Every time there was

6    a dividend that went out of MagCorp upstream, which eventually

7    got to Mr. Rennert and the Renco group, they got a percentage,

8    nearly $7.2 million of net worth payments.  The testimony in

9    this case will be that not one of these officers ever once

10   disagreed with Mr. Rennert.

11         Next.

12         What happened to these dividends.  The dividends were

13   taken.  The biggest dividend was in 1996.  Over $75 million was

14   taken.  That dividend was taken four months later, went up to

15   Renco Group.  Four months later they formed a company called

16   Blue Turtle.  Blue Turtle, a couple of months later, purchased

17   a very large parcel of property in the Hamptons, at Sagaponack.

18   There Mr. Rennert, really Renco Group, built the largest

19   occupied house in the United States of America:  29 bedrooms,

20   two bowling alleys, 157-seat theater, and it goes on and on.

21         Here is that house on a 60-acre parcel.

22         Put up the next slide.

23         You'll see another slide of it.  These houses, by the

24   way, right here are not his.  This is the property.  There is

25   another view of it.

1          It's those monies that were improperly taken from

2      MagCorp that Mr. Buchwald, the trustee, the court-appointed

3      trustee, is asking you to return so that they can go back to

4      the bankruptcy estate and pay the creditors, the people that

5      loaned MagCorp money.  They have not got a single penny on

6      significant amounts that they loaned to this company since

7      2001.  That's a very long time.  I have a board.

8          THE COURT:  Mr. Beus, make sure if you are talking

9      you're at the mic so we can hear you.

10          MR. BEUS:  I appreciate that.

11          Here is a simple board that gives you the timeline of

12      when the $118 million was taken.  You see The Renco Group forms

13      MagCorp in order to buy AMAX.  They paid $44 million for it.

14      They also paid some money for some working capital.  In 1993,

15      they go out and borrow $75 million.  One of the things I want

16      you to understand, this purchase price of $44 million wasn't

17      all cash.  $12 million of it was a promissory note.  Kind of

18      like if you buy a car, you put the down payment.  This was a

19      big down payment.

20          There was $12 million that was a promissory note.

21      That means we are going to pay you over a period of time.  They

22      were supposed to pay $2 million a year.  They got security for

23      it.  If you don't pay the $12 million, the seller of AMAX then

24      can take the entire facility back, secured with all of the

25      stock that they bought.

1          Think about that.  What happened in 1993.  MagCorp was

2     behind on that $12 million note.  They couldn't pay it.

3     Instead of taking the company back, $13.6 million was then owed

4     with that and some other obligations, and there is no argument

5     about that.  I'll show you the documents that are not in

6     dispute in this case.  They took a haircut.  They went from

7     $13.6 million to $7 million.  That will describe to you how

8     much trouble this company was in.  AMAX didn't want that back,

9     so they took almost a 50 percent haircut.

10         During this '90 to '94 time frame, MagCorp was losing

11    significant amounts of money.  Then something wonderful

12    happened to MagCorp.  The price of magnesium shot up.  We call

13    it a bubble.  Call it any word you want.  And that occurred in

14    1995.  The reason it occurred is some other magnesium

15    competitors went out of business.  By the time you get to 1996,

16    the price is dropping, it shoots up, and then it starts back

17    down early in the year, 1996.  Even in the end of '95 it's

18    starting back down.

19         The price is dropping.  But what happens here is $150

20    million is borrowed.  They go to the marketplace and they

21    borrow $150.  Not one penny of the principal of that $150

22    million has ever been paid back.  Not one.

23         The cost to do that borrowing, and I am going to show

24    you in a minute, is a little over $105 million.  That includes

25    some dividends that were taken out of those monies.

1          Then this is where you see the $118 million taken,

2     right here through this period up through October of '98.

3          When you get to the '96, '97, '99 time frame, if you

4     put C back up for me, this facility -- that's okay.  I'll go

5     back to this.  I'll just tell them about it.  This facility,

6     you see those buildings.  What's inside those buildings.  And

7     you are going to see some models in this case -- I won't take

8     the time in my opening -- where they take the brine from the

9     Great Salt Lake, they evaporate it back to where they have

10    magnesium chloride and get all the purities out of it and then

11    put it in a melt reactor, raise the temperatures to between 700

12    and 1400 degrees.  Through that they have an electrolytic cell,

13    and you will understand all of this because you will hear from

14    one of the scientists that put this together.

15         In the process of going up and down those temperature

16    ranges, this plant creates really nasty environmental problems

17    called chlorinated hydrocarbins, and there are a lot of them:

18    Dioxins, furans and so on.  The Clean Air Act that was

19    promulgated was coming.  There was a lot of chlorine emissions

20    and they knew they had to get better equipment.  They had a

21    technology problem.  The technology that they acquired in 1989,

22    which was put in place in 1972, when NL Industries built

23    this --

24         MR. PARK:  Your Honor, we don't know what he's

25    pointing at.  We don't have a picture up.  Is there some way we

F22MBUC3                    Opening – Mr. Beus

 1   can position that?

 2            THE COURT:  Mr. Beus, can you use your pointer?  Will

 3   it reach the screen?

 4            MR. BEUS:  Yes, it will.

 5            MR. PARK:  Thank you.

 6            MR. BEUS:  I apologize.

 7            THE COURT:  It's okay.

 8            MR. BEUS:  I guess we are having a little trouble

 9   getting this up.  We gave you a small copy of this.

10            MR. PARK:  I just want to see where you're pointing.

11            MR. BEUS:  I will talk about the year when I'm

12   pointing to the year.  1972 is not on this.

13            The technology in this plant came from Germany in the

14   1930s.  It's called IG Farben technology.  I am going to spend

15   a little more time with that.

16            They are searching the world to find other technology.

17            They find a company called Alcan, Aluminum Company of

18   Canada.  And what they want to do is, they want to license this

19   and they know they have got to have new technology to meet the

20   Clean Air Act.  They know they have got to have technology to

21   solve environmental problems.  And equally important, they know

22   they have got to have technology to stay in business.  You are

23   going to hear in this case, without new technology they

24   couldn't save the business.  You see the IG Farben and the

25   sealed cells.  In order to continue in business, that they had

1    to modernize in order to save the business.

2             In Alcan, in October of '96, about the same time,

3    shortly thereafter, that they take the $105 million, it costs

4    $105 million, they then think they have got an answer.  But

5    Alcan doesn't work.  Alcan had only been working one place in

6    the world, at a titanium factory in Japan.  And that feed or

7    brine -- which really wasn't brine.  It was feed -- was pure

8    magnesium chloride, MgCl2.  The brine out of the Great Salt

9    Lake had all of these contaminants:  Boron, sulfur, lithium,

10   and iron.  And lithium and iron were the biggest problems.

11   They spent three years trying to figure out Alcan and they

12   couldn't.

13            All the time they were trying to figure that out,

14   knowing that they had to have a major input in cash in order to

15   build this facility, they were taking dividends out and taking

16   MagCorp not only to an insolvency, but below insolvency.

17            Let me show you 32, if you would, please.

18            Here is what happened.  With a discounted AMAX note --

19   so I have taken the AMAX note out of this number right here,

20   1993.  From 1990, they bought it in August of '89, but the

21   first year is '90 through '94.  Those five years, they lost a

22   total of $26.6 million.

23            33.  Here is where I told you.  This is right out of

24   their financial statements of the prospectus when they got the

25   '93, $75 million.  They tell you this amount, the same AMAX

1    note I told you about, 10 million, this amount represents a

2    subordinated note payable to AMAX, which is carried as

3    long-term debt on the company's financial statements.  The

4    company has negotiated to purchase such note and accrued

5    interest and $3.6 million of other related obligations for $7

6    million.  Use your common sense, as the judge told you, when

7    you think about why AMAX would take 7 million as opposed to

8    13.6.

9            Put up No. 8 for me.

10           Here is what happened to the prices.  And this

11   evidence, all of the underlying documents are stipulated.  Here

12   is what happens to the spot price of magnesium.  You see in

13   '93, it pops up there in '94 and '95.  Then it drops way off.

14   That's a spot price that the world deals with.  The green line

15   is MagCorp's actual numbers, what they are actually receiving.

16   The evidence in this case will tell you that they are getting

17   about 90 percent of spot price.

18           With that bubble they go to the marketplace to borrow

19   this $150 million.  We will come back and you'll see what they

20   have done.  As they have said, they can forecast the price of

21   magnesium at this price for seven years the entire time that

22   they are supposed to be paying back the $150 million.  They

23   never once set a dollar aside, not one dollar was ever set

24   aside to pay that $150 million.  You will hear from Mr. Haveles

25   that they had a lot of cash.  And when you hear that, ask if

1    they had any cash that comes even close to doing the $150

2    million payback.  They didn't.

3            Put up 9.

4            Here is the forecast they used to do it.  Let me tell

5    you what the testimony will be in this case.  The testimony is

6    you maybe can forecast the magnesium, which is very volatile

7    for maybe six months, maybe a year, but MagCorp, Renco Group,

8    they are all in the commodities business, will tell you, and

9    Mr. Rennert himself will tell you that any kinds of projections

10   are speculative.

11           10.  Mr. Rennert will testify that any projections are

12   speculative.  Mr. Kaplan, who has a Ph.D. and is vice-president

13   of sales, forecast is good for six months.  And Mr. Legge, the

14   CEO, the Utah CEO who ran this, who was in charge of this

15   plant, will tell you that MagCorp needs $1.60 to survive, $1.60

16   a pound.  Keep that number in your head because it will tell

17   you how much trouble they were in.

18           Here is a summary chart of where the cash was taken.

19   This was taken in '95, this was taken in '96, this was taken in

20   '97, this was taken in '98, and in '99.  This $1.2 million is a

21   fee.  I'll talk about that in a few minutes.  The Renco

22   Group --

23           MR. PARK:  I am going to ask Mr. Beus to use the

24   pointer on the screen that we can all see.  I cannot follow

25   where he's pointing.

1            THE COURT:  Mr. Beus, either point to the screen or we
2      need to shift.
3            MR. BEUS:  I apologize.
4            Every year Renco Group took $1.2 million to stay
5      informed and provide management services from MagCorp.  The
6      rest of the numbers you see on that chart are when they receive
7      dividends.  The dividends total, and there is no dispute in
8      this case, of $102 million.  There were some preferred stock
9      that was redeemed, $8.5 million, net worth appreciation
10     payments to the officers in Utah, never disagreed with
11     Mr. Rennert, of $7.1 million.  And then the management fees
12     over this five-year period of $6 million.
13           Let me show you now the prospectus where they got this
14     $150 million.  That's the document they filed with the SEC to
15     say, come and loan us money.
16           Put up No. 11.
17           There is the front page of it.  This is $150 million
18     offering.
19           Put up No. 12.
20           Here is the cost of doing that offering.  You see they
21     are going to retire the existing notes.  They had to pay a
22     premium.  So if you take the premium they paid, this shows 88.
23     Some of those notes didn't actually redeem.  So the premium was
24     a net effect of $9.94 million after a big portion of the 75 was
25     paid off.

F22MBUC3                        Opening - Mr. Beus

1           Then you see the dividend of the group, 75, stock

2      redemption 8 and a half.  The net worth appreciation payments,

3      5.3.  And the transaction fees and expenses.  When you total

4      those numbers up, just using the premium piece of this, it was

5      $105.4 million.  That burden on this company was a burden that

6      could never be survived.

7           Put up 13.

8           I want to show you this.  This is a memo to

9      Mr. Rennert, the chairman of Renco Group, from Mr. Legge, the

10     CEO of MagCorp.  He says in this document, which there is no

11     objection to, a basic business MagCorp premise is that future

12     magnesium marketing price will remain in the $1.60 per pound

13     range, average for all MagCorp products, in order to provide

14     sufficient funding.  Look at next two words.  To survive, to

15     survive.

16          Now, put up No. 18.

17          There will be no dispute in this case that all of

18     those dividends that were taken, and that stock redemption,

19     provided no benefit whatsoever to MagCorp.  And that will be

20     important for one of our legal theories that I'll talk about in

21     a few minutes.

22          19.

23          What was left after they went out and borrowed this

24     $150 million?  This comes right out of the prospectus.  This is

25     what's left.  Before, you've got cash of 32 million.  After,

1    you've got cash of 547,000.  The old notes of $75 million goes

2    to zero.  You see the line there.  The new notes go to $150

3    million.

4           I want you to look at this next line.  The total

5    stockholder's equity goes from a positive $11.8 million.  And

6    when you see a number that has brackets around it, that means

7    you're under water by $81 million.  You're broke by $81

8    million.  You have got to find $81 million before you get to

9    ground level zero.  That's what those brackets mean.

10          These statements are not fair value.  Fair value may

11   be something different, fair market value on what these assets

12   are worth.  But what it is, it is what generally accepted

13   accounting principles say and this is what you report.  They

14   are upside down $81 million as soon as they pay the $105.4

15   million that I just described.  There are no disputes about

16   that.  That's what happened.  That's what was reported.

17          They will show you a lot of statistics saying we have

18   got all of this cash.  I showed you the facility.  When you

19   say, what does it cost to operate that facility, it costs

20   $400,000 a day, $400,000 a day.  That's arithmetic that they

21   reported.

22          Put up 20 for me.  I've done the arithmetic here.

23   This is right out of the financial statements.  In '96, it's

24   400,000 and change a day.  When they say, gee, we have got the

25   ability to borrow 20 or $30 million or we have got 20 or $30

1    million dollars of working capital, divide that by 400,000, and

2    they maybe got 30, 60 days to survive if they don't get any

3    more money in.

4          21.

5          As I told you, the bubble was bursting in late '95,

6    early '96.  The price was coming back down.  Now you get to

7    1997, and this is just one of several of these.  This is from

8    Mr. Ogaard.  Mr. Ogaard was the chief financial officer of

9    MagCorp, the company operating in Utah.  It was written to

10   Roger Fay, the chief financial officer of Renco Metals and

11   Renco Group.

12         Here is what is said.  While 2 million -- and this is

13   doing some calculations of how they can do it based upon

14   whether they are making money -- while 2 million is currently

15   available for dividend, with projected negative cash strain in

16   '98 and '99, that's the projections as of this very date, 31

17   October, negative cash train in '98 and '99, from new

18   generation cell CapEx costs.

19         Let me take a minute with the word CapEx.  That's a

20   term you are going to hear a lot.  CapEx means that's the

21   amount of money we need to spend to upgrade the equipment.  We

22   got to buy new equipment.  We have got to have new technology

23   and that's a CapEx.  Now it's called capitalization expense.

24   This is the short version.

25         So we got to have new generation cell CapEx costs.

1   Then the next term is, we urge extreme caution.  After the

2   chief financial officer warns and says, use extreme caution,

3   you know what they do?  They take yet another dividend.  They

4   take $6.6 million of additional dividends with that information

5   that they are talking about between the two chief financial

6   officers.

7               22.

8               The next year, '98, and things are not going well now.

9   While 2 million -- and this is the next year.  They say the

10  same thing, only it's a little different.  While $2 million is

11  currently available for dividend with projected negative cash

12  drain, over the next three years, with CapEx costs together is

13  price declines, we urge extreme caution.

14              What did they do?  They took another seven plus

15  million dollars in dividends.  This company was doomed for

16  failure.

17              Now, the bottom line is, Mr. Rennert made a bad

18  decision when he bought the company in '89.  The brine out of

19  the Great Salt Lake is never a place where you ought to be

20  building a plant to take magnesium.

21              But he doesn't take responsibility for that bad

22  decision.  Instead, he goes and borrows this money, pays $44

23  million, and then starts pulling out, eventually pulls out $111

24  billion in dividends and stock redemptions.  Mr. Rennert had an

25  obligation to what he was doing.  There is a contract in place.

1      It's a written contract.

2                  Would you put up 29.

3                  August of '93.  Here is the contract.  This is with

4      Renco Group.  Remember, that's the parent company that owns

5      Renco Metals and MagCorp.  The consultant shall -- this means

6      the chairman, Mr. Rennert -- shall become generally informed

7      and keep itself informed as to the business and affairs of the

8      corporation.  The corporation there is MagCorp, the company

9      that's operating in Utah.  And its subsidiary corporations.

10     And general business developments in their industries.

11                 30.  For that they are going to receive $1,200,000 a

12     year, $100,000 a month.

13                 Here is what you are going to hear from Mr. Rennert in

14     this case.

15                 Put up 39 for me, would you please.

16                 You are going to hear that he did not recall Renco

17     Group's reasons for doing the $150 million offer.  That's what

18     he was going to say.  He doesn't know why he did it.  He

19     doesn't know any role in assisting.  And he did not know the

20     $150 million offering doubled the amount of MagCorp's debt.

21                 We are going to be asking you in this case to use your

22     common sense and can anybody who is taking in $111 million and

23     doesn't know what you see on this board could possibly be doing

24     his fiduciary duty.  He didn't know that the stockholders'

25     equity was negative $80 million.  That was printed in the

1  prospectus, which was filed with the Securities and Exchange

2  Commission.  That's what you are going to hear in this case.

3          Next.

4          You are going to also hear that Mr. Rennert believes

5  that all projections are speculative.  You are also going to

6  hear, and I don't want to belabor this, but you are going to

7  hear, although Mr. Rennert says he never saw a Houlihan

8  Lokey -- that's a company that says everything is solvent.

9  What Houlihan Lokey says, we are going to take management's

10  projections, which says we are going to have a $1.78 a pound

11  for magnesium over seven years.  They don't do any independent

12  investigation.  They don't find out whether that's true.  They

13  don't even find out whether they can forecast.  And the

14  testimony in this case is going to be, once you are beyond a

15  year to try to forecast the price of magnesium, you just can't

16  do it.

17          But what happens.  You are going to hear from an

18  expert in this case.  With what I have just described to you so

19  far, that expert is going to say, we used a discounted cash

20  flow and comparable company valuations that gets you to over

21  $300 million of value in this company.  Makes no sense.

22          How does he do that?  He says I am going to take seven

23  years of projections, which MagCorp, Renco Group, Renco Metals

24  all say, you can't do anything more in a year in a volatile

25  industry.  And then I am going to compare this company and use

F22MBUC3                    Opening - Mr. Beus

1    comparable analysis with like Alcoa Company of America, big

2    large multibillion dollar diversified companies.  Use your

3    common sense when you hear that.

4          Mr. Rennert himself says, discounted cash flow and

5    comparable company valuations are not meaningful.  He never did

6    his own valuation of the assets or liabilities when taking

7    dividends.  He never saw and did not rely on this Houlihan

8    solvency opinion.  That's what you are going to hear in this

9    case.

10         Next.

11         And he didn't know if MagCorp had a surplus to declare

12   dividends.  He didn't know whether the dividends were lawful.

13   We are going to be asking you to look at the Delaware statutes,

14   because this is a Delaware company, as to whether those

15   dividends were lawful.  And he didn't have any knowledge of

16   MagCorp's solvency when taking the dividends.  He didn't know

17   if they were solvent.  If they were insolvent or they were

18   rendered insolvent when they take the dividend, they have to

19   give it back.  That's what we are asking for.  Put the $118

20   million back.

21         34.  I'm sorry.  Put up 23 first, would you, please.

22         Here is what we claim in this case.  I've given you

23   some background.  And these aren't all of our claims, but these

24   are the claims that I would like to at least discuss with you

25   during opening.

1            Three claims.  One, unjust enrichment.  Did

2    Mr. Rennert get a tangible benefit?  You saw the photograph of

3    the house.  That's where he and his wife live.  Still owned by

4    Renco Group.  The money that went into Renco Group financed

5    that.

6            Was MagCorp harmed by the money being taken out?

7    There is no argument about that.  So that in and of itself

8    says, make him bay pack the $118 million.  Or was there

9    inadequate capital?  Is that company doomed to fail when it got

10   to huge burden?  Indeed it was.  Even before that it was doomed

11   to fail.

12           Or insolvency.  You'll hear a lot about insolvency in

13   this case.  Go back and let me see if I can deal with that.

14           Go to 34.  Insolvency is a word that I want to make

15   very simple and I don't think there will be anybody that will

16   argue with this.  It's a balance sheet analysis.  And a balance

17   sheet is really simple.  Assets are what you own.  Liabilities

18   are what you owe.  Every one of us in this courtroom has a

19   balance sheet.  We may not have put it on paper, but we do.

20           If you own something, it's an asset.  If you so

21   something, it's a liability.  If the liabilities exceed the

22   asset, even for one dollar, even if you are making it a whole

23   lot of money, you're insolvent.  Let me give you an example.

24   Suppose you have a car.  You know what happens when you buy a

25   car when you buy it new.  You put a mortgage on it.  If you pay

1   22,000 or $25,000 for the car and drive out of the parking lot,

2   it's worth 17 or 18 or 19, whatever the number is.  If you

3   financed 100 percent of it and that's the only thing you had

4   and your car is worth less than what you owe on that car,

5   you're insolvent.  You may be making some money, but it doesn't

6   matter whether you are making money.  That's irrelevant.

7         It's a balance sheet, what do you own, what do you

8   owe.  If what you owe exceeds what you own, you're insolvent,

9   even if by a dollar.

10        Put up 35.

11        Let me take you to what they reported because this is

12  a balance sheet.  They give you the bottom number.  They say

13  the liabilities under GAAP, generally accepted accounting

14  principle, is a negative $81 million.

15        Now, let me go to 36.  This is the full or nearly the

16  full balance sheet that they report in the report that they

17  filed with the SEC on 31 October '96.

18        (Continued on next page)

19

20

21

22

23

24

25

1              MR. BEUS:  You see cash, cash, and cash equivalents.

2     Those assets, they are what they are.  Then, you get to this

3     line:  Property, plant, and equipment.  Do you see this number?

4              This is where the argument is in this case.  They list

5     property, plant, and equipment at $65 million if you don't take

6     any depreciation.  See this accumulated depreciation and

7     amortization at $32 million?

8              On generally accepted accounting principle books, you

9     only report an asset of $32 million because you depreciate it.

10    That depreciation may not be the same as fair value.  That is

11    what you get to do for tax purposes.  That is what you get to

12    do for generally accepted accounting principles.  You lay it

13    out.

14             Now, if you say, let's not have any appreciation and

15    add $33 million back; if you add $33 million back and you're

16    already $81 million in, it doesn't really matter.  You're still

17    almost $50 million insolvent.  If you give them credit for

18    100 percent of the value.  And I will show you in a few minutes

19    that they all acknowledged that the equipment had serious

20    problems, and they had to put a lot of money into it.  I will

21    actually show you some of the documents in a few minutes.

22             Let me go to now the definition of fair market value

23    as described by their expert.  Put up 37 for me, would you

24    please.  This is their expert who comes up with this

25    $300-plus million this company is worth when it can't put a

F224buc4                         Opening - Mr. Beus

1    dollar aside to pay the $150 million notes.  Fair market value

2    is determined based upon what both a willing buyer and a

3    willing seller, having knowledge of all material facts about

4    the property, would agree to.  That is the essence of common

5    sense.

6           When you look at this property, plant, and equipment

7    and the technology and the environmental liabilities that are

8    associated with it, you ask yourself as you hear the evidence

9    in this case, what would a willing buyer, if they knew

10   everything, actually pay for this company, for that property,

11   plant, and equipment, which is not generating profits and which

12   is creating ongoing environmental liability?

13          We will urge you in this case that -- you will hear

14   from our witnesses -- they will tell you, you wouldn't pay

15   anything.

16          Go back to AMAX.  When they took the discount, they

17   didn't want the company back.  They took a discount, huge

18   discount.

19          Now go to 38.  If we give them credit for everything

20   they put in it and eliminate that $32 million, they're still

21   insolvent, by their own numbers, by almost $50 million.

22          Let me tell you what you need to consider -- put up

23   Exhibit 2582, and I don't want to take too much time with this,

24   and blow that up, who it is from and who it is to.  I want you

25   to look at this date.  It is February 23, 1996.  Right before

1    they do this $150 million borrowing and right before they take

2    the $105 million of expense out of this company.  Right before

3    they take the $75 million.  Look at these numbers.  This is

4    from Mr. Legge, the CEO of MagCorp, to Mr. Rennert himself,

5    with copies to the chief financial officers, Ogaard and Thayer.

6    Now, what it says is a key component of the 1997-1999 business

7    plan.  They're planning now what is going to happen in '97 and

8    '99.  This is before they have taken out the $75 million.

9    Business plan and cash flow projections which we plan to

10   present at the March 25 business review is the capital and

11   expense plan for those same years.

12           You'll have this document.  You'll be able to see it.

13           A product of the exercise of developing the

14   preliminary capital and expense plan is that we can more

15   clearly see additional reasons for installing the 01 spray

16   dryer scrubber in '96.  That is a big piece of equipment that

17   will cost a few million dollars.

18           Given the schedule for the EPA -- that's the

19   Environment Protection Agency -- to promulgate hydrochloric

20   acid, HCL, emissions regulations, both the spray dryer scrubber

21   installations should be completed by the end of 1998.

22           They know they have the Clean Air Act and chlorine

23   emission issues coming, so they have to spend money.  They have

24   to spend money for other reasons, too.

25           If the 01 scrubber installation is deferred until 1997

F224buc4                         Opening – Mr. Beus

1    or 1998 -- look at the next words -- we increase our risk of

2    not having the cash available from operations, plus it is

3    questionable as to whether we could install both scrubbers in

4    1998 given our operating rate.

5              What are you hearing before the $75 million is coming

6    out?  They don't even know if they're going to have enough cash

7    to do a scrubber.

8              Let's go to the second page, where you see the numbers

9    laid out for you.  Here you see the scrubber right there.

10   They're worried about having the money to do that scrubber.

11   What you see here is a schedule of what they have to do to put

12   money into equipment to keep this company viable.  You total up

13   those numbers.  This is year 1, 1996; this is year 2, 1997;

14   this is year 3, 1998; this is year 4, 1999.  This isn't all of

15   them.  You can see the numbers:  14-1/2, 15.9, 23.98, 17.42.

16   In addition, they have got some additional expenses.

17             Go to the second page.  When you add those numbers

18   together, what cash they have got to have that they're

19   budgeting in February of '98, before they take a big share of

20   these dividends out, the number totals, $78-plus million.  When

21   you hear tomorrow from Mr. Haveles and you see these numbers,

22   $40, $50 million we have, they don't have enough to do this.

23   You know what?  They don't get most of it done.

24             Now, let me move back to what was happening at the

25   same time you see this February '96 before they do this

F224buc4                        Opening – Mr. Beus

1    $150 million borrowing that they load on MagCorp's back.

2            Put up 8 again, would you please.  This is the bubble.

3    Here you see the prices coming down starting in late '95; and

4    then in '96, they continue to decline.  Now, you see MagCorp

5    numbers are a little bit behind that.  Their decline comes a

6    little later.  The reason is they have some contracts.

7            Let me say a word or two about their contracts.  They

8    have contracts that will help them with pricing.  The problem

9    is, is when there is a lower price, the customer comes back and

10   says, we're going to go somewhere else or we're not going to

11   buy it; and by and large, it didn't happen all the time, but it

12   happened a number of times.  I'm going to show you some

13   examples of what happens before, again, this big $75 million

14   dividend that was taken out in July of '96.

15           Put up 46.  Here is what is happening to the price.

16   This is in evidence.  This is a memo to Mr. Legge from

17   Mr. Kaplan.  Magnesium consumption by the West of Eastern

18   material increased in the first quarter.  It gives you the

19   tonnage.

20           What you're going to hear from the defendants in this

21   case is the reason there was a huge problem and why they went

22   bankrupt is because China was coming.  China was coming.  It

23   started coming in '92.  It was warned off even here.  This

24   reflects increased shipments to the West of Chinese material.

25   A bit more from Russia.  Chinese material continues to be sold

F224buc4                    Opening – Mr. Beus

1    at extremely low prices, as shown in the attached press

2    clipping, which is putting significant pressure on both Western

3    and Russian pricing.

4         This is information they're writing to one another.

5    Look at the date.  May of '96, 23 May of '96, again before the

6    big hunks of money are being taken out.  They have taken some

7    smaller dividends before.  Big hunks of money.  $75.7 million.

8         Next.  Here is the article that is attached.  I'm

9    sorry about the typing on the right.  It is ours, so you can

10   read it.  Look at the headline:  Weak demand makes magnesium

11   price slip. Look at the date, 23 May.

12        Price structure down 40 to 50 cents a pound so far

13   this year.

14        This is before they take the money.  The Chinese

15   cranked up the pressure, cutting prices 4.5 cents to a range of

16   $1.13.

17        Remember what I told you earlier?  $1.60 is the number

18   to survive.  To $1.22 a pound.  And this, again, is in that

19   same memo.  This is what they knew before they took this money.

20        Next.  Here you see some more.  Next one, if you

21   could.  There you go.  Here's more.  World oversupply of

22   magnesium in 1996 led to a sharp decline in prices throughout

23   the year.

24        48.  Here you see this is a memo from Mr. Legge to

25   Mr. D'Atri, the secretary of MagCorp and Metals.  He says, it's

1    obvious that the import metal is available and many contract

2    customers are throwing that back at us to challenge current

3    contract prices.

4            Remember when I told you there were contracts in

5    place?  Well, they weren't such great contracts because holding

6    those commodity prices had problems.  Here was one of their

7    very big customers.  6 May '96, this is what is there before

8    they take the hugest dividend of all.

9            Put it up next.  This is what you see was attached.

10   This is Alumax.  Big customer.  Look what he says.  This is

11   from Alumax to MagCorp.  Due to some competitively priced

12   primary magnesium in the marketplace right now, we need you to

13   put May, June, and July loads for Plant City on hold for now.

14   Confirmation/cancellation of status of those loads will come in

15   due time.

16           They just stopped buying.  Why?  They can get it

17   cheaper.  That information -- and this is not all.  There is

18   more.

19           Go to 50.  Everybody knows the onslaught of Eastern

20   material created many traumatic problems for Western producers.

21   That's when they got the spike to come.

22           Next.  51.  Look at this.  26 August, right after they

23   take the money, this is Mr. Legge, the CEO of MagCorp, from

24   Kaplan, the guy who is in charge of sales, who has a Ph.D., he

25   is writing a paper, and this is what he puts in the paper.

1    There are large amounts of Eastern material currently sitting

2    in Western ports, creating strong negative price measures.

3            They knew it was coming.  Our position in this case is

4    Mr. Rennert paid $44 million for this company.  He had an

5    investment.  He made a mistake with the investment.  This is

6    how he gets a 200-plus percent return.  He just takes the money

7    out and leaves MagCorp to die.  It is doomed for failure.

8            Let me show you what we have, and I'm going to do this

9    fast.  Put up 55.  Here is what we know about China.  They

10   flood the market in '92.  In '93, they flood the U.S. markets

11   again.  '94, the imports continue.  '95, they double their

12   production.  '96, you saw the article on $1.13 to $1.22.  And

13   they're making significant discounts.

14           Now, you ask:  How do they do that?  They don't make

15   the magnesium the same way in China as they do here.  Magnesium

16   represents 2.3 percent of the crust of the earth.  Readily

17   available commodity.  What they do is what they call the

18   pidgeon process.  They take dolomite where they can get it.

19   They heat it up.  They vaporize it.  They don't create

20   chlorinated hydrocarbons.  They don't have the same problems.

21   They don't have the brine problems.  And they just beat the

22   U.S. magnesium producer, namely MagCorp.  They just beat 'em

23   up.  So China is there.

24           Next.  And Russia is there.  Russia floods the market

25   in '92.  Eastern material creating traumatic problems for

F224buc4                    Opening – Mr. Beus

1   Western Europe.  They're again flooding the market.  Huge

2   quantities of imports continue.  You see these numbers.  You

3   see 57,200.  The whole market is around 300,000 tons.

4          Now, you see there about duties.  MagCorp tried to get

5   duties imposed and, in some cases, they were successful, but

6   they knew they could never get imports on –– this may be more

7   than you want to hear now.  MagCorp basically manufactured

8   ingots, solid magnesium pieces.  They never got any way to

9   preclude any tariff production on powder, magnesium powder.

10  About 30 percent of MagCorp's business was they would sell the

11  ingot, and the buyer would turn it into powder.  So there was

12  never protection on powder, ever.  There was also never

13  protection when you put magnesium with another product and

14  called it an alloy and shipped it in.  That really didn't work

15  for them.  But the competition continues.

16         Next.  Canadian competition.  And you see the same

17  thing.  This is cyclical.  They know what's happening.

18         Big plant coming on in Isreal.  Put up 58.  They're

19  going to get it right.  They're putting a 27,500 ton plant.

20         59.  New plant considered in Australia.  And remember

21  what I said, it is $1.60 per pound.  This company was doomed

22  for failure.

23         Mr. Rennert.  Put up 61.  Again, you can't project.

24  If you don't project, you can't take the money.

25         62.  He claims, and he will claim in this case, that

1    he didn't know the Chinese prices weren't the $1.13 you saw.

2    He didn't know Russian and Chinese metal were taking the market

3    with aggressive pricing.  He didn't know the Chinese imports

4    were coming from 1995 through 1998, the time they took these

5    dividends.  And he didn't know how the Chinese production

6    process worked or what the lead time was.  In fact, the

7    testimony in this case will be there were hundreds of Chinese

8    plants, and it wasn't a lot of money to get in it.  And they

9    could gear up fast.  And some of the MagCorp officials actually

10   went to China to look at it.  They knew.

11            So I have told you the price is dropping.  Now let me

12   talk about the technology and the equipment that they were

13   stuck with from the 1930s out of Germany.

14            Can you put up E for me.  I will try to do this

15   briefly.  You can see here that there were I.G. Farben and

16   sealed cells.  The I.G. Farben cell, these are big cells, they

17   are the size of this jury box, and they're huge, and you'll see

18   models when you get to the experts in this case.  Inside is

19   brick, it is the easiest way to call it.  This brick decomposes

20   with all of this heat.  The life span of an I.G. Farben -- oh,

21   we have a mistake where it says 8 months.  That should say

22   18 months.  I apologize.  I got a note.  I apologize for that.

23            The life of an I.G. Farben cell was about 18 months.

24   It wasn't competitive.  It took an enormous amount of energy.

25   It took an enormous about of labor.  And it produced hazardous

F224buc4                         Opening - Mr. Beus

material, which creates problems for the Environmental

Protection Agency and the environment itself.  It emits forty

to fifty thousand tons of chlorine, and the Clean Air Act had

been passed.  The regulations on how much you could actually

emit hadn't yet been put in place.  As you get through this

trial, you will see they were worried about that, and they knew

they had to get technology that would deal with that when the

Clean Air Act and the NESHAP -- NESHAP is a long word, I won't

take the time.  They tried sealed cells.  The problem with

sealed cells, it was .09 cents a pound more than the

I.G. Farben cell.  The life span was better.  You will hear

testimony, in order to save the business, they had to replace

this.

          Here is the Alcan testimony.  They licensed it in

1996, but it had never been tested.  You have to test it with

the feed material or the brine from the Salt Lake.  They had

searched the world.  This was their only option.  They never

tested it before they licensed it, and it took them not quite a

year to actually build the first cell, run it.  And then the

testimony is they couldn't run it long enough to even find out

what the problems were.  They spent a year doing that, 1997,

1998.  They tried it again, and it didn't work.  All the time

they're doing that, you know what is happening with the cash?

It is being pulled out with dividends.  They couldn't produce

high enough quality feed, and the reason was there were two

1   real problems.  The feed that they needed from the Great Salt

2   Lake had iron and lithium in it, and they couldn't get it

3   solved.  They abandoned it.

4           Then, they did their own research with some engineers

5   and came up with another cell.  And when they got a cell that

6   worked better -- didn't really solve the problems completely,

7   but it was better -- by the time they did that, everything was

8   gone.  They sold Sabel.  Put $8 million into that.  They were

9   bankrupt, and they took a bankruptcy.

10          Next.

11          THE COURT:  Just to give you an awareness of the time,

12  we're going to stop in ten minutes.

13          MR. BEUS:  Okay.  Let me do as best I can.

14          This is what Mr. Trip says.  You had to modernize to

15  save the business.  He was the production manager at this

16  facility.  Mr. Legge says it wasn't competitive.

17          64.  Let me show you how much chlorine they were

18  emitting that they had to solve.  This is pounds per year, in

19  the millions.

20          66.  Mr. Thayer, the vice president of operations,

21  couldn't produce magnesium economically.  They needed an

22  infrastructure change.  The sealed cells was 9 cents more.  I'm

23  repeating myself.

24          67.  They tried some other cells.  They did some work

25  on side-entry cells and packed cells.  They all failed, and

1    they gave them up.  So they really didn't have what they

2    needed.

3            I'm going to skip through a little.  Let's go to 73.

4    According to Mr. Thayer -- and they thought about, and you'll

5    see some documents in this case, about can they sell this

6    facility.  You've going to see in those documents that they

7    couldn't sell this facility probably to anybody without a

8    technology upgrade.  The existing technology didn't comply with

9    the Clean Air Act.  And the business was not sellable without

10   M-cell technology.  And the money was all gone.  They had taken

11   the money.

12           74.  Here is a letter to Mr. Rennert from Mr. Legge,

13   in April of 2000.  They're now on the ropes.  It is uncertain

14   that the sale of the facility can be accomplished without a

15   technology upgrade to enhance its asset value.  MagCorp

16   questions whether the business is actually salable without a

17   new DC cell technology upgrade.

18           Mr. Rennert, what does he do, who is the one deciding

19   to take these dividends?

20           75, please.  He didn't know it was necessary to

21   modernize the equipment to save the business.  He had no idea

22   at all what the cost might be for new technology when he took

23   the $118 million.  None.

24           76.  Remember, he is getting a million two a year to

25   consult and be knowledgeable about this.  76.  He didn't know

1   the difference between I.G. Farben cell.  He didn't know what

2   the difference of these cells were; sealed cell, Alcan cell, or

3   M-cell. He was never familiar with the Alcan technology, where

4   they spent almost three years trying to make Alcan work while

5   they are pulling out all of these dividends.

6           77.  He didn't recall any technology discussion at the

7   time of the notes offering.

8           But right in the notes offering itself, it says

9   they're going to have new technology, and they put a budget in

10  that document of $40-plus million.  He didn't consider the

11  state of the technology or its effectiveness when he took the

12  $118 million.

13          Your Honor, if this is a good time, I have got one

14  little section left, and I can't get it done in ten minutes.

15  What is your preference?

16          THE COURT:  So how much time do you have remaining?

17          MR. BEUS:  Probably about 13, 14, or 15 minutes.

18          MR. HAVELES:  I have no objection if he continues.

19          THE COURT:  Thank you, counsel.

20          We're going to need to show the jury the jury room and

21  the like, and I don't want them kept late, so I appreciate

22  that.  We'll finish the remaining time in your opening in the

23  morning.

24          Members of the jury, thank you very much for your

25  attention and diligence.  Ms. Nunez is going to show you the

F224buc4                    Opening - Mr. Beus

1    jury room and give you instructions for tomorrow.  We will

2    start at 9:30 tomorrow.  I will have some breakfast for you

3    beginning at 9:00.

4           Please do bear in mind my instructions about no

5    communications with each other or anyone else about the case,

6    no research about the case through any means, and please do

7    keep an open mind, as we have just begun here.

8           Thank you so much.  We'll see you in the morning .

9           (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F224buc4                         Opening – Mr. Beus

1              (Open court; jury not present).

2              THE COURT:  Please be seated.

3              So, Mr. Beus, we will begin in the morning with you,

4    15 minutes, and then we will turn it over to Mr. Haveles.

5              Matters to take up, counsel?

6              MR. HAVELES:  None on behalf of defendants.

7              MR. BEUS:  No, your Honor.

8              THE COURT:  I will meet with you at, let's say, 9:15,

9    so we can address matters.

10             Please do communicate with each other, as needed

11   tonight; and if in the morning there is anything you think we

12   should talk about in what will be the first sequence following

13   the openings, I will ask you to raise it then; and then,

14   otherwise, we will proceed at 9:15.

15             Thank you.

16             (Adjourned to February 3, 2015, at 9:15 a.m.)

17

18

19

20

21

22

23

24

25