F234buc1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   LEE E. BUCHWALD, as Chapter 7
     Trustee for Magnesium
 4   Corporation of America and
     Related Debtor, Renco Metals,
 5   Inc.,

 6              Plaintiff,

 7         v.                          13 CV 7948 (AJN)
                                       Trial
 8
     THE RENCO GROUP, INC., a
 9   Delaware corporation, et al.,

10              Defendants.

11   ------------------------------x
                                       New York, N.Y.
12                                     February 3, 2015
                                       9:20 a.m.
13
     Before:
14
                    HON. ALISON J. NATHAN,
15
                                       District Judge
16
                         APPEARANCES
17
     BEUS GILBERT, PLLC
18        Attorneys for Plaintiff
     BY:  LEO R. BEUS
19        SCOT C. STIRLING
          ROBERT STIRLING
20        MALCOLM LOEB

21   KAYE SCHOLER LLP
          Attorneys for Defendants
22   BY:  H. PETER HAVELES, JR.
          JEFFREY A. FUISZ
23        -and-
     PARK JENSEN BENNETT LLP
24   BY:  TAI H. PARK
          STEVEN C. BENNETT
25
```

F234buc1

```
 1                    (Open court; jury not present)
 2                    THE COURT:  Good morning, everyone.
 3                    Matters to take up, counsel?
 4                    MR. SCOT STIRLING:  We have nothing.
 5                    MR. PARK:  We have nothing.
 6                    THE COURT:  Nothing from plaintiff, nothing from
 7      defendants?
 8                    MR. HAVELES:  Three brief matters, your Honor.  After
 9      the openings, Mr. Stirling and I will read the stipulated
10      facts.  He will read the first half; I'll do the second half,
11      just because of the length of them, to give him a break.
12                    Secondly, the parties have agreed with respect to all
13      of the financial monthly reports and 10Ks, 10Qs, etc.  After
14      the openings, Mr. Stirling and Mr. Fuisz will offer jointly
15      those exhibits into evidence, so we don't have to bog down on
16      an incremental basis during the witnesses.
17                    The third issue, your Honor, is with respect to
18      attendance.  We gave your Honor the instruction about
19      defendants not always being here.  We talked about this
20      yesterday with counsel for the plaintiff and could not reach an
21      agreement.  We would like to have Mr. Rennert, who is going to
22      be the third witness in this case, after Mr. Buchwald and after
23      Mr. Legge, to be able to sit and watch today's testimony since
24      he is a party defendant and he was, indeed, the focal point of
25      much of yesterday's opening by Mr. Beus.  The plaintiff does
```

F234buc1

1    not consent to that, but he is a party, and we believe he does

2    have a right to be present during the proceedings today

3    notwithstanding any witness preclusion issue.  We request that

4    he be granted leave to stay during the proceedings in the

5    entirety today.

6               THE COURT:  Mr. Stirling, 615(a).

7               MR. BEUS:  Yeah, if he gets to stay here, they get the

8    best of both worlds.

9               THE COURT:  I'm going to read the rule.  You tell me

10   your argument based on the rule, Federal Rule of Evidence 615.

11   "At a party's request, the court must order witnesses excluded

12   so that they cannot hear other witnesses' testimony.  Or the

13   court may do so on its own.  But this rule does not authorize

14   excluding (a) A party who is a natural person."

15              Is there some basis for thinking that I can exclude

16   him in light of that?

17              MR. BEUS:  Just the negotiations we had, your Honor,

18   and the agreement to give him the instruction.  They kind of

19   get the best of both worlds that way.

20              THE COURT:  I see.  I'm sorry.  I missed the point.

21              MR. HAVELES:  We have a number of other defendants in

22   this case, your Honor, that are only going to be here when they

23   testify and not otherwise; like Mr. Legge, once he testifies,

24   he will return home to Utah.  The other Utah individuals will

25   be here for their testimony.  One of them, Mr. Brown, won't be

F234buc1

1    here at all because he is not a witness.  So consequently, we

2    believe that instruction is pertinent because of the breadth of

3    the individual defendants in this case, notwithstanding

4    Mr. Rennert.  He is not going to be here everyday during the

5    trial.  He just wants to stay here today.

6           THE COURT:  Is there some change to the rule that you

7    think would more accurately reflect the view, or are you saying

8    some commitment was made that is lost?

9           MR. BEUS:  We were told that they wouldn't sit through

10   other people's witnesses; and we, therefore, agreed to the

11   instruction.  It is that simple.  I don't want to make a big

12   deal out of it.

13          THE COURT:  I don't see a basis to exclude

14   Mr. Rennert.  I think the proposed instruction to the jury

15   about the defendant's absence at various points is appropriate

16   even if he hadn't agreed to it.  I will allow it.

17          MR. BEUS:  Thank you, your Honor.

18          MR. HAVELES:  Those are our preliminary issues, your

19   Honor.

20          THE COURT:  That's three?

21          MR. HAVELES:  The stipulations, the exhibits, and

22   Mr. Rennert.

23          THE COURT:  You will remind me when you want me to

24   read the instruction?

25          MR. HAVELES:  I think probably after the opening

F234buc1

1      statements and before Mr. Stirling and I start the stipulations

2      would make sense.

3               THE COURT:  Any other matters?

4               MR. HAVELES:  If Mr. Stirling and I could have two

5      more minutes to go over the stipulations before you call the

6      jury in.

7               THE COURT:  You have time.  We don't have our full

8      complement yet.  We got a call from one juror almost an hour

9      ago saying he was stuck on a train and still fairly far uptown.

10              I will step off until I get word that they have our

11     jurors.  Thank you.

12              (Recess)

13              THE COURT:  We had train delays that prevented

14     everyone from getting here on time.  We have all ten here now.

15     We will proceed.

16              Everybody ready?

17

18

19

20

21

22

23

24

25

F234buc1                      Opening - Mr. Beus

1          THE COURT:  Good morning, everyone.

2          Thank you so much, members of the jury.  I know that

3   there were substantial train delays, and I know that it took

4   several of you more than two hours to get here.  I am very

5   grateful for all of you.  Most of you were able to be here on

6   time.  We are in this together.  As you see, we can start once

7   everybody gets here.  Hopefully, the train delays won't

8   continue, but I do thank you for your efforts and your

9   diligence and for your attention as we continue trial this

10  morning.

11         We will continue with the opening statement of

12  plaintiff.

13         Mr. Beus.

14         MR. BEUS:  Thank you, your Honor.

15         Good morning.

16         Tough afternoon yesterday, right?

17         Let me just put this in context.  This is the last

18  chapter of what I'm going to talk to you about in the opening.

19  To put that in context, I will put up Powerpoint 8.  I will

20  walk you through the brief history here where MagCorp purchased

21  $44 million, promissory note was discounted.  That's AMAX.

22  AMAX is a big company.  They were eventually acquired by Phelps

23  Dodge and then Freeport-McMoRan.  They had a right --

24         MR. HAVELES:  Your Honor, there is a disconnect.

25         THE COURT:  The screen does not match the board.  Is

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

F234buc1                              Opening - Mr. Beus

 1    that your intention?

 2              MR. BEUS:  I am just going to get to that in one

 3    second.  I'm trying to do this very quickly, if I could, your

 4    Honor.

 5              THE COURT:  All right.

 6              MR. HAVELES:  We can't see what he is pointing to on

 7    this board.

 8              THE COURT:  If you stand over here, can you see?

 9              MR. HAVELES:  Yes, your Honor.  If you don't mind me

10    doing that.

11              Thank you, your Honor.

12              THE COURT:  Go ahead.

13              MR. BEUS:  They had the right to take the whole

14    company back.  They had a pledge on the stock.  Instead of

15    taking it back, they took a several million dollar discount,

16    $6.6 million, and they could have taken it back.  They chose

17    not to.

18              Then, the price bubble occurs, which you see on the

19    screen here, the big screen.  And with that price bubble in

20    1995, Mr. Rennert at Renco Group decided to load up this

21    company, and they went out and borrowed $150 million.

22              (Continued on next page)

23

24

25


                 SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

F23MBUC2                    Opening - Mr. Beus

1          MR. BEUS:  It had no benefit to MagCorp.

2          Even before they took that money the price was already

3     dropping.  It cost them $105 million to do that.

4          At the same time, when that price is dropping in early

5     1996, they don't have technology that can manufacture magnesium

6     at a price where they can be competitive and stay in business.

7     They don't have that for a full three and a half year period or

8     three-year period.

9          All the while they don't have that they are taking out

10    the $118 million in dividends.

11         By 2000 they come up with a cell.  And I have not

12    talked much about cell because you'll get to hear that.  It's a

13    huge, big place where they do a melt reactor where they melt

14    all the magnesium from the Great Salt Lake.

15         By the way, I made a mistake yesterday.  I was told

16    that I said iron came out of the Great Salt Lake.  Iron didn't

17    come out.  Iron was in the material that went into the feed

18    because it was added as a catalyst.  And if I misspoke, I

19    apologize.

20         They had this cell.  It's our money.  They then sell

21    the other company.

22         Can you put up Power Point 1 for me, please.

23         They then sell Sabel, who you will see here on the

24    screen.  They get $8 million.  They sell that in December of

25    2000.  With that $8 million they survive a little bit longer.

1     That's a business in Alabama.  That really isn't the same

2     business.  It's a different business.  But it's in the metals

3     business.  They get the pilot cell going, an M-cell.  But it's

4     roughly between 800,000 and a million dollars per cell to build

5     the M-cell.  The testimony in this case will be, they just

6     didn't have enough money to build those cells and they went out

7     of business.

8           Now, you got the bankruptcy.  Here is the cell history

9     that I took you through briefly yesterday, very simple.  Let me

10    now get the last chapter.  You heard lots of questions about

11    the Environmental Protection Agency, the EPA.  You heard

12    questions and you've seen a little bit of information already

13    about folks.

14          MR. PARK:  Your Honor, is there some reason why we

15    can't see those charts on that screen?

16          MR. BEUS:  Sure.  Put it up, would you.

17          THE COURT:  Mr. Haveles, you can see from there.  Let

18    Mr. Beus continue.

19          Go ahead.

20          MR. BEUS:  You can't see the numbers, but let me tell

21    you, when you look at this chart, which is up close, you can

22    see the environmental liabilities.  And I want to talk to you

23    about this photograph.  All of these numbers in all five of

24    those boxes, those numbers are not in dispute.  They are agreed

25    upon.  They are stipulated to.

1          Let me tell you what you have.  You have waste water

2    ditches and you'll see the area going to it from the overhead.

3    You'll see the gypsum pile.  You'll see an active waste pond.

4    That's about 400 acres.  The old waste pond, which is about

5    1200 acres, think about in the context of Central Park, not

6    quite twice the size.  Sanitary lagoons, which is there, not

7    nearly so large.  Let me see if I can just tell you what some

8    of those numbers mean and then I'll finish this last chapter.

9          The environmental preliminary remediation goals will

10   tell you this is .39.  UG means micrograms or parts per

11   billion.  This has all been tested.  The testimony will be,

12   these contaminants have been out there and have been developed

13   and added to over and over since 1972.  The half life of these

14   contaminants -- half life means how long does it take for them

15   to degrade -- are not in your lifetime, not in my lifetime, not

16   in our great grandchildren's lifetime.  That's the remediation

17   goal.

18         If you just take this, this is the maximum levels they

19   found when they went out and did testing.  2,249 UGs per

20   kilogram.  The arithmetic is simple math.  That's 5,766 times

21   the appropriate amount.  You can go through each of them and

22   you'll see the same thing.  PCBs are polychlorinated biphenyls,

23   and I will tell you what they are in a minute.  You'll see

24   that's 101 times.  HCBs are hexachlorobenzene.  That's 1900

25   times.  Arsenic, 37 times.  If we had more room on this chart

1   we would have had some other contaminants.  This gives you an

2   understanding of why this is a Superfund site today.

3          I am going to do this a little quicker.  Would you put

4   up Power Point 89 over here.  It's a little hard to read.  This

5   is the way it's here.  The date of this is 21 August 1989.

6   This is from Mr. Tripp to Mr. Thayer, before MagCorp acquired

7   it or maybe at about the same time, but this is AMAX.  Here is

8   what they write.  These are the same people on 21 August 1989.

9   Our landfill has been listed on the CERCLA (Superfund) prior

10  list.  Actually, that's not a correct statement.  They weren't

11  yet listed on the Superfund list.  They were listed on a watch

12  list to be looked at.  But that's what they knew in 1989,

13  before any of the $118 million was taken out.

14         Now, if you become a Superfund site there is an

15  enormous amount of liability and there is no question -- put up

16  78, if you would for me, please -- that there are three laws

17  you are going to be talking about in this case.  You are going

18  to hear these terms:  RCRA, CERCLA, and the Clean Air Act.  I

19  am not going to take much time with that.

20         RCRA basically deals with how you handle this

21  hazardous waste, permits, et cetera.

22         CERCLA is the Comprehensive Environmental Response,

23  Compensation, and Liability Act.  It's how you clean it up.  If

24  you make this mess, you've got to clean it up.

25         The Clean Air Act is what you put into the air.  You

1    saw tons and tons on a regular basis of chlorine emissions

2    going into the air.  The Clean Air Act wasn't yet fully in

3    place.  All the regulations hadn't been put in place.

4           One of the things, as I told you yesterday, that

5    MagCorp needed was money to create cells and the equipment that

6    would not emit all of this chlorine because it was coming.

7    Now, as you think about all of this and you use your common

8    sense through this trial, ask yourself, what would a willing

9    buyer and a willing seller exchange this property for?  Think

10   about it in your context.  What would you be willing to pay if

11   you had this kind of environmental liability?

12          Put up 83 for me, please.

13          Here is the liability under RCRA, $25,000 a day until

14   '97.  Then it goes up to $27,000 a day.  What's the cost

15   without fines to clean this up?  It's $82.4 to $157 million.

16          Would you put up Exhibit 84.  I want to show you this

17   document.  Can you put up the front page.  Never mind.

18          This is a work paper.  Mr. Tripp, the production

19   manager, to Mr. Legge, the MagCorp CEO, and they do an analysis

20   of what it costs to clean this up.  $82.4 million is the

21   low-end cost.  That's the minimum number.  They are going to

22   tell you this was put together quickly.  It wasn't fully

23   vetted.

24          Now, the high number, when you take the alternatives,

25   when you have to haul away the pond floor, their estimate then

F23MBUC2                    Opening - Mr. Beus

1    goes to $157.4 million.  Not going to be a dispute.  This is

2    the only remediation evaluation that MagCorp and these

3    defendants did prior to bankruptcy.

4              So you add these numbers.  Let me just do it for you.

5    Here is the high and the low.

6              THE COURT:  Just remember, Mr. Beus, we can't hear you

7    if you're not at the mic.

8              MR. BEUS:  Those are the numbers you see in these

9    documents, their documents, the documents they created at the

10   time.  The property planning equipment, the technology, the

11   cells.  Their number was $78 million, both on the low and on

12   the high side.  They have spent some of that money to try to do

13   some improvements to that equipment.  They still haven't solved

14   the chlorine.  They still haven't solved the problems with

15   creating dioxins and furons and chlorinated hydrocarbons.  And

16   it's now formally -- let me just show you that.

17             Put up 90, would you, please.

18             Here is the document and there is no dispute about

19   this.  It is now a Superfund site and this is the document in

20   2009.  This document explains the rationale for adding the U.S.

21   Magnesium site in Tooele County, Utah to the National

22   Priorities List, NPL.  That's a synonym for what we all call

23   the Superfund site.  This is a mess.

24             Let me show you the study site.

25             Put up 91.

1          Here is the study site that is documented.  No

2     argument.  The facility itself is 4525 acres.  The Superfund

3     study site is 78 square miles, 2.4 times the size of Manhattan.

4          Put up 87.

5          Here is a document, no dispute, will be in evidence,

6     19 July 1996.  Why do I give you this date?  Because I want you

7     to know and see that there is no dispute that dioxins, furans,

8     chlorinated hydrocarbons, the contaminants that are there,

9     arsenic, chromium, created by what they are doing.  Here is

10    what they say in their own internal memorandum:  Dioxin is the

11    most toxic family of chemicals ever studied.  They do really

12    bad things to you.  They need to be cleaned up.  The cost to

13    clean up they estimate themselves between 82 and $157 million.

14         In addition, there are penalties that the EPA, the

15    Environmental Protection Agency, can impose, as I told you.

16         Now they are everywhere.

17         Put up 101.

18         Here is Mr. Rennert, the sole decision maker, deciding

19    to take out the dividends in the stock redemption.  He doesn't

20    even know what CERCLA RCRA or the Bevill Amendment were.  And I

21    am not going to take the time in this opening to talk to you

22    about the Bevill Amendment other than to say, they claim some

23    of these waste streams were exempt.

24         If they are exempt, they are under RCRA.  There is no

25    exemption under CERCLA.  The EPA in 1994, and even earlier,

 1    said the Bevill Amendment does not exist when you commingle,

 2    and only two of your waste streams on a best-case basis is

 3    exempt.  He did know what an HCB was, hexachlorobenzene.  He

 4    didn't know what a dioxin is.

 5          He is old enough, as am I, to know what a dioxin is

 6    because that was the contaminant in Agent Orange out of

 7    Vietnam, which we know a great deal about.  Furans, PCBs, or

 8    pH.  PH means that the pH is so low that it's corrosive.  If

 9    you put your hand in something that's a pH of 1 or 2 -- I see

10    heads shaking.  You don't want to pull your hand out because

11    it's going to be a mess.  It's corrosive.  That's what's going

12    on in this plant.

13          102.  Before you leave that, 101.

14          He didn't know of any hazardous substance at the

15    Rowley plant, he claims, when he took the $118 million.  You

16    will hear from him right away.

17          102, please.

18          He didn't know there was a notice of violation in

19    1992, before he took any of these monies out.  He claims he

20    didn't have any knowledge of any disputes with the EPA.  There

21    is communications, correspondence back and forth, that

22    MagCorp -- the U.S. Marshal shows up with a search warrant to

23    do testing there and he says he doesn't know anything about the

24    dispute.  He didn't know that Mr. Tripp provided a budget for

25    82 to $157 million.

1          Now, you are going to hear Mr. Haveles, very fine

2     lawyer, stand up and tell you, we have got all these monies.

3     Much of that money comes, he claims, from a revolving line of

4     credit from a bank.  And the question is, could MagCorp borrow

5     money even if that resolving line of credit was not fully

6     expired.

7          Put up 103 for me.

8          The answer to that is no.  What was happening, the

9     maximum credit is the first $33 million.  But I want you to

10    look at what I have on the screen here.  They are not loaning

11    on the property the whole site.  What they are loaning on is

12    accounts receivable.  Account receivable is real simple.  You

13    sell something to somebody, like an Alcoa or a Ford Motor

14    Company or a General Motors or anybody or Pepsi Cola or whoever

15    buys magnesium to use.  They are not going to give you the cash

16    right away.  You generally don't get wire transfers.  They want

17    to use the money a little bit, so you have an account

18    receivable.  They owe you.  In the ordinary course of business

19    you create accounts receivable.

20         Most, not all of them, they have some disputes with

21    some folks, but most of those accounts receivable are going to

22    be paid.  They are paid by somebody else.  If everything is a

23    mess out there, they still get the account receivable.  They

24    can only borrow 80 percent of eligible accounts receivable.

25         They have also got inventory.  They can borrow 60

1    percent of their eligible inventory.  They can borrow 30

2    percent of supplies.  That's what they could do under the

3    document itself.

4            104.  Here is the history of what happened.  In '89,

5    they had $45 million of credit; in '91, it went to 30 million;

6    '92, it went to 23; and in '96, it went to 33.  You see the

7    eligible account receivables, goes down slightly, 90, 90, 90,

8    then 85.  The percentage of inventory stays constant at 60

9    percent and the supplies, the inventory consisting of supplies

10   goes from nothing in '89 down to 30 percent.

11           Here is the problem.  $33 million wouldn't touch what

12   I have got on the board here, but there is another problem with

13   that $33 million.  And there is another problem with how you

14   pay off the $150 million.  The $150 million, not one penny of

15   principal was paid in '96, '97, '98, '99, 2000, or 2001.

16   Bankrupt.  Still, $150 million is owed.

17           They didn't set aside any money for that $150 million.

18   Not one penny.  If you want to get your kids to college, you

19   try to set aside a little bit of money every single month all

20   your life and when they get to 17, 18, 19, you hope you have a

21   little bit of money that can put them through college.  They

22   didn't do that.  No rainy day fund at all.  They think they are

23   going to refinance.

24           Ubiquitous, throughout the whole world, in the lending

25   world, if you go to borrow money from a bank, you are going to

1    put a document that says you cannot have any environmental

2    liabilities to borrow money.  That was in the '93 $75 million

3    offering, it was in the '96 $150 million offering.  And it's

4    even in the Congress Financial, the bank they were borrowing

5    from them.  Would you put up for me 105.  I am going to show

6    you one of the covenants.  They are all about the same.

7              This is the loan security agreement going all the way

8    back to 1989.  It says at all times -- and this is one of the

9    representations in the warranties they have to make --

10   subsidiary to comply in all material respects with all

11   applicable provisions of laws, CERCLA, RCRA, the Clear Air Act,

12   rules, regulations, licenses, permits, approvals and orders,

13   and duly observe all requirements of any foreign, federal,

14   state, or local government authority, including, without

15   limitations, ERISA, the code, the Occupational Safety and

16   Health Act as amended, all other statutes rules, regulations,

17   orders, permits and stipulations relating to the environmental

18   pollution, to environmental pollution, RCRA CERCLA, the Clean

19   Air Act.  And then it describes it by name.  Compensation and

20   liability act of 1980, that's CERCLA.  Resource Conservation

21   and Recovery Act of 1976 and all other similar statutes.  In

22   order to borrow money they have to comply with that.  If they

23   don't comply with that, it's an event of default.  And if there

24   is an event of default they can say, give me by $150 million,

25   give me my $33 million.  Give it back.  Didn't set aside a

1    penny while MagCorp owned this.

2            AMAX, before they sold in 1989, had reserved on the

3    books $1.2 million.  Woefully inadequate, remained on the

4    books.  But the numbers I have here for the property plant

5    equipment, no reserve.  The remediation, either 82 or $157

6    million, 1.2 that was preexisting.  And then what do you have

7    left?  You have the $150 million in promissory notes.

8            As you listen to the defense in this case ask

9    yourself, were they adequately capitalized with those kinds of

10   needs, 300 to $385 million.  That's using their numbers.

11   That's without any fines.  They are not adequately capitalized.

12   If they are not adequately capitalized they can't take one

13   dollar of dividends.  Would any willing buyer or willing seller

14   acquire any business that's looking at numbers like I have here

15   on the board, $300 million for just property plant and

16   equipment, upgrading the cells, the remediation on the low end

17   or notes, or $385 million?

18           JUROR:  That would be 310.

19           MR. BEUS:  Did I make a mistake?

20           MR. HAVELES:  Object to the colloquy with the jury.

21           THE COURT:  Counsel.

22           MR. BEUS:  I misstated.  Thank you.

23           THE COURT:  Mr. Beus.  And I'll direct the jury,

24   please pay attention and without commenting.

25           And, Mr. Beus, you'll just continue with your opening

1   without engaging.  Thank you.

2              MR. BEUS:  Thank you, your Honor.

3              Good thing I'm not the accountant, isn't it.

4              THE COURT:  Mr. Beus, just continue with your opening.

5              MR. BEUS:  Let me show you 111.  MagCorp, after having

6   had this money taken from them to Renco Metals and then on back

7   to Renco Group, was asked:  Will you put some money in to solve

8   some of these problems?  Answer:  No.  They did sell Sabel and

9   got $8 million after paying off some obligations.  That was

10  used to put in some money in the M-cells as part of the $78

11  million.  They didn't come close.  Mr. Rennert claims he didn't

12  know the company needed capital for technology.

13             You are going to hear testimony that people who have

14  been there for decades had said they had been out of money for

15  over 30 years.  He is going to say, Mr. Rennert is going to

16  say, who is the chairman of MagCorp, who is the chairman of

17  Renco Metals, who is the chairman of Renco Group, who gets this

18  money, that he didn't know that.

19             112, please.

20             He doesn't recall, he says, that MagCorp violated the

21  debt covenants in '91 and '92.  He didn't know, he claims, that

22  they didn't have enough money to do the M-cells and, as a

23  result of that lack of capitalization, Mr. Legge has testified.

24  Mr. Legge will say they went into bankruptcy.  He didn't know

25  why Renco Metals was unable to pay its obligations.  They

1    worked a long time before they actually went into bankruptcy.

2    They went out to all of their trade creditors.  People who were

3    supplying them put them on 90-day terms.  Laid off people, did

4    all kinds of things.

5            119.

6            He doesn't know what Renco Group did with the

7    dividends.  But we know Renco Group because their chief

8    financial officer has said they formed Blue Turtle, and Blue

9    Turtle is the owner of the house in Sagaponack and Mr. Rennert

10   is the president of that company and they did that four months

11   after they took the big dividends in '96.  And he says he

12   didn't know if the $118 million had been put back or any

13   portion of it had been put back, whether you could avoid

14   bankruptcy.

15           Let me just end.  You've been very patient with me and

16   I appreciate it.  When you listen to the evidence in this case,

17   ask yourself, would you undertake to buy this property plant

18   and equipment, looking at $150 million you got to pay off,

19   looking at remediation costs of anywhere from 82 to $157

20   million, or equipment that you got to buy and put in place, if

21   you can figure out equipment to buy and put in place of tens of

22   millions of dollars.

23           I thank you very much.

24           THE COURT:  Thank you, Mr. Beus.

25           Members of the jury, we will now hear opening

1    statements on behalf of the defendants.

2           MR. HAVELES:  If I may, your Honor.

3           THE COURT:  You may.

4           MR. HAVELES:  Thank you, your Honor.

5           Ladies and gentlemen, good morning.  As you learned

6    yesterday, my name is Peter Haveles and I am one of the

7    attorneys that has the privilege of representing the defendants

8    in this case.  It is now my responsibility to deliver the

9    opening argument on behalf of the defendants.

10          In the course of doing so I commit that I am going to

11   focus on the facts and the evidence of what actually occurred

12   during the years that the transfers took place, 1996 through

13   1998.  But I also promise that I am going to focus on those

14   facts in full context, not with snippets and sound bites.

15          This case is about solvency.  Was MagCorp and was

16   Renco Metals solvent on each of the eight dates that dividends

17   were paid and the date that dividends were paid from the bond's

18   proceeds.  It is the plaintiff's obligation to prove on each

19   and every one of those dates that the company was not solvent,

20   and the evidence is going to show, and I am going to talk about

21   some of that now, to give you a preview of some, but not all of

22   it, because that's what the trial is for, not me, how that

23   evidence will establish solvency.

24          This is not a case about pollution.  This is not a

25   case about whether MagCorp was an environmental bad actor or

1    not and it wasn't, as you will learn.  I was not going to

2    address the environmental issues a lot in the beginning.  I was

3    going to wait until the end.

4            But I do want to make the comment about the Agent

5    Orange reference.  That, as you'll hear from the evidence, is

6    just a really false and distorted exaggeration.  Agent Orange

7    was a pretty pernicious chemical and hurt a lot of people.  You

8    are not going to hear any evidence about anyone ever, ever,

9    ever being hurt about what they have found in the dirt berms

10   and in the clay base of those waste ponds.  Don't be fooled by

11   references to extreme instances in our country's history.

12           This is not about a company with obsolete technology

13   that was desperate to replace that existing technology.  On the

14   contrary, you will hear this is about a company that was very

15   proactive and was technologically floored and every day of

16   their business lives were thinking about new technology.  This

17   is a case about a strong company and a healthy company that

18   performed well and did so until the time of bankruptcy and

19   didn't fail because of the reasons that the plaintiff suggested

20   in his opening statement, but you will see it occurred because

21   of the perfect storm, two unforeseeable events that occurred in

22   the later half of 2000 and 2001, a recession, an industrial

23   recession around the globe that decimated the market for

24   magnesium, causing the company's sales to fall by half, nothing

25   to do with technology, nothing to do with the environment,

1    nothing to do with dividends.  It is all about global economy,

2    which, as we have learned, is well beyond our control and can

3    do damage that companies and individuals cannot be blamed for.

4         And, likewise, in a manner that no one could foresee,

5    the Chinese, in the beginning of 2000, decided to double the

6    amount of powder they were importing to the United States.  Not

7    merely double, but to sell it at illegal prices that the United

8    States Government ultimately, when it had a chance to have

9    hearings, says were wrong and imposed duties.  The plaintiff is

10   not telling you about that evidence.

11        But for that perfect storm we probably wouldn't even

12   be here today.  This case is not about greed and avarice.  It

13   is about owners of a business, as the company had started to

14   succeed after allowing their monies the company made to be

15   reinvested, taking dividends based on the company's profits.

16        The plaintiff told you there was no benefit for those

17   dividends, but that's a false premise.  Dividends are an

18   absolute right of ownership.  The benefit for dividends are

19   given a long time ago.  When you invest and buy a company, the

20   dividends are your return on your investment that you made

21   years ago.  And owners are not prohibited from receiving

22   dividends just because some day in the future the economy may

23   go bad and your company may have serious business problems and

24   it may fail.

25        If there is a profit and if there is an increase in

1    value, owners are entitled to dividends.  It's no different

2    than you owned a share of IBM and they paid a dividend or they

3    paid a special dividend because of extra cash on hand.  Or if

4    you had a family-owned business and you wanted to take profits

5    out of it.

6            The plaintiff has characterized Mr. Rennert and the

7    members of MagCorp's management staff as people who were

8    disengaged, uninvolved, didn't really care about what was going

9    on, only driven by taking money.  But the snippets and

10   soundbites that you saw up on the various boards don't reflect

11   what you are going to hear from the testimony of those

12   individuals.

13           Mr. Rennert and the other individuals gave statements

14   in the course of discovery in this case about events that

15   occurred 15 years after the time they gave those statements.

16   And like all of us, 15 years after the fact memories aren't

17   perfect.  It's our own real-life experience.

18           But with the help of the records and documents and the

19   contemporaneous records and documents, which you will see in

20   their entirety, not with just little sound bites, you will see

21   what actually happened.  Those documents, those contemporaneous

22   records, which the witnesses -- Mr. Rennert, Mr. Legge,

23   Mr. Thayer, Mr. Ogaard, Mr. Tripp, Mr. Kaplan -- the people who

24   are going to testify here, those records helped them recreate

25   and restore their memory because they are the historical

1    records of what happened.

2                The plaintiff attempts to make this case an indictment

3    of Ira Rennert.  That attack is unfair and false.  Mr. Rennert

4    is a hard-working and smart businessman.  He grew up in the

5    heart of Brooklyn and he is emblematic of the American success

6    story.  He got there because of his hard work and diligence.

7                So the plaintiff attempts to stoke resentment here

8    without any real evidence to show anything about the house,

9    which I'll talk about in a second, by showing you several

10   pictures of the large estate his hard work enabled him to build

11   through Renco as an investment through the company.

12               But you will learn that there is no evidence, just

13   innuendo and huge leaps of logic, that the dividends were used

14   to pay for Blue Turtles to buy the land in the beginning of

15   1997 or to build the house in the early 2000s.  In fact, the

16   land was purchased and the buildings were built with funds that

17   Mr. Rennert had earned for Renco through his investments, and

18   that came from other sources into the Renco bank accounts after

19   the dividends.  There is not a single piece of evidence you

20   will hear in this case that shows a dollar of those dividends

21   made its way to Blue Turtles.  The evidence will show that Ira

22   Rennert was not unjustly enriched by virtue of Blue Turtle's

23   building the estate out in the Hamptons.

24               Let's talk about the big issue, financial condition of

25   the company's insolvency.  What is solvency?  Is it about

1    whether you would want to buy the company?  No, it's not about
2    the subjective feelings that you and I may have, if we had the
3    resources to buy a company such as this.  It's not about
4    whether we can find someone down on the street who would buy a
5    company like this.  It's based on more objective determinations
6    because that's what legal claims are about, not our subjective
7    beliefs.  The question is, were the assets greater than its
8    liabilities.  Could the company pay its bills.  And did the
9    company have working capital to deal with its foreseeable
10   needs.

11           What is not a measure of solvency, and let's put that
12   to rest right away.  If you can put up what Mr. Beus showed us,
13   slide 33 yesterday.  He pointed to this negative 81 million
14   dollar number.  That is not, absolutely is not a measure of
15   solvency.  You'll even hear that from Mr. Beus' solvency
16   expert, who he did not mention once, and for good reason that
17   we will talk about that later during the course of his opening
18   statement.

19           Why is that a false measure.  Because if you look at a
20   balance sheet and you can put up slide 37, what Mr. Beus showed
21   you about the assets side, that's $65 million has nothing to do
22   with what the assets are worth.  That's the number that they
23   paid for the assets back when they were built or acquired.
24   When you apply for a mortgage, you don't say I bought my house
25   20 years ago for $50,000 and, therefore, get the mortgage

1    application based on your purchase price.  You get an

2    appraisal.  What is it worth today?  And so fair market value

3    of assets, which is the measure for solvency, what are the

4    assets worth today?  It is not based on cost.  And it's a false

5    proposition to use that balance sheet.  No one would ever use

6    that balance sheet to determine solvency, and even the

7    plaintiff's expert will tell you that.

8         How do you value a factory?  Because it's different

9    than a house.  A house is something you live in, so it's what

10   the property cost and is worth.  A factory and business is

11   different.  You don't own that so you go in the factory every

12   day and hang out.  Maybe you work there because you like

13   hanging out, but that's not the reason you own it.  You own it

14   because it generates an income and a profit.

15        The financial industry and financial experts have

16   developed all kinds of models to say how you determine what

17   that income flow is worth.  What is it worth to have this kind

18   of money being generated every year from a company.  That is

19   how you determine value.  If I was talking about a share of

20   IBM, that's real easy.  We can open up the newspaper or go

21   online and say, what did IBM close at yesterday, multiply the

22   number of shares by the closing price, and we have the product

23   of that equation and we know how much IBM is worth.  With a

24   private company you can't go and look up the stock price.  You

25   have to use financial valuation tools.

1          And the plaintiff did not talk about financial

2     valuation tools in his case for good reason, as we talk about

3     later on in this opening, and you'll hear through the trial the

4     financial valuation tools all point to solvency.

5          Now, could the company pay its bills?  Between 1996

6     and 2000, the company paid the bondholders.  And you didn't

7     hear this back, but this is a piece of evidence you'll learn.

8     The company paid the bondholders over $71 million in interest.

9     It came from somewhere.

10          Between 1996 and 2000, the company paid every single

11     bill, every single wage that had to be done to make magnesium.

12     Mr. Beus put up a number, about $400,000 a day, and suggested

13     you should look at that as working capital, and they only had

14     30 to 60 days to survive.

15          The plaintiff does not tell you that the evidence

16     shows that over $120 million on average between 1996 and 2000

17     was paid by the company out of its revenues and it still had a

18     profit.  That money wasn't coming from working capital.  We

19     didn't have to go looking at it down the street from a bank.

20     The sales of the company allowed it to pay its bills and have

21     cash for other reasons.  It always had, during the time period

22     of the transfers, because that's what we have to ask about,

23     during the transfers, adequate working capital

24          If you could put up the adequate working capital

25     slide.

F23MBUC2                          Opening - Mr. Haveles

1          What is working capital?  It's an easy calculation if

2     you think about it.  It's current assets, like cash, inventory,

3     other things that you can turn into money right away, accounts

4     receivable, minus current liabilities.  What are the debts that

5     you owe in the next 12 months?  Short-term loans, bills to your

6     vendors.  You will see that the company's working capital was

7     strong until 2001, when the recession hit, and devastated the

8     sales and cut production in half.  Only 50 percent of the

9     factory was making magnesium in 2000, compared to every other

10    year when it was going full tilt.  There was lots of working

11    capital.  Current assets versus current liabilities.

12         Now, Mr. Beus projected what I was going to tell you

13    about the credit line.  It's not what I was going to tell you

14    about the credit line.  The credit line was a cushion.  The

15    credit line was not the source of paying the company's bills.

16    The revenues were.  The working capital was.  But that cushion

17    was there and you know what the most interesting thing of that

18    cushion is, they never had to borrow a dime until the recession

19    hit at the end and started to hurt the cash flow at the end of

20    2000.  That credit line sat there unused because the company's

21    financial condition was so strong.

22         I will talk about the credit line some more when we

23    get to the environmental liabilities, given what the evidence

24    will show there.

25         Let's look at the company's financial strength.

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1          If you can put up the slide on production, please.

2          That is the production of magnesium that was made

3     every year.  And you'll see there is a big jump in 1995.  Why?

4     Because the company invested in putting in more cells when they

5     could make more magnesium because it had comfort in the

6     strength of the magnesium market.  And it continued to produce

7     at all capacity until the end of 2000 and into 2001, when the

8     recession hit.  And it sold in the period 1993 through 1999 and

9     into 2000 every pound of magnesium that it made.

10          If you look at the net sales, you'll see that the

11     company was making, after it increased its capacity in 1995,

12     substantially more than $130 million every year during the

13     transfer period and the year after.  And with the effect of the

14     recession and the Chinese at the end of 2000, the numbers hit,

15     and in 2001 they hit even more.

16          Let me explain that little green blurb to you.  The

17     company made some extra money in 2001 because the power prices

18     were going off the grid and it had extra power it bought and

19     couldn't use, so it sold it back.  And it made money to boost

20     its revenues in 2001.  But the blue bar represents how much

21     magnesium it was able to sell and that's because no one wanted

22     to buy it and not because MagCorp was mad; because no one

23     wanted to buy any magnesium.

24          Let me talk to you about profit.

25          Show the slide about EBITDA.  Let me tell you what

1    EBITDA is.  EBITDA is earnings before interest, taxes,

2    depreciation, amortization, long word financial analysts use.

3    Here is the simple one.  This is the real cash profits you

4    make.  Because the other things don't tell you what the cash is

5    you are making.  Some of them are tax, like tax is depreciation

6    and amortization.  Those are going to be affecting some of your

7    tax accounting.  They are not telling you your real profit.

8    This is how much cash every year after operations, after the

9    cost of selling the goods, after the general administrative

10   expenses that the company made.  Every year until we get to

11   2001, positive EBITDA, positive cash earnings.

12          Companies are weird compared to your life and my life

13   because they do what they call accrual accounting.  They will

14   book expenses.  They will book revenues based on what their

15   accounting records say, not whether the cash is in or out of

16   the bank.  You and I do cash accounting.  We don't say I am

17   going to get paid money six months from now but I am going to

18   spend it today.  Most people do.  Most of us don't.  At least I

19   try not to.  As a result, we know what our cash is by looking

20   at our own personal income statements.  Companies, if you want

21   to know what it's really about, you look at EBITDA because that

22   translates to cash on hand.

23          Valuation.  We are going to talk more about valuation

24   later on, but this is the evaluation that was done by the

25   defendant's expert, Roger Grabowski.  The green bar tells you

1    how much, based on using the financial tools that everyone,

2    including the plaintiff's experts, say you use to determine

3    valuation, how much the business is worth, how much the assets

4    are worth.  And the blue represents the cushion, assets minus

5    liabilities.  And that's even after taking into accounting the

6    liabilities, the $150 million in bonds.

7         This company, throughout the periods of each of the

8    transfer dates, because that represents all eight of the

9    transfer dates, you didn't see any of this kind of evidence and

10   you won't see any of this kind of evidence from the plaintiff's

11   expert as to each and every transfer date, the value of the

12   company and the cushion.  In each one of the transfer dates

13   shows the lowest point is $63 million in June of 1998.  The

14   cushion, net value of the company is much greater in the other

15   years.

16        You may ask yourself, how can this be reconciled with

17   the slide that Mr. Beus showed you yesterday.

18        If you can put up Mr. Beus' slide 61, please, where he

19   told you, you need at least a dollar 60 to survive.  There is

20   some evidence that you need to know.  One, in 1996, when

21   MagCorp was doing the $250 million bond offering, it only cost

22   them a dollar eight a pound to make magnesium.

23        But, most importantly, if you look at the entire memo

24   and not just the underlined portion on page 61, you'll see that

25   this is a long memorandum that Mr. Legge prepared for

1    Mr. Rennert when MagCorp and Renco were presented the

2    opportunity to buy the magnesium business by Dow Chemical,

3    which was the one of the largest chemical competitors in the

4    marketplace.  The memo is entitled:  Analysis of Dow Fabricated

5    Metals' business.  This statement is how much it would cost,

6    how much you would have to make if you bought the Dow business

7    for that business to be profitable.  You read the full

8    four-page memo, which the plaintiff doesn't want you to do, and

9    you will see that this dollar 60 has nothing, nothing to do

10   with what MagCorp needs to make.  MagCorp was making magnesium

11   in 1996 for 1.08 a pound.

12         The same is true when he reads you snippets from

13   Mr. Kaplan's memo.  You heard one where he said at the end of

14   1996, hey, we have got a problem unless demand increases.  The

15   evidence will show you that in 1997, demand surged, set a new

16   record, leapfrogging over the records set in 1995, just as

17   Mr. Kaplan suggested had happened in another memorandum he

18   wrote in early 1997.

19         Throughout the 1990s, MagCorp was on a forward March.

20   Its performance was strong and the evidence will show it was

21   positive until the recession hit.  And let's talk about the

22   recession because I'm not making it up.  Let's look at the

23   graph.  This is the graph showing the change in gross domestic

24   product.  If you follow the financial press, the GDP is the

25   measure of what the American economy is.  Is it growing?  Is it

1    declining?  You'll see a dramatic drop in that curve starting

2    in the middle of 2000, down to 2001.  If we explore it, and we

3    won't now but we will later, by looking into the quarters in

4    2000 and 2001, you will see that the economy was bopping up and

5    down just above and just below zero growth for a year and a

6    half period.

7              And the other thing that a lot of people forget about

8    this recession is, it looked like it was going to be over in

9    the summer of 2001 and then 9/11 happened and it extended the

10   recession into 2002 because of the impact it had in the United

11   States and the globe by causing everyone to withdraw into their

12   shell out of fear.

13             MagCorp and the magnesium business.  Starting in 1989,

14   MagCorp started to make magnesium at the Rowley facility.

15   Renco had bought the business that had been owned by AMAX and

16   that had been built by NL Industries.

17             You heard briefly that magnesium is made from the

18   Great Salt Lakes, from the brine, the water.  The water is then

19   brought into the solar ponds.  It evaporates.  The brine is

20   really thicker.  He evaporated the content.  It goes through

21   the electrolytic processing, which you will hear more about,

22   and I won't try to bore you with a chemistry class right now.

23             But the important thing for MagCorp is the Great Salt

24   Lake gave it an abundant, an almost unlimited source of

25   magnesium.  Not many businesses can say -- you think about oil,

F23MBUC2                    Opening - Mr. Haveles

1   you think about, well, there is only so much in the ground.

2   The waters in the Great Salt Lake are replenished every year.

3   That magnesium was going to be there for a very, very long

4   time.

5               Magnesium is an important metal and has a lot of uses.

6               If you could put up the slide about uses, please.

7               It's used in cars, it's used in parts for cars.  It's

8   used to help make titanium metal for engines.  It's used for

9   soda cans.  Soda cans.  Simple example.  Aluminum.  If you just

10  have pure aluminum, if you bought just a box of aluminum foil,

11  it's really soft and not really strong.  You have to add

12  magnesium to make those cans strong and to hold the soda and

13  the carbonation, or the beer, the carbonation, if there are

14  some of us who drink beer.

15              My only point is, without magnesium, there are no soda

16  cans, and that is not a business that's not going away.

17              Why cars and parts of cars?  Because magnesium is one

18  of the lightest, yet strongest metals known to man.  So cars,

19  because they have to persistently reduce the weight of an

20  automobile to meet mileage requirements and to deal with all

21  other kinds of requirements the government imposes on

22  automobile manufacturers, is looking for every way to squeeze

23  an ounce, and magnesium is one of the brilliant ways to do so,

24  another industry that's not going away.

25              Titanium.  Titanium is a really important metal, has

SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

F23MBUC2                    Opening - Mr. Haveles

1  huge strategic value.  But it's used in all the jet engines

2  that help us get from here to there.  To make titanium you have

3  to use magnesium.  You need a pound of magnesium for every

4  pound of titanium that you make.  That business is not going

5  away.  MagCorp and Renco knew that in 1989, when it bought the

6  business from AMAX.  Throughout the first half of the 1990s,

7  the market for magnesium grew at 8 percent a year.  After that

8  it kept on going, records in 1995, 1997, 1998, and the first

9  quarter of 2000.

10         Only one disruption came to that market for magnesium

11  in the United States.  I am going to talk a little bit more

12  about magnesium in the United States in a second, and that was

13  in the first part of the 1990s.  When the Russians and the one

14  producer in Canada, a little bit more modestly at that time the

15  Chinese, attempted to attack the market for magnesium by

16  dumping magnesium at illegal prices, MagCorp was vigilant.  It

17  went to the governmental body set up by the United States to

18  protect American businesses and got trade orders.

19         You will hear, even from the plaintiff's own expert

20  about the magnesium market, that those orders provided

21  protection to the market in the United States.  Unfortunately,

22  not for the magnesium producers who sold magnesium in Europe

23  because Europe does not adopt laws to protect its businesses.

24         But in the United States those trade duties worked

25  throughout the 1990s.  You saw some information, memos from

SOUTHERN DISTRICT REPORTERS, P.C.         (212) 805-0300

F23MBUC2                    Opening – Mr. Haveles

1    Mr. Kaplan in a newspaper article that was being put up about

2    what was happening to magnesium prices in the 1990s.  That was

3    about what they call the global market in Europe.

4            What the plaintiff didn't tell you is the evidence

5    shows that in the United States prices tended to be 30 to 40

6    cents a pound higher than the rest of the country because the

7    laws protected American businesses from illegal price

8    competition.

9            The Israel plan.  The evidence will show that that

10   plant was running way behind schedule because they were having

11   problems getting their act together, and they didn't get their

12   act together until the end of the 1990s.  And, more

13   importantly, it had a contract to sell almost two-thirds of its

14   outports to Volkswagen to use for its automobile parts in

15   Europe.  It was a modest competitive threat.

16           You saw a slide about the Australian plan, a figment

17   in somebody's imagination.  That plant was never, ever built.

18   They had a little small pilot plant, but it was abandoned.

19           From the time that AMAX owned the property and made

20   magnesium in 1980, all the way through the end of 1995, on the

21   eve of the bond offering, prices of magnesium steadily went up

22   every year each year except during the period of the attack by

23   the Russians and the 1991 recession, which you might remember

24   from President Clinton's campaign slogan, It's the economy,

25   stupid.  Otherwise, every year the prices were going up.

F23MBUC2                      Opening – Mr. Haveles

1    Prices blipped up to a very high number, but MagCorp did not

2    base its projections based on the $2.09.  It kept it consistent

3    with the price trend that was seen during the 1980s and 1990s.

4            MagCorp was a well-run company.  Every day it paid

5    attention to its business operations, cost, technology,

6    production.  And you'll hear from a very competent group of

7    managers during the course of this trial:  Mr. Legge, its

8    president; Mr. Thayer, the head of the plant operations, a

9    truly brilliant engineer; Mr. Ogaard, the chief financial

10   officer, who is a very conservative person monitoring the

11   finances; Mr. Kaplan, known as Mr. Magnesium by many people

12   because of his success in selling magnesium.  During his career

13   he sold over a billion pounds or billion tons of magnesium.

14           You will not hear from Mr. Brown, who is another

15   officer who is a defendant here, because his work experience

16   does not bear on the issues that you have to decide, and we are

17   talking about solvency.  But he dealt with government

18   relations.  He dealt with utilities.  He dealt with employee

19   relations.  He was a critical person as well in the team.

20           Under Ira Rennert's leadership, despite what the

21   plaintiff would like to paint, he was an actively engaged

22   person.  He believed in this investment in MagCorp.  He

23   believed in rebuilding it, which is why during its first six

24   years of ownership it never took a dividend, despite the

25   positive EBITDA that you saw.  He reinvested in the company.

F23MBUC2                         Opening - Mr. Haveles

1    He went out the moment he bought that company every month for

2    two days a month for management meetings, a day in the office,

3    a day in the plant, talking to the employees, talking to the

4    managers to know what was going on.  He received constant

5    reports from management, asked them questions, wanted to know

6    what they were doing and why.  He tracked the company's

7    financial performance virtually every day with information he

8    would receive from his chief financial officer.  He may not

9    have remembered a lot when he gave his statements in discovery,

10   but the contemporaneous evidence will show every day of every

11   month he was engaged in that company.

12          Mr. Rennert, most importantly, trusted his management.

13   He knew they were smart, he knew they were hard working, and he

14   saw the success that they were making happen.  And we will talk

15   about some of that technological success in a moment.  And as

16   the slides I just showed you, the company was successful.

17          So the dividends, the transfers that we are all

18   talking about.  The bond offering.

19          By 1996, based on the steady increase, 8 percent

20   increase every year in demand, the trend of increasing prices,

21   this company had become worth a fair amount.

22          (Continued on next page)

23

24

25

1           Even though Mr. Rennert and Renco did not take any

2    dividends from the six preceding years.  But at that time, in

3    1996, investment bankers were barraging Renco, suggesting:  Why

4    don't you sell the company?  Mr. Rennert didn't want to sell

5    the company because he believed in magnesium and the strength

6    of that business.  If he thought the company was going to fail,

7    you will hear him tell you, why not sell at the price bubble

8    and just cut and run and not worry about these other

9    responsibilities.  He wanted to continue to own the business

10   because he believed in MagCorp and the magnesium industry.

11          One investment banker, DLJ, which was one of the

12   prominent investment bankers in the 1990s before it merged into

13   Credit Suisse, suggested that you should take out some of that

14   value and employ it in other investments rather than letting it

15   sit idle because you're not making any money if it is just

16   there.  Like what many people did in a strong housing market;

17   when you take out a home equity loan, you say my house has

18   increased at lot.  It is not giving me any value, but I can

19   take some of that money and invest it in college expenses,

20   invest it in other acquisitions, other properties, whatever.

21   It is an everyday feature, not only in individual lives but in

22   business life.  Nothing untoward or unseemly about that.

23          DLJ performed its due diligence.  And it was just not

24   half a day; it was over several months.  KPMG came in and

25   audited the financial statements.  Houlihan Lokey -- and I want

F234buc3                    Opening - Mr. Haveles

1    to talk about it now and a little bit more later -- a prominent

2    national investment banking boutique that's expertise, among

3    other things, was insolvency analysis, came in and did a

4    solvency evaluation at that time.  It wrote an opinion letter,

5    based on its own analysis, its own financial valuation of the

6    company, and it wrote to the board of directors of Renco Metals

7    and MagCorp that the company, on a fair value and present fair

8    salable value, assets would exceed the company's liabilities

9    and its identified contingent liabilities after the bond

10   offering; that the company should be able to pay their debts as

11   they become absolute and mature; and the capital remaining in

12   the company after the transaction, the bond offering, would not

13   be unreasonably small for the business in which the company is

14   engaged.  You will hear about how Houlihan -- I will talk about

15   it in a second -- got to that opinion.

16         The bonds are then sold to a small group of

17   sophisticated institutional investors.  No one was being

18   secretive about this dividend that was being paid.

19         If you turn to the slide about use of proceeds.  This

20   was in the offering memorandum given to bondholders.  Every

21   time there was a dividend, it was disclosed in financial

22   filings with the SEC.  This tells -- just like you saw when

23   Mr. Beus put up part of this in his opening yesterday -- this

24   tells the bondholders before they agree to buy the bond, about

25   how the money is going to be used, partly to retire the old

F234buc3                     Opening - Mr. Haveles

1   notes, a dividend of $75.7 million to Renco Group, redeeming

2   preferred shares held by Renco Group in the amount of 8 and a

3   half million dollars, $5 million in payments to the employees.

4   The bondholders, everyone, the world knew about these

5   dividends.  If you're going to do something when you think the

6   company is failing, that kind of conduct is not consistent with

7   what is going on.

8          And the dividends, they couldn't just pay dividends

9   willy-nilly.  You will hear that the loan agreement with

10  Congress Financial, that the indenture, the contract that's

11  signed with the trustee who represents the bondholder said that

12  dividends could only be paid under certain circumstances.  They

13  set a formula for when you can pay dividends.  And you will

14  hear that every time a dividend was paid, it complied with that

15  formula.  You will also learn that another requirement was that

16  Congress Financial had to affirmatively say okay to the

17  dividend before it was paid, and you will hear that Congress

18  Financial gave that assent every time.

19         Now, at the end of his statements this morning,

20  Mr. Beus suggested, well, they can't borrow any money from

21  Congress Financial or the bondholders or anyone because they

22  were breaking the law and they could be in default and

23  ultimately repaid.

24         Let me tell you one interesting fact that you'll hear

25  about.  After the government filed its suit in 2001, Congress

F234buc3                    Opening - Mr. Haveles

1    Financial continued to lend money to the company, entered into

2    a new loan agreement in August 2001 in connection with the

3    company, notwithstanding the RCRA lawsuit.  The bondholders,

4    after the RCRA lawsuit was filed, never declared a default and

5    said give us our money back because you have been sued by the

6    government.

7            For each year, the company paid dividends.  It had the

8    cash flow.  If you go back to the EBITDA slide.  In that EBITDA

9    slide, the gray-shaded area tells you the time period when

10   dividends were paid.  That shows you there was substantial cash

11   being generated each year.

12           After the dividends were paid -- if you go to the next

13   slide, cash on hand -- after the dividends were paid, just cash

14   alone, forgetting accounts receivable, forgetting inventory,

15   forgetting the over $130 million they were selling every year

16   of magnesium, they had this much cash in the bank.

17           Go to the working capital slide.  Look again at that

18   gray area.  After the dividends in all three years, they had

19   working capital.  Not only did they have working capital, it

20   was increasing in each of the years.

21           Finally, go to the EBITDA versus dividends slide.

22   During the time period in question when dividends were paid,

23   the company had $187 million and change in EBITDA.  It paid

24   dividends, including from the bond offering, which wasn't

25   coming out of the EBITDA but came out of the bond offering, of

F234buc3                          Opening - Mr. Haveles

1    $111 million.  If you took out the 75 that came from the bond

2    offering and not from EBITDA, they only took less than

3    $40 million from the $187 million of EBITDA that was earned.

4              That is a lot of the evidence that you will hear

5    during the course of this case about financial condition and

6    solvency.

7              Technology, well, you hear technology was this

8    terrible problem that they couldn't overcome.  You will

9    actually hear from the people who were responsible for this

10   company, especially Mr. Thayer, that technology and engineering

11   and technological upgrades are in this company's DNA.  Every

12   day their engineers were thinking about new things to do.  It

13   was a constant and active proactive program, how to improve

14   existing technology, how to add new technology.

15             If you could turn to the slide on capital

16   expenditures.  This is an example of every year how much money

17   they were spending on capital expenditures and on research and

18   development.  After the dividends, that money stayed strong and

19   constant, even in 2000 and 2001 during the recession.  This

20   company put its priority on dedicating its cash and its

21   resources on technology.  Never once did the company get denied

22   a dime for the technology that it needed or wanted to do.  And

23   you won't hear a single witness, see a single document that

24   says they were denied money and they were not allowed to

25   proceed with a project.

1          The cells weren't the only things going on.  In the

2     early '90s, they put in a chlorine burner to substantially

3     reduce chlorine that was being emitted.  You didn't hear about

4     that.  That chlorine burner not only eliminated chlorine, but

5     it got rid of some of the contaminants and burned up some of

6     the chlorinated hydrocarbons that Mr. Beus told you about.

7          Every day they worked on making the cells that were

8     already there in place better, doubling their life span,

9     improving their efficiency.

10          You heard they had this feed problem, the iron, all

11     the other stuff, and they couldn't solve that problem.  Not

12     true.  You will hear from Mr. Thayer, who brilliantly on his

13     own came up in 1995 with an idea called the iron stripper, and

14     they spent the next three years designing and testing it, and

15     it went into place in early 1999.  It was then, and it still is

16     today, state of the art.  It is the purest feed that any

17     magnesium company has, which is why people are always trying to

18     buy and/or steal that technology.

19          The new cell technology.  Contrary to what you heard

20     from the plaintiff, you will see substantial evidence in the

21     documents that this program was an absolute success.  It was

22     not a failure.  It was not some desperate search, we got to

23     find something and this is the only thing on the shelf, let's

24     buy it, let's give it a shot.  The MagCorp management -- and

25     the documents will show you -- that it spent a year studying

1    all the alternatives and concluded that the Alcan technology,

2    which had been around for 20 years and was in its third

3    generation, was the best for the new next generation of cells.

4            You will see that the management set two objectives:

5    Improve efficiency, reduce chlorine.  As to both of those

6    goals, management in their technology program hit it out of the

7    park.  Alcan was not licensed on the fly.  As I told you, they

8    spent a year studying.  After they decided to go with Alcan,

9    they spent another eight months visiting Alcan facilities and

10   the place in Tokyo, in Japan, where this technology was used,

11   having all of those people come to Utah, having extensive

12   meetings before the license agreement was ever signed.

13           They did three pilot cells, like any strong

14   engineering staff would do.  It is not something you just go

15   and buy off the shelf like you would with Microsoft Word, stick

16   it in your computer, and there it works.  These were

17   complicated things that had to be adjusted and tweaked and

18   customized to work for the company.  So two, three cells aren't

19   unusual.  Indeed, in the 1996 bond offering and in other

20   disclosures, they went out there, they talked about it was

21   going to take a while to put these cells in.

22           And the cells did not die.  They were taken down after

23   three to four months, so you could, as an engineer, rip it

24   apart and ask how is it working.  The first cell didn't do a

25   good job.  A lot of problems.  They did a second cell after

1    making some adjustments.  Better.  Not great.  But better.

2            As they were finishing up the second cell, the

3    engineers, because they were not complacent, said, you know, we

4    think if you try and borrow the best of our technology from the

5    sealed cells and the best of the technology from the Alcan

6    cells and compare it, combine it and make an hybrid, if you

7    will, we can make an even better cell.  Let's have a

8    competition.  That's what they did.  They spent 1998 thinking

9    about this idea, and it didn't take them much time.  It wasn't

10   until 2000.  At the end of 1998, they put the first M-cell

11   pilot into operation.  And the competition ran through 1999.

12   And the Alcan cell, good cell, but it lost the race.  The

13   M-cell turned out to be better.  And you will see Mr. Thayer

14   recommending at the end of 1999 the M-cell reduces all the

15   chlorine we wanted, it improves efficiency, not as much as we

16   had hoped but, okay, we can live with that.  But the M-cell,

17   fabulous, so let's go with the M-cell.  This was a product of

18   good engineering, not desperation, not starvation of funds.

19           And so in early 2000, you saw the memo that Mr. Legge

20   wrote to Mr. Rennert.  Consistent with the management style

21   they had, they laid out the truth to Mr. Rennert.  Hey, the

22   company is starting to see some troubles.  If you want to sell

23   it, get out of the business, you're going to have to get the

24   M-cells up.  Or we can abandon the M-cells and just stagger

25   along.  Mr. Rennert said:  I don't want to sell the company.  I

F234buc3                    Opening - Mr. Haveles

1   don't want to abandon the cell technology.  And he made sure

2   that money was there.

3          As you saw in the capital expenditures, in fiscal 2000

4   and in fiscal 2001, they spent a total of $35 million on

5   technology and R&D.  $8 million came from the increase in

6   Sabel, but also Renco gave a guarantee to Congress, so Congress

7   would increase its credit line by $5 million.  Just the month

8   before, the RCRA suit was filed.  Congress didn't cancel that

9   after the RCRA suit was filed.

10         During the whole time that this was going on, MagCorp

11  was still making and selling magnesium.  You saw the

12  producation chart.  It was producing until the recession killed

13  sales at full capacity and selling all of that tonnage.

14         Contingent liabilities.  The environment.  You heard

15  Mr. Beus talk a lot about things.  So let's talk about what

16  does this have to do with the case?  It is not about do you

17  condemn MagCorp because you don't think it was a good

18  environmental citizen.  The issue is, is there a liability that

19  should have been taken into account in 1996 because of the

20  environment?  No one had sued.  No one had filed any claims.

21  No legal liability had been created.  So it was contingent.  It

22  might happen; it might not.  And the job for anyone valuing a

23  company is to say what is that contingent liability worth at

24  the time.  Not the worst-case scenario.  But what is it likely

25  to be worth.  What is the probable likely value of that

F234buc3                    Opening – Mr. Haveles

1    liability at the time.

2            RCRA.  Mr. Beus talked about Bevill, but you have to

3    talk about Bevill because that is what this liability is all

4    about.  RCRA was a statute passed in the 1970s.  But Congress

5    realized that because mining industries, which are critical to

6    this country's economy, could not comply with that kind of law,

7    passed an exemption based on the Bevill Amendment named after

8    Congressman Bevill –– they're always named after congressmen, I

9    don't know why, but they are –– Congressman Bevill came up with

10   this amendment that said mining industries that have

11   high-volume, low-toxicity wastes may be exempt from RCRA's

12   requirements.  So they passed that amendment.  And they told

13   EPA to go and study it.  They gave a report to Congress in

14   1990.  Prior to that report, they spent a day out at MagCorp

15   studying the entire facility.  You know what, that did pass.

16   And talked about that report.  And shortly thereafter, when the

17   regulation was adopted, they adopted a special part in that

18   rule, part 16 that is about magnesium, but it only applies to

19   one magnesium plant, MagCorp.  And it said, after seeing all 2

20   and a half million gallons a day of discharge, all of those two

21   and a half million are exempt under Bevill.

22           And during the correspondence that occurred between

23   1992 and 1994, contrary to what the plaintiff may suggest, the

24   final person at the EPA said, it is the same two waste streams

25   that we sent to Congress and that Congress support, and those

F234buc3                         Opening - Mr. Haveles

1    waste streams were 2 and a half million gallons a day.  The

2    only way you get to that 2 and a half million is when you count

3    all of the waste streams.

4              In 1994, 1995, 1996, MagCorp had every reason to

5    believe, based on what the EPA was telling it, based on what it

6    told the Congress in its 1990 report, it was exempt from RCRA.

7              But there is more.  In 1992, you heard a little

8    mention yesterday about a notice of violation filed in 1992

9    about RCRA.  Yes, the state of Utah, which was responsible, the

10   primary organization to enforce the federal environmental laws

11   under the federal system that we have, filed a notice of

12   violation accusing MagCorp of violations of RCRA.  Then, the

13   two years of correspondence occurred back and forth among the

14   EPA, the Utah regulators, and MagCorp.  In 1996, they reached

15   an agreement in principal, which was signed in early 1997.  You

16   know what that agreement said?  MagCorp, you should pay a

17   penalty of only -- only -- $2,500.  $2,500 in full settlement

18   of everything, including all the Bevill stuff, all the RCRA

19   stuff they alleged there about the waste streams.

20             And there things stood until the EPA changed its mind,

21   and it did change its mind.  Sometime in the late 1990s and the

22   2000 time period, it decided it didn't like the Bevill

23   Amendment that much, so they changed the interpretation, and

24   they filed suit in 2001.  That lawsuit still goes on today.

25   Nobody, as of today, has said that MagCorp or its successor,

1   U.S. Magnesium, violates RCRA.  Indeed, with the filing of the

2   lawsuit, the EPA had the power to issue what's called an

3   administrative order; on its own, saying we think what you're

4   doing is dangerous and bad, we want you to cease and desist,

5   stop it immediately.  You will hear that the EPA has never,

6   either before or after the filing of the lawsuit, issued a

7   cease and desist order to tell MagCorp to stop putting out all

8   these things in its waste streams.

9           CERCLA, 1989, you heard about that.  That is

10  misleading evidence.  You will hear evidence that that was a

11  mistake; that the EPA acknowledged it was a mistake and

12  immediately took, once it was brought to its attention, MagCorp

13  off the watch list.  CERCLA, during all the fights, during

14  RCRA, in the early parts of 2000, was never mentioned by the

15  EPA.  CERCLA was only mentioned by the EPA after it seemingly

16  had lost the RCRA lawsuit and, in 2008, filed a notice to say

17  it should be put on the NPL, the National Priorities List.

18  What does it mean to be on the National Priorities List?  That

19  you have broken the law?  That this is a cesspool?  Neither.

20  It means that we think there is something we should look at and

21  conduct additional study to determine whether or not there is

22  something that threatens the human health and should be cleaned

23  up.

24          How did they do that?  Did they go out and take

25  samples and say, oh my gosh, you have all these terrible

F234buc3                    Opening – Mr. Haveles

1   contaminants there, the numbers Mr. Beus was putting up on the

2   screen?  No.

3        They said, even though -- we'll talk about the

4   chlorine in a second.  You're producing chlorine.  We'll take

5   the number of tons of chlorine that you're producing.  We're

6   going to multiply it by 77 square miles.  And we come up with

7   this number.  If the number puts you over the threshold, you're

8   on the National Priorities Act.  That's how EPA decided to put

9   MagCorp on the Superfund List.

10       Today, since 2011, the EPA is in the midst of a third

11  year of its five-year study conducting new sampling, conducting

12  determinations to see, is there really anything there that

13  threatens human health that needs to be cleaned up.  And you

14  will hear, as of today, there is still no determination as to

15  whether human health is threatened.  Back in 1996 and 1997 and

16  1998, at the time of the transfers, there is no indication that

17  they are going to go on CERCLA.  There is no indication, just

18  like there is today, that human health is being threatened and

19  a massive cleanup is required.

20       You heard about numbers.  The cost of cleanup.  You

21  saw a memo that was put up by Mr. Tripp.  Mr. Tripp will

22  testify to you he was asked by Mr. Legge to come in and put

23  down worst-case scenario.  What if the government won

24  everything in this lawsuit and we're required to do the worst

25  case -- dig up stuff, cover stuff, everything imaginable --

F234buc3                        Opening - Mr. Haveles

1     what might it cost?  So he gave a worst-case scenario analysis.

2           What you will also hear is that not only the

3     defendants' expert but the trustee's expert, the plaintiff's

4     expert in this case, will give you remediation costs way below

5     that number that Mr. Tripp speculated is the worst-case number

6     back in 2001.  The defendants' expert, using the analysis based

7     on his extensive experience and dealings with the EPA, said

8     somewhere between $7 and $12 million, medium-case and

9     worst-case, assuming you take a higher standard about human

10    health for the worst case, $12 million.

11          The plaintiff's expert comes up with a somewhat higher

12    number but not anywhere near the $82 million, something in the

13    worst-case $40 million range.  But it is worst case.  He is

14    saying, you have to dredge 3 feet of dirt out of the waste

15    ponds, which is kind of interesting because the waste ponds are

16    only 18 inches deep.  He postulates what are the worst-case

17    costs, but remember, contingent liability, as you hear from

18    valuation experts, are not about worst-case costs.

19          THE COURT:  Mr. Haveles, we're going to take a

20    10-minute break, 10-minute break in the jury room,

21    refreshments, and we will return for a short stretch before

22    lunch.

23          (Continued on next page)

24

25

1              (In open court; jury not present)

2              THE COURT:  You had indicated, Mr. Haveles, that your

3      opening would be 45 minutes.  It has been 55 minutes.  How much

4      longer?

5              MR. HAVELES:  I have about five to seven more.  Some

6      of the things from last night and this morning I added made it

7      longer than I thought it would be.

8              THE COURT:  Matters to take up?

9              MR. HAVELES:  Nothing for us.

10             THE COURT:  See you at 10.

11             I'm sorry.  Go ahead, Mr. Stirling.

12             MR. SCOT STIRLING:  Yes, your Honor.

13             On the plaintiff's side, there are a couple of things.

14     First, Mr. Haveles, in his opening, has referred to actions

15     taken by the ITC in 2003.

16             THE COURT:  Could you pull up the mike a little bit.

17             MR. SCOT STIRLING:  Mr. Haveles has referred to

18     actions taken by the ITC on tariff cases in 2003, alleging

19     illegal Chinese activity; prior to that, 2001 and later, which

20     were the subject of ITC action in 2003.

21             We had a motion in limine about post-'99 events, and

22     we talked about where that line would be, and you drew the

23     line at the U.S. Magnesium's financial performance, what

24     happened to U.S. Magnesium and events that relate to its

25     financial performance after that.  That is in the period of

F234buc3                    Opening - Mr. Haveles

1    U.S. Magnesium's ownership.  He is implying that that had some

2    bearing on what happened to this company; that there was a

3    determination that there was illegal activity by the ITC that

4    affected this company when there was no such determination.

5           He has also referred to the M-cell.  As we indicated

6    at the argument on that post-'99 motion, they have indicated

7    that the M-cell was the solution to all of these problems; it

8    was a wonderful, magnificent solution to their problems.

9           Your Honor, the company went bankrupt running some

10   M-cells.  Now they've implied that that is the solution to the

11   financial problems.  We had some testimony from their expert,

12   Gil Miller, financial statements that showed that with all of

13   the M-cells built, from 2002 to 2006, U.S. Magnesium, using

14   that magnificent technology, was insolvent.

15          He has told the jury that the M-cell was the solution

16   to the problems; it was right at the door before bankruptcy.

17   It was not the solution.  He has created a false picture in the

18   jury's mind about what the M-cell could do for this company's

19   financial performance, what difference it has made, and we

20   think he has opened the door to the reality, which is that with

21   the M-cell, the company, continuing to operate that facility,

22   was insolvent from 2002 the to 2006.

23          THE COURT:  Your objection is that he has opened the

24   door to reality?  What is your application?

25          MR. SCOT STIRLING:  That we be then allowed to show

F234buc3                      Opening - Mr. Haveles

1    the M-cell was not the solution to their technology problems

2    that he has represented to the jury, and show that the company

3    that continued to operate that facility after 2002 was

4    insolvent from 2002 to 2006, using M-cells.  Using the M-cell

5    technology, they still couldn't make money.

6            Second point, your Honor, he referred to

7    September 11th.  This company was bankrupt in August of 2001, a

8    month before September 11th.  To suggest that that event -- to

9    this jury -- that that event had any bearing upon the fate of

10   MagCorp or Renco Metals is inflammatory and improper, and it is

11   an impossibility.  It could not have had any effect on this

12   company's fate.

13           We think they have also opened the door, your Honor,

14   on the subject --

15           THE COURT:  Is there an application with respect to

16   the 9/11 reference?

17           MR. SCOT STIRLING:  Your Honor, I think the jury

18   should be instructed to ignore that reference and advised that

19   this company -- it is an agreed fact in the joint pretrial

20   report that this company was bankrupt in August of 2001, and

21   the events of September 11, 2001 had no effect on this

22   company's bankruptcy, these companies' bankruptcy, and to

23   disregard Mr. Haveles' suggestion that that contributed to the

24   companies' failure.

25           THE COURT:  Okay.

              SOUTHERN DISTRICT REPORTERS, P.C.     (212) 805-0300

F234buc3                         Opening - Mr. Haveles

1          MR. SCOT STIRLING:  Third, your Honor, we think they

2     have also opened the door to the subject of misrepresentations

3     in the 1996 bond offering, the reference to the extensive due

4     diligence by DLJ.  They put up the disclosures about how the

5     funds will be used and referred to the various matters that

6     were the subject of that argument on the motion in limine to

7     suggest that, in fact, the bondholders had full disclosure of

8     the facts when the bond offering was made as a result of

9     extensive due diligence by DLJ in the preparation of those bond

10    offering materials.

11         MR. HAVELES:  Your Honor, may I respond as to each of

12    the points raised by Mr. Stirling?

13         THE COURT:  You may.

14         MR. HAVELES:  First, Mr. Beus spent extensive time in

15    his opening talking about the effect of the Chinese at the end

16    of the decade on MagCorp's business.  The logical conclusion is

17    that that conduct was -- and our point is -- that conduct was

18    illegal.  If they want to raise the Chinese as a reason that

19    the company should have been aware of things, the fact is that

20    price dumping began in 2000, but the ultimate date and law of

21    that price dumping wasn't realized in 2003.  The jury shouldn't

22    be able to hear half of what was raised by the plaintiff but

23    not the conclusion.

24         THE COURT:  You're engaging on the point so that I'm

25    not going to stop them from engaging on it?

1            MR. HAVELES:  Not with respect to the ITC issue, your

2    Honor.

3            THE COURT:  We're in agreement on ITC, right?

4            MR. HAVELES:  Yes, as to that, but not to the extent

5    that it opens the door to all of what happened to U.S.

6    Magnesium.  This is purely a trade issue about the Chinese that

7    they put into their case during the opening statement.

8            Secondly, they talked about the M-cell.  I did not say

9    in my opening the M-cell was the solution to their financial

10   problems.  I said the M-cell was a solution for their

11   technological search for the next generation of cells.  We did

12   not say at any time this made the company financially strong,

13   and we did not open the door to what happened in U.S. magnesium

14   when the metals recession continued for several years

15   thereafter and sales didn't start picking up until 2005.  My

16   comments about M-cell were related solely to solving the two

17   technological goals of improving efficiency and improving

18   chlorine emissions, which it did.  It cut chlorine emissions.

19   That was the full extent of my comments.  I didn't go into the

20   solution to the financial problems.  I never made such a

21   statement.

22           The trustee has suggested that the company failed by

23   mismanagement in all of these issues and put the cause of the

24   companies' bankruptcy at issue in its opening statement.  The

25   fact is that there was a recession started and it was a

F234buc3                         Opening - Mr. Haveles

1    prolonged recession, and it went longer than people expected.

2    We did not argue or state in the opening statement that the

3    bankruptcy was caused by 9/11.  The recession was prolonged and

4    had a pernicious effect on MagCorp.

5         THE COURT:  What was the purpose of indicating that

6    the recession was exacerbated by 9/11?

7         MR. HAVELES:  Because everyone was saying in the

8    summer of 2011 the rescission was coming to an end and that

9    event had a significant impact on the economy.

10        THE COURT:  What does it have to do with this case?

11        MR. HAVELES:  It has to do with the case in that it

12   explains why the company was hobbled during the two or three

13   months of bankruptcy because the order was not about stopping

14   at the bankruptcy date.  The order was we could talk about

15   MagCorp's financial condition but we could not talk about U.S.

16   Magnesium.  MagCorp continued to stagger at the end of 2001 and

17   into the beginning of 2002.  It was, in large part, because of

18   the extension of the recession and the fact that no one was

19   buying magnesium.  That was an issue they put into play when

20   they opposed the motion in limine.  Your Honor ruled that we're

21   not going to stop at the bankruptcy date.

22        I will certainly clarify to the jury that it was not

23   my intention to suggest that 9/11 caused the bankruptcy.  It

24   prolonged the recession.

25        THE COURT:  I will allow a clarifying instruction on

1    that point.  You can propose it.  Mr. Stirling, show it to

2    Mr. Haveles and submit it to me.

3            MR. HAVELES:  With respect to the offering memorandum,

4    your Honor, Mr. Beus put up a number of excerpts, including the

5    use of proceeds section, during his opening statement.  To

6    suggest that I used, in opening, the use of proceeds section in

7    my closing somehow opens the door when I'm just putting in

8    context what he addressed in his opening statement is just not

9    correct.

10           Further, when I talked about DLJ, I never said DLJ

11   relied on that underwriting.  I said that Renco relied on DLJ's

12   work, and that has nothing to do with what was in the offering

13   memorandum.  That was what informed Renco's decision to go

14   forward with the bond offering.

15           So neither of those statements should be opening the

16   door to getting in the misrepresentations, particularly given

17   the extensive use they made of the offering memorandum in

18   Mr. Beus' opening statement.

19           THE COURT:  Okay.  I think there is not disagreement

20   on what's open with respect to ITC proceedings.

21           I have indicated I will take a look at a proposed

22   clarification on the impact of 9/11 on the recession.

23           On the misrepresentation issues, I'll look at the

24   transcript, but I'm inclined to agree with the defendants that

25   that is not inconsistent with my in limine ruling.

1          M-cells, you can put in a written submission on that

2     tonight, Mr. Stirling, based on the transcript from the

3     opening, and I will take a closer look at that.

4          All right.  Other matters?

5          See you in about two minutes.

6          (Recess)

7          THE COURT:  A couple of jurors have attempted to ask

8     my deputy, arguably, substantive questions.  Who is this?  What

9     is this?  Are we going to get that?  She, of course, just cuts

10    them off and says, I can't answer that.

11         What I propose to do is, when they come, just so it

12    doesn't continue, is to say that, to the extent you have

13    questions, it is the lawyers' job here to answer them over the

14    course of the trial; that questions to Ms. Nunez should be

15    limited to logistics and procedural, the operation of the day

16    kinds of matters; that the trial is still in its early stages;

17    that again, it is up to the lawyers to explain to you what you

18    need to know to decide this case and, at the end of the day,

19    for me to instruct you, and ask that their patience continue as

20    the process unfolds.  Okay?

21         MR. PARK:  That is agreeable.

22         MR. BEUS:  Sure.

23         THE COURT:  Give me the order of witnesses, please.

24    The first couple of witnesses will be?

25         MR. BEUS:  Lee Buchwald and Legge, followed by

```
 1    Mr. Rennert.  Then we're working out a little logistics because
 2    they have a couple of issues.
 3              MR. HAVELES:  Unfortunately, Mr. Fay had a death in
 4    his family last night.
 5              THE COURT:  The jury will come back at 12:15.  You
 6    said 5 to 7 minutes.
 7              MR. HAVELES:  Maybe 8; no more than 5 to 7 to 8, your
 8    Honor.  I cut a bunch of things to shorten it.
 9              THE COURT:  We will start on Buchwald.  We will break
10    at 1:00 for lunch.  I will give them an hour.
11              Some members of the jury were sleepy in appearance
12    even during the openings, and so what I will do throughout the
13    course of the proceedings if I'm detecting sleepiness is
14    interrupt you and take some stretching breaks and the like, as
15    needed, but you folks got to keep them interested, and it is
16    just openings.
17              Continue to work on your efforts to streamline.
18              Just so you know, I will take breaks, whether it is a
19    moment for breaking or not if I think the jury needs it, and I
20    will interrupt you as I need to, to make sure that the jury
21    isn't being taxed too much in stretches.  And also, of course,
22    after about an hour and a half or so, I need a break, the court
23    reporters need a break, you need a break.  I will try to give
24    you warning of that coming.  I will try to wait for natural
25    breaks.  At the end of the day, I'm going to do that.
```

F234buc3                          Opening – Mr. Haveles

1              All right.  Let's bring the jury in.

2              MR. SCOT STIRLING:  Your Honor, I wasn't clear just

3     now whether you recalled that before presenting the first

4     witness, we were also going to read the agreed facts to the

5     jury.

6              THE COURT:  Yes, you are.  That may be all we get

7     through, but we will see.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Open court; jury present)
 2              THE COURT:  Thank you, everyone.
 3          I will try to make sure we spread out our breaks to
 4    break things up.  Any human being paying attention for any
 5    period of time needs breaks.  We will do some stretching breaks
 6    if we can't take a full back-to-the-jury-room break, but I am
 7    aware of how taxing it will be, and I will do my best on that
 8    front.
 9          I know a couple of you approached Ms. Nunez with some
10    questions, substantive questions about who parties were, or
11    will you receive this or will you receive that and the like.
12    Ms. Nunez is instructed by me to simply say, I can't answer
13    those questions.
14          What I will tell you is, we're at the beginning stage
15    of the process.  It is these fine lawyers' job to give you what
16    you need to understand the case.  At the end of the
17    presentation of evidence, it is my job to instruct you on the
18    law and the process by which you will make your deliberations.
19    I know it is hard to not know everything up front.  They're
20    doing their best.  They will do their best to give you what you
21    need to understand the case.
22          Ms. Nunez won't have the answers to those kinds of
23    questions, so she won't be able to say anything other than, I
24    can't answer that.
25          As I say, be patient, continue being patient.  The
```

1    lawyers will, if they're doing their jobs well, present you

2    what you need to understand the case, but it will take some

3    time.  At the end of it, I will instruct you.  When you're in

4    your deliberations, if you have substantive questions, write

5    those on notes, and we will answer them for you.

6          I do appreciate that it takes some time to get your

7    head into all of it and understand as it goes forward.  They

8    will do their job by presenting you the information that you

9    need in a way that you can understand, and I hope to do the

10   same with the instructions of law.

11         Thank you very much.

12         You may proceed.

13         MR. HAVELES:  Thank you, ladies and gentlemen.

14         Let me make one last observation about the evidence

15   with respect to environmental issues and come back to the

16   solvency topic.

17         We heard about penalties.  The evidence you will hear

18   from the defendants' expert is that his estimate, using the

19   Environmental Protection Agency's own defined published penalty

20   policy, the penalties would be somewhere between $2 and

21   $3 million.  But more importantly, you will hear evidence that

22   the highest penalty ever charged to anyone under RCRA was 11.8

23   million and that penalty was charged to someone who had ponds

24   that were burning and giving off cyanide gas.

25         Solvency.  You will hear from a number of

F234buc3                        Opening - Mr. Haveles

professionals who will talk about solvency.  You will hear via
a video deposition from Houlihan Lokey about the report that it
prepared back in 1996.  It did a review.  It conducted the
discounted cash flow analysis and the market methodology
analysis.  I won't try to explain both of them to you now.
They will do a lot, lot better job than I will.  They went
through both analyses.  Not only did they use management's
projections, but they did two stress cases.  They assumed
prices might fall 25 percent in one stress case.  The other
stress case, what they called the worst-case scenario, they
thought prices might fall and sales might fall 20 percent each.
In both cases, they still found the company would be solvent,
assets exceed liability, adequate capital, enough cash to pay
its bills.  Now, you will also hear from Roger Grabowski, the
defendants' expert.  Mr. Grabowski is one of the leading
national authorities on valuation.  You will be kind of
surprised when you see him because he is not going to look that
way, but he has written the leading textbook or treatise or
book on valuation.  He teaches extensively.  He works with
clients extensively.  He is even an entrepreneur and tries his
hand in business every once in a while.  He conducted a
painstaking valuation.  He assumed nothing.  Double and
triple-checked every fact.  Made sure that nothing went
unlooked.  When he reached his conclusions, he double-checked
them for accuracy, and then he ran his own stress test, and you

F234buc3                    Opening - Mr. Haveles

1    will hear that he came to the conclusion with a chart on

2    valuation that I showed you earlier today, if you can put that

3    up, with the companies having the assets worth what is in the

4    green bar, and the cushion, the solvency amount over

5    liabilities, being in the blue bar.  He also took into account

6    contingent liabilities.

7              Then, you will hear, actually, before all of these

8    from the plaintiff's expert, Jason Frank.  Mr. Frank brought no

9    objectivity to the task.  He didn't check anything.  He didn't

10   even do a quality check on his own work.  It is full of

11   mathematical errors and arithmetic errors.  You will hear that

12   when Mr. Grabowski told him about the errors in the course of

13   all the pretrial things, Mr. Frank didn't even care to go back

14   and look to see if there were mistakes or try to correct them.

15             You will hear that when he did the market valuation,

16   he came up with a valuation of about $200 million.  When you

17   correct the mistakes he made, the basic indisputable arithmetic

18   mistakes he made in that by ignoring certain data and using the

19   wrong numbers, that goes up to 300, the same number

20   Mr. Grabowski said.  You will also hear Mr. Frank say, well, I

21   didn't really think that was relevant, so I ignored it.  Why

22   wasn't it relevant?  Because it showed a positive valuation.

23             You will also hear that Mr. Frank, to do the

24   discounted cash flow, goosed the numbers a bit.  He put, not a

25   thumb, but a brick on the scale, and not a magnesium brick,

F234buc3                    Opening - Mr. Haveles

1    which is light, but an iron brick, which is really heavy, by

2    adding 10 to 12 percent to the discount rate, saying the

3    discount rate, which is the number you use to calculate all

4    these numbers, was something in the range of 22 to 25 percent,

5    without looking to see if any company like MagCorp ever used

6    such a discount rate for valuation.  You will also learn that

7    he actually first tried a lower number but that number produced

8    a positive number, so he had to go back and use a higher

9    number, and that is the only way he came up with a negative

10   number.  You will learn that he did everything he could to

11   depress the valuation.

12          We're not here today to pass judgment 25 years after

13   the fact about whether MagCorp was well run, whether it was a

14   good environmental citizen, although, I submit the evidence

15   will show both is true.  We are here to ask only one question,

16   whether MagCorp was solvent and was able to pay the dividends

17   that were paid back on those eight dates and after the bond

18   offering occurred in December 1995 through October 1998.

19          The plaintiff's story substitutes visceral emotion for

20   evidence.  Greed, environmental hazards.  What you haven't

21   heard with all that 20/20 hindsight opinion is that there's

22   never been a lawsuit about any injury coming out of MagCorp.

23   The EPA has never shut down the facility.

24          You will hear that the facility is 25 miles from the

25   closest population; that it is surrounded by a U.S. Air Force

F234buc3                          Opening - Mr. Haveles

bombing site, a site used by the U.S. Government for chemical

and biological weapon testing.  Landfills run by the state of

Utah.  This is in a desolate area with no human health threats

posed by what's going on.

        You also will hear -- you didn't hear about it in the

plaintiff's case -- as I mentioned before, the only penalty

ever paid was $2,500.  And you will also hear that MagCorp

always -- always -- complied with the Clean Air Act obligations

with respect to chlorine in the 1990s.  It stayed within its

permits.  And indeed, because the M-cell did such a good job

when it was put in place in 2001, and all of those cells were

put in place in the spring and summer of 2001, that they

needed, given the amount of magnesium they could sell, that

MagCorp was complying with the new Clean Air Act regulations

four years before they were ever announced.  You didn't hear

that from the plaintiffs in its opening statement.

        You will also hear that the plaintiff's environmental

expert, John Veranth, has been a community activist, trying

since the mid-1990s to close the MagCorp facility down because

he resents the chlorine that they produce, and he lacks the

objectivity you would want to hear from an expert to tell you

about environmental issues.

        I have tried this morning to summarize the core

evidence, but there is a lot more evidence you will hear.  You

will see the documents.  You will hear and see the witnesses

F234buc3                           Opening - Mr. Haveles

1   from the company testify.

2            Remember that the plaintiff bears the burden of proof

3   as to each and every one of his claims regarding those

4   transfers made from 1995 to 1998.  A story can be written based

5   on sound bites, snippets and incomplete facts; but a burden of

6   proof cannot be satisfied with sound bites, snippets and

7   incomplete facts.

8            I ask that you hold the plaintiff to his burden of

9   proof and that you listen to all of the evidence in its

10  entirety and assess all of the evidence in its entirety before

11  you make your determination at the end of this trial, and I

12  will ask you to, at that time, to return a verdict in favor of

13  defendants because we believe the evidence will show the

14  plaintiff cannot meet his burden of proof as to any of his

15  claims.

16           Thank you for your patience.  I know I have tried your

17  patience a lot, and I have probably been a tad too boring.  I

18  thank you for listening to me this morning.  Thank you.

19           MR. SCOT STIRLING:  Your Honor, the matter we

20  discussed during the break was not mentioned.

21           MR. HAVELES:  I thought the court wanted to read the

22  charge.  I wasn't sure how to deal with that.  Remember, we

23  agreed on the limiting instruction.

24           THE COURT:  I'm going to give it now.

25           MR. SCOT STIRLING:  We're not referring to the

F234buc3                    Opening – Mr. Haveles

1   limiting instruction.  We're referring to the matter that I

2   raised during the break.

3            THE COURT:  Did you --

4            MR. HAVELES:  I'm sorry.

5            THE COURT:  I can't hear you.

6            MR. HAVELES:  I was confused, your Honor.  I thought

7   your Honor was going to read the instruction rather than me.

8            THE COURT:  I didn't realize you had come to it

9   already.  You may read it.

10           MR. HAVELES:  Ladies and gentlemen, during the course

11  of my opening comments before the recess, I made reference to

12  9/11.  The parties agree that the events of September 11th had

13  nothing to do with the companies' bankruptcy filing and the

14  companies' condition as of the time the companies filed for

15  bankruptcy in August 2001.

16           THE COURT:  Thank you.

17           I also want to provide an initial instruction.

18  Members of the jury, regarding the presence of the defendants

19  during trial, you may notice that during the course of the

20  trial, the defendants, many of whom will be witnesses in this

21  case, will not be an audience in the courtroom at all times.

22  That should play no role in your deliberations.  No inference,

23  either positive or negative, should be drawn from the fact that

24  a defendant is not present during any part of the trial.

25           Before we proceed to the calling of the first witness,

F234buc3                    Opening - Mr. Haveles

1    counsel for both sides will read some stipulations,

2    stipulations that have been entered into relating to various

3    facts in the case.  And a stipulation is an agreement between

4    parties as to what certain facts are, and it facilitates the

5    trial process for the lawyers to, where they can, agree on

6    facts; that evidence doesn't have to be presented on things

7    over which there is no disagreement.

8           We will hear some stipulations of fact at the outset.

9

10          MR. SCOT STIRLING:  Thank you.

11          These are the agreed statements of fact:

12          On August 2, 2001, Renco Metals, Inc. (which is

13   hereafter called "Renco Metals") and its subsidiary, Magnesium

14   Corporation of America (which is hereafter called "MagCorp"

15   (both of which together are hereafter called the "debtors")

16   filed voluntary petitions under chapter 11 of the United States

17   Bankruptcy Code in the United States Bankruptcy Court for the

18   Southern District of New York.

19          Plaintiff Lee E. Buchwald is the duly appointed

20   chapter 7 trustee of the estates of Renco Metals and MagCorp.

21          On March 3, 2003, the Bankruptcy Court entered an

22   order approving the appointment of a chapter 11 trustee, and on

23   April 14, 2003, Mr. Buchwald was appointed as chapter 11

24   trustee for MagCorp and Renco Metals.  Subsequently, on

25   September 24, 2003, the Bankruptcy Court entered an order

F234buc3                           Opening - Mr. Haveles

1   converting the chapter 11 cases to cases under chapter 7, and

2   Mr. Buchwald was appointed as the chapter 7 trustee for each of

3   those two companies.

4             (Continued on next Page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. S. STIRLING:  Defendant The Renco Group, Inc.,

2     which is hereafter called Renco, is a privately held

3     corporation organized under the laws of the State of New York,

4     having its principal place of business in New York, New York.

5     At all pertinent times Renco maintained its offices at 30

6     Rockefeller Plaza, Suite 4225, New York, New York 10112.

7          Renco Metals was formed in 1993 and is a corporation

8     organized under the laws of the State of Delaware having, at

9     all times relevant to this action, its principal place of

10    business at 30 Rockefeller Plaza, New York, New York 10112.

11    During all times at issue in this litigation, Renco Metals was

12    a wholly owned subsidiary of defendant Renco.

13         Renco Metals wholly owned two operating subsidiaries,

14    MagCorp and Sabel Industries, Inc., which is hereafter called

15    Sabel.  Renco Metals' only business was as a holding company

16    for those two companies.

17         MagCorp is a corporation organized under the laws of

18    the State of Delaware having, at all times relevant to this

19    action, its principal place of business in Utah.  MagCorp

20    became a wholly owned subsidiary of Renco Metals in August 1993

21    and was a direct or indirect subsidiary of Renco since 1989.

22         Sabel is a corporation organized under the laws of the

23    State of Alabama.  Renco acquired Sabel in 1987.  In August

24    1993, Renco contributed the ownership of Sabel to Renco Metals.

25    Sabel engaged in diversified steel service operations.  On or

F23MBUC4

1    about December 4, 2000, Renco Metals sold all of the

2    outstanding stock of Sabel to K. Sabel Holdings, Inc.

3            Defendant Ira Leon Rennert has been chairman of the

4    board, chief executive officer, and a director of Renco since

5    August 1986.  Mr. Rennert was a director of Renco Metals from

6    1993 to 2002 and a director of MagCorp from August 31, 1989 to

7    2002.

8            Defendant Roger Fay was a director and vice-president

9    of Renco from August 29, 1986 to December 2012.  Mr. Fay was

10   vice-president of finance for Renco Metals from August 1993 to

11   2002.

12           Defendant Justin D'Atri was an attorney licensed to

13   practice law in the State of New York from 1952 until his

14   retirement in 1996.  Mr. D'Atri died on April 14, 2003.  He

15   served as a director of Renco from 1986 to April 14, 2003;

16   secretary of Renco from August 29, 1986 to April 14, 2003;

17   secretary of Renco Metals from July 19, 1993 to 2002; secretary

18   of MagCorp from August 31, 1989 to 2002; and a trustee of and

19   for the Ira Leon Rennert revocable trust until April 14, 2003.

20           Defendant Michael Ryan became assistant secretary of

21   Renco Metals and assistant secretary of MagCorp on September

22   25, 1998, and held those positions until June 24, 2002.

23           Defendant Dennis Sadlowski is an attorney licensed to

24   practice law in the State of New York.  He has been the

25   vice-president - law for Renco since March 4, 1996, and he was

F23MBUC4

1    the assistant secretary of each of Renco Metals and MagCorp

2    from September 25, 1998, to 2002.

3            Defendant Michael Legge was MagCorp's president and

4    chief executive officer from 1993 to 2002.  Prior to that time,

5    Mr. Legge was employed by NL Industries, Inc., from 1979 to

6    1980, by AMAX Magnesium, Inc., which is hereafter called AMAX,

7    from 1981 to 1989, and by MagCorp as vice-president of

8    operations from 1989 to 1993.

9            Defendant Ron L. Thayer was employed by AMAX in 1988.

10   Mr. Thayer was thereafter employed by MagCorp in 1989 and was

11   MagCorp's vice-president of operations from 1993 to 1998 and

12   chief operating officer from June 2001 to June 2002.

13           Defendant Todd R. Ogaard was vice-president of finance

14   of MagCorp from 1995 to 2002.

15           Defendant Lee Brown was vice-president of human

16   resources of AMAX from 1984 to 1989 and for MagCorp from 1989

17   to 1998.  From 1998 to 2002, Mr. Brown served as vice-president

18   of public and governmental affairs at MagCorp.  Mr. Brown was

19   employed by NL Industries, Inc. from 1978 to 1980.

20           Defendant Howard Kaplan was vice-president of sales

21   and marketing of AMAX from 1986 to 1989 and for MagCorp from

22   1989 until he retired in 2000.  Mr. Kaplan continued to serve

23   as a consultant to MagCorp after he retired through 2002.

24           MagCorp's primary business consisted of producing pure

25   magnesium and magnesium alloys, which MagCorp extracted from

F23MBUC4

1    the brine of the Great Salt Lake.  MagCorp's magnesium

2    production operations were located at its facility in Rowley,

3    Utah, which is hereafter called the Rowley facility.

4         The major products that MagCorp produced at the Rowley

5    facility were refined and alloyed magnesium, cast into many

6    different product lines.  The Rowley facility also produced

7    several other products, including chlorine.  MagCorp reused

8    some of the chlorine in its magnesium production process and

9    sold a portion of it to customers.

10        Since 1972, primary magnesium, produced from an ore or

11   mineral feedstock, as opposed to scrap, has been produced at

12   the Rowley facility by means of an anhydrous, that is, with all

13   water removed.  This process involve two steps.  First, a

14   purification process, by which brine from the Great Salt Lake

15   is purified; and, second, an electrolytic process by which the

16   magnesium is ultimately separated from the brine.

17        As of 1995, MagCorp was the third largest producer of

18   pure magnesium and magnesium alloys in North America and the

19   fourth largest producer in the world, excluding Russia and

20   China.  By mid-1996, MagCorp accounted for approximately 21

21   percent of North America's production of magnesium and 16

22   percent of the western world's magnesium production.

23        In 1995, approximately 90 percent of MagCorp's

24   magnesium shipments were to customers in North America, of

25   which 87 percent was pure magnesium sold in all the common end

1   use segments.

2          Salty, mineral-rich water from the Great Salt Lake is

3   concentrated by evaporation in a series of solar ponds.

4          The concentrated brine is subjected to two chemical

5   processes to remove sulfate and boron.

6          Sulfate and boron are chemically removed from the

7   concentrated brine which is then sprayed into a hot chamber,

8   causing most of the water to evaporate and leaving a

9   spray-dried powder consisting of magnesium chloride and some

10  magnesium oxide.

11         The spray-dried powder is then sent to a melt/reactor,

12  which removes any remaining water and converts any magnesium

13  oxide impurities into pure molten magnesium chloride through a

14  purification and coloration process wherein the powder is

15  exposed to pure chlorine gas and certain other chemicals at

16  high temperatures.

17         The melt/reaction process produces certain exhaust

18  gasses that includes pollutants such as chlorine and certain

19  particulate matter which must be treated before being released

20  into the environment.

21         The brine is next sprayed into a hot chamber where

22  most of the water is removed, leaving only a spray-dried powder

23  consisting of magnesium chloride and some magnesium oxide.

24         The next step, known as purification or chlorination,

25  produces pure magnesium chloride by converting any magnesium

F23MBUC4

1   oxide impurities into magnesium chloride and removing the small

2   amount of water remaining after spray-drying.

3          Spray-dried powder is melted and pure chlorine gas is

4   injected into the molten substance to convert the magnesium

5   oxide to magnesium chloride and to remove any remaining water.

6   The result of the purification process is pure, molten

7   magnesium chloride.

8          The melt/reaction process also creates exhaust gases

9   that contain chlorine in various forms and particulates.

10          During the course of treating the exhaust gases from

11   the melt/reactor, chlorine gas is converted into a hydrogen

12   chloride and collects as a hydrochloric acid solution.  Some of

13   the acid is reused during magnesium processing and some of it

14   is sold.

15          The melt/reactor Ducon scrubbers spray a scrubber

16   solution, consisting of recirculated water and cooled

17   hydrochloric acid, through the exhaust gases to remove hydrogen

18   chloride gas, which becomes hydrochloric acid and part of the

19   scrubber solution and some of the particulate matter.

20          The melt/reactor Ducon scrubbers spray the exhaust

21   gases with water and recirculated hydrochloric solution which

22   captures the hydrogen chloride in the liquid.

23          The reactor acid dump tank receives waste water from

24   the melt/reactor Ducon scrubbers.

25          Diluted scrubber liquors may also originate at any of

F23MBUC4

1  the individual quench towers associated with each melt/reactor

2  cell, which discharge to the reactor building acid dump tank,

3  which discharges to the main ditch, although spills from the

4  tank may drain to the central waste collection ditch.

5        The exhaust gases also include chlorine gas, which

6  generally is insoluble in water.  The next device in sequence

7  is the chlorine reduction burner/scrubber, which removes the

8  chlorine gas from the melt/reactor gases by converting it into

9  hydrogen chloride gas and then scrubbing it.  The chlorine gas

10 is converted to hydrogen chloride gas by burning it in a

11 natural gas flame.  Then, a solution of recirculated

12 hydrochloric acid is sprayed through the hydrogen chloride gas

13 in the scrubber portion of the device to cool and capture it.

14 The gas becomes hydrochloric acid and part of the scrubber

15 solution.  Some of the residual particulate matter from the

16 melt/reactor exhaust gases is also removed by the chlorine

17 reduction burner.

18       The chlorine reduction burner/scrubber removes the

19 chlorine gas from the melt/reactor exhaust gases by burning the

20 gas to convert it into hydrogen chloride.  Recirculated

21 hydrochloric acid is then sprayed through the hydrogen chloride

22 gas in the scrubber portion of the chlorine reduction

23 burner/scrubber to cool and capture it.

24       The chlorine reduction burner was first installed in

25 the summer of 1990 and was therefore not in operation in 1989.

F23MBUC4

1    MagCorp installed the chlorine reduction burner to the

2    melt/reactor offgas pollution-control system in June 1990.

3           The chlorine reduction burner sometimes discharges

4    deluge water through a seal leg.

5           Hot gas is cooled in the lower quench section of the

6    chlorine reduction burner.  Using recirculating cooled scrubber

7    liquors, the scrubbing liquors are sent to the storage tanks or

8    the reactor building's acid recirculation tank for reuse, but

9    liquid spills from the chlorine reduction burner report to a

10   drain located at the north end of the chlorine reduction burner

11   containment pad that eventually drains to the central waste

12   collection ditch.

13          The next device in sequence consists of packed tower

14   scrubbers.  These scrubbers also use water and recirculated

15   hydrochloric acid to remove residual hydrogen chloride gas and

16   some particulate matter from the melt/reactor exhaust gases.

17   Spills of scrubber liquor from the west packed tower report to

18   one of the drain gutters that eventually reports to an opening

19   in the central waste collection ditch.

20          The melt/reactor Ducon scrubbers, chlorine reduction

21   burner/scrubber, and packed tower scrubbers operate by

22   recirculating large volumes of scrubber solution to thoroughly

23   contact and absorb the gaseous pollutants.  Any upsets or

24   overflows of scrubber solution caused by pressure surges

25   involving these scrubbers may also be discharged to the waste

F23MBUC4

1   water pond through what are known as seal legs.

2           The fourth device is a high energy scrubber which

3   removed most of the remaining particulate matter by

4   accelerating the off-gases flowing through the scrubber while

5   spraying water through them.  The sprayed water captures most

6   of the remaining particulate matter and most of the residual

7   hydrogen chloride gas.  The scrubber solution used in the high

8   energy scrubber is recirculated in this scrubber and ultimately

9   discharged to the waste water pond.

10          Scrubbing underflows are discharged to the process

11  waste water system via the spent liquor tank.  Spills drain to

12  an opening in the central waste collection ditch.  The purpose

13  of the spent liquor tank is to convey process waste water from

14  several sources to the waste water ditch system.

15          Scrubber liquors in the spent liquor tank were

16  routinely pumped to the main ditch and, if a spill occurs, to a

17  nearby drain that feeds into the central waste collection

18  ditch.  The ditches, spent liquor tank, and reactor acid dump

19  tank all discharge to the Red River, which leads to the waste

20  pond.

21          The molten magnesium chloride from the melt/reactor is

22  transported to electrolytic cells where it is separated by

23  electric current into pure magnesium metal and chlorine gas.

24          The exhaust gases produced in the electrolytic cells,

25  including the chlorine gas separated from the magnesium metal

F23MBUC4

 1    in the electrolytic cells, contain both chlorine and cooled

 2    droplets of molten electrolyte salts referred to as anode dust.

 3         The electrolytic Ducon scrubber mechanically sprays

 4    water through the electrolytic cell exhaust gases to remove

 5    anode dust.  The waste water containing anode dust flows into a

 6    sump and is eventually discharged into the waste water pond.

 7    Scrubber liquors are discharged to the Ducon sump, the

 8    electrolytic Ducon scrubber sump discharges to the spent liquor

 9    tank, which conveys process waste water from several sources to

10    the waste water ditch system.

11         At all times relevant to this action, the facilities

12    at the Rowley facility included solar evaporation ponds,

13    concentrator tanks, a boron removal unit, a calcium chloride

14    operation, spray dryers, melt cells, electrolytic cells, a cast

15    house, and a ferrous and ferric chloride unit.

16         At all times relevant to this action, the operations

17    at the Rowley facility included use of an anhydrous process to

18    extract minerals from Great Salt Lake surface waters.  The

19    extraction process included concentrating the waters and

20    crystallizing minerals in solar evaporating ponds and in

21    concentrator tanks, removing boron and sulfates by solvent

22    extraction and other methods, and spray drying to produce an

23    impure magnesium-rich powder.

24         At all times relevant to this action, the operations

25    at the Rowley facility included a process for purifying the

154

F23MBUC4

magnesium-rich powder by melting, drying, and adding chlorine to it, in order to convert magnesium oxide impurities into magnesium chloride.

At all times relevant to this action, the operations at the Rowley facility included a process for separating the molten magnesium chloride into chlorine and magnesium by electrolysis.

At all times relevant to this action, the operations at the Rowley facility included conveying molten magnesium metal to a foundry for casting.

By mid-1996, MagCorp accounted for approximately 21 percent of North America's production of magnesium and 16 percent of the western world's production.

ALCAN International Limited, which is hereafter called ALCAN, was an affiliate of ALCAN Aluminum Limited and owned and had developed certain technology and patents regarding the design of multipolar electrolytic cells. In August 1996, MagCorp entered into a license for the use of that proprietary electrolytic cell technology from ALCAN.

In February 1997, MagCorp installed and operated its first pilot cell utilizing the ALCAN technology at the Rowley facility.

In May 1998, MagCorp installed and operated a second ALCAN pilot cell at the Rowley facility.

In September 1999, MagCorp installed and operated a

F23MBUC4

1  third ALCAN test cell that incorporated further design

2  modifications.

3          In 1998-1999, while running the ALCAN pilot cells,

4  MagCorp developed an alternative cell technology derived from

5  the ALCAN technology, which MagCorp ultimately called the

6  M-cell.  Beginning in December 1998, MagCorp installed and

7  operated the first of a series of pilot M-cells.

8          The first production M-cell was placed into operation

9  in May 2001.

10          MR. HAVELES:  Your Honor, in the interest of

11  disclosure, there are seven more pages for me to read.  I am

12  not sure if you want to break now.

13          THE COURT:  We will do the lunch break and pick that

14  up before we call the first witness.

15          Members of the jury, it's 10 of 1.  We will take an

16  hour for lunch.  So please do be back in the jury room ready to

17  go at 10 of 2.  We will start promptly at that time.  Thank you

18  so much for your diligence and patience and attention.

19          (Jury not present)

20          THE COURT:  Matters to take up, counsel.

21          MR. HAVELES:  None for defendants, your Honor.

22          MR. S. STIRLING:  None for the plaintiff, your Honor.

23          THE COURT:  I appreciate stipulations.  To the extent

24  that you continue to think you need all of what you are

25  reading, you might want to see if there is any streamlining

F23MBUC4

1    that can be done over lunch.

2           To be clear, what I don't want to see is testimony

3    that re-covers any of the grounds that are stipulated to.  That

4    would not be a good use of anyone's time.

5           I will meet with you at 10 of, so 10 minutes before

6    that.  Enjoy your lunch.

7           (Luncheon recess)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F23MBUC4

```
 1                        AFTERNOON SESSION

 2                             1:50 p.m.

 3           THE COURT:  Matters to take up?

 4           MR. S. STIRLING:  Your Honor, the defendants and

 5      plaintiff had agreed on a joint list of exhibits to be moved

 6      into evidence.  I provided the defendants' counsel with a list

 7      of plaintiff's exhibits to be moved into evidence.  And we

 8      spoke about it and wanted to clarify before moving these

 9      whether we can -- each of us has a copy of the list, the

10      other's list.  Whether we can simply hand up the list and then,

11      without taking time in front of the jury or reading the numbers

12      of the exhibits into the record, whether we can work off the

13      lists that have been exchanged between counsel and clarify at

14      the end of the day what exactly has been moved into evidence.

15           THE COURT:  I think that's fine.  I do like to be

16      clear to the jury what I have admitted in their presence.  Why

17      don't you move a list of stipulated to exhibits for admission,

18      mark the list itself as an exhibit, and I'll just inform the

19      jury that there are a list of exhibit numbers contained on that

20      exhibit which are stipulated-to exhibits for admission and part

21      of what they will have when they go back will include that list

22      of exhibits.  Does that make sense?

23           MR. HAVELES:  I think so, your Honor.  I think we can

24      also, if you want, because they essentially fall within the

25      generic category of monthly reports and 10K and 10Q filings
```

F23MBUC4

1    made during the time period.  I think that's all of them except

2    for the one that's the photograph.  I think that generically

3    describes them all, Mr. Stirling?

4              MR. S. STIRLING:  There are two lists.  The list that

5    is jointly proposed -- there are generic descriptions of

6    categories of documents included in this list.  The second list

7    is a list of exhibit numbers that does not have that kind of

8    description.

9              MR. HAVELES:  Better safe not to say anything about

10   part of as opposed to all of the list.

11             THE COURT:  I'm sorry.  I don't know what that means.

12             MR. HAVELES:  Since the second list that Mr. Stirling

13   has to which we have agreed is a potpourri of exhibits that can

14   be categorized, I am not sure it makes sense to tell the jury

15   about some of the documents but not all of them.

16             THE COURT:  Do you need to do it now?

17             MR. S. STIRLING:  For my purposes, your Honor, there

18   is only one other exhibit that I was going to move at

19   commencement of Mr. Buchwald's testimony, which is the aerial

20   photograph, 2456.  For his testimony I do not need these other

21   exhibits.

22             THE COURT:  Do you need those exhibits now, yes or no?

23             MR. S. STIRLING:  Yes, your Honor.  Some of them, yes.

24   For Mr. Legge's testimony we will be referring to some of these

25   other exhibits.

F23MBUC4

1                    THE COURT:  How long is Mr. Buchwald's testimony?

2                    MR. S. STIRLING:  Very brief, your Honor.

3                    THE COURT:  How long is the cross?

4                    MR. HAVELES:  I think when we talked about it, it's 45

5       minutes to an hour collectively for the two, your Honor.

6                    MR. PARK:  Your Honor, I expect the cross will be

7       about 10, 15 minutes.

8                    MR. S. STIRLING:  The direct may be as short as five,

9       five to 10.

10                   THE COURT:  Let me see the list.

11                   Is it a document range?  Can you say we are moving the

12      admission of 1 through 103, no objection, admitted?  Can we do

13      it that way?

14                   MR. S. STIRLING:  Not precisely, because they were not

15      numbered that cleanly.  They are not all organized that neatly

16      on the exhibit list.

17                   Your Honor, here is the exhibit list and almost all of

18      them have been stipulated to.  There is another binder.

19                   Those are some of the documents that are on the second

20      list that you have there, the two documents.

21                   THE COURT:  Here is what I propose.  You are in

22      agreement as to these exhibits, is that right?

23                   MR. HAVELES:  Yes, your Honor.

24                   THE COURT:  What I propose is that I say that there is

25      a list of exhibits that the parties have agreed may be received

F23MBUC4

1    into evidence.  Rather than reading all of those numbers of

2    exhibits to you, tomorrow we are going to put in a document

3    itself as an exhibit which contains just the exhibit numbers of

4    all of the agreed-to exhibits.  Okay?

5             MR. S. STIRLING:  Very good.

6             MR. HAVELES:  Yes, your Honor.

7             THE COURT:  I'll hand these back.  And that will be,

8    you will mark that, we will take care of that administrative

9    business in the morning, but it will just be the exhibit

10   numbers.  And if you want to just include some language at the

11   top, the parties stipulate that the following exhibits may be

12   received into evidence and sign it and you will mark that as an

13   exhibit, we will put that in tomorrow.  Thank you.

14            We are continuing down the path that we are on?

15            MR. HAVELES:  I'll be fleet of foot, your Honor.

16            (Jury present)

17            THE COURT:  Good afternoon, members of the jury.  I

18   hope you had a pleasant lunch.

19            We are going to proceed and hopefully soon conclude

20   with the reading of some initial stipulations, and then we will

21   take up one other administrative matter and then turn to our

22   first witness.

23            Mr. Haveles.

24            MR. HAVELES:  Thank you, your Honor.

25            Ladies and gentlemen, I am going to resume with the

F23MBUC4

1    stipulated facts that Mr. Stirling was reading prior to the

2    luncheon recess.

3            National Lead Industries, hereafter called National

4    Lead, began construction of the Rowley facility in 1970.

5    Actual startup of the magnesium operations occurred in the

6    summer of 1972.

7            In 1980, National Lead sold the magnesium operations

8    to AMAX, Inc., a diversified mining and natural resource

9    company.

10           AMAX, Inc., through its subsidiary, AMAX Magnesium

11   Corporation, operated the Rowley facility from 1980 to 1989.

12           Through its subsidiary RENMAG, Inc., Renco acquired

13   the magnesium production business from AMAX, Inc. in 1989.

14           In 2002, U.S. Magnesium LLC purchased the assets of

15   MagCorp in an auction in the chapter 11 proceedings before the

16   bankruptcy court and has operated the Rowley facility since

17   that time.

18           MagCorp's production of magnesium at the Rowley

19   facility generated air emissions, water discharges and solid

20   wastes.

21           The Resource Conservation and Recovery Act, which is

22   hereafter called RCRA, established a comprehensive regulatory

23   scheme governing the treatment, storage, and disposal of

24   hazardous waste.

25           The EPA regulates the generation, management and

F23MBUC4

1   disposal of solid waste under RCRA.  Congress directed the EPA

2   to identify hazardous wastes that would be subject to RCRA.

3            Subtitle C of RCRA regulates solid wastes, including

4   liquids that are deemed hazardous under the regulations

5   promulgated by the EPA.

6            In 1980, Congress enacted the Bevill Amendment, which

7   required the EPA to study whether certain high volume, low

8   hazard special wastes produced in the extraction, beneficiation

9   and processing of ores and minerals should be exempt from

10  regulation under RCRA, to submit its findings to Congress, and

11  to issue a final determination on how special wastes should be

12  regulated.

13           On June 15, 1991, the EPA published its final

14  regulatory determination for special wastes from mineral

15  processing, the mineral waste exclusion.

16           On or about April 21, 1993, UDEQ, the Utah Department

17  of Environmental Quality, sent MagCorp a copy of an April 1992

18  memorandum from region 8 of the EPA concerning the scope of the

19  Bevill exemption at the Rowley facility.

20           On April 21, 1993, Tom Tripp of MagCorp sent Dennis

21  Downs, Director of Utah Division of Solid and Hazardous Waste

22  at UDEQ.

23           On July 9, 1993, Matthew A. Straus, director of the

24  EPA waste management division, wrote a memorandum to Robert L.

25  Duprey, director of the hazardous waste management division

F23MBUC4

1    regarding MagCorp's Bevill exemption.

2              On March 23, 1994, Michael Shapiro, director of the

3    EPA Office of Solid Waste, wrote a memorandum to Robert L.

4    Duprey, director of the hazardous waste management division,

5    also regarding MagCorp's Bevill exemption.

6              On May 10, 1994, Dennis R. Downs, executive secretary,

7    Utah Solid and Hazardous Waste Control Board, sent Tom Tripp of

8    MagCorp a copy of the March 23, 1994 letter prepared by the

9    EPA.

10             On January 16, 2001, the United States commenced an

11   action against MagCorp and other parties in the United States

12   District Court for the District of Utah, alleging violations of

13   RCRA and contending that certain waste streams at the Rowley

14   facility were not exempt under the Bevill Amendment.  The

15   United States sought (i) a declaration that MagCorp had

16   violated its obligations under RCRA and (ii) penalties under

17   RCRA.

18             As of the commencement of this trial, the Utah

19   district court has not determined whether MagCorp and the other

20   defendants are liable for any environmental violations.

21             The EPA added the Rowley facility to the Superfund

22   National Priority List in November 2009.

23             On August 4, 2011, U.S. Magnesium LLC, the current

24   owner and operator of the Rowley facility, executed a consent

25   order with the EPA in which U.S. Magnesium LLC agreed to

1    conduct a Remedial Investigation/Feasibility Study under CERCLA

2    with respect to the Rowley facility, and that study is

3    presently underway.

4         Magcorp's Rowley facility comprises approximately

5    80,000 acres bordering the Great Salt Lake to the southwest

6    near Rowley, Utah.  The main plant area of the facility is

7    located approximately 10 miles north of Interstate 80, and

8    waste water and waste management areas and solar evaporation

9    ponds located to the north, east and southeast between the main

10   plant and the Great Salt Lake.

11        Since 1972, the Raleigh facility has produced

12   magnesium metal from brine extracted from the Great Salt Lake

13   and concentrated in solar evaporation ponds.  The facility has

14   also produced chlorine, calcium chloride, iron chlorides, and

15   hydrochloric acids as saleable byproducts of the production

16   process.

17        Investigations conducted of the Rowley facility to

18   date have identified dioxins/furans, HCB, and PCBs as the

19   primary contaminants of concern, hereafter called COCs.

20        Those COCs primarily have been identified in the

21   following areas:  Old waste water pond, gypsum pile, landfill,

22   active waste water pond, waste water ditches, sanitary lagoon,

23   and courtyard.

24        The old waste water pond comprises approximately 1200

25   acres in the northeast section of the Rowley facility bordering

F23MBUC4

1    the Great Salt Lake.

2              Waste water discharges from the Rowley facility were

3    transported to the old waste water pond from the initiation of

4    operations in 1972 through approximately 1985.

5              The old waste water pond was taken out of service in

6    1985 after it was inundated by a historic high water level in

7    the adjoining Great Salt Lake.

8              Sampling conducted prior to 2007 identified

9    dioxin/furans toxicity equivalent, TEQ, up to 11.53 parts per

10   billion, HCB up to 192,000 parts per billion, and PCBs up to

11   5,619 parts per billion in the sediments in the inlet area of

12   the old waste pond, i.e., the western portion of the pond).

13             The gypsum pile is situated to the north of the main

14   plant along the northern bank of the main ditch and extends

15   north/northeast toward the old waste pond.

16             Sampling conducted prior to 2007 identified

17   dioxins/furans, TEQ up to 2.28 parts per billion, HBC up to 98

18   parts per billion and PCPs up to 6,360 parts per billion in

19   samples collected from various depths within the gypsum pile.

20             The landfill is located to the north of the main plant

21   and along the south bank of the main ditch.  Gypsum has been

22   reportedly been used as a cover material for the landfill.

23             Sampling conducted prior to 2007 identified

24   dioxins/furans, HCB, and PCBs in samples of gypsum collected

25   from the gypsum pile.

F23MBUC4

1         The active waste water pond is located to the

2    southwest of the old waste water pond and has been used for

3    management of acidic waste water streams via evaporation since

4    the inundation of the old waste water pond by the Great Salt

5    Lake in approximately 1985.

6         Like the old waste water pond, the active waste water

7    pond contains sediments that contains COs from the

8    manufacturing process.

9         Sampling conducted prior to 2007 in the active waste

10   water pond identified dioxins/furans, TEQ up to 13.63 parts per

11   billion, HCB up to 140,000 parts per billion, and PCBs up to

12   19,000 parts per billion, decachlorobiphenyl in the shallow

13   sediments.

14        The waste water ditches include the main ditch,

15   central ditch, western ditch, chlorine ditch, and the former

16   boron ditch.

17        The waste water ditches were dug into the ground

18   surface by excavating down to the highly impermeable clay layer

19   that underlies the Rowley facility at a depth of approximately

20   eight to 10 feet in the early 1980s using a dragline.  The

21   ditches have been used to convey facility waste water to the

22   ponds since that time.

23        Sampling conducted prior to 2007 identified dioxin

24   furans, TEQ up to 2,249 parts per billion, HCB up to 2,100,000

25   parts per billion, and PCBs up to 75,020 parts per billion in

F23MBUC4

1    samples and deposits in the ditches at depths up to three feet.

2         The sanitary lagoon is situated between the chlorine

3    ditch and the central ditch.  The sanitary waste water

4    generated from the Rowley facility has historically been

5    managed in the sanitary lagoon where water is evaporated and

6    its solids remain behind.

7         Sampling conducted prior to 2007 identified

8    dioxin/furans, TEQ up to 1.49 parts per billion, HCB up to

9    6,000 parts per billion, and PCBs up to 1,730 parts per billion

10   in sediment samples collected from the periphery of the lagoon.

11        The courtyard comprises approximately a one-acre area

12   surfaced with gravel in the interior, southern section of the

13   main plant.

14        Sampling conducted prior to 2007 identified dioxins,

15   furans, TEQ up to 0.92 parts per billion, HCB up to 290,000

16   parts per billion, and PCBs up to 15,500 parts per billion.

17   Decachlorobiphenyl in shallow soil samples collected from the

18   courtyard.

19        In July 1993, Renco Metals issued $75 million in 12

20   percent senior notes due in 2000.  At that time it also issued

21   to Renco 8500 shares of 10 percent preferred stock, par value

22   $1,000 for $8.5 million.

23        In 1996, Renco Metals engaged in a public debt

24   offering, which is hereafter called the 1996 bond offering.  In

25   connection with the 1996 bond offering on May 24, 1996, Renco

F23MBUC4

Metals, MagCorp, and Sabel filed a form S-1 registration

statement for $150 million of 11 and a half percent senior

notes due 2003, which are hereafter called the 1996 notes.

          MagCorp and Sabel guaranteed Renco Metals obligation

under the 1996 notes.

          On April 8, 1995, MagCorp paid a dividend to Renco

Metals in the amount of 6,121,500.

          In December 1995, Renco Metals paid Renco a dividend

of $6,121,500.

          On February 12, 1996, MagCorp paid a dividend to Renco

Metals in the amount of $3,700,000.

          In February 1996, Renco Metals paid Renco a dividend

of $3,700,000.

          On May 16, 1996, MagCorp paid a dividend to Renco

Metals in the amount of $4,100,000.

          In May 1996, Renco Metals paid Renco a dividend of

$4,100,000.

          On July 3, 1996, Renco Metals used $143.5 million in

net proceeds from the 1996 bond offering, together with an

estimated $34.8 million in available cash to: (i) purchase and

retire 98 percent of the 1993 notes at a price of 112.75; (ii)

redeem the outstanding preferred stock from Renco for $8.5

million; (iii) fund a $75 million dividend to Renco on the

outstanding common stock held by Renco, as more specifically

described in the next paragraph; and (v) under the Net Worth

1   Appreciation Agreement, fund payment of approximately $5.3

2   million to the MagCorp officers.

3              On June 3, 1996, in connection with the 1996 bond

4   offering, MagCorp paid a dividend to Renco Metals in the amount

5   of $75,028,175.21 and Renco Metals paid a dividend in that

6   amount to Renco.

7              On May 19, 1997, MagCorp paid a dividend to Renco

8   Metals in the amount of $1,300,000.

9              On July 31, 1997, MagCorp paid a dividend to Renco

10  Metals in the amount of $5,300,000.

11             In 1997, Renco Metals paid dividends of 1,300,000 and

12  $5,300,000 to Renco.

13             On January 8, 1998, MagCorp paid a dividend to Renco

14  Metals in the amount of $2 million.

15             On June 6, 1998, MagCorp paid a dividend to Renco

16  Metals in the amount of $3,200,000.

17             On or about October 19, 1998, MagCorp paid a dividend

18  to Renco Metals in the amount of $2 million.

19             On January 8, June 6, and October 1, 1998, Renco

20  Metals paid dividends of $2 million, $3,200,000 and $2 million

21  to Renco.

22             In 2001, Renco Metals used the $8 million proceeds

23  from the sale of Sabel to provide financing for the

24  installation of new electrolytic cells at the Rowley facility.

25             MagCorp entered into Net Worth Appreciation

F23MBUC4

1    Agreements, which are hereafter called the NWA agreements, with

2    certain of its officers.  Under those agreements, MagCorp

3    agreed that, among other things, it would make payments to its

4    officers whenever MagCorp paid dividends.

5            Ron Thayer, Howard Kaplan, Michael Legge, Lee Brown

6    and Todd Ogaard each had an NWA agreement with MagCorp.

7            Under the NWA statements, those individuals received a

8    total of $428,505 in connection with the 1995 dividends and a

9    total of $546,000 in connection with the February and May 1996

10   dividends.

11           Under the NWA agreements, those individuals received a

12   total of $5,255,495 in connection with the July 1996 dividends.

13           In May and July 1997, under the NWA agreements, those

14   individuals received a total of $462,000 in connection with the

15   1997 dividends.

16           In 1998, under the NWA agreements, those individuals

17   received a total of $504,000 in connection with the 1998

18   dividends.

19           Your Honor, that ends the stipulated facts.

20           THE COURT:  Thank you, Mr. Haveles, and members of the

21   jury for your attention to that.

22           We are about to call the first witness.  I did want to

23   indicate the parties have also agreed on the admission of a

24   large number of exhibits, and administratively what we are

25   going to do is, tomorrow they are going to produce all of the

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

F23MBUC4

1  numbers of the exhibits that they have agreed come into

2  evidence and we are going to mark that list itself as an

3  exhibit.  When it's time for your deliberations, you will know

4  every piece of evidence that they have agreed to that comes in

5  in addition to everything you see me admit over the course of

6  the trial and that, too, will help facilitate the process.  In

7  a sense, I am admitting a number of exhibits now that the

8  parties agreed to, and that list of numbers will be produced to

9  you as an exhibit as well.  I will deem them stipulated to

10  exhibits now admitted with the list to be admitted itself

11  tomorrow.

12          Plaintiff may call its first witness.

13          MR. S. STIRLING:  Plaintiff calls Mr. Lee Buchwald.

14          THE COURT:  Mr. Buchwald.

15  LEE E. BUCHWALD, <!0>

16      called as a witness by the Plaintiff,

17      having been duly sworn, testified as follows:

18          MR. S. STIRLING:  Your Honor, I move the admission of

19  Exhibit 2456.

20          MR. PARK:  No objection.

21          THE COURT:  Without objection, 2456 is admitted.

22          (Plaintiff's Exhibit 2456 received in evidence)

23  DIRECT EXAMINATION

24  BY MR. S. STIRLING:

25  Q.  Mr. Buchwald, you're the Chapter 7 bankruptcy trustee for

1    both Renco Metals and MagCorp, is that correct?

2    A.  That's correct.

3    Q.  You were appointed in 2003?

4    A.  Yes, I was.

5    Q.  When you were appointed bankruptcy trustee for Renco Metals

6    and MagCorp, was this facility a part of the bankruptcy estate?

7    A.  No, it was not.

8    Q.  How did you come to be appointed trustee?

9    A.  A committee of bondholders petitioned the Court for a

10   trustee and that petition was eventually granted.

11   Q.  When you were appointed trustee, what did you understand

12   your responsibilities to be with respect to the assets and

13   liabilities of the estate?

14   A.  Investigate the financial affairs of the estates and review

15   and collect the assets of the estates ultimately for

16   distribution to the creditors.

17   Q.  The MagCorp magnesium facility in Utah had been sold out of

18   an auction in the bankruptcy a year before you were appointed,

19   is that correct?

20   A.  Yes.

21   Q.  When you were appointed trustee in 2003, how much cash did

22   you have in the estates of MagCorp and Renco Metals?

23   A.  Collectively, $220,000.

24   Q.  Let me ask you about some of the claims made against the

25   estate.  Were there claims against the estates of MagCorp and

1   Renco Metals?

2   A.  Yes.

3   Q.  What were some of the descriptions of the types of claims

4   that you had?

5   A.  Bond claims, trade claims, and government claims.

6   Q.  Can you describe briefly for the jury what trade claims

7   refers to?

8   A.  Sure.  The trade would be businesses that had dealings with

9   the company.  So it wasn't a loan, but actual products that

10  were sold or say electricity that was supplied, things of that

11  nature.

12  Q.  Do you recall the amount, approximate amount of the trade

13  claims?

14  A.  About $5 million.

15  Q.  You mentioned there were noteholder claims.  What are you

16  referring to there?

17  A.  Well, it's the notes that we have been hearing about a lot

18  the past couple of days.  $150 million of notes, plus about 19

19  million of accrued interest.  So there was interest on the

20  notes that hadn't been paid by the time of the bankruptcy.

21  Q.  What was the total amount of the noteholder's claim?

22  A.  169.

23  Q.  Million.  169 million?

24  A.  Million.  I'm sorry.  Yes.  Correct.

25  Q.  You referred to some government claims.  Can you tell me

1   what you are referring to there?

2   A.   They are claims from the Environmental Protection Agency

3   that -- some of which date back to 1992, and the bureau of land

4   management claims which date back to about 1993.

5   Q.   The amount of the EPA claim that you referred to, that has

6   not been resolved, is that correct?

7   A.   That's correct.  It's still the -- the case is still

8   pending.

9   Q.   With respect to the BLM claim, what was the amount of the

10  bureau of land management claim?

11  A.   That claim was $6.1 million.

12  Q.   What is your understanding about the time period for which

13  that claim --

14  A.   The time period was beginning in 1993.

15  Q.   Have you paid any of those claims that you just described?

16  A.   None at all.

17  Q.   Do you have any money available to pay those claims?

18  A.   Not at all, no.

19          MR. S. STIRLING:  No further questions, your Honor.

20          THE COURT:  Mr. Park.

21          MR. PARK:  Your Honor.  I have a couple of binders.  I

22  doubt I will be referring to these documents, but for purposes

23  of refreshing the witness' recollection if necessary.  If I

24  could hand them up.

25          THE COURT:  Okay.

1    CROSS-EXAMINATION

2    BY MR. PARK:

3    Q.  Mr. Buchwald, let me try to understand exactly what your

4    role is.  You're not a government employee, is that correct?

5    A.  That's correct.

6    Q.  In fact, you are an owner of a company called Buchwald

7    Capital, is that right?

8    A.  Buchwald Capital Advisors LLC.

9    Q.  Buchwald Capital Advisors.  I apologize.

10         And that is a company that you formed in 2001, is that

11   correct?

12   A.  That's correct.

13   Q.  And it has a single employee, you?

14   A.  That's it.

15   Q.  And the function of this organization is, in part, to

16   provide litigation support services, correct?

17   A.  In part.

18   Q.  And what that means is, sometimes lawyers, like Mr. Beus or

19   other lawyers in this room, might hire you to provide support

20   for their litigation, correct?

21   A.  Yes.

22   Q.  And so you essentially help lawyers with their lawsuits in

23   part, correct?

24   A.  I don't know if you would describe it as helping the

25   lawyers with the lawsuits.

1   Q.  You said you provide litigation support services, right?

2   A.  Right.

3   Q.  So you support their lawsuits, correct, yes or no?

4   A.  Yes.  I guess that's correct.

5   Q.  Now, in this case you were appointed by the bankruptcy

6   court, correct?

7   A.  Yes.

8   Q.  And you were appointed in April of 2003?

9   A.  Yes.

10  Q.  And you said that you were appointed on the motion of a

11  committee of senior noteholders, right?

12  A.  Yes.  They are called the ad hoc committee.

13  Q.  When you say an ad hoc committee, that means that it was an

14  informal committee of bondholders, right?  It wasn't a

15  committee formed at the behest of the bankruptcy court?

16  A.  Yes.

17  Q.  And this ad hoc committee was comprised of holders of the

18  1996 bonds that are at issue in this litigation, correct?

19  A.  Correct.

20  Q.  And some of these bondholders include AIG Global Investment

21  Corporation, is that right?

22  A.  At the time, yes.

23  Q.  At the time that you were appointed, correct?

24  A.  Yes.

25  Q.  And there was another organization called Carlyle High

1    Yield partners, correct, at the time?

2    A.   At the time, yes.

3    Q.   And Carlyle is one of the best-known private equity firms

4    in this country, is that right?

5    A.   I've heard of them.  I don't know if they are the best

6    known.

7    Q.   Mr. Buchwald, among other things, you have had experience

8    as an investment banker, correct?

9    A.   Yes, that's right.

10   Q.   And you would not consider Carlyle to be one of the best

11   known private equity firms in this country?

12   A.   I am not sure how you would calculate best known.  I know

13   them and they are well known, I would say.

14   Q.   Well known.  Thank you.  That's fine.

15        AIG Global Investment Corp., that's the hedge fund

16   division of the insurance giant AIG, correct?

17   A.   I believe so.

18   Q.   And another member of this ad hoc committee was Citadel

19   Equity Fund Limited, Correct?

20   A.   Yes.

21   Q.   And Citadel is a very well-known hedge fund, correct?

22   A.   Yes.

23   Q.   And another member of this committee was the RCG Carpathia

24   Master Fund, right?

25   A.   I believe so, yes.

1    Q.  That's a hedge fund, right?

2    A.  I don't recall.

3    Q.  In any event, these were all institutional investment

4    firms, is that right?

5    A.  Yes.

6    Q.  And this group, just this group, holds more than $95

7    million of the 1995 Renco notes, is that correct?

8    A.  I don't know what they hold today.

9    Q.  At the time, in 2003, do you recall that they held $95

10   million?

11   A.  I don't recall the amount.

12   Q.  I am going to ask you to turn to tab 5, paragraph 1.  I'm

13   sorry.  Paragraph 3A.  If you look at the numbers that are

14   reflected there alongside the investment funds, there were

15   bondholders.  Do you agree that that calculates to about $95

16   million?

17   A.  Excuse me.  Looks about right.

18   Q.  Does that refresh your recollection that in 2003 this

19   collection of bondholders held about $95 million of the notes?

20   A.  I don't recall seeing this document.  It's been a while.

21   But that sounds about right.

22   Q.  At some point you saw this document, right?

23   A.  I really don't recall.

24   Q.  You're a trustee of this estate.  Isn't it your job to

25   review all of the filings in connection with the bankruptcy

1    proceeding?

2    A.  I may have reviewed it.  I just don't recall right now.

3    Q.  You don't recall reviewing this document, but you're not

4    challenging that they held about $95 million?

5    A.  Correct.  I am not challenging the contents of it.  I just

6    don't recall.

7    Q.  Fair enough, Mr. Buchwald.

8            Some of these bondholders, the ones that we have just

9    identified, actually bought the bonds after the bankruptcy was

10   filed, correct?

11   A.  I don't know.

12   Q.  Do you have any reason to believe that some of these

13   bondholders did not file until after the petition was filed?

14           MR. S. STIRLING:  Objection.

15           THE COURT:  It was a foundation objection?

16           MR. S. STIRLING:  Yes, your Honor.

17           THE COURT:  Proceed.  Overruled.  Go ahead.

18   Q.  Do you have any reason to believe that some of them were

19   not postpetition purchasers?

20   A.  I don't know when these purchases were made.

21   Q.  Let's take a look at the same tab, tab 5, and I ask you to

22   turn to page 4.  Read that paragraph to yourself.  And tell us

23   if that refreshes your recollection that some of these

24   bondholders bought these bonds after the petition was filed?

25   A.  That's what it says.

1          MR. S. STIRLING:  Your Honor, I object to the

2   relevance.

3          THE COURT:  Overruled.

4   Q.  Mr. Buchwald, when a company that issued a bond files for

5   bankruptcy, that bond is sometimes known as distressed debt, is

6   that right?

7   A.  Yes.

8   Q.  And investors who buy distressed debt, i.e., bonds for

9   companies that are in bankruptcy, are sometimes known as

10  opportunistic investors, correct?

11  A.  Yes.

12         MR. S. STIRLING:  Objection, your Honor, relevance.

13         THE COURT:  Overruled.

14  Q.  Opportunistic investors are also sometimes known as vulture

15  funds, aren't they.

16  A.  Yes.

17  Q.  So in this case many of the bondholders who are creditors

18  for whom you were trying to bring money back are vulture funds,

19  aren't they, yes or no?

20  A.  If they still hold the bonds.  I don't know who holds the

21  bonds now.

22  Q.  As you sit here now, as the trustee of this estate, you

23  don't know who holds the bonds.  Is that your testimony?

24  A.  I don't know who the holders are.

25  Q.  You don't know who the holders are?

1    A.  No.

2    Q.  Let me make sure I understand that.

3            Some of the bondholders who bought these bonds

4    postpetition were part of this group that filed a motion in

5    bankruptcy court to cause you to be appointed as a trustee,

6    correct?

7    A.  Yes.

8    Q.  After that point is it your testimony that some of these

9    bondholders may have subsequently sold the bonds to other

10   potential investors?

11   A.  Yes, that is possible.

12   Q.  They would also be distressed debt opportunistic investors,

13   wouldn't they?

14   A.  It's possible, yes.

15   Q.  Every single one of them, whoever they are, who bought

16   subsequent to 2003 are all vulture funds, aren't they?

17   A.  I don't know that.

18   Q.  Let me turn to a different subject.

19           You are not being paid by the hour to act as trustee,

20   correct?

21   A.  No, I'm not.

22   Q.  In fact, you expect to be paid out of the recovery in this

23   litigation, correct?

24   A.  That's correct, yes.

25   Q.  And, in fact, you expect to be paid a commission out of any

1    recovery in this case, correct?

2    A.   That's correct, yes.

3    Q.   A percentage, correct?

4    A.   Yes, that's right.

5    Q.   The larger the recovery, the bigger your cut, right?

6    A.   Yes.

7               MR. PARK:  No further questions.

8               THE COURT:  Mr. Stirling.

9    REDIRECT EXAMINATION

10   BY MR. S. STIRLING:

11   Q.   Mr. Buchwald, the claim for $169 million that you referred

12   to on behalf of the bondholders was filed by the indenture

13   trustee?

14   A.   Yes, it was.

15   Q.   That is the entity or the person that holds that claim for

16   $169 million, correct?

17   A.   Yes.

18              MR. S. STIRLING:  No further questions.

19              MR. PARK:  Nothing further, your Honor.

20              THE COURT:  You may step down, Mr. Buchwald.

21              (Witness excused)

22              THE COURT:  Plaintiff call your next witness.

23              MR. BEUS:  We would like to call Mr. Mike Legge for

24   cross-examination.

25              MR. PARK:  Your Honor, if it's okay if I collect the

F23MBUC4

1    binders.

2            THE COURT:  Yes.

3            MR. BEUS:  May we pass up the binders as well.

4            THE COURT:  You may.

5            (Continued on next Page)

F234buc5

1          THE COURT:  Remain standing and face my deputy.

2          Thank you.

3     MICHAEL H. LEGGE,

4          called as a witness by the Plaintiff,

5          having been duly sworn, testified as follows:

6          THE DEPUTY CLERK:  Please state and spell your full

7     name for the record, please.

8          THE WITNESS:  I am Michael H. Legge.  And that is

9     M-I-C-H-A-E-L, H., middle initial, last name L-E-G-G-E.

10         THE COURT:  Thank you.

11    DIRECT EXAMINATION

12       BY MR. BEUS:

13    Q   Mr. Legge, you started working at the Rowley facility in

14    1979; correct?

15    A   That's correct.

16    Q   Before that, you worked for Phelps Dodge; correct?

17    A   I did.

18    Q   Phelps Dodge is now acquired by who?

19    A   Freeport-McMoRan.

20    Q   Does Freeport-McMoRan also own AMAX?

21    A   I am not aware of that.

22    Q   One way or another?

23    A   No.

24    Q   Okay.  In 1983, you had responsibility for the

25    environmental matters as the process superintendent at the

1    Rowley facility; am I correct?

2    A    Yes.

3    Q    That went on for approximately five years; am I correct?

4    A    Approximately five.

5    Q    Okay.  You were there in 1989, when AMAX was sold to The

6    Renco Group, a company called -- that formed a company called

7    MagCorp; right?

8    A    That's correct.

9    Q    And you then became plant manager; am I correct?

10   A    That is correct.

11   Q    And in 1993, you became the president and chief executive

12   officer of MagCorp; right?

13   A    That's correct.

14   Q    You have remained in that position since that time, up

15   until bankruptcy?

16   A    Up until the bankruptcy.

17   Q    While you were there in the 1980s, the Rowley facility was

18   losing tons of money; isn't that correct?

19            MR. PARK:  Object to form.

20            THE COURT:  Overruled.

21            THE WITNESS:  AMAX was investing a lot of money in the

22   facility, and we were not getting the returns on the sales, so

23   we were losing money.

24   BY MR. BEUS:

25   Q    I'm going to ask it again, Mr. Legge.  In fact, the

F234buc5                       Legge - direct

1    facility was losing, quote, tons of money; isn't that true, in

2    the '80s?

3                MR. PARK:  Object to the form, your Honor.  It has

4    been asked and answered.

5                THE COURT:  Overruled.  The witness is directed to

6    respond to the question.

7                THE WITNESS:  It was losing a lot of money.  I don't

8    know about tons.  It was losing a lot of money.

9    BY MR. BEUS:

10   Q   You don't know about tons?

11   A   I don't know about tons of money.  I don't recall that.

12   Q   Let me ask you if you recall giving the following answer to

13   the following question at page 54 of your deposition in

14   December of '02.

15               MR. PARK:  May I have the line, please?

16               THE COURT:  I need the deposition.  Where am I

17   looking?

18               MR. BEUS:  Page 54.

19               Do you recall --

20               THE COURT:  Before you inquire, what line?

21               MR. BEUS:  The question is at line 5, the answer is at

22   line 10.

23               THE COURT:  Just a moment.

24               MR. PARK:  I'm sorry.  What is the date?

25               MR. BEUS:  December 4th '02, page 54.

F234buc5                          Legge - direct

1              THE WITNESS:  Line what?

2              MR. BEUS:  Your answer begins at line 10.

3              THE WITNESS:  Page --

4              MR. BEUS:  Page 54, I'm sorry.

5              THE WITNESS:  Page 54.  Excuse me.

6              THE COURT:  Go ahead.

7    BY MR. BEUS:

8    Q   Do you recall, at line 5, being asked the following

9    question by Ms. Corman the government lawyer:

10   "Q   But does cost matter when you're considering which option

11   to follow?"

12              Your lawyer, Mr. Stevens:  "Are you talking about

13   neutralizing hydrochloric acid?"

14              "Ms. Corman:  Yes, for example."

15   "A   Costs are not insignificant because you can also go broke

16   doing these things.  This company was not making money in the

17   '80s.  It was bleeding.  It was losing tons of money.  So costs

18   were not ignored.  But we also, the first step to see if

19   anything will even work.  And if you neutralize something like

20   hydrochloric acid, you would hope that the cost -- excuse me --

21   benefits turn it into a by-product.  You would hope that it

22   would offset the cost of running whatever process it was.  That

23   would be a hope."

24              Is that the testimony you gave?

25   A   It is.  I didn't recall it.

F234buc5                          Legge - direct

1    Q   But it is what you said back then and you didn't correct it
2    after you read it?
3    A   No.
4    Q   So, in the '80s, we have tons of money being lost.  It was
5    also draining cash for the entire '80s; isn't that true?
6    A   It was draining cash.  I don't recall if it was for the
7    entire, but it was draining cash.
8    Q   Page 59, do you recall giving the following answers to the
9    following questions --
10              THE COURT:  What line?
11              MR. BEUS:  Line 7.
12              MR. PARK:  Your Honor, may we have a side bar?  This
13   is improper impeachment.
14              THE COURT:  Thank you.  What line?
15              MR. BEUS:  Line 7.
16              THE WITNESS:  Okay.  I'm on line 7.
17              THE COURT:  Go ahead.
18              MR. BEUS:  Question:  "Under AMAX, were the decisions
19   made in Denver?
20   "A   I don't know.  I'm just saying if you're a part of a much
21   larger corporation and you're draining cash, which we were for
22   the entire '80s, you're going to have some direction as to how
23   much cash you can drain in a given year."
24   BY MR. BEUS:
25   Q   Is that the testimony you gave?

          SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

F234buc5                          Legge - direct

1    A    It appears to be it's the testimony.

2    Q    Accurate?

3    A    It is as accurate now as it was then.

4    Q    AMAX was a very large company; correct?

5    A    Correct.

6    Q    Well financed?

7    A    It was well financed.

8    Q    There was never a time that AMAX could not put money into

9    the Rowley facility, to the best of your knowledge; isn't that

10   true?

11   A    I don't know that to be true.

12   Q    You don't know one way or another?

13   A    No.

14   Q    We're going to see some documents that you have written or

15   received.  Mr. Haveles indicated you folks had done some work

16   to be prepared for this trial.  Is that correct?

17            MR. PARK:  Objection to the commentary, your Honor.

18   He should put a question to the witness.

19            Your Honor --

20            THE COURT:  That's enough.  Do you have an objection?

21   If you have an objection, just say you have an objection, and

22   then I will rule.  Okay?

23            MR. PARK:  Thank you.  I do object.

24            THE COURT:  Sustained.

25            Ask your question.

F234buc5                         Legge – direct

1    BY MR. BEUS:

2    Q    Did you do work to prepare for this trial so that your

3    testimony could be accurate?

4    A    I did.

5    Q    Did you try to refresh your recollection so that you could

6    testify before this jury in preparation for this trial?

7    A    To the best of my ability.

8    Q    And you looked at a lot of documents; is that fair?

9    A    I looked at a lot of documents.

10   Q    Did you ever write a document that you think now, having

11   looked at it, that you can identify for us that you think was

12   wrong?

13            MR. PARK:  Objection.  Vague, your Honor.

14            THE COURT:  Overruled.

15            THE WITNESS:  Say the question, again.

16            MR. BEUS:  Sure.

17   BY MR. BEUS:

18   Q    Do you know of any document that you wrote that upon

19   reflection and review of that document, you believe is not

20   correct or accurate?

21   A    As I went through the documents, I found certain places

22   that it was not accurate.

23   Q    Tell me what document that you can identify was not

24   accurate that you wrote.

25   A    That I wrote?

SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

F234buc5                          Legge - direct

1    Q    Yes.

2    A    Okay.  I thought you meant all documents.

3    Q    I'm asking about what you wrote.

4    A    I can't recall a specific document that I wrote that was

5    incorrect.

6    Q    Are there any documents that you can recall now that you

7    have received that you now believe were not accurate at the

8    time?

9    A    I can't recall specific documents.

10   Q    So can you tell us any document we ought to be aware of

11   before I start showing you documents where you believe, based

12   upon the work you have done to prepare for this trial, that you

13   think is inaccurate?

14   A    I can't think of specific ones.

15   Q    Who was the chairman of MagCorp?

16   A    It was Ira Rennert.

17   Q    Who was the sole decision maker at MagCorp?

18   A    Sole decision maker.  Operations?  Or the whole business?

19   Q    The whole business if it was any material decision.

20   A    I made decisions on business.

21   Q    If you expended more than $10,000, did you get

22   Mr. Rennert's permission?

23   A    I would get a sign-off on it.

24   Q    In fact, you didn't have the authority to make a decision

25   over $10,000 in terms of expenditures without Mr. Rennert's

F234buc5                              Legge - direct

1   sign-off; is that correct?

2   A    That's incorrect.

3   Q    How is it incorrect?

4   A    It is incorrect because those terms were early in the

5   1990s.  And as I recall, later it was more of a -- we notified

6   Mr. Rennert, and we just basically came to a mutual

7   understanding that we would expend the money.

8   Q    So you had an unlimited budget at some point in time?

9   A    We had a budget limited by our own common sense.

10  Q    But you didn't need Mr. Rennert's permission to spend

11  money?

12  A    We would put capital appropriations requests in front of

13  Mr. Rennert, but we had a practice through almost all of the

14  1990s where we did not put a total of capital expenditures in

15  front of him such that we couldn't fund them with cash from

16  operations.

17  Q    So when we see documents here in a few minutes where you're

18  asking for permission to build something or to spend anything,

19  what is the purpose of those communications to Mr. Rennert?

20  A    It would be, one -- there's two purposes:  We had a

21  structure within our own organization which we told ourselves

22  we were going to spend a certain amount of money on

23  capitalization and we had accountability in the system.  If we

24  submitted a capital budget of a certain amount, then we did not

25  overrun that.  Mr. Rennert would approve.

F234buc5                    Legge - direct

1    Q    What you did is you prepared a budget, submitted it to

2    Mr. Rennert; right?

3    A    That's correct.

4    Q    Had monthly meetings, had a budget meeting, and Mr. Rennert

5    would be informed as to what you were going to do, how you were

6    going to do it, what you were going to spend, that kind of

7    thing?

8    A    That kind of thing.

9    Q    That happened monthly, probably 9, 10, 11 times a year,

10   maybe a month was missed?

11   A    10 or 11 times a year we had a monthly meeting and reviewed

12   this.

13   Q    At these monthly meetings, you would have reports given to

14   Mr. Rennert on production; right?

15   A    That's correct.

16   Q    On environmental issues?

17   A    If there was something significant, yes.

18   Q    On cell technology?

19   A    On cell technology if we had something going on in cell

20   technology.

21   Q    Was there ever a time where you said in these meetings --

22   those meetings took place from what, 1993, when you were

23   present, until after bankruptcy; right?

24   A    Sometime in that period, yes.

25   Q    Was there ever a time when you disagreed with anything

1  Mr. Rennert asked you or anybody on the management team to do?

2  A   I can't recall him disagreeing and saying no to anything

3  that we said we were going to do.

4  Q   I'm sorry.  Maybe I misspoke on the question.  I want to

5  know if you ever disagreed with any decision Mr. Rennert made

6  as it related to MagCorp or Renco Metals, Inc.?

7  A   We might give him our opinion on something.  We'd say, we

8  think we're going to do this, but I don't recall us ever saying

9  we disagree with what you're doing, Mr. Rennert.

10 Q   Mr. Rennert directed all of the policies; right?

11 A   Say again.

12 Q   Mr. Rennert himself directed and controlled the policies of

13 Metals and MagCorp; correct?

14         MR. PARK:  Objection, your Honor.  Compound.

15         THE COURT:  Overruled.

16         THE WITNESS:  He was the director of MagCorp, so

17 ultimately he controlled policies.

18 BY MR. BEUS:

19 Q   If you wanted to change your position, he had the ability

20 to do that; right?

21 A   He certainly did.

22 Q   And you always did what Mr. Rennert asked; right?

23 A   We did.

24 Q   And all members of management did what Mr. Rennert asked;

25 correct?

F234buc5                          Legge - direct

1    A    They always did what I said.

2    Q    I'm sorry?

3    A    They always did what I said, and I would do what

4    Mr. Rennert -- what was in his best interests.

5    Q    Let's get to the 1996 offering, where $150 million was

6    borrowed.  Dividends were paid out of that offering.  Did you

7    participate in that decision at all?

8    A    Which decision?

9    Q    To take the dividends.

10   A    No.

11   Q    You didn't.

12         Let me ask you:  Is it true that you had presented to

13   you by Mr. Rennert a document called the net worth appreciation

14   document or words to that effect?

15   A    Yes, I did.

16   Q    And when you got that document, you didn't even ask for it;

17   did you?

18   A    No.

19   Q    You didn't negotiate it?

20   A    No.

21   Q    Mr. Rennert just came in, told you to sign it, and

22   basically said, you'll get 3 percent of any dividends that are

23   passed up to Renco Group; isn't that true?

24   A    After vesting.

25   Q    You had already vested, though; right?

F234buc5                          Legge - direct

1    A    In '93, no.  It was three years to vest.

2    Q    By '96, you got a net worth appreciation --

3    A    '95, '96.

4    Q    It didn't take three years to vest.  This was given to you

5    in March of 1993; right?

6    A    Yes.

7    Q    At the time of the $75 million offering; right?

8    A    I don't recall that coincidence.

9    Q    Did you, in fact, consider each time, when you decided not

10   to object to dividends being paid out of MagCorp, did you ever

11   consider in your own mind that you might be conflicted as the

12   president and chief executive officer to support that dividend

13   because you get 3 percent of that?

14   A    No.

15   Q    It didn't cross your mind?

16   A    No.

17   Q    All the other officers of MagCorp, also, received a

18   percentage of every dividend paid by way of a net worth

19   appreciation payment each time a dividend was made; isn't that

20   true?

21   A    That's true.

22   Q    It is also true, isn't it, that none of those managers --

23   Mr. Thayer, Mr. Kaplan, Mr. Brown, Mr. Ogaard -- none of those

24   managers asked for that net worth appreciation payment, either;

25   did they?

F234buc5                          Legge - direct

1    A    I can't speak for them.

2    Q    Are you aware of whether they asked for it or whether, just

3    like you, they were just handed the net worth appreciation

4    payment contract and signed it?

5    A    I just don't know that.  I can't tell you what went on

6    there.  I'm not in their shoes.  I just know what happened with

7    mine.

8    Q    As the president and CEO, the chief executive officer, you

9    didn't take into consideration whether or not those officers

10   who reported to you might be conflicted as a result of the net

11   worth appreciation payments they might receive; is that true?

12   A    No.

13   Q    Didn't consider it?

14        Now, in addition to the net worth appreciation

15   payments, you had other benefits that were bestowed upon you by

16   Mr. Rennert; isn't that true?

17   A    We had a salary structure, yes.

18   Q    You had a retirement plan; didn't you?

19   A    I had no retirement plan.  That was the net worth

20   appreciation agreement.

21   Q    There was more than the net worth appreciation agreement,

22   wasn't there, that compensated you if and when you retired?

23   A    Not that I'm aware of.

24   Q    This is in evidence now.  Is the retirement program part of

25   the net worth appreciation payment?

F234buc5                         Legge - direct

1   A   The retirement program?

2   Q   The retirement program.

3   A   I'm aware of three levels of compensation I had.

4   Q   Let's go through those because I want to be fair to you.

5   You got a salary.

6   A   Base salary.

7   Q   You got a guaranteed bonus?

8   A   No guaranteed bonus.

9   Q   What was the basis for the bonus?

10  A   Performance bonus.

11  Q   Discretionary by Mr. Rennert; right?

12  A   If you didn't perform, you didn't get it.

13  Q   It was his decision as to what and how much you would get;

14  right?

15  A   Yes.

16  Q   And then, if there were dividends paid out, you would get

17  3 percent of whatever the total dividend was; correct?

18  A   That was a component of the net worth agreement.

19  Q   In 1996, for example, you received almost $3 million of net

20  worth appreciation payments; correct?

21  A   I don't recall exact number, but it is in that range.

22  Q   In that range.  Okay.

23          Would you look at Exhibit 2186.

24          Would you put that up for me, please.

25          I would like to understand this document.  It is in

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

F234buc5                          Legge - direct

1   the binder, and they are in numerical order, if you wish to see

2   it, as opposed to what is on the slide.

3          THE COURT:  Mr. Beus, do you have a binder for me?

4          MR. BEUS:  We do.

5   BY MR. BEUS:

6   Q   Look at the second page.  That's your signature; am I

7   correct?

8   A   Yes, it is.

9   Q   Let me get that on the screen, the second page.  There at

10  the bottom of this.  I will go quickly.  Right there, Michael

11  Legge.  And that is Ira Rennert's signature; am I correct?

12  A   That's correct.

13  Q   Go to the first page.  There is a line through this, but it

14  is a binding document, isn't it, even though this document that

15  was produced has this diagonal line?

16  A   Yes.

17  Q   Is your memory refreshed, looking at this document, as to

18  what you were given in June of 1996 in anticipation of the

19  $150 million you're going to borrow at MagCorp?

20  A   Yes.

21  Q   Let's just look at the first paragraph there.  Blow it up

22  as big as you can.  I would appreciate it.  Paragraph number 1.

23          Who drafted this document, by the way?  Do you have

24  any idea?

25  A   I don't.

1  Q   All right.  Let's just read paragraph 1.

2            It says, right before that, "This will confirm our

3  agreement with you as follows."

4            By the way, is this the agreement you signed and was

5  this the deal?

6  A   This is the agreement I signed in 1996.

7  Q   June 11th, 2 and a half, 3 weeks before the $150 million

8  borrowing; right?

9  A   That's correct.

10           MR. PARK:  Your Honor, I object.  I object to the form

11  of the question, to the word "agreement" --

12           THE COURT:  Overruled.

13  BY MR. BEUS:

14  Q   Paragraph 1 says, "As you know, our parent company, Renco

15  Metals, Inc., is contemplating a refinancing under which it

16  will issue 150 million of senior notes due 2003 (new notes) and

17  retire its presently outstanding 75 million of senior notes due

18  2000 (the existing notes)."

19           Does that refresh your recollection and put this in

20  context?

21  A   It does.

22  Q   Did you negotiate for this?

23  A   No.

24  Q   Mr. Rennert brings it in, gives it to you, you sign it, and

25  you get this deal; right?

F234buc5                         Legge - direct

1    A    Yes.

2    Q    Okay.  Let's go on and see what the deal is.

3              It says, "On the issuance of the new notes, this

4    company will pay a dividend to Renco Metals.  Concurrently with

5    the payment of such dividend, this company will make a payment

6    to you on account of the dividend and the agreement and you

7    will accept same in full settlement of all of your rights

8    arising from the payment of the dividend."

9              Do you see that?

10   A    I see that.

11   Q    It goes on to say, "In consideration of such payment and

12   your agreement to the amends to the agreement as outlined in

13   paragraph 2 below, the company agrees that although after

14   paying the above-mentioned payment, 'cumulative net income'

15   under the agreement would be approximately negative

16   $50 million.  Nevertheless, your cumulative net income will be

17   deemed to be zero as of July 31, 1996."

18             What did you understand that to mean?

19   A    What I understood that to mean is this was an amendment to

20   the original net worth agreement of 1993, and it basically

21   said, after the dividend, after the refinance -- after the

22   refinancing, that accumulated net worth calculation would be

23   reset to zero.

24   Q    Is it the net worth calculation or is it the cumulative net

25   income would be approximately negative $50 million?  Do you

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1    know which it is?

2    A    Cumulative net income is, in effect, net worth.

3    Q    The cumulative net effect at that point in time was

4    $50 million; right?

5    A    I don't recall what the number was before this document was

6    signed.

7    Q    Well, you knew that you were losing money '91, '92, '94 in

8    big numbers; and cumulatively, you had lost approximately

9    $50 million.  Mr. Rennert is right; right?

10   A    Negative.

11          MR. PARK:  Objection.

12   Q    Negative by about $50 million --

13          THE COURT:  If there is an objection --

14          THE WITNESS:  I'm sorry.

15          THE COURT:  I overrule the objection.

16   BY MR. BEUS:

17   Q    You did understand that Mr. Rennert's calculation of this

18   negative $50 million, it's an approximation, is what the

19   history had been since you took over as president, right, or a

20   little before?

21          MR. PARK:  Objection, your Honor.

22          THE COURT:  Overruled.

23          THE WITNESS:  I understood that that was the number.

24   BY MR. BEUS:

25   Q    So did you ever ask Mr. Rennert why he is giving you this

1   much money?

2   A    No.

3   Q    Did you ever think about why he's giving you this much

4   money?

5   A    No.

6   Q    He just came in and gave it to you, put you to zero?

7   A    Again, this is a component of the original net worth

8   agreement.

9   Q    But he brought it to zero; didn't he?

10  A    That was a reset.

11  Q    All right.  That's talking about a net income number.

12  Let's look at the balance sheet number.  Can you look at 2067.

13  It's in evidence.

14           Would you go down to where --

15  A    Excuse me.  I'm getting the hard copy.

16  Q    You bet.  Exhibit 2067.  They're in numerical order.

17  A    Okay.

18  Q    While he is doing that, can you put the full document there

19  so the jury has the opportunity to look at the date on the top.

20  Would you blow that top portion up.

21           You see the date here?  You got it on the first page.

22  This is July 31, '95.  You see that?

23  A    I see that date.

24  Q    If you go over there, you see July 31, '96.  There is the

25  budget number.  This is the actual number for July 31, '96.

F234buc5                          Legge - direct

1    A   I see that.

2    Q   Would you turn to the second page, Mr. Legge.  And would

3    you look at total stockholders' equity there, right there at

4    the bottom.  Can you blow that up for me, this line right here.

5    Right here.

6           All right.  If we're on the July 31st actual 1996

7    column, what is that number right here?  Up one line.  The

8    total stockholders' equity.  What's that number?

9    A   As of July 31, 1996, that number is 74.3 million negative.

10   Q   74.3 -- did you say "negative"?

11   A   Parentheses are negative.

12   Q   That means you're in the hole by $74.3 million as of the

13   time Mr. Rennert walks in and hands you what he thought was

14   $50 million negative and brings you to zero for calculations of

15   the net worth appreciation payment?  Am I correct?

16   A   That's what these two numbers say.

17   Q   That $74 million, $74 million in the hole to put it in

18   simple terms; right?

19   A   It is a negative stockholders' equity of 74 million.

20   Q   Now, let me ask you this:  In 1996, there was never a

21   valuation done of the assets of MagCorp; was there?

22   A   In 1996?

23   Q   In 1996.

24   A   I simply don't recall that.

25   Q   Didn't go out and get a valuation expert to go appraise

F234buc5                    Legge - direct

1    what the value of any of the assets were or what the company as

2    a whole was worth; did you?

3    A   I don't recall doing that.

4    Q   You don't know of one being done; do you?

5    A   I said I don't recall.

6    Q   '97, same answer?  No valuation; right?

7    A   '97, that's correct.

8    Q   That's also true for '98; is it not?

9    A   We did no valuation in '98.

10   Q   You didn't do one in 1995; did you?

11   A   We didn't do a valuation, to my knowledge.

12   Q   So when there is no validation done in '95, '96, '97, '98,

13   those are the same years where there was $111 million taken out

14   by Mr. Rennert; right?

15   A   We did no valuations in those years.

16   Q   And the number you have here in your own financial

17   statement shows a negative $74 million; right?

18   A   That's in our financial statement, that's correct.

19   Q   Those financial statements are supposed to be accurate;

20   aren't they?

21   A   They're accurate financial statements.

22   Q   And let me ask you:  Do you know whether the other senior

23   members of your management team also had the same benefit that

24   you had where Mr. Rennert walked into them and said, you're

25   also going to be brought to zero for net worth appreciation

1    calculations?

2    A    I believe that they all had the same agreement, but I'm not

3    certain.

4    Q    And is it your understanding, at least as you sit here,

5    that they didn't have to negotiate for that calculation of

6    wiping out, whether it is $50 or $74 million of negative, in

7    the hole, net worth and bring it to zero?  Am I correct?

8    A    I don't know what they did, but I assume they did the same

9    thing I did.

10   Q    Let me change subjects for just one second.  I want to

11   establish this clearly.  You were at the plant, and you have a

12   master's degree from the University of Arizona in metallurgical

13   engineering; right?

14   A    That's incorrect.

15   Q    What do you have?

16   A    Bachelor of science in metallurgic engineering.

17   Q    You don't have a master's degree?

18   A    I have one in business.

19   Q    The Eller School of Business?

20   A    It's been so long I can't remember the name of it.  It was

21   the School of Business.

22   Q    All right.  And you were head -- I don't want to repeat

23   myself -- from the '83 to '88 period, you were in charge of

24   environmental issues?

25   A    I had the environmental manager reporting to me as process

F234buc5                         Legge - direct

1     superintendent.

2     Q    There came a time when you understood there were hazardous

3     materials on the Rowley site; isn't that true?

4     A    In what period?

5     Q    Well, at the time you were deposed, you knew there were

6     hazardous materials; right?

7     A    Deposed by you or the government?

8     Q    Deposed by me.

9     A    Okay.

10    Q    You did?

11    A    Yes.

12    Q    And you knew that the contaminants you knew about at the

13    time of your deposition had existed on this property since you

14    went to work for AMAX in '89; right?

15    A    I don't recall knowing that.

16    Q    Let me ask you this:  As you sit here today, can you

17    describe for me the alleged environmental contamination at the

18    time of the NPL listing that were not alleged to have existed

19    in 1996?

20    A    Please say that again.

21    Q    All right.  I want to know, as you sit here today, if you

22    can describe for me any alleged environmental contamination at

23    the time of the NPL listing that were not alleged to have

24    existed in 1996.

25    A    I can't.

F234buc5                         Legge - direct

1    Q   I'm sorry?

2    A   No.  I said, I don't know what alleged violations there

3    were in contaminants at the time of the NPL listing nor the

4    alleged, in 1996, so it would be difficult for me to compare

5    those and say one existed and one didn't.

6    Q   Let me ask you if you recall giving the following answers

7    to the following questions at page 195, beginning at line 4.

8              THE COURT:  Same depo?

9              MR. BEUS:  March 2011, March 31, 2011.

10             MR. PARK:  I'm sorry.  What page is that?

11             MR. BEUS:  Page 195.

12             MR. PARK:  Line?

13             MR. BEUS:  4.

14             THE WITNESS:  Lines?

15   BY MR. BEUS:

16   Q   Beginning at line 4.

17   "Q   They're allegations.  I want to know, as you sit here

18   today, if you can describe for me or for the record alleged

19   environmental contamination at the time of the NPL listing that

20   were not alleged to have existed in 1996."

21             MR. PARK:  Your Honor, there was an objection to that

22   question.

23             THE COURT:  In any event, I'm sustaining the objection

24   here now.  You're not going to read this deposition.

25             MR. BEUS:  Okay.

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

F234buc5                          Legge - direct

1        THE COURT:  You can ask him if this refreshes his

2   recollection.

3   BY MR. BEUS:

4   Q   Does it refresh your recollection that you can't cite any

5   contamination that was allegedly existing in the CERCLA

6   regulation that didn't exist in the 1990s?

7   A   Let me read it.

8   Q   Sure.

9   A   The question is confusing, as it was then.  But I would say

10  I'm not aware of environmental contamination that they

11  referenced in the, I guess, NPL listing.  That's what you're

12  saying?

13  Q   Yes.

14  A   Okay -- that did not exist as of 1996.  I just don't know

15  that.  I don't know the difference.

16  Q   You don't know the difference.  So, as far as you know,

17  whatever existed at the time of the NPL listing also existed,

18  whatever it was back, in the 1990s?

19  A   I don't know that.

20  Q   You don't know one way or another?

21  A   No.

22  Q   Do you --

23  A   I don't have the evidence on that.

24  Q   You know who John Veranth is; right?

25  A   I do.

F234buc5                    Legge - direct

1    Q    He worked for you for a while; did he not?

2    A    He worked in the process control department.  I cannot

3    remember if he reported directly to me or someone else, but he

4    was in our department.

5    Q    And he has two degrees from MIT; right?

6    A    I believe he has mechanical engineering degrees from MIT.

7    Q    He is a competent engineer; isn't he?

8    A    When he worked for us, I regarded him as a competent

9    engineer.  And he was a mechanical.

10   Q    Now, he is a Ph.D.  Do you understand that?

11   A    I do not.

12   Q    When you, in July of '96, received the change that you

13   talked about in the net worth appreciation payment structure,

14   several months before, something happened to the magnesium

15   market.  Can you describe that?

16   A    In 1996?

17   Q    No.  Months before.  Let's talk about '95.

18   A    '95?

19   Q    Yes, let's say between '95 and '97, how would you

20   characterize that period?

21        MR. PARK:  Object to the form, your Honor.

22        THE COURT:  Overruled.

23   BY MR. BEUS:

24   Q    As to what it meant with respect to magnesium prices.

25   A    Without documents in front of me, I would say, in general,

F234buc5                        Legge - direct

1    I recall that the world inventories were tight for the amount

2    of shipments that were occurring, and that caused reasonable

3    good prices, and I recall that the International Magnesium

4    Association reports reflected that.

5    Q   So do you consider the period between about '95 and '97 as

6    the zenith of the last three decades?

7    A   I believe that I had stated that in the deposition

8    somewhere.  It was -- it really seemed to be the beginning of a

9    breakout in the use of magnesium in a lot of ways.  It was

10   better than the last several decades insofar as I knew about

11   the last decades.

12   Q   The last three decades covered the decades previous to

13   2002, when this deposition was taken; right?

14   A   Yes.

15   Q   Okay.

16   A   Excuse me.  I believe I was thinking a breakout from the

17   three decades prior to 1996 or '95.  You said '95-'96 period?

18   Q   I said '95 to '97.

19   A   Okay.  I thought you meant the three decades prior would

20   have been prior to that.

21          THE COURT:  Shall we take our mid-afternoon break

22   here.

23          Members of the jury, we have some refreshments for you

24   in the jury room.  Take about 10 minutes, come back, and we'll

25   finish out the day.  Thank you.

F234buc5                          Legge - direct

1          THE COURT:  Matters to take up?  Anything, counsel?

2          MR. PARK:  No, your Honor.

3          THE COURT:  All right.  I will return in 10.

4          (Recess)

5          (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           THE COURT:  Matters to take up?

2           MR. PARK:  No, your Honor.

3           MR. BEUS:  None, your Honor.

4           THE COURT:  Thank you.

5           Bring in the jury.

6           Estimated time, Mr. Beus.

7           MR. BEUS:  I hope to finish with him by the end of the

8    day.  It's a little slower than I thought.

9           (Jury present)

10          THE COURT:  Members of the jury, thank you for your

11   continued attention and diligence.

12          Mr. Beus, you may proceed.

13   BY MR. BEUS:

14   Q.  Mr. Legge, what benefit did MagCorp itself get for the

15   dividends?

16   A.  None.

17          MR. BEUS:  Would you put up Exhibit 2033, page 11, for

18   me, please.

19   A.  What number?

20   Q.  2033.  It will be in the binder.  They are in numerical

21   order.

22          Are you with me, page 11?

23   A.  I'm with you.

24   Q.  The heading at the top -- maybe you can just bring it down

25   a little bit -- is use of proceeds.  This is the use of

1    proceeds that's described as to what's going to happen with

2    some of the $150 million, am I correct?

3    A.  You are correct.

4    Q.  Now, would you go down to the uses.  It shows retire the

5    existing notes, $88.8 million.

6              You see that?

7    A.  I see that.

8    Q.  In fact, it wasn't quite that much because all of those

9    noteholders didn't allow their bonds to be retired, right?

10   A.  I vaguely remember that.

11   Q.  Now, the rest of these items, the dividend of the group of

12   75.7, the redemption of the 10 percent preferred stock of eight

13   and a half million, the contractual compensation, the net worth

14   appreciation payments and the transactional fees, those were

15   all costs to MagCorp, right?

16   A.  They are use of proceeds.

17   Q.  They are costs.  That's money that is not going to be

18   available to MagCorp, right?

19   A.  Yes.

20   Q.  Those items alone total $96 million, right?

21   A.  It's about right.

22   Q.  And the premium, instead of being $13.8 million, was

23   actually $9.4 million for a total cost to MagCorp in cash of

24   $105 million as a result of borrowing this $150 million.

25             Do you agree with that?

1    A.  That's the total of the numbers, yes.

2             MR. BEUS:  Now, go back to 1993.  Would you go to

3    Exhibit 2040.  This is the '93 offering of $75 million.  Would

4    you go to page 13, Exhibit 2040.

5             Can you go down where the first highlighting is and

6    blow up from the first highlighting through the footnotes

7    please, Bart.

8    Q.  Do you see the AMAX note there of $10 million up above,

9    right here, that was owed to AMAX by MagCorp?  You see that $10

10   million?  Look right up here.  It may be easier for you.

11   A.  I do now there is a footnote by it.  I think it's footnote

12   B, right?  Footnote B.

13   Q.  Would you read that footnote into the record for me,

14   please.

15   A.  This amount representing a subordinated note payment to

16   AMAX which is carried as long-term debt on the company's

17   financial statements.  The company has negotiated to purchase

18   such note and acquired interest and 3.6 million of other

19   related obligations for $7 million.

20   Q.  Am I correct that there is $13.6 million that MagCorp

21   acknowledges that is owed to AMAX and that's being discounted

22   to $7 million, is that correct?

23             MR. PARK:  Your Honor, misconstrues this record, the

24   company.

25             THE COURT:  Mr. Park, if you have an objection, you'll

1    take to your feet and say the word objection.  And if I ask for

2    more, you can give me a one-word ground.

3              MR. PARK:  Very well.  I apologize.

4              THE COURT:  Overruled.

5    A.  It appears that that's right, it was discounted.

6    Q.  From 13.6 to $7 million?

7    A.  That's what it looks like.

8    Q.  And that $6.6 million difference, that was actually

9    reported as income on MagCorp's books, right?

10   A.  Yes, and it would be.

11   Q.  So if you look at the historic numbers of MagCorp, from

12   '90, '91, '92, '93, '94, '93 should be in terms of $6.6 million

13   of gain or of income, came as a result of getting a discount,

14   not by production of magnesium, right?

15   A.  That's what appears, yes.

16   Q.  Let's go to Bates 67.  That's the numbers on the very

17   bottom there.  These are in the footnotes to the financial

18   statements.

19             Are you with me?  Page 67.

20             THE COURT:  I'm sorry.  What Bates are you referring

21   to?

22             MR. BEUS:  67.  It's F12 in the financial statements,

23   Exhibit 2040.

24   Q.  Have you had a chance to review the subordinated notes?

25   A.  Is it F12?

1    Q.  F12, the financial statements.  Page 67.

2              Do you see that, where it says promissory note right

3    here?

4    A.  I'm reading.

5    Q.  You got it?

6    A.  Yes.

7    Q.  Were you aware that AMAX had a lien on all of the stock of

8    MagCorp when they decided to take a $6.6 million discount?

9    A.  No.

10   Q.  That's what this footnote says, right?

11   A.  I am not sure it says that.

12   Q.  Let's just look at it.  The third sentence says:  The note

13   is secured by all of the issued and outstanding capital stock

14   of MagCorp.  And $167 guarantee by an affiliate of Renco, which

15   will be paid during the remainder of calendar year '92.  You

16   see that?

17   A.  I see that.

18   Q.  Do you have any doubt about its accuracy, seeing it in the

19   audited financial statements?

20   A.  No.

21   Q.  AMAX took the $6.6 million discount, even though it had to

22   write and had the security for all of the stock of MagCorp.

23   Did I get that right?

24   A.  Apparently, yes.

25   Q.  We have talked about the '96 dividends.  Let's go to the

1    '97 dividends.

2            MR. BEUS:  Would you put up Exhibit 2716.  I don't

3    think we got this in the binder, your Honor.  I apologize.

4    It's in evidence.

5            Can you put up Exhibit 2716, Bates 992 for me, Bart.

6    Will you highlight the very top paragraph.

7    Q.  Do you know what this is?

8    A.  The entire document?

9    Q.  This page.

10   A.  It says it's a calculation of dividend eligibility.

11   Q.  This is calculated for 1998, right?  Have you ever seen

12   this document before?

13   A.  I don't recall seeing this document.

14   Q.  Do you see that there is a reference where they urge

15   extreme caution in taking a dividend?

16   A.  I recall seeing that statement.

17   Q.  You do.

18           How do you recall that statement to exercise extreme

19   caution in taking dividends?

20   A.  Because I now recognize this document as one I went over.

21   Q.  You have an identical document to this in '97 as well,

22   didn't you?

23   A.  There were two years.

24   Q.  '97 and '98?

25   A.  That's correct.

1   Q.  Notwithstanding urging extreme caution, in this document

2   the dividends were taken, right?

3   A.  Yes.

4   Q.  And this comes from TRO, that's Mr. Ogaard, the chief

5   financial officer of MagCorp?

6   A.  Yes.

7   Q.  And it's sent to Mr. Fay, who is the chief financial

8   officer of both Renco Metals and Renco Group, right?

9   A.  That's right.

10  Q.  The dividends were all taken in '97, '98, notwithstanding

11  that, right?

12  A.  It was advice that Mr. Ogaard was given.

13  Q.  Do you know if that was ever discussed with Mr. Rennert?

14  A.  I don't know.

15  Q.  Now, you were here when Mr. Haveles talked about the

16  Chinese coming in in 2001.

17          Do you recall that, in his opening statement?

18  A.  2001, I recall him talking about the Chinese.

19  Q.  In fact, the Chinese had already come in much earlier than

20  that, isn't that true?

21  A.  To what degree?

22  Q.  Enough to cause the market to start declining in early '96.

23  A.  I don't agree with that.

24  Q.  Let's look at some documents.

25          Before we do, let's talk about tariffs.  There was

220

1    never a time where MagCorp got tariff on powder, right?

2    A.  There was a tariff on powder, but I believe it was in 2001,

3    2003 period, some time in that period.

4    Q.  Do you recall giving the following answers to the following

5    questions at page 107 of your March 31, 2011 deposition

6    beginning at line 8.

7            MR. PARK:  What page was that?

8            MR. BEUS:  Page 107.

9            THE COURT:  Just a second.

10           You're pointing to line 8?

11           MR. BEUS:  Line 8 through line 13.

12   A.  Line 8 through line 13.  Again, what page, Mr. Beus?

13   Q.  Page 107.

14           MR. BEUS:  May I, your Honor?

15           THE COURT:  What's the question.

16   Q.  The question, did you ever get --

17           THE COURT:  What question did you ask the witness

18   here?

19           MR. BEUS:  I asked the witness, did they ever get

20   relief on powder.

21   A.  I don't believe I'm still on the same page.  My page --

22           THE COURT:  Just a second.  The question you asked

23   here in court was:  There was never a time where MagCorp got

24   tariff on powder, right?

25           MR. BEUS:  Yes.

1              THE COURT:  And his answer was:  There was a tariff on

2    powder, but I believe it was in 2001, 2003 period, some time in

3    that period.

4              What are you pointing me to here?

5              MR. BEUS:  Let me withdraw the question.

6    Q.  You never got relief on powder with any tariff prior to

7    2001, is that correct?

8    A.  That's correct.

9    Q.  And you never got relief on any alloys in the '90s to the

10   best of your knowledge, did you?

11   A.  No.

12   Q.  And an alloy is when you mix magnesium with some other

13   chemical, right?

14   A.  That's correct.

15   Q.  And when you do seek relief you go to the ITC, right?

16   A.  That's the International Trade Commission.

17   Q.  And you can't predict the outcome of what you can get in

18   the ITC, can you?

19   A.  No.

20   Q.  In fact, you didn't even attempt in '96, '97, '98 or '99 to

21   appeal the refusal of the ITC to provide a tariff on magnesium

22   alloys.  Isn't that true?

23   A.  I can't recall what we did during that period on tariffs.

24   Q.  Let me just read you from the 10K exhibit, 2075, at page

25   10, middle paragraph, if you can put that up.

1    A.   Is that in the binder or in the stack?

2    Q.   It's right here.  He will put that middle sentence up right

3    out of the 10K, if that's okay.  I would like to move along as

4    fast as I can.

5         There at top paragraph it says:  No antidumping duties

6    were imposed against magnesium alloys.  These rates are subject

7    to revision and administrative reviews, which can be requested

8    annually.  Such reviews could have been requested in May 96,

9    '97, '98 and '99, but none were.

10        Is that a true statement?

11   A.   That's a true statement.  I'm certain there was reason we

12   didn't request it.

13   Q.   That you didn't request it and you didn't get it, right?

14   A.   Right.

15   Q.   Let's go to Exhibit 26.  I'm sorry.  Exhibit 2038.

16        Can you tell me what is spot pricing?  Just the term

17   spot pricing.  What does it mean?

18   A.   It's basically a sale that's done not under contract and

19   sort of more on an ad hoc basis.  In other words,

20   contractors --

21   Q.   It's just what the open market will bear without a

22   contract, is that right?

23   A.   Somewhat, yes.

24   Q.   At Exhibit 2038 here, this is from Mr. Kaplan to yourself.

25   This is 8 April 96 before the figure dividends.

1          Are you with me?

2     A.   Yeah.  I'm with you.

3     Q.   Let's go down to the second paragraph.  I need to move it

4     along.  Second paragraph says:  Magnesium shipped to the west

5     from the east increased to 56,300 metric tons from an estimated

6     44,200 tons in 1994 and 50,100 tons in '93.

7          By the way, that's more than the total production at

8     MagCorp, right, those numbers?

9     A.   At that time it would be, yes.

10    Q.   It goes on to say, quote, this is consistent with reports

11    that have been expanding of late, indicating significant

12    additional production of Chinese material available in the west

13    along with currently more Russian material.

14         Was that the case, was Mr. Kaplan right?

15    A.   That's accurate, that sentence, yes.

16         MR. BEUS:  Let's go to page 2.  Let's move this along.

17    Last paragraph.  Can you highlight that and blow that up for

18    me, Bart.

19    Q.   Here it says for the first quarter of 1996, we have seen

20    some reduction in orders.  The orders being referred to there

21    are MagCorp orders, right?

22    A.   That would be right.

23    Q.   It goes on in the next sentence.  It says:  Contract

24    pricing is firm, but continued growth in imports of Russian

25    pure, FSU and Chinese alloy and waste of scrap are creating

1    some problems with spot pricing.

2              Is that true?

3    A.  First back to the first sentence it says there is a

4    reduction of orders in the aluminum segment.  That's one

5    segment.  And contract pricing, he is saying it's creating some

6    problems with spot pricing.  And we were about 85, 90 percent

7    contract.

8    Q.  And I'll come back to the contracts in a minute.  Would you

9    look at Exhibit 2039 for just a moment.  This is dated 22 May

10   96.  This is from Mr. Kaplan, again to yourself, with a copy to

11   the New York folks, right?

12   A.  Yes.

13             MR. BEUS:  Go to the second page, the page after this,

14   if you would, Bart.

15   Q.  This says:  Inventory increased to 30,300 metric tons from

16   the end of '95 from 22,800 tons.

17             Inventories go up as more supply has normally an

18   adverse effect on the price, right?

19   A.  Yes.

20   Q.  Then it goes on to say:  Magnesium consumption by the west

21   of eastern material increased in the first quarter to, and it

22   gives the same numbers that I think we saw before.  This

23   reflects increased shipments to the west of Chinese material

24   and perhaps a bit more Russian.

25             Do you see that?

1    A.  I see that.

2    Q.  When you mean the west, you mean Europe and North America?

3    A.  The west is everywhere except China, Russia.

4    Q.  It says, quote, Chinese material continues to be sold at

5    extremely low prices as shown in the attached press clipping,

6    which is putting significant pressure on both western and

7    Russian pricing.

8            Was that true, as of May of '96?

9    A.  It says that it's putting significant pressure on both

10   western and Russian pricing.  Western pricing is all over and,

11   again, we are selling primarily in North America.  He doesn't

12   say North America pricing.

13   Q.  Did it have an impact on North American pricing?

14   A.  It had less of an impact on our North American pricing

15   because we were 85 percent contract.

16   Q.  Some of those contracts fall apart, don't they?

17   A.  At points in time.

18   Q.  We will come to that in a few minutes.

19   A.  But not during this period.

20   Q.  Take a look at Bates 6 of this document, the press

21   clipping.  Blow that up.  Is this the press clipping that you

22   received from Mr. Kaplan?

23   A.  Yes.  I believe -- it was attached to a report.

24   Q.  Hard to read, but it basically says that the price in

25   Rotterdam, if I've got it right is 1.13 to $1.22.  Is that

F23MBUC6                          Legge - direct

1   right?

2   A.   That's in Rotterdam.

3   Q.   That affects you, doesn't it?

4   A.   We weren't selling it to Europe.

5   Q.   Europe never has tariffs, do they?

6   A.   There were some tariffs in place in Europe briefly, but

7   then the producer that had standing went out of business.

8   Q.   When the price goes down in Rotterdam, there is no tariff

9   protection at all from the Netherlands to the United States, is

10  there?

11  A.   From the Netherlands.  They are not a producer.  The

12  imports come in and their tariffs are put on them as producers.

13  Q.   Well, by May of '96 you are worrying about the price and

14  Mr. Kaplan is telling to worry about the price.  Isn't that

15  true?

16  A.   Mr. Kaplan is telling me how he views the market, and we

17  are always looking at price.  We are always looking at supply

18  and demand inventory.  It's constant.

19  Q.   And the price is coming down in May of 96, right, by your

20  own documents?

21  A.   It's not that significant at that time.

22  Q.   It doesn't impact you at all?

23  A.   It does.  But I'm just saying, Mr. Kaplan is covering a

24  pretty broad field.  He's basically showing us, myself,

25  everything out there in the market.

F23MBUC6                          Legge - direct

1    Q.  Let's take a look at Exhibit 2663.  This front cover here,

2    Bates 1, is from you to Mr. Ryan, right?

3    A.  I'd like to find 2663.

4    Q.  If you can just look off the screen, it will save us a lot

5    of time.  If not, I will wait for you.

6              THE COURT:  Also, it's in front of you on that screen.

7    Are you able to read that?

8              THE WITNESS:  On this screen I have some problems with

9    it, but I'll work with it.

10             THE COURT:  You need to be able to see it.  If you

11   can't, we will take the time to look in the binder.

12   A.  I will give it a try.

13   Q.  Can you see the big screen?

14   A.  I can.

15   Q.  This is from you to Mr. Ryan.  Let's turn the page.  This

16   is on May 6.

17             MR. BEUS:  Blow that up as much as you can.  Thank

18   you.

19   Q.  On May 6, '96 you yourself are writing Mr. D'Atri, right?

20   A.  That is correct.

21   Q.  Copy to Mr. Ryan and Mr. Sadlowski, right?

22   A.  Yes.

23   Q.  And this is regarding a conference call with DLJ, right?

24   A.  Yes.

25   Q.  You say:  Dear Justin, I have attached a recent fax from an

F23MBUC6                           Legge - direct

1   Alumax buyer to show that we have recently experienced real

2   feedback from customers regarding import magnesium priced below

3   our existing contract pricing.

4            Did you write that?

5   A.  I can see that.

6   Q.  Did you write it?

7   A.  I did.

8   Q.  It goes on to say:  Thus, we should introduce this in the

9   discussion under the section risks.  I don't know how this

10  situation will develop by late June to early July.

11           Did you write that?

12  A.  I did.

13  Q.  You go on to say:  It's obvious that the import metal is

14  available and many contract customers are throwing that back at

15  us to challenge current contract prices.

16           Did you write that?

17  A.  I did.

18  Q.  Was it true?

19  A.  Customers were always throwing back import prices to us if

20  they were lower.

21  Q.  So prices go down even though you have a contract, it

22  creates problems, right?

23  A.  It didn't say it broke the contracts.  They say they throw

24  it in our face.

25  Q.  Then you have to make decisions as to whether you meet the

1    price or lose the customer, right?

2    A.  That's not entirely correct.

3    Q.  It's partially correct?

4    A.  You can live by the contract until it's finished and

5    renegotiate.

6    Q.  And if you do that, and you don't meet the price, isn't it

7    true?

8    A.  You may not lose a contract and you may.

9    Q.  Let's take a look at next page of this document.  It says,

10   quote, due to some competitively -- this is from Alumax, a very

11   big customer, right?

12   A.  That's correct.

13   Q.  Is it your single biggest customer?

14   A.  At that time, I don't recall.

15   Q.  Was it close to your single biggest customer?

16   A.  Large customer.

17   Q.  They write, who is Don Barber?

18   A.  I have no idea at this time.

19   Q.  It's from Alumax, though, right?

20   A.  I assume it was purchasing.

21   Q.  You're sending it on to the New York folks because you are

22   worried about it, right?

23   A.  I think we are sending it on because we want full

24   disclosure, accurate disclosure in the prospectus.  That was

25   the intent because we were talking about updating the area

1  called risks.

2  Q.  Let's look at what this document says.  Quote:  Due to some

3  competitively priced primary magnesium in the marketplace right

4  now, we need you to put May, June, and July loads for plant

5  city on hold for now.  Confirmation/cancellation of status of

6  those loads will come in due time.

7  A.  I see that.

8  Q.  One of your largest customer puts this on hold, right?

9  A.  Yes.

10 Q.  Let me have you take a look at Exhibit 2024.  This is

11 another document you received from Mr. Kaplan on 26 August 96.

12 This document describes a number of problems you are having

13 from the Chinese and eastern markets, right?

14 A.  It describes a number of concerns we have on imports.

15 Q.  And it reports there in the third paragraph, without taking

16 the time to read it all, it says:  The excessive amounts of

17 eastern material available continues to promote three-tiered

18 pricing system with Chinese material available in Rotterdam at

19 prices on the order of 2200 to $2400 per metric ton, right?

20 A.  That's what it says.

21 Q.  And $2200 a metric ton is a dollar a pound, right?

22 A.  Roughly, yes.

23 Q.  You see all of this coming.  And on the next page you talk

24 about the aluminum market and Alumax, right?

25 A.  That's right.

1   Q.  And you say:  Alumax and other large companies are pushing

2   this back at you because they can buy it cheaper.  Isn't that

3   right?

4   A.  Yes.

5   Q.  How many factories were there in China as of 1996?  Do you

6   have any idea?

7   A.  I have no idea.

8   Q.  Let me have you take a look at Exhibit 2001.  Go to page

9   158.

10          Were there, in fact, hundreds of Chinese factories in

11  the '90s?

12  A.  In this report, the sources, I have not found it yet.

13  Q.  Here is a list of some of the factories, just a few in '96.

14          Do you see those?

15  A.  I do see it.

16  Q.  Did you go to China?

17  A.  I did not.

18  Q.  Did anybody go from MagCorp to China?

19  A.  Howard Kaplan did.

20  Q.  And did he report there were hundreds of factories in

21  China?

22  A.  He said there were a great deal of very small producers.

23  Q.  They used a different system, didn't they?

24  A.  They did.

25  Q.  They used a pigeon system, right?

1   A.  Yes.

2   Q.  Did they create chlorinated hydrocarbons?

3   A.  I have no idea.

4   Q.  The onslaught continues, does it not, as to Chinese

5   magnesium in '96 and '97, right?

6   A.  That's not my word.  I don't agree with onslaught.

7   Q.  You do agree, don't you, that the Chinese material, as of

8   May '96, continues to be sold at extremely low prices, putting

9   significant pressure on both western and Russian pricing?

10  A.  In the overall western market.

11  Q.  In fact, by March of '97, you are writing Mr. Kaplan

12  yourself, with a copy to Mr. Rennert, stating that the western

13  markets have become more saturated with eastern imports and

14  Chinese magnesium, right?

15  A.  I don't see that document, where it is.

16  Q.  Let me just show you.  I am trying to move quickly.  2555.

17  There it is right here on the screen:

18          You are writing this to Mr. Rennert.  Go to the second

19  page.  I am going to move very quickly.

20  A.  I see it.

21  Q.  So the western markets are becoming more saturated with

22  eastern imports and Chinese magnesium.  The pricing on

23  commodity magnesium will deteriorate more significantly,

24  leaving only more complicated products with reasonable pricing

25  and margins.

1              Did you write that?

2   A.  Yes.

3   Q.  Was it true?

4   A.  Yes.

5   Q.  Let me show you Exhibit 2556.  This is from you to

6   Mr. Rennert.  Is this a document that you wrote on the 2nd of

7   January, on or about that date, 1998?

8   A.  It is.

9   Q.  Let's go to page 3 of this document that you sent to

10  Mr. Rennert.  Would you go to page 3.

11  A.  Give me the document number because I have not located it?

12  Q.  2556.

13  A.  Which binder?

14  Q.  I can't tell you which binder.

15              Can you see this up here?  If you can't --

16  A.  Okay.  Got it.

17  Q.  You say in this e-mail to Mr. Rennert:  A basic business

18  MagCorp premise is that future magnesium market pricing will

19  remain in the dollar 60 per pound range (average for all

20  MagCorp products).

21              Is that a true statement?

22  A.  In the context of this memo?

23  Q.  There is no context here.  It says:  Average for all

24  MagCorp products.  Is that what it says it means or it means

25  something else?

F23MBUC6                    Legge - direct

1   A.  That's what it says.  But this memo was analyzing a

2   purchase of a Dow fabrication facility, and I wrote things in

3   here that were -- some of them were specifically addressed

4   towards that evaluation of that purchase.

5   Q.  Mr. Legge, I understand you're thinking about whether or

6   not you can buy a piece of the Dow property.  But you are

7   laying out the basic fundamentals of what MagCorp does with

8   magnesium in this paragraph, are you not?  That's what you are

9   doing, isn't it?

10  A.  I am saying, in this memo that I'm looking at the metal

11  that would be going to the Dow fabricated business and I'm

12  saying, we have to have metal prices for this specific venture

13  be about a 1.60 range, and later in the document it shows they

14  are selling -- that Dow is selling metal on a subsidized basis

15  into this venture and it has to go on for three more years if

16  you acquire the venture.  That's the context.

17  Q.  You say, do you not, future magnesium marketing prices will

18  remain in the dollar 60 per pound range (average for all

19  MagCorp products).  Was that the average for all MagCorp

20  products?

21  A.  Dollar 60 at that time?

22  Q.  Yes.

23  A.  I don't know what it was at that time, but I said, it needs

24  to be in that range.

25  Q.  Then you go on to say:  Quote, in order to provide

1    sufficient funding to survive.

2              Those are your words, are they not, yes or no?

3    A.  Yes.

4    Q.  I could show you another whole handful of documents you

5    wrote regarding how China in 1996 and 1997 were selling at very

6    cheap prices and they would impact MagCorp?

7              MR. PARK:  Objection.

8              THE COURT:  Sustained.

9    A.  I wrote --

10             THE COURT:  I sustained the objection, sir.

11             Next question, Mr. Beus.

12   Q.  Did there come a time when you had concerns that MagCorp

13   would be perceived in the marketplace as not a long-term

14   player?

15   A.  Some time in the period, around, I believe, 2000, 2001,

16   some time in that period, when the market deterioration was

17   really accelerating, I was concerned that if we didn't do

18   certain things we could be perceived as not a player.

19   Q.  Could it be as early as 1999, when you wrote Mr. Rennert a

20   memo that said exactly that?

21   A.  It could have been.  I would have to see the exhibit.

22   Q.  I would like you to look at Exhibit 2581.  It isn't in

23   evidence yet.  Would you look at it.  You need the binder there

24   because I can't publish it.

25   A.  It's here?

F23MBUC6                           Legge - direct

1    Q.  2581, please.

2              THE COURT:  While he's looking at it, I invite the

3    jury to take a standing break with me, stretch a little bit in

4    place.

5              Thank you.

6    Q.  Do you have Exhibit 2581 in front of you?

7    A.  Got it.

8    Q.  Is that a memo you wrote to Mr. Rennert on October 29,

9    1999?

10   A.  Yes.

11             MR. BEUS:  I move the admission of Exhibit 2581.

12             MR. HAVELES:  Your Honor, we object to 2581 to the

13   extent that page 2 is hearsay.  It's a reproduction from

14   another periodical.  The first page we have no objection to.

15   Page 2 is for argument sake.

16             THE COURT:  Are you moving both pages, counsel?

17             MR. BEUS:  May I approach, your Honor?  Here is the

18   second page.

19             MR. HAVELES:  We have it.

20             MR. BEUS:  May I approach the witness?

21             THE COURT:  Yes.

22             Counsel, are you moving both pages or just the first?

23             MR. BEUS:  Both.

24             THE COURT:  Where is it from?

25             MR. BEUS:  The document is from a light metals

         SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

1    magazine.  It's what he has attached.  I don't think there is a

2    dispute as to what's attached.

3              THE COURT:  Sustained with respect to the second page.

4    Without objection, the first page of 2581, which has the Bates

5    8831 at the bottom, is admitted.  Sustain the objection with

6    respect to the second page.  Go ahead.

7              (Plaintiff's Exhibit 2581, first page received in

8    evidence)

9    Q.  This is when you wrote that MagCorp may not be perceived as

10   a long-term player, right?

11   A.  Yes.

12   Q.  That was in October 99?

13   A.  It was a perception coming out of the press, primarily.

14   Q.  Things continued to get worse and worse in '99 and 2000,

15   don't they?

16   A.  2000, 2001 is really when the deterioration started.  We

17   saw a little bit of it in 1999, but not as significant as the

18   last two years.

19   Q.  Why did the company file bankruptcy?

20   A.  It filed bankruptcy because we had cash outflows that were

21   in excess of our earnings from sales overall.

22   Q.  Just didn't have any more money, right?

23   A.  I think I testified in my last deposition, it was something

24   to do with cash outflows.

25   Q.  You were unable to sustain the outgoing payment obligations

 1   and at the same time stabilize the business and continue to

 2   operate.  Isn't that true?

 3   A.  That's when you are running out of funding.

 4          THE COURT:  Mr. Legge, if you could keep your voice

 5   projected and close to the mic.  Thank you.

 6   Q.  Let's talk for a few minutes about some of the problems.

 7   Let's go to the technology.

 8          When you joined the cell system was an IG Farben cell,

 9   right?

10   A.  When I joined we were running somewhere over 100 IG Farben

11   cells.  And shortly after I started we started the first sealed

12   cell.

13   Q.  The IG Farben cells had problems in terms of how much it

14   cost to operate and manufacture magnesium, right?

15   A.  They were an inferior cells to the sealed cell.

16   Q.  The sealed cell costs nine cents a pound more to operate

17   than the IG Farben cell?

18   A.  Nine cents a pound more?

19   Q.  Nine cents a pound more.

20   A.  I don't see that right now.

21   Q.  Did they cost more to operate?

22   A.  At what point in time?

23   Q.  All the times there were sealed cells and IG Farben cells,

24   did the sealed cell costs nine cents more per pound to operate?

25   A.  In the beginning, when we were first going through the

1   pilot phase, the lives were shorter and so forth, they were

2   more expensive, but we refined the sealed cells and brought the

3   operating costs down over a long period of time.

4   Q.   Did the IG Farben cells also create anode dust?

5   A.   Excuse me.  The IGs or the sealed cells?

6   Q.   The IGs.

7   A.   Yes.

8   Q.   And chlorine?

9   A.   They emitted chlorine.  They were an open cell.

10  Q.   Was there any way to solve the chlorine problem that you

11  could figure out, even after you put in the chlorine reduction

12  burner in 1990?

13  A.   The chlorine reduction burner was installed on the

14  melt/reactor stack.  Are you asking about the problem -- I'm

15  confused about his question.

16  Q.   I'll withdraw.

17            THE COURT:  Just for the witness, if the court

18  reporter asks you something, you just need to repeat what you

19  say.  Thank you.

20  Q.   The IG Farben cell, if you couldn't find a replacement for

21  that, the business wouldn't survive.  Isn't that true?

22  A.   That's not true.  We have a replacement in the early 1980s.

23  It was the sealed cell.

24  Q.   And when you filed bankruptcy, how many IG Farben cells

25  were operating?

1    A.   None.

2    Q.   How many in 1999?

3    A.   We were operating one building of them, building 3, which

4    would have been somewhere around 28 to 30.

5    Q.   Is it in fact the case that you reported in the prospectus

6    of July of 1996 that you needed $40 million to meet

7    environmental goals and standards in new cell technology?

8    A.   I don't know if that's exactly what we reported.  I haven't

9    seen it.

10            MR. BEUS:  Let's go to Exhibit 2033, page 10 under

11   environmental matters.  Can you blow that last sentence up, the

12   last four lines of the environmental matter paragraph.

13   Q.   The company's cost of compliance with environmental laws

14   and remediation obligations under such laws has been, as

15   expected, continued to be significant.  MagCorp plans to spend

16   approximately $40 million of its capital budget by the year

17   2000, directly or indirectly to meet environmental regulatory

18   requirements.  By purchasing new electrolytic cell technology,

19   that will reduce chlorine emissions at the source.

20            Is that what you reported?

21   A.   That's what I reported.

22   Q.   What was thought about there was the ALCAN cells, right?

23   A.   The ALCAN cells, and 40 million was for much more than just

24   the environmental impact.  They had a significant cost savings.

25   Q.   The ALCAN can operate a lot cheaper, then you can be

1   competitive, right?

2   A.   We certainly felt that the ALCAN cell would be the best

3   cell technology at that time that we could install in 1996.

4   Q.   And you licensed in 1996 the ALCAN cell from ALCAN, right?

5   A.   We did.

6   Q.   Never been tested with anything like Salt Lake brine, had

7   it?

8   A.   Salt Lake brine.  It hadn't been tested with the exact cell

9   feed that we produced.

10  Q.   Cell feed, meaning you start with the Salt Lakes brine --

11  A.   Salt Lakes feed coming from the melt/reactor building.

12  Q.   You go through a whole process getting out of the

13  melt/reactor building.  There was a problem with ALCAN.  Tell

14  the jury what the problem was with ALCAN.

15  A.   The problem -- initially we didn't believe there was a

16  problem.  We wouldn't license it.  We licensed it and we went

17  to Sumitomo Sitix and also to Tohoo, saw these type of cells

18  operating, the multipolar cells.  They were operating very

19  well.

20          We ultimately licensed the cell and we started, I

21  think, as previously indicated by Mr. Haveles, one cell in '97,

22  one in '98, one in '99, and those were three prototypes.  Each

23  one -- each successive one was improved significantly over the

24  other as far as construction changes.

25          And so the problem was, by 1999, we had started

1    working in parallel on one of our own cells.  And in the last

2    year we ran the ALCAN cell, it was inferior.  The performance

3    was inferior to our new cell.  It was a problem, but it wasn't

4    something we couldn't get around.

5    Q.  Isn't it true that in '96, '97, '98, and '99, that time

6    period, other than your disappointing attempts at ALCAN

7    technology, you really didn't have any other place to go to

8    reduce chlorine emissions?

9    A.  That's absolutely untrue.

10   Q.  Do you recall giving the following answer to the following

11   question at page 50 of your deposition?

12           THE COURT:  Which deposition?

13           MR. BEUS:  Of March 31, 2011.

14           THE COURT:  Just a moment.

15   A.  What page?

16   Q.  50.

17   A.  Say again.

18   Q.  50.

19           THE COURT:  What lines?

20           MR. BEUS:  Starting at line 7.  I'll go through the

21   next page to line 3.

22           THE COURT:  Just a moment.

23           Go ahead.

24   Q.  "QUESTION:  Is it fair to say that in '96, '97, '98, '99,

25   that time period, other than your disappointing attempts at

1    ALCAN technology, you really didn't have any other place to go

2    to reduce chlorine emissions?

3    "A.  The objective as stated in environmental matters, page 10,

4    was reduce chlorine emissions at the source.  That means you do

5    it at the cell.  And we really didn't have another option.  And

6    we didn't have a reason to believe for a period of time that

7    the ALCAN technology simply wouldn't work.

8    "Q.  If you don't reduce emission chlorine emissions at the

9    source, namely the electrolytic cell, what other options do you

10   have?

11   "A.  If you don't reduce them at the source, you have to react

12   the chlorine elsewhere, which is, you might call that

13   scrubbing, but you could react it with something else, some

14   other chemical, which would be extremely expensive.

15   "Q.  Prohibitively, competitively, prohibitively."

16           Did you give those answers?

17   A.  I did.

18   Q.  Were they true at the time?

19   A.  No.  I misspoke here on line 14, 15, and 16, especially 15

20   and 16, looking at it.  When I said we didn't have another

21   option, we didn't have another option other than reducing it at

22   the source.  In other words, I didn't view any of these other

23   things as being economic.  You couldn't -- there was no way you

24   could economically do it.  So what I really meant in this

25   testimony is, you had to do it at the cell and at that point in

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1    time the sealed cell would do the job.

2    Q.  In fact, the sealed cell wasn't competitive, was it?

3    A.  I would disagree with that.

4    Q.  Would you disagree with Mr. Thayer if he said that?

5           MR. PARK:  Objection, your Honor.

6           THE COURT:  Sustained.

7    Q.  The ALCAN cell, you wouldn't solve the problem with the

8    lithium.  Am I correct?

9    A.  There is a little place I would say that I had -- I

10   inaccurately interpreted some of the things you threw in front

11   of me.  I would say it was a more complex problem than that.

12   It was lithium and largely cell voltage, high voltage, but when

13   I had documents put in front of me subsequent to this that I

14   didn't see in the 2011 deposition, it was clear to me that it

15   was a more complicated issue, and Mr. Thayer explained that

16   very well in those documents.

17   Q.  Let me ask you if you gave the following answers to the

18   following questions at page 46 of your March 31, 2011

19   deposition.

20   A.  Pages, again?

21   Q.  46.

22          MR. PARK:  May we have a line?

23          MR. BEUS:  Line 8.

24          THE WITNESS:  I'm on line 8.

25          (Continued on next page)

1    THE WITNESS:  Again, this is a place I told you I

2    misspoke because I had subsequently found that Mr. Thayer knew

3    more about what was going on in these cells and it was a more

4    complex problem.

5    THE COURT:  Go ahead.

6    BY MR. BEUS:

7    Q   Do you recall giving these answers to these questions,

8    page 46 line 8:

9    "Q   Was there ever a time when you thought you could solve the

10   lithium chloride problem?

11   "A   We didn't, no.

12   "Q   You finally just gave up on Alcan and said we've got to

13   design our own M-cell technology to get around the lithium

14   chloride problem?

15   "A   That is correct."

16        Was that your testimony?

17   A   It was.

18   Q   The first Alcan pilot failed after you ran it five months;

19   right?

20   A   The first one failed --

21   Q   Yes or no, please.  I'm sorry.

22   A   We took it off in five months, yes.

23   Q   The second Alcan pilot still couldn't operate ten months

24   after that; isn't that true?

25   A   We took it off after a certain number of months.

1   Q    In fact, you couldn't have it operate long enough to even

2   find out whether there were other problems; isn't that true?

3   A    On the first two.  On the first one, especially.

4   Q    And after the third pilot cell, you just gave up; right?

5   A    We gave up because we found it was inferior to the other

6   cell we were running, which was the M-cell.

7   Q    The M-cell, when was it first in place?

8   A    My recall is the pilot, late '98, early '99, sometime in

9   there.

10  Q    Could it be a little later than that?  If you just don't

11  know, I will move on.

12  A    I don't know exactly, but that's about it.

13  Q    When you were looking to find something to reduce the

14  chlorine reduction emissions, is it fair to say that you had

15  searched the world and you found no other commercial cell

16  technology except Alcan?

17  A    We had searched the world because that's our job.  We

18  looked at every cell -- anybody that would sell a cell, we

19  looked at it.

20  Q    You searched the world, and the only thing you found was

21  Alcan; right?

22  A    And Toho.

23  Q    Yes, right?

24  A    Yes.

25  Q    And the brick decomposed because of the lithium refractory

1    inside; right?

2    A   I would say correct, it was -- deposition was more complex.

3    It was lithium, but also it was a high-current density.

4    Q   Let me ask you if you gave the following answers to the

5    follows questions at the March 31st deposition at page 44,

6    beginning at line 16.

7    A   Line?

8    Q   Line 16.

9    A   Okay.

10          THE COURT:  Go ahead.

11          THE WITNESS:  Okay.

12          MR. BEUS:  "Question:  Did you ever get an explanation

13   as to why your brick decomposed and theirs didn't?

14   "A   We know why our brick decomposed.

15   "Q   Why is that?

16   "A   Because of lithium chloride in the Great Salt Lake.

17   "Q   There was no lithium chloride in the source material for

18   the Japanese entity; am I correct?

19   "A   That's correct."

20          Is that the testimony you gave?

21   A   That is.

22   Q   Was the evolution of the M-cell necessary to maintain the

23   competitive nature of the business?

24   A   The M-cell was necessary to reduce costs and increase the

25   competitiveness in the business, but the sealed cell would have

f234buc7                         Legge - direct

1    also given us much of the -- if we had to default to the sealed

2    cell, it would have given us much of the advantages that we got

3    in the M-cell, but it would have been a slightly higher cost.

4    Q    How much higher?

5    A    I don't know.  It's simply -- the sealed cells are a cell

6    that was somewhat smaller, but that was irrelevant at that time

7    because the M-cell was running well.

8    Q    Even as early as '95, you were trying to investigate and

9    find Alcan cells; right?

10   A    Yes.

11   Q    Okay.  Let me have you look at Exhibit 2562.

12          Is this an email you wrote to Mr. Rennert in

13   February of '96 regarding capital spending projections?

14          Did you write that?

15   A    I did.

16   Q    Was it accurate?

17   A    Yes.

18   Q    This is 4 and a half months before the $75 million

19   dividend; right?

20   A    That's right.

21   Q    It says right in the first paragraph, "A key component of

22   the '97-'99 business plan and cash flow projections which we

23   plan to present at the March 25 business review is the capital

24   and expense plan for those same years."

25          You wrote that?

1    A    Yes.

2    Q    All right.  Let's skip the other stuff and go to the third

3    paragraph.  You're talking about the spray dryer scrubber;

4    right?

5    A    That's correct.

6    Q    What is that?

7    A    That is a pollution control enhancement that we were going

8    to add to -- we were going to add to two of the three spray

9    dryers.

10   Q    In February of '96, you say, in the third paragraph, "A

11   product of the exercise of developing the preliminary capital

12   and expense plan is that we can more clearly see additional

13   reasons for installing the 01 spray dryer scrubber in '96."

14            Are you with me?

15   A    With you.

16   Q    "Given the schedule for the EPA" -- that is Environmental

17   Protection Agency; right?

18   A    That's correct.

19   Q    -- "to promulgate hydrochloric emission regulations, both

20   the spray dryer scrubber installations should be completed by

21   the end of 1998."

22            Did you write that?

23   A    I did.

24   Q    "If the 01 scrubber installation is deferred until 1997 or

25   1998, we increase our risk of not having the cash available

SOUTHERN DISTRICT REPORTERS, P.C.            (212) 805-0300

1    from operations."

2              Did you write that?

3    A    I did write that.

4    Q    Was it true?  Yes or no?

5    A    Yes.

6    Q    And did you then attach the financial -- let's go to the

7    second page, if you would.

8              Did you send this to Mr. Rennert as to capital

9    expenditures in year 1, '96; year 2, '97; year 3, '98; and year

10   4, '99?

11   A    That is the second page of the memo.

12   Q    I'm not going to go through all of the numbers.  The next

13   page after that shows some additional moneys that would have to

14   be laid out; right?

15   A    That's correct.

16   Q    If you total all of those, am I correct that they total

17   roughly $78.4 million?

18   A    I haven't done that arithmetic.  Could you go back to the

19   other page?

20   Q    Sure.  That page--

21   A    Just go back one.

22   Q    Go back one, take the bottom lines there and add 14 and a

23   half, 15.9, 23.88, and 17.42, it is roughly $71.8 million.  Do

24   you agree with that?

25   A    Yes.

1   Q     On the next page, it is roughly $6.6 million.  Do you

2   agree?

3   A     That's correct.

4   Q     If my arithmetic is right, that is 78.4; right?

5   A     Yes.

6   Q     And you were concerned -- I want to make sure we

7   understand -- that if you didn't do the scrubber in '96, you

8   may not have the cash available from operations?  I've got that

9   right; don't I?  And that's what you wrote; yes?

10  A     Yes, that's what I wrote.

11  Q     Thank you.

12  A     Because if you look at our --

13  Q     Thank you very much.

14            Did there come a time when you asked The Renco Group

15  to put money into MagCorp?

16  A     It must have been sometime in late 2000 -- I can't remember

17  exactly -- but we had indicated to them, to complete certain

18  things, we gave them several options.  We told them what we

19  would require to do those options.  And we sent that -- I think

20  I had a cover letter on a Thayer memo.

21  Q     Did The Renco Group send you any money?

22  A     Shortly thereafter, they did.

23  Q     Was that money from the sale of Sabel?

24  A     That's correct.

25  Q     Any other moneys that The Renco Group put in other than the

f234buc7                        Legge - direct

1   sale of Sabel, the sister corporation of MagCorp?

2   A    As we heard earlier, they also back-stopped, or gave a loan

3   to guarantee, on five more million on the revolver.

4   Q    So they had to guarantee Congress in order to get five more

5   million dollars from the Congress revolver; is that correct?

6   A    I heard that structure just this morning.

7   Q    You didn't know that before this morning?

8   A    I couldn't remember.

9   Q    So this morning somebody told you something that you are

10  now testifying to under oath while you're here, is that --

11  A    No, I'm saying --

12  Q    I want to understand this, Mr. Legge.

13  A    It was in an opening statement.

14  Q    So what you heard Mr. Haveles say in an opening

15  statement you repeated under oath --

16  A    I --

17          THE COURT:  Mr. Legge, wait until the question is

18  finished, and then you may respond.

19          THE WITNESS:  Okay.

20  BY MR. BEUS:

21  Q    You heard something Mr. Haveles said at the podium, and now

22  you picked it up and are saying --

23  A    No, I'm just saying I understood that.  I had no recall of

24  it up until then.

25  Q    Where was that $5 million?

SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

f234buc7                          Legge - direct

1    A    I'm not sure.

2    Q    Have you seen any document that would suggest that

3    $5 million was put up?

4    A    I don't recall that.

5    Q    There's no document you've seen in the preparation for this

6    trial that says that; do you?  Is there?

7    A    I just don't know that, Mr. Beus.

8    Q    Well, you've testified under oath in your prior depositions

9    that Renco Group never put any money in except for the proceeds

10   of the sale of Sabel?

11   A    That's what I knew at that time.

12   Q    Okay.  Are you under oath willing to say that there was

13   anything else other than the Sabel proceeds?

14   A    No.

15   Q    And you understood Sabel was a wholly owned subsidiary of

16   Renco Metals; right?

17   A    I did.

18   Q    You knew Renco Metals was on the hook to pay back the

19   $150 million; right?

20   A    They are the parent of --

21   Q    So the answer is yes; right?

22   A    Yes.

23           MR. PARK:  Objection.

24           THE COURT:  Sustained.  You may finish your answer,

25   Mr. Legge.

f234buc7                        Legge - direct

1          THE WITNESS:  What I'm saying is I knew Renco Metals

2     was the parent of MagCorp.

3     BY MR. BEUS:

4     Q    And you knew if Renco Metals had an obligation to pay the

5     150 million back to the bondholders that they could get to

6     Sabel because that was an asset of Renco Metals; didn't you?

7     A    Say that again.

8     Q    Sure.  Renco Group sits here, Renco Metals sits here.

9     Renco Metals owns MagCorp, and Renco Metals owns Sabel.  Is

10    that right?

11    A    That's right.

12    Q    Renco Metals is obligated to the creditors of Renco Metals,

13    which includes the $150 million.  Do you have that?

14    A    Got it.

15    Q    They were the issue.  So by giving up Sabel, they really

16    didn't give up anything at all because the bondholders could

17    get that in any event; couldn't they?

18    A    I just don't know that.

19    Q    You don't know that?

20    A    No.

21    Q    Okay.  Thank you.

22          Let me ask you to -- would you look at Exhibit 2111.

23    I think there is an objection on this, so don't publish it yet.

24          Is this a memo you wrote to Ira Rennert and signed?

25    Exhibit 2111.

f234buc7                          Legge - direct

1    A    I see it now, yes.

2    Q    You've got it?

3    A    Uh-huh.

4    Q    You wrote this to Mr. Rennert on or about 5 April 2000;

5    right?

6    A    That's correct.

7              MR. BEUS:  I move the admission of Exhibit 2111.

8              MR. PARK:  No objection.

9              THE COURT:  2111 is admitted.

10             (Plaintiff's Exhibit 2111 received)

11

12   BY MR. BEUS:

13   Q    Okay.  Let's publish it, please.

14             Why did you write this?  I withdraw that question.

15             Did you recommend to Renco Group in this document --

16   let's look at the very last paragraph -- I think I can do it

17   that quickly -- that Renco Group should divest itself of

18   MagCorp because they wouldn't support bringing this company to

19   a capacity of 60,000 tons?

20   A    In the first place, I don't recall this number at all.

21   That is what that -- apparently, that first bullet point, it

22   says that we didn't want to go to 60,000 tons and we were

23   already planning to go on the partial upgrade or modification.

24   Q    Would you look at the second page.  There is an email there

25   from Mike Legge to Howard Kaplan.

1   A   I see it.

2   Q   It says, "Contact with Michael Mohajery."  How do you say

3   that last name?  "Mohajery"?

4   A   I'm not certain.

5   Q   Do you remember dealing with Mr. Mohajery?

6   A   I do not.

7   Q   Did you deal with him?

8   A   I said I had a phone call with him, so I did.

9   Q   Did you tell him, come and buy MagCorp before investment

10  bankers try to sell it?

11  A   I said it would be better to deal directly with Renco.

12  Q   The only source of cash you had was cash from operations;

13  right?

14  A   During 2001?

15  Q   Yes.  Times got hard in '99, '98, and 2000.

16          MR. PARK:  Objection.

17          THE WITNESS:  The only source of cash up to the --

18          MR. PARK:  Your Honor, there is an objection.  There

19  is an objection to that.

20          THE COURT:  Just a moment.

21          MR. BEUS:  Let me withdraw.  I probably didn't do a

22  good job on the question.

23  Q   Other than the sale of Sabel, the only source of cash you

24  had was cash from operations; am I correct?

25  A   That's correct.

f234buc7                        Legge - direct

1   Q    The financing you had from Congress depended upon

2   inventory, receivables, or supplies; right?

3   A    It was an asset-based revolver.

4   Q    They weren't looking to MagCorp to pay; they were looking

5   to those assets?  Right?  Congress Bank.

6   A    Congress would look to the assets.

7   Q    And the availability on that line of credit went from

8   $45 million down to $33 million from the '89 time period to the

9   '96 time period; isn't that true?

10  A    I don't have those numbers in front of me.

11  Q    You wouldn't dispute that, though, if the documents said

12  that?

13  A    No.

14  Q    By March of 2001, you've gone out to the vendors to try to

15  get 90-day terms so you don't have to pay them on time; right?

16  A    We were trying to stretch the terms to 90.

17  Q    You started that process in January of '90 -- I'm sorry --

18  January of 2001; didn't you?

19  A    That sounds about right.

20  Q    The volumes fell off in the '99 and 2000 and 2001 time

21  periods; didn't they?

22  A    They fell off marginally in '99 and significantly in 2000,

23  2001.  2001 was the worst.

24  Q    When that happened, you had to reduce production, decrease

25  the tonnage you could produce; correct?

1   A    You had to reduce your operating rate, that's correct.

2   Q    By the way, one question:  The I.G. Farben created anode

3   dust; didn't it?

4             MR. PARK:  Asked and answered.

5             THE COURT:  Overruled.

6             THE WITNESS:  Yes.

7   BY MR. BEUS:

8   Q    And anode dust is a known source of chlorinated

9   hydrocarbons; is it not?

10  A    There were levels in the anode dust of chlorinated

11  hydrocarbons, yes.

12  Q    I want to make sure there is no misunderstanding.  You

13  never used the Alcan technology to help you with the M-cell

14  technology; did you?

15  A    We did not use the core proprietary part of the Alcan cell.

16  Q    What did you use?

17  A    We used more peripheral, I guess, design and structure --

18  structures that were on the Alcan cell that were not

19  proprietary.  The proprietary portion was the bipolar

20  electrodes.  We, obviously -- we expanded the box

21  significantly, the volume, and we adopted other aspects of the

22  Alcan cell, but we also used a huge amount of developmental

23  sealed cells.

24  Q    Did you use any -- so your testimony is you used some of

25  the Alcan technology that you perceived not to be proprietary.

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1   Have I got that right?

2   A    That's right.  We were precluded from using the proprietary

3   bipolar concept in our own cell.

4   Q    Let me ask you if you gave the following answers to the

5   following questions at the March 11th deposition, beginning at

6   page 37, line 19.

7            THE COURT:  I don't have March 11th.  March 31?

8            MR. BEUS:  March 31.  I'm sorry.

9            THE COURT:  Page?

10            MR. BEUS:  Page 37, line 19.

11            THE WITNESS:  That is correct.

12            MR. PARK:  Wait.

13            THE COURT:  Just a second.

14            THE WITNESS:  It is a proprietary --

15            THE COURT:  Just a second, Mr. Legge.

16            THE WITNESS:  Okay.

17            MR. PARK:  I object, your Honor.

18            THE COURT:  Sustained.

19   BY MR. BEUS:

20   Q    Let me make sure I got it clear.  You did use some of the

21   Alcan technology to help develop the M-cell.  Have I got that

22   right?

23   A    But not the proprietary part.

24            MR. BEUS:  I would request that I get to read the

25   question and answer, your Honor.

f234buc7                    Legge - direct

1             THE WITNESS:  Okay.  We used some.

2             THE COURT:  Give me the page again.

3             MR. BEUS:  Page 37, line 19.

4             THE COURT:  Go ahead.

5     BY MR. BEUS:

6     "Q   Did you use any of the Alcan technology to help you

7     develop the M-cell technology?

8     "A   No.  We were precluded from that.  That's proprietary

9     technology."

10            Did you give that answer to that question?  Just yes

11    or no?

12    A   I did.

13    Q   Let me have you take a look at --

14            THE COURT:  Before you start the next sequence, it is

15    just about 5:00.  We will stop for the day.

16            Members of the jury, thank you very much for your

17    attention and diligence.

18            Bear in mind all of my instructions.  No research, no

19    communication regarding the case in any way.  Keep an open

20    mind.  As you see evidence come in piece by piece and it takes

21    some time to develop, so do keep an open mind until the trial

22    is complete.

23            We will begin promptly at 9:30 tomorrow.  I know that

24    it is far for many of you, but the more we can stick to that

25    schedule the more I can make sure that we get done in the time

f234buc7                          Legge - direct

1    that I promised you that we would.

2            Thank you so much.  We will see you in the morning at

3    9:30.  Breakfast will be available starting at 9.

4            (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

f234buc7                         Legge - direct

1    (Open court; jury not present)

2              THE COURT:  Matters to address, counsel?

3              MR. BEUS:  Your Honor, I'm really concerned about the

4    time.  I didn't think I would have to be taking the time to

5    read this many depositions, but after I heard Mr. Haveles in

6    his opening, it is clear it is going to be more time consuming

7    than I would anticipate, and I would just ask some indulgence

8    with that.

9              THE COURT:  Just as an example, Mr. Beus, you spent

10   about 10 minutes fighting over tons of money versus a lot of

11   money.  If that's how you want to spend your time, that's how

12   you spend your time.  It only reinforces my view that with

13   focus on what's important, with organization of documents,

14   including the deposition testimony and the like, you have more

15   than sufficient time.

16             Other matters to address?

17             MR. PARK:  Your Honor, I wanted to apologize to the

18   Court.  I had understood that you wanted an objection with a

19   single sentence --

20             THE COURT:  But you took advantage of that and did far

21   more than that.  Also, with the microphone, if you're sitting

22   down, I didn't know if you were objecting.  So the rule for

23   everyone is, if you have an objection, you're on your feet at

24   the mike with the word "objection."  If I want more, I will ask

25   for it.

              SOUTHERN DISTRICT REPORTERS, P.C.      (212) 805-0300

f234buc7                          Legge - direct

1                    MR. PARK:  Thank you, your Honor.  I apologize.

2                    THE COURT:  Any other matters to address?

3                    MR. PARK:  Nothing from the defense.

4                    MR. BEUS:  No, your Honor.

5                    THE COURT:  We will pick up at 9:15, so we can discuss

6       any issues before the jury is here.

7                    We lost an hour this morning with the train delay, so

8       all the more need to keep things moving, but I have to get the

9       jury breaks as they need it.

10                    See you at 9:15.

11                    Have a good night.

12                    (Adjourned to February 4, 2015, at 9:15 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION

 2   Examination of:                          Page

 3   LEE E. BUCHWALD

 4   Direct By Mr. S. Stirling . . . . . . . . . . 172

 5   Cross By Mr. Park . . . . . . . . . . . . . 176

 6   Redirect By Mr. S. Stirling . . . . . . . . 183

 7   MICHAEL H. LEGGE

 8   Direct  . . . . . . . . . . . . . . . . . . 185

 9                    PLAINTIFF EXHIBITS

10   Exhibit No.                            Received

11    2456   . . . . . . . . . . . . . . . . . . 172

12    2581, first page  . . . . . . . . . . . . 238

13    2111   . . . . . . . . . . . . . . . . . . 256

14

15

16

17

18

19

20

21

22

23

24

25
```