F2o4buc1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   LEE E. BUCHWALD, as Chapter 7
    Trustee for Magnesium
4   Corporation of America and
    Related Debtor, Renco Metals,
5   Inc.,

6                Plaintiff,

7         v.                           13 CV 7948 (AJN)
                                       Trial
8
    THE RENCO GROUP, INC., a
9   Delaware corporation, et al.,

10               Defendants.

11  ------------------------------x
                                       New York, N.Y.
12                                     February 24, 2015
                                       9:40 a.m.
13
    Before:
14
                    HON. ALISON J. NATHAN,
15
                                       District Judge
16
                        APPEARANCES
17
    BEUS GILBERT, PLLC
18       Attorneys for Plaintiff
    BY:  LEO R. BEUS
19       SCOT C. STIRLING
         ROBERT STIRLING
20       MALCOLM LOEB

21  KAYE SCHOLER LLP
         Attorneys for Defendants
22  BY:  H. PETER HAVELES, JR.
         JEFFREY A. FUISZ
23       -and-
    PARK JENSEN BENNETT LLP
24  BY:  TAI H. PARK
         STEVEN C. BENNETT

25


        SOUTHERN DISTRICT REPORTERS, P.C.      (212) 805-0300

F2o4buc1

1          (Trial resumed; jury not present)

2          THE COURT:  Good morning, everyone.

3          I sent what I believe is the final version of the

4    draft charge and special verdict form after inputting the

5    changes from the conference yesterday.  I circulated that to

6    you last night just to see if there were any final technical

7    edits or any problems as a result of my incorporation of those

8    changes.

9          Mr. Haveles.

10         MR. HAVELES:  Yes, your Honor.  With respect to charge

11   19 on punitive damages, what happened was -- I will hand up a

12   black-line in a second -- is that 90 percent of the Delaware

13   charge was added but all of the New York language changed in

14   the punitive damages charge.  If I may, I will hand up a

15   black-line that reflects that.

16         THE COURT:  Yes.  Yes.  I see it.

17         MR. HAVELES:  What I have handed up to Mr. Stewart and

18   he has handed up to your Honor, is we have shown the text of

19   the last two sentences of the Delaware pattern instruction that

20   didn't make it, and then we have stricken the New York charge

21   that stayed within the punitive damages section.  That's the

22   only thing that we saw in reviewing the verdict form and the

23   charges, your Honor.

24         THE COURT:  Okay.  Mr. Stirling.

25         MR. STIRLING:  I'm trying to follow exactly what is

F2o4buc1

1    the error, the part that you think should now be out.

2          MR. HAVELES:  Based on our discussion yesterday, the

3    New York patent instruction was going to be deleted and the

4    Delaware patent instruction, as modified by the Court, was

5    going to be inserted.  None of the New York instruction was

6    deleted, so we have the two combined together.  We have

7    stricken through what was the New York patent instruction that

8    was to be deleted on the bottom of page 1, what would be

9    line 23 and then extras, the last two sentences of the Delaware

10   pattern charge that was inadvertently omitted from the

11   inclusion.  Everything thereafter is the New York charge that

12   should have been stricken.

13         THE COURT:  Looking at what I have circulated last

14   night on page 28, it would cut lines 24 through all of page 29,

15   and that would eliminate the New York charge, which was meant

16   to be eliminated.  And then you're saying, Mr. Haveles, the

17   last two sentences of what you handed up on your page 28 are

18   part of the model charge that I didn't include.

19         MR. HAVELES:  Yes, that was the last two sentences in

20   the sixth paragraph of the pattern Delaware instruction that we

21   gave to your Honor yesterday.  I have an extra copy of that to

22   hand up to you and Mr. Stewart if you would like to see it.

23         THE COURT:  I will take it again.

24         MR. HAVELES:  Your Honor, the paragraph that begins,

25   "In determining any award."

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

F2o4buc1

| | |
|---|---|
| 1 | THE COURT:  Yes. |
| 2 | MR. HAVELES:  It is the last two sentences in that |
| 3 | paragraph that was inadvertently omitted. |
| 4 | THE COURT:  All right. |
| 5 | MR. STIRLING:  Understood.  I concur. |
| 6 | THE COURT:  Thank you. |
| 7 | MR. HAVELES:  We have nothing else, your Honor. |
| 8 | THE COURT:  Thank you for that. |
| 9 | Just to be clear, we're cutting, beginning on page 28, |
| 10 | line 24, through all of 29, and then we're adding the following |
| 11 | sentences to the end of the paragraph that now is on page 28, |
| 12 | line 23, last word "deterrence" and then a new sentence, "Any |
| 13 | award of punitive damages must bear a reasonable relationship |
| 14 | to plaintiff's compensatory damages.  If you find that |
| 15 | plaintiff is entitled to an award of punitive damages, state |
| 16 | the amount of punitive damages separately on the verdict form." |
| 17 | Mr. Stirling, anything else -- |
| 18 | MR. STIRLING:  No, your Honor. |
| 19 | THE COURT:  -- from yesterday? |
| 20 | MR. STIRLING:  Nothing, your Honor. |
| 21 | THE COURT:  Thank you very much.  Thank you for that |
| 22 | catch. |
| 23 | With that, we will clean up the cover sheet of this |
| 24 | just to say jury charge and today's date, and we will clean up |
| 25 | the cover of the verdict form and say special verdict form and |

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

F2o4buc1

1    today's date, which is February 24th, and then we'll get copies

2    of those printed during the day today.

3              Other matters to take up?

4              MR. HAVELES:  Just the agenda items we talked about in

5    terms of exhibits once the jury comes in.

6              Do you want to do the court exhibits in their presence

7    or before they come in?

8              THE COURT:  Court exhibits, we won't do in their

9    presence.  I will take up getting final word on the exhibit

10   list.  I just did want to hear, to make sure we get it done

11   before the jury, are there any other matters in anticipation of

12   summations?  I know what came in last night, there were some

13   exhibits that had not been recirculated.  I gather those are

14   not going to be used.

15             MR. HAVELES:  We have spent several hours last night,

16   Mr. Fuisz, with email exchanges with Mr. Beus' colleagues.  We

17   have worked out whatever is going to be used by Mr. Beus in the

18   slides, and your Honor issued an order sustaining objections to

19   two.  All the remaining slides we have reached a resolution as

20   to what is to be used.

21             THE COURT:  Okay.

22             MR. PARK:  Your Honor, I just want to get one point of

23   clarification.  There is just going to be one video clip from

24   Mr. Adams' testimony that I'm going to play.  I did not provide

25   a screen shot of that to plaintiff's counsel.  I just wanted to

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

F2o4buc1

1     be sure that because that is in evidence that is not considered

2     kind of a demonstrative that I needed to share with them.  I

3     can tell them which clipping it is.  It is just where Mr. Adams

4     says that what the Chinese did was not foreseen.  It is just

5     that part of his videotape that came into evidence; five

6     seconds, ten seconds of that videotape.

7              MR. STIRLING:  Your Honor, the videotape is not

8     evidence.  There was testimony that the jury saw, and they can

9     cite to the transcript or from the court exhibit, the

10    transcript that was played to them, but we understood your rule

11    that we are not allowed to show a still picture from a

12    deposition.  That video should not be replayed.

13             MR. PARK:  That's fine, Judge.  I thought it was in

14    evidence, but that's fine.

15             THE COURT:  The testimony is technically in evidence,

16    just like the testimony of people who were here live is in

17    evidence.  I think it is unrelated to the issue of the still

18    photo, but just read from the testimony, as you would any other

19    testimony.

20             MR. PARK:  Very well, your Honor.

21             MR. STIRLING:  Related to that, we would like to know

22    before the commencement of the arguments, what is the Court's

23    protocol for objections if we perceive something objectionable

24    is being stated during arguments?  In my experience, there's a

25    lot of different approaches as to how that should be addressed,

F2o4buc1

1    and we would like to know your preference for how to make a

2    record of our objection in a timely way so that it can be

3    addressed, if necessary, immediately or at the conclusion of

4    the argument.

5         THE COURT:  Obviously, there should be some amount of

6    restraint, but if you have an objection, you should make it

7    contemporaneously.

8         MR. STIRLING:  Very well.

9         Finally, your Honor, with respect to the discussion we

10   had yesterday about Court exhibits, I think there was a little

11   ambiguity or uncertainty about where we were with respect to

12   the agreed facts.  I understood that those were going to be

13   marked as a Court exhibit.  After an exchange with Ms. Nunez, I

14   believe she was under the impression that we should mark that

15   as one of the plaintiff's exhibits.

16        THE COURT:  I didn't think it should be marked as a

17   Court exhibit.  If I said that, I made a mistake.  I think you

18   want that to go back to the jury.

19        MR. HAVELES:  I think our agreement was on the record

20   yesterday it would be the next in line of plaintiff's numbers

21   to go in as a plaintiff's exhibit.

22        THE COURT:  If for some reason you don't want to call

23   it the plaintiff's exhibit, I'm happy to call it a court

24   exhibit but send it back.

25        MR. STIRLING:  That's fine.  We brought it over in

F2o4buc1

1    both forms, unmarked and marked, as our next Exhibit 2792.

2    They were exchanged last night.  We had some discussion about

3    it.  I will offer that when the jury is here as Exhibit 2792.

4            THE COURT:  Okay.  2792, that's going to be offered.

5            MR. HAVELES:  We have 8129 that will be offered before

6    the jury, your Honor.

7            THE COURT:  Was there anything else?

8            MR. HAVELES:  8129 is the only one that we will offer,

9    your Honor.

10           THE COURT:  Okay.  My deputy gave you a list of all

11   exhibits admitted into evidence.  It is marked at the top as of

12   the end of day -- it says, end of day, 2/24/15.  There are

13   additional ones.

14           MR. HAVELES:  Ms. Nunez has included 8129, so I think

15   it is intended to reflect the two documents that are going to

16   be offered.

17           THE COURT:  Does it include 2792?

18           MR. HAVELES:  Yes, it does.  We talked about it with

19   Ms. Nunez so she would have it on a list for your Honor.

20           THE COURT:  I understand you have been shown the

21   three-page list, it says as of end of day 2/24/15, which I

22   understand to be the complete list, including the last two we

23   just discussed of all exhibits.  Is that correct?

24           MR. HAVELES:  Yes, your Honor.  From defendant's

25   perspective, the list is accurate.

F2o4buc1

```
 1              THE COURT:  Mr. Stirling?

 2              MR. STIRLING:  Yes, your Honor.

 3              THE COURT:  Let me ask you:  I am fine with the list

 4    itself going back to the jury, if you would like, as a kind of

 5    cover to the exhibits.

 6              MR. HAVELES:  I have no objection.

 7              MR. STIRLING:  That would be fine, your Honor.

 8              THE COURT:  Okay.  Let me just get from my deputy what

 9    court exhibit I'm marking this list as.

10              THE DEPUTY CLERK:  Number 9.

11              THE COURT:  The list that we just discussed that

12    everybody has agreed is the full list that says as of end of

13    day, 2/24/15, final, I am going to mark as Court Exhibit 9; but

14    on everyone's agreement, we will provide a copy of it on top of

15    the exhibits that are going back with the jury so that they

16    have the full list of admitted exhibits.

17              MR. HAVELES:  Thank you, your Honor.

18              THE COURT:  And then let me also get final

19    confirmation that you have both looked at the actual physical

20    set of exhibits that are going to go back with the jury to the

21    jury room and make sure that it is complete and acceptable.

22              MR. HAVELES:  From defendants' perspective, we believe

23    the documents collected are consistent with the list that we

24    have marked as Court Exhibit 9, your Honor.

25              MR. STIRLING:  Yes, your Honor.
```

F2o4buc1

 1          THE COURT:  What else do we need to take up?

 2          MR. HAVELES:  The court exhibits we need to mark are

 3  for the designations from the Adams and Bowen video deposition.

 4  I believe we reserved Court Exhibit 6 and 7 for those, your

 5  Honor.  We're going to mark them A and B, one for each side's

 6  designations therefrom.

 7          THE COURT:  You want to hand those up?

 8          MR. HAVELES:  Yes, your Honor.  I'm going to hand to

 9  Ms. Nunez the Adams designation, the Bowen designation so they

10  can be marked 6B and 7A, respectively.  I will hand a copy to

11  Mr. Stirling.

12          THE COURT:  Thank you.

13          Mr. Stirling, if you're in agreement, we will mark the

14  designations of Mr. Adams -- is it Mr. Adams' that is 6A and 6B

15  and Ms. Bowen 7A and 7B?

16          MR. HAVELES:  Yes, with the proponent of the witness

17  being A and the counter designation being B, your Honor.

18          THE COURT:  Acceptable, Mr. Stirling.

19          MR. STIRLING:  Yes, your Honor.  I have 6A our

20  designations from Mr. Adams, and 7B our designations for

21  Ms. Bowen.

22          THE COURT:  Okay.

23          MR. HAVELES:  Your Honor, for the record, each side

24  exchanged these last night to review to make sure that we were

25  in accord that they were the correct designations.

F2o4buc1

1           THE COURT:  Great.  Thank you.  Those will be marked

2    as the indicated court exhibits.

3           Anything else?

4           MR. HAVELES:  Your Honor, I believe that's it on my

5    list.

6           THE COURT:  Who will be doing the closing?

7           MR. PARK:  I will.

8           MR. BEUS:  I will.

9           MR. HAVELES:  I get the day off, your Honor.

10          THE COURT:  All right.  And so are you set up,

11   Mr. Park?

12          MR. PARK:  Yes, I am, your Honor.

13          MR. BEUS:  I gave him a little space.

14          THE COURT:  I appreciate that, Mr. Beus.

15          Anything else from the plaintiff's perspective?

16          MR. BEUS:  If we were to object, can we just stand and

17   not say anything and have you notice us?  If it is outside the

18   record, just say record?

19          THE COURT:  Why don't you stand and say objection so

20   that's on the record, but no grounds are necessary unless I

21   ask.  Thank you.

22          All right.  We will take a few minutes until we get

23   our full set of jurors.  Let's assume a five-minute break.

24   Thank you.

25          (Recess)

2690

F2o4buc1

1              THE COURT:  We do have all of our jurors.  There is

2    one who is not feeling so well but indicated he is okay to

3    continue.  Barring any developments there, we are ready to

4    proceed.

5              (Continued on next page)

F2OMBUC2

1          THE COURT:  Is that poster board for your opening,

2     Mr. Park?

3          MR. PARK:  Yes, your Honor.

4          (Jury present)

5          THE COURT:  Everyone may be seated.

6          Members of the jury, good morning.  Thank you very

7     much for your attention and diligence and for taking an extra

8     day off yesterday so that we could finish the work we needed to

9     do to get ready for today.

10         In just a few moments we will begin the summation

11    arguments of counsel.  This will be an opportunity for the

12    lawyers to summarize all of the evidence that has come in

13    during the course of the trial and put it together for you in a

14    way as they argue how the evidence supports the outcome that

15    they seek in the case.  And we will hear first the closing

16    argument on behalf of the defendants, which Mr. Park will make,

17    and then we will end with the closing argument on behalf of the

18    plaintiff, which will be made by Mr. Beus.

19         Before that, we have a few housekeeping matters to

20    take care of.

21         Mr. Haveles.

22         MR. HAVELES:  Your Honor, we offer Defendants' Exhibit

23    8129 into evidence.

24         THE COURT:  Without objection from Mr. Stirling.

25         MR. S. STIRLING:  No objection.

F2OMBUC2

 1              THE COURT:  8129 is admitted.

 2              (Defendant's Exhibit 8129 received in evidence)

 3              THE COURT:  Mr. Stirling.

 4              MR. S. STIRLING:  Your Honor, we offer Exhibit 2792.

 5              MR. HAVELES:  No objection, your Honor.

 6              THE COURT:  2792 is admitted.

 7              (Plaintiff's Exhibit 2792 received in evidence)

 8              With that, Mr. Park, you may take the podium.

 9              MR. PARK:  Thank you, your Honor.

10              Good morning, ladies and gentlemen.  One of the nice

11     things about being able to go first is that I get to be the

12     first to tell you how grateful all the lawyers in this

13     courtroom are for all of the attention and the patience that

14     you have shown throughout this trial.  It really has been

15     extraordinary.  There has been extraordinarily complex terms

16     thrown around, coming very fast, very furious and the rapt

17     attention that you have listened to that evidence has been

18     exceptional and we are all very, very grateful.

19              Ladies and gentlemen, your particular focus was

20     particularly important in this case because of the

21     extraordinary demand that the plaintiff is making in this case.

22     Let's make no mistake about what it is that they are asking

23     from you.

24              Lee Buchwald wants an owner of a company, an owner

25     that owned 100 percent of that company, to return all of the

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

F2OMBUC2                    Summation - Mr. Park

1    earnings that it received in the form of dividends 20 years

2    ago.  Lee Buchwald wants the managers of MagCorp, the

3    executives who worked so hard during the 1990s to assist the

4    company in becoming successful, he wants them to return their

5    money 20 years later.  We are talking about Mike Legge, Ron

6    Thayer, Lee Brown, Howard Kaplan, Todd Ogaard.

7          From his very opening statement Mr. Beus told you that

8    the plaintiff has this storyline of recklessness and greed,

9    managers and owners were driving a company, MagCorp, into

10   bankruptcy.  I submit to you that the evidence in this case has

11   shown no such thing.

12         Plaintiff's claims are that the dividends that were

13   received from December 1995 to October 1998 were fraudulent

14   conveyances in a sense that those dividends and the payments to

15   the managers left the company insolvent, that it couldn't pay

16   its bills, that it had inadequate capital, that its assets were

17   below its liabilities after those dividends.  That is the issue

18   in this case.  That is the sole issue in this case.  It is the

19   issue upon which all of their claims, whether it's fraudulent

20   conveyance, fraudulent transfer, violations of fiduciary duty,

21   unjust enrichment, they rely heavily on the plaintiff's ability

22   to prove insolvency during those three years.

23         Bankruptcy in this case was filed six years after the

24   first dividend.  Bankruptcy was filed three years after the

25   last dividend.  Mr. Beus says that they want hundreds of

1    millions of dollars.  He said that in his opening statement.

2           If this plaintiff succeeds in forcing the owner and

3    the MagCorp managers to return this money, do you know who gets

4    it?  Let's go over the evidence that came into this case.

5           Ira Rennert told you who they are, the bondholders who

6    have filed claims in this case are the ones who are poised to

7    receive any funds that are returned in this case.  They are not

8    the original bondholders.  Ira Rennert told you they are

9    vulture funds.  What does that mean?

10          MR. S. STIRLING:  Objection.

11          THE COURT:  Overruled.

12          MR. PARK:  What does that mean?  When Mr. Buchwald,

13   the trustee, first took the stand, he described, on my

14   examination, the fact that there are opportunistic investors.

15   These are bondholders or these are investors, hedge funds, like

16   AIG or Carlyle, who buy bonds at fire sale after the company

17   has filed for bankruptcy.  Ira Rennert told you they buy it at

18   2 cents on the dollar.  It's a fire sale.

19          Why are they doing that?  This company is in

20   bankruptcy.  Because of the opportunity.  What is the

21   opportunity?  The opportunity is if they convince you to force

22   the owner and the MagCorp managers to return money earned 20

23   years ago, these investors earn 98 cents more on the dollar

24   than they paid for those bonds.  It is called a windfall.

25   That's what we are dealing with.  The trustee, the plaintiff,

1   Buchwald told you there are other claimants.  There are trades,

2   there are businesses.  He also told you they comprise about $5

3   million of the claims.  The bondholders comprise $169 million

4   of claims in this case.  So ask yourself where is this money

5   going to go if it is taken from the owner and MagCorp managers?

6   You know the answer.  That is some opportunity.

7        Now, what's in it for Mr. Buchwald, the trustee, the

8   plaintiff in this case?  He told you that himself.  He gets a

9   cut of whatever the size of the recovery in this case is.  The

10  larger the recovery, the bigger his payout.

11        In order for this to happen the plaintiff has to prove

12  his case because it is an extraordinary demand.  What he has to

13  show is that of the 12 years that the Renco Group owned

14  MagCorp, from 1989 to when bankruptcy was filed in 2001, during

15  that 12-year time period there were three years in which Renco

16  Group, the owner, took dividends.  What they have to prove is

17  that during those three years the company was rendered

18  insolvent.  That is the focus of this case.

19        To support this extraordinary demand you think the

20  plaintiff would walk in here with hard, compelling evidence

21  that proved to you and left you with an understanding that,

22  yes, the company was left insolvent as a result of these

23  dividends, evidence that you can hold onto.

24        But, instead, the plaintiff walked in here with an

25  incredibly complex story about environmental issues that dated

F2OMBUC2                    Summation - Mr. Park

1     all the way back to the '80s, an incredibly complex story about

2     technological progression in the electrolytic cells at the

3     MagCorp facility that went on and on about ALCAN cells and

4     sealed cells, an incredibly complex story about the magnesium

5     global market and the vicissitudes over the 1990s and 2000s.

6     He put up document after document dating from the 2000 time

7     period, not December 1995 to October 1998, but from December --

8     I'm sorry, from 2000 and beyond.  There is a reason why he did

9     that.  Because he doesn't want you, I submit to you, he doesn't

10    want you to focus on that period.  That is your chief

11    attention.

12          Let's put up Defense Exhibit 9010A.  This is an

13    exhibit that came into evidence.  The reason why he cannot have

14    you focus on this period is because the financial data speaks

15    for itself.  As of October 1995, they have $23.9 million

16    sitting in a bank account just collecting interest.  Why?  They

17    had already paid all the costs.  That's what they have left

18    over.  In October 1995, they have got $18.40 million in a

19    credit line that they never tap because they don't have to

20    because they pay all their bills with cash.  And they are still

21    left with $23 million.  In 1996, $17.2 million left in cash,

22    $22 million of credit available.  1997, $23 million in cash;

23    1998, $19.6 million.  Even in 1999, when things start to

24    tighten, they are doing fine, $5 million in cash and their

25    credit keeps going up.  During those three years that is the

1    focus of your attention.  There is no dispute that MagCorp

2    comprised 21 percent of the magnesium sales market in North

3    America.

4         Every witness who was asked this question of you at

5    trial told you that before the bond offering that you heard so

6    much about, the bond offering that happened in 1996, before

7    that, they were each totally comfortable with the financial

8    strength of the company.  Who are they?  Let's start with Ira

9    Rennert, Mike Legge, Roger Fay, CFO of Renco Group; Todd

10   Ogaard, CFO of MagCorp, chief financial officers.  They were

11   intimately familiar with the financial records and performance

12   of MagCorp throughout the '90s.  Todd Ogaard created the

13   documents that sit here now before you.  These are the

14   financial filings and the financial statements year after year,

15   month after month of MagCorp.  These gentlemen had no concerns

16   about the financial strength, nor should they, did they have

17   any reason to be concerned.

18        It wasn't only the financial statements that they were

19   working on that gave them this comfort.  During the bond

20   offering you heard about three professional independent firms

21   that gave these men, who are defendants in this case, whose

22   money the plaintiff wants, three independent firms who got

23   involved intimately with the bond offering.

24        Who are they?  DLJ, Donald Lufkin Jenrette, an

25   investment banking firm on Wall Street that's now a part of

1    Credit Suisse.  KPMG, one of the big four remaining accounting

2    firms globally.  Congress Financial, now a part of Wells Fargo,

3    MagCorp's lending bank.  We will get to in greater detail what

4    role these major institutions played, but you will remember

5    their names coming up.  They were very much involved in the

6    bond offering.  You learned how much each of these entities had

7    access to the financial data of MagCorp prior to the bond

8    offering becoming effective.  KPMG is a regular outside

9    auditor, gets access to their financial records for purposes of

10   auditing those records.  Congress Financial is their regular

11   lending bank.  They are the ones who extended that credit that

12   you see in the blue bars year after year after year.  Is there

13   any question about their comfort level regarding the financial

14   strength of MagCorp?

15          But there was a fourth independent firm that

16   specifically focused on analyzing MagCorp's solvency.  That

17   firm was called Houlihan Lokey.  And you will recall Ms. Bowen,

18   Marjorie Bowen, who testified by video, who talked about the

19   extensive work that she did, completely focused on the single

20   question, as of 1996, prior to the bond offering, is MagCorp

21   solvent?  Is Renco Metals solvent?  You know what her

22   conclusion was.  She told you her job was not to just see if

23   MagCorp is okay during the good days.  She used the term doom

24   and gloom.  Her job was to stress test this company and its

25   numbers and see whether they can survive a downturn, the bad

1    days.

2              And based on the information then available to

3    everyone in 1996, because that's the time period you have to

4    put yourself in, not today, but in 1996, during that time

5    period, with the information available, she would stress test

6    MagCorp's financials.  They concluded solvency, totally

7    solvent.

8              She also told you it's not just her.  Houlihan Lokey

9    is a valuation firm, well-known one.  She had the highest

10   members of management of Houlihan Lokey review her conclusions,

11   peer review, to ensure that the firm itself would stand behind

12   this conclusion.  That's what she told you.

13             Besides all of these professionals, who else had to be

14   very comfortable with MagCorp's financial condition?  The

15   bondholders.  Institutional investors who bought MagCorp's

16   bonds invested $150 million, gave $150 million to MagCorp or

17   Renco Metals, confident that they would get their money back,

18   they would get a stream of income of 11.5 percent interest

19   every year.

20             Who were these bondholders?  Are we talking mom and

21   pop down the road?  No.  We are talking about players, the most

22   sophisticated institutional investors that you can imagine.

23   You heard about Fidelity.  You think they don't know what they

24   are doing when they put their money in an investment?  Harvard

25   Investments is another bondholder that you heard about from Ira

1    Rennert, Players.  Let's put them up here.  Call them

2    institutional investors.

3            As if that weren't enough, he had another professional

4    come in front of you and talk to you about his stress testing,

5    his solvency analysis.  That was Roger Grabowski of Duff &

6    Phelps.  He was defendants' expert.  He was the last one you

7    heard from, a person who literally wrote a book on business

8    valuation.  He told you, with all the information currently

9    available to him, but putting himself in the seat of 1996

10   through 1998, he concluded solvency.

11           Now, plaintiff tells you, put all of that aside.

12   MagCorp was insolvent.  What's the proof they have of that?

13   Who tells you that?  A lone voice, Jason Frank, that's their

14   expert.  You remember the young man that came up here.  He

15   spoke for about 30 minutes on direct examination, showed you

16   not a single document, not a single calculation.  Talked a mile

17   a minute and told you MagCorp was insolvent, Jason Frank.

18   That's their solvency case.

19           According to the plaintiff, everyone else on this page

20   were wrong to believe in the financial strength of MagCorp in

21   the 1990s.  I'll have a lot to say about Mr. Frank during my

22   summation.  But this much is clear right now.  If you are left

23   with a contest between Mr. Frank and Marjorie Bowen and her

24   peer review at Houlihan Lokey, and Roger Grabowski and his peer

25   review at Duff & Phelps, the comfort and the financial strength

1    of this company during the 1990s at all of these institutions

2    and the managers of MagCorp drew from those numbers, among

3    others, if that's the contest, it's not a contest.

4            I submit to you they have flatly failed to sustain

5    their burden of proof in this case and that's the key.  They

6    have the burden.  We don't have to prove solvency.  They have

7    to prove insolvency.  You realize how deeply inadequate

8    Mr. Frank's testimony is when you consider this and you

9    consider their burden.  Especially when you consider that for

10   his conclusions Mr. Frank just assumed that MagCorp was sitting

11   on a huge environmental contingent liability, and I want to

12   move to that now.

13           Liability that would drag down those numbers into the

14   red.  What's the bottom line here, ladies and gentlemen?  We

15   heard so much about dioxins and furans and HCBs, again and

16   again and again.

17           What's the bottom line?  The bottom line is we are

18   sitting here in 2012.  There has been zero finding of liability

19   for environmental violations.  It is a wall that stands before

20   the plaintiff and his experts and they want you to ignore that

21   wall.  You cannot ignore that wall because contingent liability

22   asks you to do the following.  If you are sitting in 1996, you

23   are sitting in 1998, you sit there and you go, what are the

24   chances I am going to be found liable for environmental cleanup

25   costs or fines of any materiality to me.  That's the question.

1    You have to do that probability analysis.  The judge will tell

2    you that.

3           Astonishingly, not a single one of the plaintiff's

4    experts, not a single one of their witnesses offered you any

5    clue about how you to do a probability analysis.  They said,

6    assume 100 percent liability.  Are you serious?  You walked in

7    here in 2012, 20 years later, with no liability finding, and

8    you think you can just start talking about dioxins and furans

9    and cause the jury to just say, well, I guess this is a

10   problem.  I guess that was a sesspool so there must be a

11   contingent liability that makes these numbers irrelevant.

12   That's their suggestion to you, ladies and gentlemen.  It

13   should be rejected because you have to do the probability

14   analysis.  That is the law.

15          Was there a probability in 1996 that the company was

16   in violation of environmental laws and regulations?  The

17   evidence has shown you that the answer to that is no.  Was

18   MagCorp, during that time period, looking at such huge

19   environmental liability concerns that would sink the company.

20   The answer to that, the evidence has shown, is no.

21          Let's just assume for a moment, let's humor the

22   plaintiff and say, you know what, there is a hundred percent

23   liability.  That's just assume that.  Notwithstanding the fact

24   that nothing has ever been in terms of liability, let's assume

25   for that exercise.  What is the fine?  What is the cleanup

1   costs that MagCorp would have faced in 1996 through 1998?

2   What's the evidence?  Not conjecture, not fantastical numbers,

3   but the evidence.

4          You heard from defense witnesses Dr. Powell, who

5   talked about cleanup costs, and Steven Johnson, the former unit

6   chief at EPA region 9, who told you about the fines and the

7   cleanup costs, pragmatic, fair.  Though they told you it's 10

8   to $14 million, all in, fines and cleanup.  That's what MagCorp

9   would really have been looking at.

10          And when you look at these numbers, ladies and

11  gentlemen, listen.  $14 million is a lot of money.  But MagCorp

12  could have paid that with a credit card in a single quarter, it

13  would not impact of any materiality on MagCorp's solvency.

14  That's what the evidence in this case has shown.  Strip away

15  all of the smoke screens and all of the confusion and that's

16  what we are left with.  If there is a finding of liability, if

17  it is a hundred percent certain, $14 million tops, top range,

18  top range, is what you'd be looking at.

19          Let's talk about technology.  Plaintiff came in here

20  and relentlessly talked about the ALCAN cell.  It was a

21  failure, wasn't it.  ALCAN was a failure.  Again and again.  I

22  am going to spend some time on that.  But I leave you with this

23  now.  The M-cell that was developed by Ron Thayer and his group

24  of engineers at MagCorp, Ira Rennert told you this and it was

25  uncontroverted.  The M-cell is best in class.  In terms of

1    electrolytic cells that make magnesium, best in class.  That

2    was developed in the 1998, tested throughout the 1998, '99 time

3    period, put into production as of May 2001.

4            So you have the evidence that shows you a company that

5    is relentlessly driving toward technological improvements,

6    spending millions of dollars, not just on the ALCAN cells and

7    the M-cells, the electrolytic cells, but all the other

8    technologies that go into making a competitive company.  And

9    they focus in on this ALCAN cell, call it a failure and say,

10   therefore, therefore what?  Therefore, this company was doomed

11   to fail.  Said that over and over again.  Where is the

12   evidence?  Where is the evidence of that?

13           Let's go to the production slide.  Let's talk about

14   the evidence.  This is a document.  It's a slide that takes its

15   numbers from the exhibits that are in evidence in the lower

16   left-hand corner.  These bar charts tell you how much magnesium

17   MagCorp was producing during the time period in question.  You

18   see that yellow area.  That's the period of the transfer dates,

19   the period that is your focus, transfers of dividends.  They

20   are flat out making as much magnesium as the plant is capable

21   of handling, more than 43,000 tons of magnesium.  That's tons

22   of magnesium every year.

23           What are they doing that with?  Broken down, doomed to

24   fail technology?  You see it curving down in 2001 to only

25   21,000 tons and we will get to that.  The reason why is because

1    they shut down because there were no sales to be made.  We will

2    get to that.

3          If you focus in the yellow period, the three-year

4    period, that is proof of a company that is robust, that is

5    going flat out for the next generation, because that was being

6    produced by their IG Farben cells and their sealed cells.  But

7    for their next generation cells, during that time period, it is

8    an unrelenting continued progressive search for betterment,

9    more efficiency, more chlorine capture.  And we will go through

10   that to some extent, because there has been so much confusion

11   created about it.

12         But that is evidence that stands before you and tells

13   you that this company was not in any kind of threat whatsoever

14   from its technological status.  The technology issue is noise.

15   It's static.  It takes you away from the financial question

16   during that yellow period.

17         Let's talk about the market.  The plaintiff spent days

18   trying to convince you of market factors that cast doubt on

19   solvency.  But the evidence in this case shows you that during

20   the 1990s the market was not only strong for MagCorp, it was

21   trending upward.  It started to slow in 1999 and then fell off

22   the cliff by 2001.

23         During the three years of the transfers, the outlook

24   for MagCorp was excellent.  Was competition something that

25   MagCorp had to watch out for?  Of course.  Of course.  Were the

1    Chinese and their constant efforts to get into the U.S. and

2    North American markets something that had to be watched out

3    for?  Absolutely.  The record in this case is abundantly clear

4    that Howard Kaplan, the head of sales and marketing, did

5    exactly that.  Watched the Chinese, watched the Russians,

6    watched the Ukrainians, watched the Canadians.  That vigilance

7    and prudence is all that is shown in this evidence at trial.

8            What the plaintiff wants to do with that is to say

9    they were seeing the Chinese and the Chinese ended up coming in

10   2000, and 2001, and, therefore, they must have known that in

11   this time period there was insolvency.  It doesn't work that

12   way.  We will talk about why the Chinese, during the entire

13   '90s, were not a threat to MagCorp, that focused on the North

14   American market, focused on alloy and not the powder.  We will

15   talk about why the Chinese, notwithstanding its continued

16   encouragement, did something extraordinary in 2000, that even

17   the plaintiff's own expert witness told you was unforeseen.

18           The plaintiff can parade up all of these horribles,

19   but not a single one of them is supported by the evidence.

20           I am going to come back to all of these theories.  But

21   let me say this.  When you line up the real evidence, the

22   witnesses who walked in here and gave you their best testimony

23   of what was going on in the 1990s, plaintiff's theories, every

24   single one of them evaporate.  There is nothing left.  It's

25   fumes.

1          Every document, when put into context, not when lifted

2     out in specific passages, not when taken in snippets, but when

3     considered as a whole from that time period, either they

4     undermined the plaintiff's theory or saying nothing in support

5     of it.  I submit to you that at the end of the day what the

6     plaintiff is really hoping is this.  They will never say it to

7     you because it's not permitted.  But what they are really

8     hoping for is that you will conclude that because the company

9     filed for bankruptcy in 2001, it must have been insolvent

10    during that time period.  That is their secret hope and you are

11    not to do that.

12         Why?  The judge will tell you that you can't conclude

13    because something bad happened today necessarily that it

14    existed back in the time period for your consideration.  And

15    your common sense and everyday experience tell you the same

16    thing.  Sometimes life throws a curveball and knocks you flat

17    on the ground.  Just get up and move forward.  You don't say,

18    maybe I shouldn't have been up here today walking forward.  You

19    don't do that.  Life throws some curveballs.  Just keep going.

20         It's easy for guys like the plaintiff involved with

21    your funds to swoop in after the fact with 20/20 hindsight and

22    second-guess the company management's decision, second-guess

23    Mike Legge and say he had a conflict of interest because he had

24    an incentive program.  It's easy for them to come in and say

25    stuff like that.

1            But second guessing has no place in this courtroom,

2    especially when you consider this.  The Federal Reserve Bank

3    website shows you what the gross domestic product, or GDP, of

4    the U.S. Government was and the U.S. economy was historically.

5    They keep a website.  And we introduced into evidence Defense

6    Exhibit 9024.  And based on that exhibit we created a chart.

7            What you see is a GDP U.S. economy growth from 1995 to

8    1996.  It grows to 3.8 percent.  From '96 it goes to '97,

9    growth.  '97 to '98, flat.  '98 to '99, more growth.  What

10   happens now?  '99 to 2001.  What happens from 2000 to 2001?

11   That is the GDP.  That is the U.S. economy.  That's called

12   recession.  It's undisputed.

13           Mike Legge and all the other witnesses who talked

14   about a recession, they weren't making it up.  There is no

15   mystery about what happened when the recession took over the

16   economy during this time period.  And at the very same time,

17   it's not just a recession.  I want to be very clear on this.

18   At the very same time the Chinese came in, in 2000 and 2001,

19   and dumped humongous volumes of powder magnesium into this

20   particular market, the very market that magnesium relies on,

21   not Europe, not China, not the east; the United States and

22   North America.  That was U.S. Magnesium's market -- I'm sorry,

23   that was MagCorp's market.

24           And in that market the Chinese came in, and it's not

25   that they just came in, ladies and gentlemen.  It's very

1    important to keep in mind, they lowered their price from $1.19

2    per pound to $.89 per pound.  That's call illegal dumping.

3    It's against the law and that's what they did.

4          What happened as a result?  Demand dries up.  You

5    can't sell this stuff and you are in for a tough haul.

6          The plaintiff ignores what happened to the economy.

7    You never heard it from them.  They won't acknowledge it.  Just

8    like they won't acknowledge the fact that 20 years after 1995,

9    we still don't have any inkling of any environmental liability.

10   They won't confront that either.  They won't confront this.

11         Just like that they ignore that the M-cell is best in

12   class today.  Just don't confront it.  They tell you instead,

13   focus on dioxins, furans, HCBs, PCBs.

14         As counsel relentlessly harped on witnesses'

15   inconsistencies between their testimony up there and their

16   deposition testimony, I want to talk about that.

17         Ira Rennert spent hours on the stand, getting flogged,

18   frankly, for how terribly how he did at his deposition, where

19   he was totally not prepared and did not prepare himself.

20         What does that have to do with your mission, whether

21   the company was solvent December 1995 to October 1998?  What

22   does that have to do with anything?  On that issue you need

23   help from an expert, a solvency expert?  They put Mr. Frank up

24   there for 30 minutes on direct examination.  But they will

25   spend hours embarrassing Ira Rennert for his horrendous

1   deposition performance.

2          This is their case.  This is their approach.  They

3   show you a big picture of the house, a huge house.  Do you

4   remember, during the opening statement they said, this is Ira

5   Rennert's house.  Did you ever see that house again?  Did that

6   house picture get into evidence?  You didn't.  You know why?

7   Because there is zero evidence in this case connecting that

8   house to the dividends at issue here.  Why was that house

9   brought into this?  Why was it shown to you?  You know why.

10  Because it takes your eye off that ball, gets you angry, right,

11  just like dioxins and furans, it gets you really angry.  But

12  anger has no place in this courtroom.  Let's focus on the

13  evidence.

14         One thing is clear.  Given your obvious focus

15  throughout this trial, you are not a jury that's going to

16  ignore the evidence.  You are not a jury that's going to be

17  sidetracked by pictures of big houses and consistent reminders

18  about furans and dioxins.  You are going to look at the

19  evidence.  Some of you have been taking more notes that are

20  probably better than the transcripts that these court reporters

21  have been taking.  We are very appreciative of that.  So let's

22  talk about the evidence.

23         Here is how I am going to proceed, ladies and

24  gentlemen.  I am going to talk at some length about solvency.

25  Then I am going to talk about why MagCorp, what the evidence

1     shows as to why MagCorp was so successful during that time

2     period and why they were brought to their knees during the

3     latter time period.  Then we are going to talk about each of

4     the plaintiffs, what I call distractions, take the eye off the

5     ball matters.  And we will talk about the claims in this case.

6          Let's start with the core issue.  Was MagCorp

7     insolvent in December 1995 to October 1998 when its owner,

8     Renco, took dividends.  Let me be a little more precise because

9     this is important.  For the dividends that were paid out in

10    December 1995 and 1996, the plaintiff has to prove that the

11    company was insolvent during that time period.  In other words,

12    you take each dividend and the financial condition of the

13    company at the point of that dividend separate from the other

14    time periods of the dividends.  When you get a verdict sheet

15    you will see that the dates of the dividends are broken out

16    separately because you must reach a judgment about the solvency

17    condition and the plaintiff's failure to prove that solvency

18    during each of those periods.

19          If it's in insolvent in 1998, it has nothing to do

20    with 1996.  Same for 1996 versus 1998.  That is how focused

21    your job has to be.  This is not easy.  You don't throw stuff

22    up against the wall and say, well, I guess they were all

23    insolvent during that entire time period.  It doesn't work that

24    way.

25          Let's look at those years.  What's the evidence that

1    during any of those years, those three years, MagCorp failed

2    the solvency test, that it, number one, couldn't pay its bills

3    or that, number two, its liabilities were greater than its

4    assets, or, number three, that it had an inadequate amount of

5    capital to continue to operate.

6          The Renco Group owned MagCorp from 1989 to 2001, 12

7    years.  During the 12 years there are only three periods of

8    dividends because during the other time periods there were no

9    dividends taken.  How is the company doing during that entire

10   time period in the '90s?  Let's go to the sales slides.  From

11   these financial records that sit before you that are in

12   evidence, we took the data that gives you the numbers we are

13   about to go through in these slides.  There is no dispute about

14   these numbers.

15         What you see is that in 1995, they made $136 million

16   in revenue.  During the yellow time period they are above $140

17   million every year.  It starts to dip in 2001 and you see the

18   green part.  That's when things were so bad, they shut down the

19   cells because they had too much inventory.  There was no point

20   in making magnesium because they couldn't sell it.  So they

21   sold some of the energy back.  That's what the green comprises.

22   $81 million was their low point of sales in 2001.

23         Let's go to the EBITDA slides.  Again, EBITDA,

24   earnings before interest tax, depreciation and amortization.

25   You heard about that.  Basically, income.  During the time

1    period, the three-year time period, EBITDA is very strong, $54

2    million, $40 million, $39 million.  Waste basket in 2001.

3    That's how bad things got.

4            You remember all the back and forth that Mr. Beus did

5    with Ira Rennert about these EBITDA slides and whether it was

6    before the dividends, after the dividends.  There was a big

7    fight over that.  You know what, who cares.

8            Take that down.  Let's go to the next slide.  Let's go

9    to the cash and cash equivalent slide.

10            This slide tells you what was left after everything

11    was paid, the dividends were paid, the interest on the bonds

12    were paid, all the costs, operating costs, capital expenditure

13    costs, everything is paid.  This is the cash that remains.

14            Let's go to credit available slides.  Credit is

15    available from Congress Financial to MagCorp during that time

16    period and you see it going up every year.  By 1999, their

17    credit was close to $30 million.  They never drew on this

18    credit.  What does that say to you about a company's ability to

19    pay its bills, that they wouldn't need to even draw on a line

20    of credit that is so readily available to them?

21            In fact, let's go to the income slides.  The money

22    that MagCorp had available in excess cash was so great that you

23    heard Todd Ogaard, the CFO of MagCorp, tell you that he was

24    able to go to their bank, Congress Financial, and negotiate a

25    very sweet rate of return on interest.  In 1995, they made

1   close to $600,000 in cash just from their banks.  Their banks

2   were paying them.  In 1996, the green is Congress Financial.

3   The others are other financial institutions.  They are making

4   over a million dollars.  In 1997, close to a million dollars,

5   just income from these financial institutions, paying MagCorp.

6   Same thing in 1998.

7          Let's go to the total liquidities slide that you saw

8   before.  This is the final metric, cash available, credit

9   available.  When asking yourselves whether assets exceed

10  liability, all you need is a dollar more than liability to be

11  solvent.  They weren't just squeaking by with solvency.

12         In terms of valuation analysis, Roger Grabowski told

13  you what the assets versus liability picture really looks like.

14  Let's take a look at the solvency cushion slide.  Based on

15  information and the exhibits that came in through Mr.

16  Grabowski, in 1996, at the time of the bond offering, you are

17  seeing an enterprise bond value of $310 million.  Debt and

18  contingent liabilities that he estimated based on the inputs

19  that he was given of 161.  Solvency cushion, cushion, just a

20  cushion for solvency, $149 million.

21         So if we can take a minute to just think about what

22  these documents show and what it is that the plaintiff has in

23  opposition to these documents, let's go to the cash needs

24  document, Plaintiff's Exhibit 2786.  This is a document that

25  Mr. Beus showed Roger Grabowski.  This is a slide that

F2OMBUC2                       Summation - Mr. Park

1    plaintiffs created.

2            We will bring up the right one.  Cash and cash

3    equivalents.  I want to present this to you and walk through

4    this thing with you because it's very important because in many

5    ways on a single sheet of paper this tells you what the

6    plaintiff's approach to this case is.  It's a totally

7    misleading slide on a number of different levels, and I want to

8    go through why.

9            First of all, they say that it's MagCorp 1995 to 1998.

10   Actually, that's not -- it looks like four years.  It's

11   actually not.  It's actually December 1995 to October 1998,

12   which is a little less than three years.

13           But, more importantly, what you have in the right

14   column is, they added during that time period, that three-year

15   time period, all the cash and cash equivalents and came to 83.6

16   million.  That's fine.  But on the left-hand column what they

17   do is, they create a bar that looks like that the cash needs

18   during that time period would absolutely overwhelm the cash

19   that's available to MagCorp during that time period, and it's

20   utterly misleading.

21           Let's start with the very top bar there, note payoff

22   of $150 million.  That belongs nowhere on this chart.  Why is

23   that?  Because the note payoff, the bonds, the 1996 bonds, they

24   are not due to be paid until 2003.  That's like saying you've

25   got a mortgage of $100,000 on your house that's due five years

        SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1     from now and you've only got $10,000 in your bank account today

2     and they said, well, you must be broke because you have a cash

3     need now of $100,000.  That's obviously a fallacy, that they

4     put it up there.  It doesn't belong on that chart.

5              Let's go to the technology down below where it says

6     $58 million.  That's CapEx technology costs.  They put that in

7     the chart.  That's wrong, too.  Because the cash and cash

8     equivalents is net of all CapEx costs and expenses.  That green

9     is what you have after all the CapEx expenses have been paid

10    during that time period.  Maybe what they have in mind is that

11    the $58 million isn't technology CapEx from the '95, '98 time

12    period, but rather it is for future periods and they call that

13    a cash need in this time period.  But that's wrong, too.

14    Because if you want to put that $58 million of cash for CapEx

15    costs for the future, you should show the $100 million of

16    revenue that's coming in in the future and you make that $58

17    million just go away because it doesn't belong on this chart,

18    and they have remediation costs of $157 million.

19             Now, that's from Tom Tripp's memo that he did in 2001,

20    after MagCorp filed a lawsuit.  Tom Tripp told you he did a

21    back of the envelope, hasty, here are some estimates, assuming

22    a vindictive EPA and assuming we lose the entire case.  That's

23    what he told you.  The case hasn't been lost anywhere close,

24    vindictive EPA hasn't been shown.

25             Their own expert, Mr. Allen, has a high of $77

1    million.  But does that stop them from putting $157 million up

2    there just to jack up that bar?  Of course it doesn't stop

3    them.  That should be removed.  It doesn't belong there.  It's

4    got no relevance to this case.  We can talk about that,

5    Mr. Allen's $77 million, which is 100 percent liability, when

6    you know after 20 years there has been no liability.  At a

7    minimum, if you do a contingent liability probability analysis

8    you are going to cut that by 50 percent because if you're

9    sitting at '96, what do you think that the probabilities are

10   that there is going to be any liability.

11        When you do all of this, tops, $10 million, maybe of

12   remediation costs.  That's what remains.  And you are left with

13   $83 million in cash.  That means you're $73 million on top.

14        (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1              MR. PARK:  This chart is useful in a number of ways.

2      Number one, it is useful because it shows you what their

3      approach is and how misleading it can be.  Number two, it shows

4      you that if you actually apply the right numbers and even

5      assuming this bar graph is remotely accurate, you apply the

6      right metrics, you end up with solvency, their own graph.

7              Let's now talk about why -- if we can put up 9010A --

8      why during the time period at issue MagCorp's numbers are so

9      good, why they're so strong.  Howard Kaplan did projections

10     year after year.  He would project what are we going to sell

11     next year, what are we going to sell two years from now, three

12     years from now.  If you look at forecast, the actual slide

13     8916, actual year to date, plan year to date, the variance --

14     variance means, if it is positive, that means they did better

15     than projections for sales, they did better for operating

16     income.  In fact, if anything, the projections were always

17     slightly conservative because they always ended up doing

18     slightly better than Howard Kaplan projected.  It bespeaks a

19     level of diligence and accuracy.  I say I'm going to do it, I

20     not only do it, but I do it a little bit better than what I say

21     I'm going to do.

22              That's a bar graph depiction of the table that you

23     just saw, where the black is the actual and the forecast is

24     gray.  It gives you a picture.  If you go back to 9010A, I want

25     to suggest this to you:  If you're looking at that graph and

1    you're thinking, that looks like solvency to me, that's what

2    your common sense tells you, it looks like solvency to me, you

3    should trust your judgment because it is reliable.

4            There is a lot of testimony in this case about

5    business valuation principles.  It is not easy stuff.  But

6    remember what Marjorie Bowen told you -- she was from Houlihan

7    Lokey -- she agrees with your take on these numbers.  Your

8    reactions to these numbers are sound.  The numbers show

9    solvency.  Her much more elaborate analysis comes to the same

10   conclusion.

11           Let's go to DX 8225.  Let's go to the first page so we

12   can get oriented.  This is Marjorie Bowen, Houlihan Lokey's

13   solvency opinion report dated up there in July of 1996.  If you

14   go to page 4, going to the next page, as well, on a pro forma

15   basis, the fair value and present fair salable value of the

16   company's assets would exceed the company's stated liabilities

17   and identified contingent liabilities.  Test number one.  Test

18   number two, the company should be able to pay its debts as they

19   become absolute and mature.  Test number three, the capital

20   remaining in the company after the transaction -- which means

21   the bond offering and the dividends -- would not be

22   unreasonably small for the business in which the company is

23   engaged, as management has indicated it has now conducted and

24   is proposed to be conducted following the consummation of the

25   transaction.  Those formal tests are all satisfied after her

1    analysis.

2            Why was this period so strong for MagCorp?  Remember

3    what Ira Rennert said?  He referred to this as the miracle

4    metal.  This is magnesium.  Super strong, super light.

5    Essential for aluminum.  Essential for titanium.  It is made

6    from the salt water brine of the Great Salt Lake.  Virtually, a

7    limitless supply.  Its primary first source of energy is the

8    sun that evaporates and separates most of the water from the

9    brine, leaving the materials ready for chemical processing.  It

10   is in abundant supply.  It has a market that is never going to

11   stop.  This is what Ira Rennert saw.  This is why during the

12   1990s its progression and strength was so great.

13           Mike Legge also told you that at MagCorp they made an

14   unusually pure quality of the magnesium that had it stand out

15   from its competitors.

16           Congress Financial, which was involved in the initial

17   purchase with Mr. Rennert and Renco Group, they did their own

18   environmental analysis.  They had an evaluation done to ensure

19   that there were no serious problems here.  This was a valuable

20   investment.  All Ira Rennert saw was upside.  He also saw

21   management; mike Legge, Ron Thayer, Howard Kaplan, Lee Brown.

22   You didn't hear much about Lee Brown, but Lee Brown was head of

23   government relations for the company, by the way, also named as

24   a defendant, virtually never mentioned in this case, just put

25   his name up as a defendant, don't even bother to put any proof

f2o4bcu3                    Summation - Mr. Park

1    against him, but Lee Brown was important to defending the

2    company's competitive landscape.  He brought anti-dumping and

3    enforcement efforts, he spearheaded them during the early 1990s

4    to prevent the Canadians and Russians at that time and, to some

5    extent, the Chinese from coming in.  He found these people who

6    had been with the Rowley plant for many, many years.  They were

7    all, for the most part, engineers.  Conservative,

8    straightforward, hard working, knew this side inside out.

9    Fundamentals of a strong company.

10         Howard Kaplan got his Ph.D from University of

11   Pennsylvania, ivy league education, also an extraordinary

12   salesman, an engineer in metallurgical engineering.  Ira

13   Rennert found quality, and these men worked hard throughout the

14   time period in question to make this company successful.

15         Todd Ogaard was the youngest member.  He came from

16   KPMG in 1993 and later became the CFO in 1994.  You saw him

17   testify.  Mild, calm, cautious, very careful person.  Very

18   straightforward and very much expert in financial data.

19         This was the workings of MagCorp.  These are the men

20   that Ira Rennert left in charge.  But he didn't just leave them

21   in charge.  You learned that he went there every month for two

22   days a month.  Renco Group, during that time period, had a

23   number of other companies that it owned.  Renco Group, as you

24   can imagine, had investments that it had to take care of.  But

25   Ira Rennert would take that plane to Utah every month, the

1    entire 12 years, spend two days out there, one day walking the

2    plant.  Why?  Ask yourselves why.

3            They have created this picture of a man who just wants

4    his money and is going to cut out and take off.  That's the

5    picture they have of him.  But the evidence has actually

6    shown -- you can totally disregard his testimony, I don't care

7    whether you take his testimony or not -- you heard it from all

8    the other witnesses, and in fact there is no dispute he went

9    out there every month, that he walked the plant.  Why was he

10   doing that?

11           Why not take conference calls?  Just have a phone

12   call.  How you guys doing?  I'm getting your financial reports.

13   Let me fire off some questions.  Get them answered.  Move on.

14           Why is he going out there walking the plant every

15   month?  And why does Renco Group, after they buy MagCorp,

16   institute a profit-sharing plan for the first time in that

17   plant, where the union guys, the staff people, they all share

18   ten percent of the profits of the company?

19           Now, the plaintiff made this big deal about the fact

20   that there is this NWAPA agreement.  This NWAPA agreement, net

21   worth appreciation participation agreement.  In 1992, Renco

22   Group said to the key managers of MagCorp -- in 1992, four

23   years before the dividends at issue -- said I want you guys to

24   be part of this agreement.

25           What is that agreement?  It says, guys, stay here

1    long, work hard, if the company succeeds, you succeed.  That's

2    called an incentive, performance incentive plan.  That's all it

3    is.  And somehow they have converted even that to a conflict,

4    as if this were a tool for creating a conflict of interest so

5    that those managers would not do their jobs in protecting

6    MagCorp's interests.  It is a false and baseless picture.

7         Ask yourselves:  Did they ever show any evidence of

8    any kind that any of these men violated their duties to the

9    company?  Did they ever shirk their duties in trying to enable

10   this company to be as successful as it could be?

11        Ira Rennert told you that his goal when he bought this

12   plant was make it the biggest, the best, the most efficient

13   producer of magnesium in the world.  He's that kind of guy.  He

14   is going to make it the biggest and the best.

15        What does the evidence show?  Let's go to the

16   production panel.  I'm sorry.  Let's go to the capex panel,

17   DX 9018.  In case you're thinking, well, Ira Rennert is sitting

18   up there, so he'll say whatever he is going to say, let's just

19   go to the proof.  Let's not rely on people's testimony years

20   later, let's rely on what was getting created back in the

21   period that you have to keep your eyes on.  This shows the

22   capital expenditures from 1991 to 2001.  Put your money where

23   your mouth is.  You see continued expenses being paid from the

24   company's cash flow, getting plowed right back into the

25   engineering and physical improvements.  From 1996 to 2001, the

1    expenses just ramp up.  Renco took its $75 million in dividends

2    in 1996 with the bond offering.  So what does this picture have

3    to do with a greedy owner who is going to cut and run?  Why is

4    he saying, yeah, put in $10 million for capital expenditures

5    rather than giving it to me?

6            It is not just capital expenditures, ladies and

7    gentlemen.  It is research and development.  What does that

8    mean?  It means the scientists and engineers are spending that

9    kind of money, $2 million in 1997, another $2 million in 1998,

10   just to research new technological improvements.  Why is that

11   happening?  It is happening because Ira is going to make this

12   company the biggest and the best.  There is no other

13   explanation.  That's proof.  Not a single dividend in the early

14   years, 1989 to 1996.  The first one is December '95.

15           What are they spending their money on?  Mike Legge and

16   Ron Thayer told you.  They went on and on about the different

17   projects; to cut down chlorine emissions, to increase

18   productivity, less energy, more production.  So they talked

19   about the chlorine reduction burner, the spray dryer, the

20   high-energy scrubber, the iron stripper, countless

21   modifications to the electrolytic cells, including the sealed

22   cells that had been in existence, the I.G. Farben cells, the

23   Alcan cells, the M-cells.  This is a company, a management, and

24   an owner committed to creating a foundation for something that

25   will last.

1              If you're going to walk in here and say Ira Rennert,

2      Mike Legge, and Ron Thayer weren't in it for the long haul, for

3      MagCorp, have an explanation, please.  Give us an explanation

4      for why they are committing these kinds of resources again and

5      again.  Don't settle for conjecture, ladies and gentlemen.

6      Demand evidence.

7              Plaintiff spent so much time on electrolytic cells.  I

8      want to spend a minute to sort out what that's about.

9              THE COURT:  Before you do, Mr. Park, we're going to

10     take our mid-morning break.

11             Members of the jury, we're going to take about a

12     10-minute break.  Enjoy your break.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

f2o4bcu3                           Summation – Mr. Park

1              (In open court; jury not present)

2              THE COURT:  All right.  Anybody need me?  Ready to

3    take a break?

4              MR. BEUS:  I do have one item.

5              THE COURT:  Go ahead.

6              MR. BEUS:  When there are repeated references to

7    somebody is only on the stand for 30 minutes, at some point in

8    time, they need to be told we were on a clock, with that kind

9    of argument.  It is just only fair.

10             THE COURT:  I think that's right.  I will let the jury

11   know that I did have everyone on a clock.  The problem with it

12   is it then just opens up to arguments about how long you spent

13   on certain things and others, but I do think that the

14   references to the time require some note that all the lawyers

15   had a clock for the amount of time they could present evidence,

16   it was the same amount of time for both sides.  Okay?

17             MR. BEUS:  Thank you.

18             THE COURT:  Mr. Park?

19             MR. PARK:  That's fine.

20             THE COURT:  I will do it when they come back.

21             MR. BEUS:  You may tell them, in the closing, we have

22   clocks, so they know we are going to end sometime.  Just

23   kidding.

24             THE COURT:  You're kidding?

25             MR. BEUS:  I actually think it is a good idea so they

1    know the circumstances under which we're operating.

2             MR. PARK:  I don't think that is necessary.

3             THE COURT:  You only have a clock insofar as I gave

4    you the time that you asked for.

5             MR. BEUS:  We didn't dare ask for more.

6             THE COURT:  I actually assumed you asked for more than

7    you thought I would give you on the assumption I would cut

8    that.

9             MR. BEUS:  We actually thought you would cut it back.

10            THE COURT:  I thought about it, but given the time

11   constraints, though I think the way trial occurred only

12   confirmed my belief that the amount of time was appropriate,

13   but given that you felt crunched, I wanted to give you the time

14   you needed in the closing.  I gave you more than you needed

15   because you asked for it.

16            MR. BEUS:  I could make another request to have a

17   little extra time, if I could, your Honor.

18            THE COURT:  I can't tell if you're joking.

19            MR. BEUS:  I'm half joking and half serious.

20            THE COURT:  I won't change the rules.  I gave you

21   exactly what you asked for, and it is the case that sometimes

22   less is more.

23            MR. BEUS:  Your Honor, in that regard, you've

24   conditioned us such that we have to be very reasonable in our

25   requests.

1            THE COURT:  Then, my job is done here.

2            MR. BEUS:  I know.

3            THE COURT:  No, I assumed you asked for more than you

4    thought I would give you, but I gave it to you.  One, it was

5    what you asked for; and two, that both sides had had an

6    understanding of what the ground rules would be.

7            So we will take a break.  When they come back, I will

8    make the point about that there was reference to the amount of

9    time with certain witnesses and the like.  I do want the jury

10   to know that both sides had a certain amount of time in total

11   to present evidence; and that it was the same amount of time

12   for both sides, and what they did with that time was their

13   choosing.  And I will, I think, just give them a sense that --

14   just to give the sense of the day -- we may or may not get

15   through -- well, how much time do you anticipate, Mr. Park?

16           MR. PARK:  I was going to take the full two and a half

17   hours, Judge.  I have been told I have an hour and 15 minutes

18   left.  I'm glad Mr. Stewart confirmed that.

19           THE COURT:  I will tell them that we may or may not

20   get through the closings today, I may or may not instruct them

21   on the law today, but certainly by sometime tomorrow morning we

22   will be finished with the closings and the instructions and

23   they will head into their deliberations.

24           Mr. Park, you have to speak into the mike.  Your voice

25   sometimes comes almost to a whisper.

1            MR. PARK:  I apologize.

2            THE COURT:  I'm watching the court reporters.  They're

3      getting you.  I think at some point there is some struggle

4      among the jurors to hear what you're saying.

5            MR. PARK:  I saw that, too.  I will keep it up.

6            THE COURT:  Just the mike in front of you, especially

7      if you're turning to face the board or the projector.  And if

8      you're doing that sort of quieter delivery, do it more loudly.

9            MR. PARK:  Okay.

10            THE COURT:  See you shortly.

11            (Recess)

12         (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court; jury present)

2           THE COURT:  Thank you, members of the jury.

3           Just a few quick notes about the clock:  One, there

4    was reference to the amount of time spent on certain witnesses

5    or evidence and the like.  I do want you to know that both

6    sides were on a clock for the trial, and that is to say they

7    had a certain number of hours total that they could use.  It

8    was the same amount of time for both sides, and what they did

9    with their time was up to them.  I did want you to know that

10   since reference was made to time.

11          Also, just to give you a sense of what I anticipate

12   for the time today, we may or may not get through both closings

13   today.  If not, we will finish up in the morning, and then I

14   will instruct you on the law, and you will start your

15   deliberations; or we may get through closings today, and I may

16   or may not start instructing you.  I suspect the instructions

17   will come in the morning, but we will see.  I want to make sure

18   we're getting breaks as you need it so that your attention can

19   remain at the level that it has for both sides as they proceed.

20          With that, Mr. Park, you may return to the podium.

21          MR. PARK:  Thank you, your Honor.

22          When I left off, we were talking about trying to sort

23   out the technology, the electrolytic cell issue.

24          In 1990, Congress passed a Clean Air Act, and it was a

25   new law that basically told companies and industries in the

1    United States, at some point, we are going to issue regulations

2    that restrict the level of air emissions.  It was not clear

3    when those regulations would actually go into effect, but they

4    would go into effect eventually.  The regulations that went

5    into effect was what's known as NESHAP.  Don't ask me what the

6    acronym stands for.  NESHAP came into effect in 2005, but here

7    we are in 1990, Clean Air Act comes in.  What you heard a lot

8    about is MagCorp's effort in predicting that eventually NESHAP

9    would get into effect, finding new technology to drastically

10   cut down their chlorine air emissions.

11            Through the course of this trial, you heard some

12   reference to the fact they were a big polluter, they had some

13   chlorine air emissions.  One thing to keep in mind -- and there

14   is no dispute about this -- MagCorp was always within permitted

15   amounts.  There were chlorine emissions, yes.  They were within

16   permitted amounts.

17            With the new NESHAP coming on board, the goal was to

18   get new technology in place that would further diminish the

19   chlorine air emissions.  They had the initial German

20   technology, the I.G. Farben cells.  They had developed the

21   sealed cells that did, in fact, substantially reduce chlorine

22   air emissions.  They wanted to do better.  So they looked for

23   the Alcan cell.  And that is where the Alcan cell came in.  You

24   heard about them going out to Japan, doing some testing,

25   looking for the best that was out there, to increase the

f2o4bcu3                        Summation - Mr. Park

1   production.

2           Just keep in mind, it is not just about the Clean Air

3   Act.  It is about generally decreasing the amount of

4   electricity and power that they need to create greater output

5   of magnesium.  So that was the goal.  In the mid-'90s, the

6   company embarks on this effort to find this technology.  They

7   find Alcan.  They think it is terrific.  They bring it on

8   board.  They started it in 1996, and it goes through several

9   years of test piloting, which is not unusual.

10          Now, during this entire time period, I showed you that

11  magnesium production chart.  They weren't waiting on the Alcan

12  cell, by any means.  They were producing every ounce of

13  magnesium that they could sell.  That is really important to

14  keep in mind.  So when plaintiff puts this in the context of

15  doomed to fail and all this other kind of scary sounding

16  language, it has got no basis in the evidence.  Yes, they were

17  looking for this next generation, which would drastically

18  curtail emissions and increase their productivity.

19          What the evidence actually shows is this -- Exhibit

20  9000 -- this is a memo that was created by Ron Thayer in

21  December of 1999.  It was sent to Mike Legge.  What it does, it

22  is a multipage document.  You will have it available for you to

23  review during deliberations.  It tells you -- again, forget

24  about the testimony in this case.  People's recollections and

25  testimonies are always going to be flawed, always.  Look for

1    the documents.  Look for the stuff that was created back then.

2    And what this document does is it chronicles for you, in a

3    detailed, very professional way, what Ron Thayer is telling his

4    boss, Mike Legge, about the progression of all of their cell

5    testing, efforts, disappointments, progress.  It is a document

6    that puts to rest any suggestion currently concocted by

7    plaintiff that there was any fear of failure, doomsday, or

8    anything along those lines.

9        What it shows you, it talks about Alcan cells.  It

10   talks about sealed cells.  Why is that important?  Because

11   Alcan is not the only technology they have got going that

12   they're modifying.  The sealed cells have been improving

13   through the modifications in such a dramatic fashion that if

14   you go to table 711, this table on this page, it compares the

15   various different types of cells that were under examination at

16   the time.

17       I won't spend a lot of time on this, but you look at

18   chlorine capture, the efficiencies, you look at the pounds that

19   are being put out, pounds of magnesium being put out, if you

20   study this, you'll realize that the sealed cell is actually

21   performing at almost the holy grail goal that Ron Thayer and

22   MagCorp had set for themselves.

23       Why is that important?  It is important because, as

24   the witnesses told you, if Alcan didn't work out and if they

25   didn't find M-cells, the sealed cells were going to be awesome.

1   As it turns out, the M-cell was superior to everything.  That's

2   the chronology.  Those are the facts.  This memo talks about

3   those facts.

4           Now, let's talk about the paragraph that describes Ron

5   Thayer's reaction to the Alcan cell.  In the conclusion, Ron

6   Thayer says, "The program has a number of operating challenges

7   and problems, but does appear to be effective in reducing

8   operating costs.  We appear to be able to decrease labor,

9   energy, and environmental expenses with these units.  We have

10  met some, but not all of our original program objectives."

11  December 1999.  This is Ron's report to Mike.

12          Mr. Beus, during his examination of Mike Legge, said:

13  Well, isn't it true that at a deposition you said the Alcan was

14  a failure?  And Mike said, I did say that, I was mistaken.

15          Let's go to the documents, shall we?  Let's quit

16  playing around with these deposition transcripts.  Let's go to

17  the documents.

18          If any of you were asked a question about something

19  that happened 15 years ago, you might venture a guess, but I

20  think you pretty much would say, you know what, let me go to my

21  notes back then because it might be a little more reliable.

22  This is that note.

23          Now, in this document, there is a reference to the

24  fact -- and the plaintiffs have just spent so much time on this

25  passage -- where he says, "We need to pursue development and

1      installation of the cell technology to ensure our financial

2      survival."

3             Here we are, we've got a multipage document that

4      describes the strenuous efforts and the innovation that Ron

5      Thayer and his group is engaged in.  And he puts that line in

6      that basically says we gotta be the best, in effect.  That's

7      their doomsday statement.

8             This is what I mean when I say don't permit the

9      plaintiff to substitute snippets and passages taken out of

10     context for actual evidence, for what was really going on

11     during that time period.  And what ended up happening?  The

12     M-cell is best in class.

13            This technology issue is a red herring.  It has got

14     nothing to do with the solvency problem question back then.

15     Was MagCorp saying, we are going to spend this amount of money

16     for technology?  Were they hoping to get it sooner in place

17     than it actually ended up?  M-cell was in place by May 2001.

18     No dispute about that.  So what?  Sometimes there are delays.

19     What has that got to do with this notion of insolvency in

20     October of 1995 -- I'm sorry -- December 1995 to October '98?

21     What is the relevance?  When you have evidence that throughout

22     that entire period there is just a continued emphasis on capex

23     and R&D spending.

24            Let me go to this competitive landscape and the

25     magnesium market issue.  Howard Kaplan got up here and he

1   walked you through two sets of documents.  He created these

2   documents during that time period.  One was his IMA

3   presentations, his presentations to the International Magnesium

4   Association.  He had such status in that group that he was

5   doing these presentations about the state of the market.

6          The second category of documents that he went through

7   with you when he was on the stand were his memos to Mike Legge

8   that described for Mike during that time period what he was

9   seeing in the marketplace, what other people were saying about

10  the marketplace.  You read any one of them, you will find a

11  balanced accounting of everything he is saying.  This is good.

12  This is not so good.  That could be improved.  There is a

13  little risk out there.  The Chinese are over here.  The

14  Russians are over here.  It is normal course, prudent

15  monitoring of the marketplace, of the competitive marketplace.

16  It is evidence of just extraordinary diligence, really.  Read

17  these memos.  Any one of them.

18          They turn those memos and taking passages out of them

19  in 1996 and say, well, you see, Howard Kaplan told you that in

20  1996 the Chinese are in Rotterdam.  Who cares?  North America

21  is the market.  Alloy is MagCorp's market.  MagCorp makes the

22  purest magnesium going out there.  They are not threatened.

23  You will not see a doomsday, sky-is-going-to-fall-in, Chicken

24  Little statement by Mr. Kaplan during that time period, from

25  '96 to 1998.

1          Will you see him talking about the Chinese and the

2     need to keep an eye on them?  Absolutely.  To convert that to

3     what they would have you believe, to evidence of looming

4     insolvency, a crumbling foundation, pure 20/20 hindsight, made

5     up.

6          Did Howard Kaplan ever say while he was sitting in

7     front of you, you're right, Mr. Stirling or Mr. Beus?  You're

8     right, we really were seeing what the Chinese were going to do

9     to us that happened in 2000?

10         I'm going to do a couple of the IMA presentations, the

11    presentations he made to the IMA in 1996.  The first is Defense

12    Exhibit 8181, page 3.  "Overall magnesium demand in 1995 hit

13    another record, up approximately 5.8 percent from 1994."

14         "It would seem the industry would remain in some sort

15    of balance to allow 4 to 5 percent growth per year in 1997 and

16    1998."

17         "This was surpassed in the second quarter of the year

18    where demand reached 82,050 metric tons.  This first half of

19    1997 demand annualizes," yada, yada, yada, "increases of 9.6

20    percent."  Everything is just going up.

21         Let's go to Defense Exhibit 86 -- I'm sorry -- 8307,

22    page 5.

23         We had skipped ahead.  That is 8307.  So there we are

24    in the first half of 1997, demand annualizes, which is an

25    increase of 9.6 percent.

1            Let's go to 1998 IMA presentation, 8388.  "Overall

2     magnesium demand in 1998 was 7.9 percent above 1997, to set a

3     new record for Western consumption of 360,300 metric tons."

4            You can go through all of the IMAs.  The memos, for

5     those of you who were taking notes, the memos to Mike Legge

6     from 1996, 1997, and 1998 -- and we don't need to show them

7     now -- Defense Exhibit 8275, 8335, 8384.

8            It is not just Howard Kaplan's data from this period

9     that proves a strong trend in North America.  If you look at

10    Defense Exhibit 8908, this is a slide that was created by the

11    market expert, Robert Edgar, who shows you the powerful trend

12    upward during the entire '90s, where it falls in 2000.  If you

13    look at Defense Exhibit 8454, page 1, in 2001, biggest drop

14    clearly was in North America, a drop of 22 percent.

15           In all of these memos, there is reference to Chinese.

16    It doesn't prove anything.  It shows prudence and watchfulness.

17    It is not just the Chinese.  Watch the entire competitive

18    landscape.  Don't let them take things out of context.

19           What the Chinese did -- I mentioned earlier -- they

20    came in in 2000 and 2001.  They not only accelerated

21    exponentially the dump of powder into the United States in

22    2000, but they dropped the price from $1.19 to .87 cents per

23    pond, massive undercutting of the prices.

24           So when the plaintiff suggests to you, you know what,

25    you guys should have seen this might happen in 1996, ask them

f2o4bcu3                       Summation - Mr. Park

1    for evidence of that.  I'm actually going to give you some

2    evidence why that was not foreseeable.

3           You heard from Mr. Adams, the gentleman on video.

4    That was their market expert, the man with the British accent,

5    it with hard to follow what he was saying.  He was their market

6    expert.  He was part of CRU, a firm that specialized in

7    watching this market.  Mr. Adams, their own expert, told you

8    the following -- it is on page 147 of the video, line 18 --

9    this is on cross-examination by my colleague, Mr. Haveles.

10          Question:  Haven't you expressed as your opinion that

11   what happened with the export of Chinese powder in 2000 and

12   2001 was not foreseeable?

13          Answer:  Well, I have expressed the opinion that we

14   did not -- we did not foresee it.  If we had, we would have put

15   it in our report, which you have gone through carefully.

16   Whether it was foreseeable by others in the market is a matter

17   of speculation.

18          It goes on.

19          Question:  Well, let me read you a report, your

20   rebuttal report, the last sentence of paragraph 49.  It states:

21   I also accepted as unreasonable to argue that MagCorp should

22   have foreseen this particular scenario, referring to the

23   increase in Chinese experts.

24          Did you believe that sentence when you signed your

25   rebuttal report?

1           Answer:  Yes.

2           Question:  Back in the summer of 2012?

3           Answer:  Yes.  I -- we didn't see it.  So it would be

4  very gratuitous of us to argue that MagCorp should have

5  foreseen it.

6           That is the evidence.  It comes right out of

7  plaintiff's mouth, plaintiff's expert's mouth.

8           This market stuff, it is just another distraction.  It

9  takes your eyes off the ball of what was happening in the time

10  period that must be your focus.

11           Let me now turn to the 1996 bond offering, and let's

12  put that in context.  What is it and why did it occur?  You

13  heard both Marjorie Bowen and Roger Grabowski tell you it is

14  very common for private companies, like MagCorp and Renco

15  Metals, to raise money by issuing bonds.  They call it

16  leverage, you get leveraged., there is a lot of debt out there.

17  Unlike public companies that issue equity, shares, stock in

18  IBM, for example, private companies raise money through

19  issuance of bonds.  It is very common.

20           You heard Roger Fay and Ira Rennert describe the debt

21  offerings.  Mr. Rennert told you that one of the ways for

22  smaller companies to mature into the marketplace and to become

23  known to banks, to increase their liquidity, is to issue bonds,

24  to participate in the bond market.

25           I would submit that you can think of it like having a

1    teen-aged child who is about to leave the house.  You give him

2    or her a credit card.  Why?  So that they can start using it.

3    They get a credit score.  They make the payments on time.  And

4    as a young adult, when they're looking for their first house,

5    they have got a credit score.  They can get mortgages from

6    banks because they have a score that banks can rely on to feel

7    comfortable about this person.  This is not that much

8    different.

9          So what is it that happened here?  Well, in 1993, you

10   learned the Citibank had underwritten a smaller bond offering

11   for $75 million.  What happens in 1996 is DLJ, the investment

12   bank, comes to Ira Rennert and The Renco Group and suggests,

13   you do a refinancing.

14         Now, why is DLJ coming to Ira Rennert?  Mr. Rennert

15   told you that it was not at all uncommon for major banks to

16   approach him or The Renco Group about doing new deals.  Lehman

17   Brothers, you heard from him, even suggested that he sell

18   MagCorp to General Motors.  Mr. Rennert wasn't interested.

19   This was in the '90s.  DLJ comes to him and makes a proposal:

20   We think MagCorp is in such a good financial position, you

21   should do a refinancing, meaning take the 1993 bonds, refinance

22   it, like a new mortgage, refinance your mortgage, you extend

23   the terms, you get better terms.  Rather than 12 percent

24   interest under 1993 bonds they were going to get a slightly

25   better one at 11.5 percent.

1          MR. PARK:  But, importantly, it increases the term of

2     the maturity date of the bonds and it also benefits some of the

3     debt covenants that were attached to the initial 1993 bonds.

4          Let's take a look at Defense Exhibit 8180B.  If we go

5     to the first page, this is a document that Mr. Rennert

6     identified during his testimony as a document that DLJ had

7     presented to him and you see that in March of 1996.  It's DLJ's

8     presentation to him.  And if you go to the first page, there

9     are a number of things that they provide in summary form on

10    this page about why it may be a good idea for Ira Rennert to

11    think about refinancing.  They talk about in the second bullet

12    the restrictive covenants in the 1993 bond.  That's what the

13    reference to the 12 percent senior notes is to.  They talk

14    about in the second highlighted bullet, unless the company has

15    significant CapEx projects, it is very inefficient to leave

16    this cash sitting on the balance sheet.  This cash, meaning

17    MagCorp is making money.  It's inefficient to be sitting there.

18    What does that mean?  Put it to use.  Put it to an investment

19    where it can draw a much higher rate of return.  That's their

20    thought.

21          And then towards the end they say:  Assuming there are

22    no significant capital expansion projects, the excess cash

23    currently in the company, along with cash from new debt

24    issuances can be dividended to Renco Group.

25          They come to him and say, take some of this cash and

1   take some of the proceeds of the new bonds and take a dividend.

2   You haven't done one in a while.  This is what they propose.

3           Go to the next page.  They have a number of

4   alternatives as to what Renco Group could do and one of them is

5   case 3, option 3, tender offer, refinance existing notes, the

6   1993 notes.  And if you go to the last page, case 3 is further

7   defined.  It says:  Refinance notes.  And then they suggest

8   dividends of $95 million.  This is DLJ's notion.  Now, Renco

9   Group thinks about it.  They actually do it.  It's not at 95.

10  It's at 75.  But this is how this bond offering occurs,

11  something that DLJ brings to their attention as a possible good

12  thing for Renco Group and MagCorp to do.

13          So what happens?  They do the bond offering.  Now, one

14  of the things that the plaintiff's counsel have repeatedly

15  returned to, and you saw that on that cash needs chart that I

16  was so critical of earlier that Mr. Beus showed Mr. Grabowski,

17  it is this notion, you've got $150 million debt obligation

18  that's out there.  What are you going to do?  It's going to

19  crush you.  That is their theme.  It is one of their many

20  themes, but that's one of them.  It is a false theme.  It is

21  one that is not based in financial reality, in business

22  reality.  How do you know that?  Because Roger Grabowski,

23  Marjorie Bowen at Houlihan Lokey, Ira Rennert, Roger Fay, the

24  CFO of Renco, they all told you the same thing.  Private

25  businesses like this that are leveraged simply refinance.

1   That's what you do.  That's how the 1993 got refinanced.  The

2   1996 bonds will get refinanced.  When is it due?  2003, way off

3   into the future.  As you get closer to that, you get it

4   refinanced.

5          Look.  Plaintiffs can walk in here and take a bunch of

6   jurors who are not in the world of finance and say, $150

7   million debt, ladies and gentlemen, and get you to gasp.  It's

8   easy to do that.  But you got to take the evidence in the

9   context in which you find it.  $150 million debt offering with

10  a seven-year maturity, for a company that is making this kind

11  of money, that is as valuable as it was during the 1990s, is a

12  nothing.  And it is part of what Marjorie Bowen at Houlihan

13  Lokey was looking at.  That's part of their solvency analysis.

14  She told you during her testimony she did hundreds of solvency

15  analyses during the '90s for private companies that are

16  leveraged.  It is that common.

17         Let's go to Defendants' Exhibit 8225 at page 5, the

18  paragraph before that.  Again, this is a Houlihan Lokey report,

19  July 1996, Marjorie Bowen created it, sent it to MagCorp.

20         One of the things she says, if you look at the last

21  sentence of that paragraph:  With regard to any such

22  refinancing of the new notes, nothing has come to the attention

23  of our personnel working on this engagement in the course

24  thereof that has caused us to believe that it is unreasonable

25  for us to assume that the new notes would be refinanced on or

1     before December 31, 2003.

2              This, again, in 1996, tells you what everybody is

3     thinking and what the expectation in the marketplace is.  You

4     just get a refinance.  If you have a home mortgage and it's

5     coming due in five years and it's $100,000 and your house is

6     worth $400,000 and banks are coming to you and saying, hey, we

7     got a new interest rate, what are you going to do?  You are

8     going to refinance.  In the private bond market that tells you

9     how common this is.  Do not buy into this notion that's created

10    by plaintiffs that somehow having a bond issuance of $150

11    million years and years later is a burden that you need to have

12    cash in hand to deal with.  There is no evidence, not a single

13    witness, not a single document with support such a fallacy.

14              If we go back to the bond offering I want to take a

15    look at 2578, Plaintiff's Exhibit 2578.  This is an

16    organizational meeting chart that DLJ created May 1996.  And if

17    you go to page, the due diligence page, let's blow that top

18    part up, please, Derek.  DLJ is leading this.  They are the

19    underwriters.  They are leading this effort to get ready for

20    the bond offering.  And I'm not going to spend the time to go

21    through each of these items.

22              But I urge you to look at this document, take it back

23    and look at it.  There is virtually no issue confronting

24    MagCorp.  Potentially or in actuality the DLJ doesn't say we

25    want to take a look at it.  Competitive landscape.  The

1  duration of the contracts, how stable they are, environmental

2  issues, the state of technology.  Talk about China, Soviet

3  Union, Ukraine.

4        Let's go to the next page, under environmental.

5  Environmental consultant to review plant and plant operation,

6  discuss pending problems in the litigation.  Above that,

7  contracts, stability of contracts.  Cost management program

8  towards the end.  Discuss costs as relating to the new cells

9  that will be built in 1997 to 1998.  They are talking about

10 building new cells for that time period.  It ends up being

11 delayed more.  But these issues are all being very closely

12 reviewed.  It's called due diligence because everyone is being

13 diligent.  They come in here after a bankruptcy and says, how

14 dare you do that deal.  That's not the test.  The test for

15 every one of the defendants that they have filed a lawsuit

16 against, the test is how careful and diligent and prudent were

17 they at the time, 1996.  Heaven forbid if my judgments should

18 be tested on the basis of how some of my judgments later end

19 up.  That's not the test, it's not fair, and it's not the way

20 it works.  That shows you prudence.  That shows you a level of

21 diligence.  That is evidence.

22        Now, DLJ just doesn't do that.  Ira Rennert, like all

23 these guys who knew about the finances, told you, we are

24 comfortable with the financial solvency.  We are good.  We have

25 seen these.  We have lived with these numbers.  We know this is

F2OMBUC4                   Summation - Mr. Park

 1   good.  But DLJ says, I want to do something else.  I want to

 2   get a separate solvency opinion done by Houlihan Lokey.  It's

 3   their idea.  This is how careful they are.

 4          Who are these guys, by the way, DLJ?  Who are these

 5   guys?  They are an independent underwriter.  They are putting

 6   their name, their brand, and their reputation behind this deal

 7   because they are going out to some of the big boys on Wall

 8   Street and saying, this is a good deal, buy into these bonds.

 9   So they are going to want to make sure that they are not

10   missing anything.

11          One of the pieces of testimony you heard, and it's in

12   this document as well, is, they are separately represented by a

13   separate law firm, Cahill, Gordon, Reindel, a major Wall Street

14   law firm.  Roger Fay told you they are specialists in this

15   area.

16          Why do they have their own law firm?  Because DLJ has

17   their absolute own interest independent of whatever Ira Rennert

18   or MagCorp or anybody else cares about.  They are going to do

19   their own diligence.  That is the protection that was and the

20   prudence that was surrounding this deal, so they cause Houlihan

21   Lokey to do this diligence.

22          And what does she do, Marjorie Bowen?  We talked about

23   her conclusion.  I showed you the letter.  She told you that

24   the way they do this analysis is to use the bankruptcy court's

25   legal standards for solvency and fraudulent conveyance.  Think

          SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

1      about that.  She is saying, we are going to do this so right

2      that there can be no question later on that we did it right.

3      We are going to do the full legal standards.

4              So she says we do the doom and gloom scenario.  We

5      stress test these numbers.  One of the big issues that have

6      just put me to sleep, frankly is, again, and again, there is a

7      talk about Howard Kaplan using a $1.78 projection price per

8      pound for seven years in this projection that they sent to

9      Houlihan Lokey.  I want to clarify what this is.

10             Houlihan Lokey says to MagCorp, we need a projection

11     of what you think that the price per pound of magnesium is

12     going to be and we need it for seven years.  Howard Kaplan

13     says, well, let's see.  The spot price last year or about now

14     is like $1.90.  It's high.  But what I'll do as a projection is

15     shave it off and use $1.78.  And then he puts it out for seven

16     years because that's his projection.  He actually doesn't do

17     seven years.  Those two years get tacked on because that's the

18     time period that Houlihan Lokey wants.

19             Howard Kaplan doesn't use seven-year projections

20     because it's meaningless.  He is just out there doing a budget.

21     He does it on an annual basis and you saw how accurate his

22     budgets are.  But this is for a different purpose.  Houlihan

23     Lokey wants it.  They make it seem like that decision was a

24     careless reckless decision by Howard or Todd Ogaard to somehow

25     fool Houlihan Lokey.  Houlihan Lokey is not being fooled.  They

1    asked management for a projection and management provides it.

2    It's $1.78.

3           Now, they had their expert and all of their questions

4    showing this spot price and how the $1.78 is well above the

5    spot price as it actually transpires.  It doesn't mean

6    anything.  It's irrelevant.  Why?  Because Marjorie Bowen told

7    you she just doesn't accept management representations.  She

8    gives it a haircut.  She assumes a scenario that is too

9    optimistic.  This fact, if you look at her work papers, let's

10   take a look at Defense Exhibit 8187.  We showed you her

11   opinion, that letter.  This is her work paper.  Let's blow that

12   up.  April 30, 1996.  It is a multi-page financial analysis

13   telling you how she reached her opinion of solvency.  It's got

14   a base-case scenario which means -- let's just take

15   management's numbers and run it and see what happens.  It's got

16   a downside scenario, it's got a worst-case scenario, it's got a

17   stress test scenario, assuming that management's numbers are

18   wrong.

19          Now, we have just blown this up.  Derek is ahead of

20   me.  See if we can get it a little bigger.

21          So you see that base case number of $1.86 -- I'm

22   sorry.  The first one I can't quite read but the second one you

23   see clearly, $1.78, $1.77, $1.78 on the bottom, right.  That's

24   the projected numbers that MagCorp provides.  But above it what

25   you see her doing is taking that 25 percent haircut off that

1    number, assuming that that number is going to be 25 percent

2    lower price per pound.

3         That's right, ladies and gentlemen.  You spent hours

4    and days listening to criticism of $1.78 and it is completely

5    irrelevant to the question of solvency, December 1995 to

6    October 1998.  It was rendered irrelevant because Marjorie

7    Bowen didn't rely just on that base case number.  She ran it,

8    because you do look at management's representations about

9    what's reasonable, but then you stress test it and that's what

10   she did.

11        What was her conclusion?  Solvency, no problem.  Just

12   another distraction, just another thing that they picked out

13   and decided to go after.

14        Now, this $1.78, I just don't want to leave it out

15   saying this because I want to defend Howard Kaplan's decision

16   to use $1.78.  They make it seem so ridiculous that he would

17   use a $1.78 projection and that it would be used for a

18   seven-year period.  Mr. Edgar, the other market expert, Robert

19   Edgar, told you this.  That's actually not at all unreasonable.

20   He was the head of sales and marketing for Norsk Hydro, one of

21   MagCorp's main competitors, and he's now a consultant and he

22   was an expert on the market.  What he told you is something

23   very, very sensible.

24        If you are sitting in 1996 and you are asked, give me

25   a projection about what the price of magnesium is going to be a

1    year from now, two years from now, three years from now, what

2    are you supposed to do, kind of give it a wavy up and down just

3    for the sake of it?  What Mr. Edgar told you is this.  You pick

4    one number unless you have some basis for believing that

5    something is going to happen two years from now or four years

6    from now that would cause you to decide that number you've just

7    chosen is not going to be valid at that time.

8        And what Mr. Edgar told you is based on everything

9    that was known to the market in 1996.  Picking $1.78 was not

10   such a bad idea.  And not varying it was a totally reasonable

11   decision.  At the end of the day it's irrelevant to your

12   considerations because Marjorie Bowen's solvency analysis did

13   not rely on an assumption that, in fact, it would have to be

14   $1.78 years down the road.  It's just another distraction.

15       Now, let me give you another distraction that they

16   raised.  Ira Rennert didn't read the Houlihan Lokey report.

17   Okay.  You are right, he didn't.  So what?  So what?  Ira

18   Rennert is the chairman of the Renco Group.  He has many

19   companies under Renco Group.  He has got a CFO named Roger Fay

20   who is his chief financial officer, a guy he has known since

21   the '70s, whom you heard testify.  Roger Fay read the Houlihan

22   Lokey report.  Roger Fay told you he reviewed it with Ira

23   Rennert.  And everything is fine.

24       So what's the significance of the fact that Ira

25   Rennert didn't read the report?  There is no significance.

F2OMBUC4                       Summation - Mr. Park

1    Does that mean that the Houlihan Lokey report was irrelevant to

2    Ira or irrelevant to Roger Fay?  No, it doesn't.  Those guys

3    knew the financial documents.  They were comfortable with

4    solvency in the financial strength of the company, but both Ira

5    Rennert and Roger Fay told you this when questioned.

6          If Houlihan Lokey had come in and said, hey, guys, we

7    have got a problem here, this note offering and the dividend

8    transfers that are being considered are going to cause a

9    problem, they told you what they would have done.  They said,

10   okay, well, maybe we should reconsider.  Of course they would.

11   Why wouldn't they?  This is an idea brought to them by DLJ.  Is

12   there any evidence anywhere in this trial or anywhere else that

13   you've heard that Ira Rennert said, we have got to do this come

14   hell or high water?  There is no such evidence.  This is a

15   commonplace transaction that occurred when a bank brought this

16   deal.  It made sense.  They did all the due diligence and it

17   was good to go.

18         If Houlihan Lokey had said, you guys are missing

19   something here, there is a problem, what do you think Roger

20   Fay, Ira Rennert and even the MagCorp executives would have

21   done?  They would have said, let's do something else.  There is

22   absolutely no evidence to suggest to you that that would not

23   have been their decision.  That was the importance of the

24   Houlihan Lokey report.  It doesn't matter that Ira Rennert

25   didn't read the report personally.  It was important to the

1   diligent process.

2          We talked about Congress Financial earlier.  It's not

3   just DLJ doing this diligence.  These managers, including Ira

4   Rennert, manager of the Renco Group, they have got this group

5   of highly professional firms that are looking at the same

6   things that he is, and they are all giving this the green

7   light.

8          Congress Financial, who are they?  They are not just a

9   lending bank.  Todd Ogaard, Roger Fay, they both described for

10  you how powerful this entity is over the affairs of MagCorp.

11  Why is that?  Because they have got a line of credit of over

12  $30 million at any one time for MagCorp.  You think this

13  company is not going to be a hawk over exactly what's going on

14  financially at the company that they are extending such a huge

15  amount of credit to?  Of course they are.  That's why Todd

16  Ogaard told you about the monthly reports that they would make

17  to Congress Financial reporting on what's happening.

18         And the other thing you learned is that Congress

19  Financial actually has the receivables of MagCorp.  What does

20  that mean?  Receivables, bills.  So MagCorp sends out a bill to

21  a customer they just sold 100 pounds of magnesium, you owe us a

22  couple million dollars, that receivable held by Congress

23  Financial.

24         The level of reporting to Congress Financial and the

25  level of awareness of Congress Financial is not in question in

1    this case.  Here they are, buying into this bond offering and a

2    dividend transfer and, as you will learn, as the evidence

3    shows, for every dividend that was subsequently taken, Roger

4    Fay and Todd Ogaard would tell Janet Last or others at Congress

5    Financial and get their approval.  December 1995 to October

6    1998, Congress Financial knew about every single dividend.  And

7    I showed you the graph.  The credit bars are going up, up, and

8    up, increasing the credits every year.

9             Just put up Defense Exhibit 8149 just for a second,

10   Derek.

11            This is an example of a letter from Todd Ogaard to

12   Janet Last at Congress Financial Company.  This is as of

13   December 1995.  It talks about the section of the agreement

14   between MagCorp and Congress Financial, talking about projected

15   financial statements for fiscal 1996.  So they put together a

16   projection of what they think they are going to do and they

17   have got to share that with Congress Financial.  It's not just

18   what we did last week; it's what we think we are going to do

19   next week.  That's the level of vigilance that Congress

20   Financial has over MagCorp's finances, and that's being sent

21   every month and that's not a year-end thing, but a similar

22   document is being sent every month by Todd to Congress

23   Financial.  There is no dispute about that.

24            It's not just Congress Financial.  We talked about

25   KPMG, external audit firm.  This is the external auditor who

F2OMBUC4                    Summation - Mr. Park

1   comes in and audits the books and records of MagCorp,

2   quarterly, annually.  And both Todd Ogaard and Roger Fay

3   described for you how important their role is.  They provided

4   the clean opinion, meaning an opinion that said, we are not

5   qualifying it any way in connection with the bond offering, as

6   well as all the other financial statements that MagCorp filed.

7        And you heard about 10-Ks.  Once the bond, 1993 bond

8   offering was made, the company was required, Renco Metals was

9   required to submit a financial report and file it with the SEC

10  so it would be publicly available.  You could go online with

11  the SEC and find all the other financial reports by every other

12  company that has a public bond offering out there.  It's

13  available for people to look at and analyze what's going on in

14  that particular company.

15        KPMG has to sign off on these documents.  KPMG is not

16  going to sign off on these documents if they actually think

17  there is a problem.  If they do, they will do what's known as

18  qualified opinion.  We are signing off, but it's qualified.

19        What you learned in this trial is that KPMG never

20  qualified or gave a nonclean opinion until February of 2001.

21        This is Defense Exhibit 8834, page 2.  This is the

22  independent auditor's report.  February 14, 2001, for the first

23  time they include this:  As discussed in note 14 to the

24  financial statements, the company has suffered recurring losses

25  from operations and has a net capital deficiency that raise

F2OMBUC4                    Summation - Mr. Park

1    substantial doubt about its ability to continue as a going

2    concern.

3         That passage tells you a couple of things.  Number

4    one, KPMG is aware if MagCorp runs into problems.  Number two,

5    KPMG will raise an alarm when they see that a company has run

6    into problems.  There is actually a third.  I forgot.  KPMG

7    never raised any such concern until February of 2001.

8         What does that say to you again about your time

9    period, December '95 to October '98?  As I said earlier, there

10   is a whole another set of professionals.  It's the

11   institutional investors who bought the bonds.

12        What did they know about the company?  You heard about

13   all of the diligence the DLJ did.  You heard about all the

14   access that KPMG and Congress Financial had to MagCorp's

15   finances.  What did the bondholders, the potential investors,

16   know?  Terms like Fidelity or Harvard Investments.

17        When you take a look at prospectus, Plaintiff's

18   Exhibit 2033, and you'll have a very good idea of what they

19   knew.  This is a prospectus that is sent to every potential

20   investor that might be interested in participating in this 1996

21   bond.  You will have a copy of it.  It is a thick document full

22   of information, financial.  There is a management discussion

23   about challenges, all the issues that they are looking at, they

24   are thinking about.  It's got a section in there about

25   environmental issues, technological issues, competitive issues.

F2OMBUC4                       Summation - Mr. Park

1    Essentially all the things that you saw in that DLJ

2    presentation about due diligence that they did for due

3    diligence shows up in this prospectus.

4            If you go to page 11 of this document it tells all of

5    the potential investors how the proceeds of the bonds are going

6    to be used.  It told them that $75 million of it would be used

7    to pay dividends to Renco Group.  It told them about the

8    contractual compensation payments to MagCorp executives.  Those

9    are the NWAPA payments.

10            All these investors, sophisticated institutional

11   investors are told, if you want to get in on it, just be aware,

12   this is what's going to happen.  This was sold out,

13   oversubscribed.  Bonds were oversubscribed.  Nobody had any

14   concerns about that.

15            Let's go to page 7, because this is the issue that

16   plaintiff and plaintiff's counsel repeatedly referenced.  This

17   shareholder's equity deficit, the negative shareholder equity

18   number of $81 million.  You see that.  This is yet another one

19   of those things where plaintiff's counsel come in and say to

20   you, look at that.  It's a negative number.  How could there be

21   any solvency?  Every single witness to come in here to talk

22   about that told you, that is a big fat zero, nothing, for

23   solvency and business valuation purposes.

24            Why?  Because if you bought a house in 1990 for

25   $50,000 and it is now worth $500,000, on a GAAP balance sheet

F2OMBUC4                    Summation - Mr. Park

1    accounting it would still show as $50,000.  The current market

2    value of your house or of MagCorp has nothing to do with that

3    GAAP balance sheet accounting.  That's why everybody said,

4    well, wait a second, this is a case about solvency and what the

5    value of the company was in '96 to 1998.  And you're talking

6    about the amount that Renco Group bought MagCorp for back in

7    1989.  It's irrelevant.

8            More importantly, you know how it's irrelevant.  It's

9    not just me.  It's not just Roger Fay and Ira Rennert and

10   everybody else who was asked.  It's the noteholders, the

11   bondholders.  They were told about this.  You think they don't

12   know how to read a prospectus?  You think they missed this?

13   The fact that this bond was sold out tells you, without any

14   question, this is a big nothing for purposes of figuring out

15   whether MagCorp is a good investment, whether MagCorp has value

16   in the future or today.

17           I am not sure where this was going, but periodically

18   Mr. Beus asked some of the questions or suggested to them that

19   not all the important information showed up on this prospectus.

20   It's not clear what information he is referring to.  But if you

21   hear him say that when he gets up for his summation, ask him

22   this question to yourself.  You are not allowed to ask

23   questions to us.  But ask yourselves, really?  Is that an

24   important fact that an investor would have cared about?  If so,

25   why was there not a single bondholder who came into this room

1   to talk about that, to say, hey, jeez, I didn't know that.

2   Somehow I should have known that.

3          Mr. Beus in his opening statement I think made the

4   point that he has got to call our clients as witnesses because

5   they are the ones with personal knowledge during that time

6   period.  If he is going to inject this notion that there was

7   some information in that prospectus that didn't have all of the

8   information that people needed to know, there are other people

9   with personal knowledge from that time period that he could

10  have gotten coming in here.  They are called bondholders.

11  Bondholders filed claims in this case.

12         Where were they?  Isn't the most logical conclusion

13  that you can draw is they didn't come here because they got

14  nothing to complain about?  They knew everything was laid out.

15  And sometimes, ladies and gentlemen, things happen, a recession

16  comes in, the Chinese at the same time engage in illegal

17  dumping.  Sometimes bad things happen.  You got no basis to

18  come in and say, oh, jeez, I should have known about X, Y, and

19  Z.  Don't let these little suggestions by counsel substitute

20  for evidence.

21         Now, we do know bankruptcy occurred.  We do know that

22  there were -- I'm running out of time, so I want to get to the

23  environmental stuff.

24         Any time I make reference to something and you want an

25  exhibit about it, just ask and the judge will get it for you.

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1    There was a loss of three key customers in 2000.  There was a

2    memo from Mike Legge to Ira Rennert and said, we have lost

3    major customers, the Chinese are here.  Mike Legge showed you a

4    monthly report of the end of '01 where he talked about 9,000

5    tons of magnesium that's just sitting on the shelves.  They

6    can't sell it.  There is so little demand.  Bankruptcy is filed

7    in 2001, August of 2001.

8               The fact of that recession is not in question.

9               If I can get command over the Elmo.

10              You saw this before.  It's MagCorp's sales of

11   magnesium.  If I overlay on top of that the GDP chart, you see

12   almost a precise correlation of the pattern of what is going on

13   at this company.  And, again, it is not just about the

14   recession.  It is about what the Chinese did during that time

15   period.

16              I want to talk about the environment.  It's a big

17   topic.  MagCorp is a metal producer.  They have byproducts.

18   It's an industry that has contaminants.  That's why there is a

19   Bevill exemption.  The policy debate from the 1990s occurred

20   when Congress passed a Bevill exemption to say certain

21   industries shall be exempted from standard RCRA obligations as

22   long as criteria are satisfied.  What this case is not about is

23   the EPA lawsuit against MagCorp that was filed not during the

24   time period in question but in 2001.  They would like to think

25   that all of the horrendous things they keep talking about were

1    a foregone conclusion.

2           You know it's not a foregone conclusion because here

3    you are, 20 years later, and there has not been any liability.

4    MagCorp is litigating that case and has been doing so for 2001,

5    and you should not decide that just because he keeps saying

6    dioxins and furans and all the rest of it that there must be a

7    serious problem here.

8           What actually ended up happening, as Tom Tripp

9    described -- again, documents are in evidence, and you can ask

10   for them -- what ended up happening is that before the Bevill

11   exemption was granted for MagCorp, the EPA was present, they

12   came and did the inspections.  They looked at the sites.  They

13   determined to grant the Bevill exemption.  They talked about

14   process waste water.

15          If we can put that one document with the schematic up,

16   please.

17          They talked about the kinds of process waste water

18   that's created at MagCorp and is sent to the waste pond and

19   they said, this is Bevill exempt.  The process waste water

20   that's created is now at issue with the EPA.  They say, well,

21   no, not all of your process waste water is Bevill exempt.  That

22   schematic on the left side is the schematic drawn by the EPA in

23   Washington after their inspection and prior to their granting

24   the Bevill exemption.

25          And they described the process waste water, scrubber

1    underflow, and scrubber liquor going to the evaporation pond as

2    all being ultimately Bevill exempt.  The dispute today with the

3    EPA, found in 2001, is, we didn't mean all of those scrubber

4    underflow or scrubber liquor, in essence.  There is only a few

5    streams that are Bevill exempt, not all of them.

6         So that's the dispute in a nutshell.  And all you need

7    to know right now is that MagCorp has said, you know what, you

8    cannot look at that Bevill exemption and tell me that what you

9    are saying makes any sense.  2.46 million metric tons of waste

10   water was referenced in that same report.  At the bottom it

11   says approximately 2.465 -- whatever -- metric tons of process

12   waste water reportedly were generated by the Rowley facility.

13   That kind of value encompasses all of the process waste water,

14   scrubber liquor flow, and the scrubber underflow.  EPA

15   disagrees.  Fine.  We will have a disagreement.  And that

16   litigation will continue.

17        But before that EPA exemption was granted, as Tom

18   Tripp told you, there was a reason to believe that the EPA

19   actually had sampled and had found HCBs and PCBs, trace

20   amounts.  They knew about it before this exemption was granted.

21   So they can come in here and make this place seem like a

22   sesspool and it would be false.

23        Ron Thayer and Tom Tripp are out there, they have been

24   out there for decades.  Ira Rennert had no problem going out

25   there walking a plant every single month.  It is a well-managed

 1    plant.  This is not an environmental case.  This is about

 2    contingent liability.  And if you think about contingent

 3    liability, what Tom Tripp was looking at, you need to look at

 4    the memo that he wrote to Roger Fay in November of 2004 to tell

 5    you precisely, it's Defense Exhibit 8107, precisely what Tom

 6    Tripp was thinking in 1994.

 7            This is where he catalogs for Roger Fay, the CFO of

 8    Renco, all of the potential environmental issues and not a

 9    single one of them is meaningful in any way.  In fact, if you

10    look at the last paragraph, he references a notice of violation

11    that the local Utah environmental agency had filed.

12            You need to keep in mind, the local agency called UDEQ

13    works with the EPA.  They come and do inspections today.  You

14    saw correspondence in this case where the UDEQ was asking EPA

15    region 8 for interpretations about the Bevill exemption.  So

16    they are working together.  So UDEQ had made an offer to settle

17    that case with MagCorp for $30,000.  And you know what MagCorp

18    said?  Pound sand, not interested.  You guys are wrong, we are

19    not going to give you $30,000.  That tells you something about

20    Tom Tripp and MagCorp's attitude about whether there was a

21    contingent liability or not.  There wasn't.  Today there is no

22    liability.  That case ends up being settled for $2,500 where

23    UDEQ says, all claims in our notice of violation is resolved.

24            Let's take a look at Exhibit 8822.  This is a document

25    Mike Legge sends to Houlihan Lokey in connection with their

F2OMBUC4                      Summation - Mr. Park

1    report.  And basically says, at most contingent liabilities

2    constitute about $600,000 a year, total nonconcern about the

3    environmental issues.

4         Let me move now.  As I said at the beginning, even if

5    there was liability, just imagine on the assumption, arguendo,

6    for argument sake, we imagine it's 100 percent liability today,

7    refer back to Mr. Johnson and Dr. Powell about what it would

8    take.  $14 million, fines, cleanup costs, all in.

9         Their expert, Mr. Allen, you heard testimony that he

10   had suggested a huge number, like over $70 million, all in,

11   without a single document to show you.  You ask for all the

12   exhibits that the experts provided that you can examine to

13   determine how reasonable their analysis is and how well

14   supported they are.  You will not see a document from

15   Dr. Allen.  You will not see a document from Jason Frank.  You

16   are just supposed to -- you know what, they are just jurors, I

17   guess I am just going to show them how smart I am and I am

18   going to tell them what my opinion is and they are just going

19   to accept it.  It doesn't work that way.  That's not proof.

20        There is nobody in this courtroom, including the

21   judge, who tells you how to evaluate the facts in this case,

22   and certainly not Jason Frank and certainly not Mr. Allen, who

23   gives you this huge number.  How did he get to that number?

24   You heard that he talked about dredging three times more dirt

25   than even the EPA's expert would have recommended or was

1    thinking about.  Examine Dr. Powell's analysis.  He is the one

2    who said, you know what, just cap it, three foot thick salt,

3    impervious, and you are done.  Even that's a lot of money.  But

4    it's $15 million, $14 million, all in, even with the fines.

5            They talk about this fine of $25,000 a day.  You heard

6    Steve Johnson.  They never really seriously criticized Steve

7    Johnson's analysis.  He showed you the EPA manual as to how to

8    go about setting a fine.  It's based on prudence, it's based on

9    fairness, it's based on what's enough.  You don't ever apply

10   the statutory maximum.  They didn't have a single witness come

11   in here to tell you that the statutory maximum has ever been

12   applied in the history of this country.  They said, well, it

13   could be, it's possible.  Green men on mars is possible.

14           Let's talk about what's real.  Let's talk about what's

15   in evidence here.  With the time remaining let me talk about

16   Jason Frank, and this is the one thing I have to say about him.

17   Compared to Mr. Grabowski, compared to Marjorie Bowen, who gave

18   you stuff to look at that you can examine some of their

19   assumptions and their calculations, Mr. Frank sat up there and

20   told you insolvency.  What can I look at to verify that?

21   Nothing.  He applied something known as a company-specific risk

22   premium, one of the most important metrics in a true business

23   valuation is the discount rate.  If you see a company showing

24   $100 million of value, depending on how much you discount that,

25   you could sink any company into insolvency.  He applied a 23

1   percent discount rate because he applied the 10 to 15 percent

2   company-specific risk premium to what's the normal discount

3   rate.  What's the result?  Insolvency.

4          Mr. Grabowski told you that in literature the

5   company-specific risk premium is called the fudge factor.  It's

6   a way to get something in.  It's results driven.  He said if

7   you are going to do it, you got to have data that you can rely

8   on and test.  It's not just sticking your thumb up in the air

9   and see which way the wind is blowing, which is exactly what

10  Jason Frank did.  You have nothing to verify.  What he told you

11  is, the basis was his judgment.  They want the owners of

12  MagCorp, the executives of MagCorp, who earned money during the

13  1990s to return that money for the vulture funds.  You would

14  think they would have somebody more than Jason Frank to come in

15  and try to prove to you that that's a just result.

16         I submit to you, ladies and gentlemen, that they have

17  utterly failed to sustain their burden of proof.  Shortly Mr.

18  Beus is going to stand up.  I won't have a chance to respond.

19  And I'm asking you to do one thing because I will not get a

20  chance to respond.  Ask him, where is the evidence of

21  insolvency?  How can I rely on Jason Frank without anything to

22  look at?  How can I rely on somebody who uses a

23  company-specific risk premium that I cannot judge?  Even Roger

24  Grabowski cannot judge as to what's right or wrong.  And if he

25  cannot answer those questions, ladies and gentlemen, I submit

1    to you, and I ask you to return a verdict in favor of each and

2    every defendant as to each and every claim.  Thank you again.

3              THE COURT:  Thank you, Mr. Park.

4              Members of the jury, we are going to take our lunch

5    break now.  Your lunch is here.  Since it's here we will do 45

6    minutes and then pick up with the closing arguments by the

7    plaintiff.

8              Thank you so much.  Enjoy your lunch.

9              (Jury not present)

10             THE COURT:  Anything to address before our lunch

11   break?

12             MR. HAVELES:  Nothing here, your Honor.

13             THE COURT:  Mr. Beus.

14             MR. BEUS:  I only have one question.  I had not

15   planned on spending much time with misrepresentations in the

16   prospectus.  I was going to deal with a few things that are

17   there.  But he raised those questions that opens that door a

18   little bit.  Am I going to get in trouble if I do that?

19             THE COURT:  Tell me what it is that you are thinking

20   about.

21             MR. BEUS:  Well, what he said was, these bondholders

22   and DLJ and everybody looked at it and the prospectus told you

23   everything, everything, everything, and, therefore, they vet

24   for that.  I would like to tell them a few things that they

25   didn't tell them.

F2OMBUC4

1          THE COURT:  If it's in evidence.

2          MR. BEUS:  It's in evidence.  There is no question.  I

3     don't want to get in trouble with your Honor.

4          MR. S. STIRLING:  Your Honor, one other --

5          THE COURT:  Mr. Park.

6          MR. PARK:  I don't know what he is referring to here

7     as to what it is.

8          By the way, I don't think we opened the door.  He

9     raised that very issue with a number of witnesses.  So I was

10    trying to anticipate something like that because otherwise I

11    wouldn't be able to respond to it.  For him to suggest that I

12    opened a door to something that he already raised --

13         THE COURT:  For present purposes there is no objection

14    to him, so long as he is relying on matters in evidence,

15    directing his summation to your claim that they had everything.

16         MR. PARK:  I'd like to know what he is referring to,

17    Judge.

18         MR. BEUS:  For example, ALCAN didn't work at the time

19    they did the prospectus.  For example, they didn't tell him

20    there are chlorinated hydrocarbons on the property.

21         MR. PARK:  No objection.

22         THE COURT:  Agreed.

23         MR. S. STIRLING:  Your Honor, one other point related

24    to that.  Mr. Park also said that, where are the bondholders

25    complaining about having been misled or deceived in this thing?

F2OMBUC4

1    Can we tell the jury that we were ordered not to go into that

2    subject during this trial?  We were not allowed to prove those

3    misrepresentation claims in this trial unless the defendants

4    opened the door, which they did in their closing argument.  Can

5    we tell the jury that we were ordered not to prove

6    misrepresentation claims in our case in chief?  Otherwise, your

7    Honor, we might very well might have wanted --

8              THE COURT:  Go ahead, Mr. Park.

9              MR. PARK:  Your Honor, it is, in fact, a statement of

10   fact that not a single bondholder raised any issues.  It was

11   simply a response, again, to Mr. Beus injecting that very issue

12   into this case at least twice.

13             THE COURT:  What are you pointing to?

14             MR. PARK:  I don't have that cite.  I believe it was

15   with Roger Fay.  He raised this issue about the prospectus.  I

16   think he was talking about environmental nondisclosures.  And I

17   can try to find that, Judge.  But he clearly --

18             THE COURT:  I don't know, for example, if you objected

19   at that point and it was sustained or what.

20             MR. PARK:  I'd have to go back.

21             MR. BEUS:  I can put that in context, your Honor.

22             THE COURT:  I don't want you getting into a discussion

23   with the jurors -- you mean right now you can put it into

24   context?

25             MR. BEUS:  Yes.

2770

F2OMBUC4

```
 1              THE COURT:  Go ahead.

 2              MR. BEUS:  They did the same thing there with Mr. Fay.

 3     They had gone through the various people who had done the due

 4     diligence, this person looked, this person looked, and this

 5     person looked.  And I said who do this, who did this and where

 6     is this and where is that?  There were objections and I was

 7     allowed to do it.  I am not going to spend much time with it.

 8              THE COURT:  I just want to know what you want to say.

 9              MR. BEUS:  I want to say there were a number of things

10     that were not told to people in both the '93 and the '96

11     prospectus.

12              THE COURT:  That's fine.  That's fine.  Again, just

13     drawing on evidence.  You can't just say that they were not

14     told things.  If there are things in evidence that aren't in

15     the prospectus, then you can make that point.

16              I thought we had moved on to Mr. Stirling asking for

17     something related.

18              MR. BEUS:  What we would really like is, when we don't

19     bring bondholders in, when we are told misrepresentations are

20     not part of the case, he shouldn't have the ability to make

21     that argument.  That should be straightened out in front of the

22     jury.  The empty chair is a major issue for jurors.

23              (Continued on next page)

24

25
```

F2o4buc5

1          MR. HAVELES:  Mr. Beus has already said he asked

2     questions of Mr. Fay about what wasn't in the prospectus --

3          THE COURT:  True.  If they had sought to bring

4     bondholders in, that was part of what you objected to.

5          MR. HAVELES:  There was never any proposal to bring

6     bondholders in.  No bondholder was ever deposed.  They never

7     listed a bondholder on a witness list.  Therefore, I would not

8     have objected to something that would have been pure

9     speculation on our part.  Moreover, it is a statement of

10    undisputed fact that no bondholder ever filed a claim under 33

11    or 34 act with respect to statements in the offering

12    memorandum.

13         THE COURT:  When you say it is a statement of

14    undisputed fact, you mean a stipulated fact?

15         MR. HAVELES:  No, it is an undisputed proposition

16    that -- it is not in the statement of facts -- but it is an

17    undisputed proposition -- and Mr. Beus is not in a position to

18    suggest otherwise -- that there was never a bondholder who

19    commenced an action for misrepresentations under the securities

20    laws with respect to the offering memorandum.  The fact is that

21    there were issues raised, as Mr. Beus acknowledged, in

22    Mr. Fay's examination about what was in or not, what was not in

23    the prospectus.  There were questions about that.  They could

24    have brought a bondholder in here for any purpose.  Never

25    deposed one, never put one on the witness list.  If they had,

F2o4buc5

1   we would have evaluated it, but it would be speculative of us

2   to say we should have objected to something that was never

3   proffered.

4        THE COURT:  All right.  I think it was on the edge.  I

5   think Mr. Park did tie it to what was in evidence as a result

6   of Mr. Beus's own questioning, so I'm going to not start

7   getting into an explanation to the jurors because it just isn't

8   directly implied, it isn't directly in front.  There is no way

9   to say that they were prohibited from calling bondholders.

10       If you want some sort of missing witness instruction

11   that both sides have access to the ability to call witnesses

12   and the like, I would certainly consider something along those

13   lines.

14       MR. HAVELES:  We would have no objection to such an

15   instruction, your Honor.

16       THE COURT:  I think, because you asked questions that

17   that was in response to and because there was no explicit

18   preclusion of calling bondholders, I think the bounds of what

19   was discussed in the closing were comparable to the bounds that

20   occurred at trial and, in part, due to your very question.  So

21   we will leave it at that.

22       If you want some sort of instruction, you can propose

23   it to me by the end of the day to make clear that both sides

24   had access to all witnesses.

25       Okay.  Anything else, Mr. Beus?

F2o4buc5

1              MR. STIRLING:  No.  Thank you, your Honor.

2              THE COURT:  All right.  We will see you in about

3    40 minutes.

4              Thank you.

5              (Luncheon recess)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F2o4buc5

AFTERNOON SESSION

(2:45 p.m.)

1

2

3      THE COURT:  Anything to take up?

4      MR. BEUS:  No, your Honor.

5      MR. HAVELES:  No, your Honor.

6      THE COURT:  Mr. Beus, do you want the board up with

7 the writing on it?

8      MR. BEUS:  I do.  I will take it down promptly.  I

9 want to make some comments on it, if that is all right.

10      THE COURT:  Okay.

11      MR. BEUS:  He had taken it down, and I asked him to

12 put it back up.

13      THE COURT:  Okay.  I will just remind you, Mr. Beus,

14 if you're pointing at the board, it's hard to hear.

15      MR. BEUS:  I apologize if I turn my back on you a

16 little bit.

17      THE COURT:  That's fine.

18      MR. BEUS:  I may not get that done.

19      THE COURT:  I can't hear you.

20      MR. BEUS:  If they don't go with me, I will go back to

21 the big board.

22      THE COURT:  Okay.  I will say, given the time, my plan

23 is to just bring them first thing -- I think we will get

24 through today, barring anything unexpected, but I will make

25 sure we get breaks, Mr. Beus -- I will bring them in tomorrow

F2o4buc5

1   morning and do the charge.

2          MR. BEUS:  Thank you for the breaks.  Afternoons are

3   tough.

4          (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F2o4buc5

1   (In open court; jury present)

2            THE COURT:  Members of the jury, I hope you had a

3   pleasant lunch.

4            We now turn to the closing arguments, summation on,

5   argument behalf of the plaintiff.

6            Mr. Beus, whenever you're ready.

7            MR. BEUS:  Thank you, your Honor.

8            First of all, let me thank each of you, as did

9   Mr. Park.  That is one of the few things we share a view on.

10  You have been a phenomenal jury.  You have been awake.  I hope

11  I can keep you awake this afternoon.  Afternoons are always

12  tough.  I hope you had a good lunch but didn't eat too much.

13           What I heard earlier this morning made me

14  uncomfortable.  Lee Buchwald was appointed by a federal

15  bankruptcy judge.  He was asked to look at what this estate

16  had.  He testified, when he got appointed in 2003, there was

17  $220,000 and lists and lists of creditors.  There's no doubt

18  there are some bondholders that are vulture funds, but there

19  are a lot of bondholders who are not, and there are trade

20  creditors, businesses that provide goods and services.  There's

21  the EPA.  There's the IRS.  There's the Bureau of Land

22  Management.  And it goes on.  These people were left high and

23  dry while Mr. Rennert took $118 million, he and his compadres.

24           Mr. Rennert, you saw him.  Very smart, very wealthy,

25  and very generous to people who do what he asks them to do.

1          I'm going to turn around, but I have to stay here for

2     the microphone if I can.

3          I want you to take a look at this list that Mr. Park

4     put up there.  You may not be able to see.  This is the list of

5     the so-called people that independently did due diligence.

6     Mr. Legge, Mr. Fay, Mr. Ogaard.  They all worked for him.  They

7     have net worth appreciation payments.

8          DLJ, do you know what they got paid?  Put up 2033.

9     Let me tell you what they got paid.  Can you put it up for me,

10    Bart?  It is in the prospectus, take my word for it.

11    $4.5 million to do that bond offering.  There you see it.  It

12    is right in the prospectus, Exhibit 2033.  Four and a half

13    million dollars.  We don't know how much KPMG got paid, but

14    they got paid whatever they billed.  Houlihan Lokey, we don't

15    really know, either.  Roger Grabowski, we know how much he got

16    paid, kind of.  He said he got paid, quote, upwards of a

17    million dollars, end quote.  If you're rich enough, you can get

18    all kinds of professionals to do things for you.

19          Let me take just a moment and deal with Houlihan

20    Lokey, if I could.  Would you put up 812 for me, because what

21    you just heard from Mr. Park isn't what Houlihan Lokey did.

22    812, please.  This is their report.  Here is what it says:  "We

23    have relied upon and assumed, without independent verification,

24    that the financial forecasts and projections" -- the seven-year

25    forecast, and you heard Mr. Park just say they're meaningless.

1    Somebody should have told Houlihan Lokey they are meaningless.

2    That's what they relied on.

3              "Provided to us have been reasonably prepared."

4              Let's go back.  How were they prepared?  They had only

5    been doing one-and-two-year projections.  They went out seven

6    years.  They went out five years and tacked on two more years.

7              "And reflect the best currently available estimates of

8    the future financial results and condition of the company."

9              I will show you in just a moment one of the

10   assumptions that they ask Houlihan Lokey to make, which they

11   did.  They didn't do an independent investigation, that is what

12   they say.  You're going to have $20 million a year in cost

13   savings with Alcan.  I'm going to show you that in just a

14   second.

15             I want to finish this.  It goes on, it says, "We have

16   not independently verified the accuracy and completeness of the

17   information," and we do not assume any responsibility with

18   respect to it.  They haven't done a physical inspection, and

19   they haven't done anything else.

20             1091, can you put that up.  You see HLHZ, that means

21   it came out of their files it is in evidence, Trial Exhibit

22   2562.  What are they going to do?  Energize building 1 north

23   Alcan cells by April of 1998.

24             Alcan had never been tested.  Never tested.  You've

25   all heard the adage garbage in, garbage out.  And they knew it

1    hadn't been tested.  When this work was done, Alcan wasn't even

2    licensed until August of 1996, and they want to say the best

3    we've got to vouch for what we're doing is Houlihan Lokey.

4         Then they're going to energize another building.

5    There were four total buildings.  That's what's going on here.

6         1094.  Let me show you the reduction in costs.  If you

7    look right over there, you see when they come on, the cost of

8    94.7, that's the cost of goods sold, that is the '94 numbers,

9    the second one, 1998, that's what they're going to do.  Look at

10   the reduction.  79, 78, 80.  See the reduction?  That's from

11   the Alcan cells.  Didn't happen.

12        In fact, what happens is costs go up.  Put up 824.

13   This is also in evidence, Trial Exhibit 2729.  You go back to

14   90, it was 99 cents.  This is right out of their documents,

15   this is their production documents.  You see, by '94, it is up

16   to $1.10.

17        Put up the next page, 818, please.  There you go.

18   '95, 92 cents, and then '96, it jumps to $1.20, $1.30.

19        817, please.  Look at it.  It goes all the way up to

20   $.57.  Alcan didn't work.  It failed.

21        Marjorie Bowen didn't ever say she came in and made an

22   appraisal for a purchase or a sale.  I showed you the

23   documents.  There they are.  They're in evidence.  When you see

24   them, you can visit about them.

25        Now, you remember one of the things Mr. Park said?  He

1    said it was not unusual to spend seven years to develop a cell.

2    I think I got that quote.

3         I think I said it wrong.  I wrote it down.  Seven

4    years is not unusual to develop a cell.  That's what he said.

5    Think about that as I take you now through some evidence.

6         I asked Mr. Grabowski -- by the way, Jason Frank, we

7    were limited on time, no question about it, but what did he

8    use?  He used CRU's, an independent set of projections for

9    revenues.  What did he use for costs?  The exact costs that

10   came out of MagCorp.  You know why they didn't take very long

11   with him?  They couldn't lay a hand on him.  Who is he?  He is

12   a guy that does a lot of appraisal work, valuation work, for

13   banks, including Wells Fargo.  You heard that background.  No

14   one challenged it.  He is very qualified.

15        I want to be kind when I say this, Mr. Grabowski may

16   just be a little overdue.  But let's go to Mr. Grabowski

17   because he has written a book, and he wrote one entire chapter

18   of that book on company-specific risk.  He didn't do that as it

19   related to MagCorp.  I will get there in a minute.  He said

20   MagCorp is like ALCOA.  But let's look at what he did say.

21        639.  This is Mr. Grabowski at page 2222.  How do you

22   do that?  How do you make that determination that a company as

23   of a particular date back in time was able to pay its bills?

24        It's a really good question, isn't it?  Let me tell

25   you what Mr. Rennert would like you to believe.  If you can pay

1    this month's bills, you can pay your bills.  I ask you to put

2    that in juxtaposition with Mr. Park, who says it is not unusual

3    to develop a cell over seven years.  If it takes you seven

4    years to build a cell, one of the things you have to do is to

5    have money to last through that seven years.  That goes to

6    this.  Let me show you.

7              He says:  Well, you look, first of, all at forecasts

8    made at that time.  And you want to analyze the forecasts, and

9    he says, whether they are reasonable.  You put your best

10   estimate on it.

11             Can you go to 640 for me, please.  He goes on.  This

12   is Mr. Haveles.  This is not me cross-examining him.  Is there

13   anything else to which you look?

14             Well, you want to look then at whether or not what the

15   cash balance is in the beginning, how much the business will

16   earn, how much you'll have to pay for things like capital

17   expenditures.

18             Seven years to build a cell.  That's a capital

19   expenditure.  Seven years to have Houlihan Lokey to give you a

20   solvency opinion, thinking it may take seven years to build the

21   cell.  They never had seven years of cash.  Never, ever, ever.

22   Why?  They sucked it out and looted it out in dividends.  What

23   did you hear Mr. Rennert say about that?  Oh, I didn't want to

24   leave it in there because I wouldn't get a good return on it.

25             Hello?  Anybody home?  He could have invested it in

f2o4bcu5                        Summation - Mr. Beus

1    MagCorp while he was waiting to get the development.  No.  He

2    took virtually every dollar out of MagCorp that he could suck

3    out of it.  He looted that company and left the creditors

4    holding the bag.

5           Look at what Mr. Grabowski gives us.  He says you got

6    to look at how much you have to pay for things like capital

7    expenditures, interest, and all the things to run the business,

8    and whether or not at the end of the day you'll still have a

9    cash balance.  That's the ability of paying bills in the normal

10   course of business.  That's how it is defined in the

11   literature.  You take all of those things into consideration,

12   then you either do have it or you don't have it.

13          Go to 650, would you please.  Mr. Grabowski, this is

14   their expert.  What data did you use for the expected profits?

15          You look at projections.

16          We know all about projections.  You heard more of that

17   than you probably even want to hear.

18          You're looking at projections of investment that has

19   to be made to keep the business going.

20          Ability to pay bills is not like you and I may think

21   of it.  Can I make the rent payment at the end of the month?

22   Can I pay the tuition?  Can I pay those bills?  This is paying

23   bills over a reasonable period of time.  And when her Honor

24   instructs you, that's the language she will use.  Can you pay

25   your bills over a reasonable period of time?  What's

          SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

1   reasonable?  It is on the context.  What is the context?

2   Mr. Grabowski gave it to you.  Mr. Park helped.  He put a

3   timeline on it.  Investments, capital expenditures, remediation

4   costs, and $150 million that they have got to pay back.

5          Would you put up 959 for me.  You'll recall -- it is a

6   lot easier to see over here, for me at least -- this EBIDTDA

7   number on the side is their number.  I took that from their

8   graphs.  There is no argument about the $177.4 million.  These

9   numbers over here, if you recall, I took Mr. Grabowski through

10  them.  These were all numbers that over a reasonable period of

11  time you've got to pay.  Are you going to have enough money to

12  do that?  Well, interest you got to pay.  Taxes you got to pay.

13  And I got Mr. Grabowski to agree with all of that.  Technology,

14  you have to pay for it.  That is the underlying assumption that

15  was made.  Those numbers are right out of their documents.

16         Then, we have these dotted lines from low to high on

17  what their remediation costs would be.  There's a disparity in

18  those.  That's a decision you'll have to make.  And when you

19  make it, you'll put it in the context of a willing buyer and

20  willing seller, what would be the appropriate number.  You'll

21  have to decide whether Mr. Powell's low number, after 14 years

22  of litigation, he is going to get off of it for $2.8 million.

23  And I will talk to you about probability in a minute.  Or

24  whether it is going to be the whole number that Mr. Tripp, who

25  was on the scene at the time.  Oh, they say, they put that

 1    together really quick.  You didn't hear Mr. Tripp say on that

 2    stand that number is wrong.  He testified.

 3           Now, Mr. Park said, forget -- this is a quote --

 4    forget about the testimony.  When he said that, I thought, why

 5    in the world have we been here for almost a month.  That's

 6    insane.  I don't want you to forget about the testimony.  I

 7    want you to remember it.

 8           So you take $157 million and then the note.  You heard

 9    Mr. Park say, oh, you can just refinance the note.

10           Well, let me tell you what you can refinance, and you

11    have heard it in this trial.  You can refinance your accounts

12    receivable because you got somebody else to collect from.  You

13    can refinance the magnesium ingots because you can go take

14    those and sell them.  You might get hit a little bit.  That's

15    what you can do.  Refinancing a loan that MagCorp owns is

16    really problematic.

17           Would you put up Exhibit 2744, page 33, if you can.

18    This is the loan agreement here.  Can you go to page 33 for me,

19    please.  Blow that up.

20           I did this with Mr. Grabowski.  We were going a

21    hundred miles an hour when we went through this, I appreciate

22    that.

23           This is a covenant that a borrower -- and according to

24    Mr. Grabowski and every witness, it is typical in every loan

25    document.  What it says:  "Borrower has obtained all material

1     permits, licenses, certificates, approvals."  And it goes on,

2     is in compliance in all material respects with a whole bunch of

3     laws, and the last was the environmental laws.

4            MagCorp didn't even get a permit.  MagCorp didn't even

5     get a permit.  They are in violation of the law.  When you're

6     in violation of the law in a loan covenant, let me tell you

7     what happens.  The bank or the bondholders or whoever the

8     lender is says you're in default, everything is immediately due

9     and payable.  If you buy a car, you don't make car payments for

10    three months, you know what a bank will do?  They will come and

11    take the car.  That's exactly what happens here.  If you're in

12    default, they can come and take the car.

13           What does that mean?  That means you don't get

14    Mr. Park's seven-year period to build a cell.

15           MR. PARK:  Objection.

16           THE COURT:  Overruled.

17           MR. BEUS:  You don't get that seven-year period to

18    build a cell because they're going to say -- the bondholders

19    say, pay me now.  If the bondholders had been told the truth

20    about the conditions of the cells and the environmental

21    problems that are there, they would have called the loan.  Or

22    they would have at least had the right to call the loan.  But

23    you're not going to go get refinanced.

24           Go back for me, would you, to cash because that is

25    what Mr. Grabowski said.  Put up 960.  This is a parallel

1    chart.  You see there's the cash over that period, and the cash

2    should have stayed in the business.  Ability to pay bills means

3    you leave the money in the business.  They don't have to leave

4    it in cash.  They can invest it.  Mr. Rennert said he would

5    invest it in hedge funds.  He can do that.  But you don't rip

6    it out of MagCorp, have the creditors sit there and rip them

7    off, because that's what happened here.  That's exactly what

8    happened.

9            One of the jury instructions, one of the claims we

10   have is you can be insolvent, you don't have to do any

11   arithmetic on assets, liabilities, which is higher.  If you

12   conclude when you deliberate that the ability to pay bills as

13   defined by Mr. Grabowski and as defined by her Honor in the

14   jury instructions you will have, that's it.  You tell

15   Mr. Rennert to put that money back.  To put it back.  He got

16   it, and he shouldn't have had it.

17           Look at what they have here.  You mentioned their cash

18   needs, which we do there, and I took interest and taxes out

19   because they were paid.  I deleted those numbers because they

20   were paid.  The technology, 58.8.  That comes directly from

21   Mr. Ogaard's October 31st, 1998 document.  If you can find it

22   in the documents, you will understand.

23           Mr. Grabowski agreed with that.  You can take any of

24   those other lines on the remediation and the note.  They never

25   had the ability to pay their debts as defined by valuation

1    standards.

2            706.  This is Mr. Ogaard.  Remember, in 2000,

3    Mr. Rennert testified he went and talked to the bondholders and

4    said, hey, I will pay you.  He first told you, I will pay you.

5    I was surprised.  He said, I'd pay.

6            Then, when we really got into it, he said, well, what

7    I asked them to do was not make me pay the interest payment and

8    then down the road I might make you pay.  Then, I said:

9    Mr. Rennert, did you agree to guarantee it?  You sign on for

10   it?  Wouldn't do that.  What he did was just put that off

11   again.  That was intentional conduct so that he could take the

12   proceeds from Sabel and try to put it in an M-cell.  And then

13   he acquired this company after the bondholder and the creditors

14   were left holding the bag, he acquired it in the bankruptcy.

15   Tell Mr. Rennert put that money back.

16           406, this is Mr. Ogaard.  I'm sorry.  706.  I

17   apologize.  I gave you the wrong number.  Mr. Ogaard's

18   testimony, even after not making that payment, that is the

19   first bond payment they missed.  Interest, they had to pay

20   interest twice a year.  Was MagCorp able to continue to pay its

21   bills?  They passed on an $18 million payment.  If you pass on

22   an $18 million payment, you would think you would have some

23   money left over.

24           Here is what he says:  No.  Even after stopping

25   that -- even by not paying that bond interest payment in

f2o4bcu5                    Summation - Mr. Beus

1    January, we were in a horrendous cash flow situation.  We had

2    tapped out the Congress Financial line all the way, and we were

3    asking our vendors -- our vendors, that's the same as trade

4    creditors -- to extend their payment terms.

5           That's what Mr. Rennert did.  If he had done what he

6    was supposed to do on ability to pay bills, he would have

7    kept -- I just got a note.  I misspoke.  I said 18 million.

8    That's an annual payment.  It should have been 9.  I make

9    mistakes, I'm supposed to get corrected.  I apologize for that.

10   He's a tough task manager.

11          What happens here if they don't pay these vendors?

12   And they take them, instead of paying in 30 days or 60 days or

13   90 days, 120, as long as they can get.  You'll have documents

14   when you'll go through the documents where all that is laid

15   out.  I don't think there was very much testimony except

16   Mr. Thayer here.

17          Ability to pay bills, you don't have to do any

18   arithmetic for that.  You don't have to balance the assets

19   against the liabilities.  That is a judgment call on your part.

20          There is another claim that is just a judgment call on

21   your part that doesn't take any arithmetic.  It's called unjust

22   enrichment.  You will be asked, not to do arithmetic, not to

23   see whether the assets and liabilities match or don't match,

24   you will be asked in the jury instruction that you will get

25   from her Honor, it will go something like this:  If you find it

1    unfair and unconscionable and if Mr. Rennert benefited,

2    directly benefited from this $118 million, you have the power

3    as a jury --

4                MR. HAVELES:  Objection.

5                THE COURT:  Sustained.  I will provide you the exact

6    wording in my instructions when I give you the instructions.

7                Go ahead, Mr. Beus.

8                MR. BEUS:  You will have the ability to make a

9    decision to make him put the dividends back that he got.

10               Now, let's go to the arithmetic claims.  I may not get

11   to breach of fiduciary duty, but you will follow those without

12   any trouble at all.  Let's go to arithmetic claims because

13   these are fairly complicated, and we probably, as lawyers, did

14   a pretty bad job of laying it out as clearly as it should have

15   been.

16               Mr. Grabowski, again.  I'm going to use their expert

17   where I can.  473.  What role -- this is again, Mr. Haveles

18   asking this question.  What role does judgment play in the

19   determination of solvency?

20               Very first sentence, valuation is an exercise in

21   judgment.

22               There's no science to this.  They were very critical

23   of Jason Frank because Jason Frank said I think MagCorp is

24   unique.  Mr. Grabowski said, no, it is just like Reynolds,

25   Kaiser, ALCOA, the guideline companies he used.

1          So what does he say you have to do?  He says you can't

2     be uninformed when you exercise your judgment.  He has to go

3     out there and gather data about the characteristics of the

4     company.  I have to find out what data an investor would use in

5     assessing how much this company is worth.

6          474.  What else did he testify to?  What role does due

7     diligence play?

8          It's the key to understanding the industry and the

9     business.

10          You can't make judgment calls unless you do some work.

11     Understandable.  You first understand the industry, and then

12     you understand the individual company in question.

13          Then, you have to apply that to a definition of value.

14     Mr. Grabowski gave us that.  472.  You look at it as though a

15     hypothetical willing buyer and a hypothetical willing seller --

16     what would they exchange this property for.  That's assuming

17     you have all relevant information.

18          So you put yourself in the position of would you buy

19     MagCorp.  And when you buy MagCorp, you take on all of its

20     liabilities.  You got to fight with the EPA.  You got to pay

21     the $150 million.  You've got to pay every liability that's out

22     there.  So put yourself in the shoes of saying, would I buy

23     MagCorp and would I pay something north of $170 million,

24     because that was generally the debt.  Before you get to

25     remediation costs.

1          If you would go back and put up 959 for me, please.

2     What you're taking on is some variation of the block there on

3     the right for $447 million.  We can argue until the cows come

4     home as to whether Mr. Tripp is right at 157.  That is the head

5     of the environmental department at MagCorp.  That's his number.

6     That's the worst-case number.  His low-case number is 82.

7     You'll see that right here.  Then you've got Mr. Powell, Mr.

8     Allen, you've got all of those numbers, but what you have on

9     this chart is not in dispute.  Those are the numbers.  Now you

10    say, would you buy that, would you take on the EPA litigation.

11         641.  Just to make sure that you know that I am giving

12    you evidence.  This is Mr. Grabowski.  How do you determine

13    whether assets exceeds liabilities?  You have to take the value

14    an investor would pay and you have to compare that to the

15    liabilities.  What I just told you is exactly what

16    Mr. Grabowski said.

17         So, I'm going to deviate for one second.  1093.  This

18    is a document that Mr. Grabowski created.  Remember this

19    document?  Where he had total net debt-like liabilities.  He

20    has these numbers:  142, 143, 141.

21         Do you remember what he did to get that number, so he

22    could push these numbers, the liabilities down as far as he

23    could?  For this whole time period, there is $150 million in

24    note offerings that are due.  How do you get from 150 to 141

25    and make that work into all of your numbers?  How do you do

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1    that?  You may remember when I asked the question, how did you

2    do that, Mr. Grabowski, or words to that effect; and his answer

3    was, after a little twisting by me, I took the cash and

4    subtracted it from the liabilities.  That's what he did when he

5    ran through his numbers.  Took the cash -- you saw those cash

6    numbers on those charts that Mr. Park showed you.  He

7    subtracted the cash number from the liabilities to come up with

8    the value.

9            He, then, gave you an example of how you do a

10   valuation.  I thought his example was a very good one.

11   Remember the house example?  You go into a subdivision, lots of

12   houses are nearly the same or exactly the same or a little

13   bigger or a little smaller.  He said, what you do is you look

14   at the house, and then if you see another house like it, you

15   turn it into a square foot price.  If you have 1,000 square

16   foot house, it is $100,000, you get to a square foot price and

17   then you just match those up.  That's what he did in that

18   example.

19           Then, if you will recall, I asked him, isn't the very

20   best comparable -- because you're trying to compare things --

21   if you're in a subdivision and you have a house exactly like

22   your next-door neighbor's and you got the same granite, same

23   carpet, same windows, same everything, the house next door

24   sells for $100,000, you can say, assuming it was on the market

25   and it was sold, my house has got to be worth about a hundred

1    thousand.

2         I asked him this question:  What's the very best

3    example of any comparable in the world to come up with these

4    metrics to know what your house is worth?  He gave me a very

5    good answer.  If you've got the very same house that sold

6    earlier or later, all you have to adjust is for the market a

7    little bit in between.  That's the single best comparable.

8         And you know what, ladies and gentlemen?  We have that

9    comparable in this case.  Timing is a little different.  That

10   comparable occurred in 1993.  It was called AMAX.  AMAX, as

11   you'll recall, was the seller of the company in 1989 to

12   MagCorp.  Mr. Rennert didn't pay cash for all of that.  He took

13   money, and then he added a $12 million note, and he promised to

14   make $2 million payments every six months on that note, and the

15   note is in evidence.  You can see it if you want.  Did that in

16   August of '89.  Now we get to the offering in 1993.  And guess

17   what?  There is still $10 million owed on that note.  Now, that

18   should tell you something.  Because it should have been paid

19   off by that time.  That $2 million every six months -- not

20   quite -- nearly paid off.

21        Let me show you what the prospectus shows, 535,

22   because this was disclosed.  This comes right out of the

23   prospectus in 1993.  The AMAX note is at $10 million, this is

24   April 30, 1993.  The note is August of 1989.  You click

25   through.  There should be a much smaller balance on that note.

SOUTHERN DISTRICT REPORTERS, P.C.            (212) 805-0300

1    I don't dare do the arithmetic for sure one of you will catch

2    me.  Then, it says, "This amount represents a subordinated note

3    payable to AMAX, which is carried as long-term debt on the

4    company's financial statements."

5          The company -- you remember me asking Mr. Rennert --

6    Mr. Rennert negotiated to purchase that note and accrued

7    interest and 3.6 million of other related obligations for

8    $7 million.  So what was owed in total was $13.6 million.  He

9    got a discount.

10         Let me show you the note.  953, please.  There it

11   shows the note.  That's the note.  It is in evidence.  You see

12   the six-month payments.

13         Put up 400, if you would.  This is Mr. Grabowski.  Do

14   you know whether MagCorp was keeping current -- at page 2314 --

15   on the obligations of the note?

16         He says I don't remember, if it was -- that they had

17   to pay interest periodically or if it was a bullet loan.

18         Do you remember how much the note was?

19         He says it was $10 million.

20         686, please.  Now we look at the note offering.  I

21   asked him:  Is this something you looked at for his valuations

22   for December of '95?  Did he look at this?

23         He answers yes.

24         Why did he look at this?  687.

25         He says he looked at that because it would be

1    required.  He had some standards that he had to look at, and he

2    had to look at things that far back.  He was required to do

3    that.

4           So what do we know?  We know that he looks at a

5    $10 million note that should have been nearly paid off.  It

6    wasn't paid off.  Then, there's a haircut, a huge haircut.  He

7    takes $13.6 million worth of obligations and he gets it paid

8    off for $7 million.  The math is easy if it were $14 million.

9    But I have done the arithmetic.  It is 48 percent discount.  I

10   want you to remember that 48 percent number.  On the very best

11   comp that exists in this company.  48 percent discount.

12          Now I'm going to tell you right now why.  Jason Frank

13   used 22, 23, or 24 percent discount rate.  The higher the

14   discount rate, the less the value of the company.

15   Mr. Grabowski used 10 and 12.  Amazing.  We will get to that in

16   a minute.

17          690.  Now let me tell you what I asked.

18   Mr. Grabowski, looking at this document and based upon your

19   experience, and assume for the purpose of this that the

20   security that we've read there is a security on the stock of

21   the company.  You do understand that AMAX would have the right

22   to sell the stock if it were not paid?  Correct?

23          I don't -- I'd have to read the note to know the

24   actions they could take if they weren't paid.

25          Did you read the note?  Remember, he admitted that it

1    was required.  I then asked:  Did you read the note?

2              He said no.  Our first date was 1995, was our first

3    date.  This information about the business is not relevant to

4    the 1995 valuation date, the transfer date.

5              Can you imagine that testimony?  The very best comp he

6    doesn't take into consideration, and he says it is irrelevant.

7    Yet he read the prospectus because he was required to.  That

8    should tell you a million dollars, like the net worth

9    appreciation payments and like all the other payments, got in

10   the way of objectivity.

11             688.  I'm sorry.  1009.  I want you to look at this

12   testimony because I asked Mr. Rennert, knowing we would get to

13   this question:  Did you have any view that you were not

14   obligated, meaning that MagCorp was not obligated to pay the

15   $12 million note?

16             I wanted to know whether there was a problem.  Why he

17   had a 48 percent discount rate.  So if there was a dispute,

18   i.e. the note is not owed for some reason, I wanted to know

19   that.

20             Here is Mr. Rennert's testimony:  I'm of the view that

21   MagCorp was obligated to pay the note.

22             I would like you to infer that AMAX didn't want to

23   foreclose on the stock of MagCorp because they could have

24   foreclosed on that stock if somebody showed up and bid, they

25   have gotten the entire $13.6 million or at least the

1    $10 million on the note.  They chose not to do that.

2    Mr. Rennert testified, we negotiated --

3              MR. HAVELES:  Objection.

4              THE COURT:  Overruled.

5              MR. BEUS:  Mr. Rennert testified that the money was

6    owed, there is no dispute they had the security.  It's like if

7    you have a loan on your house and you've got a mortgage.  They

8    had a mortgage on that stock, so they could have had the rights

9    to force that stock to be sold to get paid.

10             Did they?  No.  What does that tell you?

11             48 percent first is the discount rate.  A little

12   earlier in time.  So when you think of that discount rate, you

13   want to remember that.  Second, these people at AMAX were

14   providing technical services, so they were around knowing what

15   was happening at MagCorp.  That is how the $3.6 million came

16   together.  And they didn't want this business back.

17             689.  Then, I asked him:  You knew that; right?

18             Yes.

19             There is no reference to that in your report or in

20   your appendix?

21             Not that I recall.

22             So Mr. Grabowski ignored and didn't put in his report

23   or in his appendixes anything about this 48 percent discount.

24   He passed on that.  He passed on that.  Do you know why?  If he

25   had put a 48 percent discount in that, Jason Frank's number

1    would have looked completely ridiculous.  They would have been

2    so insolvent, it would have been hundreds of millions of

3    dollars.  So what does he do?  He ignores it.  And remember, he

4    admitted that was the very best comp.

5         19., just so there is no misunderstanding, I want to

6    clear this.  I asked Mr. Rennert:  Did AMAX have a lien on all

7    of the stock of MagCorp?

8         I believe so.

9         Would they have the right to take the entire stock

10   back and own the facility?

11        I am not sure that's accurate.

12        Did you understand all of the stock of MagCorp was

13   used as security, pledged, so that the note would be paid?

14        He says yes.

15        685.  Then, I asked Mr. Grabowski:  What portion of

16   the 1993 earnings came as a result of the transaction?

17        He said, I don't remember that number.

18        I'm going to tell you how that worked.  He had a $6.6

19   million discount.  You put it into earnings because you've got

20   forgiven of debt.  You combine that $6.6 million with the

21   losses they had had over the prior five years.  It was

22   $26 million negative.

23        MR. HAVELES:  Objection.

24        THE COURT:  Sustained.  The jury will disregard the

25   last statement of Mr. Beus.

1          MR. BEUS:  Let me move on to what else Mr. Grabowski

2     didn't look at.  Put up 690, please.  I'm sorry.  742.

3          This is a question that was asked, and you may not

4     remember the Legge affidavit by date, but Mr. Legge filed an

5     affidavit in the bankruptcy court.  We have seen it a number of

6     times.  In 2001.  And I'm quoting from that, where it said --

7     it is Exhibit 2206 -- We always knew the environmental issues

8     would create an obstacle to completing a sale or plan of

9     reorganization.

10         Mr. Grabowski -- this is information, if you -- it's

11    later than his time period, but if this is something that is

12    knowable as a result of this information, he is required to

13    take that into consideration.

14         What does Mr. Legge say?  We always knew.

15         Remember back in the December 1999 meetings, they

16    couldn't do a sale because of both the remediation problems and

17    the technology problems.  Alcan didn't work, and they didn't

18    have anything else.  What does he say about this document?  I

19    never read this document.  Because if he had read it, the

20    question he would have had to have asked -- and he had meetings

21    with Mr. Tripp -- Mr. Tripp, did you know that in '95?  If

22    Mr. Tripp had told him the truth, he would have had to say yes.

23    In '96, he would have had to say yes, in '97 and '98 and all

24    the transfer dates when Mr. Rennert was taking this money from

25    the company.

1          743.  Would you put up Exhibit 2672, another affidavit

2     of Mr. Legge.  This, again, is in the bankruptcy court.  It's

3     in 2001.  I'm quoting from it.  "A major impediment to the

4     debtors' ability to emerge from bankruptcy is the uncertainty

5     that the United States' claims in the RCRA lawsuit, including

6     its claims for civil penalties.  These claims have had a

7     chilling effect on the attempts to finalize the process to

8     attract investment in or a purchase of MagCorp?"

9          What does he say?  I never saw this?

10         Then, what does he say?  It doesn't pertain to events

11    that happened after my dates.  You can't do that.  You can't

12    pick and choose what you're going to do.

13         He really didn't look at the AMAX 48 percent discount.

14    He didn't look at -- they always knew they had these

15    environmental problems.

16         968.  Let me show you a little bit of what we were

17    reading from.  Here's the affidavit itself right here,

18    paragraph 32 of it, Exhibit 2206.

19         Now, let me tell you what's worse than all of that:

20    How Mr. Grabowski went about coming to his evaluation.  I'm

21    going to show you in a few minutes that he considered the key

22    assumption in values was the price of magnesium.  Back to

23    Houlihan Lokey.  They got a projection, $1.78 for seven years.

24    That makes no sense.

25         Mr. Grabowski has to assume what are the future

1    profits, cash flows, EBIDTDA, whatever matrix you want to use.

2    697.  It all starts with what is the price of magnesium times

3    the number of tons or the number of pounds because it is price

4    per pound.  Look at the question:  What price of magnesium did

5    you use after the first transfer date after July of 1996?

6              This is the most amazing thing that you can even

7    imagine.  He did not know.

8              Let's talk about a few of the things on the

9    environmental.  By the way, I want you to know I heard Mr. Park

10   say:  Listen to the evidence.  He also said:  Don't, forget the

11   testimony.  He told you that in this summation.

12             I don't want you to forget the testimony.  That's why

13   I'm taking -- I'm probably boring you to death a little bit

14   with some of the granularity that I'm going through here to

15   show you some of the testimony.

16             So he doesn't know about that.

17             737.  This next piece is unbelievable.  You don't have

18   any recollection of ever reading any correspondence between

19   MagCorp and the EPA; did you?

20             No, I do not recall that.

21             He took a site visit.  He had conversations with

22   management.  And he didn't read what the communications were

23   between the EPA and MagCorp?

24             Here's what you start feeling like.  I can get to this

25   number you want, a couple hundred million dollars, if I don't

1    look at anything, if I don't look at AMAX, if I keep these

2    binders really tight, if I don't look at that 48 percent, if I

3    don't look at the EPA communications, and if I don't even get a

4    price for magnesium.

5            739.  This question, "Did you can ask specifically

6    about what was known about the extent of the contamination by

7    hazardous substances when you met with management?

8            Can't recall asking that specific question.

9            961.  He didn't see this document, either.  We have

10   all seen this so many times.  2001, cost of remediation.  There

11   is no question that the cost of remediation in 1996 or '97 or

12   '98 might have been different than this.  There might have been

13   some inflation on it.  Take 2, take 5, take 8, take 10 percent

14   off of it.  It really doesn't matter.  You heard the testimony.

15   What you could get in a couple of hours or a couple of days or

16   whatever it was they asked Mr. Tripp to do, he came up with

17   detailed numbers.

18           963.  Look at the numbers.  He breaks them down.  He

19   breaks them down by replacing the ditch.  He goes through each

20   of the details.  Then, he prepares alternatives.  When you run

21   those numbers, you get to $82 million.  If you run the

22   alternatives, the expensive ones, it is $157 million, but it

23   really doesn't matter.  There is no way anyone in the world

24   would show up and buy, a willing buyer/willing seller analysis,

25   and take on this kind of liability.  And this does not include

1    penalties.  This is just the cost to remediate.  That's what he

2    says, RCRA remediation costs for bondholder disclosure, which

3    by the way -- I will pass on that.  Thank you.

4                745.  I asked him if he saw Mr. Tripp's estimate.

5                I don't remember.  He had no recollection of seeing

6    it.

7                738.  What did he do?  I want you to get into his head

8    because he is a very nice gentleman and a very good witness.

9    He could turn and look at you and make you feel very

10   comfortable and make you want to trust him.  But he didn't look

11   at anything before the transfer dates, including the most

12   important comp.  When you get to October 31, 1998, he doesn't

13   look at anything after that.

14               So here's the question:  You never asked about the

15   extent of the contaminants of the hazardous substances at the

16   MagCorp facility in '95 to '98; did you?

17               Listen to what he did.  We had discussions about

18   environmental issues when I interviewed management, and there

19   had been a notice of violation -- you've heard this through the

20   whole trial -- and it had been settled, and as far as I was

21   concerned, that put that behind me -- behind it.

22               He was done.  He didn't take environmental

23   considerations at all.

24               But let me show you 85, please.  This is Mr. Rennert's

25   testimony in this trial.  Did you have any understanding of

1    what it might cost MagCorp in the '95 to '98 time frame to be

2    RCRA compliant?

3          We had many discussions, ongoing discussions, at

4    business review sessions in this regard.

5          Do you remember how many times he said he didn't know

6    anything at all to me?  We used a lot of time having to read

7    his deposition because he had a so-called refreshed

8    recollection.  That is really pretty hard to believe.  He says

9    this spontaneously, and we found no document.  He says, I got

10   refreshed for this testimony, so I could say things differently

11   at trial than I said in my deposition.  His answer:  Nothing

12   was significant.  The number $7 million, $8 million sticks in

13   my head.

14         754, please.  Would you put up 8222.  This is a

15   question:  Do you recall this requirement that all statutes,

16   laws, ordinances, or government rules and regulations have to

17   be complied with or otherwise you're in default?  This was the

18   $150 million note indenture there at the top.

19         He said, I don't remember reading this, either.  He

20   made the assumption in this trial that you could refinance even

21   if you were in violation of loan covenants where they could

22   call the loan due.

23         814.  That's the compliance certificate that has to be

24   sent to the bondholders on a regular basis.  They never once

25   said we're not in compliance.

1            Let's keep going.  753.  What else did Mr. Grabowski

2    exclude?  I asked him:  You ignored the fact that there was a

3    lawsuit in 2001 in your evaluation?

4            Answer -- look at this answer -- 2001 is a post-event.

5    He cut the world off.  He put those blinders on just like this

6    and said, I'm not going to look at anything before

7    December 1995, I'm not going to look at anything after

8    October 31, '98.

9            So you didn't take it into consideration?

10            I did not take it into consideration.

11            He didn't even look at that lawsuit to determine

12    whether it was talking about dioxins, furans,

13    hexachlorobenzene, chromium, zinc, arsenic, all of those things

14    that existed there even in the '95 to '98 time frame.

15            When you read the jury instructions and when you hear

16    the judge instruct you, ask whether or not he had a duty.  Was

17    that known or knowable if he had looked at that as to those

18    time frames?

19            Then I asked him the simplest question of all.  398.

20    I asked him:  Tell me what MagCorp's reserve was for

21    environmental liability.

22            It was small.  He didn't know.

23            (Continued on next page)

24

25

1          MR. BEUS:  Now, 402, please:  Changing the subject a

2     little bit I asked him this:  If you think about a hypothetical

3     willing buyer, with all the information to make a decision,

4     they would evaluate whether the company had enough technology

5     in place to survive, wouldn't they?

6          It's a pretty simple question.  Do you have enough

7     technology to survive?  Or do you need enough money to get you

8     through seven or eight or nine years or however many years it

9     may take to invent that technology?

10          Look at his answer:  No.  Absolutely not.  They would

11     look at whether or not they had the ability of being able to

12     make the technology over time operate and work.

13          Because he knew they didn't have the technology.  He

14     knew the sealed cell and the IG Farben cell didn't work.  It

15     produced magnesium, don't misunderstand.  But they had to have

16     an iron stripper.  That cost several million dollars.  If they

17     didn't have an iron stripper, they made nine cents a pound more

18     to get the brine out of the Great Salt Lake, pure enough so it

19     would not decompose everything in their cells.

20          So he says, I don't look at whether they actually have

21     the technology.  I look to see whether they are smart people.

22     I submit they probably are very smart people, but they didn't

23     have the technology.  So if you don't have that technology,

24     remember what he said in the very beginning, you've got to have

25     enough capital to get you through what the periods are going to

1   be to discover that technology.  They never came close to that.

2   Do you know why?  Because Mr. Rennert looted this company.  He

3   ripped that $118 million out.

4            949.  You've all seen this document.  It's a document

5   dated 30 September 98, one month before the last dividend was

6   taken.  There is a document almost like it earlier, a year

7   earlier.  Mr. Ogaard sends this and it goes off to Renco Group.

8   Sabel's September results not yet available, but assume break

9   even.  If $2 million dividend is taken, Sabel's loss could be

10  as much as 150,000.  While 2 million is currently available for

11  dividend -- that's under a formula -- with projected negative

12  cash drain over next three years.

13           Look at what they are predicting.  Negative cash drain

14  over next three years, with cell CapEx costs, together with mag

15  price declines.  We urge extreme caution.

16           Right then he should have never taken that October

17  document.  And that language is nearly identical.  The dates

18  are different.

19           The year before they warned him of extreme caution.

20  What did they do?  They say:  Here we got CapEx cap

21  requirements, $58 million.  No one could argue about that.

22           Do you know why Mr. Grabowski couldn't deny that?

23  Because it was within this window, December 31, 1995 to October

24  31, 1998 that he had to opine on.  This was a document that was

25  there.  That's why he agreed with my chart.

SOUTHERN DISTRICT REPORTERS, P.C.              (212) 805-0300

1           Can you put my chart up one more time, 960.

2           This is the cash chart.  They are told here, here is

3    the $58 million.  They are told here there is going to be a

4    cash drain over the next three years.  Adequate capital?

5    Absolutely not.  No adequate capital, unjust enrichment.

6    That's real, real simple.

7           Mr. Rennert has an ability to kick it down the road.

8    He has been in litigation with us for 12 plus years for us to

9    get here.  He has been in litigation with the EPA for 14 years.

10   Kick it down the road.  Then he finds every possible excuse

11   that you can think of.  One of the excuses here was, you've

12   heard the word perfect storm, perfect storm, perfect storm.

13          Let me just show you, you saw Mr. Park put on this

14   overlay showing what happened with the GDP.  Let me show you

15   the whole GDP and let me remind you, Mr. Rennert worked on a

16   Ph.D. in finance at NYU, a terrific school.  Just to get in a

17   Ph.D. program in finance, you can conclude he's very, very

18   smart.

19          Put up 916.  Here is what you were not shown.  I want

20   you to look at this.  This is perfect storm or a mild

21   recession.  All you saw was a very little snippet where you saw

22   things go down.  This is not like almost any recession you've

23   seen.  It's as mild as can be.  In fact, and what you see here,

24   that's the time period where they claim there is a recession.

25   You still got positive GDP.  When gross domestic proceeds are

1    still positive, that's as mild a recession as you can have, and

2    I'm not the only one saying it.  Let me show you Mr. Thayer's

3    testimony.

4              Would you put up 456, please.

5              What does he say?  He had a model recession and then

6    he said you had the Chinese flooding the market.  I am going to

7    talk about whether they should have known about the Chinese in

8    a few minutes.

9              THE COURT:  Mr. Beus, I have snacks for the jurors.

10   We are going to break here and take about a 10-minute break.

11   Thank you very much.

12             (Jury not present)

13             THE COURT:  So that's an hour and I figure we will try

14   to do two short breaks.  That was the time.

15             Matters to take up.

16             MR. PARK:  Your Honor, I did rise to object on Mr.

17   Beus' repeated reference to my saying that the cells can take

18   seven years to build.  I don't recall ever saying seven years.

19   I was going to let it pass the first time.  But when he used it

20   at least three other times to make it seem like there is some

21   undisputed fact here, I think that's misleading.

22             THE COURT:  You said that the pilot was seven years.

23   Am I remembering that right?

24             MR. PARK:  I think I said several years.  I never said

25   seven years.  I would never have thought to put that number on

1    it.  I just think that needs to be corrected.

2              THE COURT:  Mr. Beus.

3              MR. BEUS:  I heard seven.  If I misspoke -- I clearly

4    heard that.  I'm an old guy with bad eyes, but I have got

5    pretty good ears.

6              THE COURT:  You are overdue.

7              MR. BEUS:  I'm overdue.

8              THE COURT:  I thought I had heard it, too, but maybe

9    it was several and it sounded like seven.

10             MR. PARK:  It's possible.  Seven years is a long time

11   and it has implications.

12             THE COURT:  What's the application?

13             MR. PARK:  The application is to correct it, first --

14             THE COURT:  What are you asking me to say?

15             MR. PARK:  To indicate to the jury, or maybe Mr. Beus

16   can correct it, and I would be fine with that as well, that he

17   said that I had said seven years, and I had not said seven

18   years.  He just misheard.  I think that correction would be in

19   order.

20             MR. BEUS:  My suggestion is maybe the court reporter

21   can find it.

22             THE COURT:  I did a term search for seven and the only

23   time it comes up is in referencing not this.  I don't know.  It

24   doesn't mean that it's not in there.

25             MR. BEUS:  I will just not use it again, but I do not

SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

1    want an instruction.

2              THE COURT:  It appears to be wrong and you are not

3    disputing that it's wrong, right?

4              MR. BEUS:  I heard seven.

5              THE COURT:  We will search the transcript again and if

6    it's not in there then I'll correct it.

7              MR. PARK:  Thank you, your Honor.

8              MR. BEUS:  Your Honor, I took some time about that and

9    I wrote it down at the time and so did my partner.  He should

10   have stood up and objected the first time I said it if he

11   really didn't think that was correct.  That's what I heard.

12             THE COURT:  He did object.  I overruled it.

13             MR. PARK:  Your Honor.

14             THE COURT:  He objected at the time.  I can see that

15   at the time I searched the transcript.

16             MR. PARK:  Simply would not make any sense for me to

17   say seven years.  ALCAN --

18             THE COURT:  Is there anything in the record, Mr. Beus,

19   that would have supported his saying seven years?

20             MR. BEUS:  Yeah.  If you look at what it took from

21   1995, they get the first production cell of an M-cell in 2001,

22   so that's nearly seven years.  I can show you memos in '95.

23             THE COURT:  Go ahead.  What do you want to show me?

24             MR. BEUS:  I don't have it in front of me, but we have

25   got -- can you get me the document that has the bullet points.

1    I don't know whether it's March of '95 or September of '95.

2    Where they are in the process of working with ALCAN at that

3    point in time and they license it in August of '96.  It's

4    Exhibit 8997.

5            Can you put that up, Bart.

6            THE COURT:  While you are doing that, I'm term

7    searching for seven and so far it's only in the context --

8    maybe what was in my head, the seven-year projections,

9    obviously.

10           MR. BEUS:  I'm sorry.  This is October of '95.  There

11   you see it.

12           Blow up the bottom part, if you would.

13           This is where they are going to Japan or they had been

14   to Japan to work on this to get it in place.  It's not quite

15   seven years by the time they get it in place

16           MR. HAVELES:  That was due diligence, your Honor.

17   They signed the licensing agreement in July of 1996 and the

18   first production cell was put in place in May of 2001.  That's

19   less than five years.

20           THE COURT:  Just to be clear, you want me to say that

21   it's five years and not seven years.

22           MR. HAVELES:  The curative instruction was that

23   Mr. Park did not say seven years.  He used the word several.

24           THE COURT:  But in your view it's five years, not

25   seven years.

1          MR. HAVELES:  The totality of the project was less

2    than five years.

3          MR. BEUS:  That's not true.

4          MR. S. STIRLING:  That's not correct.

5          MR. HAVELES:  The work that was done beforehand was

6    due diligence.  It was buyers' due diligence before they signed

7    the contract.  There was no development work that was begun

8    until after Mr. Thayer testified, until after the license was

9    signed.  And all this memo shows is they went to make a visit

10   to help inform them when to sign a licensing agreement.

11         THE COURT:  I don't see it.  I have done the term

12   search for it.  I think that it was a mishearing of several for

13   seven.  And if you are saying you spent some time on it, Mr.

14   Beus -- you didn't spend more than five minutes.  I'll credit

15   you five minutes and I'll tell the jury that you referred to

16   Mr. Park having said seven years for the cell development, but

17   in fact he said several.

18         MR. BEUS:  Your Honor, if we have to make that

19   correction, I would rather myself do it rather than the Court.

20         THE COURT:  What are you going to say?

21         MR. BEUS:  I've been informed during the break that

22   Mr. Park meant to say several.  We don't know whether he said

23   several or seven.

24         THE COURT:  I just checked the transcript and I don't

25   see the word seven.

1              MR. S. STIRLING:  Do you find the word several years?

2              THE COURT:  I have not searched for it.  You have the

3     Live Note, too.

4              Here it is, several.  In the mid '90s the company

5     embarks on this effort to find this technology.  They find

6     ALCAN.  They think it's terrific.  They bring it on board.

7     They started it in 1996 and it goes through several years of

8     test piloting, which is not unusual.  That's what the

9     transcript says, Mr. Beus.

10             MR. BEUS:  Whatever you would like me to do I'll do,

11    your Honor.

12             THE COURT:  How about this.  You had heard Mr. Park

13    say seven years, so you have referred to that.  In fact, he

14    said several years.  Okay?

15             MR. BEUS:  Okay.

16             THE COURT:  Just to put it in context, I'll say that

17    Mr. Beus commented recently on Mr. Park having said during his

18    closing that it took seven years to pilot the cell technology.

19    In fact, Mr. Park said it took several years.  Okay, Mr. Beus.

20             MR. BEUS:  Yes.  May I also then say that the record

21    then shows five?

22             THE COURT:  If the record shows five, you can make an

23    argument after I give my instruction.  You can make arguments

24    from the record.

25             MR. BEUS:  Is there any way I can make that instead of

1    you?  They will think I've cheated when I did that and I don't

2    feel like I cheated at all.

3              THE COURT:  Tell me what you are going to say.  I'm

4    fine with you saying it.

5              MR. BEUS:  I would just say, Mr. Park told me he did

6    not say seven.  He said several.  And if I said seven and he

7    didn't mean seven, I don't want --

8              THE COURT:  He didn't say seven.  You misheard him.

9    If you want to say you innocently misheard him, he said

10   several.  You had heard it as seven.  I'm correcting my having

11   said that he said seven.

12             Other matters.

13             Mr. Stirling.

14             MR. S. STIRLING:  Nothing else.

15             THE COURT:  I think you have each shown two different

16   versions of 2785.  In your closing is it possible for you to --

17   it's not this document.  You showed 2785 during the course of

18   your closing, Mr. Park.

19             MR. HAVELES:  There are two.  There is 85 and 86, your

20   Honor.

21             THE COURT:  Can you pull up what you showed as 2785.

22             That's different from what they have showed as 2785

23   and I think what they showed is correct.

24             MR. HAVELES:  This is the one they gave us that we

25   loaded into our system that was marked --

F2OMBUC6                    Summation - Mr. Beus

 1              THE COURT:  What's different about it, Mr. Haveles?

 2              MR. HAVELES:  I am --

 3              THE COURT:  Look at top box on the right.

 4              MR. PARK:  Are we looking -- he also used the EBITDA

 5     version.

 6              THE COURT:  I'm talking about 2785.  There is a reason

 7     we put numbers on exhibits.

 8              Why don't you pull up, Bart, what you show at 2785.  I

 9     don't think it's a big deal.  It's just different and there was

10     no objection.  I just want to make sure that the record is

11     clear on what 2785 is and that's what goes back to the jury and

12     there is just no doubt about it.  But I'm pretty sure what we

13     are about to see, which is what says 2003 --

14              MR. PARK:  They have EBITDA for 2785.  That's the

15     difference.

16              THE COURT:  I'm talking about 2785.  That says 2785.

17              MR. PARK:  We got 2785, Judge, with the cash

18     equivalent.

19              THE COURT:  There is a 2785.  What is it?  That is not

20     it, correct?

21              MR. HAVELES:  Your Honor, I believe what's happened

22     here -- I am not sure what's happened here.  I know the two

23     that we have loaded into the system that we have been doing

24     with the copies that we were given during the course of trial,

25     785 and 86, this is 786, in our system we have this marked as

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

 1    86.

 2              THE COURT:  I know that this is correct because you

 3    objected to this document not having the 2003 note in it.  But

 4    the one that you showed didn't have 2003.

 5              MR. HAVELES:  Right.

 6              THE COURT:  This is, I believe, and what I'm pointing

 7    to, is -- let me finish -- what plaintiff showed during their

 8    closing as 2785.  I believe that's 2785.  I believe what you

 9    showed during your closing at 2785 is not a document in

10    evidence.

11              MR. HAVELES:  Your Honor.

12              THE COURT:  I just want a clear record.

13              MR. HAVELES:  Your Honor, without being fresh, we are

14    both right because you've picked up the notice there.  What

15    also we have picked up and we were focusing on, what we were

16    distracted from is this 2785 is the green box, has EBITDA.  The

17    copy that we have is the green box that we were given and we

18    were using because it was the copy given to us before trial

19    that had cash and cash equivalents.  There are two differences

20    there.  I was focusing on the green box.  They are both

21    different.

22              THE COURT:  Let me ask the plaintiff a question.  This

23    document that's on the screen, which is what you showed during

24    your closing, which is marked 2785 as an exhibit from trial, is

25    that what I admitted as 2785?

1          MR. S. STIRLING:  Yes, your Honor, we believe this is

2     what was admitted after whatever objections or other things we

3     have gone through about prior versions of the exhibits had been

4     resolved.  This is what was admitted.

5          MR. HAVELES:  There are two bar graphs like this, your

6     Honor, 85 and 86.

7          THE COURT:  That, I believe, is what defendants showed

8     as 2786 during their closing.

9          MR. HAVELES:  We had that shown as 85.  And I think

10    part of the confusion is, the copies that we have in our

11    systems were the copies that have been given to us and

12    somehow -- because we didn't create these documents.  Both are

13    in the folder.  The correct ones are in the folder for the

14    jury.  That we do know.

15         THE COURT:  Pull them out and let me see.

16         MR. HAVELES:  But the ones that were in our computer

17    system are the copies of what had been given to us earlier and

18    that's where the confusion comes from, and I apologize, your

19    Honor.

20         THE COURT:  2785 and 2786 are in evidence.  My memory

21    from trial is that they both, one had EBITDA on the left, one

22    had cash and cash equivalents on the left.  Both of them,

23    because of defendants' objection, contained in the upper box

24    2003.

25         MR. HAVELES:  Absolutely, your Honor.  That one I

1   agree.  Now we are just trying to make sure --

2              THE COURT:  What is in the folder that was just handed

3   to me, which is marked as 2785, does not have 2003 in the box.

4              MR. HAVELES:  Those documents were not prepared by us.

5   They were prepared by plaintiffs.  I think we got some

6   confusion on all the exhibits here and we will have to fix

7   those, too.

8              THE COURT:  Sort it out.  When I come back in five you

9   will let me know what the resolution is.  What matters is a

10  clarity of record in case anybody is unhappy with the result

11  here and they want to take it to the circuit.  You are

12  responsible for your exhibits, which is why it's important for

13  me to get agreement on what the exhibits are.  And my job, part

14  is to make sure there is a clear record.  Of course, what goes

15  back to the jury will only be what I actually admitted into

16  evidence.  Take a look, talk with each other, and let me know

17  where we are.  I'll return in five.

18             (Recess)

19             THE COURT:  Mr. Haveles.

20             MR. HAVELES:  I was going to say it appears, your

21  Honor, in the folders that pick up after all the things that

22  were done, when the parties after trial will exchange exhibits

23  like this, both sides seem to have the earlier version or

24  iteration in their folders as having been the ones marked in

25  evidence as opposed to the final version that was just put up

1   on the screen.

2          So what we need to do is, for the purpose of sending

3   things out to the jury tomorrow, is get the correct versions

4   tonight and put them in the folder.  I am not sure how it

5   happened or why.  Both sides just kind of didn't pay attention

6   to it when we were exchanging exhibits each night about

7   newly-created exhibits that were based on demonstratives and

8   for that I'll take responsibility and apologize, your Honor.

9          THE COURT:  Mr. Stirling.

10          MR. S. STIRLING:  Your Honor, I believe, after the

11   review that we have done here, that what is correct is the

12   EBITDA slide should be 2785 and what is in the box does not

13   have the year 2003 on it, that it should be added, and 2786

14   should be the cash and cash equivalents slide and that should

15   also have the 2003 added to it.  That I believe is what was

16   finally approved with those numbers.

17          MR. HAVELES:  Somehow in each side's folders, because

18   it was in both sets we looked at, it was the inverse and it was

19   the earlier iteration, your Honor.  We will correct that this

20   evening, your Honor.

21          THE COURT:  Anything else before we bring in the jury?

22          MR. HAVELES:  No, your Honor.

23          MR. S. STIRLING:  Nothing.

24          (Jury present)

25          THE COURT:  Thank you, members of the jury.

1              Mr. Beus, you may proceed.

2              MR. BEUS:  I have used the word seven and I should

3     have used the word several.  And so when I said seven before, I

4     should have said several.  The timeline is --

5              THE COURT:  Just to be clear, Mr. Beus is referring to

6     when he said that Mr. Park said it took seven years to develop

7     the cell technology.  As you may recall, when Mr. Park was

8     closing, he said several years to develop the cell technology.

9     Mr. Beus misheard him as saying seven and he has referred to

10    that and we are just correcting that.

11             MR. BEUS:  That's what happens when you get old.  I'm

12    older than you think.

13             Put up 387 for me, please.

14             I am going to change subjects now.  I am going to talk

15    about some other principles of a valuation.  I am back to Mr.

16    Grabowski.  And this is really an important methodology that

17    I'm sure you already all understand.  But I want to go over it.

18             Do you agree that the reliability of the market

19    approach is dependent on the relative comparability of the

20    guideline companies to the subject company that is being

21    valued?

22    "A.  Yes."

23             You remember the debate about guideline versus

24    comparable.  We just went directly to the guideline companies

25    in this question, so we got a common denominator that they need

1   to be comparable.  He said yes.

2           And do you agree with this, that the ideal guideline

3   companies are in the same industry as the subject company?

4   "A.  That's the ideal guideline company."

5           644.  And if you'll remember, Mr. Haveles spent a lot

6   of time describing Alcoa as a guideline company.  And it is

7   just back like to do the houses, if you can figure out Alcoa is

8   worth this on a per square foot basis, you apply it to MagCorp,

9   and you know what MagCorp is.  Of course, it's not square

10  footage; it is the attributes of Alcoa, are they like the

11  attributes of MagCorp.  Different size.  You apply one here,

12  apply one there and you try to get that comparable.  And Mr.

13  Grabowski said that.  He said that Alcoa was a very good

14  guideline company.

15          674.  And he said it was good enough -- similar enough

16  that you could draw multiples from it.  You get down to the

17  square foot price.  Look at these characteristics.  You come up

18  to a common matrix number.  Then you apply it to MagCorp,

19  MagCorp's EBITDA, MagCorp's earnings, whatever you apply it to.

20          392.  This is an important piece.  Do we agree now

21  that MagCorp is riskier than Alcoa, yes or no?

22  "A.  Its equity is more risky than Alcoa.

23  "Q.  Is MagCorp's debt more risky as well than Alcoa's is?"

24          Look at what he said.  I don't know.  I don't know the

25  rating that Alcoa has, so I'd have to look at that.

1          Why would you look at a rating?  The better the

2   rating, the better your credit score if you go to buy a car,

3   the less interest you are going to pay.  It's real simple.  If

4   you've got a good credit rating you are going to pay less money

5   in interest.  We have gone through a recession on subprime

6   mortgages, by having them not rated.  Rating is everything when

7   it comes to evaluating risk.  He says:  I don't know the rating

8   that Alcoa has, so I'd have to look at that.  Then I ask him,

9   678:  Did you put in your report anywhere where the rating was

10  of Alcoa compared to MagCorp?

11  "A.  It's in the source documents.  I don't recall that we put

12  it into the report."

13          Now, Alcoa was the poster child that you saw Mr.

14  Haveles take Mr. Grabowski through.

15          672.  Did you look at the terms of the debt with the

16  comps, the comparable companies?

17  "A.  We looked at all the filings for the guideline companies."

18          Then I asked:  Tell me what the cost of debt was.  How

19  much interest are you paying?  How much risk do you have is

20  what I'm asking here.  Tell me what the cost of debt was of the

21  one that you and Mr. Haveles spent so much time about with

22  Alcoa.  What was their cost of debt in the 1996?  I don't

23  recall.

24          858.  This comes right out of the exhibits that were

25  in Mr. Grabowski's report.  If you take a note you can go back

1    and find this and you take a note you can see the page numbers.

2    The bond rating for MagCorp is B, which is not investment

3    grade, and Mr. Grabowski told us that.  What's the bond rating

4    for Alcoa?  Investment grade.  Then you look to see what's

5    really the risk.  And the risk there tells you exactly the

6    relationship between MagCorp and Alcoa.  You add those

7    together, we have those numbers and you add these together to

8    calculate the average rate.  And you can see the relationship

9    between the risk of Alcoa and the risk of MagCorp.  The

10   arithmetic is 2.22 times greater risk for MagCorp, simple

11   arithmetic.

12          679.  So you looked.  I won't take you through them.

13   But the Alcoa numbers, which was the example that you and Mr.

14   Haveles took us through, shows the average cost of December,

15   less than half of the cost of debt for MagCorp.  Can we agree

16   on that?  I will accept your assumption, your supposition.

17          638.  What does cost of capital have to do with

18   valuation?  And Mr. Grabowski:  There are two major components

19   in a valuation.  There is the profits that you are trying to

20   determine how much you are willing to pay for and the cost of

21   capital.  It's one of those terms that make it hard for people

22   to know what we do.  It's the rate of return that's appropriate

23   for the risk of the potential investment.

24          This is not all that complicated.  You evaluate the

25   risk and the marketplace does that.  They rate them.  If the

1    market wants them, the price goes up and the rating gets

2    better.  If the market doesn't want them, the price goes down

3    and the rating goes down.  Even the United States Government's

4    debt rating has gone down in the last few years, big news.

5    That's all they are doing is evaluating risk.

6         684.  So what you do is, you take the guideline

7    companies, come up with the multiple and then apply it to

8    MagCorp, right?  He says right.

9         854.  I'm sorry.  I should have said 858.  I

10   apologize.

11        We are back to the same thing.  So whatever rate that

12   the risk market says you have for Alcoa, you have to do what?

13   You have to multiply 2.22 times that number.  Then I asked this

14   question, 677:  Those numbers are not anywhere in your report

15   or your appendix?  No.  Thank you.  They are in the report.

16   Then I say:  You didn't do a chart up here that you could show

17   anywhere in your report to say, we think MagCorp is comparable

18   to Alcoa, did you, as it relates to debt?  His answer was no.

19   He also made an assumption that a major part of this capital

20   structure is going to be debt.  So it's really, really

21   important.

22        391.  I asked the next question:  You didn't do any

23   arithmetic to make a conclusion that MagCorp and Alcoa are

24   comparable, are relatively comparable to one another as it

25   relates to the cost of debt.  Am I correct?  And he says no.

1    He didn't do that.

2              Now think about that.  So I asked some more questions.

3         645.  Were they, in fact, diversified companies?

4    Because you all know that if you have a company that is in a

5    whole bunch of different businesses, when one business goes

6    down, the other businesses can buoy them up.  They say they

7    want what we call vertically diversified.  They weren't into

8    different countervailing businesses where one would offset

9    another.  They were all making aluminum products, for example.

10   Vertical diversification means that you manufacture and sell

11   and go to the retail market and do that.

12        806.  Let me show you what the facts are.  This is

13   Alcoa.  This is out of the 10-K that was in Mr. Grabowski's

14   files.  Look at diversification packaging, transportation,

15   distributor, aluminum and chemicals, building and construction.

16        805.  This is an interesting fact.  Alcoa Closures

17   Systems International, Inc. is the world's largest producer of

18   plastic closures for beverage containers.  Is this starting to

19   not feel that they are the same, not very comparable?

20        804.  And they are in the vinyl business, vinyl

21   windows and patio and door markets.  This is right out of their

22   documents from Mr. Grabowski's file.

23        734.  Then we pull this out of their file and this --

24   you can find this in these two exhibits, one is MagCorp's and

25   one is Alcoa's.  Look at the difference.  Stockholder's equity.

1     MagCorp, negative $69 million, negative, in the hole.

2     Positive, Alcoa, $4.5 billion.  Do they feel like comparables?

3     It's kind of funny, isn't it.

4          Net income, sales, cash, EBITDA, cost of debt.  Look

5     at those numbers, 735.  Here you see again, one plant, one

6     location, 76,800 employees.  Does it feel like you are

7     comparing a mansion versus a shack?  You see these comparables.

8          670.  What's the cost of equity.  The cost of equity

9     is always more than the cost of debt, right?  Yes, it is.

10         When you see the amplification and the differences

11    between debt, it's even greater with equity.

12         403, I asked this question.  What about Alcoa, did

13    they ever have a technology challenge that if they couldn't

14    solve it, they wouldn't survive?  No.

15         Could you put up 392.

16         Then I ask kind of the ultimate question:  Do you

17    agree now that MagCorp is riskier than Alcoa, yes or no?

18    "A.  Its equity is more risky than Alcoa because it has more

19    leverage."

20         Is MagCorp's debt more risky as well than Alcoa's

21    debts?  He didn't know.  He has to look at the ratings.  We

22    just did the arithmetic.

23         Put up 858 again.  When you do that arithmetic, you

24    know it's 2.2 times greater.

25         Put up 857 for me.  So the comparable they used to get

1    to the cost of debt and the cost of equity and to put in the

2    income approach comes from, say, MagCorp and Alcoa are

3    comparable.

4           We now know, just looking at the simple data that's in

5    the records that you are going to see in the jury room, when

6    you deliberate, they are not even close to the same.  Alcoa is

7    a multibillion dollar company.  Alcoa has been around, I should

8    have put that up there, since 1888, 1888; MagCorp, 1989.

9    Recessions, if you're well capitalized, you get through a

10   recession.  If you have a recession like 2009, it may be tough.

11   But the companies that are supposed to be of the Alcoa types,

12   they just walk through recessions.  What happened to MagCorp

13   when they had a recession and a little competition?  They

14   called that the perfect storm and they are done.

15          What's the difference between Alcoa and MagCorp?  It's

16   huge.  And nobody is in there looting Alcoa.

17          MR. HAVELES:  Objection.

18          THE COURT:  Sustained.  The jury will disregard the

19   last comment.

20          MR. BEUS:  Here is the income approach, future EBITDA

21   based on projections, and we are going to talk about those in a

22   minute.  Times the discount rate, which is the guideline

23   company.

24          Now, you remember the number that Mr. Grabowski used

25   as the multiple, the discount rate.  It was 10.  Do you

1   remember the number Jason Frank used?  22 and 23.  2.22 times

2   10 is exactly Jason Frank's number, exactly his number.  And

3   what do you come up with?  Major insolvency.  What did Mr.

4   Grabowski do?

5              MR. HAVELES:  Objection.

6              THE COURT:  Sustained.  The jury will disregard.

7              MR. BEUS:  Put up 668 for me again.

8         When you are trying to value a company you say I've

9   got two pieces in a simple algebraic equation.  The first piece

10  is, you have projected forecasted revenues on an income bases,

11  right?  Yes.  Then you take that income and you bring it back

12  to present value using a discount, right?  Yes.  That's how

13  it's done.

14        I've just taken through how noncomparable Alcoa is to

15  MagCorp.  I could take you through -- the numbers would be

16  slightly different -- all of the seven guideline companies.

17  You'd come up with a result when you made the appropriate

18  adjustments and you would get to Jason Frank's number.

19             MR. HAVELES:  Objection.

20             THE COURT:  Sustained.  The jury will disregard.

21             MR. BEUS:  736.

22        Let's look at projections, one of the pieces you have

23  there.  You didn't give forecasts going earlier than the fiscal

24  year 1995 in the work you did.  This is to Mr. Grabowski.  We

25  looked at the plans that had been put together in the normal

1     course of business in fiscal years earlier than '95.  And there

2     were no fiscal years prior to 1995 that went back more than one

3     year?  I believe that's correct.

4          So on one year's projections they are going to go out

5     seven years.

6          694.  Let me ask you, do you agree with this:  The

7     forecast for magnesium prices is the key assumption for

8     MagCorp's financial forecast?  He says yes.

9          693.  Did you ever ask Mr. Kaplan what the forecasts

10    were over the next seven years?  Remember Mr. Kaplan.  He is

11    the forecast guy.  He is the guy Mr. Park told you that did the

12    IMA reports.  That's the guy you would go to if you are going

13    to get the information and put it out.

14         Where did Mr. Frank get his forecast?  He went to CRU,

15    an independent forecasting company that did magnesium prices.

16    And did he even go back to Mr. Kaplan and ask?  He said no.

17         651.  What's his testimony?  His testimony, you have

18    to have a good idea that the projections are reasonable.  He

19    didn't even get the projections from management.

20         652, he says they cannot be biased.

21         Then I ask him this, 650:  By the way, if they are

22    bias, you have to go do something else?  650.  What data did

23    you use for the expected profits?  You look at projections.

24    Remember this is simple algebraic equation.  You have to assess

25    the projections.  You are looking at projections of profit and

1    you are looking at projections of investment that has to be

2    made to keep the business going.

3          406.   Then I ask him:  You never got management to say

4    the price of magnesium is going to be this amount in '97, 98,

5    '99, 2000, other than in the July time frame?  I don't remember

6    how the information was transmitted.  But if we didn't, we

7    could easily calculate it, just like Mr. Edgar did.

8          You remember him saying he got his information from

9    Mr. Edgar.  He didn't do it.

10         Put up 406.  I'm sorry.  466.  This is a question of

11   Mr. Edgar by my partner, Mr. Stirling:  Mr. Edgar, all three of

12   the plan financial statement documents that you referred to in

13   your report as incorporating average price forecasts that you

14   provided to Mr. Grabowski are, in fact, derived from documents

15   that you do not include the price figures that you have

16   included in your report?

17   "A.  That's correct."

18         Where are we?  We have got Mr. Grabowski not getting

19   them from Mr. Kaplan, but he is using these projections to come

20   out to his number.  Can you even imagine anybody paying the

21   kind of number that Mr. Grabowski says his company is worth.

22         Then what does he do?  He says I get them from Edgar.

23   Mr. Edgar says he never gave him those numbers.  Who knows what

24   he really has done.

25         98.   Ira Rennert.  How far can you predict prices?

1    You can't, at all?

2    "A.  No."

3              Was that your view in '95 through 2001?

4              That's one of the questions that he answered correctly

5    in his deposition and didn't change at trial.  And he changed a

6    lot.

7              132.  Mr. Legge, the president, had been there for

8    many years.  These projections, if you go beyond a year, would

9    be very uncertain, right?  I don't know that I would use the

10   word very uncertain.  Uncertain?  They would be uncertain.

11             133.  This is, again, Mr. Legge.  Have you ever in

12   your entire history projected out other than three years?

13   "A.  Except for this occasion in 1996?  Yes.  Except for that,

14   no."

15             So this is the first time in your whole career, if I'm

16   correct, you have ever projected more than three years.  He

17   says, yes, as I recall.

18             Then Mr. Stirling asked a lot of questions of

19   Mr. Edgar.

20             Put up 699.  That's the first question there at the

21   top of that page.  You'll recognize the other document and what

22   we have just done is added the imputed number for the MagCorp

23   price that would have to be obtained on the spot market.

24   "Q.  And at the time that forecast was made for the prior three

25   years, MagCorp was getting 90 percent of the spot price,

1    correct?

2    "A.  Relative to the forecast, yes."

3          So what have you got here?  Mr. Grabowski, who comes

4    in and tries to give you a number, with his key projections

5    number, doesn't even know where he got it or where it comes

6    from.  And he mixes it up between spot price and what MagCorp

7    actually gets.  And if you look at the green line, and you put

8    it in juxtaposition to the spot price line, you can see why

9    that is generally about 90 percent.

10         Do you remember all the questions I asked and do you

11   remember the questions Mr. Stirling asked Mr. Edgar?  Did you

12   ever get a price for magnesium, how much a pound?  No.  How did

13   they derive it?  Do you remember those sheets where they said,

14   we will assume 43,500 pounds?  I'm sorry, tons.  And then do

15   you remember the questions.  Where did you figure out the

16   price?  And you got some machination, you can never figure that

17   out again because, why?  They took the revenues that included

18   the revenues from chlorine, hydrochloric acid, ferric chloride

19   and ferrous chloride.  They didn't even know what they were.

20   Mr. Edgar could not give those answers and neither could Mr.

21   Grabowski.

22         463.  You see we ask about where did that come from?

23   It's not mentioned in the documents.

24         692.  What other products?  I don't know.  I don't

25   remember.  I would have to go look.

1          462.  MagCorp didn't list the prices.  Here it's $1.62

2     or $1.61.  Remember the document, 559.  It takes a $1.60 to

3     survive.

4          Ladies and gentlemen, Jason Frank was short and you

5     know why now.  He was clear and unequivocal.  He had an exact

6     solid source from a professional forecaster in the magnesium

7     world.  When Mr. Adams was cross-examined and you saw the

8     video, they didn't touch him on that issue.  They didn't lay a

9     glove on him.  They didn't lay a glove on Mr. Frank.  And when

10    it came to the cost numbers, he took the exact cost numbers out

11    of the financial information.  You may not like that he's

12    younger than Mr. Grabowski, but maybe you do.  Very smart man,

13    an MBA from the University of Chicago, been in the business for

14    a long time, is the head person at one of the largest valuation

15    companies in the country.

16          (Continued on next page)

f2o4bcu7                     Summation - Mr. Beus

1          MR. BEUS:  Now, let's move to pricing for just a

2     minute.  849.  I will try to do this quickly.  In the early

3     '90s, MagCorp had seen prices plummet.  Let me take you through

4     some of the details so you can see the documents.

5          775, please.  This document right here you probably

6     haven't seen before.  It is in evidence.  This is Marjorie

7     Bowen's notes of her conversations with Mr. Kaplan.  Market

8     flooded with magnesium in the early '90s.  Canadian, MagCorp

9     price war, $1.11 low.  And remember the $1.60 survival number?

10    If you have seen the cycle before, you're likely to see it yet

11    again.

12         774.  More notes.  '92 to '94, huge quantities of

13    imports from Russia and China.

14         Could somebody say you cannot predict China?

15    Mr. Kaplan is telling her this or at least she is writing it

16    down.

17         950.  I'm sorry.  Go to 527.  Now we're in April of

18    '96.  This is Mr. Kaplan to Mr. Legge.  "This is consistent

19    with reports that have been expanding of late indicating

20    significant additional production of Chinese material."

21         Bart, can you blow up the data on that, or can you say

22    it for me?  8 April '96.  This is April '96 before the

23    $75 million dividend was taken.  It also indicates that some of

24    the traditional European Russian sales have been replaced by

25    poorer quality, lower priced Chinese material.  Look at what

f2o4bcu7                    Summation - Mr. Beus

1   the next sentence says.  That forces an apparent more Russian

2   material to the other Western markets.  So when China comes to

3   Europe or Rotterdam, which you heard about by Mr. Park, what

4   that does is that causes the Russian magnesium to go into North

5   America.  This is a worldwide industry.

6           Next, please.  526.  This is April of '96, again

7   before the $75 million taking.

8           530.  Magnesium consumption by the West of Eastern

9   material increased in the first quarter to 17,400 tons.  Here

10  you see Chinese material continues to be sold at extremely low

11  prices, as shown in the attached press clipping.  This is from

12  Mr. Kaplan to Mr. Legge.

13          Now let me show you -- there it is.  That is

14  Rotterdam.  It doesn't say it on there, but I will tell that it

15  is referring to Rotterdam.  $1.13.  That is creating pressure.

16          757.  I'm sorry.  787.  This is back to Marjorie

17  Bowen's notes before the note offering.  Here is what she is

18  told:  Two big risks.  Ask yourself:  Was this predictable?

19  Supply from China and economy tanking.

20          Where did she get that information?  These notes come

21  from conversations with Mr. Kaplan.  Did they plug these into

22  projections?  If you know those are the two big risks and you

23  have a company, what do you do?  You put adequate capital in

24  place to fight the competition and get to -- to use

25  Mr. Grabowski's phrase -- to the end of the day.  That's what

f2o4bcu7                    Summation - Mr. Beus

1    you have to do.

2          950.  This comes from United States Geologic, USGS, a

3    government document.  '92, you see 11,800 tons, imports; 96,

4    you see a 400 percent increase to 46,600.  This is all, again,

5    before that big $75 million dividend.  Mr. Rennert, as the

6    chairman of the board of MagCorp and as the chairman of the

7    board of Renco Metals, had a duty to keep this company

8    adequately capitalized.  He had a fiduciary duty to do that.

9          Mr. Edgar, 441.  This is Mr. Edgar describing these

10   good years.  Prices are relatively stable.  You have two

11   exceptional years, and you've got six other what you call

12   normal years.  Exceptional years are '95 and '96.

13         What numbers did they use to do all of their

14   projections, Mr. Grabowski, Houlihan Lokey?  They took one

15   number, 1996, $1.78 in these two exceptional years.

16         Well, let us not misunderstand.  Somebody who

17   understands this in the time frame, knows what their

18   responsibilities are as a fiduciary, you don't take the money

19   out.  And we're asking you to tell Mr. Rennert to put the money

20   back.  And let it be used for the creditors in this case.

21         Let's go to technology for just a minute.  319,

22   Mr. Tripp.  You recall when it was that you got the

23   understanding that in order to continue in business, there

24   would need to be improved technology?

25         I don't recall the date, but it was the early 1990s.

f2o4bcu7                        Summation - Mr. Beus

1          That's Mr. Tripp.  He didn't want to say that, but he

2     had said it in his deposition, so it came out here.  Early '90s

3     they knew they had to have improved technology.

4          993.  Mr. Legge.  In the depo, he said bleeding,

5     losing tons of money.  At trial, he said, AMAX was investing a

6     lot of money in the facility, and we were not getting the

7     returns on the sales.

8          Bleeding and losing tons of money is pretty graphic.

9     That's the testimony he gave in his deposition.  That's the

10    technology that was trying to operate.  It was a problem.

11         146.  We had searched the world to find something

12    else.  We looked at every cell.  Anybody that would sell a

13    cell, we looked at it.

14         Mr. Park suggested that there were other cells and

15    other ways to do this.  That's not true.  These folks had

16    searched the world.

17         230.  Mr. Legge.  Early in the '90s, did you believe

18    that the evolution of the M-cell was necessary to maintain the

19    competitive nature of MagCorp?

20         He does better.  He says, early in the 1990s, I

21    believed that the evolution to a new cell was required,

22    whatever cell it was, and which would be the best available

23    technology.

24         356.  Mr. Thayer, the now-president of U.S. Magnesium.

25    What were they using there?  This testimony.  They were using

f2o4bcu7                          Summation - Mr. Beus

1    two cells, I.G. Farben and sealed cells.  Modified I.G. cells,

2    they had some cooled cells that didn't last.  They had been

3    trying to develop other electrolytic technology throughout that

4    time period, that is correct.  How long had they been at it?

5    At least since 1989.  When you get to 1995, they discover

6    Alcan.  They go to Japan to see if it might work.  They're

7    hopeful.  But it doesn't work.

8            357.  At the end of that period of time -- it is

9    important you get this time period -- October 1998, you still

10   didn't have any alternative to -- develop alternatives to

11   either the I.G. Farben cell or the sealed cell, isn't that

12   true?

13           We didn't have a commercial cell ready to replace

14   either of those two versions as of that date.

15           Now, let me tell you what they tell other folks.  Put

16   up 822 for me, would you.  This is in the '93 notes offering.

17   This is what they're telling investors and bondholders.  "Due

18   to its high quality brine from the Great Salt Lake and a

19   state-of-the-art production process."

20           Any wonder why investors might be there?

21           And by the way, investors aren't here because they

22   asked a court to appoint a trustee.  They petitioned the

23   Bankruptcy Court, and the judge decided to appoint --

24           MR. HAVELES:  Objection.

25           THE COURT:  Sustained.  Counsel, keep comments to

f2o4bcu7                        Summation - Mr. Beus

1     matters in evidence.

2               The jury will disregard.

3               MR. BEUS:  A trustee was appointed by the Bankruptcy

4     Court.

5               220.  This is Mr. Legge.  Was there ever a time when

6     you thought you could solve the lithium chloride problem?  You

7     remember the problem.  That's with the Alcan cell.

8               We didn't know.

9               By the way, you remember me asking Mr. Grabowski, you

10    know what this problem was?  He didn't know.  Had no idea.

11              We didn't, no.  We finally just gave up on Alcan and

12    said we've got to design our own M-cell technology to get

13    around the lithium chloride problem.  That is correct.

14              Was that your testimony?

15              It was.

16              By the way, you heard Mr. Haveles in the opening say

17    the M-cell hit it out of the park, and you heard Mr. Park say

18    how wonderful it is, first class, best in show or whatever the

19    words were.

20              Put up 550.  Let's take a look and see how they have

21    done with the M-cells.  They still don't have this problem

22    solved, or at least as of 2002, they haven't.  There you see a

23    very short period in 2002 where they lost $3.8 million.  And in

24    2003, they lost $19 million.  That's with the M-cell, and they

25    had the iron stripper with it.  They were still losing huge

f2o4bcu7                    Summation – Mr. Beus

1    amounts of money.

2             1008, please.  The timing of this document is valuable

3    because you're now in October of 1995.  This is from Mr. Legge

4    to Mr. Rennert.  "The Alcan cell has not been proven as a

5    commercial electrolytic cell for primary magnesium production,

6    and that burden will fall on MagCorp and Alcan jointly."

7             This isn't something you could just go buy off the

8    shelf.

9             The Alcan cell has certain deficiencies in an

10   application with a primary magnesium producer (i.e. metal

11   purity, cell life, cost of rebuilt, etc.,) which Alcan doesn't

12   yet fully recognize.  Then, it says, the cell is larger and

13   thus more costly than MagCorp had anticipated.

14            That's in October of '95.  We all know what

15   Mr. Grabowski was told.  It will work.  And it didn't.

16            Put up 567 for me, please.  You have all seen this,

17   this is Exhibit 2562.  This is the capital budget program.  You

18   saw numbers by Mr. Park about how much they had been spending

19   on research and development.  They had been.  They had been

20   spending money on research and development because they were

21   looking for something that would keep them alive, to make them

22   competitive, to continue in business.  You see those numbers?

23   They didn't spend those numbers.  When you take their charts

24   into the jury room, look at what they actually spent and put it

25   up against this document.  They spent a small fraction of it.

f2o4bcu7                         Summation - Mr. Beus

1    Had they not taken the dividends, they might have gotten to the

2    point where they could have survived.  Who knows?  They were

3    never adequately capitalized.

4           And there was never a time when their assets exceeded

5    their liabilities.  Jason Frank made that perfectly clear.

6    Roger Grabowski, you clearly understand why he couldn't get

7    there.

8           568.  That is the next page of it.  It is a

9    two-page document.  152.  I asked Mr. Legge:  Is the

10   $78.4 million a combination of page 1 and page 2?  Correct?

11          He says yes.

12          You've seen this before, but when you're dealing with

13   capital expenditures, if you'll remember in the offering

14   memorandum in '96, they talked about $46 million was going to

15   be put in to make it better and better.  Their intent was to do

16   that with Alcan.  The problem was they didn't spend it because

17   Alcan didn't work.  They did exactly what they should have

18   done.  They put a pilot cell in.  They worked at it.  It takes

19   seven, eight, nine, ten months to get a pilot cell in, find out

20   that it doesn't work.  When it didn't work, they tried it

21   again.  It still didn't work.  Then, they tried a third one,

22   and then they said we better start working on something else,

23   and then they started working on the M-cell, and the bankruptcy

24   hit before they got the M-cell going.  Even after they got some

25   M-cell going, they still lost money with it.

2843

f2o4bcu7                    Summation – Mr. Beus

1          949.  Here is the document on September 30, '98.  You

2    see number 4?  Here is what I want to show you.  Reminding you

3    of this document.  Remember this is in the narrow, blindfolded

4    time frame that Mr. Grabowski was willing to look at.  His

5    cutoff date is 31 October '98.  This is 30 September '98.  Look

6    at what he says.  757.  He didn't recall it.

7          293.  M-cell, May 2001.  That's also a stipulated

8    fact, which you'll have when you get into the jury room.

9    That's three months later, is the bankruptcy.

10         213.  Why did they go into bankruptcy?  Mr. Legge

11   gives us testimony.  Why did you file bankruptcy?  Our cash

12   flow was in excess of our earnings.  Didn't have any more

13   money, couldn't stabilize the business.  Running out of

14   funding.

15         352.  Well, let me show you Mr. Haveles' statement in

16   opening statement.  1064, please.  This is what you were

17   promised.

18              MR. HAVELES:  Objection.

19              MR. BEUS:  Here's the language.

20              THE COURT:  Just a second.

21              Overruled.

22              MR. BEUS:  1064.  This is what Mr. Haveles said in his

23   opening argument.  "Never once did the company get denied a

24   dime for the technology that it needed or wanted to do."

25              That's what you were told you would hear the evidence

f2o4bcu7                        Summation - Mr. Beus

1    to be.

2              "And you won't hear a single witness, see a single

3    document that says they were denied money and they were not

4    allowed to proceed with a project."

5              352.  We're reading here from a document, Exhibit

6    2112, which is in evidence.  At that time, you wrote -- this is

7    paragraph 4 -- the Renco Corporate Group does not wish to

8    engage in economic support of the technology upgrade program?

9              Yes.

10             Was that true when it was written?

11             Yes.

12             And at that point in April of 2000, you had already

13   been operating pilot M-cells since December of 1998; correct?

14             Yes.

15             167, referring to this document.  Isn't this, in fact,

16   a summary of the future business plan options that the group

17   had in December of 1999?

18             Answer:  Yes.

19             Let me switch subjects.  Let me switch to technology

20   before my time runs out.  569.  November 9, 1996.  You've heard

21   a lot about the Bevill exemption.  Let me first make it very

22   clear.  There's two laws that we're dealing with:  RCRA and

23   CERCLA.  CERCLA puts you in a superfund site with remediation

24   obligations.  It does not have daily penalties associated with

25   it.  It has remediation costs.  RCRA, on the other hand, deals

f2o4bcu7                    Summation - Mr. Beus

1    with how waste is permitted to be held, distributed, or taken

2    care of.  It has serious penalties, and it has a number of

3    other things.  It has a duty for the company to tell the EPA

4    whether there's hazardous wastes on these sites or not.

5          That didn't happen.  You remember John Veranth

6    testifying, Dr. Veranth?

7          So what you have heard in this case, and you've heard

8    it from Mr. Grabowski, the notice of violation was done by the

9    state of Utah that was settled for $2,500.  The hope was that

10   they would have a determination of Bevill, of the Bevill

11   exemption on that.

12         Let me show you what the documents actually say.  569.

13   This is really easy to understand.  This is from Mr. Bassani to

14   Mr. Thayer, with a copy to Mr. Tripp.  "Solid and hazardous"

15   -- and this is November 9, 1997 before this is settled.  It's

16   during the negotiations.  "$2,500 was agreed to be acceptable

17   to settle the NOV in total.  Language for clarifying the

18   regulatory status of our waste streams will not be incorporated

19   into the settlement agreement."

20         Clear and unequivocal.  You'll have the settlement

21   itself.  You can read it.  You'll come to understand it.

22         Put up 539.  Remember Mr. Haveles in the opening?

23   Well, let me show you what Mr. Haveles says in the opening.

24         1072.  Here is what he told you:  "And there things

25   stood until the EPA changes its mind, and it did change its

f2o4bcu7                    Summation - Mr. Beus

1   mind.  Sometime in the late 1990s and the 2000 time period, it

2   decided it didn't like the Bevill Amendment that much, so they

3   changed the interpretation, and they filed suit in 2001."

4           Let's look at Exhibit 2089, Powerpoint 539.

5           1999.  This is from Mr. Thayer to Mr. Legge.

6   "Jacobson was accompanied by several additional EPA personnel,

7   as well as two state solid and hazardous waste regulators.

8   Steve Hoffman, from Central EPA, apparently visited to discuss

9   the Bevill status of the pond and reiterated the regulatory

10  position that our interpretation was incorrect.  He stated that

11  the EPA would review the issue and again give us their

12  opinion."

13          Now, look at the last line.  "This is a disagreement

14  that has been ongoing for 20 years and additional confrontation

15  appears likely."

16          There was additional confrontation.  Predictable?

17  Sure.  20-year dispute.  Sure.  It's predictable.

18          247.  Then the question is asked of Mr. Legge:  Has

19  there been an ongoing dispute about this position?

20          He says it is.

21          324.  Let's go to the '94, '95 time frame.  Not

22  something that happened as part of the perfect storm.  324.

23  Quoting Exhibit 2608, and below that, the paragraph following

24  says, "Additionally, this exemption applies only to those waste

25  streams as generated, which means at the point at which they

f2o4bcu7                          Summation - Mr. Beus

1    are produced from the processing of the ore or mineral."

2          Do you see that sentence in the 1994, 1995 time

3    period.

4          325.  He says he does.  Okay?  So they knew what the

5    problem was in the '94 and '95 time frame.

6          So when they did the projections, they knew there was

7    an issue.  It was wasn't 1999 or 2000 when the EPA changed its

8    mind.

9          325.  Following that, it went on to say:  As applied

10   to MagCorp, this means that the exempt wastewaters are

11   generated from the scrubbers, and the exemption may be

12   jeopardized if non-exempt wastes are commingled with the

13   wastewaters.

14         You are aware of that being EPA's position?

15         Answer:  Yes.

16         That's the, '94, '95 time frame.

17         321.  It goes on to say, "These are the only two waste

18   streams at MagCorp which are eligible for the mineral

19   processing waste exclusion?  Do you see that sentence?

20         Answer:  That is what is written there.

21         Did you read it when you received their memorandum in

22   1993?

23         Yes, I did.

24         It goes back even further.

25         322.  You understood that the exclusion applied only

f2o4bcu7                        Summation - Mr. Beus

1    to aqueous waste streams, wastewaters; correct?

2              He said yes.

3              And you understood that it only would apply to wastes,

4    quote, directly associated, closed quote, with mineral

5    processing?  Is that your understanding?

6              Answer:  Yes.

7              326.  Let me just ask you the plain English

8    definition.  The anode dust, when it comes out of the

9    electrolytic cell into the anode header, is a dry dust, is that

10   right?

11             Answer:  Yes.

12             Clear admission that Bevill exemption does not apply

13   to anode dust.  When you heard Dr. Veranth take you through the

14   models -- if I had time, I would bring the models back up here

15   -- remember the anode header, the anode dust, chlorinated

16   hydrocarbons.  The M-cell today creates chlorinated

17   hydrocarbons.  That was his testimony.  That anode dust is not

18   exempt.  It has never been exempt.  It's not water.  It's not

19   liquid.  It's dust.  Dr. Veranth explained to you how that

20   happened.  I know it went fast.  They take it out of the

21   header, and for awhile, they just washed it down and ran it in

22   the ditches.  And when you go out there and you know birds are

23   dying and everything else is happening, you know why.  Because

24   they have contaminated that entire area.

25             Let me show you one chart.

f2o4bcu7                        Summation - Mr. Beus

1          THE COURT:  While you're putting it up, I am going to

2     give the jury a five-minute break.  Just five minutes.  We will

3     come back, and we will be able to finish the closings for the

4     day.

5          Thank you.

6          (Continued on next page)

f2o4bcu7                    Summation - Mr. Beus

1           (In open court; jury not present)

2           THE COURT:  Anything else?

3           MR. HAVELES:  Your Honor, notwithstanding your

4      sustaining the objections, I'm concerned that three times

5      Mr. Beus attempted to provide an explanation for Mr. Frank that

6      he never gave during trial.  The direction was just sustained,

7      disregard it.  It wasn't clear to the jury, I think, enough

8      that Mr. Beus's attempt to substitute testimony that Mr. Frank

9      gave should be disregarded.  I would ask that you provide

10     further clarification with respect to the sustaining of those

11     three objections.

12          MR. BEUS:  I have no idea what I said that Mr. Frank

13     didn't testify about either on direct or cross.  I have read it

14     recently.

15          THE COURT:  Well, in any event, I sustained the

16     objection.  It was made contemporaneously, as it should have

17     been.  I expressly told them to disregard, and I make every

18     assumption that they'll follow my directions.

19              If it happens again, I can go further.  As I sit here,

20     it is not necessary.

21          MR. HAVELES:  Thank you, your Honor.

22          THE COURT:  Anything else?

23          MR. HAVELES:  No, your Honor.

24          THE COURT:  We will start in now four minutes.  This

25     is just a short break, as we're going to finish today.

f2o4bcu7                    Summation - Mr. Beus

1          (Recess)

2              THE COURT:  Anything?

3    (In open court; jury present)

4              THE COURT:  Mr. Beus, you may proceed.

5              MR. BEUS:  You'll see -- and I don't want to stand in

6    your way, so I will just speak from here for just a minute -- a

7    chart.  This is a visual.  The underlying document is in

8    evidence, and all the numbers except for the arithmetic we've

9    done on how many times over what is called the PRG, that is the

10   recommended guideline number for the EPA as to how many

11   dioxins, hexachlorobenzene.  All of this is in evidence, and

12   you'll be able to find that when you get to the exhibits.

13             Let me just give you an illustration of a few.

14             Can everybody see?

15             MR. HAVELES:  May I, your Honor?

16             THE COURT:  Yes.

17             MR. HAVELES:  Thank you.

18             MR. BEUS:  You see here in the wastewater ditches,

19   these ditches down here -- I'm not trying to indicate that they

20   are in any specific location, just in the ditches where they

21   have tested.  You'll see the EPA preliminary remediation goals.

22   That's how many parts per billion.  This is the maximum levels

23   they found.  So they are 5,666 times as great as what the limit

24   should be.  PCBs, 101 times the limit.  HCBs, which is

25   hexachlorobenzene, 1,909 times.  Arsenic, 37 times.  When you

f2o4bcu7                    Summation – Mr. Beus

1    go around, you see multiples everywhere; active waste pond,

2    gypsum pile, sanitary lagoon, old waste pond.

3        Now, what Mr. Haveles told you in the very beginning

4    of this trial is that this is in desolate areas.  This is not

5    all that desolate.  Hill Brothers Chemicals is right next door

6    with over 200 employees.  You heard testimony there were cattle

7    out there.  You heard testimony where there were people who

8    went out there to hunt.

9        Now, you heard the suggestion from defendants'

10   experts, put up a sign.  That's how they were going to do it.

11   Take a rock salt cover.

12       What happens when it rains?  What happens if the Great

13   Salt Lake has another flood?  What happens to that salt cap?

14   It is supposed to be there for millenniums.

15       Back to the Bevill exemption.  Just one thing I

16   missed.  983, if you would, please.  So I'm really clear,

17   because I made this point, I will split it up a little.  The

18   first reason there was never a Bevill exemption, the Bevill

19   exemption never applied to solid waste, anode dust.  The second

20   thing, the Bevill exemption never applied to other processes.

21   Let me see if I can show you that.

22       The chemical manufacturing where they're creating

23   chlorine, there is no exemption for that.

24       984.  Mr. Van Housman.  You probably don't remember

25   this because it was read.

2853

f2o4bcu7                         Summation - Mr. Beus

1              Can you tell me what they are?

2              This is not covered under Bevill exemption.  This is a

3    person from the --

4              MR. HAVELES:  Objection.

5              THE COURT:  Sustained.  Counsel will restrain comments

6    to matters in evidence.

7              The jury will disregard the last comment.

8              MR. BEUS:  May I have a side bar?

9              THE COURT:  You may.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

f2o4bcu7                          Summation – Mr. Beus

1              (At the sidebar)

2              MR. SCOT STIRLING:  Your Honor, this is in evidence.

3     The evidence of Van Housman was that two waste steams, they had

4     the cathode scrubbers and the Ducon scrubbers off the

5     melt/reactor cells, those were exempt because they were mineral

6     processing.  This is an exemption for mineral processing by the

7     anhydrous processes.  He was asked about other scrubbers.  He

8     said:  Is that from mineral processing? He said no.  There are

9     other scrubbers used there in chemical manufacturing

10    operations.  That is not mineral processing.  That is the

11    distinction.  It is in the record.

12             He testified the chlorine reduction burner is not

13    leased out.  It is part of the chlorine manufacturing process.

14    He testified the water wash column is not exempt.  High-energy

15    scrubber is not exempt.  Those are part of the chlorine,

16    chemical, and hydrochloric acid manufacturing processes.  That

17    is his testimony.

18             MR. HAVELES:  That is not what Mr. Beus said.

19    Mr. Beus put up there a statement, a quotation from

20    Mr. Housman.  He made a naked assertion as an attorney, this is

21    not covered by Bevill.  Mr. Beus wants to talk about what

22    Mr. Housman testified.  He should say what Mr. Housman

23    testified, not give his own conclusion about whether it is

24    exempt from Bevill or not.  That is the reason I objected.

25             MR. SCOT STIRLING:  We don't have to --

f2o4bcu7                     Summation – Mr. Beus

1            THE COURT:  Just a second.

2            MR. BEUS:  Chlorine production.  It is about chlorine

3     production.  It is not covered.  That's his testimony, and that

4     is in the record.

5            THE COURT:  Chlorine production --

6            MR. BEUS:  It goes into the scrubbers.  When the

7     chlorine is produced --

8            THE COURT:  Which scrubbers does it go into?

9            MR. BEUS:  Chlorine scrubbers.

10           MR. SCOT STIRLING:  The scrubbers that are downstream

11    of the Ducon scrubber coming off the melt/reactor system,

12    beginning with the chlorine reduction burner, are part of the

13    chemical manufacturing operations that Mr. Van Housman was

14    testifying about.  He said the two exempt wastes are the Ducon

15    scrubber coming off the melt/reactors and the cathode scrubber.

16    That's it.

17           MR. HAVELES:  Then they should say it is Mr. Housman's

18    testimony.

19           THE COURT:  Okay.  I'm going to tell them I'm changing

20    my ruling on that.  I'm overrule the objection.  You can

21    proceed.

22               (Continued on next page)

23

24

25

f2o4bcu7                    Summation - Mr. Beus

1              (In open court; jury present)

2              THE COURT:  Members of the jury, I am changing my

3    ruling on that one.  I'm overruling the objection.  Mr. Beus

4    did refer to testimony in evidence.

5              Mr. Beus, you may proceed.

6              MR. BEUS:  Thank you, your Honor.

7              Would you put up 984 again.  Let me see if I can

8    summarize it.  There are two types of wastes that have never

9    been Bevill-exempt:  Solid waste anode dust.  That is where a

10   lot of -- as you remember, Dr. Veranth, where he said, when the

11   temperature goes up and it comes down, it goes through this

12   temperature between 450 degrees or 700 degrees, that is where

13   chlorinated hydrocarbons are created.  Then, they go into the

14   anode header.  They come out as dust.  If it is solid as

15   opposed to a liquid, it has never been exempt.  And Mr. Tripp

16   admitted that, and you saw his testimony.

17             The second non-exempt waste is waste if you make it

18   from chlorine or something other than mineral production.  What

19   I'm showing you here is when they manufacture chlorine that

20   they sell that has no exemption, and this is Mr. Van Housman's

21   testimony on that subject.  He is talking about what is not

22   exempt, and he says, "There is a chlorine production facility

23   that employs a scrubber or a material that acts a scrubber

24   called a wash column.  There is a device called a high-energy

25   scrubber."

f2o4bcu7                    Summation - Mr. Beus

1           You may remember Dr. Veranth kind of took you through

2     this -- it is a lot of material -- that acts upon gases that

3     come from the chlorine reduction burner of proofer that acts as

4     a scrubber.  A scrubber is a cleaning device.  It is a way to

5     clean things up.

6           I don't want any misunderstanding.  Anode dust,

7     manufacture of chlorine are nonmineral manufacturing, has never

8     been Bevill-exempt, ever.  And Mr. Tripp, Mr. Legge, and others

9     have admitted that.

10          MR. HAVELES:  Objection.

11          MR. BEUS:  Put up 326.

12          THE COURT:  Just a second.

13          Sustained.

14          MR. BEUS:  Put up 326.

15          THE COURT:  The jury will disregard the last statement

16    of Mr. Beus.

17          Go ahead.

18          MR. BEUS:  Let me move on to some of the duties they

19    had.  Put up 1082.  This is Mr. Veranth.  He says there is a

20    document called the Toxic Release Inventory that every major

21    chemical producer has to file -- it's a public document -- that

22    tabulates the releases of materials to the environment.  I

23    examined the reports.  They are available on the EPA website.

24    Anyone can download them.  And the first time I found things

25    like hexachlorobenzene reported was in the year 2000, 2000 year

f2o4bcu7                    Summation – Mr. Beus

1    report, I believe.

2              They had a duty to characterize.

3              Put up 320.  Mr. Tripp.  The first item there says

4    that a person who generates a solid waste must determine if

5    that waste is a hazardous waste.  This is reading from the

6    statute.

7              Answer:  That is what it says.

8              Question:  Is that your understanding, that one of

9    your obligations of MagCorp during this time frame was to

10   determine whether the solid wastes that you were generating at

11   the facility were hazardous?

12             Correct.

13             Now, 584.  This is in evidence.  R315-3-1(A), the rule

14   states:  No person shall own, construct, modify, or operate any

15   facility for the purpose of treating, storing, or disposing of

16   hazardous waste without first submitting and receiving the

17   approval of the executive secretary for a hazardous waste

18   operation plan for that facility.

19             315.  MagCorp did not have a permit to dispose of

20   hazardous waste at the Rowley facility; did it?

21             Answer:  We had no permit to dispose of hazardous

22   waste.

23             Let me make this real simple.  You heard Mr. Park talk

24   about a probability analysis.  MagCorp has been operating

25   there, according to Dr. Veranth, from '89 to 2000 without a

f2o4bcu7                          Summation - Mr. Beus

1    permit, without discharging their duty to characterize that

2    waste and tell the regulatory agencies what that waste really

3    was.

4            Now, you do a probability analysis.  If you have a

5    duty to report and you don't report, how happy, how willing do

6    you think the EPA may be to just close their eyes to it?  You

7    analyze that for yourself.  We know that 100 percent of this

8    site is contaminated.  We know that contamination has been

9    going on for a very long period of time.

10           And you have seen it in this trial, you have heard the

11   words, vindictive EPA.

12           Mr. Rennert testified, when he decided to settle for

13   $2,500, you know his phrase, it is just like paying a parking

14   ticket.

15           They never did what their duty required them to do.

16   They needed to go out and test and characterize.  They knew it

17   was there.  They waited to get caught.  They didn't

18   investigate.  They didn't study.  They didn't report.

19           Probability of having a problem with that is very

20   close to a hundred percent.  And they've got a problem.  And

21   they have been litigating for over a decade.  Mr. Rennert has

22   the notion, just put it off down the road.  Put it off, put it

23   off, put it off, in capitalization.

24           MR. HAVELES:  Objection.

25           THE COURT:  Overruled.

f2o4bcu7                    Summation – Mr. Beus

1          MR. BEUS:  Put it off.  Litigate.  Do whatever you

2     have to do.  Leave it for somebody else.

3          He took that $118 million out.  Left the creditors,

4     left the EPA, left the taxpayers to clean up this contaminated

5     mess.

6          MR. HAVELES:  Objection.

7          THE COURT:  Sustained.

8          The jury will disregard the last comment.

9          MR. BEUS:  986.  Dr. Veranth, do you have an opinion

10    as to whether there were any material changes in the waste

11    processes system, waste generated through the processes at the

12    Rowley facility from the time that you were employed in the

13    1970s and 1980s through the 1990s?

14         Answer:  In my report, I tabulated some specific

15    process changes that slightly increased or decreased flows, but

16    my overall conclusion was that the wastewater flow and the

17    production of chemical and chlorinated hydrocarbons has been

18    approximately constant, except for changes at the plant

19    production level.

20         372.  Their expert, Mr. Powell.  This is their expert.

21    And in preparing your report in this case, one of the things

22    that you concluded was that you could use this information in

23    this report prepared in 2003 for your report in this case

24    because the contaminants described here existed in prior

25    periods, in the 1990s and prior to that, correct?

f2o4bcu7                    Summation - Mr. Beus

1          Yes.  It was and remains my belief that the types of

2    contaminants they found in 2003 likely existed in the same

3    areas of the property back in 1998.

4          If you go to Exhibit 2792 when you deliberate and you

5    go to pages 16 through 19, you'll have it all laid out for you.

6    You'll also find that in Exhibits 2607 and 2681.

7          Let me go on with Mr. Powell.  373.  And 1994 and

8    before that -- he got it back to '98.

9          Answer:  I am not sure how far back you can go before

10   that, might be a problem, but certainly in that '95, '98 time

11   frame it would have been true.

12         That's their expert.

13         975.  And the nature of the waste and the contaminants

14   in those wastes that were being generated also had not changed

15   from the 1990s to the 2000s, right?

16         That's right.

17         That contamination that you see on this board, and

18   when you see the documents, it's been there since the 1990s.

19         338.  This is our expert, which I have mostly stayed

20   away from our experts because their experts basically concede

21   everything we need in this case.  When Mr. Park said, have

22   Mr. Beus show you the evidence, you've seen a lot of evidence.

23   You've seen documents, you've seen their folks make one

24   admission after another.

25         338.  Lastly, in connection with advising a party to a

f2o4bcu7                    Summation - Mr. Beus

1    potential purchase of MagCorp's business in 1996, were there

2    any other potential environmental liabilities that you

3    considered?

4           Somebody has got to pay for this whole cleanup mess,

5    but there is a tack on in addition to that.

6           The other category that I considered and would have

7    advised the client on was the category of penalties or fines

8    for noncompliance with RCRA.

9           548, please.  Here's an inspection report.  It's in

10   evidence.  January 12-13, 2001.

11          547.  Here is what it says.  You know this has been

12   there a long time.  You just heard their expert.  "The sample

13   shows that the waste generated from anode box number 4 is a

14   RCRA hazardous waste because it failed the toxic characteristic

15   leachate test.

16          The anode dust also contains -- by the way, when you

17   look at these documents, you'll see the attachments.

18          The anode dust also contains solid waste such as

19   hexachlorobenzene at levels which may pose a substantial risk

20   to human health and the environment.

21          Remember the document that you saw that dioxins and

22   furans are the most dangerous chemicals ever studied?  That is

23   an internal MagCorp document in 1996.

24          Additionally, the analysis showed that the facility is

25   generating and disposing of PCBs in excess of the regulatory

f2o4bcu7                              Summation - Mr. Beus

1    limit of 50 parts per million and is fully regulated under the

2    Toxic Substance Control Act.  The sample analysis from the

3    central ditch and main ditch show that the facility has engaged

4    in illegal disposal of a RCRA hazardous waste, a TSCA PCB

5    waste, another solid waste for an extended period of time

6    creating a substantial risk to human health and the environment

7    at the facility.

8            Lastly, the analysis shows a different fingerprint or

9    a different species of dioxin at various locations at the

10   facility, strongly indicating that the anode header is not the

11   only source of dioxin at the facility.

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. BEUS:  360, Mr. Van Housman.  Can you summarize

2    for me what wastes from Rowley contained chlorinated

3    hydrocarbons?  I believe every waste, with the possible

4    exception of the ferric ferrous chloride waste that is the

5    subject of our complaint, contains chlorinated hydrocarbons.

6          973.  It's a Superfund site today.  Mr. Rennert

7    testified that he thought they had appealed it and it hadn't

8    been final.  You all know, because you've heard the testimony,

9    it is final.  They lost that appeal.

10          811.  This is a RCRA compliance report, February of

11    '03.

12          810.  On January 16, 2001, the United States

13    Department of Justice filed suit against the Magnesium

14    Corporation of America.

15          MR. HAVELES:  Objection.  I withdraw the objection.

16    I'm sorry, your Honor.  I looked at the wrong exhibit.

17          THE COURT:  Go ahead.

18          MR. BEUS:  Would you put up 810 again.

19          On January 16, 2001, the United States Department of

20    Justice.  DOJ, filed suit against the Magnesium Corporation of

21    America, MagCorp, charging that the company illegally handled

22    hazardous waste at its production facility in Rowley, Utah.

23    The suit alleges that MagCorp, now known as U.S. Magnesium,

24    USM, is illegally storing, treating, and disposing at least six

25    hazardous wastes on site in several unlined ditches, a 400-acre

1    surface impoundment, and a landfill.

2              The six complaint wastes are:  1, anode dust from the

3    electrolytic process; 2, waste water from the chlorine plant

4    water wash column; 3, waste water from the chlorine reduction

5    burner; 4, seal leg waste waters associated with the chlorine

6    reduction burner; 5, waste water from the high-energy scrubber;

7    and, 6, solids from the production of the iron chloride

8    solutions.  The complaint wastes exhibit the hazardous waste

9    characteristics of toxicity and/or corrosivity.

10             809.  Solid anode dust from both the north and south

11   grizzly boxes exhibit the hazardous waste characteristic of

12   toxicity due to chromium.

13             Anode dust from the north grizzly box contains total

14   PCB greater than 50 million grams per kilogram, parts per

15   million, the threshold concentration for regulation under the

16   Toxic Substances Control Act.  It goes on and then says:  The

17   anode dust was not sent to a permitted PCB facility.

18             808.  The solids that settled in the electrolytic

19   Ducon scrubber sump contain PCBs greater than 50 milligrams per

20   kilogram.  Then it lists the five streams.  You can see that.

21             Probability, expense, they have done this for decades.

22             This is really bad stuff.  Put up 845 for me, would

23   you, please.

24             Effects of dioxins.  Toxicity:  According to 3, and

25   that's a footnote for the source of authority, dioxin is the

1    most toxic family of chemicals ever studied.  Dioxin has been

2    shown in laboratory tests to be carcinogenic to mammals.

3           365.  This is John Works at the EPA.  Are you familiar

4    with any concerns EPA may have regarding impacts to wildlife?

5    Yes.  What are the concerns?  The EPA is concerned that

6    waterfowl or birds are being impacted by the contaminants.

7           366.  When you say impacted, what do you mean?  That

8    they are dying as a result of landing in the ponds or being

9    contaminated with the constituents that are found in and around

10   the facility.

11          367.  And which contaminants?  Hexachlorobenzene,

12   dioxin furans, PCBs.  Chlorinated hydrocarbons, yes.  Anything

13   in addition?  Acids in the ponds, low pH in the ponds.

14          369.  This is John Works, EPA.  Do you have any other

15   evidence that they have been contaminated or impacted?  None

16   other than the observations of the one bird that we saw and a

17   statement by Mr. Tripp.  What was that statement?  Something to

18   the effect that the birds, when they land on the pond, that

19   there is no need to try to retrieve them because they are gone

20   within about 15 minutes anyway.

21          You'll recall the testimony that they were proactive.

22   Remember that?  Proactive?  They haven't characterized, they

23   haven't permitted, they haven't cleaned up.  The cost is

24   material.  I won't take you through all the numbers from

25   Mr. Allen.  You've got those on a slide.

1              Let me just show you one more thing that ought to go

2      into the mix of how you deal with as a likelihood -- is there a

3      likelihood there is going to be a problem?

4              Put up 546, will you.  This is Exhibit 2146.

5              This is a compliance evaluation and inspection report,

6      January of '01.  The agency determined that the sampling

7      inspection was to be conducted as an unannounced inspection and

8      that because of the past sampling history with MagCorp, an

9      administrative warrant should be obtained to guarantee quick

10     and unobstructed access.  I secured the assistance of two U.S.

11     Marshals from Salt Lake City to accompany the sampling team and

12     assist in the service of the warrant.

13             371, Mr. Works on the penalties.  Do you recall what

14     the range of civil penalty that is currently being considered?

15     Yes.  And that range is between, on the low end, 18 to 28

16     million, and a statutory maximum -- max of upwards around 750

17     to 900 million.

18             968.  Mr. Legge's affidavit, when they couldn't get

19     financing in the bankruptcy court, when they couldn't get a

20     buyer in the bankruptcy court:  Quote, we always knew the

21     environmental issues would create an obstacle to completing a

22     sale or plan of reorganization.

23             Who helped Mr. Rennert in all of this?  He had a group

24     of people that he paid highly.  Those are the people who we are

25     suing for aiding and abetting, giving assistance to, and

 1    knowing about a violation of fiduciary duties and aiding and

 2    abetting an improper fraudulent conveyance.

 3            When you get in deliberations, Exhibit 2090 -- can you

 4    put that up for me -- and Exhibit 2792 are two documents that I

 5    would hope you would look at.  That will tell you, these two

 6    documents will tell you how you find the numbers that we want

 7    you to put in that jury verdict form.  There again, 2090 and

 8    Exhibit 2792, beginning at pages 19 through 22.

 9            I have tried very hard to not give you some kind of an

10    emotional presentation.  I have shown you almost 200 slides of

11    evidence.  Mr. Park asked you to look at the evidence.  That's

12    exactly what I ask you to do.  Tell Mr. Rennert to put the $118

13    million back.  And in light of his always wanting to kick it

14    down the road, and in light of how difficult they have been

15    with the United States Government, how callous they have

16    been --

17            MR. HAVELES:  Objection.

18            THE COURT:  Sustained.  The jury will disregard Mr.

19    Beus' last comment.

20            MR. BEUS:  When you think about the background and the

21    history from U.S. Marshals to lack of characterization, from

22    illegal conduct, there will be a verdict form for punitive

23    damages.

24            MR. HAVELES:  Objection with respect to the reference

25    to marshals.

1          THE COURT:  Overruled.

2          MR. BEUS:  When you get to that verdict form for

3     punitive damages, we want you to have a relationship between

4     the $118 million and the amount you put in there.  We want you

5     to put in there $236 million, twice what he took.  I don't know

6     if that will solve the problem and you probably don't either

7     with Mr. Rennert, but that's what we would like you to do.

8          MR. PARK:  Objection.

9          THE COURT:  Sustained.

10         MR. BEUS:  Mr. Buchwald got $220,000 when he took over

11    this estate, appointed by a bankruptcy trustee.  Give him that

12    money back from Mr. Rennert so he can go partially take care of

13    the creditors.

14         Thank you very much for your attention.  I really

15    appreciate it and especially in an afternoon session.  Thank

16    you.

17         THE COURT:  Thank you, Mr. Beus.

18         Members of the jury, that concludes the summation

19    portion of the trial and brings us close to the end.  What's

20    left is for me to provide you the instructions of law and give

21    you that tomorrow morning, along with the verdict form for your

22    deliberations.  It will take me about an hour to instruct you

23    and we will begin that at 9:30 sharp so that you've got time,

24    want to get started at 9:30.  We will have breakfast waiting

25    for you starting at 9.  We will start at 9:30 and then we will

F2OMBUC8

1    turn it over to you for your deliberations.

2            Please bear in mind that all my instructions continue

3    to apply.  Though the evidence is closed, you have heard the

4    summation arguments of counsel.  You'll hear from me and that's

5    important.  And then you'll be able to discuss the case freely

6    amongst yourselves and come to your conclusions.

7            Thank you so much.  See you tomorrow morning.

8            (Jury not present)

9            THE COURT:  Anything to take up?

10           MR. BEUS:  No, your Honor.

11           MR. HAVELES:  Your Honor, in light of the inflammatory

12   comments that Mr. Beus made to the jury regarding punitive

13   damages, I would ask you to reconsider whether you will reserve

14   on whether that instruction should be given to the jury.

15           THE COURT:  I have reserved and I will continue to

16   reserve.

17           Because we are going to print the charge and verdict

18   form tonight, Mr. Beus, I don't know if you want it or not, but

19   we had discussed something related to missing witness.  If you

20   want it, I need to hear it now.

21           MR. BEUS:  I think we will just pass.

22           THE COURT:  So the charge is closed.  We are going to

23   print that, come in, I will read the charge.  After I read the

24   charge I'll pull you to the side to make sure that there were

25   no objections or mistakes in my reading of the charge, and then

2871

F2OMBUC8

1    I'll send them in for their deliberations.  I will have lunch

2    provided for them tomorrow so they can just continue with their

3    deliberations throughout the day.

4            Let's say 9:15.  Thank you.

F2OMBUC8

```
 1              (Adjourned to Wednesday, February 25, 2015, at 9:15

 2    a.m.)

 3                        PLAINTIFF EXHIBITS

 4    Exhibit No.                              Received

 5     2792    . . . . . . . . . . . . . . . . .2692

 6                        DEFENDANT EXHIBITS

 7    Exhibit No.                              Received

 8     8129    . . . . . . . . . . . . . . . . .2692

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```