F2PMBUC1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    LEE E. BUCHWALD, as Chapter 7
     Trustee for Magnesium
4    Corporation of America and
     Related Debtor, Renco Metals,
5    Inc.,

6                 Plaintiff,

7         v.                              13 CV 7948 (AJN)
                                          Trial
8

9    THE RENCO GROUP, INC., a
     Delaware corporation, et al.,

10                Defendants.

11   ------------------------------x
                                          New York, N.Y.
12                                        February 25, 2015
                                          9:25 a.m.
13

14   Before:

15               HON. ALISON J. NATHAN,

                                          District Judge
16

                         APPEARANCES
17

18   BEUS GILBERT, PLLC
          Attorneys for Plaintiff
19   BY:  LEO R. BEUS
          SCOT C. STIRLING
          ROBERT STIRLING
20        MALCOLM LOEB

21   KAYE SCHOLER LLP
          Attorneys for Defendants
22   BY:  H. PETER HAVELES, JR.
          JEFFREY A. FUISZ
23        -and-
     PARK JENSEN BENNETT LLP
24   BY:  TAI H. PARK
          STEVEN C. BENNETT

25

```
 1                  (Trial resumed; jury not present)

 2                  THE COURT:  I don't see present Mr. Beus or Mr. Park.

 3                  MR. HAVELES:  Your Honor, Mr. Park, he e-mailed me.

 4       He got stuck in traffic on the Bruckner and asked that the

 5       Court not wait for him and he apologized.

 6                  MR. S. STIRLING:  Your Honor, Mr. Beus is here.  He

 7       must have just stepped out for the moment.

 8                  THE COURT:  I received a letter this morning from

 9       defendants.  Is this from you, Mr. Haveles?

10                  MR. HAVELES:  Yes, your Honor.

11                  THE COURT:  I know there have been other times when

12       letters were written by Mr. Park but signed by you.  This is

13       from you.

14                  MR. HAVELES:  I wrote this myself, your Honor, at 7:20

15       this morning.

16                  THE COURT:  Maybe it was the early morning, but it

17       seems to me that there are statements in here which I truly, in

18       all of the things I have seen in this case I find -- the most

19       charitable word I can come up with is just wrong.

20                  MR. HAVELES:  All right, your Honor.

21                  THE COURT:  I want you to address it because I'll just

22       read the line.  The Court precluded defendants in this action

23       from putting forward any evidence whatsoever about the RCRA

24       action beyond stating that it is unresolved as of today.  Is

25       that true or false?
```

F2PMBUC1

1          MR. HAVELES:  Your Honor, it's incomplete and I

2     apologize.

3          THE COURT:  It's not incomplete.

4          MR. HAVELES:  Your Honor, I believe that we were

5     precluded from putting in any evidence of what had happened in

6     the course of the action and that's what I meant to say and I

7     apologize --

8          THE COURT:  When you asked a question, I forget who

9     the witness was, about summary judgment in that action, did I

10    preclude you?

11         MR. HAVELES:  You sustained the objection to that,

12    your Honor.

13         THE COURT:  You are wrong.  And I am going to read the

14    transcript from my discussion with Mr. Park on this.  You were

15    here for that.

16         MR. HAVELES:  Yes, your Honor.

17         THE COURT:  We had a lot of back and forth.  There is

18    a lot I underlined from this portion of the transcript in

19    thinking how you could have made this statement in this letter.

20              I'm reading at page 1686 of the transcript.

21         MR. HAVELES:  Do you have a day, your Honor?  Because

22    I have it by day.

23         THE COURT:  February 12.  Starting at line 19,

24    although it started much earlier.  It's in the context of a

25    long back and forth between Mr. Park and me on a request to

F2PMBUC1

1   have Mr. Thayer testify as to what an unfinalized EPA offer of

2   settlement, which was the evidentiary issue on the table.

3          MR. HAVELES:  Yes, your Honor.

4          THE COURT:  And a letter came in in response to that

5   issue from defendants, I think that was the one that I said

6   sounded like Mr. Park.  We had a long discussion about that

7   piece of evidence.  I said there were 408 problems, I said

8   there were hearsay problems.  I said there was a nonfinality

9   issue of settlement that would be confusing.  I also said there

10  is a certain kind of late surprise, quoting myself.  It feels

11  like sandbagging, to be honest, because it had never been

12  anticipated that Mr. Thayer would testify about, and this was

13  the issue on the table, the EPA offer of a nonfinalized

14  settlement, though you have known since, as far as I can tell,

15  the beginning of time of this litigation and stipulated to the

16  fact yourself and have spent an inordinate amount of time

17  bringing it to the jury's attention that there has not yet been

18  or ever been liability assessed.

19          And now I am going to read from page 1686, beginning

20  at line 19.  I have not precluded you from trying to make as

21  much as you can out of the fact that all of this time later

22  hasn't been liability.  I think the only time I have addressed

23  anything specific to these issues, there were deposition

24  designations from -- I said EPA lawyers, but I don't think

25  that's right, that went into the district court's original

F2PMBUC1

1    decision dismissing and then the affirmance and all of the

2    complications of that.  I did sustain that objection and I'll

3    note here -- this is not quoting from the transcript -- that

4    was in limine pretrial and, as I said all along, and as was

5    done in many instances, issues could be reraised as things

6    played out differently at trial.

7             Continuing with the transcript, 1687, line 1:  And

8    then I think the second one that I'm dealing with is this one,

9    which has come up in the middle of trial and has a host of

10   evidentiary problems that I don't see a response to.  You are

11   not precluded.  When I read your letter I thought, good point,

12   but what is missing is what you said, which is, it's got to tie

13   back, just like they are eliciting the fact of the RCRA

14   litigation.  There is just no doubt that there are inferences

15   available to tie it back to contingent liabilities that existed

16   several years earlier.  I think there is a possible line for at

17   least the defendants' views as to the vindication of their

18   understanding of the contingent liabilities in the relevant

19   time period by events that have occurred afterwards, and I have

20   not prevented you from making those points except in the ways

21   that you have attempted in the two instances that we have

22   talked about.

23             There are other places in the course of that long

24   discussion with Mr. Park in which I just was as clear as clear

25   can be that it was not a total bar, that I was open to the

F2PMBUC1

1    possibility of evidentiary admissible evidence being

2    permissible.  And so then I read this letter this morning and I

3    am going to read it again and ask if it's true.  Maybe I'm

4    missing something.  The Court precluded defendants in this

5    action from putting forward any evidence whatsoever about the

6    RCRA action beyond stating that it is unresolved as of today.

7              Is that just incomplete or is that not true?  Connect

8    the dots for me.

9              MR. HAVELES:  Yes, your Honor.  I believe during the

10   course of that colloquy and additional colloquy, I can't

11   remember which right now -- and I confess, fatigue has blurred

12   things together here -- we also had a discussion during the

13   course of Mr. Thayer's testimony where I wanted to proffer the

14   fact of summary judgment and the summary judgment decision that

15   had been issued by the district court, and that objection was

16   sustained.

17             THE COURT:  It was.  And to be clear, a new different

18   argument was made, but you wanted the factual findings of the

19   district court to come in.  And the problem with that is that

20   that is no longer an existing district court decision.  It has

21   been vacated by the Tenth Circuit.  And then you made an

22   argument in the 56.1 papers they didn't contest some of these

23   things.  All of that might have been possible to deal with, but

24   you couldn't, just in the course of the trial, offer the

25   district court opinion because of all of the confusion that it

F2PMBUC1

1    engendered.

2              Nevertheless, you ask multiple witnesses --

3              MR. HAVELES:  There is no question, your Honor, I

4    asked, was there a judgment or determination there.  Your

5    Honor, I understood, because I try to deal with evidence

6    through competent witnesses, that when your Honor granted the

7    motion in limine to preclude us from calling Mr. Ford or

8    Mr. Wikstrom, which we proffered to talk about, the procedural

9    posture and the defenses that were put forward on behalf of the

10   parties in the case to show exactly what you talked about just

11   a moment ago, when you and I were just talking separate and

12   apart from reading the transcript about whether we had -- what

13   the good -- what our basis for defending and so forth was.

14   That evidence was precluded.

15             THE COURT:  But it was precluded in limine and it was

16   precluded precisely because of the complications of the effort

17   to rely on a vacated district court decision.  That is wholly

18   separate and apart from a proffer.  And I don't know what it

19   is, but it wasn't put in front of me.  How do we tell the jury

20   what is relevant, and this is what you said in the letter, but

21   it was not part of the evidentiary proffer, that is to say, the

22   later letter that I was responding to regarding Mr. Thayer's

23   testimony.

24             MR. HAVELES:  Yes, your Honor.

25             THE COURT:  How to tie those matters in with the

1     vindication, in a sense, of the defendants' position regarding

2     the waste water streams and the Bevill amendment and all of

3     that.  I could not have been clearer on February 12 that I saw

4     relevance, I saw the possibility of doing it in a

5     nonprejudicial way.  But what was in front of me then wasn't

6     it.

7          MR. HAVELES:  Your Honor, our proffer with respect to

8     Messrs. Wikstrom and Ford went beyond merely the summary

9     judgment, but it was to talk about all the defenses that had

10    been asserted, including the current posture of the defenses,

11    meaning, what was left after the remand from the Tenth Circuit

12    about the attempt to apply the interpretation retroactively,

13    which was arbitrary and capricious.  There is the full panoply

14    that we outlined in our motion in limine at that time.

15          I say this, your Honor, not to show disrespect for

16    you, but out of also the respect that I have for the rules of

17    evidence, Mr. Thayer, with Mr. Wikstrom and Mr. Ford precluded

18    as witnesses, to get into those kinds of issues and defenses,

19    Mr. Thayer or Mr. Tripp would not have been competent witnesses

20    if I was going to have testimony of that on a personal

21    knowledge basis.

22          And so the effect of precluding the Ford and Wikstrom

23    testimony was to mean that except to the extent that I could

24    say that these individuals were personally involved -- and they

25    weren't handling the litigation.  They testified about their

F2PMBUC1

1      personal views and we elicited that, but not about what's been

2      going on with the litigation.  Via a competent witness who we

3      were allowed to call, I don't believe, and maybe it's because

4      I'll accept your Honor's suggestion that my views of competence

5      might be too narrow and short-sided in that regard, but I don't

6      believe we had a competent witness through whom I could elicit

7      such testimony beyond the fact that the action is stuck.

8           THE COURT:  And, again, I am going to start all of

9      this, which is how it came to me.  This issue, which is a very

10     complex, fact-specific issue came to me not with defendant

11     saying, Judge, there is just no way you can let them talk about

12     the filing of the RCRA litigation because if they do, then it

13     just opens up all of this stuff that we can't do.  What came to

14     me was stipulation of fact in the joint pretrial order.  So any

15     notion that it was about how the plaintiff has made too much of

16     it is baloney; charitably, baloney.

17          MR. HAVELES:  Your Honor, I'm not questioning that

18     point.

19          THE COURT:  It came to me with an agreement,

20     essentially, between the parties as to those facts and then,

21     yes, the in limine came and I said repeatedly in the in limine,

22     these are preliminary.  Things change at trial.  You can

23     reraise.  And you did on some.  And that in limine

24     specifically, the reasoning, the rationale was in the context

25     of, and I think this is clear from my reading of my ruling,

F2PMBUC1

1    what I understood wanted to be done, which was to go through

2    the district court's findings, which had been vacated, Tenth

3    Circuit's decision, all of that, which then opens up Chevron

4    deference, any host of things.

5            MR. HAVELES:  I understand.

6            THE COURT:  So I understood, essentially, with that

7    specific piece of it not permitted because of the obvious

8    complications and prejudice and side shows and confusion, I

9    understood, essentially, the position of the parties to be, all

10   right, we understand.  There is this balance.  They can say the

11   litigation was filed and we can say, as we did, and the we is

12   the defendants, I want to say maybe a hundred times in this

13   trial --

14           MR. HAVELES:  I know.  Probably more.

15           THE COURT:  -- fifteen years have gone by and there is

16   no liability, and they never objected to that.

17           MR. HAVELES:  Your Honor, the issue raised in this

18   letter is not anything more than the comment that Mr. Rennert

19   was kicking the can down the road and just trying to

20   procrastinate and avoid getting a resolution.

21           THE COURT:  We will get to that.  I got stopped by

22   what I thought was --

23           MR. HAVELES:  I apologize if I misphrased it in a way,

24   your Honor, because that was not my intent.  I hoped during the

25   course of the four weeks we have been spending a lot of time

F2PMBUC1

1   together, plus the earlier time, that your Honor understands

2   that I try to show some fidelity to the record.  If I wrote it

3   in a way that did not, I apologize.  That was not my intention.

4         THE COURT:  Just to be clear, no one left here as a

5   boy scout, in my view.  I'm sorry.  I know everybody has been

6   at this for a long time.  I know you're exhausted as a result

7   of this trial.  I know that everybody is zealously representing

8   their clients.  But there have been problems on both sides, and

9   this is one of them.  You said it was a misstatement.  You

10  wanted me to instruct the jury.  The application here is:

11  Request your Honor instruct the jury that Mr. Beus' comments

12  were inappropriate, which is a separate issue, that the Court

13  had determined that no evidence regarding the litigation of the

14  RCRA action would be admitted into evidence and that there is

15  no evidence regarding Mr. Rennert delaying the RCRA action and

16  thus kicking down the road.

17        I can't do that because it's not true.

18        MR. HAVELES:  I understand.  Your Honor, I understand

19  what your Honor is telling me.

20        THE COURT:  Anything else?

21        MR. HAVELES:  No, your Honor.

22        Just to be clear, when you say you can't do it, your

23  Honor, is it for the entirety of the request or the particular

24  clause that your Honor just --

25        THE COURT:  That's the application in front of me I

F2PMBUC1

1    can't do.

2              MR. HAVELES:  Even with the middle clause deleted

3    then.  Because the principal part of this is the inference that

4    somehow Mr. Rennert is responsible for a delay in the

5    resolution of the environmental litigation.

6              THE COURT:  No.  I'm denying that request.  I

7    sustained the objection.  Was there an instance where I didn't

8    sustain that objection?  There may have been one.  I don't

9    know.

10             MR. HAVELES:  There are other instances where you

11   didn't, but, your Honor, I'm only focusing on this issue

12   because it was in the context of punitives and tying it to

13   sending a message to Mr. Rennert about the environmental

14   litigation.  Because the other comments were about kicking the

15   can in this lawsuit, not about the environmental litigation.

16             THE COURT:  Can you point me to the specific language

17   in the transcript from yesterday.

18             MR. HAVELES:  Yes, your Honor.  The language that's

19   the subject of my letter is at the very end of the closing, on

20   page 2868.  It's lines 9 through 16 that I object.

21             THE COURT:  At line 18 I sustained.  The jury will

22   disregard Mr. Beus' last comment.

23             MR. HAVELES:  Yes, your Honor.

24             The nature of the way you sustained it, it was a

25   paragraph to which I was objecting, whether it is also

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

F2PMBUC1

1    ambiguity as to whether it is the last of the series to which I

2    objected in that paragraph.

3             THE COURT:  If anything, the ambiguity cuts in your

4    favor because it sounds like I'm striking the whole paragraph.

5             MR. HAVELES:  The next objection you did not sustain,

6    but it was a different point, your Honor.  And because he was

7    talking about, when mentioned on page 2808, it was in

8    connection with this lawsuit, your Honor, I did not object at

9    that time.

10            THE COURT:  I don't think there is anything additional

11   that needs to be done on that point.

12            Anything else?

13            MR. PARK:  Judge, if I could be heard very briefly.

14            THE COURT:  Sure.

15            MR. PARK:  2868 is the most prominent part of that

16   sentence where Mr. Beus says:  In light of how difficult they

17   have been with the United States Government, how callous they

18   have been, at that point Mr. Haveles objected and your Honor

19   sustained and said the jury will disregard the last comment.

20            I believe it will be entirely unclear to the jury that

21   that's a reference to Mr. Rennert kicking the litigation down

22   the road.  Your Honor is absolutely correct, given the way that

23   the stipulations have played out and what both parties have

24   made of the RCRA litigation, the primary defense on that issue

25   was to highlight for the jury that that litigation has not

F2PMBUC1

1    resolved any liability after all of this time.

2         THE COURT:  Clearly a strategic choice you made, and I

3    understand it.

4         MR. PARK:  Mr. Beus spent probably the last 15 minutes

5    of his summation essentially reading from the RCRA litigation,

6    reading from the complaint, reading from EPA submissions of

7    their position.  For him to then essentially in three or four

8    words dismantle the one defense we have to all of that, which

9    is to say, it's not just about the EPA making these

10   allegations, if it were that simple, this case would have

11   resolved it in liability.  For him to essentially dismantle all

12   of that by suggesting that Mr. Rennert caused a delay, when

13   they know well and truly that is not true, there is absolutely

14   zero evidence in the record that Mr. Rennert had anything to do

15   with any delays, there have not been any delays, that case is

16   enormously complex, it resulted in a judgment against the EPA,

17   which was vacated, but with findings of fact that as a matter

18   of law the findings of fact are not somehow no longer valid.

19        So I believe, your Honor, it is critical, critical to

20   our defense that the jury be made to understand, Mr. Beus made

21   comments about Mr. Rennert kicking that litigation, the RCRA

22   litigation, down the road.  Ladies and gentlemen, there is no

23   evidence of it, you are to disregard that comment.  That's all

24   we are asking for, Judge.  I think it's critical to our

25   position.  Otherwise, the jury is going to go back in and, in

F2PMBUC1

1    my experience, they will latch on to that kind of comment and

2    say, that case hasn't gone anywhere because Ira Rennert is very

3    good at just dragging these things out.  And there is no basis

4    for that kind of a comment.  There is no basis in the record

5    and it's highly prejudicial to the one defense we have had

6    submitted in this case, to the volumes of information that he

7    have been inundated with about the RCRA and EPA obligations.

8    That's all we are asking for, Judge.  I think it's fair.  There

9    is no basis in the record for that comment.

10            THE COURT:  I'll hear you, Mr. Beus, or Mr. Stirling.

11            MR. S. STIRLING:  Your Honor, this gives new meaning

12    to the word inconceivable.  That they could stand up and say

13    that there is no evidence in the record of the defendants

14    kicking the can down the road with respect to these

15    environmental liabilities is absolutely preposterous.  And the

16    specific statement made by Mr. Beus in the closing argument at

17    page 2868 was not about the RCRA litigation specifically alone

18    or at all.  It was about their behavior since 1989, when Renco

19    Group acquired this business.

20            With respect to the RCRA liability, the evidence of

21    their kicking the can down the road begins -- first, let me

22    say, their testimony from Mr. Rennert in this courtroom in

23    front of this jury that one of the things he really admired

24    about the management at MagCorp was that they were proactive in

25    their approach to managing environmental issues, that they got

F2PMBUC1

1    out in front of their environmental responsibilities and took

2    care of them.  That was a claim that they made in front of this

3    jury.  And they said repeatedly -- they didn't just say there

4    has been no determination of liability.  They said, as you

5    noted, there is no liability.  There is no liability.

6              THE COURT:  Over and over again.

7              MR. S. STIRLING:  We let that go because we think they

8    are entitled to make their interpretation of the evidence in

9    argument to the jury and that was their claim.  We put in a lot

10   of evidence that apparently caused them some distress that

11   there is liability, that they were illegally disposing of

12   hazardous waste at this site for years, that they were hiding

13   it from EPA, that they did nothing to report it or to address

14   it until they got caught in this litigation filed in January

15   2001.

16             Let me recite that for you.  First, let me go to the

17   Bevill amendment issue.  The final rule was adopted in June

18   1991.  Exhibit 8050 is the Anderson memo dated 1992.  It is an

19   agreed fact, No. 75 in the joint pretrial report, that was

20   received by MagCorp in 1993.  So they knew EPA -- this is the

21   Anderson memo -- they knew, EPA said all of your waste streams

22   are not exempt.  You only have two exempt waste streams.

23             What was Mr. Tripp's testimony.  Here in court he

24   said, in essence, and I'm paraphrasing because I have not got

25   it in front of me, I ignored that.  That's from Anderson in

F2PMBUC1

```
 1   region 8.  He doesn't know what he's talking about.  I only pay
 2   attention to the guy Shapiro who wrote a memorandum in 1994
 3   that Mr. Tripp claimed disagreed with Mr. Anderson and showed
 4   that, in fact, EPA in DC agreed with Mr. Tripp's interpretation
 5   of the Bevill amendment.
 6           THE COURT:  We have our jurors.  Thank you.  I'm
 7   denying your request for a couple of reasons.  I sustained the
 8   objection.  I told the jury to disregard.  No request is made
 9   contemporaneously to do anything beyond that when the jury was
10   here and it was in the flow.  Essentially I think what
11   defendants are asking me, I am not saying this is your
12   intention, but the effect would be, and maybe it is your
13   intention, a kind of rebuttal point.  You made everything you
14   could as your strategic decision of the lack of liability.  I
15   didn't stop you.  They didn't object.  You did that.  And they
16   made a point about kicking it down the road.
17           I think it went too far because it was tied
18   specifically to Mr. Rennert and there is certainly no testimony
19   or evidence to show that he did anything to kick it down the
20   road.  And that's why I sustained the objection and told them
21   to disregard.
22           What wouldn't be fair would be to come back in the
23   next day and make your point as the final point right before
24   they are going into their deliberations.  It bothered me,
25   obviously, that the request was framed in what I think is just
```

F2PMBUC1

 1    not a legitimate characterization of what had occurred in this

 2    trial, but I cooled down from that and took your request

 3    genuinely and seriously, and I don't think it's fair.  I won't

 4    do it.  Had the request been made yesterday, maybe.  I think

 5    the objection occurred right during the sentence that was

 6    objectionable and it was sustained and the jury was told to

 7    disregard.  I would have reflected on an additional request at

 8    the time, but not now and not like this.

 9            Anything else?

10            MR. S. STIRLING:  Nothing from the plaintiff, your

11    Honor.

12            MR. PARK:  Your Honor, I apologize for coming in late

13    today.

14            THE COURT:  I understand.  Thank you.

15            MR. HAVELES:  Nothing else, your Honor.

16            THE COURT:  I will say, despite a month-long trial and

17    a demanding schedule, I am grateful that everybody has worked

18    as hard as they have to be here on time so we could keep things

19    moving.  So thank you.

20            We will get the jury.

21            One point.  I don't always read the verdict form to

22    the jury, but because there are a fair number of directions in

23    the verdict form that are obviously consistent with the charge,

24    the signaling directions and the like, it is my intention to

25    just read through the verdict form as well, and the reason we

F2PMBUC1

1    do any of this is just to make sure everybody is hearing the

2    instructions at least once.

3            MR. PARK:  Your Honor, I apologize, but I found

4    another cite where your Honor overruled Mr. Haveles' objection.

5    This is on page 2859, starting at line 15 going through line

6    23.  What Mr. Beus said there is, quote:  They never did what

7    their duty required them to do.  They needed to go out and test

8    and characterize.  They knew it was there.  They waited to get

9    caught.  They didn't investigate.  They didn't study.  They

10   didn't report.

11           THE COURT:  No objection.

12           MR. PARK:  Probability of having a problem with that

13   is very close to a hundred percent and they have got a problem,

14   and they have been litigating for over a decade.

15           THE COURT:  True fact in the record.

16           MR. PARK:  Mr. Rennert has a notion, just put it off

17   down the road, put it off, put it off, put it off, in

18   capitalization.  Objection.  Overruled.

19           Judge, that is a clear statement of the idea that Mr.

20   Beus was submitting to the jury, which your Honor overruled.

21   What your Honor sustained was a further statement later which

22   we have just discussed where he has this discussion about the

23   United States Government and how difficult Mr. Rennert has

24   been.  This is where I think, because Mr. Beus injected this

25   notion at least two times, and most clearly on this page 2859,

F2PMBUC1

1    that's where the prejudice comes, Judge.  And that's where the

2    lack of clarity as to what was struck on page 2868 becomes a

3    real issue.

4          Judge, I understand this happened yesterday.  We are

5    reading the transcript when we get it later yesterday night and

6    we see this.  We feel the impact at the time.  But it's often

7    the case you rereview a transcript and you realize how much

8    impact this is likely to have.  I believe that overruling that

9    objection, your Honor, was incorrect, and we would ask you to

10   cure the statement that Mr. Beus made at that time.

11         THE COURT:  Was this in the letter that you sent me

12   last night?

13         MR. HAVELES:  It was not in this morning's letter,

14   your Honor.

15         MR. S. STIRLING:  I would like to be heard on this,

16   your Honor.

17         THE COURT:  Go ahead.

18         MR. S. STIRLING:  Your Honor, first, so the record is

19   clear, with respect to the objection that you sustained on page

20   2868, we believe that objection should not have been sustained.

21   You've explained your reasons.  Because you said there was no

22   evidence in the record that Mr. Rennert was responsible for

23   that.  There is evidence in the record, your Honor, they had

24   monthly meetings --

25         THE COURT:  We are done.  The jury is here.

SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

F2PMBUC1

1           MR. S. STIRLING:  Thank you.

2           THE COURT:  I took up what was presented to me

3      yesterday, I let people ask for side bars yesterday.  You put

4      in a letter this morning.  The jury is standing outside the

5      door.  We are done.

6           (Jury present)

7           THE COURT:  Good morning, members of the jury.  Thank

8      you very much for your attention and diligence throughout the

9      trial, as I've said, but can't be said enough how grateful the

10     Court is for all your efforts.  And those efforts continue now.

11     It is my job to instruct you as to the law that you'll apply

12     during your deliberations.  I have prepared a written charge

13     that is the written instructions, and you will get copies of

14     the written instructions when you go back to the jury room.

15     You will each have a copy of everything that I'm about to say

16     to you, and you will also have the verdict form which I will

17     also read.  But it is important for me to make sure that you

18     are hearing the instructions from me, though you will get the

19     paper and can study the words more yourself as you go.

20           With that, members of the jury, let me begin.

21           Instruction No. 1, role of the Court and the jury.

22           I will now instruct you as to the law.  It is your

23     duty to accept these instructions of law and apply them to the

24     facts as you determine them.  If an attorney has stated a legal

25     principle different from any that I state to you in my

F2PMBUC1                         Charge

1    instructions, it is my instructions that you must follow.  You

2    should not single out any instruction as alone stating the law;

3    you should consider my instructions as a whole when you retire

4    to deliberate.

5         You, the members of the jury, are the sole and

6    exclusive judges of the facts.  You pass upon the evidence.

7    You determine the credibility of the witnesses.  You resolve

8    such conflicts as there may be in the testimony.  You draw

9    whatever reasonable inferences you decide to draw from the

10   facts as you have determined them, and you determine the weight

11   of the evidence.  You must weigh and consider the evidence

12   without regard to sympathy, prejudice, or passion for or

13   against any party.

14        What has been said in the opening statements, closing

15   arguments, objections, or questions is not evidence.  The

16   evidence before you consists of the answers given by witnesses,

17   the exhibits that were received in evidence, and any facts to

18   which the parties have stipulated.  You may not consider any

19   testimony that I have told you to disregard or that was

20   stricken from the record.

21        Nor is what I say evidence.  The rulings I have made

22   during the trial are not any indication of my views of what

23   your decision should be.  Since you are the sole and exclusive

24   judges of the facts, I don't mean to indicate any opinion as to

25   the facts or what the verdict should be.  The rulings I have

1    made during the trial are not any indication of my views of

2    what your decision should be as to whether or not the plaintiff

3    has proven his case.

4              Instruction No. 2, preponderance of the evidence.

5              In order to prevail, the plaintiff must meet his

6    burden of proof.  The standard under which you will decide

7    whether the plaintiff has met his burden of proof on a

8    particular issue is the preponderance of the evidence.  Some of

9    you may have heard of proof beyond a reasonable doubt, which is

10   the proper standard of proof in a criminal trial.  That

11   requirement does not apply to a civil case such as this and you

12   should put it out of your mind.

13             To establish something by a preponderance of the

14   evidence means that the evidence of the party having the burden

15   of proof must be more convincing and persuasive to you than the

16   evidence opposed to it.  The difference in persuasiveness need

17   not be great; it requires only that you find the scales tip,

18   however slightly, in favor of the party with the burden of

19   proof, that what that party claims is more likely than not

20   true.  On the other hand, if you find that the credible

21   evidence is evenly divided between the parties, that is,

22   equally probable that one side is right as it is that the other

23   side is right, then you must decide that issue in favor of the

24   defendants.

25             What is important is the quality of the evidence and

F2PMBUC1                    Charge

1   not the number of witnesses, or the number or variety of the

2   exhibits, or the length of time spent on a subject.  In

3   determining whether any fact has been proved by a preponderance

4   of the evidence, you must consider the testimony of all of the

5   witnesses and all of the exhibits.

6           Simply because I have permitted certain evidence to be

7   introduced does not mean that I have decided on its importance

8   or significance.  That is for you to decide.

9           No. 3, improper considerations.

10          Your verdict must be based solely upon the evidence,

11  or lack of evidence, developed at trial.  It would be improper

12  for you to consider any personal feelings you may have about a

13  party or witness' race, sex, age, national origin, or religion.

14  Under your oath as jurors, you are not to be swayed by

15  sympathy.

16          No. 4, conduct of counsel.

17          It is the duty of the attorney for each side of a case

18  to object when the other side offers testimony or other

19  evidence that the attorney believes is not properly admissible.

20  Counsel also have the right and duty to ask the Court to make

21  rulings of law or hold conferences out of the hearing of the

22  jury.  All those questions of law must be decided by me.

23          You should not show any prejudice against any party or

24  his client because the attorney objected to the admissibility

25  of evidence, asked for a conference out of the hearing of the

1    jury, or asked the Court for a ruling on the law.

2           No. 5, liability in general.

3           We turn now to legal responsibility, known as

4    liability.  If a party making a claim against another party

5    proves each of the essential elements of its claim by a

6    preponderance of the credible evidence, we say that the party

7    has established that the other party is legally liable.  The

8    plaintiff in this case is Lee E. Buchwald, who is the trustee

9    for two corporations in bankruptcy, Magnesium Corporation of

10   America and Renco Metals, Inc.  Together, I will sometimes call

11   these companies the debtor companies or debtor corporations.

12   There are 12 defendants in this case.  One, the Renco Group,

13   Inc., is a corporation.  Ten are individuals:  Ira Rennert,

14   Roger Fay, Justin D'Atri, Dennis Sadlowski, Michael Ryan,

15   Michael Legge, Ron Thayer, Todd Ogaard, Lee Brown, and Howard

16   Kaplan.

17          Final defendants are the trustees of trusts

18   established by Ira Rennert.

19          Although there are several defendants in this case and

20   they are being represented by the same attorneys, it does not

21   follow that if one is liable, all of the rest are liable as

22   well.  Each defendant is entitled to fair, separate, and

23   individual consideration of the case without regard to your

24   decision as to the other defendants.

25          You must now determine, in accordance with my

1    instructions, whether the plaintiff has carried his burden of

2    proving by a preponderance of the credible evidence that the

3    defendants are liable for his various claims.

4              No. 6, overview of the claims.

5              In this civil case, the plaintiff is suing the

6    defendants for damages, and to "avoid" or take back transfers

7    of money to the defendants.  The plaintiff has alleged that the

8    defendants made or received unlawful transfers of money away

9    from the debtor corporations.

10             The plaintiff's first set of claims is brought

11   pursuant to bankruptcy law for claims of fraudulent transfer

12   and under state law for claims of fraudulent conveyance.  These

13   claims are similar but defined differently under state and

14   federal law, so you must consider plaintiff's claims under both

15   definitions.

16             The plaintiff's second set of claims alleges that some

17   defendants either breached certain duties they had toward the

18   debtor corporations, or aided others in the breach of those

19   duties.

20             A third set of claims alleges that defendants paid or

21   received dividends or stock redemptions when doing so was

22   unlawful.

23             Finally, the plaintiff has alleged that defendants

24   Rennert and the trustees of the Renco trusts were unjustly

25   enriched by the transfers made from Magnesium Corporation and

1    Renco Metals.

2              You should make your award based on the merits of each

3    claim.

4              I will now explain each of those claims in more

5    detail.

6              No. 7, claim one:  Fraudulent transfer, bankruptcy

7    code.

8              Plaintiff's first claim is for fraudulent transfers.

9    The bankruptcy law allows a trustee to avoid, or, in other

10   words, take back, transfers of money made under certain

11   circumstances.  In this context, a transfer refers to any mode

12   of voluntarily or involuntarily disposing of, or parting with,

13   money or property.  In this case, the plaintiff claims that the

14   Renco Group, Inc. received transfers in the form of dividends

15   and stock redemptions from the debtor companies, that

16   defendants Ira Rennert and the trustees of the Rennert Trusts

17   were subsequent transferees, and that defendants Mike Legge,

18   Ron Thayer, Todd Ogaard, Lee Brown, and Howard Kaplan received

19   transfers from Magnesium Corporation that were made pursuant to

20   Net Worth Appreciation Agreements.

21             Plaintiff's contention is that these transfers are

22   avoidable because they are fraudulent under the bankruptcy

23   code.  In this context, fraudulent doesn't mean that you must

24   find that the defendants intended to commit actual fraud or

25   deceive someone.  Instead, there are three types of fraudulent

1    transfers for which you may find defendants responsible under

2    the bankruptcy code.  If the plaintiff has proven by a

3    preponderance of the evidence that any one of these types of

4    transfers occurred, you should find in favor of the plaintiff

5    on Count One.

6         First, a transfer is fraudulent under the law if (1)

7    the debtor received less than a reasonably equivalent value in

8    exchange for the transfer and (2) the debtor was insolvent on

9    the date that the transfer was made, or became insolvent as a

10   result of the transfer.  In other words, if the value of what

11   the debtor received was materially less than the equivalent

12   value of what the debtor transferred away, and the fair market

13   value of the debtor's assets was less than its liabilities by

14   the time the transfer was complete, that was a fraudulent

15   transfer.

16        Second, a transfer is fraudulent under the law if (1)

17   the debtor received less than a reasonably equivalent value in

18   change for the transfer -- again, if the value of what it

19   received was materially less than the reasonably equivalent

20   value of what it transferred away and, (2) immediately after

21   the transaction, the debtor was left with an unreasonably small

22   amount of remaining capital for carrying on the debtor's

23   business for a reasonable period of time, considering what was

24   reasonably foreseeable at the time of the transfer.

25        Third, a transfer is fraudulent under the law if (1)

F2PMBUC1                           Charge

1    the debtor received less than a reasonably equivalent value in

2    exchange for the transfer, and (2) the debtor intended or

3    believed that it would incur debts beyond its ability to pay as

4    they became due.

5           During the course of the trial, you have heard the

6    parties address these three types of fraudulent transfers as

7    three tests of insolvency.  For the purposes of your task, that

8    description is just a different way of saying the same thing

9    that I have just explained to you.  Accordingly, you need to

10   find by a preponderance of the evidence that only one of these

11   three types of transfers has occurred in order to find for the

12   plaintiff.  You don't need to find that all of these types of

13   transfers occurred.

14          No. 8, definitions, insolvency and debt.

15          So that you can determine whether fraudulent transfers

16   were committed as described in plaintiff's first claim, I am

17   going to give you the legal definitions of some terms.  The

18   definitions that I give you here should guide your

19   deliberations when determining whether the plaintiff has proven

20   his case.  Some of these terms will also appear in other claims

21   that I will describe later in my instructions.  Know that even

22   though I will only instruct you on the meanings of these terms

23   once, they have the same definition every time they appear in

24   my instructions, unless I specifically indicate otherwise.

25          The first term I will define is insolvency.  An entity

1    is insolvent or made insolvent at the time of transfer when the

2    sum of its debts is greater than the fair market value of all

3    of its assets.  No rigid approach should be taken regarding the

4    fair valuation of a company within the context of a solvency

5    analysis, but rather you should consider the totality of the

6    circumstances.  The fair value of a company's assets is

7    determined by the fair market value of the assets that could be

8    obtained if sold in a prudent manner by a willing seller to a

9    willing buyer with all relevant information within a reasonable

10   period of time to pay a company's debts.  To make that

11   determination, you may consider any combination of valuation

12   methodologies presented to you during the course of the trial.

13   Based on the evidence presented by the parties, you should

14   determine the fair market value of those assets.

15          The definition of insolvency that I am giving you also

16   requires a determination of the sum of all of Magnesium

17   Corporation's and Renco Metals' debts.  In the bankruptcy

18   context, a debt is defined as the amount of money that one will

19   be legally responsible to pay to other parties as a result of

20   legal rights to payment that those others have.  This right to

21   payment can include amounts owed to individuals and entities

22   that have lent an entity money, as well as reasonably certain

23   potential legal liabilities, whether or not the entity has

24   actually been sued.  You have heard the parties discuss

25   contingent liability at length during the trial, and I will

1  instruct you on the meaning of contingent liability in a

2  moment.  For now, you should know that if you find that MagCorp

3  or Renco Metals had a contingent liability, you should include

4  the amount of that contingent liability in the company's debts.

5           You must find whether insolvency existed at the time

6  of each transfer.  In determining whether Magnesium Corporation

7  and Renco Metals were insolvent, you should consider the

8  companies' assets as they were appropriately valued at the time

9  of each transfer, not at the level they later turned out to be

10  valued.  That is to say, just because Magnesium Corporation and

11  Renco Metals went bankrupt at some point after the transfers at

12  issue in this case does not determine that they were insolvent

13  at the time of each transfer.  While the solvency of MagCorp

14  and Renco Metals must be determined as of the date of the

15  transfer, you may consider evidence from after that date of the

16  transfer only insofar as you conclude that it demonstrates the

17  existence of facts that were known or, through the exercise of

18  reasonable diligence, could have been known by the date of each

19  transfer.  It is for you to decide both the value of the

20  companies' assets and the amount of their debts at the time of

21  the transfers in question.

22           No. 9, definition:  Contingent liability.

23           As I just stated, I will also define the term

24  contingent liability which you have heard the lawyers use

25  throughout the trial.

1              A contingent liability is one that although a person

2      or business is not required to pay it right now, there is a

3      reasonable probability that they will have to pay in the

4      future.  They are liabilities that are contingent on a future

5      event occurring.  For example, if someone has taken an action

6      that violates the law, any amount they may have to pay would be

7      a contingent liability if there is a reasonable probability

8      that a liability will be established in the future.  In other

9      words, a contingent liability is a cost that is reasonably

10     foreseeable based on conduct that has already occurred.

11             It is not mere speculation, nor is it the result of

12     random, unforeseeable events.  There is always a chance that

13     someone could have to pay for something that they could not

14     have expected, but that does not mean they have a contingent

15     liability.  Contingent liabilities do not exist if there is not

16     a reasonable probability that the events triggering actual

17     liability will come to pass.  Accordingly, contingent

18     liabilities only have value in proportion to the probability

19     that they will actually come to pass.

20             To determine the size of contingent liability, you

21     must first find the total amount of liability that a company

22     would take on if the event triggering that liability comes to

23     pass, and then reduce it by the probability that the liability

24     will actually come to pass.  For example, if a contingent

25     liability would be for $100, but there is only a 60 percent

chance that someone would ever have to pay that liability, the

value of the contingent liability is calculated at $60.  If you

find that there is little or no chance that a contingent

liability would come to pass, you may value it as zero.  If you

find that the likelihood that a contingent liability would come

to pass is certain, you may value it at 100 percent.

With this definition in mind, you should assess the

evidence that the parties offered as to the appropriate measure

of contingent liabilities.

The size of Magnesium Corporation's and Renco Metals'

contingent liabilities can then be factored into determining

whether the corporations were solvent.  As I have already

instructed you, a corporation is solvent when its assets are

greater than its liabilities.  Contingent liabilities are part

of the companies' overall liabilities for the purpose of

determining solvency.

No. 10, unreasonably small capital.

Of the three ways you can find liability for

fraudulent transfers in claim one, the second requires a

finding that the debtor corporations were left with an

unreasonably small amount of remaining capital for carrying on

the debtor's business for a reasonable period of time,

considering what was reasonably foreseeable at the time of the

transfer.  A company has an unreasonably small amount of

capital if, though technically solvent, it is doomed to fail.

F2PMBUC1                    Charge

1    It means that the companies were left in such a state that they

2    would be unable to sustain enough profit to continue

3    operations.  While a company must be adequately capitalized, it

4    does not need resources sufficient to withstand any and all

5    setbacks.

6           You may consider a number of factors in determining

7    whether Magnesium Corporation and Renco Metals were left with

8    enough capital to survive after the transfers.  These may

9    include the amount of extra capital the companies historically

10   kept on hand, the general amount of capital needed in the

11   magnesium production industry, and how the ratio of its

12   operations financed by the value of all of its stock compared

13   to the amount of debt it had taken on has changed since the

14   transfers.  In addition, you may consider the reasonableness of

15   the company's financial projections and whether they were

16   prudent, not with hindsight, but at the time made.

17          The mere fact that the companies later went bankrupt

18   does not mean that they were left with an unreasonably small

19   amount of capital.  Your task is to decide whether the amount

20   of capital remaining was reasonable at the time the transfers

21   were made, not with the benefit of hindsight.  That is, you

22   must decide whether someone viewing the defendants' actions at

23   the time the transfers were made, and not knowing exactly what

24   would happen in the future, would decide that they acted

25   prudently in -- I am going to start that sentence again.  That

1    is, you must decide whether someone viewing the defendants'

2    actions at the time the transfers were made, and not knowing

3    exactly what would happen in the future, would decide that they

4    acted prudently in relation to the amount of capital left in

5    the businesses.  While the adequacy of capital of MagCorp and

6    Renco Metals must be determined as of the date of the transfer,

7    you may consider evidence from after the date of the transfer

8    only insofar as you conclude that it demonstrates the existence

9    of facts that were known or, through the exercise of reasonable

10   diligence, could have been known by the date of the transfer.

11            No. 11, claim 2:  Fraudulent conveyance, New York law.

12            I will now turn to plaintiff's second claim, which is

13   that defendants Rennert, Legge, Thayer, Ogaard, Brown, Kaplan,

14   the Renco Group, and the trustees of the Rennert Trust are

15   liable for fraudulent conveyances under Section 273 of New

16   York's debtor and creditor law.  To establish a claim of fraud

17   conveyance, the plaintiff must show that:

18            1.  The debtor corporation or corporations made a

19   conveyance to the defendants without fair consideration, and

20            2.  The debtor corporation was insolvent when it made

21   the conveyance, or rendered insolvent because of the

22   conveyance, or was left with unreasonably small capital as a

23   result of the conveyance, or made the conveyance intending or

24   believing that it would incur debts beyond his ability to pay

25   as they came due.

F2PMBUC1                         Charge

1           I will now further explain each of these elements of

2    the claim.

3           No. 12, fraudulent conveyance, element one, lack of

4    fair consideration.

5           The first element of a fraudulent conveyance claim is

6    that the conveyance was made without fair consideration.  Fair

7    consideration has two components, an exchange of fair value and

8    good faith.  So a conveyance made without fair consideration is

9    one where either the party receiving the conveyance did not

10   give fair value in exchange for what it received, or the party

11   receiving the conveyance was not acting in good faith.

12          New York law defines fair value as receiving a fair

13   equivalent amount of property, or satisfying a fair equivalent

14   amount of debt, in exchange for the property given.  This does

15   not mean that the amount given on each side of the exchange

16   must be precisely the same.  The values need only be roughly

17   equal to constitute fair value.

18          Fair value can also mean that the property was given

19   as part of an advance made in the present, or because of a debt

20   incurred in the past, and the amount of the advance given or

21   debt satisfied was not disproportionately small when compared

22   with the value of the property transferred.

23          Good faith means that the party receiving the transfer

24   acted honestly, fairly, and openly.  A party may be acting in

25   good faith when it does not honestly believe that the actions

F2PMBUC1                          Charge

1    it is taking are proper, if it intends to take unfair advantage

2    of others, or if it knows or intends that the actions will

3    hinder, delay, or defraud others.

4           Fraudulent conveyance, element 2, insolvency or

5    unreasonably small capital.

6           The second element that the plaintiff must establish

7    by a preponderance of the evidence is that the debtor

8    corporations, Magnesium Corporation of America and Renco

9    Metals, were insolvent at the time the conveyances were made,

10   or were left with unreasonably small capital as a result of the

11   conveyances, or intended or believed that they would incur

12   debts beyond their ability to pay as they came due as a result

13   of the transfers.  I have already instructed you on the meaning

14   of insolvency, but for you to decide claim 2, I must instruct

15   you on its specific definition under New York law.

16          Under New York law, an entity is insolvent when the

17   present fair saleable value of its assets is less than the

18   amount that will be required to pay its probable liability on

19   its existing debt as they become absolute and matured.  In

20   other words, a company is insolvent when the sum total of

21   assets is worth less than the total amount of liabilities that

22   the company faces, or its debts exceed the fair market value of

23   its property.

24          In determining whether Magnesium Corporation and Renco

25   Metals were insolvent, you should consider the companies'

F2PMBUC1                         Charge

1    assets as they were appropriately valued at the time of the

2    transfers, not at the level they later turned out to be valued.

3    While the solvency of MagCorp and Renco Metals must be

4    determined as of the date of the transfer, you may consider

5    evidence from after the date of the transfer that demonstrates

6    the existence of facts that were known or, through the exercise

7    of reasonable diligence, could have been known by the date of

8    the transfer.

9              In determining whether the companies were left with

10   unreasonably small capital or debts that they intended or

11   believed they would not be able to pay as they came due, you

12   should apply the definitions I have already given to you.

13             If you determine by a preponderance of the evidence

14   that either Magnesium Corporation or Renco Metals was insolvent

15   at the time of transfers at issue in this case were made, or

16   that they were rendered insolvent as a result of the transfers,

17   then the plaintiff has satisfied his burden on this element.

18             (Continued on next page)

19

20

21

22

23

24

25

1              THE COURT:  Number 14.  Claim Three:  Aiding and

2    Abetting Fraudulent Conveyance.

3              The plaintiff's third claim is that defendant Ira

4    Rennert aided and abetted fraudulent conveyances made by other

5    defendants.  You will consider this claim only if you determine

6    that a fraudulent conveyance occurred.

7              A person aids and abets a fraudulent conveyance when

8    he knowingly participated in the transfer to another person who

9    commits a fraudulent transfer.  A person does not have to

10   actually cause or make the fraudulent transfer to be liable

11   under an aiding and abetting theory.  Liability as an aider and

12   abettor is, in fact, premised on the idea that the person

13   accused of aiding and abetting a violation of the law was not

14   the same person who actually violated the law.

15             To establish that a person aided and abetted another

16   person's fraudulent conveyances, the plaintiff must demonstrate

17   three things by a preponderance of the evidence.

18             First, the plaintiff must establish that fraudulent

19   conveyances were committed by a person or entity other than the

20   defendant accused in this claim.  If you find that the

21   fraudulent conveyances alleged in the previous claim were

22   committed, you should consider this element satisfied.  If you

23   find that no fraudulent conveyances were committed, you should

24   consider this claim no further and find in favor of the

25   defendants on this claim.

1           If you do find that fraudulent conveyances were

2     committed, you must next consider whether the plaintiff has

3     established that defendant Rennert knowingly induced or

4     participated in those fraudulent conveyances.  Knowing

5     participation requires that a person have actual knowledge of

6     the wrongdoing -- here, that the disputed transfers were

7     fraudulent conveyances.  A person knowingly induces or

8     participates in fraudulent conveyances when he provides

9     substantial assistance to the person or people who commit the

10    actual fraudulent conveyances.  The question for you, then, is

11    whether defendant Rennert affirmatively assisted, helped to

12    conceal, or otherwise enabled fraudulent conveyances to occur.

13          Finally, to be liable for aiding and abetting

14    fraudulent conveyances, the conveyances must have caused damage

15    to the debtor corporations.

16          Fraudulent Transfer or Fraudulent Conveyance:

17    Damages.

18          If you find in plaintiff's favor on Claim One, Claim

19    Two, and/or Claim Three -- that is, for fraudulent transfer,

20    fraudulent conveyance, or aiding and abetting fraudulent

21    conveyance -- you must next determine the full amount of the

22    fraudulent transfers or conveyances made.  You should include

23    in this amount all of the transfers that you find to be

24    fraudulent.  If there are any transfers or conveyances

25    plaintiff has alleged that you find not to be fraudulent, you

1    should not include the amount of those transfers or conveyances

2    in this calculation.  You must indicate the total amount of

3    each fraudulent transfer or conveyance, if any, in the

4    appropriate place on your verdict sheet.

5            Number 16.  Claim Four:  Breach of Fiduciary Duty.

6            The plaintiff's fourth claim is that defendants

7    Rennert, D'Atri, Sadlowski, Fay, Ryan, Legge, Thayer, Ogaard,

8    Brown, and Kaplan breached their fiduciary duties to Magnesium

9    Corporation and Renco Metals.  You will reach this claim only

10   if you conclude that MagCorp or Renco Metals was insolvent or

11   was inadequately capitalized as to a particular transfer.  I

12   will now instruct you on fiduciary duties owed by corporate

13   officers and directors to their corporations.

14           First, a corporate director or officer has a fiduciary

15   duty of loyalty.  The duty of loyalty requires that the

16   officers and directors act in the best interest of the

17   corporation and not act in any manner contrary to those

18   interests.

19           Second, a corporate debtor or officer has a fiduciary

20   duty of care.  This is the duty to perform their functions and

21   responsibilities in a manner they reasonably believed to be in

22   the best interest of those corporations, and with the care that

23   ordinarily prudent persons would reasonably be expected to

24   exercise in a like position and under similar circumstances.

25   The duty of care has been described as the duty to act on an

1    informed basis, and is violated if the plaintiff proves that

2    the officers and director failed to inform themselves fully and

3    in a deliberate manner.  The plaintiff claims that the

4    defendants breached -- that is, acted in violation of -- at

5    least one of their fiduciary duties with respect to the

6    dividend payments, stock redemptions, and the net worth

7    appreciation payments that they knew would leave the

8    corporations insolvent or with inadequate capital.

9          The duty of care is satisfied when a director or

10   officer exercises a good faith effort to be informed and

11   exercises appropriate judgment for the benefit of the

12   corporation in the performance of his responsibilities.  Acting

13   in good faith means acting honestly with a sincere intention to

14   deal fairly with others.  If so, you should find that the

15   officer or director did not violate his fiduciary duties.

16         When considering whether there was a breach of

17   fiduciary duty, you should consider each defendant against whom

18   this claim is raised separately.  Generally, it is the

19   plaintiff's burden to show by a preponderance of the evidence

20   that a particular defendant committed a breach of the fiduciary

21   duty.  However, if the plaintiff has proven by a preponderance

22   of the evidence that an officer or director is interested in a

23   transaction, the burden will shift to that defendant.  An

24   officer or director is interested in a transaction if he either

25   (1) stands on both sides of the transaction, or (2) expects to

1      receive a personal financial benefit from the transaction.

2              Each defendant that is the subject of a claim for

3      breach of fiduciary duty with respect to a conveyance that the

4      plaintiff seeks to recover, and who was interested in the

5      conveyance as defined below, has the burden of establishing

6      that the conveyance was entirely fair to the entity (MagCorp or

7      Renco Metals) of which the defendant was an officer or

8      director.

9              The entire fairness standard has two parts: fair

10     dealing and fair price.

11             Fair dealing is concerned with how a conveyance was

12     initiated, structured, negotiated, disclosed, and how the

13     approval of the conveyance was obtained.  Fair price is

14     concerned with the economic and financial considerations of the

15     conveyance, including all relevant factors, assets, market

16     value, earnings, future prospects, and any other elements that

17     affect the intrinsic or inherent value of a company's stock.

18             If you find that the defendants did not breach their

19     fiduciary duty to MagCorp or Renco Metals, you need proceed no

20     further.  If you find that the defendants did breach their

21     fiduciary duty, you must then decide whether that breach was a

22     substantial factor in causing Magnesium Corporation and Renco

23     Metals to sustain damages.  If you find that it was not a

24     substantial factor in causing these corporations to sustain

25     damages, you need proceed no further.  If you find that the

F2p4buc2                        Charge

1    defendants' breach was a substantial factor in causing the

2    corporations to sustain damages, you should find in favor of

3    the plaintiffs on this claim.  You will then proceed to

4    determining damages, as I will discuss in a moment.

5            There are two specific companies that plaintiff

6    alleges specific defendants owed fiduciary duties to:

7            As director of MagCorp and Renco Metals: (1) Ira

8    Rennert.

9            Individual defendants as officers of MagCorp:

10   (1) Michael Legge; (2) Ron Thayer; (3) Howard Kaplan; (4) Todd

11   Ogaard; (5) Lee Brown; (6) Michael Ryan (from September 25,

12   1998 to June 24, 2002); Dennis Sadlowski (from September 25,

13   1998 to June 24, 2002).

14           Individual defendants as officers of Renco Metals:

15   (1) Roger Fay; (2) Justin D'Atri; (3) Michael Ryan (from

16   September 25, 1998 to June 24, 2002) (4) Dennis Sadlowski (from

17   September 25, 1998 to June 24, 2002).

18           Number 17.  Claim Five:  Aiding and Abetting Breach of

19   Fiduciary Duty.

20           The plaintiff's fifth claim is that defendants

21   Rennert, D'Atri, Fay, Sadlowski, Ryan, Legge, Thayer, Ogaard,

22   Brown, Kaplan, and The Renco Group aided and abetted a breach

23   of fiduciary duty.  To establish that those defendants aided

24   and abetted a breach of fiduciary duty, the plaintiff must

25   demonstrate by a preponderance of the evidence of the evidence

F2p4buc2                    Charge

1    that (1) There was a breach of fiduciary duty; (2) That the

2    defendant at issue knowingly induced or participated in that

3    breach of fiduciary duty; and

4            (3) That Magnesium Corporation and Renco Metals

5    suffered damage as a result of the breach of fiduciary duty.

6            If you find that the defendants named in the

7    plaintiff's fourth claim for breach of fiduciary duty did, in

8    fact, commit a breach of fiduciary duty, then the first element

9    of the plaintiff's aiding and abetting a breach of fiduciary

10   duty is satisfied.  Conversely, if when deciding the

11   plaintiff's third claim, you decide that none of the defendants

12   committed a breach of fiduciary duty, you must find in favor of

13   the defendants on the plaintiff's claim for aiding and abetting

14   a breach of fiduciary duty.

15           If you find that there was an underlying breach of

16   fiduciary duty, you must next decide whether the defendants

17   knowingly induced or participated in that breach of fiduciary

18   duty.  A person knowingly induces or participates in a breach

19   of fiduciary duty when he provides substantial assistance to

20   the person or people who commit the actual breach of fiduciary

21   duty.  The question for you, then, is whether the defendants

22   affirmatively assisted, helped to conceal, or otherwise enabled

23   a breach of fiduciary duty to occur.

24           If you find that a defendant substantially assisted a

25   breach of fiduciary duty, you do not need to find that he

            SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

F2p4buc2                          Charge

1    intended to harm Magnesium Corporation or Renco Metals by

2    aiding and abetting the breach of fiduciary duty; you need only

3    find that he had actual knowledge of the breach of that duty

4    when he induced or participated in it.

5          Finally, to be liable for aiding and abetting a breach

6    of fiduciary duty, the underlying breach must have caused

7    damage to the debtor corporation.  Such damage can include

8    rendering them insolvent.

9          If you find that the plaintiff has established all

10   three elements of aiding and abetting a breach of fiduciary

11   duty by a preponderance of the evidence, you must find in his

12   favor.

13         Number 18.  Breach of Fiduciary Duty and Aiding and

14   Abetting Breach of Fiduciary Duty:  Damages.

15         If you find that a defendant committed a breach of his

16   fiduciary duties as alleged in plaintiff's fourth claim, or

17   aided and abetted a breach of fiduciary duty, as alleged in

18   plaintiff's fifth claim, and that the breach was a substantial

19   factor in causing Magnesium Corporation or Renco Metals to

20   sustain damages, you must then determine the amount of damages

21   that should be awarded to the plaintiff.  In that event, you

22   will award the plaintiff such an amount as you find to be the

23   actual damages sustained by way of the dividend payments, stock

24   redemptions, and net worth appreciation agreements.

25         Number 19.  Breach of Fiduciary Duty and Aiding and

1   Abetting Breach of Fiduciary Duty; Punitive Damages.  If you

2   decide to award compensatory damages to the plaintiff for a

3   breach of fiduciary duty or aiding and abetting breach of

4   fiduciary duty, you must determine whether a defendant who has

5   been found liable is also liable for punitive damages.

6        Punitive damages are different from compensatory

7   damages.  Compensatory damages are awarded to compensate the

8   plaintiff for the injury suffered.  Punitive damages, on the

9   other hand, are awarded in addition to compensatory damages.

10        You may award punitive damages to punish a party for

11   outrageous conduct and to deter a party and others like him

12   from engaging in similar conduct in the future.  To award

13   punitive damages, you must find by a preponderance of the

14   evidence that the defendants that you have found breached their

15   fiduciary duty engaged in willful or wanton conduct and acted

16   maliciously for the purpose of injuring the corporation.

17   Punitive damages cannot be awarded for mere inadvertence,

18   mistake, errors of judgment and the like which constitute

19   ordinary negligence.

20        Intentional conduct means it is the person's conscious

21   object to engage in conduct of that nature.  This standard

22   requires that the defendant first foresee that his conduct

23   threatens a particular harm to another.

24        The law provides no fixed standards for the amount of

25   punitive damages.

1            In determining any award of punitive damages, you may

2    consider the nature of the defendants' conduct and the degree

3    to which the conduct was reprehensible.  Finally, you may

4    assess an amount of damages that will deter the defendant and

5    others like him from similar conduct in the future.  You may

6    consider the defendants' financial condition when evaluating

7    deterrence.  Any award of punitive damages must bear a

8    reasonable relationship to the plaintiff's compensatory

9    damages.  If you find that the plaintiff is entitled to an

10   award of punitive damages, state the amount of punitive damages

11   separately on the verdict form.

12           Number 20.  Claim 6A:  Unlawful Payment of Dividends.

13           Plaintiff's sixth claim is that the defendant Rennert

14   made unlawful dividend payments and unlawful stock redemptions.

15   You will reach this claim only if you conclude that there has

16   been a fraudulent transfer or fraudulent conveyance.  Under the

17   law, a company may declare a dividend out of its surplus, or if

18   there is no surplus, out of its net profits from the year in

19   which the dividend was declared or the prior fiscal year.

20           A company's surplus is defined as the amount by which

21   its net assets exceed the value of its capital.  Net assets,

22   much like solvency, is defined as the value of a company's

23   assets minus the amount of its liabilities.  A company may

24   determine for itself the amount of its assets that constitute

25   capital, and you should consider the evidence presented by the

1    parties to determine the amount of Magnesium Corporation's and

2    Renco Metals' assets that should be considered capital.

3            If you find that the debtor companies did not have a

4    surplus, you should next consider whether they had net profits

5    for the year in which the dividend was declared, or the prior

6    fiscal year.  Net profits are the amount by which the money a

7    company earned in a given year exceeded its costs in that year.

8    A company that does not have a surplus may still pay dividends

9    out of its net profits.

10           Note that a company may not pay a dividend if it is

11   insolvent when it pays the dividend or would be rendered

12   insolvent by paying the dividend.  Insolvency here has the same

13   definition I gave to you earlier in instruction number 8.

14           Note, also, that when deciding whether to pay a

15   dividend, a corporate director like defendant Rennert is not

16   bound to strictly follow the corporation's balance sheet when

17   deciding whether the corporation may declare a dividend.  The

18   touchstone, instead, is whether the defendant was acting in

19   good faith.  Directors have reasonable latitude to depart from

20   the balance sheet to calculate surplus, so long as they

21   evaluate assets and liabilities in good faith, on the basis of

22   acceptable data, by methods that they reasonably believe

23   reflect present values, and arrive at a determination of the

24   surplus that is not so far off the mark as to constitute bad

25   faith.

1          To demonstrate that Mr. Rennert made unlawful dividend

2   payments and unlawful stock redemptions, the plaintiff must

3   show, by a preponderance of the evidence, that defendant

4   Rennert willfully or negligently caused a dividend to be paid

5   or a stock redemption to occur when Magnesium Corporation and

6   Renco Metals either had no surplus or did not have a net profit

7   in the fiscal year the dividend was declared or the previous

8   year.  I will explain these elements in more detail.

9          First, you must determine whether Magnesium

10  Corporation and Renco Metals were properly paid dividends out

11  of a surplus or net profits, and that the payment did not

12  exceed the amount of the companies' surplus or net profits.

13  You must also find that the companies were solvent at the time

14  the dividends were paid.  Remember that this involves

15  determining whether Mr. Rennert valued the company's surplus in

16  good faith and based on reasonable methods, and not whether he

17  was strictly correct.

18         Second, if you find that Magnesium Corporation and

19  Renco Metals were insolvent at the time that the dividends were

20  paid and the stock redemptions were made, or that they did not

21  have the required surplus or net profits to pay the dividends,

22  you must also determine whether defendants Rennert and The

23  Renco Group were acting willfully or negligently, when they

24  paid dividends or made the stock redemptions.  Willfulness and

25  negligence here have the same meaning that you would use in

F2p4buc2                          Charge

1    ordinary life.

2              A person's conduct is negligent if that person fails

3    to exercise ordinary care.  It is a failure to use that degree

4    of care that a reasonably prudent person would have used under

5    the same circumstances.  Negligence may arise from doing an act

6    that a reasonably prudent person would not have done under the

7    circumstances.

8              Willful conduct is more than negligence; it describes

9    when a person intentionally acts, knowing that his action will

10   probably result in injury or damage.

11             Accordingly, if you find that the plaintiff has proven

12   by a preponderance of the evidence that dividends were paid

13   while Magnesium Corporation and Renco Metals were insolvent,

14   and that such actions were taken willfully or negligently on

15   the part of defendant Rennert, you should find that defendant

16   Rennert made unlawful dividend payments, and proceed to

17   evaluate the affirmative defense on which I will instruct you

18   in a moment.

19             Number 21.  Claim 6B:  Unlawful Stock Redemptions.

20             A second part of the plaintiff's sixth claim is that

21   defendant Rennert made unlawful stock redemptions.  You will

22   reach this claim only if you conclude that there has been a

23   fraudulent transfer or fraudulent conveyance.  Under the law, a

24   corporation may purchase shares of its own stock only out of

25   surplus funds, as I have defined them for you.  Accordingly,

1   you must determine whether defendant Rennert made stock

2   redemptions in an amount exceeding Magnesium Corporation's and

3   Renco Metals' surplus.  If you find that the plaintiff has

4   proven by a preponderance of the evidence that he did, you

5   should find that defendant Rennert made unlawful stock

6   redemptions, and proceed to evaluate the affirmative defense on

7   which I will instruct you now.

8           Number 22.  Claims 6A and 6B: Good Faith Reliance

9   Defense.

10          Defendant Rennert has asserted a defense of good faith

11  reliance to the claims of unlawful dividends and stock

12  redemptions, as described in the previous two instructions.  I

13  earlier instructed you that plaintiff must meet the burden of

14  proof with respect to establishing his claims.  However, with

15  respect to this affirmative defense, it is the defendants'

16  burden to prove by a preponderance of the evidence.

17          Under the law, a corporate director like Mr. Rennert

18  is fully protected from liability on claims 6A and 6B (for

19  unlawful dividends and unlawful stock redemptions) when he

20  relies in good faith upon the records of the corporation and

21  upon information, opinions, reports, or statements presented to

22  the corporation by any of its officers or employees, or

23  committees of the board of directors.

24          He is also protected from liability on claims 6A and

25  6B when relying on information presented to him by any other

person as to matters the director reasonably believes are

within such person's professional or expert competence, and who

has been selected with reasonable care by or on behalf of the

corporation.  This protection applies to information as to the

value and amount of the assets, liabilties and/or net profits

of the corporation or any other facts pertinent to the exercise

and amount of the surplus or other funds from which dividends

might properly be declared and paid, or with which the

corporation's stock might properly be purchased or redeemed.

        Accordingly, if you find that defendant Rennert relied

in good faith on these matters when deciding whether to declare

a dividend or redeem stock, you should find in his favor on the

claims of unlawful dividend and unlawful stock redemption

against him.  It is defendant Rennert's burden to prove good

faith reliance by a preponderance of the evidence.

        Number 23.  Claim 6C:  Shareholder Liability for

Unlawful Dividends.

        Plaintiff's third allegation with respect to his sixth

claim is that defendant The Renco Group, Inc., received the

unlawful dividends alleged.  If you find that there was no

unlawful dividend, you should not consider this claim further.

        Under the law, a shareholder is liable for and must

repay unlawful dividends if it knew the facts indicating that

the dividend was unlawful when it received the dividend.

Accordingly, if you find by a preponderance of the evidence

1   that defendant The Renco Group, Inc., knew the facts indicating

2   that the dividends it received were unlawful according to the

3   instructions I have just given you, you should find in favor of

4   the plaintiff on this claim.

5          Number 24.  Unlawful Dividends and Unlawful Stock

6   Redemptions:  Damages.

7          If you find that the payment or receipt of unlawful

8   dividends, as alleged in plaintiff's claims 6A and 6B, or the

9   unlawful stock redemptions alleged in plaintiff's claim 6C

10  occurred, you must then determine the amount of damages that

11  should be awarded to the plaintiff on those claims.  If you

12  find for the plaintiff on any of these claims, you shall then

13  find the full amount of the dividend unlawfully paid, or to the

14  full amount unlawfully paid for the purchase or redemption of

15  the corporation's stock, and indicate that amount in the

16  appropriate place on the verdict form.

17         Number 25.  Claim Seven:  Unjust Enrichment.

18         The plaintiff's seventh claim is that defendants IRA

19  Rennert and Trustees of the Rennert Trusts were unjustly

20  enriched at Magnesium Corporation's and Renco Metals' expenses.

21  The defendants deny these claims, and contend that Mr. Rennert

22  and the Trustees of the Rennert Trusts did not receive any

23  direct benefits at the expense of Magnesium Corporation or

24  Renco Metals, and that Magnesium Corporation and Renco Metals

25  were not harmed by any of those defendants' actions.

1            Unjust enrichment occurs when one person or entity has

2       obtained money, property, or a direct benefit from another

3       person or entity that the recipient is not entitled to receive

4       and under such circumstances that, in fairness and good

5       conscience, the money, property or direct benefit should not be

6       retained.  In those circumstances, the law requires that person

7       who received the direct benefit to repay, return the property

8       to, or compensate the other person.

9            The plaintiff has the burden of proving by a

10      preponderance of the evidence that defendant Rennert and the

11      Rennert Trusts received a direct benefit from the debtor

12      companies, and that the debtor companies were harmed as a

13      result.  If the plaintiff has not proven to you that it is more

14      likely than not that the defendants received a direct benefit

15      from the debtor companies, that it would be against fairness

16      and good conscience for Mr. Rennert or the Rennert Trusts to

17      retain that direct benefit, and that the debtor companies were

18      harmed because they gave that direct benefit to the defendants,

19      you must find for the defendants on this claim.  If you decide

20      that the plaintiff has proven each of those elements, you will

21      find the defendants liable to the plaintiff and you will go on

22      to consider the value of the direct benefit that the defendants

23      obtained.

24           Your task with regard to this claim is to make three

25      findings.  First, you must decide whether defendants Rennert

1    and the Rennert Trusts received a direct benefit from the

2    debtor companies.  If you find that they did not receive a

3    direct benefit, you need proceed no further with the claim.  If

4    you find they did receive a direct benefit, you must determine

5    whether the debtor companies were harmed by conveying this

6    direct benefit.  If you find that they were, you must find in

7    favor of the plaintiff on this claim and will now consider

8    damages.  If you find that the debtor companies were not harmed

9    by conveying this direct benefit, you must find in favor of the

10   defendants.

11          Number 26.  Unjust Enrichment:  Damages.

12          If you find in the plaintiff's favor on claim seven

13   for unjest enrichment, you must next determine the amount of

14   damages that should be awarded to the plaintiff on this claim.

15   To do so, you must determine the value of the direct benefit

16   conferred on the defendants by the debtor companies.  On your

17   verdict sheet, the amount of damages you indicate should be

18   equal to the value of the direct benefit that was directly

19   conferred by the defendants.  It is the plaintiff's burden to

20   prove this amount by a preponderance of the evidence.

21          Number 27.  Agreed Instruction Regarding Ira Rennert's

22   Wealth.

23          You have heard testimony about Mr. Rennert's wealth.

24   This evidence has been admitted for a single, limited purpose,

25   and I want to explain to you the sole basis on which you should

1    consider this evidence.

2              Mr. Rennert's wealth has no bearing on any issue in

3    this case.  The fact that he is wealthy is irrelevant to this

4    case, and it does not make it more or less likely that he or

5    any other defendant is liable for any claim.

6              Mr. Buchwald presented evidence regarding the property

7    owned by Blue Turtles Inc. for the exclusive purpose of being

8    used by Mr. Rennert and his family.  That evidence is only

9    relevant to Mr. Buchwald's contention that the proceeds of the

10   dividends paid by Renco Metals to The Renco Group, Inc.

11   benefited Mr. Rennert personally.

12             If you find that Mr. Buchwald has proven that dividend

13   proceeds were used in part to purchase land, you may consider

14   this evidence in assessing what, if any, benefit Mr. Rennert

15   personally received.

16             If you find that Mr. Buchwald has failed to prove that

17   the proceeds of the dividends were used to purchase land, you

18   should disregard all evidence about the land and Mr. Rennert's

19   wealth.  In that case, this evidence should play no role in

20   your deliberations.

21             Number 28.  Nature of Evidence.

22             The evidence in this case is the sworn testimony of

23   witnesses, the exhibits received in evidence, stipulations, and

24   judicially noticed facts.

25             Actually, before I continue here, let's just take a

1   stretching break for a moment.

2                (Pause)

3                Number 28.  Nature of Evidence.

4                The evidence in this case is the sworn testimony of

5   witnesses, the exhibits received in evidence, stipulations, and

6   judicially noticed facts.

7                By contrast, the questions of the lawyers are not to

8   be considered by you as evidence.  It is the witnesses' answers

9   that are evidence, not the questions.  At times, a lawyer may

10  have incorporated into a question a statement which assumed

11  certain facts to be true, and asked the witness if the

12  statement was true.  If the witness denied the truth of the

13  statement, and if there is no direct evidence in the record

14  proving that assumed fact to be true, you may not consider it

15  to be true simply because it was contained in the lawyer's

16  question.

17               Testimony that has been stricken or excluded is not

18  evidence and may not be considered by you in rendering your

19  verdict.  Also, if certain testimony was received for a limited

20  purpose -- such as for the purpose of assessing a witness's

21  credibility -- you must follow the limiting instructions I have

22  given.

23               Arguments by lawyers are not evidence, because the

24  lawyers are not witnesses.  What they have said to you in their

25  opening statements and in their summations is intended to help

1    you understand the evidence to reach your verdict.  However, if

2    your recollection of the facts differs from the lawyers'

3    statements, it is your recollection which controls.

4           To constitute evidence which may be considered by you,

5    exhibits must be received in evidence.  Exhibits marked for

6    identification but not admitted are not evidence, nor are

7    materials brought forth only to refresh a witness's

8    recollection.

9           Finally, statements which I may have made concerning

10   the quality of the evidence do not constitute evidence.

11          It is for you alone to decide the weight, if any, to

12   be given to the testimony you have heard and the exhibits you

13   have seen.

14          Number 29.  Direct and Circumstantial Evidence.

15          There are two types of evidence that you may properly

16   use in reaching your verdict.  One type of evidence is direct

17   evidence.  One kind of direct evidence is a witness's testimony

18   about something the witness knows by virtue of his or her own

19   senses -- something the witness has seen, felt, touched, or

20   heard.  Direct evidence may also be in the form of an exhibit.

21   The other type of evidence is circumstantial evidence.

22          Circumstantial evidence is evidence that tends to

23   prove one fact by proof of other facts.  There is a simple

24   example of circumstantial evidence that is often used in this

25   courthouse.

1          Assume that when you came into the courthouse this

2     morning the sun was shining and it was a nice day.  Assume that

3     the courtroom blinds are drawn and you cannot look outside.  As

4     you are sitting here, someone walks in with an umbrella that is

5     dripping wet.  Somebody else then walks in with a raincoat that

6     is also dripping wet.

7          Now, you cannot look outside the courtroom because the

8     blinds are drawn and you cannot see whether or not it is

9     raining.  So you have no direct evidence of that fact.  But on

10    the combination of the facts that I have asked you to assume,

11    it would be reasonable and logical for you to conclude that

12    between the time you arrived at the courthouse and the time

13    these people walked in, it had started to rain.

14         That is all there is to circumstantial evidence.  You

15    infer on the basis of reason and experience and common sense

16    from an established fact the existence or the nonexistence of

17    some other fact.  Many facts, such as a person's state of mind,

18    can only rarely be proved by direct evidence.  Circumstantial

19    evidence is of no less value than direct evidence; the law

20    makes no distinction between direct and circumstantial

21    evidence, but simply requires that you, the jury, decide the

22    facts in accordance with the preponderance of all the evidence,

23    both direct and circumstantial.

24         Number 30.  Inferences.

25         During the trial you have heard the attorneys use the

term "inference," and in their arguments they have asked you to

infer, on the basis of your reason, experience, and common

sense, from one or more established facts, the existence of

some other fact.

An inference is not a suspicion or a guess.  It is a

reasoned, logical conclusion that a disputed fact exists on the

basis of another fact which has been shown to exist.

There are times when different inferences may be drawn

from facts, whether proved by direct or circumstantial

evidence.  The plaintiff asks you to draw one set of

inferences, while the defense asks you to draw another.  It is

for you, and you alone, to decide what inferences you will

draw.

The process of drawing inferences from facts in

evidence is not a matter of guesswork or speculation.  An

inference is a deduction or conclusion which you, the jury, are

permitted to draw -- but not required to draw -- from the facts

which have been established by either direct or circumstantial

evidence.  In drawing inferences, you should exercise your

common sense.

So, while you are considering the evidence presented

to you, you are permitted to draw, from the facts which you

find to be proven, such reasonable inferences as would be

justified in light of your experience.

Number 31.  Credibility of Witnesses.

1          Now for the important subject of evaluating testimony.

2     How do you evaluate the credibility or believability of the

3     witnesses?  The answer is that you use your plain common sense.

4     Common sense is your greatest asset as a juror.  You should ask

5     yourselves, did the witness impress you as honest, open, and

6     candid?  Or did the witness appear evasive or as though the

7     witness were trying to hide something?  How responsive was the

8     witness to the questions asked on direct examination and on

9     cross-examination?

10         If you find that a witness is intentionally telling a

11    falsehood, such a finding is always a matter of importance that

12    you should weigh carefully.  If you find that any witness has

13    lied under oath at this trial, you should view the testimony of

14    such a witness cautiously and weigh it with great care.  It is,

15    however, for you to decide how much of the witness's testimony,

16    if any, you wish to believe.  Few people recall every detail of

17    every event precisely the same way.  A witness may be

18    inaccurate, contradictory, or even untruthful in some respects

19    and yet entirely believable and truthful in other respects.  It

20    is for you to determine whether such inconsistencies are

21    significant or inconsequential, and whether to accept or reject

22    all or to accept some and reject the balance of the testimony

23    of any witness.

24         On some occasions during the trial, witnesses were

25    asked to explain an apparent inconsistency between testimony

F2p4buc2                    Charge

offered at this trial and previous statements made by the

witness.  It is for you to determine whether a prior statement

was inconsistent, and if so, how much (if any) weight to give

to an inconsistent statement in assessing the witness's

credibility at trial.  You may consider evidence of a prior

inconsistent statement by a witness who is not a party only

insofar as it relates to the witness's credibility.  You may

not consider it as evidence of a defendant's liability, except

for statements that have been received in evidence.  You may

consider evidence of a party's prior inconsistent statement for

whatever light you find it sheds on the issues in this case.

        You are not required to accept testimony even though

the testimony is uncontradicted and the witness's testimony is

not challenged.  You may decide because of the witness's

bearing or demeanor, or because of the inherent improbability

of the testimony, or for other reasons sufficient to yourselves

that the testimony is not worthy of belief.  On the other hand,

you may find, because of a witness's bearing and demeanor and

based upon your consideration of all the other evidence in this

case that the witness is truthful.

        In evaluating the credibility of the witnesses, you

should take into account any evidence that a witness may

benefit or suffer in some way from the outcome of the case.

Such interest in the outcome creates a motive to testify

falsely and may sway a witness to testify in a way that

F2p4buc2                         Charge

1    advances his or her own interests.  Therefore, if you find that

2    any witness whose testimony that you are considering may have

3    an interest in the outcome of this trial, then you should bear

4    that factor in mind when evaluating the credibility of his

5    testimony, and accept it with great care.

6           Keep in mind, though, that it does not automatically

7    follow that testimony given by an interested witness is to be

8    disbelieved.  There are many people who, no matter what their

9    interest in the outcome of the case may be, would not testify

10   falsely.  It is for you to decide, based on your own

11   perceptions and common sense, to what extent, if at all, the

12   witness's interest has affected her or his testimony.

13          Thus, there is no magic formula by which you can

14   evaluate testimony.  You bring to this courtroom all your

15   experience.  You determine for yourselves in many circumstances

16   the reliability of statements that are made by others to you

17   and upon which you are asked to rely and act.  You may use the

18   same tests here that you use in your everyday lives.  Among the

19   factors you may consider are the witness's intelligence; the

20   ability and opportunity the witness had to see, hear, or know

21   about the things that the witness testified about; the

22   witness's memory; any interest, bias or prejudice the witness

23   may have; the manner of the witness while testifying; and the

24   reasonableness of the witness's testimony in light of all of

25   the evidence in this case.

1          Number 32.  Deposition Testimony.

2          Some of the testimony before you is in the form of

3    depositions which have been received in evidence.  A deposition

4    is simply a procedure where the attorneys for one side may

5    question a witness or an adverse party under oath before a

6    stenographer prior to trial.  This is part of the pretrial

7    discovery, and each side is entitled to take depositions.  You

8    may consider the testimony of a witness given at a deposition

9    and received in evidence during the trial according to the same

10   standards as you would use to evaluate the testimony of a

11   witness given at trial.

12         Number 33.  Expert Witnesses.

13         In this case, I have permitted certain witnesses to

14   express their opinions about matters that are in issue.  A

15   witness may be permitted to testify to an opinion on those

16   matters about which he or she has special knowledge, skill,

17   expertise and training.  Such testimony is presented to you on

18   the theory that someone who is experienced and knowledgeable in

19   the field can assist you in understanding the evidence or to

20   reaching an independent decision on the facts.

21         In weighing this opinion testimony, you may consider

22   the witness's qualifications, his or her opinions, the reasons

23   for testifying, as well as all of the other considerations that

24   ordinarily apply when you are deciding whether or not to

25   believe a witness's testimony.  You may give the opinion

F2p4buc2                    Charge

1   testimony whatever weight, if any, you find it deserves in

2   light of all of the evidence in this case.  You should not,

3   however, accept opinion testimony merely because I allowed the

4   witness to testify concerning his or her opinion.  Nor should

5   you substitute it for your own reason, judgment, and common

6   sense.  The determination of the facts in this case rests

7   solely with you.

8           Number 34.  Conflicting Expert Testimony.

9           You have heard testimony of expert witnesses who have

10  been called by both sides to give their opinions on several

11  important issues in the case.

12          The witnesses who testified in this case did so in

13  order to assist you in reaching a decision on the issues before

14  you.

15          The testimony of these witnesses is in conflict.  They

16  disagree.  You must remember that you are the sole trier of the

17  facts and their testimony relates to a question of fact -- so

18  it is your job to resolve the disagreement.

19          The way you resolve the conflict between these

20  witnesses is the same way that you decide other fact questions

21  and the same way you decide whether to believe ordinary

22  witnesses.  In addition, since they gave their opinions, you

23  should consider the soundness of each opinion, reasons for the

24  opinion, and the witness's motive, if any, for testifying.

25          You may give the testimony of each of these witnesses

F2p4buc2                          Charge

1    such weight, if any, that you think it deserves in the light of

2    all of the evidence.  You should not permit a witness's opinion

3    testimony to be a substitute for your own reason, judgment, and

4    common sense.

5           You may reject the testimony of any opinion witness in

6    whole or in part, if you conclude the reasons given in support

7    of an opinion are unsound or, if you, for others reasons, do

8    not believe the witness.  The determination of the facts in

9    this case rests solely with you.

10          Number 35.  Stipulations.

11          Stipulations have been entered into relating to

12    various facts in this case.  A stipulation is an agreement

13    between parties as to what certain facts were or what the

14    testimony would be if certain people testified before you.  The

15    stipulations are the same for your purposes as the presentation

16    of live testimony.  You should consider the weight to be given

17    such evidence just as you would any other evidence.

18          Number 36.  Right to See Exhibits and Hear Testimony.

19          You are about to go into the jury room and begin your

20    deliberations.  The exhibits will be sent back to you in the

21    jury room.  If you want any of the testimony read back to you,

22    you may also request that.  Please remember that it is not

23    always easy to locate what you might want, so be as specific as

24    you possibly can be in requesting portions of the testimony,

25    and be patient.

1          Your requests for exhibits or testimony -- in fact,

2     any communications with the Court -- should be made in writing,

3     signed by your foreperson -- I will explain that in a moment --

4     and given to one of the marshals who will be safeguarding your

5     deliberations.  In any event, do not tell me or anyone else how

6     the jury stands on any issue until after a unanimous verdict is

7     reached.

8          Number 37.  Juror Note-Taking.

9          I remind you that any notes you may have taken are

10    simply to be used solely to assist you and are not to

11    substitute for your recollection of the evidence in the case.

12    The fact that a particular juror has taken notes entitles that

13    juror's views to no greater weight than those of any other

14    juror and your notes are not to be shown to any other juror

15    during your deliberations.  If, during your deliberations, you

16    have any doubt as to any of the testimony, you are permitted to

17    request that the official trial transcript, which is being made

18    of these proceedings be read to you.

19         Number 38.  Deliberation and Verdict.

20         The verdict must represent the considered judgment of

21    each juror.  The verdict must be unanimous as to each question

22    on the special verdict form.

23         After your deliberations are complete and you have the

24    verdict, you will indicate your verdict on the extra copy of

25    the special verdict form that I will distribute to you.  You

1    will all sign at the bottom of it and advise the marshal that a

2    verdict has been reached.  It is important that you adhere

3    strictly to the instructions on the form.  Please do not add

4    anything that is not called for by the special verdict form and

5    please skip any questions that the instructions require you to

6    skip based on your answers to the previous questions.

7           The purpose of the questions on the verdict form is to

8    help us -- the Court, the attorneys, the plaintiff, and the

9    defendants -- understand what your findings are.  No inference

10   is to be drawn as to what the answer should be.  The questions

11   are not to be taken as any indication that I have any opinion

12   as to how they should be answered.  I have no such opinion.

13          Now, finally, with respect to your deliberations, your

14   first task will be to select a foreperson.  The foreperson has

15   no greater voice or authority than any other juror but is the

16   person who will communicate with the Court when questions arise

17   by written note.

18          The foreperson will send out any notes, and when the

19   jury has reached a verdict, he or she will notify the marshal

20   that the jury has a verdict, and you will come into open court

21   and give your verdict.

22          Number 39.  Closing Comment.

23          The most important part of this case, members of the

24   jury, is the part that you, as jurors, are now about to play as

25   you deliberate on the issues of fact.  I know you will try the

1    issues that have been presented to you according to the oath

2    that you have taken as jurors.  In that oath, you promised that

3    you would well and truly try the issues joined in this case and

4    a true verdict render.

5            As you deliberate, please listen to the opinions of

6    your fellow jurors, and ask for an opportunity to express your

7    own views.  Every juror should be heard.  No one juror should

8    hold the center stage in the jury room and no one juror should

9    control or monopolize the deliberations.  If after listening to

10   your fellow jurors and if after stating your own view, you

11   become convinced that your view is wrong, do not hesitate

12   because of stubbornness or pride to change your view.  On the

13   other hand, do not surrender your honest convictions and

14   beliefs solely because of the opinions of your fellow jurors or

15   because you are outnumbered.

16           Your decision must be unanimous.  You are not to

17   reveal the standing of the jurors, that is, the split of the

18   vote, to anyone, including the Court, at any time during your

19   deliberations.  Finally, I say this, not because I think it is

20   necessary -- indeed, I know it is not -- but because it is the

21   custom in this courthouse to say this:  You should, of course

22   treat each other with courtesy and respect during your

23   deliberations, as I know you will.

24           During your deliberations, as I said, you will have

25   the exhibits with you in the jury room.  You may also ask for

1    portions of the testimony.  Again, please try to be as specific

2    as you can in requesting testimony.  It may take time to

3    provide you the testimony once you request it.

4           If you have questions for the Court, as I said, just

5    send me a note.  As I've said, each of you will have a copy of

6    this set of instructions to take with you into the jury room.

7           All litigants stand equal in this room.  All litigants

8    stand equal before the bar of justice.  All litigants stand

9    equal before you.  Your duty is to decide between these parties

10   fairly and impartially, and to see that justice is done.  You

11   should be guided solely by the evidence presented during the

12   trial and the law as I gave it to you without regard to the

13   consequences of your decision.  You have been chosen to try the

14   issues of fact and reach a verdict on the basis of the evidence

15   or lack of evidence.  If you let sympathy interfere with your

16   clear thinking, there is a risk that you will not arrive at a

17   just verdict.  All parties to a lawsuit are entitled to a fair

18   trial.  You must make a fair and impartial decision so that you

19   will arrive at the just verdict.

20          I am now just going to read the verdict form because

21   it contains some instructions, and then you will be on your

22   way, and you will also have copies of the verdict form, each a

23   copy and an extra copy for the foreperson to complete.

24          Instructions:  Your answer must be unanimous as to

25   each question.  The foreperson should place a mark next to your

F2p4buc2                        Charge

1   unanimous answer to each question.  Some questions must be

2   answered only if a certain answer was given to a previous

3   question, so please follow the directions regarding when to

4   skip questions.  Unless there are specific instructions

5   regarding a question, assume you must answer it.

6          Proceed to question 1.  (A) Fraudulent Transfer

7   (Claim 1).

8          1.  Do you find that plaintiff has proven that

9   Magnesium Corporation (MagCorp) or Renco Metals was insolvent

10  on, or rendered insolvent because of transfers made on, any of

11  the following dates, using the definition of insolvency

12  provided in instruction number 8?

13          Check "yes" or "no" for each date.

14          Then, it lists:

15          (a) December 8, 1995.  Yes or no?

16          (b) February 12, 1996.  Yes or no?

17          (c) May 16, 1996.  Yes or no?

18          (d) July 3, 1996.  Yes or no?

19          (e) May 19, 1997.  Yes or no?

20          (f) July 30, 1997.  Yes or no?

21          (g) January 5, 1998.  Yes or no?

22          (h) June 4, 1998.  Yes or no?

23          (i) October 14, 1998.  Yes or no?

24          Proceed to question 2.

25          2.  Do you find that the plaintiff has proven that

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1   Magnesium Corporation (MagCorp) or Renco Metals was left with

2   unreasonably small capital because of transfers made on any of

3   the following dates, using the definition of unreasonably small

4   capital provided in instruction number 10?  Check "yes" or "no"

5   for each date.

6          Again, it lists the same dates that I just read with

7   the prior question.

8          Proceed to question 3.

9          3.  Do you find that the plaintiff has proven that

10  Magnesium Corporation (MagCorp) or Renco Metals intended or

11  believed that it would incur debts beyond its ability to pay as

12  they became due because of fraudulent transfers made on any of

13  the following dates, as described in instruction number 7.

14  Check "yes" or "no" for each date.  Again, listing the same

15  dates that I described earlier.

16         If you answered "no" to every part of question 1,

17  every part of question 2, and every part of question 3, skip to

18  question 7 below.  Otherwise, proceed to answer questions 4, 5,

19  and 6.

20         Number 4.  This question involves only the defendant

21  The Renco Group, Inc.  If you answered "yes" to any portion of

22  question 1, question 2, and/or question 3, I instruct you that

23  defendant The Renco Group, Inc. is liable for fraudulent

24  transfers.  Accordingly, if you answered "yes" to any portion

25  of question 1, question 2, and/or question 3, you are directed

1    to indicate "yes" to this question:  Do you find that the

2    plaintiff has proven that The Renco Group, Inc., is liable for

3    fraudulent transfers in the 1996-1998 period, as they were

4    defined in instruction number 7?

5            If you answered question 4, proceed to question 5.

6            Question 5.  This question involves the individual

7    defendants listed below.  If you answered "yes" to any portion

8    of question 1, question 2, and/or question 3, you must also

9    determine if the plaintiff has proven that Magnesium

10   Corporation received less than a reasonably equivalent value in

11   exchange for the transfer.  Thus, if you answered "yes" to any

12   portion of question 1, question 2, and/or question 3, you must

13   answer the following question as to each defendant:  Do you

14   find that the plaintiff has proven that any of the following

15   defendants are liable for fraudulent transfers, as they were

16   defined in instruction number 7?  Check "yes" or "no" for each

17   defendant.

18           Then, it lists:

19           (a) Ira Rennert.  Yes or no?

20           (b) Michael Legge.  Yes or no?

21           (c) Ron Thayer.  Yes or no?

22           (d) Todd Ogaard.  Yes or no?

23           (e) Lee Brown.  Yes or no?

24           (f) Howard Kaplan.  Yes or no?

25           If you answered question 5, proceed to question 6.

1          This is question 6:  If you answered "yes" with regard

2     to a defendant in question 4 or question 5, what amount of

3     damages do you find the plaintiff has proven that defendant is

4     responsible for, using the guidance at instruction number 15?

5     Answer only with regard to defendants for whom you answered

6     "yes" in questions 4 or 5.

7                (a) The Renco Group.

8                (b) Ira Rennert.

9                (c) Michael Legge.

10               (d) Ron Thayer.

11               (e) Todd Ogaard.

12               (f) Lee Brown.

13               (g) Howard Kaplan.

14               Proceed to question 7.

15               Fraudulent conveyance (claim 2)

16          Do you find that the plaintiff has proven that any of

17     the following defendants are liable for fraudulent conveyances

18     under New York law, as they were defined in instruction numbers

19     11 through 13.  Check "yes" or "no" for each defendant.

20               (a)  Ira Rennert.

21               (b)  Michael Legge.

22               (c)  Ron Thayer.

23               (d)  Todd Ogaard.

24               (e)  Lee Brown.

25               (f)  Howard Kaplan.

F2p4buc2                              Charge

1          (g)   The Renco Group, Inc.

2          (h)   Trustees of the Rennert Trusts.

3          If you answered "no" as to all defendants in all parts

4     of questions 1, 2, 3, and 7, skip to question 21.

5          If you answered "no" as to all defendants in question

6     7 but answered "yes" to at least one part of question 1,

7     question 2, or question 3, skip to question 11.

8          If you answered at least one "yes" to question 7,

9     proceed to question 8.

10         Question 8.  If you answered "yes" with regard to any

11    defendants in question 7, what measure of damages do you find

12    that the plaintiff has proven that the defendant or defendants

13    are responsible for, using the guidance at instruction number

14    15?  Answer this question with respect to a particular

15    defendant only if you found that defendant liable by answering

16    "yes" to question 7.  Leave the space next to any other

17    defendant or defendants blank.

18         (a)   Ira Rennert.

19         (b)   Michael Legge.

20         (c)   Ron Thayer.

21         (d)   Todd Ogaard.

22         (e)   Lee Brown.

23         (f)   Howard Kaplan.

24         (g)   The Renco Group, Inc.

25         (h)   Trustees of the Rennert Trusts.

F2p4buc2                         Charge

1          If you answered any portion of question 8, proceed to

2     question 9.

3                C.  Aiding and abetting fraudulent conveyances

4     (claim 3)

5          Answer only if you marked at least one "yes" answer to

6     question 7 to at least one defendant other than Ira Rennert.

7     If you answered "no" to all parts of question 7 or your only

8     "yes" answer to question 7 was to Ira Rennert, you skip to

9     question 11.

10          Question 9.  Do you find that the plaintiff has proven

11     that defendant Ira Rennert aided and abetted fraudulent

12     conveyances on any of the following dates under the standard

13     defined in instruction number 14?  Check "yes" or "no" for each

14     date.

15          And then, once again, all of the dates I read earlier

16     are listed.

17          If you answered "no" to all parts of question 9, skip

18     to question 11.  If you answered "yes" to any portion of

19     question 9, proceed to question 10.

20          10.  If you answered "yes" to any part of question 9,

21     what measure of damages do you find that the plaintiff has

22     proven that defendant Ira Rennert is responsible for with

23     regard to aiding and abetting fraudulent conveyances, using the

24     guidance at instruction number 15?

25          Proceed to question 11.

1          D.   Breach of fiduciary duty and aiding and abetting

2     breach of fiduciary duty (Claims 4 and 5).

3          Number 11.  With respect to any transfer for which you

4     found MagCorp or Renco Metals insolvent or inadequately

5     capitalized, do you find that the plaintiff has proven that any

6     of the following defendants committed a breach of a fiduciary

7     duty as defined in instruction number 16?  Check "yes" or "no"

8     for each defendant.  Listing:

9               (a)   Ira Rennert.

10              (b)   Michael Legge.

11              (c)   Ron Thayer.

12              (d)   Howard Kaplan.

13              (e)   Todd Ogaard.

14              (f)   Lee Brown.

15              (g)   Roger Fay.

16              (h)   Justin D'Atri.

17              (i)   Michael Ryan.

18              (j)   Dennis Sadlowski.

19          If you answered "no" to all defendants in question 11,

20     skip to question 15 below.  Otherwise, proceed to answer

21     questions 12, 13, and 14.

22          12.   Answer only if you marked at least one "yes"

23     answer to question 11.  Do you find that the plaintiff has

24     proven that any of the following defendants aided and abetted a

25     breach of fiduciary duty as defined in instruction number 17?

F2p4buc2                        Charge

1    Check "yes" or "no" for each defendant, again listing:

2            (a)   Ira Rennert.

3            (b)   Michael Legge.

4            (c)   Ron Thayer.

5            (d)   Howard Kaplan.

6            (e)   Todd Ogaard.

7            (f)   Lee Brown.

8            (g)   Roger Fay.

9            (h)   Justin D'Atri.

10           (i)   Michael Ryan.

11           (j)   Dennis Sadlowski.

12           (k)   The Renco Group.

13           If you answered question 12, proceed to question 13.

14           13.   If you answered "yes" with regard to a particular

15   defendant in question 11 or question 12, what level of damages

16   do you find that the plaintiff has proven that defendant was

17   responsible for, using the guidance in instruction number 18.

18   Answer only with regard to those defendants for which you found

19   liability by answering "yes" to question 11 and/or question 12.

20   Do not include any amount for punitive damages in your answer

21   to this question.  And then listing:

22           (a)   Ira Rennert.

23           (b)   Michael Legge.

24           (c)   Ron Thayer.

25           (d)   Howard Kaplan.

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

F2p4buc2                        Charge

1            (e)   Todd Ogaard.

2            (f)   Lee Brown.

3            (g)   Roger Fay.

4            (h)   Justin D'Atri.

5            (i)   Michael Ryan.

6            (j)   Dennis Sadlowski.

7            (k)   The Renco Group.

8            If you answered any part of question 13, proceed to

9    question 14.

10           Punitive damages.  If you answered "yes" with regard

11   to a particular defendant in question 11 or question 12, you

12   must determine whether the plaintiff has proven that punitive

13   damages should be imposed upon that defendant.  Accordingly,

14   you should answer this question only with regard to those

15   defendants you found liable in question 11 or question 12 by

16   answering "yes" as to that defendant.  For all defendants to

17   whom you gave a "yes" answer in question 11 or question 12, you

18   must first indicate whether you find that punitive damages

19   should be imposed against that defendant, using the guidance in

20   instruction number 19.  To do this, check "yes" or "no" next to

21   the defendant's name.  Second, if you answered "yes" to any

22   particular defendant, you must indicate the amount of punitive

23   damages that the defendant should be responsible for on the

24   line below.  Again, listing all of the defendants that I just

25   read.

F2p4buc2                    Charge

1              Proceed to question 15.

2              E.   Unlawful dividends and unlawful stock redemptions

3    (Claims 6A, 6B, and 6C)

4              15.   Do you find that the plaintiff has proven that

5    defendant Ira Rennert made unlawful dividend payments as

6    defined in instruction number 12.   Yes or no?

7              Proceed to question 16.

8              16.   Do you find that the plaintiff has proven that

9    defendant Ira Rennert made unlawful stock redemptions as

10   defined in instruction number 21?   Yes or no?

11             If you answered "no" to both question 15 and question

12   16, skip to question 21.   If you answered "yes" to question 15,

13   question 16, or both, answer question 17.

14             17.   Do you find that defendant Rennert has met his

15   burden of establishing a good faith defense, as defined in

16   instruction number 22?   Yes or no?

17             If you answered "yes" to question 17, skip to question

18   21.   If you answered "no," proceed to questions 18 and 19.

19             18.   If you answered "yes" to question 15 and/or

20   question 16 and "no" to question 17, what measure of damages do

21   you find the plaintiff has proven that defendant Ira Rennert is

22   responsible for, using the guidance at instruction number 24?

23             If you answered question 18, proceed to question 19.

24             19.   Do you find that the plaintiff has proven that

25   defendant The Renco Group, Inc. is liable for unlawful

1    dividends under the standard as I have defined it for you in

2    instruction number 23?  Yes or no?

3         If you answered "no" to question 19, skip to question

4    21.  If you answered "yes" to question 19, answer question 20.

5         Number 20.  If you answered "yes" to question 19, what

6    measure of damages to you find that the plaintiff has proven

7    that defendant The Renco Group, Inc. is responsible for, using

8    the guidance at instruction number 24.

9         Proceed to question 21.

10        F.  Unjust enrichment (Claim 7).

11        21.  Do you find that the plaintiff has proven that

12   defendants Ira Rennert or the Trustees of the Rennert Trusts

13   received a direct benefit from Magnesium Corporation and/or

14   Renco Metals that defendants Ira Rennert or the Trustees of the

15   Rennert Trusts were not entitled to receive?  Yes or no?

16        If you answered "no" to question 21, do not answer

17   questions 22 and 23.  If you answered "yes" to question 21,

18   proceed to question 22.

19        22.  If you answered "yes" to question 21, do you find

20   that Magnesium Corporation and/or Renco Metals was harmed by

21   conveying the direct benefit you identified in response to

22   question 21?  Yes or no?

23        If you answered "no" to question 22, do not answer

24   question 23.  If you answered "yes" to question 22, proceed to

25   question 23.

F2p4buc2                          Charge

1           23.  If you answered "yes" to question 22, what do you

2     find was the value of the benefit conferred by MagCorp and/or

3     Renco Metals on defendants Ira Rennert and Trustees of the

4     Renco trusts?

5           The last page says, after completing the form, each

6     juror who agrees with the verdict must sign below.

7           Members of the jury, I'm going to ask for a few more

8     moments of patience, sit quietly there or you may stand or

9     stretch, but please remain silently for a few moments as I

10    speak with the lawyers at the side bar.

11           (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F2p4buc2                    Charge

1              (At the sidebar)

2              THE COURT:  Anything that I read wrong, counsel?

3              MR. HAVELES:  Yes, your Honor.  Page 7, your Honor,

4      line 6.

5              THE COURT:  Page 7, line 6.

6              MR. HAVELES:  You said, should not show any prejudice

7      against any party or his client, instead of any attorney or his

8      client.

9              I'm not sure that is material enough to justify.

10             THE COURT:  Are you asking me to --

11             MR. HAVELES:  No, it is not necessary.

12             THE COURT:  Anything else I read wrong?

13             Do you have anything --

14             MR. STIRLING:  We have no material.

15             MR. HAVELES:  I note a typo on page 20.  The word "if"

16     is spelled as "ig."

17             MR. BEUS:  We will waive that complaint.

18             THE COURT:  No one cares about that typo.  Okay.

19             MR. HAVELES:  Page 27.  I'm just doing what you asked,

20     your Honor.

21             THE COURT:  Fair enough.

22             Anything that I read wrong that you care about is what

23     I'm looking for here.

24             MR. BEUS:  We have nothing.

25             MR. HAVELES:  Page 27, your Honor.  Line 9, instead of

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

F2p4buc2                      Charge

1    net worth appreciation payments, you said net worth

2    appreciation agreements.  That should be corrected.

3              THE COURT:  I will correct that.  I said agreements.

4              MR. HAVELES:  Your Honor, for the purposes of the

5    record, I note my continuing objection, notwithstanding your

6    reservation with respect to the New York law, as to the

7    individual Utah defendants.

8              The punitive damages charge and the unjust enrichment

9    charge without the proviso that it should be considered only if

10   there is a fraudulent transfer or conveyance.  I note those

11   continuing objections for the purpose of just preserving my

12   record for appeal.

13             THE COURT:  Okay.

14             MR. STIRLING:  Just so it's clear, I don't think it is

15   necessary to do that to preserve the record.  We will stand on

16   the record we made earlier.

17             THE COURT:  It is not, and you do.

18             (Continued on next page)

19

20

21

22

23

24

25

1              (In open court; jury present)

2              THE COURT:  Members of the jury, I had to make sure

3    that I didn't make any mistakes in my reading of the

4    instruction.

5              Just one I want to note.  When you get the written

6    one, it will be corrected.  On page 7, instruction number 18,

7    in the last sentence, I said net worth appreciation agreements,

8    but it is actually net worth appreciation payments.  The

9    written instruction is correct.  I wanted to make sure that I

10   had read the instructions correctly.

11             With that, as you go into the jury room, we're going

12   to give you each a copy of the instructions that I read, each a

13   copy of the verdict form, and an extra verdict form, which is

14   what will be filled out by the foreperson and signed by all of

15   you when you have completed your deliberations.

16             There are envelopes and paper and writing implements

17   for any notes that come out that should be written by the

18   foreperson, any notes or questions, and lunch will be brought

19   in to you at 12:30.  You are to continue a working lunch for

20   your deliberations.

21             Other than that, we will wait to hear from you.

22             So I'm directing my staff, as they go in, to hand out

23   the copies of the instructions and the verdict forms.  With

24   that, I thank you very much, members of the jury.

25             One more thing.  We have a marshal to secure the

F2p4buc2                          Charge

1    jury's deliberations.

2              Sir, would you come forward.

3              (Marshal sworn)

4              THE COURT:  All right.  With that, you may head into

5    the jury room.

6              Thank you very much.

7              (At 10:30 a.m., the jury retired to deliberate)

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

F2p4buc2                         Charge

1             (In open court; jury not present)

2             THE COURT:  Anything to take up?

3             MR. HAVELES:  Your Honor, I believe the exhibits need

4   to be transported into the jury room.

5             THE COURT:  They do.

6             MR. HAVELES:  Several boxes.

7             THE COURT:  They will go from you to my deputy clerk

8   to the marshal, who will bring them in the room.

9             MR. HAVELES:  Yes, your Honor.

10            THE COURT:  I meant to say this and forgot:  You

11  should be here or very close to here.

12            I meant to tell the jurors that I give you a lunch

13  break.  So you can take a lunch break at 12:30, when they get

14  their lunch, on the assumption we won't get a note for about

15  45 minutes.

16            Otherwise, you should be about or letting Ms. Nunez

17  know how to get you back here within a minute or two, so that

18  if any notes come out we can address them promptly.

19            MR. HAVELES:  Your Honor, Mr. Park, Mr. Fuisz, and I

20  will be here at all times.

21            One quick question, though:  What time do you intend

22  to send the jury home today if no verdict is reached?

23            THE COURT:  I let them decide.  If I get a question

24  from them as to when it will be, I will tell them, by all

25  means, they can stop at 5:00 and resume in the morning; that if

1    they want to, they all want to continue, they may continue.  No

2    one has ever taken me up on that.  But sometimes they're close,

3    and that could happen.  But presumably, if they're not done

4    today, they will finish at 5:00.  I will bring them out,

5    instruct them, and remind them of the continuing instructions

6    that pertain, and then I will tell them to resume deliberations

7    at 9:30 tomorrow morning, when they are all present.

8              Anything else?

9              MR. HAVELES:  Nothing from this side, your Honor.

10             MR. STIRLING:  Nothing, your Honor.

11             THE COURT:  My deputy just reminded me, Court Exhibit

12   8, which everybody has agreed is the list of admitted exhibits,

13   is going to go back as a cover to the exhibits.

14             MR. HAVELES:  Yes, your Honor.

15             MR. STIRLING:  Is that Court Exhibit 8?  I had it as

16   9; 8, I think was the list that was marked pages 458, 459 of

17   the transcript, what was originally going to be Court

18   Exhibit 1.

19             THE COURT:  You're correct.  Court Exhibit 9.

20             MR. STIRLING:  Very well.

21             THE COURT:  Thank you.

22             We will wait until we hear from the jury.  As I said,

23   you can take about a 45-minute lunch break at 12:30.

24             (Recess pending verdict)

25             (Continued on next page)

F2PMBUC3

```
 1           THE COURT:  I received a note which says at the top:

 2   Request.  Then it lists a bunch of things.  I will just read

 3   what it says.  Notice of violation-EPA; settlement

 4   agreement-EPA; MagCorp balance sheets, '93 to '98; AMAX note,

 5   Exhibit No. 2092.  Then under that, amount of dividends for

 6   each defendant and dates.

 7           They have the exhibits.  I don't understand the

 8   request for Exhibit 2092.  To the extent some of the things

 9   that they are seeking are exhibits, we can certainly point them

10   to the exhibit number.

11           Taking these one at a time, notice of violation-EPA.

12           MR. HAVELES:  It must be referring to the 1992 Utah

13   one because the EPA in 2001 complaint is not in evidence, your

14   Honor.  Likewise, the settlement agreement refers to the '97

15   settlement agreement.

16           THE COURT:  I assume so, too.  Are they in evidence?

17           MR. HAVELES:  They are both in evidence, your Honor.

18           THE COURT:  The first one, notice of violation.

19           MR. HAVELES:  I need to look up the exhibit numbers

20   for each of them, your Honor.

21           The balance sheets for '93 through '98 are scattered

22   through a variety of different documents, and I would need to

23   go through them to -- and they are not uniformly in the same

24   documents.  So we would need to go through the documents to

25   pick out which ones they are.
```

F2PMBUC3

1            The AMAX note is a page in a compilation of documents.

2            THE COURT:  Go ahead.

3            MR. HAVELES:  As to 2902, I don't know --

4            THE COURT:  2092.

5            MR. HAVELES:  2092, I don't know.

6            THE COURT:  My deputy says it's not in evidence.

7            MR. HAVELES:  I don't know what that exhibit is, off

8    the top of my head.

9            MR. S. STIRLING:  Your Honor, I think 2092 is related

10   to the following request:  The amount of dividend for each

11   date, because that document is 2090.

12           THE COURT:  Somebody thought it was 2092.

13           MR. S. STIRLING:  I think that maybe is what happened.

14           THE COURT:  2090 is in evidence?

15           MR. S. STIRLING:  Yes.  Let me just confirm --

16           MR. HAVELES:  I need to look at that just to be sure

17   as well.

18           THE COURT:  I'll step down.  Take a few moments to

19   come up with and confer as to what you think is the appropriate

20   document to point them to is, if there is such a document and,

21   in the absence of that, what you propose to be sent to them.

22           MR. HAVELES:  Yes, your Honor.

23           THE COURT:  I think I've told you this.  But if I have

24   not, my procedure is, I bring them all in, I read the note out

25   loud verbatim, just to make sure that everybody has heard it,

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

2964

F2PMBUC3

1    and then provide what I've come to conclude based on your input

2    is the correct answer.

3         They didn't use an envelope for this note.  Assuming

4    they have envelopes, I will tell them to stick it in an

5    envelope.

6         I'll come back in a few moments.

7         (Recess pending verdict)

8         THE COURT:  Do you have a proposal?

9         MR. HAVELES:  Your Honor, the NOV is Exhibit 8051, the

10   settlement agreement is 8825.  The AMAX note is Exhibit 2172,

11   starting at page 0127.

12        THE COURT:  Skipping for the moment the balance

13   sheets?

14        MR. HAVELES:  Yes.  It's a little more complicated,

15   your Honor.

16        THE COURT:  I'm sorry.  Give me the note again.

17        MR. HAVELES:  2172, starting at page 0127.

18        THE COURT:  And then we believe they are asking for

19   2090.

20        MR. HAVELES:  I concur with that, your Honor.

21        There is also information.

22        THE COURT:  I'm sorry.  Pardon me.  On that one what

23   I'll say is, I'll read what they said and say there is not in

24   fact a 2092 in evidence.  We believe that what they are

25   referring to by asking for amount of dividends for each

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

F2PMBUC3

1    defendant and dates, that they are looking for Exhibit 2090.

2          MR. S. STIRLING:  Your Honor, because that information

3    is also in the agreed facts that we marked yesterday as Exhibit

4    2792, beginning on page 19, all of the payments are listed

5    there.

6          MR. HAVELES:  Except, however, starting on page 19,

7    and this is where it gets -- I don't think there is any

8    evidence that was put in the evidence.  The stipulated facts

9    aggregate says what the total number of NWAPA payments to the

10   totality of the individuals were during a calendar year, but

11   there is no itemization of the net worth appreciation payments

12   by individual in the stipulated facts, nor did plaintiff

13   introduce any documents showing the amounts of the specific

14   payments to individuals of the net worth appreciation payments.

15         MR. S. STIRLING:  Your Honor, I believe those are

16   listed in the 10-Ks for 1998 or 1999.  We can find those

17   exhibit numbers for it as well.

18         MR. HAVELES:  Do they go back to the '95 payments,

19   though?

20         MR. R. STIRLING:  It's fiscal '96, which would cover

21   December '95.  I believe it is broken out for at least three of

22   the individuals, and I believe in a footnote it refers to Brown

23   and one of the other -- Ogaard might be referenced in a

24   footnote.

25         THE COURT:  Here is my view.  Someone obviously had in

F2PMBUC3

1    their head 2090 because they asked for 2092.  And what they

2    wrote is the amount of dividends for each defendant and dates.

3    So my inclination is simply to point them to 2090.

4              MR. HAVELES:  That's fine, your Honor.

5              As to the balance sheets, your Honor, there are

6    balance sheets for MagCorp for '95 through '98.  The balance

7    sheets that are in the record for '93 and '94 are for Renco

8    Metals, which includes both Renco and Sabel.  There is no

9    separate balance sheet, even in the segment accounting in the

10   10-K, for MagCorp alone.

11             I can give you the exhibit numbers for fiscal year

12   ending October 31 of each of the years.  Fiscal year '95 is

13   8139; fiscal year '96 is 8428; fiscal year '97 is 8308; and

14   fiscal year '98 is 8369.  Let me just check the '96 one, your

15   Honor.  I think I miswrote the number.  I did miswrite the

16   number for '96.  The correct number is 8248.

17             THE COURT:  What year is that?

18             MR. HAVELES:  This is for '96.  It's 8248.  As I said,

19   there are no standalone balance sheets for MagCorp in the

20   record for '93 and '94.

21             THE COURT:  What's the proposal on that?

22             MR. S. STIRLING:  The question exactly that they

23   asked.

24             THE COURT:  It says:  MagCorp –– little hard to read.

25   It says M-a-g-c-o –– looks to me like c-o-o-r.

SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

F2PMBUC3

1            MR. S. STIRLING:  In any case --

2            THE COURT:  In any case, it means MagCorp.  It says

3   MagCorp balance sheets, '93 to '98.

4            One possibility is to respond by saying that the

5   MagCorp balance sheets in the record can be found at, and then

6   listing each fiscal year with the exhibit number.

7            Mr. Stirling.

8            MR. S. STIRLING:  I have not another proposal to make,

9   your Honor.

10            THE COURT:  Mr. Haveles.

11            MR. HAVELES:  I am looking at the footnotes that

12   Mr. Stirling referred me to about the net worth appreciation

13   payments to see what they say about payments.

14            Your Honor, with respect to the net worth appreciation

15   payments, the 10-Ks to which Mr. Stirling alluded, show the

16   specific payments for Legge, Kaplan, and Thayer.  They do not

17   show the amount of the payments for Brown and Ogaard.  Those

18   are Exhibit 8330 at page 0039 and 8382 at page 0043 for Legge,

19   Kaplan, and Thayer.  I don't believe there are any documents

20   that shows the specific amounts paid to Brown and Ogaard in any

21   other document.

22            THE COURT:  I got 8330 at page 0039.

23            MR. HAVELES:  And 8382, your Honor, for page 0043.

24            THE COURT:  8382 at 0043.

25            MR. HAVELES:  Yes, your Honor.

F2PMBUC3

```
 1              THE COURT:  And those are, again, for --

 2              MR. HAVELES:  For Legge, Kaplan, and Thayer.

 3              THE COURT:  So the proposal would be to say:  They

 4     have indicated 2092.  That's not in evidence.  It seems as

 5     though they are referring to 2090, listing the dividend amounts

 6     for who?

 7              MR. HAVELES:  That one shows the dividend payments

 8     paid to the Renco Group.

 9              THE COURT:  And then we can point them to 8330 at page

10     on 0039 and 8382 at page 0043 to find the net worth

11     appreciation payments to Mr. Legge, Mr. Kaplan, and Mr. Thayer.

12              MR. HAVELES:  I will note, your Honor, in that regard,

13     for clarity purposes they show the total dollar amount paid

14     during a fiscal year.  They don't break it down by transfer

15     dates.  So there is no allocation of the payments made to those

16     three individuals by transfer date.  It just shows the total

17     amount in a particular fiscal year paid to an individual.  And

18     as the jury verdict form that your Honor read indicates, there

19     are numerous dates within each fiscal year.  There are several

20     in fiscal '96, several in fiscal '97, and '98.

21              THE COURT:  Again, what's your proposal?

22              MR. HAVELES:  My proposal is they can look for the

23     total dollar amount paid in a fiscal year as to those three

24     individuals on the pages that we have identified, your Honor.

25              THE COURT:  Let me get it down.  And I'll ask you,
```

F2PMBUC3

1     Mr. Stirling, anything else?

2         MR. S. STIRLING:  Yes, your Honor.  I think if we are

3     going to refer them to information about net worth appreciation

4     payments, anything other than strictly dividends, that we

5     should refer them to Exhibit 2792 and the agreed facts.  I

6     think that information will be helpful to them.  It may help

7     them frame additional questions.  But we think they can

8     determine the answers to their questions from the agreed facts.

9         MR. HAVELES:  I have problems with the agreed facts.

10     But it just tells them the totality of dollars paid to the

11     group in a calendar year without breaking it down by individual

12     on the net worth appreciation payments.  I have no problem with

13     the reference to that.  I think they are going to find it

14     somewhat opaque when they read the paragraphs.

15         THE COURT:  I do the 2090, I do the 8330, 8392, as we

16     have discussed, including saying that those are for total

17     dollar amounts paid in the fiscal year as to Legge, Kaplan and

18     Thayer.  Given what they are asking here, they may also want to

19     look at stipulated facts at 2792.

20         MR. HAVELES:  To be precise, your Honor, it is pages

21     19 through 22 for everything, both dividends and net worth

22     appreciation.

23         THE COURT:  The suggestion would be to just point them

24     to that.  In light of what they are asking for, they may also

25     want to look at 2792, pages 19 to 22.  That seems quite

F2PMBUC3

1    reasonable.

2              MR. S. STIRLING:  We are fine with that, your Honor.

3              THE COURT:  Anything else, Mr. Stirling?  On the

4    MagCorp balance sheets, the proposition is to say, they have

5    asked for '93 to '98.  I can point them to the balance sheets

6    for MagCorp for fiscal year '95, '96, '97, '98 period.

7              MR. HAVELES:  With those exhibit numbers, yes, your

8    Honor.

9              THE COURT:  Yes.

10             MR. HAVELES:  Thank you.

11             THE COURT:  Okay, Mr. Stirling?

12             MR. S. STIRLING:  Yes, your Honor.  We don't have all

13   of these numbers in front of us right at moment, your Honor.

14             MR. HAVELES:  I will repeat them again.

15             MR. S. STIRLING:  I was referring to something else.

16   The net worth appreciation agreements themselves are in

17   evidence.

18             MR. HAVELES:  I don't think what's what they asked

19   for.  They are looking for numbers, not the underlying

20   agreements.

21             THE COURT:  For my mind, I think the farther we go

22   down this road the more likely I am just going to say 2090,

23   since that's what they asked for.

24             MR. S. STIRLING:  I think, your Honor, with what we

25   have identified, I think they can figure it out, the answers to

F2PMBUC3

1    their questions, or they can let us know if need further

2    direction.

3          THE COURT:  We don't know what they are looking for

4    exactly.  I think it's likely, answer what's asked and then if

5    there are more, answer them.

6          MR. S. STIRLING:  Very well.

7          THE COURT:  We will bring them out.  I will read the

8    note.  I will give the answers we have discussed.  And then

9    I'll send them back.  I will ask them to put future notes in an

10   envelope.

11         I am going to shorten your break now, because of a

12   note that fast, to 30 minutes.  I will just tell them in the

13   next 30 minutes we will be a little slow to respond.

14         MR. HAVELES:  That's fine, your Honor.

15         (Jury present)

16         THE COURT:  I received a note and I want to read the

17   note and give you the responses.  The note says at the top:

18   Request and then first lists, notice of violation-EPA.  The

19   response to that is it can be found in Exhibit 8051.

20         Settlement agreement-EPA, Exhibit 8825.

21         Next, MagCorp balance sheets, year '93 to '98.  I can

22   point you to MagCorp balance sheets for the following fiscal

23   years:  Fiscal year '95 is at Exhibit 8139; fiscal year '96 is

24   at 8248; fiscal year '97 is at 8308; and fiscal year '98 is at

25   8369.

1           Next, the request asks for the AMAX note which can be

2     found at Exhibit 2172, starting at page 0127.

3           The next request is Exhibit No. 2092 and then under

4     that is written, amount of dividends for each defendant and

5     dates.  We believe that you may be asking for 2090.  2092 is

6     not a document in evidence, but 2092 we think may be what you

7     are looking for.  I can also point you to the following

8     documents:  Exhibit 8330 at page 0039, and 8382 at page 0043.

9     You can look here for the total dollar amount paid in a fiscal

10    year with respect to the following three individuals:  Legge,

11    Kaplan, and Thayer.  You may also give them what you have asked

12    for, what to look to, Exhibit 2792, which is the stipulated

13    facts, agreed facts and, in particular, at pages 19 to 22.

14          MR. S. STIRLING:  Agreed.

15          MR. HAVELES:  Agreed, your Honor.

16          THE COURT:  Thank you.

17          That's the responses to the questions.

18          Just a few additional directions.  I will ask if other

19    notes come out if you could put them in the envelope.  There is

20    some envelopes in there, seal it, pass it to the marshal.  I

21    would appreciate it.

22          I also want you to know, I am going to give the

23    attorneys just a 30-minute break now for lunch.  Otherwise,

24    they are here and I'm here.  If you have a note in the next 30

25    minutes, we will be a little bit slow to respond.  Otherwise,

1    we will get to anything you ask as fast as we can.

2              Thanks so much.  You can return to the jury room.

3              (Jury deliberations resumed, time noted:  1238 p.m.)

4              THE COURT:  I will mark the first note that has come

5    out that I just read from as Court Exhibit 10.

6              I also want to indicate, I received a press request

7    for the verdict form.  I think what I am going to do, I meant

8    to do this anyway, I always mark the final instructions and the

9    blank verdict form as court exhibits.  I will now mark the jury

10   charge as Court Exhibit 11 and the blank verdict form as Court

11   Exhibit 12.  All the court exhibits usually go up on the docket

12   at the end.  But since I have a request, I will just docket

13   separately now Court Exhibits 11 and 12.

14             Anything else?

15             MR. HAVELES:  No, your Honor.

16             THE COURT:  We will wait to hear from the jury.  Thank

17   you.

18             (Recess pending verdict)

19             THE COURT:  I did receive another note requesting

20   items from the jury which I'll mark as Court Exhibit 13.  The

21   first is exhibits not found, No. 8139 and 8248.  8139 is not on

22   my list and 8248 is not on my list.

23             MR. HAVELES:  I apologize, your Honor, because I was

24   working from an unannotated list.  Let me see if there is a

25   defendants' version of those particular documents for those

F2PMBUC3

1    particular years.

2              THE COURT:  Thank you.

3              I suppose we should have checked what we were pointing

4    them to was actually an exhibit in evidence.

5              MR. HAVELES:  I thought they had been offered as part

6    of the financial exhibits, your Honor, and that's my mistake.

7              THE COURT:  I understand.

8              MR. HAVELES:  Your Honor, I want to check.  I think

9    they were marked twice.

10             THE COURT:  I was going to ask Mr. Stirling if he had

11   any.

12             MR. HAVELES:  I think I have it.

13             THE COURT:  If I may, while you are doing that --

14             MR. HAVELES:  I just want to look at it.

15             I do have them, your Honor.  8846 at page 3 --

16             THE COURT:  Sorry.  This is to replace 8139?

17             MR. HAVELES:  Yes.

18             THE COURT:  8139 is, in fact --

19             MR. HAVELES:  8846 at page 3, 0344.  I will also note

20   that this document shows for the jury's reference, this is for

21   the -- I'm sorry.  Wrong page, your Honor.  I gave you a

22   calendar one.

23             Your Honor, the correct page is 0248 and that shows

24   the balance sheet for fiscal year ending October 31, 1995.

25   Consistent with accounting convention, it also shows the

F2PMBUC3

1    balance sheet for the year preceding seeding October 31, 1994.

2    That partially answers the jury's question looking for the '94

3    balance sheet for MagCorp.  That's page 248 of Exhibit 8846.

4              THE COURT:  I'll tell them that that 8139 is, in fact,

5    8846 at page 0248.  And 8248 is --

6              MR. HAVELES:  8847.  I just have to get you the page

7    number, your Honor.  The page number is 0265 on Exhibit 8847

8    and that is the balance sheet for the fiscal year ending

9    October 31, 1996.

10              THE COURT:  Mr. Stirling.

11              MR. S. STIRLING:  Your Honor, I'm sorry we didn't get

12    this information sooner, but on the defendants' list, as well,

13    8844 is the MagCorp financial statements for 1993 and 8845

14    include the financial statements for 1994.  So the two earlier

15    years that the jury had requested are, I believe, both in

16    evidence as well.

17              MR. HAVELES:  Mr. Stirling is right about 8845 and

18    I'll get the page number for you in a moment, your Honor.  I

19    apologize for not having seen that earlier.  The page number on

20    8845, your Honor, is page 0261, and that is the balance sheet

21    for the fiscal year ending October 31, 1994 and showing the

22    prior year balance sheet, October 31, 1993.

23              THE COURT:  So do we need 8844 as well?

24              MR. HAVELES:  Yes.

25              THE COURT:  You want to give me the page number for

F2PMBUC3

```
1    8844.

2              MR. HAVELES:  Sure, your Honor, I can do that.  On

3    8844 the page is 0231.  Shows the balance sheet as of the end

4    of the fiscal year October 31, 1993 and it shows the prior

5    year, balance sheet for October 31, 1992.

6              THE COURT:  I'll tell them for 8139, in fact, they

7    should look to 8846 at page 0248 for the fiscal year ending

8    October 31, 1995, and instead of 8248 they should look at 8847

9    at 265.  What year is that for?

10             MR. HAVELES:  It shows the fiscal year '96.  Looking

11   backwards, the fiscal year '95 as well.

12             THE COURT:  Ending fiscal year 1996 and also,

13   consistent with their earlier request, I can also point them to

14   8844 at 0231 for the fiscal year ending October 1993, and 8845

15   at 261 for the fiscal year ending in October of 1994.

16             The next thing they say, it says:  Needed.

17   Document-testimony regarding -- I believe it says "lacking of

18   permit."

19             MR. HAVELES:  I think that may take some time, your

20   Honor, because there was one snippet of testimony shown in Mr.

21   Beus' closing, but it was a snippet of longer testimony by Mr.

22   Tripp, so we are going to have to look through Mr. Tripp's

23   testimony.  I don't have an immediate answer on that.

24             THE COURT:  And then the last under the needed is,

25   dash, testimony from yesterday, of which there was none.
```

2977

F2PMBUC3

1    MR. HAVELES:  That was all closing argument.

2    THE COURT:  I would propose telling them that they

3    have asked for testimony from yesterday.  Of course, there was

4    just closings yesterday and, as I've instructed them,

5    statements of counsel, including closings, are not evidence and

6    that I can only send back to the jury room admitted evidence.

7    MR. HAVELES:  That sounds good.  Can we have about

8    five minutes to look for that testimony, your Honor?

9    THE COURT:  You can.  I just want to get agreement on

10   what I just said.

11   Mr. Stirling.

12   MR. S. STIRLING:  Yes, your Honor.

13   MR. HAVELES:  Makes sense to me.

14   THE COURT:  So the open issue that you are looking for

15   is what they have indicated as document/testing-testing

16   regarding "lacking of permit."

17   MR. S. STIRLING:  Your Honor, I think, pages 1334 and

18   1335 of the transcript, where I asked Mr. Tripp whether they

19   had a permit to treat, store, dispose of hazardous waste.

20   THE COURT:  Thank you.  I am going to step down, see

21   if you can find what you need, see if you can come to

22   agreement.  I'll come back in a few minutes.  If you are ready,

23   let Ms. Nunez know and she will come get me.

24   (Recess pending verdict)

25   MR. HAVELES:  Do you want to deal with the pending

F2PMBUC3

1   note first?

2           THE COURT:  Sure.

3           MR. HAVELES:  We have looked at the testimony --

4           THE COURT:  No.  Just because this is just a print

5   job, maybe somebody can do it.  They are asking for nine copies

6   of Exhibit 2792.  It says please and thank you, which is nice.

7   I assume nine copies because they have one.  If somebody could

8   print -- Mr. Stirling, it's your exhibit.  That was the next

9   note which I will mark as Court Exhibit 14.

10          Returning to the earlier note, go ahead, Mr. Haveles.

11          MR. HAVELES:  Mr. Stirling had identified some

12  testimony for us to look at, your Honor.  And we concur that

13  starting at page 1334, line 21 through page 1335, line 11.  We

14  have looked to see if there is any corresponding testimony

15  during my examination on this subject, and not any that is a

16  clear correspondence, so that would be the only testimony.

17          THE COURT:  While you are looking at that, could

18  somebody print those page and line numbers, and then we will

19  get you a marker to redact anything on the page that's not

20  responsive so that we can just hand them the testimony to take

21  back.

22          MR. S. STIRLING:  Your Honor, if I may, could I cut

23  and paste that on to a Word, just those lines onto a Word --

24          MR. HAVELES:  Your Honor, we have some additional

25  testimony.  Page 1380, line 12 through 1381, line 5.  That also

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

1    deals with the issue of permit.

2              THE COURT:  Can someone, while Mr. Stirling is looking

3    at that, just remind me what 2792 is --

4              MR. HAVELES:  Stipulated facts.

5              THE COURT:  Thank you.

6              MR. R. STIRLING:  Your Honor, if I may, I'm printing

7    2792.  I don't know if we will have enough paper for nine

8    copies of it, though.

9              MR. HAVELES:  We might have some additional paper.

10             THE COURT:  We can lend a hand here.

11             Mr. Stirling, I will certainly give you time to

12   continue looking at what Mr. Haveles proposes, but I think the

13   best way to do this is just to actually, if you can -- if not,

14   we will help -- but print the pages from the transcript with

15   redaction of anything that's not responsive and that way we are

16   not cutting and pasting.  It's clear if there are two sets that

17   they are from different times and the like.

18             Mr. Haveles, are you able to print yours?

19             MR. HAVELES:  Sure.

20             THE COURT:  Okay, Mr. Stirling.

21             MR. S. STIRLING:  Yes, your Honor.

22             MR. HAVELES:  Your Honor, we also ask that the jury

23   look at page 2116, starting at line 25 through 2117 at line 11.

24             THE COURT:  You had proposed, Mr. Stirling, 1334, line

25   21 through 1335, line 11.

F2PMBUC3

1          MR. S. STIRLING:  Yes, your Honor.

2          THE COURT:  And then defendants' additional requests

3  are 1380, line 12 through 1381, line 8 and 2116, line 25

4  through 2117, line 11.

5          MR. S. STIRLING:  Yes.  I'm just looking at the

6  second.

7          THE COURT:  I'm hoping somebody is printing these.

8          MR. HAVELES:  We are attempting to, your Honor.  Just

9  some technical logistics of hooking up the hard drive to the

10 machine that's connected to the printer.

11         THE COURT:  Presumably, there might be other testimony

12 requests.  Whatever you can do.

13         MR. HAVELES:  To expedite it.  I understand.  This is

14 our first dry run.  We will get it down for the next time more

15 quickly.

16         While we are waiting, your Honor, once we get these

17 excerpted, how would they be presented, read by your Honor?

18         THE COURT:  I will send it back.  But just with

19 blacked out anything that we have not agreed to.

20         MR. HAVELES:  Got you.  Thank you.

21         THE COURT:  In fact, what we could do is bring them

22 in, I can tell them what we have discussed regarding the

23 exhibits, tell them that we are pulling together the testimony

24 that they have asked for, we will send that back shortly, give

25 my answer about their request for the testimony from yesterday,

F2PMBUC3

1    and then tell them that we are making copies of 2792 that we

2    will send back with the testimony transcripts.

3             MR. HAVELES:  Very well, your Honor.

4             THE COURT:  Is that okay, Mr. Stirling?

5             MR. S. STIRLING:  Yes, your Honor.

6             (Jury present)

7             THE COURT:  Thank you for your patience.  There is a

8    slight delay responding to your notes because of that short

9    lunch break.

10            The first note I got said:  Exhibits not found, 8139,

11   8248.  You are right.  That was a mistake.  Let me give you the

12   cross reference of those exhibits.  8139 is, in fact, 8846 at

13   page 0248.  That's for the fiscal year ending October 31, 1995.

14   And 8248 is, in fact, 8847 at page 265 and that's at page 0265

15   and that's for the fiscal year ending October 31, 1996.  I can

16   also point you to two additional ones that are responsive to

17   your earlier request:  8844 at 0231 is for the fiscal year

18   ending October 31, 1993, and 8845 at 0261 is for the fiscal

19   year ending October 31, 1994.  Again, I'm pointing you to 8846,

20   8847, 8844, and 8845.

21            On this same note you said:  Needed

22   documents/testimony regarding "lacking of permit."  We are

23   pulling that together and as soon as we get it printed, I will

24   send back to you the transcript of that testimony.

25            You also asked for testimony from yesterday.  And here

F2PMBUC3

1   what I can say is, as you recall, there was not testimony

2   yesterday.  There was just closing arguments of counsel.  And

3   as I've instructed, arguments of counsel, statements of

4   counsel, including closing arguments, are not testimony and not

5   evidence.  And so all I can send back to you at this point for

6   your deliberations is evidence.  And so I can't send you

7   anything from yesterday because there was no evidence

8   yesterday.

9          The next note that came out asked for nine copies of

10  2792, please and thank you, and we are printing copies of that

11  and very shortly it will be handed back to you along with the

12  excerpts of the trial transcript that you asked for.

13          Thank you very much.  You may return to the jury room.

14          (Jury deliberations resumed; time noted:  1:55 p.m.)

15          THE COURT:  I've been handed nine copies of 2792.

16  They don't have the exhibit numbers.  Everyone comfortable that

17  they are what they are?

18          MR. HAVELES:  Mr. Stirling showed them to me and I had

19  an opportunity to examine them.  They are what they are, your

20  Honor.

21          THE COURT:  Thank you.

22          Do you have the testimony?

23          MR. HAVELES:  We are printing it so we don't have to

24  put black lines in it so it's just the page and line.  We

25  should have it in like another minute or so, just because we

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

F2PMBUC3

1    have to print one at a time because of the logistics of going

2    back and forth between the computers since it's on a wireless

3    printer.

4              THE COURT:  You mean you cut and paste from it.

5              MR. HAVELES:  We can go into the transcript and just

6    block out so it's the page and line without the above and below

7    so we don't have to black out anything.

8              THE COURT:  We may need you to do that for Mr.

9    Stirling's as well.

10             MR. S. STIRLING:  I don't have the ability to do that

11   myself here.

12             MR. HAVELES:  I'm now being advised that we can't do

13   that.  We are printing the pages and we will have to black out.

14   I thought we could, but apparently not.

15             THE COURT:  Mr. Stirling.

16             MR. S. STIRLING:  I have pages 1334 and 1335.  They

17   have not been redacted or blacked out, just those two pages.

18             MR. HAVELES:  We have the first one.  As soon as

19   Mr. Stirling is done with the Sharpie, we will start with the

20   other one as well.

21             THE COURT:  Unless there are sustained objections,

22   it's not a concern about the jury seeing it.  It's just a

23   concern making sure that they know what we are indicating is

24   responsive.

25             MR. S. STIRLING:  Correct.

F2PMBUC3

1          THE COURT:  Could you show it to them, Mr. Stirling.

2          The marshal has come forward.  He received an oral

3    request from the jury for a calculator.

4          How would you like me to respond?

5          MR. HAVELES:  Maybe the first thing is to tell them

6    they should do their requests in writing.

7          THE COURT:  I will do that.

8          MR. HAVELES:  If we don't give them a calculator, they

9    are going to use pen and paper and their fingers.  I am not

10   sure it's a request we can deny.  We just see if we can find

11   one for them.

12         THE COURT:  Anyone object to me instructing the

13   marshal here to ask them here to put any communications,

14   including requests on paper?

15         MR. HAVELES:  I have no problem with the marshal

16   delivering that direction.

17         MR. S. STIRLING:  Certainly not.

18         THE COURT:  Directing the marshal, asking them to put

19   any communications, including all requests, on paper.  Thank

20   you, sir.

21         MR. S. STIRLING:  We are checking across the street in

22   our little war room, but we did have at least two or three over

23   there.  If they have not been packed home and sent home with

24   others, we can probably get one over here in 10 minutes.

25         MR. HAVELES:  Your Honor, the only one I have, is my

F2PMBUC3

1  BlackBerry, and I don't think we should give my BlackBerry to

2  the jury.

3           THE COURT:  Are we settled on the transcript?

4           MR. HAVELES:  Yes.  The three excerpts have all now

5  been handed up to your Honor.

6           THE COURT:  You said three?

7           MR. HAVELES:  I handed you two and Mr. Stirling handed

8  you one.

9           THE COURT:  I have all three and everybody is in

10  agreement on what goes back?

11           MR. HAVELES:  Yes, your Honor.

12           MR. S. STIRLING:  Yes.

13           THE COURT:  Page begins-ing 1334, page beginning 2116,

14  and the page beginning 1380.

15           MR. HAVELES:  Yes, your Honor.

16           THE COURT:  I will ask my clerk to give those to the

17  marshals to hand them to the jury.

18           MR. HAVELES:  Your Honor, may I step out for 30

19  seconds while we wait for the calculator?

20           THE COURT:  Everyone agrees that the calculator can go

21  back.  We tried.  We don't have one.  If you come up with one,

22  show it to each other and if you are in agreement as to it,

23  just ask my deputy to hand it back.  Don't go far.

24           MR. HAVELES:  I'm thinking about going across the

25  hall, your Honor.

F2PMBUC3

1           THE COURT:  Thank you.

2           (Recess pending verdict)

3           THE COURT:  We received a note that says:  Exhibits,

4    dash, for tomorrow.  Solvency opinions for Frank and Grabowski.

5    Thank you.

6           Also, it says:  We are at a temporary impasse with

7    respect to solvency.  Perhaps we need to break until tomorrow.

8           With respect to the latter, what I intend to do is

9    bring them in and tell them they should break -- I'll read the

10   note -- that they should break for the night to resume their

11   deliberations, go straight into the jury room beginning at

12   9:30, encourage everyone to get there on time but say they

13   can't start their deliberations until everyone is there.

14           I also think I should just remind them, as they have

15   done so far, that there should be no communication regarding if

16   there is any split of the vote, that that should not be

17   communicated in a letter.  That's not here, but it's

18   approaching that.  So I think it is worth a reminder at this

19   point.

20           And then I think once I send them home we can discuss

21   how to address the request.  Make sense?

22           MR. HAVELES:  Yes, your Honor.

23           MR. S. STIRLING:  Yes.

24           THE COURT:  We will mark this note as Court Exhibit

25   15.

F2PMBUC3

1          (Jury present)

2          THE COURT:  Members of the jury, I did receive a note

3    from you saying exhibits for tomorrow, solvency opinion for

4    Frank and Grabowski.  Thank you.

5          Also, we are at a temporary impasse with respect to

6    solvency.  Perhaps we need to break until tomorrow.  Indeed I

7    think that's a good idea.  You've obviously been working very

8    hard.  And since it's approaching 5:00 I will send you home.

9    We will pull together a response to your request for the

10   solvency opinions for Frank and Grabowski that we will provide

11   to you in the morning.

12         Let me just give you a few instructions.  First about

13   tomorrow.  You may go straight to the jury room, as you do.

14   Please be there by 9:30.  Again, we will have breakfast

15   refreshments there.  When everyone is there you can begin your

16   deliberations, but I will wait until all of you there to

17   continue your deliberations.  In between now and then the

18   instructions that I gave you before that continue to apply.

19   Obviously, you're communicating with each other in the jury

20   room about the case.  But until you are all back in the jury

21   room tomorrow, no communications about the case through any

22   means, no research, as you know, about the case through any

23   means.  Obviously, you are chewing on it now and you will

24   continue that when you are together tomorrow.

25         As I said before, but even more so, thank you for your

F2PMBUC3

1    hard work and diligence, and we will see you in the morning,

2    but do just head straight to the jury room in the morning and

3    start your deliberations and we will bring in or bring you out

4    for a response to your question as soon as we have got it

5    together.  Thank you so much.  Have a good night.

6             (Jury not present)

7             THE COURT:  I forgot the reminder I said I was going

8    to give.  We can do that in the morning, to remind them, as

9    they have, they shouldn't indicate any split of vote on any

10   matters.

11            Proposals for responses to the first request, to the

12   request.

13            MR. HAVELES:  The request was for exhibits, your

14   Honor.  And there are a number of exhibits that Mr. Grabowski

15   used during his examination.  There are no exhibits that

16   Mr. Frank used during his examination.  There is no written

17   solvency opinion.  So if we are going to give them exhibits,

18   the only exhibits to give them are those that were displayed

19   during the course of Mr. Grabowski's examination.

20            THE COURT:  Mr. Stirling.

21            MR. S. STIRLING:  We disagree, your Honor.  First they

22   asked for solvency opinions and, strictly speaking, I think

23   what they are asking for are the expert reports which are not

24   in evidence.  If they want the opinions, I think that can just

25   as easily be construed, your Honor, as requesting the testimony

F2PMBUC3

1  of the experts where they express those opinions about solvency

2  or insolvency, and I think we could suggest to them that we can

3  provide them with the testimony on direct examination where

4  each of the experts express their opinions about solvency or

5  insolvency as of the dates that are relevant to the verdict

6  form that they are being asked to complete.  Those are the

7  opinions.  That is where the opinions were expressed in the

8  courtroom.

9            THE COURT:  Mr. Haveles.

10           MR. HAVELES:  The jury has already demonstrated it has

11  an understanding of the difference between oral evidence and

12  written evidence by making requests for testimony.  They have

13  understood when they have made requests for testimony the

14  difference between oral evidence and written evidence.  So it

15  seems to me that until they request testimony, we should not be

16  proffering testimony.  The response is, there are no exhibits

17  other than the exhibits that were shown during Mr. Grabowski's

18  examination and see if they come back rather than prompting

19  him, did you really mean testimony.  I don't think that's the

20  appropriate response.

21           We should just give them the exhibits.  If they want

22  testimony, they can come back and ask for it.  And if we are

23  going to give them testimony, depending on the question they

24  come for, we can decide what the purview of that testimony is,

25  but I don't think we should anticipate testimony until they

SOUTHERN DISTRICT REPORTERS, P.C.          (212) 805-0300

F2PMBUC3

1    inquire about it and we should just give them the exhibits, if

2    that's what they want.

3         THE COURT:  Here is what I think.  The testimony of

4    the experts referenced repeatedly their solvency opinions,

5    their reports on both direct and cross for both.  So at some

6    level it may be a question of, are those in evidence or an

7    assumption that those are in evidence and they are looking for

8    those.  I don't interpret it as asking for only the exhibits

9    that came in during the testimony.  I don't think that's a

10   reasonable interpretation.  And I think it's probably right

11   that they have not yet asked for the testimony.

12        But it seems to me the appropriate response would be

13   something like:  This is what you've asked for.  The written

14   report/opinions of the experts were not admitted in evidence.

15   What there is is their testimony and exhibits admitted during

16   their testimony.  If you want some or all of that, ask.  But

17   frankly, I think they are going to come back and ask for it and

18   I would just assume, to save a step and not have them come in

19   and then go back out, I give that response and say, you may be

20   asking for the testimony of the experts in which they express

21   their opinion and any exhibits admitted during that testimony,

22   and we will provide that for you.  I'm happy to do it in two

23   steps or one and see what they ask.

24        MR. HAVELES:  My recommendation is we do the two-step

25   process, your Honor, because it's a lot of testimony to give

F2PMBUC3

1     them.

2               THE COURT:  What you'll do and have resolved and ready

3     to go before 9:30 is, you should have ready the direct and

4     cross of both experts and redirect, and then recross and

5     re-redirect.

6               MR. HAVELES:  There is only one of each.  We didn't

7     get too crazy.  Might have seemed that way.

8               THE COURT:  There were some witnesses where you got

9     that crazy.  Maybe not the expert.

10              In any event, you'll have those prepared, so each side

11     will prepare with all sustained objections redacted out and any

12     indicated, disregarded, or stricken testimony redacted out.

13     And you'll need to exchange with each other.

14              Obviously, you will do, Mr. Stirling, the direct and

15     cross and redirect of Frank and, Mr. Haveles for Grabowski.

16     And gather any exhibits admitted during any portion of that

17     testimony.

18              MR. HAVELES:  Yes, your Honor.

19              THE COURT:  What I'll propose saying, they have asked

20     for the solvency opinions for Frank and Grabowski.  As they may

21     recall, the written expert reports containing the experts'

22     opinions were not themselves admitted into evidence.  Instead,

23     the experts' opinions were expressed through their testimony,

24     and the exhibits admitted during the course of their testimony.

25              So to the extent that they wish to see any particular

F2PMBUC3

1    testimony or exhibits admitted in the course of the testimony,

2    or all of the testimony or all of the exhibits admitted in the

3    course of the testimony, they should let us know what they are

4    seeking, let me know what they are seeking, and then they are

5    going to come back five minutes later asking for all of it and

6    we will send it back.

7         MR. HAVELES:  Because they have to communicate by

8    notes, that's the way it has to go anyhow, as opposed to orally

9    polling them.

10        THE COURT:  No.  I wouldn't poll them.  I would just

11   assume that that's what they are asking for because it's

12   reasonable and then send it back.  But I'll tell them whatever

13   they indicate with respect to that we will just send back.

14        Let's just set a schedule for you to exchange those

15   because I want to resolve any disputes tomorrow.  There

16   shouldn't be disputes here, but I've said that before.

17        MR. HAVELES:  I think it will be a little laborious to

18   go through the objections.  It won't be something to do in the

19   first hour when we get back uptown, your Honor.  Probably given

20   traffic, we won't be back to the office until close to 6.  I

21   would recommend we can exchange it by 9:00 this evening.  That

22   way we have know we have redacted everything, particularly

23   since Mr. Grabowski's testimony was a tad longer.

24        MR. S. STIRLING:  I think we can certainly do that.

25        THE COURT:  And then you'll communicate with each

SOUTHERN DISTRICT REPORTERS, P.C.        (212) 805-0300

F2PMBUC3

1    other.

2              MR. HAVELES:  I'll just e-mail a proposed mark-up to

3    Mr. Stirling.

4              THE COURT:  You'll deal with back and forth and then

5    if there are any disputes, let me hear them by letter by 8

6    tomorrow morning.

7              MR. HAVELES:  Yes, your Honor.

8              THE COURT:  Anything else?

9              MR. HAVELES:  No, your Honor.

10             MR. S. STIRLING:  No.

11             THE COURT:  I'll see you in the morning, 9:15.  Thank

12   you.

13             (Adjourned to Thursday, February 26, 2015, at 9:15

14   a.m.)

15

16

17

18

19

20

21

22

23

24

25