UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

LEE E. BUCHWALD, as Chapter 7 Trustee
for Magnesium Corporation of America and
Related Debtor Renco Metals, Inc.,

               Plaintiff,

        -against-

THE RENCO GROUP, INC., *et al.*,

               Defendants.

13 Civ. 7948 (AJN)

---

**MEMORANDUM OF LAW IN SUPPORT OF MOTION OF DEFENDANTS THE
RENCO GROUP, IRA RENNERT, AND THE TRUSTEES OF THE RENNERT TRUSTS
FOR JUDGMENT AS A MATTER OF LAW OR NEW TRIAL
UNDER FEDERAL RULES 50 AND 59**

ORRICK, HERRINGTON
& SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
(212) 506-5000
jrosenkranz@orrick.com

KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
(212) 836-8000
peter.haveles@kayescholer.com

PARK JENSEN BENNETT LLP
40 Wall Street
New York, NY 10005
(646) 200-6300
tpark@parkjensen.com

Attorneys for Defendants The Renco
Group, Ira Rennert, and The Trustees of
the Rennert Trusts

# <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ..................................................................................................1

STATEMENT OF FACTS .......................................................................................................2

ARGUMENT .......................................................................................................................3

    I.   DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ................................................................................................................3

        A.  Plaintiff Failed to Present Sufficient Evidence of Solvency to Support the Verdict ........................................................................................4

            1.  Frank's testimony was unreliable and wholly insufficient to establish insolvency ..............................................................................5

            2.  The other evidence presented at trial was insufficient to support a finding of insolvency .................................................................15

        B.  Defendant Rennert Is Entitled to Judgment as a Matter of Law on Plaintiff's Unjust Enrichment and Fraudulent Conveyance Claims..............18

        C.  The Punitive Damages Award Must Be Struck as a Matter of Law..............22

    II.  IN THE ALTERNATIVE, THE COURT SHOULD ORDER A NEW TRIAL .......24

        A.  Plaintiff's Introduction of Highly Prejudicial, Non-probative Evidence Warrants a New Trial ................................................................24

        B.  The Jury's Improper Compromise Verdict Necessitates a New Trial...........27

            1.  The jury broke its impasse only by reaching an impermissible compromise verdict ............................................................28

            2.  The jury's impermissible compromise warrants a new trial..............31

            3.  Defendants properly preserved this issue ...........................................33

CONCLUSION ....................................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Calvarese Farms Maint. Corp.*,
  Civil Action No. 4262-VCP, 2010 Del. Ch. LEXIS 199
  (Del. Ch. Sept. 17, 2010) ..................................................................... 23

*Albert v. Alex. Brown Mgmt. Servs., Inc.*,
  No. C.A. 04C-05-250 PLA, 2004 WL 2050527
  (Del. Super. Ct. Sept. 15, 2004) .......................................................... 23

*In re Ames Dep't Stores, Inc.*,
  161 B.R. 87 (Bankr. S.D.N.Y. 1993) ................................................... 29

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
  303 F.3d 256 (2d Cir. 2002) ............................................. 6, 11, 14, 15

*AMW Materials Testing, Inc. v. Town of Babylon*,
  584 F.3d 436 (2d Cir. 2009) ................................................................... 5

*Andersen v. Weinroth*,
  48 A.D.3d 121 (N.Y. App. Div. 2007) ................................................. 20

*Armstrong v. Brookdale Univ. Hosp. & Med. Ctr.*,
  425 F.3d 126 (2d Cir. 2005) ................................................................. 35

*Atkins v. New York City*,
  143 F.3d 100 (2d Cir. 1998) ................................................ 27, 28, 31, 32

*Attorney Gen. of Okla. v. Tyson Foods, Inc.*,
  565 F.3d 769 (10th Cir. 2009) ............................................................. 13

*Brenner v. Brenner*,
  821 F. Supp. 2d 533 (E.D.N.Y. 2011) ................................................. 21

*Brooks v. Brattleboro Memorial Hospital*,
  958 F.2d 525 (2d Cir. 1992) ................................................................. 33

*Cameron v. City of New York*,
  598 F.3d 50 (2d Cir. 2010) ................................................................... 27

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993) .................................................................... *passim*

*Del. Open MRI Radiology Assocs., P.A. v. Kessler*,
  898 A.2d 290 (Del. Ch. 2006) ........................................................... 6, 7

*Denny v. Ford Motor Co.*,
42 F.3d 106 (2d Cir. 1994) ................................................................. 34

*Diamond D Enterprises USA, Inc. v. Steinsvaag*,
979 F.2d 14 (2d Cir. 1992) ................................................... 27, 28, 34

*Dietz v. Spangenberg*,
Civil No. 11-2600 ADM/JJG, 2013 U.S. Dist. LEXIS 123601
(D. Minn. Aug. 29, 2013) ................................................................... 23

*DQ Wind-Up, Inc. v. Kohler*,
Court File No. 27-CV-10-27509, 2013 Minn. Dist. LEXIS 118
(Minn. Dist. Ct. Aug. 29, 2013) ........................................................ 23

*Elston v. Morgan*,
440 F.2d 47 (7th Cir. 1971) ............................................................... 34

*Estate of Gallagher v. C.I.R.*,
101 T.C.M. (CCH) 1702 (T.C.) ........................................................... 8

*Farrior v. Waterford Bd. of Educ.*,
277 F.3d 633 (2d Cir. 2002) .............................................................. 18

*FDIC v. Bell*,
106 F.3d 258 (8th Cir. 1997) ............................................................. 16

*Gesoff v. IIC Indus., Inc.*,
902 A.2d 1130, 1158 (Del. Ch. 2006) ........................................... 7, 23

*Harris v. Niagara Mowhawk Power Corp.*,
252 F.3d 592 (2d Cir. 2001) .............................................................. 33

*Heil Co. v. Evanston Ins. Co.*,
690 F.3d 722 (6th Cir. 2012) ............................................................. 34

*Holston Invs. Inc. B.V.I. v. Lanlogistics, Corp.*,
No. 08-21569-CIV, 2010 WL 2495413 (S.D. Fla. June 18, 2010) .......... 7

*Horn v. McQueen*,
353 F. Supp. 2d 785 (W.D. Ky. 2004) ................................................. 7

*In re Hydrogen, LLC*,
431 B.R. 337 (Bankr. S.D.N.Y. 2010) ............................................... 18

*Kaye v. Grossman*,
202 F.3d 611 (2d Cir. 2000) .............................................................. 21

iii

*Kosmynka v. Polaris Industries*,
  462 F.3d 74 (2d Cir. 2006) ........................................................................... 33, 34

*LNC Invs. v. First Fid. Bank*,
  126 F. Supp. 2d 778 (S.D.N.Y. 2001) ............................................................. 25

*M+J Savitt, Inc. v. Savitt*,
  No. 08 Civ. 8535 (DLC), 2009 WL 691278 (S.D.N.Y. Mar. 17, 2009) ............... 21

*Maher v. Isthmian Steamship Co.*,
  253 F.2d 414 (2d Cir. 1958) ........................................................................... 27

*Maryanne McKeown (Frederick) v. Frederick*,
  39 Misc. 3d 1241 (N.Y. Sup. Ct. 2013) ........................................................... 20

*Mekdeci v. Merrell National Laboratories*,
  711 F.2d 1510 (11th Cir. 1983) ................................................................... 32, 33

*In re Nirvana Restaurant Inc.*,
  337 B.R. 495 (Bankr. S.D.N.Y. 2006) ............................................................. 29

*Norville v. Staten Island Univ. Hosp.*,
  196 F.3d 89 (2d Cir. 1999) ............................................................................. 22

*ONTI, Inc. v. Integra Bank*,
  751 A.2d 904 (Del. Ch. 1999) ........................................................................... 7

*In re Paoli R.R. Yard PCB Litig.*,
  35 F.3d 717 (3d Cir. 1994) ............................................................................. 13

*Raedle v. Credit Agricole Indosuez*,
  670 F.3d 411 (2d Cir. 2012) ........................................................................... 24

*Rodriguez v. Schneider*,
  56 Fed. Appx. 27 (2d Cir. 2003) ..................................................................... 14

*Schaafsma v. Morin Vermont Corp.*,
  802 F.2d 629 (2d Cir. 1986) ........................................................................... 34

*Schuerholz v. Roach*,
  58 F.2d 32 (4th Cir. 1932) ............................................................................. 35

*Skinner v. Total Petroleum Inc.*,
  859 F.2d 1439 (10th Cir. 1988) ....................................................................... 32

*Song v. Ives Laboratories, Inc.*,
  957 F.2d 1041 (2d Cir. 1992) ......................................................................... 18

*Stephenson v. Doe*,
    332 F.3d 68 (2d Cir. 2003) ...................................................................27, 31, 32, 33

*In re Sunbelt Beverage Corp. S'holder Litig.*,
    No. CIV.A. 16089-CC, 2010 WL 26539 (Del. Ch. Jan. 5, 2010) .............................7

*In re Trinsum Group, Inc.*,
    460 B.R. 379 (Bankr. S.D.N.Y. 2011) ..................................................................29

*U.S. Bank Nat'l Ass'n v. Verizon Communs.*,
    *Inc.*, 817 F. Supp. 2d 934, 944 (N.D. Tex. 2011) .................................................23

*Wacht v. Cont'l Hosts, Ltd.*,
    No. C.A. 7954, 1994 WL 525222 (Del. Ch. Sept. 16, 1994) ...................................7

*Weisgram v. Marley Co.*,
    528 U.S. 440 (2000) ...............................................................................................4

*Zaretsky v. New Century Mortg. Corp.*,
    CV08-378, 2011 U.S. Dist. LEXIS 152617 (E.D.N.Y. Oct. 3, 2011) ....................22

**Statutes**

11 U.S.C. § 548(a)(2) ...................................................................................................30

N.Y. Debt. & Cred. L. § 273 (2014) .............................................................................21

**Rules**

Fed. R. Civ. P. 49 .........................................................................................................34

Fed. R. Civ. P. 49(a) .....................................................................................................34

Fed. R. Civ. P. 49(b) .....................................................................................................34

Fed. R. Civ. P. 49(b)(3) ................................................................................................33

Fed. R. Civ. P. 50 ....................................................................................................3, 18

Fed. R. Civ. P. 50(a) .....................................................................................................19

Fed. R. Civ. P. 50(a)(1) ..................................................................................................3

Fed. R. Civ. P. 50(a)(1)(B) .............................................................................................4

Fed. R. Civ. P. 50(b) ......................................................................................................3

Fed. R. Civ. P. 59 ...........................................................................................5, 18, 24, 34

Fed. R. Civ. P. 59(a)(1)(A) ........................................................................................24

Fed. R. Civ. P. 59(e) .................................................................................................22

Fed. R. Ev. 702 ...........................................................................................................5

**Constitutional Provisions**

Seventh Amendment ..................................................................................................33

**Other Authorities**

12 Moore's Fed. Practice § 59.13[2][b][E] (Matthew Bender 3d ed.) .........................25

Gary R. Trugman, *Understanding Business Valuation* (3d ed. 2008)................7, 11, 12

Israel Shaked and Robert F. Reilly, *A Practical Guide to Bankruptcy Valuation* (2013) ...................................................................................................................7

Shannon P. Pratt & Alina V. Niculita, *Valuing a Business* (5th ed. 2008) ...................7

## PRELIMINARY STATEMENT

Though this was a complex case, the primary task facing Plaintiff Lee E. Buchwald was straightforward: to establish that MagCorp and Renco Metals (the "Debtors") were insolvent at the time of each of the challenged transfers.  Plaintiff did not come close to satisfying this burden.  The flawed and meager evidence he adduced of the Debtors' insolvency was insufficient as a matter of law to support the jury's verdict of fraudulent conveyance, and he was similarly unable to establish his claims for unjust enrichment and punitive damages.  Knowing he could not persuade the jury to rule in his favor on the relevant facts, Plaintiff focused his efforts at trial on a different goal: convincing the jury that defendants The Renco Group and Ira Rennert ("Defendants")[1] were responsible for massive environmental contamination in the years following the transfers, and that Rennert in particular should be punished accordingly, despite the Court's instruction that these issues were of little relevance to Plaintiff's legal claims.  Plaintiff's tactics skewed the jury's deliberations, yielding an impermissible compromise verdict that cannot stand.

Because Plaintiff failed to establish at trial that his claims were justified in both law and fact, the Court should enter judgment in Defendants' favor.  The testimony of Plaintiff's valuation expert, Jason Frank, exposed the deep flaws in his methodology and analysis; as Defendants argued, he should have been precluded from testifying entirely.  Moreover, at trial Frank failed to offer any meaningful support for his conclusory opinion that the Debtors were insolvent at the time of the transfers, and no reasonable jury could have given Frank's testimony any significant weight.  Because Plaintiff adduced no other evidence demonstrating insolvency,

---

[1] The term "Defendants" in this motion refers only to The Renco Group, Ira Rennert, and The Trustees of the Rennert Trusts; none of the other named defendants in this matter are signatories to this motion.

Plaintiff's presentation was insufficient as a matter of law to support his claim for fraudulent conveyance. The verdict holding Defendants liable for unjust enrichment and punitive damages similarly must be vacated. Those claims were unavailable to Plaintiff as a legal matter and unsupported by the scant evidence Plaintiff offered during the proceedings. In the alternative, the Court should order a new trial. Recognizing that he could not win this case on financial evidence alone, Plaintiff took every opportunity to introduce irrelevant allegations of Defendants' supposed environmental wrongdoing. Although the Court ruled before trial that evidence related to MagCorp's contingent liabilities at the time of the transfers was admissible, Plaintiff failed to meaningfully connect the evidence he introduced to the only question it was meant to answer: whether the Debtors were insolvent.

The prejudicial effect of Plaintiff's conduct was all too evident. Undoubtedly confused by Plaintiff's conflation of the issues, the jury's deliberations stalled on multiple occasions, prompting defense counsel to repeatedly seek a mistrial. And the only way to explain the verdict the jury finally did reach is that it was the result of an improper compromise among jurors who could not agree that Defendants were liable under the applicable law and established facts. The jury specifically and unequivocally found that Plaintiff had failed to prove the Debtors' insolvency, yet held Defendants liable for fraudulent conveyance—a claim that *required* finding that the Debtors were insolvent at the time of the transfers. In light of the deficiencies in Plaintiff's proof, the inescapable conclusion is that the jury found Defendants liable on a subset of Plaintiff's claims simply because Plaintiff convinced some jurors to punish Defendants for alleged conduct that had nothing to do with the claims at issue. If the Court declines to enter judgment in Defendants' favor, it should order a new trial.

## STATEMENT OF FACTS

The Court held a trial in this matter between February 2, 2015, and February 27, 2015.

At the close of the trial, the jury returned a verdict finding Defendants liable on certain of Plaintiff's state-law claims, despite the fact that the jury specifically found that Plaintiff had failed to prove that the Debtors were insolvent.  Ct. Ex. 25 at 2-5.  The jury held Defendants liable, among other things, for fraudulent conveyance, breach of fiduciary duty, and unjust enrichment, and awarded damages against The Renco Group ("Renco") in the amount of $101,000,000 and against Ira Rennert and the Trustees of the Rennert Trusts in the amount of $16,222,000, as well as $1,000,000 in punitive damages against Renco.  *Id.* at 7-16.[2]  On March 16, 2015, the Court awarded Plaintiff prejudgment interest of 6%, accruing from the date of the bankruptcy petition, in a total amount of $82,698,246.58 against Renco and $13,280,847.12 against Ira Rennert and the Trustees of the Rennert Trusts.  Dkt. 342; Dkt. 389.  On March 23, 2015, the Court entered a final judgment in this matter.  Dkt. 389.

## ARGUMENT

## I.  DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW

Under Rule 50, if a court finds that the evidence adduced at trial would not allow a reasonable jury to find for the nonmoving party on a particular claim, the court may grant judgment as a matter of law in favor of the moving party on that claim.  Fed. R. Civ. P. 50(a)(1), (b).  Because the evidence was insufficient to support the jury's verdict on Plaintiff's fraudulent conveyance and unjust enrichment claims, this Court should grant judgment for Defendants.  In addition, because punitive damages were not available to Plaintiff under Delaware law, that portion of the jury's verdict must be struck as well, and it would therefore be proper for the Court to amend its post-judgment interest award under Rule 59(e) as well.

---

[2] The jury also found certain individual defendants liable for fraudulent conveyance, breach of fiduciary duty, and/or aiding and abetting breach of fiduciary duty, but awarded no damages.  Ct. Ex. 25 at 7-11.  The jury found other individual defendants not liable on any claim.  *Id.*

### A.  Plaintiff Failed to Present Sufficient Evidence of Solvency to Support the Verdict.

At trial, Plaintiff failed to present sufficient evidence to support his central assertion: that the Debtors were insolvent during the period when Renco Metals paid dividends to Renco. Plaintiff's key witness was his valuation expert, Jason Frank.  As Defendants contended before trial, Frank failed to satisfy the *Daubert* standard for admissibility.  New evidence that came to light at trial further revealed Frank's lack of a reliable methodology.  Moreover, the testimony Frank *did* offer regarding the Debtors' financial condition at the time of the transfers was so conclusory and unsupported by facts or analysis that no reasonable jury could have accorded it any weight.  Because Plaintiff presented no other evidence sufficient to establish insolvency, no reasonable jury could have determined that the Debtors were in fact insolvent.  *See Weisgram v. Marley Co.*, 528 U.S. 440, 457 (2000) ("[A court may conclude that] on excision of testimony erroneously admitted, there remains insufficient evidence to support the jury's verdict.").

Moreover, the verdict form indicates that even *this* jury did not find Plaintiff's evidence to be sufficient.  When asked directly whether Plaintiff had proven that the Debtors were insolvent, left with unreasonably small capital, or unable to pay their debts, the ten jurors marked "NO" for each of the nine transfers for all three questions.  Ct. Ex. 25 at 2-5.  That is "NO" 270 times over.  In light of the weakness of Plaintiff's evidentiary showing at trial, the jury's unequivocal response to these questions confirms that Defendants are entitled to a judgment as a matter of law on Plaintiff's fraudulent conveyance and related claims.[3]  At a minimum, the Court

---

[3] Because the claims for aiding and abetting fraudulent conveyance, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty all depended on a finding that the Debtors were insolvent or undercapitalized, Ct. Ex. 11 at 20, 22, 25, judgment must be entered in Defendants' favor on those claims as well.  *See* Fed. R. Civ. P. 50(a)(1)(B) (if a court finds that there was no legally sufficient evidentiary basis to find for the nonmoving party on an issue, it can grant a

should grant a new trial because the jury's verdict as to fraudulent conveyance was against the weight of the evidence.  *See AMW Materials Testing, Inc. v. Town of Babylon*, 584 F.3d 436, 456 (2d Cir. 2009) ("A district court may grant a new trial pursuant to Rule 59 even when there is evidence to support the jury's verdict, so long as the court determines that, in its independent judgment, the jury has reached a seriously erroneous result or its verdict is a miscarriage of justice." (internal quotation marks omitted)).

### 1.  Frank's testimony was unreliable and wholly insufficient to establish insolvency.

Even before trial, Frank's insolvency opinion was highly dubious.  When Defendants moved to exclude that testimony under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), the Court acknowledged that Frank "may have made debatable assumptions or mistakes that, in some cases, favored his client."  Dkt. 36 at 25 ("*Daubert* Op.").  The Court noted that Frank's methodology had "flaws," *id.* at 11, he provided "barely any explanation" of how he arrived at an important component of his calculations, *id.* at 12, "his report contain[ed] no explanation of why" he used certain statistics, *id.* at 18, and he made "two errors in the data that [he] used," *id.* at 25.  The Court held, however, that those problems, and others that Defendants identified in their motion, went to "weight, not admissibility."  *Id.* at 19.

Defendants maintain their position that Frank's testimony was inadmissible from the outset and should not have been presented at trial.  But Defendants also heeded the Court's direction to expose the "faults in Frank's analysis by bringing them to the jury's attention through [Defendants'] own expert's testimony and cross-examination."  *Id.* at 25.  That

---

motion for judgment as a matter of law "on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue").

testimony revealed new defects in his methodology that warrant reconsideration of the Court's original *Daubert* ruling.  And even if all the flaws in Frank's testimony—both old and new—go to weight rather than admissibility, a review of the trial transcript demonstrates that weight is zero.  Frank's direct testimony was so conclusory, his testimony on cross examination so damaging, and contradictory evidence from other witnesses so compelling, that no reasonable jury could conclude that the Debtors were insolvent at any relevant time.

      ***Company-specific risk premium.***  The deficiencies in Frank's methodology are most evident in his use of an outsized company-specific risk premium to conclude that the Debtors were insolvent.  As the Second Circuit has noted, "any step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible."  *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002).  Frank's unsupported use of company-specific risk was not just "any" step in his analysis; it was the crux of his conclusion that the Debtors were insolvent.  The premium played such an important part in Frank's analysis that if it is removed from his calculations, the Debtors are solvent on every transfer date.  Dkt. 16 Ex. 5 at 218-19 ("Grabowski Rep."); Frank Dep. 568:25-569:14, Dkt. 16 Ex. 6.

      Assigning a company-specific risk is dangerous.  As this Court recognized, the methodology behind assigning the premium has "flaws":  "[T]here is academic literature suggesting that a company-specific risk premium is an overly-subjective 'fudge factor.'" *Daubert* Op. 10, 11.  Experts can use it simply "to bring their final results into line with their clients' objectives, when other valuation inputs fail to do the trick."  *Del. Open MRI Radiology Assocs., P.A. v. Kessler*, 898 A.2d 290, 339 (Del. Ch. 2006).  A company-specific risk premium can also lead to double counting if it is based on factors that are already accounted for in other components of the analysis, such as the "industry beta" or the underlying financial projections.

Calculating a premium thus requires comparing the subject company to a benchmark, usually a company that is similar in relevant respects to the subject company.  Shannon P. Pratt & Alina V. Niculita, *Valuing a Business* 202 (5th ed. 2008), Dkt. 16 Ex. 22.  Frank's own authorities confirm this.  Tr. 1860:15-20; 1861:1-4, 1862:1-5; *see* Gary R. Trugman, *Understanding Business Valuation* 368 (3d ed. 2008), Dkt. 18 Ex. 8; Israel Shaked and Robert F. Reilly, *A Practical Guide to Bankruptcy Valuation* 29-30, 36-37 (2013), Dkt. 23 Ex. 44.

Frank failed to take that critical step here, rendering his methodology unreliable.  On cross, he admitted for the first time that he did not actually compare MagCorp to any benchmark companies when determining the amount of the company-specific risk premium:

> Q:  You didn't do that here, you didn't compare MagCorp to other companies to help you determine the amount of the company-specific risk premium; did you?
>
> A:  So the answer is no.

Tr. 1861:5-8.  That admission doomed Frank's entire testimony, and casts his methodology in a new light:  If Frank did not look at the characteristics of the benchmark companies, he had no way of knowing whether his "company-specific risk premium for Renco Metals was based on identified risks that were unique to that company."  *Daubert* Op. 15.

Not grounded to any benchmark, Frank chose a massive 10%-15% premium, a figure significantly higher than the premiums in any of the cases cited by Plaintiff or this Court.  *See Daubert* Op. 10-11, 15; Dkt. 23 at 21-22 (Plaintiff's opposition to *Daubert* motion).[4]  The

---

[4] *Citing Kessler*, 898 A.2d at 339 n.130 (2% and 3.5% company-specific risk rate); *In re Sunbelt Beverage Corp. S'holder Litig.*, No. CIV.A. 16089-CC, 2010 WL 26539, at *13 (Del. Ch. Jan. 5, 2010) (3%); *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1158 (Del. Ch. 2006) (3%); *Holston Invs. Inc. B.V.I. v. Lanlogistics, Corp.*, No. 08-21569-CIV, 2010 WL 2495413, at *4 (S.D. Fla. June 18, 2010) (3% company-specific risk rate and 7% sovereign risk adjustment); *ONTI, Inc. v. Integra Bank*, 751 A.2d 904, 919 (Del. Ch. 1999) (3.4%); *Wacht v. Cont'l Hosts, Ltd.*, No. C.A. 7954, 1994 WL 525222, at *6 (Del. Ch. Sept. 16, 1994) (5% adjusted to 3% by court); *Horn v.*

premium formed a large part of the 23% discount rate that Frank admitted was in the range he had used for startup companies and companies going into bankruptcy—neither of which the Debtors were.  Tr. 1864:5-1865:1.  As the Court observed, Frank's report provided "barely any explanation" for why he "select[ed] a 10% company-specific risk premium, as opposed to, say, a 3% premium or a 20% premium."  *Daubert* Op. 12.  Indeed, Frank initially used premium amounts that were much more favorable to the Debtors, but subsequently adjusted the amount upward without explanation.  Tr. 1880:16-1889:21.  The Court identified this lapse as "an appropriate topic for cross-examination," *Daubert* Op. 16, and cross showed it to be fatal:  Frank acknowledged "there is nothing in the work papers [he] produced explaining why [he] used 10 percent as opposed to 3 percent."  Tr. 1883:17-21.  And he never supplied an explanation at trial. As Defendants' valuation expert Roger Grabowski put it, no one had "any idea how [Frank] calculated those … numbers."  Tr. 2263:11-13.

The conclusory justifications that Frank offered for assigning the massive company-specific risk premium crumble on examination.  In his report, Frank purported to impose the premium based on the Debtors' (1) "aggressive projections"; (2) "little ability to control pricing"; (3) lack of diversification, and (4) "significant technological … risks."  *Daubert* Op. 11-12; Dkt. 16 Ex. 1 at 42 ("Frank Rep.").  But at trial he presented no evidence to back up his assertion that those factors made the Debtors unique, and he did not explain why those factors are relevant distinctions or would lead to a massive premium.

Although Frank asserted that the Debtors' projections were "aggressive," Frank Rep. 42, he never attempted to explain how those projections were "aggressive" compared to other

---

*McQueen*, 353 F. Supp. 2d 785, 840 (W.D. Ky. 2004) (approximately 4%); *Estate of Gallagher v. C.I.R.*, 101 T.C.M. (CCH) 1702, at *14 (T.C.) (4%).

companies' projections.  He also never explained how the nature of those projections correlates with the selected size of the company-specific risk premium.  In short, the jury heard not a single piece of evidence supporting the notion that the Debtors' management projections warranted the imposition of a company-specific risk premium.  Moreover, this amounts to a double counting: Frank had already disregarded the management projections and instead used other less "aggressive" forecasts when performing his analysis.  Tr. 1762:18-1763:19.

Frank also gave no explanation for his belief that the benchmark companies were better able to control their prices.  Frank Rep. 42.  In fact, none of them were more able to do so, as Grabowski demonstrated.  Grabowski Rep. 160, 227.  At trial, Frank did not say a word about any company's ability to control prices.  And the benchmark companies' supposed greater "diversification" is neither relevant nor true.  Grabowski demonstrated this, Grabowski Rep. 156-57; Tr. 2239:1029, and Frank's trial testimony did not cure these problems.  He named one benchmark company, Reynolds Metals, that "does many things beyond production of just a metal."  Tr. 1854:13-14.  Grabowski explained, however, that Reynolds was not more diversified in any meaningful sense, as evident from the fact that Reynolds' "profits moved up or down" when "aluminum prices moved up or down," Tr. 2239:9-15, just as the Debtors' profits moved with the price of magnesium, Tr. 2232:4-18.  Frank did not conduct his own "correlation analysis … for the price of metals moving" with the price of any benchmark company, nor did he challenge the accuracy of Grabowski's analysis.  Tr. 1853:6-10, 23-25.  Remarkably, he instead simply described Grabowski's assessment of diversification as "very thorough."  Tr. 1853:22.

Finally, Frank's assertion that Renco Metals had technological risks distinct from the benchmark companies is false.  Tr. 1771:24-1772:1.  At trial, he admitted that "other companies also had technology changes going on" like the Debtors.  Tr. 1852:15-17.  This was in line with

9

Grabowski's view that "many of these [benchmark] companies had technology risks that were described very similarly." Tr. 2261:25-2262:4.  Frank also revealed that his opinion was based on facts that are simply not true:  Frank said that the Debtors "didn't have new technology at the time of 1998, and they were not in compliance with the Clean Air Act."  Tr. 1879:9-11.

At trial, Frank provided an additional justification for the company-specific risk premium that was not part of his report: that "the company had environmental liabilities."  Tr. 1767:6-8. This was no minor consideration.  Frank described it as "*the* important factor in [his] solvency analysis," Tr. 1828:11-12 (emphasis added), noting that he believed there was "significant environmental exposure and contamination" that "needed to be considered," Tr. 1868:12-15. But Frank never evaluated this issue in any legitimate way.  Assessing how much the contingent liabilities contribute to the Debtors' unique riskiness requires determining both the size and the probability of those liabilities actually coming to pass.  *See* Ct. Ex. 11 at 14.  A 1% probability of occurrence merits less of a company-specific risk than does a 25% probability.  But neither Frank nor Plaintiff's environmental liability expert Douglas Allen (on whom Frank relied) ever performed any probability analysis.  *See* Tr. 1578:11-14; 1828:17-20.  Thus, there was no basis upon which Frank could judge the impact of the environmental claims on company-specific risk.

Moreover, including contingent liabilities as part of company-specific risk makes no sense in the first place.  These are merely contingent claims—which experts like Frank value all the time.  In determining solvency, Frank should have valued those (and all other) liabilities and then subtracted them from the Debtors' assets, just as the jury was told to do.  Ct. Ex. 11 at 12-13.  Even more confusing, Frank testified that his valuation of the company was "before the consideration of environmental liabilities," directly contradicting his later testimony.  Tr. 1759:1-2, 5-6, 9-10.  This distorted and frankly inexplicable use of environmental liabilities, which came

to light at trial, shows that Frank's company-specific risk analysis lacked any "methodological underpinning." *Daubert* Op. at 14.

In short, Frank's reasons for applying the company-specific risk premium were so divorced from reliable principles and actual data that they were "simply inadequate to support the conclusions reached." *Amorgianos*, 303 F.3d at 266. Although determining the size of a company-specific risk premium may require the exercise of judgment, that is not a "free pass" from *Daubert*'s requirement that an expert's methodology be reliable. Here, Frank should have used established and accepted methodologies to test, verify, and inform his judgment. His failure to do so is fatal under *Daubert*, and his testimony gives the Court new information to make that assessment that it did not have at the time of the original *Daubert* ruling. Even if Frank's testimony is admissible, no reasonable jury could have given his conclusions any weight.

***Market Approach.*** Frank and Grabowski each conducted a Market Approach analysis, and both analyses demonstrated that the Debtors were solvent at all relevant times. Frank Rep. 8-10; Tr. 1841:11-1846:15; Grabowski Rep. 34-89, 99. For no good reason, however, Frank excluded these findings from his "final" solvency determination. Frank Rep. 34-35.

The Market Approach assesses the value of a company by comparing it to other "guideline companies." *See* Trugman 199-201. The American Society of Appraisers recommends that term "to highlight the fact that no two companies are truly comparable, but rather, that similar companies can provide guidance about other companies." *Id.* at 200. While guideline companies will never be identical, experts can adjust their valuation to account for those differences. *Id.* This ensures that the expert can perform a market approach valuation while accounting for key differences between the guideline and the subject companies. A search for the "perfect" guideline will end in futility for nearly any company.

At trial, Grabowski explained the proper use of guideline companies under a Market Approach. Grabowski described how he chose the guideline companies, and how he used those companies to determine MagCorp's value. Tr. 2229:21-2249:2. Grabowski also explained the significance of "guideline" companies, relying on the American Society of Appraisers' definition of the term, and noted that they need not (and cannot) be identical to the subject company. Tr. 2228:25- 2229:20; *see also* Trugman 200 (noting "no two companies are truly comparable").

Frank claimed to exclude the Market Approach based on his opinion that the guideline companies were not similar enough to the Debtors. *Daubert* Op. 23. Frank's testimony, however, revealed his flimsy and incorrect methodology. On direct, Frank said little more than that he "didn't find good comparables that were truly similar to MagCorp." Tr. 1761:23-24. As a result, he asserted, performing a proper Market Approach analysis was impossible. Frank Rep. 34-35; Tr. 1761:13-25. Frank's misunderstanding and misapplication of proper methodology, however, was obvious. He stated that the "overall premise of the methodology" is that a guideline company is "exactly the same and share[s] the exact same risk." Tr. 1849:16-18. This definition—which Frank never provided in his report—is indisputably wrong. *See supra* at 11. As Grabowski explained, Frank premised his analysis entirely on an "old obsolete definition" of guideline companies. Tr. 2229:18. Frank failed to "come forward with any authority" to endorse his "definition of a guideline company" or establish that Grabowski's is not the accepted standard in the valuation profession. Tr. 1840:20-24; *see also* Tr. 1849:24-1850:10.

Not only was Frank's assumption about what constituted a guideline company false, but he also failed to use the guidelines properly: He did not adjust his valuation based on evidence of critical distinctions from the guidelines companies, nor did he find better companies to serve as points of comparison. He merely dismissed an unfavorable result as invalid. Tr. 1761:13-15,

23-25.  Misapplying the methodology, as we now know Frank did, rendered his testimony

inadmissible under *Daubert*.  *Attorney Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 780

(10th Cir. 2009); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994).

     Frank also failed to identify any factual basis for his decision to ignore the Market

Approach.  He simply stated that the guideline companies he identified were too large and too

diversified, and that MagCorp had unique technological risks.  Frank Rep. 34; *Daubert* Op. 23.

As explained earlier, Frank's assertion of diversification and technological risks is wholly

unsupported by fact or logic.  *See supra* at 9-10.  The same is true for Frank's assessment of size.

At trial, Frank said little more than a single word on the topic:  "Yes" to the question "Size?"

Tr. 1851:1-2; s*ee also* Tr. 1771:20 (describing companies as "huge").

     Unrebutted evidence, however, established that Frank's claim was factually wrong and

not based on a reliable methodology:  Grabowski identified several guideline companies that

were *not* substantially larger than the Debtors.  Grabowski Rep. 181-82, 188.  Nor did Frank

attempt to rebut Grabowski's testimony that the market is "the complete opposite of what

[Frank] thought":  The "littler companies in the potential set actually sold for more per dollar of

profit than the bigger companies."  Tr. 2237:20-23; 2238:7-9; Grabowski Rep. 181-82, 188.

Moreover, Frank purported to account for the differences in size already when he made "size

adjustments" to his analysis.  Frank Rep. 91-92; Grabowski Rep. 187-97.  And although at trial

Frank added "environmental contamination" as a reason the guideline companies were too

dissimilar, Tr. 1854:18, he admitted that some of those companies had $176 million of

environmental liability on their balance sheets.  Tr. 1852:24-25.

     The deficiencies in Frank's testimony and analysis did not stop there.  Most

astonishingly, Frank never explained why his insolvency conclusion for July 31, 1996, should

apply backward eight months, to December 1, 1995, to include all the transfers.[5]  *See* Tr. 1759:12-14.  In fact, his approach was so bereft of intelligible analysis that on summation Plaintiff's counsel felt compelled to improperly supply the jury his *own* unsupported theories of how Frank reached his solvency conclusion.  *See Rodriguez v. Schneider*, 56 Fed. Appx. 27, 28-29 (2d Cir. 2003) (noting impropriety of counsel's reference in summation to facts not in evidence).  Those theories were so flawed that had they actually been part of Frank's testimony, they would not have come close to satisfying the *Daubert* standard.

Counsel told the jury, for example, that because the Debtors were 2.22 times riskier than Alcoa based on their respective costs of debt, Tr. 2823:24-2824:11, it made sense that Frank's discount rate for the Debtors was 2.22 times greater than Grabowski's, Tr. 2828:20-2829:4. How Alcoa's cost of debt correlates to a discount rate is a mystery, especially because this is not at all how discount rates are calculated.  Counsel seems to have simply found some number in the record that happened to be the ratio between Frank's and Grabowski's rates, and offered it to the jury to make it appear as if Frank actually applied a methodology.  Making matters worse, immediately after the Court sustained Defendants' objection, counsel told the jury—with no basis in the record—that if you performed the same analysis with all of the guideline companies "you would get to Jason Frank's number."  Tr. 2829:14-18; *see also* Tr. 2798:18-22 (suggesting to the jury the vague and inexplicable math that by combining the $6.6 million of debt that AMAX forgave with an unknown amount of "losses [the Debtors] had over the prior five years," then "[i]t was $26 million negative.").

---

[5] Because Frank offered absolutely zero support for this conclusion, *see* Frank Rep. 3, and any solvency estimate for the period before the July 1996 bond offering would necessarily exclude the considerable bond-related debt, at the very minimum the Court should grant Defendants judgment on Plaintiff's fraudulent conveyance claim for the $14 million in transfers predating that offering.  Dkt. 189 at 35-36.

As this episode demonstrates, Frank's valuation analysis was not just fraught with errors,[6] but was so unsound that there were analytical chasms "between the data and the opinion proffered." *Amorgianos*, 303 F.3d at 266. As Defendants argued prior to trial, the Court should exclude Frank's testimony to "ensure that the courtroom door remains closed to junk science." *Id.* at 267. And the trial revealed further flaws in Frank's methodology that are fatal to his reasoning, which the Court did not have the benefit of considering in its initial *Daubert* ruling. Frank's testimony should be excluded, and without it, there is insufficient evidence to show that the Debtors were insolvent. *See infra* at 15-18. But even with his testimony, the Court should enter a directed verdict in favor of Defendants. The Court advised that the way for Defendants to "address any faults in Frank's analysis is by bringing them to the jury's attention." *Daubert* Op. 25. Defendants did just that, and the jury in fact concluded that the Debtors *were* solvent. *See* Ct. Ex. 25 at 2-5. Because no reasonable jury could have found otherwise, the Court should enter judgment on Plaintiff's fraudulent conveyance claim accordingly.

> ## 2. The other evidence presented at trial was insufficient to support a finding of insolvency.

The deficiencies in Frank's trial testimony are fatal for Plaintiff's claims, as Plaintiff presented no other evidence demonstrating insolvency. One of the key premises of Plaintiff's case was that the contingent liabilities MagCorp faced at the time of the transfers—particularly those associated with possible environmental liability—were both so large and so certain that

---

[6] There were additional flaws in Franks' methodology. The capital structure he assigned for the Debtors was derived from his guideline public company analysis—the very analysis he previously disregarded as useless. Frank Rep. 43; *see* Tr. 1768:3-5. He used circular reasoning to assign a size risk premium. *See Daubert* Op. 17-18. He did not use the data for his equity risk premium that his own report states he should use. *See id.* at 19-21. And he improperly excluded MagCorp's cash reserves from his analysis. *See* Dkt. 14 at 33-34 (Defendants' *Daubert* motion).

they rendered MagCorp insolvent.  *See, e.g.*, Dkt. 54 at 1-3, App. A; Dkt. 58 at 3; Dkt. 59 at 1-4, App. A.  But the evidence presented at trial supports neither prong of Plaintiff's theory.

As the Court's instructions to the jury emphasized, to determine the size of any contingent liability, the jury had to first "find the total amount of liability … if the event triggering that liability comes to pass," and then it had to "reduce [that liability] by the probability that the liability will actually come to pass."  Ct. Ex. 11 at 14; *see also FDIC v. Bell*, 106 F.3d 258, 264 (8th Cir. 1997) ("To correctly value [a] contingent liability it is necessary to discount it by the probability that the contingency will occur and the liability become real." (internal quotation marks omitted)).

Plaintiff, however, did not even attempt to show the probability of any potential environmental liabilities coming to fruition.  To the contrary, Douglas Allen admitted that he performed *no* probability analysis regarding environmental liabilities, Tr. 1578:11-14, and at no point during trial did any other witness supply the jury with a reasonable basis for deciding how likely it was that MagCorp would actually be subject to the liabilities that Plaintiff insisted had to be accounted for in assessing its financial condition at the time of the transfers.  Aside from Plaintiff's counsel's improper attempt to supply the jury with his own probability figure on summation, *see* Tr. 2859:19-20 ("Probability of having a problem with that is very close to a hundred percent."), there was simply no evidentiary basis upon which the jury could have calculated contingent liabilities according to the Court's express instructions.

Moreover, even if the jury used the high end of the contingent liability estimates offered by Plaintiff's expert, *and* assumed a 100% probability of liability—itself a preposterous conclusion in light of the undisputed fact that MagCorp's liability in this respect is currently *zero*—the total contingent liability to which MagCorp could have been subject at the time of the

transfers was *less* than the lowest point of the solvency cushion Grabowski calculated between

1995 and 1997.  While Allen's estimate of MagCorp's potential liability topped out at $78

million,[7] Grabowski's solvency cushion never dropped below $100 million during that time,

Def.'s Ex. 8960; Tr. 2280:2-11, and—aside from Frank's unsupported valuation—Plaintiff

presented no other figure from which the jury could have calculated any contingent liabilities to

render Debtors insolvent.  Accordingly, a reasonable jury could not have found MagCorp

insolvent at the time of the transfers due to contingent liabilities.

     In contrast, Defendants presented significant evidence indicating that MagCorp *was*

solvent at the time of the transfers.  As already noted, at trial, Grabowski—unlike Frank—

offered substantial analysis supporting his conclusion that MagCorp was solvent at all relevant

times.  *See supra* at 9-10, 11-13.  Defendants also introduced the independent report prepared by

Houlihan Lokey in 1996 concluding that MagCorp was solvent.  *See* Defs.' Exs. 8187 at 2, 8225

at 4-5.  Plaintiff put forward no evidence challenging the Houlihan Lokey report, preferring

instead to criticize it—incorrectly—for relying on financial projections by MagCorp officers.  Tr.

2777:19-2778:19; *see also* Defs.' Ex. 8187 at 2, 53-54 (discounted cash flow valuation based on

the average of management's projections and a downside scenario using prices 25 percent below

management's projections).  Indeed, Frank testified that in his work for Plaintiff he did not

---

[7] *See* Tr. 1565:8 (Compliance Costs: $8.3 to $20.2 million); Tr. 1568:22 (CERCLA/RCRA
Remediation: $28 to $46 million); Tr. 1570:19-20 (Study Costs: $3.6 to $10.8 million);
Tr. 1572:20-21 (Tort Claims: a few thousand to $1 million).  Allen's own testimony gave the
jury ample reason to discount his estimates significantly.  *See* Tr. 1565:24-1566:6 (stating that
environmental concerns "at some point in time *might* trigger" a remediation requirement
(emphasis added)); Tr. 1599:21-1601:9 (acknowledging discrepancy between EPA and his own
remediation estimates).  And the only additional basis for assigning a figure to environmental
liability was John Works's preposterous statement that the EPA was seeking a penalty range "on
the low end, 18 to 28 million and a statutory max of upwards around 750 to 900 million."  Tr.
1978:18-20; *see also* Tr. 2099:5-2100:4-5 (testimony from Steven Johnson noting that the
highest EPA penalty issued between 1990 and 2001 was just under $12 million).

evaluate the Houlihan Lokey analysis.  Tr. 1822:17-1825:9.  In addition, other witnesses established at trial that MagCorp was solvent, adequately capitalized, and able to pay all its bills during the period relevant to the transfers.  *See, e.g.*, Tr. 1080:17-1081:7 (Roger Fay); 1288:10-1289:13 (Todd Ogaard).  Even Frank conceded he was unaware of any bills that Magcorp failed to timely pay between 1996 and 1998.  Tr. 1867:4-1869:2.

In short, because the evidence adduced at trial establishes that the Debtors were solvent when the transfers occurred, Defendants are entitled to judgment as a matter of law on Plaintiff's fraudulent conveyance claim.  At minimum, the jury's verdict as to fraudulent conveyance—which was not tied to any of the specific transfer dates—was against the weight of the evidence, requiring a new trial.  *See Farrior v. Waterford Bd. of Educ.*, 277 F.3d 633, 634 (2d Cir. 2002) ("A grant of a new trial on the ground that the verdict was against the weight of the evidence is appropriate if the jury has reached a seriously erroneous result or … the verdict is a miscarriage of justice." (internal quotation marks omitted)).[8]

### B.  Defendant Rennert Is Entitled to Judgment as a Matter of Law on Plaintiff's Unjust Enrichment and Fraudulent Conveyance Claims.

Plaintiff based his unjust enrichment claim solely upon Ira Rennert's use of a house owned by a Renco subsidiary, Blue Turtles.  To prevail on that claim, Plaintiff had to demonstrate that Rennert benefitted—at the Debtors' expense—from using the house; in other words, Plaintiff had to present evidence that the house was financed with funds derived from the transfers challenged by Plaintiff.  *See In re Hydrogen, LLC*, 431 B.R. 337, 359 (Bankr. S.D.N.Y.

---

[8] This standard is less stringent than the standard for granting judgment as a matter of law under Rule 50.  Under Rule 59, "a new trial may be granted even if there is substantial evidence to support the jury's verdict."  *Song v. Ives Laboratories, Inc.*, 957 F.2d 1041, 1047 (2d Cir. 1992).  Additionally, a trial judge is "free to weigh the evidence [herself] and need not view it in the light most favorable to the verdict winner."  *Id.* (internal quotation marks omitted).

2010) (under New York law, a claim for unjust enrichment requires, among other things, that

"defendant was enriched … at plaintiff's expense"); Dkt. 318 at 31-35 (Plaintiff arguing that the

evidence proffered at trial satisfied this standard).  As Defendants explained in their Rule 50(a)

motion, Plaintiff failed to make either showing.  Dkt. 300 at 15-17.  Because the Court has not

yet ruled on that motion, judgment in Defendants' favor is appropriate now.[9]

Plaintiff presented no evidence at trial establishing that the house was financed by the

dividend funds.  In discussing this claim at the pretrial stage, the Court allowed that "[t]he chain

[connecting the dividends to the house] may have more than one step."  Pretrial Hr'g Tr. 48:6-7

(Dec. 19, 2014).  Plaintiff, however, failed to establish *any* chain at all; his evidence amounted to

no more than the fact that Renco established and funded Blue Turtles four months after Renco

Metals paid $75 million in dividends to Renco, Tr. 590:5-19, 1055:2-3, and that in January 1997

Blue Turtles paid $11 million for the land on which the house eventually was built, Tr. 611:13-

14.  Plaintiff came nowhere close to demonstrating, as he was required to, that the $11 million

Blue Turtles used to buy the land came from the $75 million Renco received in dividends.

First, the jury heard that, after the $75 million dividend payment was put into a general

Renco transfer account, "most … was invested in the next couple of months," and was logically

not available to fund the purchase of the land.  Tr. 1089:10-15.  Plaintiff did not counter this

testimony with *any* evidence that any portion of the $75 million remained in the transfer account

at the time the land was purchased, much less $11 million.  Second, the jury heard uncontested

---

[9] As Defendants argued during trial, judgment in their favor on this claim is also warranted if the
Court finds that the jury's verdict as to fraudulent conveyance must be vacated.  *See* Tr. 2555:24-
2560:25; Dkt. 308 (arguing that, under New York law, an unjust enrichment claim cannot stand
if the claim respecting the underlying wrongful conduct is rejected).  The Court reserved
decision on that issue, Tr. 2600:11-13, and the jury instructions and verdict form allowed the jury
to find liability on unjust enrichment without a finding of liability on the fraudulent conveyance
claim, Ct. Ex. 11 at 36-37, Ct. Ex. 25 at 16.

evidence that subsequent to Renco's receipt of the $75 million dividend—but before it established Blue Turtles—Renco received an *additional* $125-150 million from sources unrelated to the Debtors, and deposited that money in the same transfer account that later funded Blue Turtles.  Tr. 1108:8-19; *see also* Tr. 613:21-614:9.  In other words, the unrebutted evidence established both that Renco used most, if not all, of the dividend money on investments that did not involve Blue Turtles, *and* that Blue Turtles was likely funded by funds that did not originate with the dividend payment.  *See* Tr. 1088:23-1089:15 (Roger Fay).

Moreover, Plaintiff offered no evidence whatsoever regarding the origin or amount of the funds used to build the house after Blue Turtles purchased the land, so at best Plaintiff's unjust enrichment claim rests on any benefit Rennert may have received from the land alone, not the house.  As the Court indicated, Tr. 2009:25-2013:11, Plaintiff did not even attempt to offer evidence from which the jury could have calculated the value of Rennert's purported benefit from the house, such as how often he used it, its value, or what it would have cost to procure similar housing on the open market.  *See Andersen v. Weinroth*, 48 A.D.3d 121, 137 (N.Y. App. Div. 2007) (denying unjust enrichment claim in part because plaintiff offered no evidence regarding amount of benefit allegedly conferred); *Maryanne McKeown (Frederick) v. Frederick*, 39 Misc. 3d 1241 (N.Y. Sup. Ct. 2013) (no unjust enrichment in part because plaintiff failed to establish that improvements increased the property's value).

The paucity of Plaintiff's evidence is evident in the jury's award of $16,222,000, an amount that bears no relationship to the only figure Plaintiff offered—the $11 million Blue Turtles spent to purchase the land.  Inexplicably, the jury awarded damages against the Trustees as well, even though Plaintiff never even suggested that *they* received a benefit from the house. This speculative damages award confirms that Plaintiff failed to adduce evidence of "the specific

20

and direct benefit moving from the plaintiff to the defendant" necessary to support an unjust enrichment claim. *Brenner v. Brenner*, 821 F. Supp. 2d 533, 541 (E.D.N.Y. 2011) (internal quotation marks omitted); *see also M+J Savitt, Inc. v. Savitt*, No. 08 Civ. 8535 (DLC), 2009 WL 691278, at *10 (S.D.N.Y. Mar. 17, 2009) ("It is not sufficient for defendant to receive some indirect benefit—the benefit received must be 'specific and direct' to support an unjust enrichment claim." (citing *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000)).  Under these circumstances, the jury's damages award cannot stand, and Rennert is entitled to judgment as a matter of law on unjust enrichment.

The Court should also enter judgment as a matter of law for Rennert on Plaintiff's fraudulent conveyance claim.  It is undisputed that under New York law a fraudulent conveyance claim requires that the defendant receive a "conveyance" from the debtor.  N.Y. Debt. & Cred. L. § 273 (2014); Ct. Ex. 11 at 17.  As Defendants pointed out at trial, Plaintiff introduced absolutely no evidence demonstrating that MagCorp or Renco Metals "conveyed" anything to Rennert.  *See* Tr. 1992:4-5 (defense counsel noting that "there is an absence of any evidence to show the benefit that Mr. Rennert received" from the dividend payments).  To the contrary, the stipulated facts indicate that each dividend payment went to Renco Metals and then to Renco, not to anyone else.  Dkt. 189 at 35-36.  Accordingly, Plaintiff failed to satisfy his evidentiary burden with respect to this claim, and the Court should enter judgment accordingly; at minimum, the jury's verdict was clearly against the weight of the evidence, warranting a new trial.

The damages award for the breach of fiduciary duty claim must be vacated as well.  As Plaintiff has not demonstrated that there was any conveyance to Rennert (fraudulent or otherwise), the "fraudulent" conveyances in this case total $101,000,000 at most.  *See* Ct. Ex. 11 at 21 ("If there are any transfers or conveyances … that you find not to be fraudulent, you should

not include the amount of those transfers or conveyances in [the damages] calculation.").  If

Plaintiff prevails on his claims against Renco and recovers the $101,000,000 plus interest, the

Debtors have been made whole, rendering the $16,222,000 an unjustified windfall recovery for

the estates.  *See Zaretsky v. New Century Mortg. Corp.*, CV08-378 (DRH) (WDW), 2011 U.S.

Dist. LEXIS 152617, *7 (E.D.N.Y. Oct. 3, 2011) (plaintiff bringing fraud and breach of fiduciary

duty claims "[o]f course … cannot get a double recovery under the two causes of action, but only

his actual damages").

### C.  The Punitive Damages Award Must Be Struck as a Matter of Law.

The $1,000,000 punitive damages award the jury entered against Renco must be struck

from the judgment as a matter of law.[10]  As Defendants explained in their letter briefing, punitive

damages are not allowed under Delaware law for breach of fiduciary duty.  Dkt. 307.  While the

Court recognized there was "serious doubt" as to the soundness of Plaintiff's demand, it

ultimately reserved decision on this point.  Tr. 2601:5-17, 2627:3-14.  After Plaintiff's counsel

urged the jury at closing argument to award massive punitive damages against Defendants,

defense counsel raised the issue again.  Tr. 2868:20-2869:9, 2870:11-14.  The Court, however,

reiterated its reservation decision, presumably with the intention of addressing the question only

if necessary at the posttrial motion stage.  Tr. 2870:15-16.

It is now imperative that the Court recognize that Delaware law does *not* allow punitive

damages for breach of fiduciary duty, and strike the jury's award of such damages.  *See Norville*

*v. Staten Island Univ. Hosp.*, 196 F.3d 89, 100 (2d Cir. 1999) ("An erroneous jury instruction,

---

[10] The jury's punitive damages finding was one factor the Court considered in setting the
prejudgment interest rate above the federal postjudgment interest rate.  Dkt. 342 at 9.  If the
Court concludes that there was insufficient evidence to support this portion of the verdict, it
should also amend the judgment to lower the interest rate.  *See* Rule 59(e).

unless harmless, compels reversal.").  The Delaware courts are unequivocal on this point.  *See*

*Adams v. Calvarese Farms Maint. Corp.*, Civil Action No. 4262-VCP, 2010 Del. Ch. LEXIS

199, at \*82 n.204 (Del. Ch. Sept. 17, 2010) (the Court "lacks jurisdiction to award punitive or

exemplary damages" because the state legislature has not authorized them for breach of fiduciary

duty claims); *Gesoff v. IIC Industries, Inc.*, 902 A.2d 1130, 1154 (Del. Ch. 2006) ("Obviously,

the Court cannot award punitive damages" in a case involving breach of fiduciary duty); *see also*

*Albert v. Alex. Brown Mgmt. Servs., Inc.*, No. C.A. 04C-05-250 PLA, 2004 WL 2050527, at \*7

(Del. Super. Ct. Sept. 15, 2004) (acknowledging that an obligatory transfer of a breach of

fiduciary duty claim to Chancery would "depriv[e] the Plaintiffs of a jury trial and a chance to

reap punitive damages").[11]

The punitive damages award must also be struck as a matter of law because Plaintiff

presented no evidence that Defendants acted "maliciously"—a necessary element for awarding

punitive damages under Delaware law generally.  Ct. Ex. 11 at 28; *see also* Tr. 2545:19-2548:2

(Defendants raising this issue at trial).  Though Plaintiff suggested that evidence regarding

chlorinated hydrocarbons and toxic waste supported a maliciousness finding, Tr. 2546:2-4, that

alleged wrongdoing has nothing to do with supposed maliciousness in connection with the

transfers in question—which are the basis of the breach of fiduciary duty claim, Tr. 2547:9-19;

*see also* Tr. 1075:15-1081:22 (Fay testimony regarding due diligence efforts conducted in

---

[11] Recognizing the clarity of Delaware law on this question, courts in other jurisdictions applying
that law have flatly denied attempts to seek punitive damages for alleged breaches of fiduciary
duty.  *See Dietz v. Spangenberg*, Civil No. 11-2600 ADM/JJG, 2013 U.S. Dist. LEXIS 123601,
at \*71 (D. Minn. Aug. 29, 2013); *U.S. Bank Nat'l Ass'n v. Verizon Communs., Inc.*, 817 F. Supp.
2d 934, 944 (N.D. Tex. 2011); *DQ Wind-Up, Inc. v. Kohler*, Court File No. 27-CV-10-27509,
2013 Minn. Dist. LEXIS 118, at \*23 (Minn. Dist. Ct. Aug. 29, 2013).

connection with 1996 bond offering).  Plaintiff thus failed to meet his burden with respect to

punitive damages even under his own misguided understanding of Delaware law.

## II.  IN THE ALTERNATIVE, THE COURT SHOULD ORDER A NEW TRIAL

Under Rule 59, a court may order a new trial when the circumstances warrant.  *See*

*Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 417 (2d Cir. 2012) ("A court may grant a new

trial 'for any reason for which a new trial has heretofore been granted in an action at law in

federal court.'" (quoting Fed. R. Civ. P. 59(a)(1)(A)).  In light of Plaintiff's introduction of non-

probative and highly prejudicial evidence, and the jury's impermissible compromise verdict, a

new trial is required here.

### A.  Plaintiff's Introduction of Highly Prejudicial, Non-probative Evidence Warrants a New Trial.

Prior to trial, Plaintiff indicated that he intended to introduce evidence purporting to

demonstrate environmental contamination at the Rowley facility.  *See, e.g.*, Dkt. 54 at 1-3, App.

A; Dkt. 58 at 3; Dkt. 59 at 1-4, App. A.  When Defendants moved to exclude this evidence as

non-probative and prejudicial, the Court granted the motion in part, acknowledging that this

lawsuit "is not an environmental action to determine whether MagCorp was operating in

violation of federal or state environmental laws."  Pretrial Hr'g Tr. 29:22-24 (Dec. 19, 2014).

The Court nonetheless permitted Plaintiffs to present extensive testimony and documentation

regarding the EPA's 2001 RCRA lawsuit, post-bankruptcy environmental conditions at the

Rowley facility, and human and animal toxicity issues.  Because this evidence was far more

prejudicial to Defendants than probative of any Plaintiff's legal claims, Defendants renew their

objections to Plaintiff's introduction of that evidence,[12] and request that the Court grant a new

---

[12] *See, e.g.*, Dkts. 44, 45, 53, 54, 57, 59, 68, 69, 81, 82; Tr. 515:15-16, 856:24-857:1, 1532:4-5.

trial.  *See LNC Invs. v. First Fid. Bank*, 126 F. Supp. 2d 778, 787 (S.D.N.Y. 2001) ("'The

improper admission of evidence at trial may warrant the grant of a motion for new trial,

particularly when the evidence improperly admitted is found to be prejudicial.'" (quoting

12 Moore's Fed. Practice § 59.13[2][b][E] (Matthew Bender 3d ed.)).

The supposed purpose of Plaintiff's environmental evidence was to establish that, at the

time of the transfers, MagCorp faced contingent environmental liabilities that rendered it

insolvent.  *See* Dkt. 58 at 3.  Much of Plaintiff's evidence, however, had no bearing on

contingent liability.  *See, e.g.*, Tr. 1975:15-1977:12 (Works's testimony regarding dead birds at

the Rowley site); Tr. 1523:17-24, 1533:5-23 (Allen's testimony regarding the potential human

toxicity of chlorinated hydrocarbons).  Plaintiff acknowledged that MagCorp never faced

liability stemming from injuries to animals or humans.  Tr. 1036:12-13 ("I want this to be clear,

we are not saying that anybody has sued for any of these other health effects.").  Moreover, even

if some of Plaintiff's environmental evidence was probative in theory, Plaintiff made no attempt

to show the probability of any related liabilities coming to pass—information that was essential

to the jury's ability to calculate MagCorp's contingent liabilities.  *See supra* at 16-18.  As a

result, most of the environmental evidence was ultimately useless to the jury with respect to the

only purpose for which it could have been properly admitted: determining the Debtors'

insolvency.

Although the jurors were unable to find any proof of insolvency in Plaintiff's

environmental evidence, its prejudicial effect was fully apparent.  As the Court itself recognized,

Plaintiff sought to paint for the jury an image—unsupported by fact—of MagCorp and Rennert

as inveterate polluters who knowingly created a toxic, carcinogenic environment.  *See*

Tr. 1036:14-15 (Court noting that Plaintiff wanted the supposed negative effects on human

health to be "implied and in the air"). Plaintiff's counsel repeatedly—and improperly—suggested that the jury use this lawsuit as an opportunity to punish Defendants for their alleged environmental misdeeds. *See, e.g.*, Tr. 2859:15 (telling jury that Defendants "never did what their duty required them to do" regarding alleged environmental contamination). Most brazenly, counsel told the jury that if they did not find Defendants liable, "the taxpayers" would be left to "clean up this contaminated mess"—a statement counsel knew was wholly untrue. Tr. 2860:3-5. And counsel urged the jury to use the punitive damages claim—which, as established above, should not have been in the case in the first place, *see supra* at 22-24—as a tool for reprimanding Defendants for their alleged environmental infractions. Tr. 2868:20-23, 2869:2-7.

Plaintiff's counsel also misused the environmental evidence in another way. Throughout trial, Plaintiff introduced post-transfer evidence—including the testimony of EPA officials responsible for the Rowley site—suggesting that MagCorp faced significant contingent liability from the RCRA action. *See, e.g.*, Tr. 1949:9-1958:18 (Van Housman); Tr. 1971:16-1979:20 (Works). Defendants were limited in what they could say in response; the Court's rulings precluded much evidence and witness testimony regarding the RCRA proceedings themselves, Dkt. 175 at 3; Pretrial Hr'g Tr. 75:22-80:16; Tr. 1685:21-1687:16, and the witnesses Defendants were allowed to present were not in a position to properly testify to the critical issues, Tr. 2880:7-2881:7. Accordingly, Defendants were largely left to counter Plaintiff's insinuations with a single undisputed fact: that, as of today, Defendants have been assessed *no* RCRA liability whatsoever.

On summation, however, Plaintiff's counsel repeatedly suggested that the only reason MagCorp had not been subject to such liability was because of Defendants' efforts to "kick [the case] down the road." Tr. 2808:7-10, 2868:13-14; *see also* Tr. 2859:21-23 ("Mr. Rennert has the

notion, just put it off down the road.  Put it off, put it off, put it off ….").  Counsel's statements

were not only false, but, coming in the trial's final moments, left Defendants with no opportunity

to respond.  Though the Court sustained one of Defendants' objections, Tr. 2868:18-19, it

declined to instruct the jury separately to disregard counsel's comments, Tr. 2883:4-2893:5.

Thus, the die was cast:  The jury began deliberations having heard that Defendants were

incorrigible polluters who had unfairly avoided the financial consequences of their actions.

As demonstrated below, the confusing and prejudicial effect of Plaintiff's environmental

evidence proved impossible for the jury to overcome.  Accordingly, the Court should order a

new trial.  *See Cameron v. City of New York*, 598 F.3d 50, 61 (2d Cir. 2010) (new trial is

warranted unless the court can "conclude with fair assurance that the [erroneously admitted]

evidence did not substantially influence the jury" (internal quotation marks omitted)).

**B.  The Jury's Improper Compromise Verdict Necessitates a New Trial.**

Compromise verdicts are "improper"; jurors may not "reach agreement by means other

than a conscientious examination of the evidence."  *Maher v. Isthmian Steamship Co.*, 253 F.2d

414, 416-17 (2d Cir. 1958).  Jurors sometimes compromise improperly by, for example, bridging

a divide "on the question of defendant's liability" by awarding only a fraction of claimed

damages when the amount of damages is uncontested.  *Id.* at 417.  Improper compromise may

also arise when jurors agree to find for the plaintiff on some issues and the defendant on others,

despite disagreement as to all.  *E.g.*, *Stephenson v. Doe*, 332 F.3d 68, 80 (2d Cir. 2003) (noting

possibility of "compromise" where jury was "told that it could find that [a police officer] used

excessive force but could then still let him off the hook by finding qualified immunity").  A court

"may infer that a verdict is a compromise" where it is "inconsistent," either with itself or the

evidence adduced at trial, and there are "other indicia" of compromise, "such as a close question

27

of liability," *Atkins v. New York City*, 143 F.3d 100, 104 (2d Cir. 1998), or "difficulty in jury

deliberations," *Diamond D Enterprises USA, Inc. v. Steinsvaag*, 979 F.2d 14, 17 (2d Cir. 1992).

### 1. The jury broke its impasse only by reaching an impermissible compromise verdict.

All indications are that the jury here reached an improper compromise verdict.  First, as

the verdict form itself shows, liability in this case was indisputably "a close question."  *Atkins*,

143 F.3d at 104.  Second, there was "difficulty in jury deliberations."  *Diamond*, 979 F.2d at 17.

The first day of deliberations ended with the jury reporting "a temporary impasse with respect to

solvency."  Tr. 2986:6-7.  The next morning, the jury sent a note asking for specific "amount[s]"

to answer Question 6, which addresses damages for fraudulent transfers—a question the jury

would have raised only had it tentatively found liability.  Tr. 3002:25-3003:3; *see* Dkt. 304

(verdict form).  But that afternoon, the jury reported, "Unfortunately, we cannot agree on No. 1

and therefore we are hung.  I'm sorry."  Tr. 3020:17-18.  Question 1 addressed solvency, which,

as the Court put it, "[t]he parties agree [is] the 'sine qua non' of the [Plaintiff's] claims."  Dkt. 36

at 2.

Defendants accordingly moved for mistrial.  Over Defendants' objection, however, the

Court then gave the jury an *Allen* charge.  Tr. 3022:1-19, 3030:6-3031:1.  Forty minutes later, the

jury sent another note:  "We need a break from the room.  One juror is having a panic attack."

Tr. 3032:7-8.  Defendants again moved for mistrial, which the Court again denied.  Tr. 3033:18-

19.  The jury indicated it would continue deliberating but would then retire for the night a short

time later.  Early the next morning, a Friday, the jury then requested "new final verdict forms,

maybe one for each juror."  Tr. 3038:3-4.  A few hours later, it returned its verdict.

The verdict the jury returned on its new forms, however, contained fundamental

inconsistencies—a third indication the jury reached an improper compromise.  In answering

Questions 1 to 3, the jury found that, on the dates of each of the transfers at issue, the Debtors were neither insolvent nor rendered insolvent by the transfers.  Ct. Ex. 25 at 2-5.  Accordingly, the jury found the Defendants not liable for fraudulent transfer under federal law, and thus awarded no damages in Question 6, *id.* at 6—the question for which the jury had asked the Court's guidance in calculating the proper "amount[s]" the day before.  Tr. 3002:25-3003:3.

Yet the jury then found Defendants liable for fraudulent conveyances under New York law—in response to a general verdict question that was not tied to any of the specific transfer dates—which gave them a path to award damages against Rennert and Renco.  Ct. Ex. 25 at 7-9.  The problem:  To find a fraudulent conveyance under New York law, the jury was told it had to find that the "debtor corporation was [1] insolvent when it made the conveyance, or rendered insolvent because of the conveyance, or [2] was left with unreasonably small capital as a result of the conveyance, or [3] made the conveyance intending or believing that it would incur debts beyond [its] ability to pay as they came due."  Tr. 2907:20-25.  But those are *the same facts* the jury found were absent in Questions 1-3 under federal law, and for these three issues the federal and New York standards are materially identical, as everyone in this litigation has agreed.

Indeed, in instructing the jury on the second and third concepts to the jury, the Court stated explicitly that it should apply "the definitions I have already given you," i.e., under federal law.  Tr. 2910:9-12.  And although the Court gave the jury a "specific definition" for insolvency under New York law, the standard is identical in substance:  Each standard simply requires determining whether the value of liabilities exceeded the value of assets.[13]  Tr. 2909:15.  At no point did anyone suggest (nor would the evidence support) that the Debtors could meet one

---

[13] *See, e.g.*, *In re Trinsum Group, Inc.*, 460 B.R. 379, 392 (Bankr. S.D.N.Y. 2011); *In re Nirvana Restaurant Inc.*, 337 B.R. 495, 506 (Bankr. S.D.N.Y. 2006); Tr. 2901:25-2902:17 (instruction under the Bankruptcy Code); Tr. 2909:16-2910:8 (instruction under New York law).

definition but not the other.  *See* Tr. 2505:11-2507:24; *In re Ames Dep't Stores, Inc.*, 161 B.R.
87, 89, n.1 (Bankr. S.D.N.Y. 1993) ("[T]he components of a fraudulent conveyance claim under
New York state law … are almost identical to th[ose] of 11 U.S.C. § 548(a)(2).").

The jury also found many Defendants liable for breach of fiduciary duty (and aiding and
abetting such breaches), but yet again awarded damages only against Rennert and the Renco.  Ct.
Ex. 25 at 9-13.  Same problem, but even starker:  The jury was instructed that it would "reach
this claim only if you conclude that MagCorp or Renco Metals was insolvent or was
inadequately capitalized as to a particular transfer."  Tr. 2913:9-11; *see also* Dkt. 304 at 9
(Question 11) ("*With respect to any transfer for which you found MagCorp or Renco Metals
insolvent or insufficiently capitalized*, do you find that the Plaintiff has proven that any of the
following Defendants committed a breach of fiduciary duty …?") (emphasis added).  But in
Questions 1 and 2, the jury had *not* found either company insolvent or insufficiently capitalized
with respect to any transfer, so it could not answer the breach of fiduciary duty claims "yes" after
answering Questions 1 and 2 "no."  Those verdicts are irreconcilable as well.

Similarly irreconcilable were the jury's answers that (1) Rennert acted in "good faith"
with respect to unlawful dividends and unlawful stock redemptions (Question 17), yet (2)
Renco—which Rennert controls—"engaged in willful or wanton conduct and acted maliciously
for the purpose of injuring the corporation" with respect to the same underlying transfers, and
thus should pay punitive damages (Question 14 and Instruction No. 19).  Ct. Ex. 11 at 28; Ct.
Ex. 25 at 13-14.  And to top it off, the jury awarded a damages amount against Rennert and the
Trustees—$16,222,000—that has no basis in the record.  Ct. Ex. 25 at 7, 9, 12, 16.

In sum, then, the jury hit a "temporary impasse" one day, reported a "deadlock" on
solvency the next day, received an *Allen* charge that was followed by a juror's "panic attack,"

30

and then finally returned a verdict, which (1) unanimously found no insolvency while awarding damages—against Rennert and Renco alone—on claims that *do* require insolvency, (2) found that Rennert acted both in good faith *and* willfully and wantonly, and (3) awarded damages unmoored to the facts of the case.

This sequence of events gives rise to an inescapable inference, *Atkins*, 143 F.3d at 104, that the jury broke its panic-inducing deadlock on the case's key issue by improperly reaching a compromise:  Those jurors who thought the Debtors were not insolvent (consistent with the only reasonable view of evidence, *see supra* at 4-18) could vote their conscience on the specific factual interrogatories in Questions 1 to 3.  And those jurors who were convinced Defendants had to be liable for *something* could do so by finding liability on the state-law claims.  By persistently seeking to make Defendants' alleged environmental misconduct and Rennert's personal wealth the central issues in the case, Plaintiff's counsel implored the jury to do nothing less.  *See, e.g.*, Tr. 36:12-37:7 (showing image of Sagaponack house and telling the jury the land was purchased with money "improperly taken from MagCorp"); Tr. Tr. 2837:19-20 ("[W]e're asking you to tell Mr. Rennert to put the money back.").  Despite the Court's repeated warnings that such issues were largely irrelevant, Tr. 605:11-607:1, 609:21-615:6, Plaintiff's relentless efforts to misdirect the jury's attention produced a verdict that cannot be squared with the facts or law.

### 2.  The jury's impermissible compromise warrants a new trial.

These circumstances closely resemble others in which courts have found improper compromise verdicts.  In *Stephenson*, for example, a jury found that a police officer "had used excessive force against [the plaintiff] but was nevertheless entitled to qualified immunity," notwithstanding that the court had "emphasized that [the] law [on excessive force] was clearly established for purposes of qualified immunity."  332 F.3d at 71, 78.  The Second Circuit held

the verdicts were inconsistent. *Id.* at 79. "Moreover," the court noted, "[t]he jury was, in effect, told that it could find that [the officer] used excessive force but could then still let him off the hook by finding qualified immunity. On this record, there is a risk that the effect of having such an 'out' (by finding qualified immunity) affected the care with which the jury conducted the excessive force inquiry." *Id.* at 80. In light of this possible "compromise," the court could not allow the excessive force verdict to stand. *Id.* Instead, the court "remand[ed] this case for a new trial despite the burden this places on the parties and the court." *Id.*

In *Mekdeci v. Merrell National Laboratories*, 711 F.2d 1510 (11th Cir. 1983), the court ordered a new trial where the jury awarded only partial damages and "the sequence of events leading up to that verdict furnishes ample additional evidence" of compromise: "[T]he jury sent several communications to the judge indicating its uncertainty on the central issue" in the case; "the jury sought the district court's permission to render a verdict with an explanation of its reasons"; "after the court denied that request, the jury sent word that it was 'hopelessly deadlocked'"; the court "gave a modified *Allen* charge"; and the jury then returned its verdict. Tr. 1514-15. The jurors' communications and request "reinforces the notion that the jurors could not reach an agreement on the substantive issues," and thus the court held that "the *Allen* charge may have had the unintended effect of compelling a compromise." Tr. 1515.[14]

---

[14] *See also Skinner v. Total Petroleum Inc.*, 859 F.2d 1439, 1445-46 (10th Cir. 1988) (granting a new trial where "a close question of liability, and an odd chronology of jury deliberations [were] all indicia of a compromise verdict," particularly the jury's "suspect" "pattern of jury deliberations," including its "sudden arrival at unanimity, when just a few hours before it was still struggling with an apparently close issue of liability"); *Atkins*, 143 F.3d at 104 (remanding for retrial where "the issue of liability was close and vigorously contested and … the verdict on damages was inconsistent with the facts adduced at trial," suggesting an improper compromise verdict, even though "there is in this case no evidence proving that a compromise verdict was returned").

Here as well, the sequence of events suggests that the Court's *Allen* charge may have inadvertently prompted the jury to break its deadlock by returning an improper compromise verdict.  The Court should therefore order a new trial.  Indeed, the jury's inconsistent verdict is itself ground for a new trial even in the absence of an improper compromise.  "[W]hen faced with seemingly inconsistent verdicts," a court "'must adopt a view of the case, if there is one, that resolves any seeming inconsistency,'" but "[i]f no such resolution is possible, the Seventh Amendment requires that the court order a new trial."  *Harris v. Niagara Mowhawk Power Corp.*, 252 F.3d 592, 598 (2d Cir. 2001) (quoting *Brooks v. Brattleboro Memorial Hospital*, 958 F.2d 525, 529 (2d Cir. 1992)).  A verdict is irreconcilably inconsistent when a jury's finding on one claim necessarily negates an element of another claim, *e.g.*, *Kosmynka v. Polaris Industries*, 462 F.3d 74, 86-87 (2d Cir. 2006), or when the jury misapplies the jury instructions to reach opposite answers to questions that call for the same answer, even where the instructions are not identical, *e.g.*, *Stephenson*, 332 F.3d at 78-81.  As noted, that is the case here.

### 3.  Defendants properly preserved this issue.

Although Defendants respectfully disagree with, and preserve their right to appeal, the Court's March 4 Order holding that Defendants waived their right to seek judgment as a matter of law under Rule 49(b)(3), *see* Dkt. 325 at 5-9, it is important to note that the Court's analysis in that Order does not resolve Defendants' present challenge to the jury's dysfunctional deliberations and resulting improper compromise verdict.  Defendants preserved this challenge by moving for a mistrial—twice—as the jury's difficulties in deliberations became apparent.  Tr. 3022:15-19, 3033:18.  And, recognizing the risk that an "*Allen* charge may have … the unintended effect of compelling a compromise," *Mekdeci*, 711 F.2d at 1515, Defendants objected to the Court's *Allen* charge.  Tr. 3022:15-17.  Then, when that risk materialized in the form of the

jury's inconsistent verdict, Defendants moved for a mistrial a *third* time, citing the jury's improper "compromise verdict" and raising every ground noted above.  Tr. 3063:5-3064:21.

That was more than enough to preserve this challenge.  All three of Defendants' mistrial motions maintained Defendants' position that the jury should be dismissed because it had shown itself unable to reach a unanimous decision.  The relief Defendants sought then—both before and after the jury was discharged—is precisely what they seek now: a new trial.  Defendants need not have made yet another motion for mistrial immediately after the verdict but before the jury's discharge.  No opportunity for further deliberations was lost, because Defendants were not asking that the jury be instructed to reconcile its verdict; rather, their request all along was that this clearly deadlocked and dysfunctional jury be dismissed and the case retried before a new jury.[15]  Nor were Defendants required to raise their compromise verdict challenge in connection with the special verdict form or the charging conference; Defendants' challenge would have been unripe before there was any "difficulty in jury deliberations."  *Diamond*, 979 F.2d at 17.[16]

---

[15] None of the cases regarding predismissal objections the Court cited in its March 4 Order (at 6) involved improper compromise verdicts by formerly deadlocked juries, so they do not govern here.  Rather, they involved only pure inconsistent-verdict claims in cases where the jury might have been able to reconcile its verdict had it been given the chance—unlike the troubled jury here.  Even as to pure inconsistent-verdict claims, however, an objection is timely if made prior to entry of judgment, even after the jury has been discharged, because "the terms of Rule 49(b) make it the 'responsibility of the trial judge to resolve the inconsistency' even when no objection is made."  *Schaafsma v. Morin Vermont Corp.*, 802 F.2d 629, 634-35 (2d Cir. 1986) (citing *Elston v. Morgan*, 440 F.2d 47, 49 (7th Cir. 1971)).  Not objecting prior to the jury's discharge need not result in waiver of a pure inconsistent-verdict objection.  *Denny v. Ford Motor Co.*, 42 F.3d 106, 111 (2d Cir. 1994) (directing "[a] case-by-case application of the principles of waiver" under both Rules 49(a) and 49(b)); *see also Heil Co. v. Evanston Ins. Co.*, 690 F.3d 722, 727 (6th Cir. 2012) (addressing defendant's inconsistent verdict argument and granting a new trial under Rule 59, even though defendant conceded it waived any objection under Rule 49).

[16] Even as to Defendants' pure inconsistent verdict claims, no such objection was required because the jury instructions and verdict form were not incorrect, but rather the jury simply failed to apply them correctly and in a logical manner.  *Kosmynka*, 462 F.3d at 85.  And Defendants *had* warned of the risk of juror confusion anyway.  Tr. 2497:18-2498:12, 2504:2-3.

Moreover, even if Defendants had failed to preserve their objections, which they did not, a new trial would be warranted because the jury's compromise verdict is a fundamental error.  An error is "fundamental" if it is "so serious and flagrant that it goes to the very integrity of the trial or deprives the jury of adequate legal guidance to reach a rational decision." *Armstrong v. Brookdale Univ. Hosp. & Med. Ctr.*, 425 F.3d 126, 136 (2d Cir. 2005) (internal quotation marks and alterations omitted).  In *Armstrong*, the Second Circuit found fundamental error and ordered a new trial where a verdict sheet "misinformed the jurors in a critical way" that yielded an inconsistent verdict, "and undermined the integrity of the trial." *Id.*  Here the error is even more "serious and flagrant," and strikes at "the very integrity of the trial."

Not only did the jury return an inconsistent verdict reflecting a legal impossibility—that the Debtors were solvent on the dates of the relevant transactions, yet Defendants committed fraudulent conveyances—but it also did so in circumstances suggesting that the verdict "was the result not of justifiable concession of views, but of improper compromise of the vital principles which should have controlled the decision."  *Schuerholz v. Roach*, 58 F.2d 32, 34 (4th Cir. 1932).  As noted, the twice-deadlocked jury was able to return a verdict, on a Friday, only by agreeing to find for Defendants on the underlying factual questions, while nevertheless awarding damages against the two "deep pocket" defendants, Rennert and Renco.  Little could more seriously "undermine the integrity of the trial" than the failure of jurors to reach consensus on the issues, as reflected in an irrational verdict, or to candidly acknowledge it would never be able to reach agreement.  Because the trial ended in an invalid compromise verdict, it was fundamentally unfair and a new trial should be ordered.

## CONCLUSION

For the foregoing reasons, the Court should enter judgment as a matter of law in Defendants' favor or, in the alternative, order a new trial.

Dated: New York, New York
April 20, 2015

Respectfully submitted,

/s/ E. Joshua Rosenkranz

E. Joshua Rosenkranz
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
(212) 506-5000
jrosenkranz@orrick.com

Douglas S. Mintz
Kelsi Brown Corkran (*pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
Columbia Center
1152 15th Street, N.W.
Washington, DC 20005

H. Peter Haveles, Jr.
Jeffrey A. Fuisz
KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
(212) 836-8000
peter.haveles@kayescholer.com

Tai H. Park
Steven C. Bennett
PARK JENSEN BENNETT LLP
40 Wall Street, 41st Floor
New York, NY 10005
(646) 200-6300
tpark@parkjensen.com

Attorneys for Defendants The Renco Group, Ira
Rennert, and the Trustees of the Rennert Trusts

36