UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X
:
LEE E. BUCHWALD, as Chapter 7 Trustee for : Case No. 1:13-CV-07948-AJN
Magnesium Corporation of America and Related :
Debtor, Renco Metals, Inc., : **PLAINTIFF TRUSTEE'S REPLY**
                                                 X **IN SUPPORT OF RULE 59(E)**
                                                : **MOTION TO ALTER OR AMEND**
                                 Plaintiff, : **JUDGMENT RE AWARD OF**
                                            : **PREJUDGMENT INTEREST**
                           vs. :
                                                X
:
THE RENCO GROUP, INC., a Delaware :
corporation; K. SABEL HOLDINGS, INC., an :
Alabama corporation; KPMG PEAT :
MARWICK LLP; DONALDSON, LUFKIN & :
JENRETTE SECURITIES CORPORATION; :
HOULIHAN LOKEY HOWARD & ZUKIN; :
CADWALADER, WICKERSHAM & TAFT, :
LLP; IRA LEON RENNERT; ROGER L. FAY; :
JUSTIN W. D'ATRI; DENNIS A. :
SADLOWSKI; MICHAEL C. RYAN; :
MICHAEL H. LEGGE; RON L. THAYER; :
TODD R. OGAARD; LEE R. BROWN; :
HOWARD I. KAPLAN; KEITH SABEL; :
UNIDENTIFIED TRUSTEES of Trusts :
Established by Ira Leon Rennert; and DOES I :
through XX, :
:
                                Defendants. :
:
------------------------------------------------------------ X

190913

**TABLE OF CONTENTS**

**Page No**.

I. OVERVIEW ................................................................................................................. 1

II. THE TRUSTEE'S MOTION IS PROCEDURALLY APPROPRIATE, WHILE DEFENDANTS' REQUEST FOR RECONSIDERATION IS SIMPLY REHASHING THE DEFENDANTS' ORIGINAL ARGUMENT, USING THE SAME FACTS AND AUTHORITIES CITED BEFORE ................................................................................................... 4

    A. The Trustee's Motion Requests Reconsideration In Light Of Accurate Information That Was Not Considered When The Order Was Entered .................................................................................................. 4

    B. The Defendants' Argument For A Reduced Rate Of Prejudgment Interest Merely Repeats Arguments Already Considered And Rejected ..................................................................................................... 5

III. THE PERIOD OF PREJUDGMENT INTEREST SHOULD INCLUDE THE ENTIRE PERIOD AFTER THE DEBTORS CEASED PAYING THEIR CREDITORS FOR THE USE OF THEIR MONEY ............................................. 6

IV. THE RATE OF PREJUDGMENT INTEREST SHOULD COMPENSATE THE DEBTORS FOR THE LOSS OF USE OF THE MONEY AND ALSO DENY UNDESERVED FINANCIAL BENEFITS TO THE DEFENDANTS .................................................................................................. 9

    A. The Debtors Should Be Compensated For The Loss Of Use Of Money As Measured By Long-Term Average Yields In The Relevant Market ............................................................................................. 9

    B. The Defendants Should Not Benefit Unfairly From The Use Of Other People's Money ..................................................................................... 14

V. CONCLUSION .......................................................................................................... 15

190913

# **TABLE OF AUTHORITIES**

**Page No.**

**Cases**

*Analytical Surveys, Inc. v. Tonga Partners, LP,* 684 F. 3d 36 (2d Cir. 2012) .............................. 5

*Citicorp Trust Bank, FSB v. Makkas,* 67 A.D.3d 950, 889 N.Y.S.2d 656 (2009) ......................... 8

*Congregation Yetev Lev D'Satmar, Inc. V. 26 Adar N.B., Corp.,* 192 A.D.2d 501, 596 N.Y.S.2d 435 (2d Dept. 1993) ............................................................................................. 8

*Ede v. Ede,* 598 N.Y.S.2d 90, 193 A.D.2d 940 (1993) ................................................................. 8

*EEOC v. Wooster Brush Co. Employees Relief Ass'n,* 727 F.2d 566 (6th Cir. 1984) .................. 15

*Ehrler v. Cataffo,* 42 A.D.3d 424, 840 N.Y.S. 2d 375 (2007) ....................................................... 8

*Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.,* 689 F.Supp.2d 585 (S.D.N.Y. 2010) ................................................................................................................ 3

*Fotta v. Trustees of the UMW Health & Ret. Fund of 1974,* 165 F.3d 209 (3d Cir. 1998) .......................................................................................................................................... 15

*In re Fine Diamonds, LLC,* 501 B.R. 159 (Bankr. S.D.N.Y. 2013) ............................................... 1

*In re Nelson Co.,* 117 B.R. 813 (Bankr. E.D. Penn. 1990) ....................................................... 7, 8

*In re White Metal Rolling and Stamping Corp.,* 222 B.R. 417 (1998) ......................................... 8

*Munafo v. Metro. Transp. Auth.,* 381 F.3d 99 (2d Cir. 2004) ....................................................... 4

*Rodriguez v. New York City Housing Authority,* 91 N.Y.2d 76, 689 N.E.2d 903 (1997) ............................................................................................................................................. 1

*S.E.C. v. Contorinis,* 743 F.3d 296 (2d Cir. 2014) ........................................................................ 3

*Saulpaugh v. Monroe Community Hospital,* 4 F.3d 134 (2d Cir.) ............................................. 15

*Schwartz v. Liberty Mut. Ins. Co.,* 539 F.3d 135 (2d Cir. 2008) ................................................... 4

*SEC v. First Jersey Securities, Inc.,* 101 F.3d 1450 (2d Cir. 1996) ............................................ 15

*Servants of Paraclete v. Does,* 204 F.3d 1005 (10th Cir. 2000) .................................................... 4

*Shrader v. CSX Transp., Inc.,* 70 F.3d 255 (2d Cir. 1995) ............................................................ 5

*William A. Graham Co. v. Haughey,* 646 F. 3d 138 (3rd Cir. 2011) ........................................... 15

*Williamsburg Fair Housing Committee v. New York City Housing Authority,* 2005 WL 2175998 (S.D.N.Y. 2005) ...................................................................................................... 5

**Other Authorities**

11 U.S.C. § 544 ........................................................................................................................ 7, 8

11 U.S.C. § 547 ........................................................................................................................ 7, 8

New York Debtor and Creditor Law § 273 ................................................................................... 8

New York Debtor and Creditor Law § 273(a) ................................................................. 8

**Rules**

Federal Rules of Civil Procedure 59 ................................................................................. 4

Federal Rules of Civil Procedure 59(e) ............................................................................ 4

New York Civil Practice Law and Rules § 213(1) ........................................................... 8

New York Civil Practice Law and Rules § 5001(b) ......................................................... 1

New York Civil Practice Law and Rules § 5004 .............................................................. 1

190913

I.      **OVERVIEW**

In the Court's Order dated 16 March 2015 (the "Order"), the Court exercised its discretion to commence prejudgment interest on the date of the Debtors' bankruptcy filings, and at a lower rate than that provided by New York law, for the reasons explained in the Order. The Trustee's Rule 59(e) Motion (the "Motion") does not question the logic of the Order, but raises two points in response to statements that appeared for the first time in the Order as substantial factual predicates for the Court's specific decisions (1) to commence interest on the date of the Debtors' bankruptcy filings (2 August 2001) and (2) to award interest at the rate of 6%.[1] Because the Trustee believes that two factual statements made in the Order were incorrect, and material to the Court's decision-making process, he asks the Court to reconsider its decision in light of the more complete and accurate information provided in the Trustee's Motion.

The Court has expressed an understandable concern with the possibility of overcompensating the Debtors' estates and their creditors, and has explained the decision to commence the accrual of prejudgment interest several years after the dates of the fraudulent conveyances for that reason. The Trustee's Motion accepts the logic of the Court's Order that prejudgment interest should not begin while the Debtors' creditors were actually being paid interest on the use of their money, and seeks reconsideration based upon correct information

---

[1] The Trustee had argued for the application of New York law as provided in N.Y. CPLR §§ 5004 and 5001(b). *See In re Fine Diamonds, LLC,* 501 B.R. 159, 187 (Bankr. S.D.N.Y. 2013) ("The interest rate to be applied is 9% per annum, computed from 'the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred.... or upon all of the damages from a single reasonable intermediate date.'"). The New York legislature has kept that prejudgment interest rate at 9% since 1981. *Rodriguez v. New York City Housing Authority,* 91 N.Y.2d 76, 79, 689 N.E.2d 903 (1997) (Court of Appeals observing that, before the legislature acted in 1981, "defendants had exploited the system by investing and accruing interest on funds which would otherwise have been used to pay judgment creditors (1981 McKinney's Session Laws of NY, at 2658)" and "the rate has remained unchanged since").

1

about when the Debtors actually ceased paying interest and when they defaulted on their largest fixed obligation.[2] The Trustee's Motion is not simply rearguing the position taken in the Trustee's original submission on the issue of prejudgment interest, and does not ask the Court to award interest for the period of approximately four years after the fraudulent conveyances during which the Debtors were actually paying interest on the $150 million 1996 Notes.

The Trustee's Motion also accepts the reasoning expressed in the Court's Order that the rate of prejudgment interest should not overcompensate the Debtors' estates or creditors for the use of the money that the jury determined to be fraudulent conveyances. However, the Trustee's Motion seeks reconsideration of the specific rate fixed by the Court, based upon accurate information about the actual yields and returns to investors during the periods (a) since the fraudulent conveyances, and (b) since the Debtors ceased paying interest on the use of the creditors' money, which information was apparently not considered in the Order.[3]

The Trustee asks the Court to reconsider both of these specific points in light of the fact that the purpose of an award of prejudgment interest on claims for fraudulent conveyances and unjust enrichment is not only to compensate the Debtors' estates and their creditors for the loss

---

[2]  The 1996 Notes represented an undisputed obligation of $150 million; the Debtors ceased paying interest on the 1996 Notes after July 2000 and defaulted in January 2001 (missing two semi-annual payments before the Bankruptcy petitions in August 2001). The trade creditors were owed approximately $5-6 million as of the date of the Bankruptcy petitions, and were not being paid timely for some time before that (see Exhibit 2046 page 2, about extending payment terms to "all vendors" by 60 days, and Exhibit 2375 page 2 (referring to "delayed payments of trade accounts payable"). The RCRA environmental liabilities were asserted in January 2001 RCRA Complaint by the Department of Justice, for liabilities existing since at least the 1990s, but were not yet quantified by the Department of Justice at the time of the Complaint.

[3]  The Order expressed the Court's concern that the New York statutory rate of 9% "likely overstates the potential performance of those funds for Plaintiff, and those whose interest he represents, during the time period since the transfers were made[,]" Order at 7, but did not refer to or cite any specific information about the actual performance of similar investments during that time.

of use of their money, but *also* "to deprive the wrongdoer of the benefit of holding the illicit gains over time by reasonably approximating the cost of borrowing such gain." *S.E.C. v. Contorinis,* 743 F.3d 296, 307, 308 (2d Cir. 2014); *see also Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.,* 689 F.Supp.2d 585, 622 (S.D.N.Y. 2010) (beginning prejudgment interest on "the date on which defendants realized the profits they are now being ordered to disgorge …").

One of the results of the Court's Order awarding prejudgment interest at the rate of 6% from 2 August 2001 is that these Defendants will have had the use of the Debtors' money for almost 20 years from the dates of the fraudulent conveyances in December 1995 to October 1998, at less than 5% simple interest (not compounded). If interest is calculated on the entire amount from the fraudulent conveyances' "center of gravity" on 3 July 1996, the effective rate is only 4.37%; if calculated from any other date through the date of the last dividend on 19 October 1998, the effective rate is less than 5%. That is less than the prevailing Federal Reserve Discount Rate during the period of the fraudulent conveyances.[4] Because Renco Group's businesses actually borrowed money at 12% (Renco Metals $75 Million 1993 offering), 11-1/2% (Renco Metals $150 Million 1996 offering), 10% (WCI Steel $300 Million 1996 offering and 1997 Exchange Offer),[5] and 10-7/8% (Renco Steel $120 Million 1998 Offering and Exchange Offer),[6] the Trustee believes the Order results in a significant and undeserved windfall to the Defendants.

---

[4] The Federal Reserve Discount Rate was 5.25% at the time of the December 1995 payment, and 5.0% at the time of every subsequent payment until October 31, 1998 (the date of the last Net Worth Appreciation payments), when the rate was 4.75%. Docket 329 page 4, fn. 6.

[5] See WCI Prospectus offering to trade 10% 1996 Notes for 10% "Exchange Notes" in 1997, available on the SEC website at this link:
https://www.sec.gov/Archives/edgar/data/897745/0000912057-97-006431.txt

190913

The requested reconsideration of the Order to reflect the accurate information identified in the Trustee's Motion will not result in over-compensating the Debtors' estates, and is consistent with the reasoning expressed in the Order. An award of prejudgment interest from July 2000 at a rate of between 7.5% and 9% simple interest (not compounded) is consistent with the objectives of New York law, and with actual returns to investors in B-rated domestic corporate bonds since that time (including the effects of both the 2001 recession and 2008 financial crisis). It is also more than fair to the Defendants, who will have had the use of the Debtors' money for almost 20 years at a substantial discount to the rates at which the Defendants' businesses were able to borrow money, and thus will be required to return only a fraction of the financial benefit they actually realized from the fraudulent conveyances.

## II. THE TRUSTEE'S MOTION IS PROCEDURALLY APPROPRIATE, WHILE DEFENDANTS' REQUEST FOR RECONSIDERATION IS SIMPLY REHASHING THE DEFENDANTS' ORIGINAL ARGUMENT, USING THE SAME FACTS AND AUTHORITIES CITED BEFORE

### A. The Trustee's Motion Requests Reconsideration In Light Of Accurate Information That Was Not Considered When The Order Was Entered

Reconsideration is appropriate to request the Court's consideration of "data that the court overlooked" in its original decision.[7] *Analytical Surveys, Inc. v. Tonga Partners, LP,* 684 F. 3d

---

[6] See Renco Steel offer to trade 10-7/8% Notes for 10-7/8% "Exchange Notes" in 1998, available on the SEC website at this link:

https://www.sec.gov/Archives/edgar/data/1057959/0001047469-98-022764.txt

[7] *Schwartz v. Liberty Mut. Ins. Co.,* 539 F.3d 135, 153 (2d Cir. 2008) ("Rule 59(e) covers a broad range of motions, and the only real limitation on the type of the motion permitted is that it must request a substantive alteration of the judgment, not merely the correction of a clerical error, or relief of a type wholly collateral to the judgment"); *Munafo v. Metro. Transp. Auth.,* 381 F.3d 99, 105 (2d Cir. 2004) ("district courts may alter or amend judgment 'to correct a clear error of law or prevent manifest injustice'"). A Rule 59 motion is appropriate to reconsider a judgment where the court has misapprehended the facts, a party's position, or the controlling law. *Servants of Paraclete v. Does,* 204 F.3d 1005, 1012 (10th Cir. 2000).

36, 52 (2d Cir. 2012); *Shrader v. CSX Transp., Inc.,* 70 F.3d 255, 257 (2d Cir. 1995). *See also Williamsburg Fair Housing Committee v. New York City Housing Authority,* 2005 WL 2175998 (S.D.N.Y. 2005) (granting motion to alter or amend in part, to increase award of attorneys' fees).

That is precisely what the Trustee has requested in his Motion. The points made in the Trustee's motion were expressly made in response to factual statements made for the first time in the 16 March Order, and the Trustee's arguments were both appropriate and timely responses to statements that appear to be at least a substantial part of the factual predicates for the reasoning expressed in the Order. The Trustee's Motion is not merely "rehashing" arguments made before – although that is precisely what the Defendants have done, especially in Part II.C of their Response – but is responding to specific factual statements by the Court, and asking that the Order and resulting Judgment be modified in two specific respects.

### B. The Defendants' Argument For A Reduced Rate Of Prejudgment Interest Merely Repeats Arguments Already Considered And Rejected

While the Trustee's Motion raised specific factual issues in response to statements made for the first time in the Court's Order of 16 March, the Defendants' Response at pages 9-12 repeats the same arguments made in the Defendants' original submission on the subject of prejudgment interest (Document 336) on 10 March, citing the same cases for the same points and for the same result.[8] Even if the Court were willing to entertain the Defendants' suggestion to "expand" the scope of the Trustee's Motion, that is not what the Defendants are actually attempting by their Response – this "rehashing" of the same arguments made in their original submission is inappropriate, when the Defendants have not identified any legal issue, new

---

[8] For example, *Goldman Sachs Execution & Clearing* (cited in Document 336 at 7), *In re Palermo* (cited in Document 336 at 8, 16, 21, and 22), and *In re CNB* (cited in Document 336 at 4, 18, and 21).

5

authority, or factual information that was not expressly considered by the Court, and have not pointed to any factual or legal error in the Order with respect to any of the arguments in Part II.C of their Response.

### III. THE PERIOD OF PREJUDGMENT INTEREST SHOULD INCLUDE THE ENTIRE PERIOD AFTER THE DEBTORS CEASED PAYING THEIR CREDITORS FOR THE USE OF THEIR MONEY

The Order clearly suggested that the Court intended to award prejudgment interest to compensate the Debtors' creditors for the loss of use of their money, and that the date of the bankruptcy petitions was selected to represent that date because the Court believed that creditors were actually being compensated for the use of their money up to the date of the bankruptcy filings.[9] In fact, as the Trustee's Motion demonstrated, the Debtors stopped paying interest on the $150 million 1996 Notes after 1 July 2000 – thirteen months before the bankruptcy petitions.

The Defendants have not denied, because they cannot deny, that the Debtors stopped paying interest on the $150 million Notes after 1 July 2000, and had actually defaulted by missing two semi-annual interest payments before the bankruptcy filing in August 2001. The effect of the Court's Order and resulting Judgment is to commence the accrual of prejudgment interest intended to compensate the creditors for the loss of the use of their money thirteen months after the Debtors actually stopped paying interest on the $150 million 1996 Notes.

Because the Defendants cannot deny the factual predicate for the Trustee's Motion, they have made three arguments at pages 12-13 of their Response, each based upon a plain error, in an attempt to justify the denial of prejudgment interest between July 2000 and August 2001.

---

[9] Order at pages 9-10: "There is no evidence in the record that MagCorp had ceased to pay its debts before the date of bankruptcy, so starting the interest earlier risks double recovery[,]" and again at page 10 that "there is no evidence that investors ceased receiving the expected return on their investment before the bankruptcy petition was filed."

6

190913

**First**, the Defendants have argued that the Trustee's argument for correcting the date when the Debtors stopped paying interest is a "new argument" that the Trustee could have made before the Court's Order. In fact, as explained in the Trustee's Motion, the suggestion that the Court should begin the accrual of interest in July 2000 is a response to the Court's statement that there was no evidence of any breach by the Debtors before the date of the bankruptcy, which was made for the first time in the Court's Order, when the Court selected the date of the Bankruptcy petitions as the date for the commencement of prejudgment interest. Because that statement was factually incorrect, and the Trustee had no reason to anticipate that statement in the Court's Order, the point was appropriately raised in the Trustee's Motion.

**Second**, the Defendants have argued that the use of the bankruptcy date to commence prejudgment interest rests upon the fact that "[i]t is only because the Debtors 'went into bankruptcy that the transfers became actionable at all.'" Motion at 12, quoting in part the Court's Order at 10, and citing *In re Nelson Co.,* 117 B.R. 813 (Bankr. E.D. Penn. 1990). However, that is also incorrect. *In re Nelson* concerned a *preference* action under Bankruptcy Code section 547 which is a creature of the Bankruptcy Code and is created by the filing of a bankruptcy petition.[10] That has absolutely nothing to do with an action for *fraudulent conveyances* under New York's Debtor and Creditor law, which are state law creditors' claims asserted by the Trustee under the authority of Bankruptcy Code Section 544, which allows a bankruptcy trustee to bring creditors' claims under that state law.

---

[10]  The preference claim was the only issue in that case: "The debtor, supported by the official committee of unsecured creditors, asserts no objection to the sum that Amquip claims is due in its second amended proof of claim. Its challenge is limited to Amquip's asserted secured status. *The debtor contends that Amquip should be classified as an unsecured creditor because any judicial lien it now possesses arose during the preference period established by 11 U.S.C. § 547.*" *Id.* at 816 (emphasis added).

7

190913

In *Nelson*, the court recognized that prejudgment interest usually runs from the time the cause of action accrues. *Id.* at 818. For Bankruptcy Code Section 547, that date is the filing of bankruptcy, because the *preference* action does not exist apart from a bankruptcy filing, and is a claim that exists solely by virtue of its creation in the Bankruptcy Code. However, that is not true of the Trustee's state law causes of action in this case for fraudulent conveyances, for unjust enrichment, or for breaches of fiduciary duty. A cause of action for a constructive fraudulent conveyance under Section 273 of the New York Debtor and Creditor law arises "*at the time the fraudulent conveyance occurs.*" *Ehrler v. Cataffo,* 42 A.D.3d 424, 425, 840 N.Y.S. 2d 375 (2007);[11] *Citicorp Trust Bank, FSB v. Makkas,* 67 A.D.3d 950, 952, 889 N.Y.S.2d 656 (2009) ("Constructive fraud claims predicated upon Debtor and Creditor Law §§ 273 and 273-a, are governed by the six-year statute of limitations set forth in CPLR 213(1), and arise at the time that the alleged fraudulent conveyance is made"). In other words, the filing of a bankruptcy petition is *not* an element of a fraudulent conveyance claim under New York's Debtor and Creditor Law. *In re White Metal Rolling and Stamping Corp.,* 222 B.R. 417, 429 (1998) (listing elements of constructive fraudulent conveyance under New York law), *Ede v. Ede,* 598 N.Y.S.2d 90, 193 A.D.2d 940 (1993) (finding a fraudulent conveyance without any mention of an existing bankruptcy). The cause of action arises on the date of the transfer and, upon the filing of a bankruptcy petition, 11 U.S.C. § 544 authorizes the Trustee to pursue the *already-existing* fraudulent conveyance claims of the creditors. However, the cause of action arises under state law and existed from the date of the transfer – as the Defendants conceded in their Renewed

---

[11]  Similarly, a claim for unjust enrichment accrues "upon the occurrence of the wrongful act giving rise to a duty of restitution." *Congregation Yetev Lev D'Satmar, Inc. V. 26 Adar N.B., Corp.,* 192 A.D.2d 501, 503, 596 N.Y.S.2d 435 (2d Dept. 1993).

8

190913

Motion for Judgment as a Matter of Law on behalf of the Individual Defendants, where they argued that the limitations period was running from the dates of the transfers.

**Third**, the Defendants have made a half-hearted attempt to suggest that the creditors were only denied the use of interest payments from July 2000 to August 2001, rather than the use of the principal amount of the fraudulent conveyances, so that prejudgment interest should not run on the principal amount from the earlier date. Response at 13. That is nonsense. The award of prejudgment interest is intended to compensate the Debtors' estates (and their creditors) for the loss of use of the principal amount of the fraudulent conveyances, which occurred in 1995-1998. Thus, the estate was denied the use of the entire $117+ million, and the Defendants had the benefit of their misappropriating the entire $117+ million, during that time. Basing the award of prejudgment interest on the missed interest payments alone would constitute an award of interest on interest, which the Trustee has not requested.

## IV. THE RATE OF PREJUDGMENT INTEREST SHOULD COMPENSATE THE DEBTORS FOR THE LOSS OF USE OF THE MONEY AND ALSO DENY UNDESERVED FINANCIAL BENEFITS TO THE DEFENDANTS

### A. The Debtors Should Be Compensated For The Loss Of Use Of Money As Measured By Long-Term Average Yields In The Relevant Market

In response to the Order's suggestion that the New York statutory interest rate "likely overstates the potential performance of those funds for Plaintiff, and those whose interest he represents, during the time period since the transfers were made" (Order at 7) the Trustee's Motion provided accurate factual information about *both* the actual yields for all domestic B-

rated corporate bonds over that entire period of time (Motions Exhibits A and B)[12] *and* actual default rates and credit losses over the same period of time (Exhibits C and D).

Thus, the Defendants' Response at page 4 misrepresents the Trustee's Motion, and the underlying facts, when it argues that the Trustee seeks "all the benefits of a risky return, with none of the risk." That is simply false. In fact, the Trustee's Motion at page 12 and in Exhibits C and D explicitly considered the default rate, cited the data showing normal default and credit loss levels during the relevant period, and also cited the supporting data for that statement. Motion page 12. Those data show that the New York statutory rate does *not* overstate the potential performance (or the value) of the funds to the Debtors' estates and creditors, as measured by the performance of the same types of investments during that period, but in fact represents a very good approximation of the actual returns on investments in both equity and debt markets over long periods of time.

The Trustee's Motion cited the average Yield to Worst for B-rated domestic corporate bonds[13] over the entire time periods reflected in Motion Exhibits A and B[14] for the same reason that the SEC requires the disclosure of Yield to Worst to potential investors, and for the same

---

[12] Motion Exhibits A and B showed average yields for Single B, Double B, and the US High Yield Master Index measured as "Yield to Worst" for the periods since the fraudulent conveyances and for the period since July 2000.

[13] The universe of B-rated corporate domestic bonds is the appropriate measure of the lost opportunity cost to investors in the 1996 Note Offering, who represent the largest part of the liquidated claims against the Debtors' estates, because that is the market in which the original investments were made, and because the Noteholders' claims represent the majority of quantified proofs of claim (the $150 million principal alone is more than 93% of all such claims, after including the trade creditors' claims of approximately $5 million, and the BLM claim of $6.1 million). Trial Transcript pp. 173-174.

[14] Exhibit A considered the entire period mentioned in the Court's Order, from the time of the fraudulent conveyances through 2014; Exhibit B considered the same data for the period from July 2000 through 2014. Both include the 2001 recession and the 2008 financial crisis.

reason that Yield to Worst is the industry standard – it is a meaningful measure of the *lowest yield* promised from a bond investment in the absence of default. It is also worth noting that, *by definition*, the *actual* yield of B-rated corporate domestic bonds is higher than Yield to Worst.

The Trustee's Motion also provided accurate information about *actual default rates* for B-rated domestic corporate bonds,[15] and *actual credit loss rates*,[16] which also support the Trustee's argument that the New York statutory rate does *not* overstate the potential performance of funds in the hands of investors in that market during the time period since the fraudulent conveyances were made. At the same time that default rates briefly spiked during the financial crisis of 2008, yields also spiked in the same way to more than 20% before returning to more normal levels;[17] neither metric can be taken in isolation or as a "snapshot" as of a specific time, without misrepresenting the actual historical data over the relevant period of time. By calling attention to a relatively brief spike in default rates while ignoring the corresponding spike in yields, that is exactly what the Defendants have tried to do.[18]

---

[15] "Default rates increased during the 2001 and 2008 recessions, but also quickly returned to historical normal levels as the U.S. economy recovered in both cases. Cumulative data for domestic corporate bond defaults (including data sorted by rating and by industry sector) are published by S&P, and by Moody's. The data confirm and are consistent with the data published at the Federal Reserve website, and show that the effects of the 2001 and 2008 recessions peaked and relatively quickly returned to normal default levels of less than 2%. See, *e.g.,* the Moody's Report, Exhibit 10." Motion p. 12.

[16] "To put this in perspective, the average annual credit loss rate for Moody's-rated issuers since 1982 is 1.0%." Motion Exhibit D (Moody's Report), page 7 Exhibit 10, showing credit loss rates for *all* "speculative-grade" bonds returning to less than 2% after the 2008 financial crisis.

[17] Motion Exhibit A, page 1 ("Merrill Lynch Single-B US High Yield Index" showing the Yield To Worst above 20% in 2008).

[18] It is important to note that a "default" is defined to include both missed and *delayed* payments, and a default does not always represent a credit loss. Thus, defaults from delayed payments during a relatively brief period of extraordinarily tight credit and unavailability of normal credit financing during the 2008 financial crisis do not represent lost investments.

11

The data cited in the Trustee's Motion represented averages and normal levels over an extended period of time since the dates of the fraudulent conveyances, and are the most relevant accurate data available to answer the question raised by the Order, whether the New York statutory rate of 9% likely overstated the potential performance of the funds during the period since the fraudulent conveyances. In fact, long-term average default and credit loss rates that reflect a 90% probability of being paid *at least* the Yield to Worst average of more than 9% support a prejudgment interest award of more than 8% and are consistent with actual returns in B-rated domestic corporate bonds of between 8 and 9% over long periods of time.[19]

The Defendants have misrepresented that actual history of investment in B-rated domestic corporate bonds by cherry-picking other inapposite data from Exhibits C and D to justify their use of a quote that "[O]ver a five-year period a portfolio of B-rated issuers defaulted at a 26.5% average rate between 1983 and 2010" – omitting to state that the quote expressly refers to a table (Motion Exhibit D at page 33, Exhibit 35,) entitled "Average Cumulative Issuer-Weighted *Global* Default Rates, 1983-2010" which includes emerging markets and third-world sovereign debt. That is not the market in which these bonds were issued, and Exhibit D at pages 27-29 shows that the "Annual Issuer-Weighted *Corporate* Default Rates by Letter Rating 1920-2010" was consistently much lower than the rate cited by Defendants.

The use of the actual yields and returns to the entire universe of B-rated corporate domestic bonds does not, as the Defendants suggest, require an inquiry into the specific goals, motives, or investment strategies of any individual investors or group of investors. Response at

---

[19] As Defendants observed in their Response, there is no such thing as a free lunch. Investors in B-rated domestic corporate bonds do not take the increased risk of default (over the risk associated with investment grade corporate bonds) without being compensated for the risk, and the actual returns in that market reflect that demand for increased returns on such investments.

12

5. In fact, it is the Defendants who have repeatedly gone outside the record in an effort to introduce speculation about the Debtors' creditors. The Trustee's Motion is based upon the nature of the investment that accounts for the largest part of the Debtors' liquidated claims, the only market in which the Debtors (and the Defendants' other companies, including WCI and RG Steel) were able to borrow money during the relevant period, and the same investment that the Court considered and referred to several times in its Order. It is a simple fact that most of the money raised by the Debtors came from that segment of the high yield bond market.[20] Moreover, as the Trustee observed in his Motion, if the Court were instead to look at the financial performance of the most commonly used index for equity investments over the same period (the S&P 500 index), the return would be even *greater* than the New York statutory rate – even after including the effects of the 2001 recession and the 2008 financial crisis.[21]

The Defendants have tried to bolster their argument with a link to a FINRA "Bond Trade Activity" search result that is neither in the record nor an appropriate subject of judicial notice. In fact, what is actually reported in the "trading run" information cited at page 8 of the Defendants' Response does not support their argument. Even taken at face value,[22] the "trading

---

[20] The fraudulent conveyances these Defendants took from the Debtors greatly outweighed their equity investment in MagCorp - $32 million in cash and a $12 million promissory note that was subsequently discounted by approximately half – and that half was paid with money borrowed in 1993 and subsequently rolled over into the 1996 Notes, and so was actually financed by the Debtors and their creditors.

[21] Motion at 9, fn. 10: "However, even in the equity markets, the S&P 500 average annualized return for the entire period from the time of the transfers (from 1995 to 2014) was **9.85%,** which is not unusual for the long-term performance of the equity markets. The annualized return for the S&P 500 Index (and its predecessor S&P 90 Index) between 1926 and 2013 was about **10.08%,** and that includes both the Great Depression and the financial crisis of 2008 and the subsequent recovery."

[22] The database that the Defendants have pointed to does not require that all transactions or actual prices be reported, does not distinguish between arms-length market transactions and transfers of ownership from one entity to a related entity for reasons other than effecting a sale,

13

run" shows that there is no effective market for the Debtors' bonds; there is very little evidence of any substantial number of bonds changing hands during the past 15 years, with unspecified transactions reported on a total of only *eight trading days* between 2005 and 2011 (a period of six years)*, no* transactions appearing before July 2005, and *none* since December 2011.

### B.   The Defendants Should Not Benefit Unfairly From The Use Of Other People's Money

It is also appropriate for the Court to also take into account the benefit to Defendants that will result from a low interest rate calculated from August 2001. The last dividend was paid on 19 October 1998, and the "center of gravity" for the fraudulent conveyances was 3 July 1996. If the Defendants are required to pay interest at the rate of 6% simple interest not compounded from August 2, 2001, the effective interest rate on $117,222,000 from the time of the fraudulent conveyances to March 23, 2015 is less than **5%** (simple interest not compounded) calculated from October 1998 (the date of the last dividend), and only **4.37%** calculated from the "center of gravity" of the fraudulent conveyances in July 1996. That is less than the prevailing Federal Reserve Discount Rate for the period when the fraudulent conveyances were made, and represents an enormous financial benefit to the Defendants from their misconduct. An award of prejudgment interest at 7.5% represents an effective rate of less than 5-1/2% to Defendants since July 1996 – less than half the rate at which Defendants actually borrowed the money used to finance the fraudulent conveyances, still a very substantial benefit to the Defendants.

It is appropriate when making an award of prejudgment interest to take into account the rate of interest the Defendants would have had to pay to borrow the money that was wrongfully

---

and does not require reporting of the number or face amount of the transfers. Purportedly showing trades since 2001, over a period of *fourteen years* the "trading run" shows only *a single transaction* (in 2008) when a commission was paid in connection with a reported transfer.

14
190913

taken or withheld from the Debtors. *See EEOC v. Wooster Brush Co. Employees Relief Ass'n,* 727 F.2d 566, 579 (6th Cir. 1984); *Saulpaugh v. Monroe Community Hospital,* 4 F.3d 134, 145 (2d Cir.) (prejudgment interest appropriate to prevent the defendant "from attempting to enjoy an interest-free loan for as long as it can delay paying"), *cert. denied,* 510 U.S. 1164, 114 S.Ct. 1189, 127 L.Ed.2d 539 (1994); *SEC v. First Jersey Securities, Inc.,* 101 F.3d 1450, 1476-77 (2d Cir. 1996) (upholding prejudgment interest award in securities fraud case at the rate the Internal Revenue Service charges on delinquent taxes). *See also William A. Graham Co. v. Haughey,* 646 F. 3d 138, 145 (3rd Cir. 2011) (referring to "the purposes of prejudgment interest – 'making the claimant whole and preventing unjust enrichment'"); *Fotta v. Trustees of the UMW Health & Ret. Fund of 1974,* 165 F.3d 209, 212 (3d Cir. 1998).

## V.     CONCLUSION

The Trustee respectfully asks that the award of prejudgment interest be modified to commence on 2 July 2000, and to accrue at a rate reflecting the actual yield and return from similar investments since that date, between 7.5% and the statutory rate of 9% simple interest.

Respectfully submitted this 18th day of May 2015.

**BEUS GILBERT PLLC**

By:    *Scot C. Stirling*
Leo R. Beus (Arizona Bar No. 002687) Admitted *Pro Hac Vice*
lbeus@beusgilbert.com
Scot C. Stirling (Arizona Bar No. 005757) Admitted *Pro Hac Vice*
sstirling@beusgilbert.com
Malcolm Loeb (Arizona Bar No. 017338) Admitted *Pro Hac Vice*
mloeb@beusgilbert.com
Robert O. Stirling (Arizona Bar No. 027749) Admitted *Pro Hac Vice*
rstirling@beusgilbert.com
Nishan J. Wilde (Arizona Bar No. 031447) Admitted *Pro Hac Vice*
nwilde@beusgilbert.com
701 North 44th Street
Phoenix, Arizona  85008-6504
Telephone:    (480) 429-3000        Fax:        (480) 429-3100
*Attorneys for Plaintiff*

15

190913