UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: AUG 1 9 2015

Lee E. Buchwald,

                    Plaintiff,

          —v—

The Renco Group, *et al.*,

                    Defendants.

13-cv-7948 (AJN)

MEMORANDUM &
ORDER

ALISON J. NATHAN, District Judge:

    This matter came before the Court for a jury trial beginning on February 2, 2015.  On

February 27, 2015, the jury returned a unanimous verdict in Plaintiff's favor on claims of

fraudulent conveyance, aiding and abetting fraudulent conveyance, breach of fiduciary duty,

aiding and abetting breach of fiduciary duty, and unjust enrichment.  The jury awarded Plaintiff

compensatory damages of $101,000,000 against Defendant The Renco Group, Inc., and

$16,220,000 against Defendants Ira Rennert and the Trustees of the Renco Trusts, jointly and

severally; the jury also assessed $1,000,000 in punitive damages against The Renco Group, Inc.

On March 16, 2015, the Court in its discretion determined that the appropriate rate of

prejudgment interest was six percent per year, *see* Dkt. No. 342, and on March 23, 2015, the

Clerk entered final judgment, *see* Dkt. No. 389.

    Now before the Court are three post-judgment motions: (1) a motion for judgment as a

matter of law or a new trial under Federal Rules of Civil Procedure 50 and 59 filed by

Defendants The Renco Group, Inc., Ira Rennert, and the Trustees of the Rennert Trusts; (2) a

motion for judgment as a matter of law filed by Defendants Legge, Ogaard, Thayer, Kaplan,

Brown, Ryan, Sadlowski, and the estate of Defendant D'Atri, in the event that a new trial is

granted; and (3) a motion by Plaintiff to amend the judgment in order to award a higher rate of prejudgment interest.

For the following reasons, the motion by The Renco Group, Ira Rennert, and the Trustees of the Rennert Trusts for judgment as a matter of law is GRANTED IN PART and DENIED IN PART. The same Defendants' motion for a new trial is DENIED. The remaining Defendants' motion for judgment as a matter of law is DENIED AS MOOT. And Plaintiff's motion to amend the award of prejudgment interest is DENIED.

## I.      Background

This matter arises from the 2001 bankruptcies of Magnesium Corporation of America, Inc. (MagCorp) and Renco Metals, Inc., which were wholly owned subsidiaries of Defendant The Renco Group, Inc. Plaintiff Lee Buchwald is the trustee in bankruptcy for MagCorp and Renco Metals (collectively, the "Debtor Corporations" or "Debtors"). In 2003, Plaintiff initiated an adversary proceeding against, *inter alia*, The Renco Group, its officers and directors, and the trustees of trusts established by Defendant Ira Rennert, who is the Chairman and Chief Executive Officer of The Renco Group. All other Defendants named in the Amended Complaint were either dismissed by the Bankruptcy Court or settled with Plaintiff.

In 2013, the Court, then in the person of Judge Sweet, granted Plaintiff's unopposed motion to withdraw the reference from the Bankruptcy Court in order to pursue a jury trial, after Defendants declined to consent to a jury trial in the Bankruptcy Court. *See* Dkt. Nos. 1 & 4. The Court, now the undersigned, resolved Defendants' *Daubert* motions on August 21, 2014, *see* Dkt. No. 36, and resolved the parties' motions *in limine* (or reserved them for trial) at a conference held on December 19, 2014. *See* Dkt. No. 175 (Order summarizing rulings). Trial began with jury selection on February 2, 2015.

Presentation of evidence began on February 3, 2015 and concluded on February 19, 2015. In addition to party witnesses and certain depositions of non-party witnesses either read into the record or played for the jury as videos, the jury heard testimony from several experts. These included, for Plaintiff, Dr. John Veranth, a professor of pharmacology and toxicology at the

2

University of Utah, *see* Tr. 826; Douglas Allen, an environmental liability consultant, *see* Tr. 1512; and Jason Frank, a valuation professional, *see* Tr. 1755. Expert witnesses for Defendants included Robert Powell, a civil engineer and hydrogeologist, *see* Tr. 2024; Stephen Johnson, an environmental consultant, *see* Tr. 2076; Robert Edgar, a consultant for marketing in raw materials, *see* Tr. 2148; and Roger Grabowski, a valuation expert, *see* Tr. 2211. Furthermore, video was shown to the jury of deposition testimony by Plaintiff's expert Robin Adams, who passed away before trial, *see* Tr. 1912.

The Court conducted a charging conference that lasted the entire day on February 20, 2015 and most of the day on February 23, 2015. The jury heard summations on February 24, 2015, and was instructed and began deliberations on February 25, 2015. It returned its unanimous verdict on February 27, 2015. As reflected on the final verdict form, *see* Ct. Ex. 25 (Dkt. No. 327-27), the jury found as follows:

- In favor of all Defendants on Plaintiff's claim of fraudulent transfers under the Bankruptcy Code;
- In favor of Plaintiff against Defendants Ira Rennert and The Renco Group on Plaintiff's claim of fraudulent conveyance under New York law, with an award of $101,000,000 in damages against The Renco Group and $16,222,000 against Ira Rennert; no damages against all other Individual Defendants, and no liability against the Trustees of the Rennert Trusts;
- In favor of Plaintiff against Defendant Ira Rennert on Plaintiff's claim of aiding and abetting fraudulent conveyance, with an award of $16,222,000 in damages;
- In favor of Plaintiff against Defendants Ira Rennert and The Renco Group on Plaintiff's claims of breach of fiduciary duty and/or aiding and abetting breach of fiduciary duty, with damages in the amount of $101,000,000 against The Renco Group and $16,222,000 against Ira Rennert; no damages against Defendants Legge, Thayer, Kaplan, Brown, and Fay, and no liability against Defendants Ogaard, D'Atri, Ryan, and Sadlowski;

3

- Punitive damages of $1,000,000 against Defendant The Renco Group, *see* Ct. Ex. 26 (Dkt. No. 327-28);
- In favor of Defendant Ira Rennert on Plaintiff's claims of unlawful dividends and unlawful stock redemptions; and
- In favor of Plaintiff against Ira Rennert and the Trustees of the Renco Trust on Plaintiff's claim of unjust enrichment, with damages in the amount of $16,222,000

The Court decided Plaintiff's motion for prejudgment interest on March 16, 2015, *see* Dkt. No. 342, and judgment was entered on March 23, 2015, *see* Dkt. No. 389. The instant motions were timely filed on April 20, 2015.

## II.    Standard for Rule 50 and Rule 59 Motions

Federal Rule of Civil Procedure 50 permits a court to enter judgment as a matter of law "[i]f a party has been fully heard on an issue … and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue … ." Fed. R. Civ. P. 50(a). Such a motion must be raised before the case is submitted to the jury, but a party may renew after judgment a motion made during trial. Fed. R. Civ. P. 50(b). A party may not raise new grounds for judgment as a matter of law after trial under Rule 50(b), but is limited to those grounds "specifically raised" in the party's pre-verdict motion under Rule 50(a). *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 286 (2d Cir. 1998).

The standard for obtaining judgment as a matter of law under Rule 50 is a stringent one. *See Velez v. City of New York*, 730 F.3d 128, 134 (2d Cir. 2013). Such a motion will be granted only if, after making all credibility assessments and drawing all reasonable inferences against the moving party, "a reasonable juror would have been *compelled* to accept the view of the moving party." *Zellner v. Summerlin*, 494 F.3d 344, 370-71 (2d Cir. 2007) (quoting *Piesco v. Koch*, 12 F.3d 332, 343 (2d Cir. 1993)). The Court must assume that jurors need not wholesale accept any witness's testimony, but can believe some parts while rejecting others. *Haywood v. Koehler*, 78 F.3d 101, 105 (2d Cir. 1996). A moving party's "incontrovertible evidence" will be taken by the

4

Court to establish the proposition in question only if "it so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party." *Zellner*, 494 F.3d at 371 (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)). And the Court will not subvert any finding of fact implicit in the jury's findings if it has adequate support in the record. *Id.* As the Second Circuit has stated, judgment as a matter of law should be granted against a jury verdict only if the moving party shows "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture." *In re Joint E. & S. Dist. Asbestos Litig.*, 52 F.3d 1124, 1131 (2d Cir. 1995) (quoting *Samuels v. Air Transp. Local 504*, 992 F.2d 12, 14 (2d Cir. 1993)) (quotation marks omitted).

A party may also, at the same time it makes a post-trial motion under Rule 50(b), raise a motion for a new trial under Federal Rule of Civil Procedure 59, which a court may grant "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Ordinarily, a motion for a new trial should be granted only when the Court "is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *R.R. Love, Ltd. v. TVT Music, Inc.*, 282 F. App'x 91, 93 (2d Cir. 2008) (summary order) (quoting *DeFalco v. Bernas*, 244 F.3d 286, 305 (2d Cir. 2001)). Such circumstances include when the verdict is against the weight of the evidence. *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133 (2d Cir. 1998) (citing *Byrd v. Blue Ridge Rural Elec. Co-Op*, 356 U.S. 525, 540 (1958)). Unlike when evaluating a Rule 50 motion, a court may independently weigh the evidence when evaluating a motion for a new trial, and can grant the motion despite the existence of "substantial evidence" supporting the verdict. *DLC Mgmt.*, 163 F.3d at 134. Even so, Rule 59 is not an invitation to second-guess the jury; the verdict must be "egregious" to warrant a new trial, and the court should rarely disturb the jury's credibility determinations. *Id.* (citing *Dunlap-McCuller v. Riese Org.*, 980 F.2d 153, 158 (2d Cir. 1992)).

### III.    Preservation of Arguments

At the conclusion of Plaintiff's case, Defendants moved for a directed verdict on the grounds that:

(1) Utah law, rather than New York law, governed Plaintiff's claims of fraudulent conveyance against the "Utah Defendants" (that is, all defendants other than The Renco Group, Ira Rennert, and the Trustees of the Rennert Trusts), *see* Tr. 1981:8-1982:18.

(2) Claims based on transfers to The Renco Group prior to July 31, 1997 were time-barred because Utah law governed those claims as well, *see* Tr. 1982:19-1983:14.

(3) Plaintiff's evidence of fraudulent conveyances against the "Utah defendants" was legally insufficient because Plaintiff did not demonstrate a lack of reasonably equivalent value, *see* Tr. 1983:15-1984:13.

(4) Plaintiff presented insufficient evidence of fraudulent conveyances because the Trustee had not shown Frank's testimony was reliable under Federal Rule of Evidence 702, and thus Defendants' *Daubert* motion should have been granted and his testimony excluded, *see* Tr. 1984:14-1985:12.

(5) There was insufficient evidence on Plaintiff's common-law claims against Defendants Sadlowski, Ryan, Brown, Thayer, Kaplan, D'Atri, Legge, and Ogaard, *see* Tr. 1985:13-1990:22.[1]

(6) There was insufficient evidence to show that Defendant Rennert received a benefit, or what the value of that benefit was, for Plaintiff's unjust enrichment claim, *see* Tr. 1990:23-1992:6.

*See also* Dkt. No. 300 (Defendants' written Rule 50 submission at close of Plaintiff's case, making same arguments). Defendant now raises Rule 50 arguments that were not raised before the verdict: that Defendant Rennert is entitled to judgment as a matter of law on Plaintiff's fraudulent conveyance and breach of fiduciary duty claims, and that Plaintiff did not present

---

[1] Because the jury assessed no damages against these Defendants and the Court has not ordered a new trial on any of these claims (nor has Plaintiff moved for one), the Court does not recount these arguments in detail.

evidence showing insolvency before July 1996. Those arguments are waived, although as explained below, the Court finds that they would fail even if preserved.

## IV.     Evidence of Insolvency

Defendants' first argument for judgment as a matter of law, or in the alternative for a new trial, is that the testimony of Plaintiff's expert Jason Frank should have been excluded as unreliable under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). Although the Court determined before trial that Frank's testimony should not be excluded under *Daubert*, *see* Dkt. No. 36 (*Daubert* Order), Defendants now argue that Frank's trial testimony exposed fatal errors in his methodology that require the Court to revisit its conclusion and strike Frank's testimony. And without that testimony, Defendants contend, Plaintiff failed to introduce sufficient evidence to allow a rational jury to find that the Debtors were insolvent[2] when the conveyances at issue were made—a necessary element of Plaintiff's fraudulent conveyance claim.

The Court finds that Frank's testimony met *Daubert*'s benchmark for reliability and therefore was appropriate for presentation to the jury. Furthermore, Frank's testimony contained sufficient evidence of insolvency to support the jury's verdict and damages award in favor of Plaintiff, and the Court will not disturb the jury's conclusion on the grounds that such a verdict was against the clear weight of the evidence. The Court therefore denies Defendants' Rule 50 and 59 motions as they relate to the inadequacy of Frank's testimony and Plaintiff's evidence of insolvency.

### A.  Background

### 1.  Defendants' *Daubert* Motion

Both federal and New York law make transfers by an insolvent entity fraudulent as to creditors without regard to the transferor's state of mind. *See* 11 U.S.C. § 548; N.Y. Debtor &

---

[2] For the sake of convenience, the Court will use "insolvency" in this section to refer to all three definitions of insolvency in the jury instructions: liabilities exceeding assets, unreasonably small capital, and inability to pay debts as they come due. *See* Tr. 2907:12-25.

Creditor Law § 273.  Whether an entity is solvent at the time of a given transfer is ordinarily a question of fact for the jury.  *See In re Actrade Fin. Techs. Ltd.*, 337 B.R. 791, 803 (Bankr. S.D.N.Y. 2005) (citing *In re Roblin Indus.*, 78 F.3d 30, 35 (2d Cir. 1996)).  Accordingly, in order to succeed on his claims of fraudulent transfer and fraudulent conveyance, Plaintiff was required to establish the Debtors' insolvency by a preponderance of the evidence.

To that end, Plaintiff engaged Frank as an expert in corporate valuation.  Frank rendered before trial a "solvency opinion" as to Renco Metals and MagCorp, and found both companies to be insolvent as measured on three dates during the period when the challenged transfers occurred: July 31, 1996; October 31, 1997; and October 31, 1998.  Frank used a valuation method known as "discounted cash flow" analysis, which involves projecting a company's cash flows several years into the future based on estimated revenues and expenses, calculating a "terminal value" for the company at the end of the projection period, and then discounting the future cash flows and terminal value to their present value.  *See Daubert* Order at 3 (Dkt. No. 36).  Frank also considered two alternative valuation methods, one based on using "comparable companies' stock prices as a multiple of certain performance metrics," and another based on "the value placed on similar companies in the context of mergers and acquisitions transactions during the relevant time frame."  *Id.*  Ultimately, however, Frank discarded these latter two analyses because he concluded that any potentially comparable companies were too dissimilar to Renco Metals to provide a useful basis for determining its solvency.  *Id.* at 3-4.

Defendants moved before trial to preclude Frank's testimony under Federal Rule of Evidence 702, arguing that Plaintiffs had not established the reliability of Frank's methodology as is required under *Daubert*.  As explained in greater detail in the Court's *Daubert* order, Defendants' motion keyed on Frank's calculation of Renco Metals's "Weighted Average Cost of Capital," which is a component of the overall discounted cash flow analysis.  The Weighted Average Cost of Capital is, as the name suggests, the average "cost" associated with a company's debt and its equity, weighted according to the portion of the company's capital structure constituted by each form of capital (debt and equity).  *See Daubert* Order at 8-9.  To

determine the cost of equity, Frank used an approach known as the Capital Asset Pricing Model. In simplified form, the model uses three factors to project a company's rate of return: the risk-free rate, the market risk premium, and *beta*, which is a variable that reflects the risk of the asset in question compared to other risks of the same type.

Defendants did not object to Frank's use of the Capital Asset Pricing Model generally, but they did find fault with Frank's calculation of risk. Frank used an "industry *beta*" to capture the risk of equity investments in the same industry as Renco Metals generally, and also included a "company-specific risk premium" and a "size-risk premium" in his calculations to "capture specific attributes of the company that justified a higher overall rate of return (or cost of capital)." *Daubert* Order at 9. Defendants argued that Frank's analysis of the company-specific risk premium, size risk premium, and market risk premium were all erroneous, and so divorced from accepted methodologies that Frank should be precluded from testifying.

The Court denied Defendants' motion as to Frank in all respects. *See* Dkt. No. 36. In its order, the Court noted that the company-specific risk premium is a commonly used measure that has been admitted as a part of expert testimony in many cases, and further that Frank's particular choice of the relevant company-specific risk premium in his expert report was plausibly explained, and partook only in the normal amount of qualitative (rather than quantitative) analysis that generally characterizes expert evaluation of a company-specific risk premium. *Id.* at 11-14. As the Court noted at the time, "company-specific premiums are necessarily somewhat subjective and Frank's specific choices can readily be addressed on cross-examination." *Id.* at 15. The Court rejected Defendants' other challenges to Frank's methodology as well, finding generally that Frank's conclusions were based on an application of accepted methodologies, and that any errors or portions of Frank's opinion that were underexplained were of the sort that are appropriately grounds for cross-examination at trial and determination by the jury, rather than grounds for preclusion of his testimony.

**2. Frank's Trial Testimony**

At trial, Frank testified consistently with his opinion that he did not find a company that would serve as a good comparison to MagCorp or Renco Metals in order to make a valuation using a comparable-company method. Tr. 1761:13-15. He testified that "good comparables" are companies that are "similar in nature in how they do business," with a similar financial performance, that operate in similar locations, and that are affected by "outside forces" in similar ways. Tr. 1762:5-13.

As to the "income method" for valuing the company, Frank testified that he first estimated what the companies' cash flows would be in the future. He began with management's projections, but deemed them unreliable and unrealistic. Tr. 1762:20-22. For example, he disagreed with their assertion that the price of magnesium would stay flat at $1.78 for seven years. Tr. 1762:22-24. He also concluded that management's projections about expenses were incorrect because the company assumed that using new cell technology would lower the cost, which proved not to be the case. Tr. 1763:1-2. He explained that to arrive at his projections for revenue, he used Mr. (Robin) Adams's expert opinion, and "CRU's forecasts" for the price of magnesium into the future. Tr. 1763:5-8. To determine expenses, he looked at MagCorp's actual operating expenses for its previous 12 months of activity, as well as the operating expenses of Sabel, another former subsidiary of the Renco Group. Tr. 1763:9-15.

Frank explained to the jury his method for calculating the weighted average cost of capital, and it was generally in line with what he had represented in his expert report before trial. He testified that to determine the equity component, he looked at the risk-free rate of return, the equity risk premium, and the size risk premium, all of which were determined based on well-known "outside sources." Tr. 1764:18-1765:11.

Frank then turned to the company-specific risk premium, which he explained could not be pulled from an existing source, but rather must be determined by an exercise of professional judgment. Tr. 1765:17-21. He explained that "any characteristic" could go in to determining the company-specific risk premium, including financial, technological, environmental, operational, and managerial factors. Tr. 1765:21-23. For Renco Metals and MagCorp, Frank testified that

10

his evaluation of the company-specific risk was based on "four main categories": (1) the risk the companies faced in attempting to comply with Clean Air Act and NESHAP regulations; (2) risk from the company's technology and the need to improve to stay competitive, as explained by Dr. Veranth; (3) the risk that the companies would not be able to maintain their level of profitability because the company made aggressive projections for the future from the standpoint of a high point in performance; and (4) the company's overall liquidity and ability to pay debts. Tr. 1766:7-1767:9.

Frank then explained the final component of weighted average cost of capital, which is debt. He testified that he used the company's actual debt rate of roughly 11.5%, and "tax-effected" it. Tr. 1767:20-23. After applying a discount rate for an average participant in the specific nonferrous metals industry, Frank concluded that the Debtors' weighted average cost of capital was approximately 23% in July 1996, 24% in October 1997, and 22.5% in October 1998. Tr. 1768:2-18.

Frank addressed Grabowski's use of guideline companies in his direct testimony. He explained that he disagreed with Grabowski's decision to use Alcoa, Phelps Dodge, Alumax, Kaiser, and others as guideline companies because of "unique risks" facing MagCorp. Tr. 1771:13-20. Specifically, he pointed to the fact that all of these supposed comparators were "huge multinational billion-dollar companies" with operations around the globe, whereas MagCorp had operations only on the Great Salt Lake. Tr. 1771:19-24. This led to heightened environmental and technological risks for MagCorp, said Frank. Tr. 1771:24-1772:1.

Frank further detailed five other points of disagreement with Grabowski that did not pertain specifically to guideline companies, but did affect the overall solvency opinion. These were: (1) Grabowski's assumption that the price of magnesium would stay at $1.78 for the entire seven-year period of the forecast; (2) his assumption that Alcan technology was working and would reduce costs; (3) his failure to include risks specific to MagCorp, such as environmental risks and technology risks; (4) his assumption that MagCorp could borrow approximately $300

11

million at 11.5% interest; and (5) his assumption that MagCorp had a cash surplus. Tr. 1772:2-1774:6.

On cross-examination, Frank was asked about his use of comparative analysis, and specifically about his decision that there were no guideline companies that could effectively be compared to MagCorp or Renco Metals. He admitted that the literature on the subject no longer uses the term "comparative" company and instead uses "guideline companies," and acknowledged that Grabowski had criticized the definition of guideline companies that he had employed. Tr. 1840:15-1841:8. Frank testified that the "overall premise" of the methodology was that companies have to be "exactly the same" and share the "exact same risk," Tr. 1849:16-18, and stated that he had not put forth a source for his definition in his testimony, Tr. 1850:5-10.

Frank explained that he disagreed with Grabowski's conclusions that certain companies were guideline companies because he did not believe that Grabowski's analysis showed them to be "true comparables." Tr. 1854:8-9. For example, he explained that Reynolds Metals is a "multibillion, multinational company that does many things beyond production of just a metal." Tr. 1854:10-14.

### 3. *Daubert* Standard

Though Defendants raise their argument in part as an attack on Frank's overall credibility and not wholly as a renewed *Daubert* motion, much of their argument attacks his methodology as unreliable and suggests that it should be excluded under the *Daubert* standard. *See, e.g.*, Def. Mot. at 4 (Dkt. No. 409). In particular, Defendants state that "[n]ew evidence that came to light during trial" demonstrated that Frank's methodology was unreliable, *id.*, and they otherwise rely on caselaw construing the admissibility of expert testimony, *see id.* at 6. Accordingly, the Court will begin by setting out the *Daubert* standard in order to guide its analysis.

Under *Daubert* and its progeny, the Court must determine whether proffered expert testimony has a sufficiently reliable foundation before it may be considered by the trier of fact. *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002). This inquiry largely involves considering the "indicia of reliability" laid out in Federal Rule of Evidence 702:

12

"(1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case." *Amorgianos*, 303 F.3d at 265 (quoting Fed. R. Evid. 702) (internal quotation marks omitted). There is no rote list of factors to be considered when evaluating a *Daubert* motion, and the inquiry is designed to be flexible to respond to the context and circumstances of each case. *Id.* at 266. Nevertheless, whether the theory can and has been tested, whether it has been subject to peer review, the technique's potential rate of error, and whether the technique has been "generally accepted" in the relevant professional or academic community have all been identified as relevant considerations. *See Daubert*, 509 U.S. at 593-94; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (applying *Daubert* to all expert testimony, not just scientific testimony).

Minor flaws in reasoning and "slight modification[s]" of reliable methods do not, on their own, require exclusion. Rather, to require exclusion of expert testimony under Rule 702, the flaws in the expert's conclusion must be sufficiently large that he or she "lacks good grounds for his or her conclusions." *Amorgianos*, 303 F.3d at 267 (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 746 (3d Cir. 1994)) (internal quotation marks omitted). It is appropriate to allow weaknesses in an expert opinion to be pointed out on cross-examination instead of completely excluding the testimony because of the existence of some weaknesses. *Olin Corp. v. Certain Underwriters at Lloyd's London*, 468 F.3d 120, 134 (2d Cir. 2006).

### B. Analysis

Defendants' motion attacks the adequacy of Frank's analysis on two fronts. It first argues that Frank's chosen company-specific risk premium was selected based on a flawed and unrealiable analysis, and therefore undermines his solvency opinion such that no rational jury could use it to find insolvency. Second, Defendants fault Frank for rejecting the "market approach" to corporate valuation, arguing that he excluded it without reason and based on a faulty understanding of what constitutes a "guideline company." Neither argument entitles Defendants to post-judgment relief.

### 1. Company-Specific Risk Premium

Defendants seek to undermine Frank's use of a company-specific risk premium from a number of angles. They call the entire concept of company-specific risk "dangerous," *see* Def. Mem. at 6 (Dkt. No. 409), and state that Frank failed to adequately justify the company-specific risk premiums he used when evaluating Renco Metals's solvency. Specifically, they suggest that Frank erred by failing to compare Renco Metals to other companies to determine whether its risks were unique; by presenting no evidence that the factors Frank found to be unique to Renco Metals were appropriate considerations; by "double-counting" the risk presented by certain factors and applying other factors out of context; and by using a "massive" company-specific risk premium. Defendants also claim that Frank failed to proffer support from the stand for his reasons for choosing certain risk factors as part of his analysis.

The unifying problem with Defendants' arguments is that they present "deficiencies" that were appropriately called to the jury's attention rather than the Court's. The question of whether Renco Metals and MagCorp were solvent at the times of the disputed transfers presented the jury with a fairly standard battle of the experts. The Court's province in these circumstances is not to determine, whether Defendants' solvency expert, Robert Grabowski, was more credible than Frank, or whether the jury should have accepted Grabowski's conclusions—which is what much of Defendants' motion appears to argue. *See* Pl. Mem. at 9 (Grabowski "demonstrated" benchmark companies were not different), 10 (explaining "Grabowski's view"), 12 (Grabwoski "explained the proper use of guideline companies"), 13 (Grabowski "identified several guidelines companies"). Instead, the Court's more limited role is to (1) determine whether Frank's testimony meets the threshold of reliability for presentation to the jury under *Daubert*, and (2) determine after the verdict whether the record contains evidence that would permit the jury to find as it did. As the Supreme Court advised in *Daubert*, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. at 596. Defendants' motion asks the Court to trespass beyond its role as gatekeeper into the jury's realm

of determining the credibility of Plaintiff's admissible evidence. *See Amorgianos*, 303 F.3d at

267-68 ("[T]he district court's *Daubert* gatekeeping role does not permit the district court, in

ruling on evidentiary sufficiency, to reject admissible expert testimony.").

 As an important preliminary matter, it is undisputed that the Capital Asset Pricing Model

generally, and the use of company-specific risk premium in general, are part of accepted

methodologies in corporate valuation and that neither on its own undermines the adequacy of

Frank's testimony. *See generally Daubert* Order at 10-11 (Dkt. No. 36). The concept of

company-specific risk premium has both its academic and judicial critics, but such criticism is

not on its own grounds for striking Frank's testimony or calling the jury's verdict into question,

particularly in light of the fact that even critics have accepted expert testimony about company-

specific risk as sufficiently reliable evidence. *See, e.g.*, *Del. Open MRI Radiology Assocs., P.A.

v. Kessler*, 898 A.2d 290, 339 (Del. Ch. 2006). With that in mind, the Court turns to Defendants'

specific grounds for striking Frank's testimony, or in the alternative finding it unreliable.

 **a. Comparison to Benchmark Companies & Factors That Made the Debtors Unique**

 First, Defendants' argument that Frank's methodology for fixing a company-specific risk

premium was fatally flawed misstates both the record and the literature about company-specific

risk. Defendants hone in on two aspects of Frank's analysis that they claim were inadequately

explained: his conclusion that benchmark companies did not provide a good comparison from

which to determine the debtors' company-specific risk, and his conclusion that certain factors

created risks specific to the Debtors. In both instances, however, Frank's explanations allowed

the jury rationally to conclude that he employed reliable methods, and the deficiencies that

Defendants identify involve matters there were appropriately left for determination by the finder

of fact.

 In the first instance, Defendants' contention that Frank erred by refusing to compare the

debtors to benchmark companies is not accurate. Frank testified that he *did* attempt to draw a

comparison to other companies, and it was his judgment that none of the companies that might

otherwise serve for comparison were sufficiently similar to MagCorp or Renco Metals to be

useful for analysis.  Tr. 1761:2-15; Tr. 1762:4-13.  Defendants focus on Frank's response that "the answer is no" when asked whether he compared the debtors to other companies to determine company-specific risk, *see* Tr. 1861:5-8, but in context it was clear that Frank's intent was to state that he believed other companies did not offer an adequate comparison, not that he entirely eschewed any attempt at this mode of analysis.  He further stated in the same general portion of his testimony that he knew that the company-specific risk premium should be determined by "try[ing] to compare the uniqueness of the company you're trying to identify, the risks, to other companies if they share those risks."  Tr. 1862:22-24.  He went on to testify that he "did not see any company that had unique risks to technology and environment that MagCorp had during the relevant period," Tr. 1863:3-5, and that he and his team looked at "10-Ks" and the "public information that was disclosed" for potentially comparable companies, and found that none of them had the "unique risks to technology and environment" that MagCorp and Renco Metals faced during the time period.  Tr. 1863:3-9.

Moreover, the Court does not agree with Defendants' assertion that a company-specific risk premium must be based on "specific quantitatively observed differences" from benchmark companies, *see* Tr. 2256:21-23, to be admissible.  Though Grabowski testified that this was the appropriate way to determine company-specific risk premium, the Court concludes that the academic literature in the field, and the "generally accepted" method of determining company-specific risk, does not require such quantitative precision for admissibility.  There is ample authority stating that company-specific risk *cannot* be determined in such a purely quantitative way.  *See* Israel Shaked & Robert Reilly, American Bankruptcy Institute, *A Practical Guide to Bankruptcy Valuation* 30 (2013) ("[T]here is no generally accepted model, formula, equation or method to quantitatively measure the CSRP [company-specific risk premium].  The only 'model' available to measure the SCRP is the analyst's informed professional judgment, based on the analyst's studied consideration of various recognized factors."); Shannon P. Pratt & Roger J. Grabowski, *Cost of Capital* 288 (2010) ("Many analysts are able to express qualitative reasons for company-specific risk adjustments but rarely can provide data relating these qualified factors

to actual measurements in expected return."). In other words, a method of assigning company-specific risk based on qualitative factors is sufficiently reliable in light of the factors considered under *Daubert*, *see* 509 U.S. at 593-94. Frank's use of such factors was therefore appropriately considered by the jury.

Similarly, the factors that Frank testified that he relied on when determining the debtors' company-specific risk were both consistent with the accepted methodology for determining company-specific risk and sufficiently justified to substantiate the jury's verdict. Frank identified several risks that he found specific to the Debtor Companies compared to others in the field, including: (1) the need for new technology to stay competitive; (2) potential environmental liabilities and regulatory issues; (3) the risk that management had projected future performance too aggressively; (4) lack of liquidity; and (5) lack of product or geographical diversification. *See* Tr. 1766:9-1771:24. All of these factors are well within the range of considerations that experts use to determine company-specific risk, and otherwise reflect a sufficiently sound methodology for the purpose of consideration by the jury. *See, e.g.*, Sharon P. Pratt & Alina V. Niculita, *Valuing a Business* 202-03 (5th ed. 2008) (Dkt. No. 16-43) (listing factors).

Insofar as Defendants argue that the factors Frank considered were not adequately justified by facts proving them to be unique to the Debtors, their argument turns on points of disagreement they identify between Frank's testimony and Grabowski's. For example, they argue that Grabowski "explained" that Reynolds Metals was not more diversified than Renco Metals, Def. Mem. at 9 (Dkt. No. 409), and that other companies had similarly described technology risks, *id.* at 10. Whether to believe Frank or Grabowski on these and similar points was a quintessential jury question, and Defendants' recourse when contesting the factual underpinnings of Frank's otherwise sufficiently reliable testimony was cross-examination and presentation of countervailing evidence. Defendants did both, and the jury appears to have found Frank's version more credible. Frank, for his part, offered sufficient factual justification to make the jury's reliance on his conclusions reasonable; fair inferences were available from his testimony that the Debtors faced unique risks when compared to the benchmark companies

17

Grabowski offered, and that other factors—such as "aggressive projections"—spoke to more systematic failures at MagCorp that generated unique risk.  And Frank was not, of course, required to trace the entire causal chain of his expert reasoning back to the academic underpinnings of his conclusions every time he gave an answer from the stand.  *See Glossip v. Gross*, No. 14-7955, 576 U.S. ___, slip op. at 28 n.8 (U.S. June 29, 2015) ("[I]t would be unusual for an expert testifying on the stand to punctuate each sentence with a citation to a [scholarly] journal.").

Defendants had ample opportunity at trial to argue to the jury why Frank's conclusions about the debtors' company-specific risk should not be accepted, both when cross-examining Frank and on direct examination of Grabowski.  They took repeated advantage of these opportunities.  *See* Tr. 1860:5-1864:7; Tr. 1875:8-1880:11; Tr. 1881:14-1886:8; Tr. 1889:12-1890:22; Tr. 1910:5-1911:1; Tr. 2256:10-2258:9; Tr. 2261:3-2263:13.  The jury was not swayed, and similarly was not convinced by Grabowski's testimony that he would not use a valuation method dependent on company-specific risk at all in these circumstances, *see* Tr. 2256:21-2257:6.  The jury's apparent decision to credit Frank's testimony was neither irrational nor against the weight of the evidence.  Moreover, even if the Court would have come to a different conclusion than the jury—a matter on which the Court renders no opinion—the Court could not grant a new trial merely because it disagreed with the jury's assessment of the credibility of Frank's testimony.  *See Readle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012) (citing *United States v. Landau*, 155 F.3d 93, 104 (2d Cir. 1998)).  The verdict may not be undermined on these grounds.

### b. Double-Counting, Contingent Liabilities, & The Size of the Company-Specific Risk Premium

Defendants also argue that the unreliability of Frank's testimony was demonstrated by his "double-counting" of certain factors that reduced the debtors' value, irrationally pushing his valuation toward insolvency.  This argument is newly presented post-trial, and to the extent that it is not waived, Defendants have failed to show that it seriously undermines Frank's testimony.

The academic literature on company-specific risk implicitly reveals that factors that are properly considered when determining such risk may also have implications elsewhere in the company's valuation. For example, while legal and litigation costs may affect company-specific risk, it is clear that such costs may also impose direct financial burdens on a company. *See* Pratt & Niculita, *supra*.

The most emphatic double-counting charge levied by Defendants involves Frank's use of contingent environmental liabilities as a factor in setting the debtors' company-specific risk. Defendants argue that Frank claimed that environmental factors were "*the* important factor in his solvency analysis." Def. Mem. at 10 (Dkt. No. 409) (quoting Tr. 1828:11-12). This selective quotation misstates the record; Frank was responding to questions about the manner in which he used environmental liabilities, and stated that, as it involved environmental liabilities, "the important factor in [his] solvency analysis was knowing that there is environmental exposure at the site; that anyone would know if they were going to do [due] diligence." Tr. 1828:11-14 (transcription error corrected). Frank's point was that the extent of environmental contamination on the debtors' sites would lower any reasonable valuation of the companies, independent of the specific amount of contingent liability they faced. At any rate, Frank also testified that the debtors were insolvent "before the consideration of contingent liabilities," Tr. 1759:1-2, 5-6, 9-10. It was up to Defendants to undermine this conclusion with cross-examination and evidence of their own.

Finally, Defendants' argument that Frank's chosen company-specific risk was "massive" compared to that used in other cases is not enough to undermine the general acceptability of Frank's testimony. The figures chosen did not reveal Frank's methodology to be unsound, and the jury was appropriately tasked with determining whether Frank's figures should be accepted.

### 2. The Market Approach

In addition to their arguments based on Frank's assignment of a company-specific risk premium, Defendants also assert that Frank's testimony was critically undermined by his failure to apply the so-called "market approach" to corporate valuation. Grabowksi employed this

19

method, which involves comparing the target company to "guideline companies" that are similar to the company under evaluation. Defendants state that Frank neglected the market approach "[f]or no good reason," and that he failed to faithfully apply the accepted standard for choosing guideline companies. *See* Def. Mem. at 11-13 (Dkt. No. 409).

Because the market approach was primarily relied on by Defendants, it was their responsibility—not Plaintiff's—to present evidence of this method. They did so through Grabowski, *see* Tr. 2227:19-2230:22, and also cross-examined Frank about his reasons for rejecting the market approach, *see* Tr. 1842:16-1846:13. Frank's testimony that he did not find the market approach apposite for evaluating the debtors did not undermine his general solvency analysis under the Capital Asset Pricing Model, and his rejection of the market approach does not present grounds for otherwise excluding or striking his sufficiently competent analysis. It was the trier of fact's task to choose between two competent and competing expert methods of valuation; the Court will not disturb the verdict on the grounds that Frank should have been *forced* to testify about a valuation method that he opined could not be appropriately applied.

Additionally, the errors in Frank's understanding of the market approach asserted by Defendants do not present grounds for excluding his testimony, even if there were a coordinate *Daubert* principle that an expert must have reliable reasons for rejecting a certain model. Specifically, Grabowski's testimony that Frank used an "old obsolete definition" of "guideline companies" in his analysis, Tr. 2229:18, and that Frank should not have required as much similarity between guideline companies as he did, Tr. 1840:15-1841:10, falls into the category of "minor errors" that do not require exclusion of expert testimony (if indeed they are errors at all). *See Amorgianos*, 303 F.3d at 267. This is particularly true in light of Frank's decision *not* to apply the market approach, which means any errors in his understanding of that approach did not affect his ultimate solvency analysis under the approach that he applied. The remedy for exposing any error in Frank's treatment of the market approach was cross-examination. Nothing about that cross-examination, or Grabowski's presentation of an alternative theory, was so devastating to Frank's testimony that it undermines the validity of the verdict.

20

Defendants' final argument on this score is that Plaintiff offered in his summation separate, unsupported theories on valuation that were "so flawed that had they actually been part of Frank's testimony, they would not have come close to satisfying the *Daubert* standard." Def. Mem. at 14 (Dkt. No. 409). Of course, any deficient argument by counsel does not expose flaws in Frank's expert opinion, particularly in light of Defendants' admission that counsel's flawed arguments were not grounded in Frank's testimony. Of the specific portions of the summation that Defendants identify, one was met with a *sustained* objection, and the other was an attempt to identify purported inaccuracies in *Grabowski's* testimony. *See* Tr. 2823:23-2824:11; 2828:14-2829:6. Nothing in Plaintiff's summation infected Frank's testimony such that the verdict must be vacated and a new trial granted.

In sum, Defendants' attacks on Frank's rejection of the market approach neither demonstrate that a reasonable jury could not find in Plaintiff's favor, nor prove the jury's verdict to be against the weight of the evidence.

### 3.  Pre-July 1996 Analysis

As a final note on Frank's testimony, Defendants claim in a footnote argument that Frank offered no analysis of the Debtor Companies' solvency before July 1996, and therefore judgment must be entered for Plaintiffs on any transfers made before that date. *See* Def. Mem. 13-14 & n.5; Def. Reply Mem. 2-3. This argument was not made in Defendants' Rule 50 motion during trial, and therefore is not preserved for a post-trial motion. *See* Tr. 1985:8-1992:21 (Rule 50 motion); *see also* Dkt. No. 300 (Defendant's written Rule 50 submission during trial). At any rate, Defendants do not explain why a fair inference of insolvency for the months before that valuation was not available to the jury, and no new trial on this narrow question is warranted.

### V.    Unjust Enrichment

The Court now turns to the motion by Defendants Ira Rennert and the Trustees of the Rennert Trusts for judgment as a matter of law on Plaintiff's claim of unjust enrichment. For the purposes of this section, "Defendants" will refer only to Rennert and the Trustees.

Defendants argue that the evidence was insufficient to demonstrate that Rennert was enriched at Plaintiff's expense by the transfers from MagCorp and Renco Metals. Plaintiff's theory at trial was that The Renco Group used the funds transferred away from the debtors in the form of dividend payments to purchase land and build a home for Defendants in Sagaponack, New York, and that these transactions were made by a wholly-owned subsidiary of The Renco Group, Blue Turtles, which was formed expressly for that purpose. The jury was instructed that:

> Unjust enrichment occurs when one person or entity has obtained money, property, or a direct benefit from another person or entity, that the recipient is not entitled to receive and under such circumstances that, in fairness and good conscience, the money, property or direct benefit should not be retained. In those circumstances, the law requires that person who received the direct benefit to repay, return the property to, or compensate the other person.

The Court further instructed the jury that it had to make "three findings" as to unjust enrichment. The first was whether "Defendants … received a direct benefit from the debtor companies." If and only if the jury found that he had, it was instructed to "determine whether the debtor companies were harmed by conveying this direct benefit." Finally, the jury was instructed to consider damages if it found both of these questions in Plaintiff's favor. Tr. 2927:24-2928:8.[3]

An unjust enrichment claim under New York law has three elements: (1) that the defendant received a direct benefit, (2) that it was received at the plaintiff's expense, and (3) that "equity and good conscience" require the defendant to return the benefit. *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000). Before trial, the parties disputed in the course of *in limine* briefing

---

[3] The Court notes that there is an apparent split of authority in New York law over whether a jury may resolve an unjust enrichment. At least one court has stated, in conformity with New York's pattern jury instructions, that a jury may determine only the existence of underlying facts necessary to finding unjust enrichment, and that it is left to the court to make the equitable determination whether the enrichment was unjust. *See Learning Annex Holdings, LLC v. Rich Global, LLC*, No. 09-cv-4432 (SAS), 2011 WL 2732550, at *1 n.3 (S.D.N.Y. July 11, 2011) (citing New York Pattern Jury Instructions: Inst. 4:2 comment). However, a number of cases decided both in this circuit and in New York's state courts have implicitly approved a jury's entry of a verdict on all aspects of an unjust enrichment claim. *See Saunders v. Kline*, 75 A.D.2d 531, 531 (N.Y. App. Div. 1980), *aff'd* 421 N.E.2d 113, 114 (N.Y. 1981); *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000); *Oorah, Inc. v. Schick*, 552 F. App'x 20, 23 (2d Cir. 2014); *Scott v. Health Care Plan, Inc.*, 247 A.D.2d 822, 822-23 (N.Y. App. Div. 1998); *MacQuesten Gen. Contracting, Inc. v. HCE, Inc.*, 296 F. Supp. 2d 437, 447 (S.D.N.Y. 2003). A possible distinction may exist between quasi-contractual unjust enrichment claims and ones that sound more in tort, but the Court need not decide the question, as Defendants do not now suggest that the claim should not have been submitted to the jury.

22

whether Plaintiffs had proffered evidence of a benefit at all, and the Court determined that, because "a benefit can include when a person is saved expense or loss," provision of rent-free housing can constitute a benefit even absent permanent transfer of ownership. *See* Dkt. No. 182 at 47:1-8. The parties also disputed whether Plaintiff could establish that the benefit conveyed to Defendants was sufficiently direct, and the Court concluded that "[w]hether Plaintiff can demonstrate that connection is a question of the sufficiency of the evidence, and that would … be premature to decide at this stage." *Id.* at 48:8-10. Defendants' motion focuses on this question of whether the benefit conveyed was sufficiently direct.

For the benefit to be "direct," the defendant must either be put in possession of the benefit, or otherwise obtain financial relief because of the benefit; it is not enough that the funds "indirectly" benefit the defendant—for example, by providing a financial boon to someone close to the defendant. *Kaye*, 202 F.3d at 616 (explaining that a loan that enabled defendant's daughter to continue at college was not sufficiently direct as to defendant); *see also M+J Savitt, Inc. v. Savitt*, No. 08-cv-8535 (DLC), 2009 WL 691278, at *10 (S.D.N.Y. Mar. 17, 2009) (dismissing claim of unjust enrichment based on loan made to third party, despite allegations that defendant did not have to make similar payments because of plaintiff's loan). Put differently, a benefit is direct when it or its functional equivalent[4] is in the defendant's possession to return.

Defendants argue that Plaintiff presented no evidence showing that they directly benefited from the challenged transfers, because there is no evidence that those same funds were used by Blue Turtles to purchase the land in Sagaponack. At trial, the jury heard testimony that Blue Turtles purchased the land in Sagaponack four months after a $75 million dividend was paid from Renco Metals to the Renco Group in 1996. Tr. 590:5-22 (Rennert Testimony), that all of the money used to fund Blue Turtles came from the Renco Group, Tr. 1054:23-1055:3 (Fay Testimony), and that Rennert ultimately used that land for a personal residence, Tr. 590:23-24 (Rennert Testimony). They further heard testimony that the land on which the Sagaponack

---

[4] "Functional equivalent," in these circumstances, refers to something like debt relief. The notion is that a defendant may no longer possess the physical asset, but still retains its direct economic equivalent.

residence was built cost Blue Turtles $11 million, Tr. 611:13 (Rennert Testimony). Defendants suggest that this set of facts alone—that Blue Turtles purchased the land sometime after the $75 million dividend was paid to Renco Group—is not enough for a rational jury to conclude that funds originating with Renco Metals were ultimately used to convey a benefit on Defendants.

Plaintiff does not contest the underlying state of the evidence. Rather, his response is bottomed on the notion that, based on the timing of the land purchase and the fact that Blue Turtles was funded entirely by The Renco Group, the jury could reasonably infer that the funds used for the Sagaponack land purchase came from the funds originally taken from Renco Metals. Even if no direct line can be traced back to the transfers, says Plaintiff, the dividend made money available for the Sagaponack purchase by freeing up funds that would otherwise have to go toward other obligations belonging to the Renco Group.

Based on all of the evidence presented, an inference was available to the jury that the dividend payment either provided The Renco Group with the funds to purchase the Sagaponack property or freed up the funds to otherwise enable The Renco Group to purchase the property, but there was no available inference that the benefit *from the Debtors* accrued to an entity other than The Renco Group or Blue Turtles.[5] The undisputed evidence is that The Renco Group transferred to its subsidiary Blue Turtles the money to purchase the Sagaponack property, *see* Tr. 612:6-9, and evidence was presented that would allow a rational jury to find that Blue Turtles conveyed a benefit on Defendants by purchasing the property that would ultimately be used for his home—even though ownership of the home was at no point transferred to Rennert, *see* Tr. 432:9-13. While The Renco Group and Blue Turtles may have conveyed a benefit to Defendants, the property—for the purpose of returning what was allegedly unjustly taken from Plaintiff—still resides in Blue Turtles's possession, not Defendants'. To the extent Defendants have received any benefit, it is the value of the use of property, which was not in the relevant period Plaintiff's to transfer to Rennert; even assuming that some of the funds used to *purchase*

---

[5] Plaintiff has not argued that the corporate veil should be pierced as to either entity.

the home could be traced back to Renco Metals, the rental value from use of the land thereafter cannot be traced directly back to anything transferred away from the Debtor Companies.

Furthermore, even if the benefit of Rennert's rent-free land use could be traced directly back to the Debtors, Plaintiff's evidence was insufficient to establish an appropriate measure of damages. The only benefit that Plaintiff's evidence showed that Defendants received was Rennert's rent-free use of the Sagaponack property. However, Plaintiff presented no evidence of the fair rental value of the property; Plaintiff's evidence showed either the value of the property itself, or the amount of transfers from the Debtors to the Renco Group. The fact that the damages awarded by the jury on Plaintiff's unjust enrichment claim were equal to the amount of fraudulent conveyances for which the jury found Rennert responsibile indicates that the jury did not consider the actual rental value of the property when assessing damages. *See* Ct. Ex. 25 (Dkt. No. 327-27) (verdict form). And the lack of any evidence on which a rational jury could have made an assessment of the rental value indicates that Plaintiff failed to carry his evidentiary burden. No rational jury could find an appropriate measure of damages on the evidence presented.

The Court therefore must grant Defendants' motion for judgment as a matter of law on the unjust enrichment claim. Because Plaintiff's damages award against the Trustees of the Rennert Trusts was premised only on this cause of action, the judgment shall be amended to reflect that Plaintiff shall take no damages from that Defendant. The damages for unjust enrichment being otherwise redundant of damages otherwise properly assessed against Defendant Ira Rennert, the judgment shall not be amended as to Rennert.

## VI.   Fraudulent Conveyance and Breach of Fiduciary Duty

Defendants further argue that judgment as a matter of law should be entered in Rennert's favor on Plaintiff's fraudulent conveyance and breach of fiduciary duty claims against him. This argument was not raised in Defendants' Rule 50 motion made at trial, and therefore is not

preserved for a post-trial Rule 50 motion.[6]  Defendants do not appear to move for a new trial on these claims, *see* Def. Mem. at 21-22, but even if they had, the jury's verdict was not against the weight of the evidence.

Defendants also argue that the jury's $16,222,000 damages award against Rennert for breach of fiduciary duty is necessarily duplicative of the $101,000,000 award against The Renco Group, and must be vacated.  This argument is underdeveloped, but appears to depend on the notion that $101,000,000 is the make-whole amount for Plaintiffs because the jury found $101,000,000 in damages against The Renco Group for fraudulent conveyances, and therefore any amount in excess of that must not have been fraudulent, and could not support a breach of fiduciary duty claim.  Defendants do not otherwise suggest that there was insufficient evidence to demonstrate a breach of fiduciary duty, nor that Rennert had to personally be in possession of the funds to be held liable for a breach of fiduciary duty.  Furthermore, they do not—and could not, based on the evidence presented at trial—argue that Plaintiff did not present evidence of losses greater than $101,000,000 to the Debtor Companies.  Defendants have cited no authority for the proposition that because Rennert did not receive any fraudulent transfers himself, the damages for his breach of fiduciary duty must be capped at the amount of the fraudulent transfers to the Renco Group, outside of an Eastern District of New York case stating the general proposition a plaintiff cannot receive double recovery.  *See Zaretsky v. New Century Mortg. Corp.*, No. 08-cv-378 (DRH) (WDW), 2011 WL 7121621, at *2 (E.D.N.Y. Oct. 3, 2011).  Defendants appear to have abandoned this argument in their reply brief, or at least do not mention it, and as presented to the Court it is wholly lacking in any reason to vacate the damages award.

---

[6] Defendants cite the transcript of their Rule 50 motion in an attempt to show preservation, but the portion they cite is from their argument that a directed verdict should be entered on the unjust enrichment claim: "Consequently, regardless of whether one wants to accept for the purposes of the jury the issue of whether the $10 million came from the dividends or not, there is an absence of any evidence to show the benefit that Mr. Rennert received, i.e. the damages *that would be the benefit of the unjust enrichment claim*."  Tr. 1992:2-6 (portion omitted from Defendants' brief italicized).  Neither Defendants' oral nor written Rule 50 submissions mentioned the fraudulent conveyance or breach of fiduciary duty claims against Rennert.

The Court notes that Defendants have not moved against the jury's determination that Rennert is liable for aiding and abetting fraudulent conveyances for damages, or the jury's award of $16,220,000 in damages on that claim.  That verdict is therefore left undisturbed as well.

## VII.   Punitive Damages

The Court now turns to Defendants' argument that the punitive damages award against The Renco Group must be vacated because Delaware law would not permit punitive damages for a breach of fiduciary duty.[7]  The Court reserved this question during trial, Tr. 2601:5-6, and now concludes that punitive damages are not available on Plaintiff's claim.

In Delaware, the Court of Chancery has exclusive jurisdiction over claims of breach of fiduciary duty.  *See McMahon v. New Castle Assocs.*, 532 A.2d 601, 604 (Del. Ch. 1987); *Reybold Venture Grp. XI-A, LLC v. Atl. Meridian Crossing, LCC*, Civ. A. No. 08C-02-481 (RRC), 2009 WL 143107, at *3  (Del. Super. Ct. Jan. 20, 2009).  And the Court of Chancery has explained that it may enter punitive damages only when the legislature has expressly authorized them by statute, which is not the case for breach of fiduciary duty by corporate directors.  *Adams v. Calvarese Farms Maint. Corp.*, Civ. A. No. 4262 (VCP), 2010 WL 3944961, at *21 n.204 (Del. Ch. Sept. 17, 2010); *see also Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1154 (Del. Ch. 2006) (stating that court cannot award punitive damages in fiduciary duty action).  In one instance, the First Circuit did not contest a district court's conclusion that punitive damages are available for a breach of fiduciary duty under Delaware law, although the district court did not cite the basis for its conclusion that Delaware law permits such damages, and the First Circuit ultimately affirmed a decision not to award punitive damages.  *See Niehoff v. Maynard*, 299 F.3d 41, 52-53 (1st Cir. 2002).  Based on the above-cited Court of Chancery cases that flatly

---

[7] The punitive damages claim was presented to the jury based only on Plaintiff's claims for breach of fiduciary duty and aiding and abetting breach of fiduciary duty, both of which were brought under Delaware law. To the extent that Plaintiff suggests in its memorandum that his "aiding and abetting fraudulent conveyance" claim would sustain a punitive damages award, he seeks to insert something he has never before pleaded or asked for at the post-trial stage. *See* Pl. Resp. at 24 (Dkt. No. 415).  It is too late to assert any potential claim for punitive damages on this theory now.

contradict *Niehoff*'s implicit conclusion that punitive damages are available, the Court concludes that *Niehoff* does not set forth an accurate statement of Delaware law.

Plaintiff argues that the Delaware case law holding punitive damages unavailable reflects only a "jurisdictional limit" rather than a substantive rule, and that Delaware's substantive law *does* permit punitive damages on a breach of fiduciary duty claim. Claiming that the Chancery Court's inability to award damages is a matter of the "separation of law and equity" in Delaware, Plaintiff contends that a federal court, which does not face the same separation, need only look to Delaware's "substantive" law to find that punitive damages are available. In effect, Plaintiff argues that punitive damages for breach of fiduciary duty claims under Delaware law available only *outside* of Delaware's own courts.

From a formal standpoint, Plaintiff appears to argue that Delaware's distinction between equitable claims heard in the Court of Chancery and legal claims heard in the Superior Court, and the concomitant restriction on Chancery's ability to award punitive damages, is a "procedural" rather than "substantive" aspect of Delaware law. Thus, implies Plaintiff, a federal court applying the rule that federal courts sitting in diversity apply state substantive law and federal procedural law, *see Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996); *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938), would ignore Delaware's "procedural" limitation on punitive damages. Federal law governs what is substantive and what is procedural for *Erie* purposes. *See Liberty Synergistics Inc. v. Microflo Ltd.*, 718 F.3d 138, 152 (2d Cir. 2013). And what is "substantive law" for *Erie* purposes is not the same as what a state defines as substantive law, or what might be considered substantive for conflict-of-laws purposes. *See Sun Oil Co. v. Wortman*, 486 U.S. 717, 726 (1988). Therefore, when determining whether a state rule that straddles both categorizations should be applied in federal court, a court must consider "the twin aims of the *Erie* rule: discouragement of forum-shopping and avoidance of inequitable administration of the laws." *Gasperini*, 518 U.S. at 428 (quoting *Hanna v. Plumer,* 380 U.S. 460, 468 (1965)).

28

The availability of punitive damages on state claims in federal courts is generally governed by state law under *Erie*. *See Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 278-79 (1989); *see also Motorola Credit Corp. v. Uzan*, 509 F.3d 74, 80 (2d Cir. 2007). Even understood as an argument that punitive damages are somehow "available" and yet jurisdictionally barred under Delaware law, the question is whether application of Delaware's prohibition on punitive damages in Chancery would "have so important an effect upon the fortunes of one or both of the litigants that failure to [apply] it would [unfairly discriminate against citizens of the forum State, or] be likely to cause a plaintiff to choose the federal court?" *Gasperini*, 518 U.S. at 428 (quoting *Hanna*, 380 U.S. at 468 n.9) (alterations in original).

Here, failure to apply the prohibition on punitive damages in fiduciary duties claims, based on Delaware's "procedural" rule allowing such claims to proceed only in Chancery, would produce all of the harms *Erie* sought to avoid. A different set of remedies would obtain for those applying Delaware law in Delaware and thus applying the same law outside of it. While not exactly a "statutory cap on damages" in the most straightforward sense, Delaware's rule partakes of the same characteristics, and a statutory cap on damages is patently substantive. *See Gasperini*, 518 U.S. at 428. The Court will not order an award of punitive damages wholly unavailable to a plaintiff litigating in Delaware courts based on some sleight-of-hand that makes Delaware law on punitive damages different in federal court than state court. *Cf. Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 496 U.S. 257, 278 (1989) ("In a diversity action, or in any other lawsuit where state law provides the basis of decision, the propriety of an award of punitive damages for the conduct in question, and the factors the jury may consider in determining their amount, are questions of state law.").

Because the Court has determined that punitive damages are unavailable under Delaware law on Plaintiff's claim, it need not address Defendants' alternative argument that Plaintiff did not present evidence of maliciousness necessary to sustain a punitive damages award. The punitive damages award must be vacated.

## VIII.  Alternative Arguments for a New Trial

Defendants raise two further arguments that, while not presenting grounds for judgment as a matter of law, they contend warrant a new trial under Rule 59. First, they state that Plaintiff was erroneously permitted to present "highly prejudicial, non-probative" evidence of the environmental conditions at the Debtors' magnesium plant. Second, they characterize the verdict as an "impermissible compromise" that cannot be permitted to stand. Neither argument bears scrutiny.

### A. Environmental Evidence

### 1. Admission of Environmental Evidence

During trial, Plaintiff presented evidence of environmental contamination at MagCorp's facility in Rowley, Utah, as probative of both the contingent liabilities that the debtor companies were likely to face, and a factor that could lower the overall valuation of the debtor companies. The Court explained during trial that the use of such evidence required the Court to "draw and police" a "very fact specific, deeply context-specific line" as to what was admissible, Tr. 1037:2-4, as "[t]here [had] to be connections made between allegations of toxicity and other wrongdoing that tie [into] probative value that outweighs the prejudice," Tr. 1036:21-23. As Defendants' argument implicitly notes, the question of which side of the line certain pieces of evidence fell on came up repeatedly during trial, and the Court made a number of rulings admitting evidence over Defendants' Rule 403 objections. But to consider all of these rulings as demonstrative of a single, overarching decision to permit introduction of a category of "environmental evidence" mischaracterizes the record, depriving it of the nuance that went into each decision.

Some of the motions that Defendants cite as illustrations of instances where Plaintiffs were permitted to present environmental evidence to the jury are demonstrative of the fact-specific lines that were drawn. Defendants' motion *in limine* to preclude evidence of the environmental reputation of the Renco Group and of MagCorp's "Toxic Release Inventory reports," *see* Dkt. Nos. 68 & 69, for example, presented evidence on both sides of the line. The Court granted the motion to preclude evidence of The Renco Group's "reputation" as being far more prejudicial than probative of the debtors' valuation. But it declined to preclude

30

presentation of the Toxic Release Inventory reports, which more directly tended to show MagCorp's need to upgrade its facilities in order to comply with foreseeable environmental regulation, which in turn was probative of the value of the company's assets and its solvency. *See generally* Order Dec. 23, 2014 (Dkt. No. 176) (discussing the Court's reasoning).

The other examples of "prejudicial" environmental evidence that Defendants point to were evaluated under similar reasoning, and the Court is confident that they did not cause undue prejudice. Indeed, some of the objections during trial that Defendants now identify as bases for their motion were not, at trial, Rule 402 or 403 objections at all, but rather objections on other evidentiary grounds such as foundation. *See* Dkt. No. 82 (motion *in limine* to exclude "undisclosed expert opinion testimony"); Tr. 1531:18-1534:4 (testimony of Plaintiff's expert Douglas Allen). Elsewhere, Defendants point to evidence that was admitted only after Defendants opened the door to it. *See* Tr. 1045:16-20. In general, the scattershot nature of the evidentiary decisions that Defendants rely on in their motion serves to underscore the Court's conclusion that it drew a line at trial that permitted Plaintiff to present probative evidence while keeping out evidence that presented a substantial risk of prejudice to Defendants when compared to its probative value.

## 2. Probability Evidence of Contingent Liabilities

Defendants next argue that, even if Plaintiff's environmental evidence could have been relevant, it was rendered irrelevant because Plaintiff did not introduce evidence that permitted the jury to determine the probability of contingent liabilities coming to pass. *See* Def. Mem. at 25 (Dkt. No. 409). Largely, this appears to be more a question of whether Plaintiff presented sufficient proof rather than one of relevance; the argument that the evidence was inadequate does not deprive it of its "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *McKoy v. North Carolina,* 494 U.S. 433, 440 (1990) (quotation mark omitted). Furthermore, Plaintiff's expert Douglas Allen testified that the debtors were likely to face contingent liabilities, and direct evidence of conditions leading to such liabilities was relevant to

31

support his testimony. Defendants offer no reason why a *precise* estimate of contingent liabilities was required to make the issue relevant to the jury. The Court need not speculate as to what actually occurred in the jury room, but merely notes that the evidence was relevant, and did not become unduly prejudicial to Defendants because of a lack of detailed probability analysis.

### 3. Defendants' Post-Transfer Evidence

Defendants also argue that the Court permitted Plaintiff to introduce evidence of environmental conditions at the Rowley facility from after the time period when the transfers took place, while denying Defendants the opportunity to present evidence taken from the post-transfer period. The Court explained at trial that this was a mischaracterization of its rulings, and that Defendants were not barred from presenting post-transfer evidence. *See* Tr. 2874:8-2890:8. Each of the general types of evidence that Defendants now argue they were improperly prevented from introducing were properly excluded on grounds other than the timeframe in which the evidence arose.

Defendants first point to the Court's exclusion of proposed testimony by Defendant Ron Thayer that the EPA had extended a non-finalized offer to settle the debtors' environmental liability in ongoing litigation under the Resource Conservation and Recovery Act (RCRA) in the District of Utah. However, the Court, after giving Defendants an opportunity to respond and explaining that there might be a substantive opening to introducing the evidence, *see* Tr. 1686:16, excluded it under Federal Rule of Evidence 408 and as hearsay, as well as on grounds of unfair surprise. *See* Tr. 1686:16-1687:15 (explaining that Defendants were not precluded from offering evidence that the debtors had not, to that date, been subjected to any environmental liability).

Defendants further state that the Court erred by preventing them from introducing evidence of the procedural history of, and "litigation events" in, the Utah RCRA action. However, the Court's ruling—which restrained both parties—indicated that the parties could not present a *de novo* legal argument about the meaning of RCRA, in an attempt to relitigate the Utah proceedings in front of the jury. *See* Pretrial Hr'g 75:22-80:16 (Dkt. No. 182); Order of

Dec. 23, 2014 at 3 (Dkt. No. 175).  The Court explained that the question of whether the parties'
interpretation of the law was correct in the present day was irrelevant to determining the
existence of contingent liabilities in 1996-98, and that there was an intolerable likelihood of juror
confusion if they were permitted to do so.  Nevertheless, the Court informed the parties that they
"may still present argument and evidence related to [the] debtor corporations' contingent
liabilities in '96 to '98, which may include evidence regarding the EPA[' s] and Defendants'
interpretation of the law at the time; that is to say, the dispute and the likelihood that such
interpretation would succeed." Tr. 78:23-79:3.

The Court similarly excluded evidence of the now-vacated district court opinion in the
Utah action.  The probative value of that opinion, which was vacated by the Tenth Circuit, was
low, particularly when compared to the likelihood that lay jurors would be substantially misled
by evidence of the litigation history in that case.  Presenting the evidence would have required a
mini-lesson in civil procedure for the jurors, and much of its probative value appeared to depend
on jurors being confused about the effect of the district court's since-vacated initial opinion.
Even with this ruling, Defendants were permitted to introduce evidence that no environmental
liability had been imposed on MagCorp, and they made much out of that fact.  *See* Tr. 1586:6-8,
Tr. 1897:4-13, Tr. 2277:20-2278:4 (asking Grabowski about liability not imposed for 15 years);
Tr. 2701:17-21 (summation) ("What's the bottom line?  The bottom line is we are sitting here in
2012 [sic].  There has been zero finding of liability for environmental violations.  It is a wall that
stands before the Plaintiff and his experts and they want you to ignore that wall.").

Ultimately, the Court is satisfied that the Defendants were not deprived of the opportunity
to present relevant, admissible evidence, and the jury was not unfairly prejudiced by any
environmental evidence that was admitted.  The jury returned a measured and reasonable verdict,
which bore a rational relationship to the evidence, and was not unduly punitive in its treatment of
Defendants nor otherwise demonstrative of inflamed passions.  The environmental evidence that
was admitted was relevant to the jury's task, and not unduly prejudicial compared to its probative

weight.  Even if there were some close calls at the margins, the environmental evidence could not have caused sufficient prejudice to make a new trial appropriate.

## B.  The Verdict

Finally, Defendants maintain that a new trial is required because the jury returned an improper compromise verdict.  No indications of a juror compromise were present, and the Court cannot order a new trial on this basis.

### 1.  Compromise Verdict Standard

For a court to conclude that a jury's verdict reflects an impermissible compromise, "the record itself viewed in its entirety must clearly demonstrate the compromise character of the verdict."  *Ajax Hardware Mfg. Corp. v. Indus. Plants Corp.*, 569 F.2d 181, 184 (2d Cir. 1977) (quoting *Maher v. Isthmian S.S. Co.*, 253 F.2d 414, 419 (2d Cir. 1958)).  In *Maher*, the Second Circuit stated that a verdict must be "inconsistent with the facts adduced at trial if the reviewing court is to reverse it on the ground that of an improper compromise of the jury."  253 F.3d at 416-17; see also *Vichare v. AMBAC Inc.*, 106 F.3d 457, 463 (2d Cir. 1996) ("Traditionally, in order to constitute an impermissible compromise the verdict must, at least, be inconsistent with the facts adduced at trial.").  A substantial reduction in damages, out of keeping with the evidence and despite a finding of liability, is a common feature of compromise verdicts, although even substantially reduced damages in conflict with the theory of liability offered at trial are not enough; there must also be "other indicia" of compromise such as "a close question of liability" or difficulty in jury deliberations.  *Atkins v. New York City*, 143 F.3d 100, 104 (2d Cir. 1998); *Diamond D Enters. USA, Inc. v. Steinsvaag*, 979 F.2d 14, 17 (2d Cir. 1992).  In the absence of a verdict in conflict with the facts, some potential indicia of compromise—such as jurors' request to make a pre-verdict statement expressing their frustration with the law—will not suffice absent an affirmative indication that the verdict actually was a compromise.  *See Vichare*, 106 F.3d at 461-64; *see also Aczel v. Labonia*, 584 F.3d 52, 58-60 (2d Cir. 2009) (finding compromise verdict when juror note indicated that jurors were "trying to compromise"); *Stephenson v. Doe*,

34

332 F.3d 68, 80 (2d Cir. 2003) (remanding for new trial in light of jury instructions that effectively permitted jury to compromise).

Here, Defendants do not argue that the jury substantially lowered the damages liability as a result of a compromise, that the Court's instructions gave the jury tacit permission to compromise, or that the jury gave any affirmative indication that it intended or desired to compromise. Instead, Defendants suggest that the jury must have comprised because: (1) liability was a "close question" based on the verdict form; (2) the jury at one point asked to break for the evening because of a "temporary" impasse, and at another point indicated an impasse and were given a modified *Allen* charge; and (3) there were "fundamental inconsistencies" in the verdict. Even accepting all of Defendants' propositions as true, they would not lead to an "inescapable inference" that the jury ultimately reached a verdict by impermissibly compromising. The first two of these factors, if credited, would merely be "plus" factors used to demonstrate a compromise when some basic ground for finding a compromise, such as a low damages award contradicted by the evidence, is already apparent. And the final factor Defendants posit, "fundamental inconsistencies" in the verdict, is contrary to Defendants' positions at trial regarding the jury instructions and verdict form. At any rate, Defendants' interpretation of the events at the end of trial does not hold up to scrutiny. This case involved a good deal of technical evidence accumulated over the course of three weeks during trial, and slightly more than two days of deliberation was in no way unexpected. The Court has every confidence that the jurors undertook their task with fidelity to the Court's instructions. Contrary to Defendants' assertions and self-serving inferences from events that took place toward the end of trial, there are no indications that the jury compromised when arriving at its verdict.

### 2. Background on the Jury's Deliberations and Verdict

A reexamination of the events at trial after the close of the evidence demonstrates the failure of Defendants' contention regarding a compromise verdict, and puts the Defendants' early and repeated motions for a mistrial into context.

The Court charged the jury on the morning of February 25, 2015. *See* Tr. 2893:7. The jury sent thirteen notes over the course of its deliberations before ultimately reaching a verdict on the afternoon of February 27, 2015. *See* Tr. 3054:16. The first three notes all asked for certain pieces of evidence or bits of testimony from trial, with no further commentary from the jury. The fourth note, received roughly twenty minutes before five o'clock on February 25, asked for the solvency opinions of Plaintiff's and Defendants' experts (Frank and Grabowski), and further indicated that "we [the jury] are at a temporary impasse with respect to solvency. Perhaps we need to break until tomorrow." Ct. Ex. 15. The fifth note, however, stated that "[i]n order to Answer #6 we need to know the total amount received for [various Defendants]." Ct. Ex. 16. Because the verdict form directed the jurors to answer Question 6, which was a question of damages for the fraudulent transfer claim under bankruptcy law, only if it had found insolvency under at least one of the three federal definitions of the term provided in Questions 1 through 3, there was an available—but by no means inescapable—inference that the jury had already answered at least one of those questions in Plaintiff's favor.

Though there was no direct indication from the jury that they had in fact resolved any questions in Plaintiff's favor, Defendants were on a hair trigger to move the Court for a mistrial after this first indication that the jury might not return a swift verdict in their favor. The jury's next (and seventh) note asked for witness testimony, but the following note stated, "— Unfortunately—we cannot agree on # 1 and therefore we are hung. I am sorry." Ct. Ex. 19. Upon receiving the note, which was the first indication that the jury felt that they might have irresolvable differences (the earlier note suggested that the impasse was temporary), the Court proposed giving the jury a modified *Allen* charge. *See* Tr. 3020:16-21. Defendants objected, suggesting that the charge was "unnecessary" in light of the jurors' expressed disagreement, and stating that declaring a mistrial was appropriate at that point. Tr. 3022:15-19. The Court noted that it was very premature to call a mistrial at that stage for three reasons. First, there remained the possibility of a partial verdict and no need for a mistrial on all charges based on an expressed deadlock as to question one. Tr. 3022:22-23. Second, and more importantly, the jurors'

attention, questions, and demonstrated ability to follow directions during trial gave the Court

every reason to believe that the jury could follow a balanced and proper modified *Allen* charge.

Tr. 3023:8-14; 3031:23-3032:3.  And third, because the note was received around 3:30 p.m. on

February 26, 2015, *see* Ct. Ex. 19, the jury had been deliberating for only about a day and a half

after receiving *three weeks'* worth of evidence at trial.  *See* Tr. 3027:10-17; 3031:15-22.

Accordingly, the Court gave the jury the following modified *Allen* charge over Defendants'

objection:

> I have received [a] note from you, that you have not been able to reach a
> unanimous verdict with respect to all questions.  This case is important for the
> plaintiff and for the defendants.  Both parties, as well as the Court, have expended
> a great deal of time, effort, and resources in seeking resolution of this dispute.  It
> is desirable if a verdict can be reached that this be done, both from the viewpoint
> of the plaintiff and of the defendants.  But as I stated in my instructions to you,
> your verdict must represent the conscientious judgment of each juror.
>
> It is normal for jurors to have differences.  This is quite common.  While
> you may have honest differences of opinion with your fellow jurors during the
> deliberations, each of you should seriously consider the arguments and opinions
> of the other jurors.  Do not hesitate to change your opinion if after discussions of
> the issues and consideration of the facts and evidence in this case you are
> persuaded that a change of your original opinion is justified.  Again, I emphasize
> that no juror should vote for a verdict unless it represents his or her conscientious
> judgment.

Tr. 3030:7-3031:1.  Defendants do not now argue that giving a modified *Allen* charge was

improper, or that the content of the modified *Allen* charge was improper.

The jury resumed deliberations until it sent another note at roughly 4:15 p.m.  It stated,

"We need a break from the room.  One juror is having a panic attack."  Ct. Ex. 20; Tr. 3032:6-23.

The Court called the jury into the courtroom and instructed the jurors to take a 10-15 minute

break, and to then send a note indicating whether they wanted to break for the day.  Tr. 3032:22-

3033:6.  After the jury left the courtroom, Defendants immediately raised their second motion for

a mistrial, which the Court denied.  The jury returned and indicated that they wished to continue

deliberations until 5 p.m., and then return the next day to deliberate further.  Ct. Ex. 21; Tr.

3034:3-4.  The Court agreed with that procedure, and the parties had no objections.  Tr. 3034:5-

3035:20.

The jury returned the following morning, February 27, 2015. After sending two notes asking for evidence and clarification of the verdict form, the jury sent another note at roughly 11:30 a.m., stating, "We're getting close. We need 1/2 hr break. Thank you." Ct. Ex. 24; Tr. 3052:12-13. The jury took their break, returned, and continued deliberating up to and through lunch.

That afternoon, the jury indicated that it had reached a verdict. As the verdict was being read, however, the foreperson indicated that the jury had recorded its answer on the punitive damages questions incorrectly. Tr. 3057:11-18. The Court finished reading the verdict and polled the jury; the jurors indicated unanimity except as to the punitive damages as written on the form. Tr. 3058:12-18. The Court then saw counsel at sidebar, and received counsel's agreement to an instruction allowing further deliberation on the punitive damages question until they unanimously indicated the correct number. Tr. 3060:7-15. The Court also asked counsel, "Is there anything else on here that you identify as a reason, once we resolve this, that the jury cannot be dismissed?" Tr. 3060:16-18. Counsel for both parties answered that there was not. Tr. 3060:19-20.

After the jury returned to the jury room for further deliberations, the Court asked counsel if there was "anything to take up." Tr. 3061:9. Defendants' counsel responded, "Not until after you dismiss the jury, Your Honor." Tr. 3061:10-11. The jury returned with a verdict on punitive damages shortly thereafter, and the Court asked counsel, after reading that verdict and polling the jurors, whether there was any reason that the jury could not be dismissed—giving counsel a third opportunity to raise any issues with the verdict. Tr. 3062:3-4. Again, both parties indicated that there was not. Tr. 3062:5-6. Moments after the jury was dismissed, Defendants' counsel moved for a mistrial based on a "dramatic inconsistency in the verdict." Tr. 3063:6-7. The Court denied Defendants' motion, and further explained its reasoning for denying the motion in a written order filed on March 4, 2015. *See* Dkt. No. 325.

**3. Analysis**

38

As the Court noted above, Defendants adopted the strategy of seeking any thin reed on which to base a mistrial motion from the first indication that the jury might return a verdict in Plaintiff's favor.  Once the verdict was read, however, Defendants chose to abstain from making a motion based on the supposedly inconsistent or compromise verdict until after the jury was dismissed, despite being given three opportunities to raise any issues with the verdict while the jury was still impaneled.  Indeed, the second time the Court asked whether there were any issues to take up after the jury had rendered the bulk of its verdict, Defendants' counsel indicated, "Not until after you dismiss the jury." Tr. 3061:10-11.  In other words, Defendants apparently had already conceived of their final mistrial motion based on the alleged inconsistency or compromise nature of the verdict, and made a tactical decision to forego raising it until after the jury was no longer able to address the asserted error.  While such maneuvering might be enough to hold that Defendants waived any claims based on the verdict, the Court need not rely solely on procedural grounds.  The motion should be denied substantively as well.

### a.  Lack of Compromise

First, there was no indication of compromise in the verdict, in the sense that Defendants' liability for damages was substantially reduced by the jury's decisions.  The fraudulent conveyance and fraudulent transfer claims involved the same transfers, and the jury did not award Plaintiffs an irrationally small or even substantially reduced amount of damages on the fraudulent conveyance claim when compared with the evidence in this case.  It would make little sense for the jury, as a "compromise," to award full or near-full damages, and ones that were supported by the record.

Second, and unlike the Second Circuit cases finding a compromise verdict without diminished damages, there was neither a communication from the jury indicating that it might reach a compromise verdict, nor an instruction to the jury indicating that it could reach such a compromise.  Defendants' argument that the modified *Allen* charge "inadvertently prompted the jury to break its deadlock" by compromising is a matter of pure conjecture at best, particularly because they find no error in the charge itself.  The modified *Allen* charge in fact made it clear

39

that the jury could not compromise: "But as I stated in my instructions to you, your verdict must represent the conscientious judgment of each juror. ... Again, I emphasize that no juror should vote for a verdict unless it represents his or her conscientious judgment." Tr. 3030:14-3031:1.

Third, the jury gave multiple indications that they were considering the evidence carefully and following the Court's instructions. They sent several notes asking for further evidence and testimony, including a note asking for testimony the morning after a juror had a "panic attack." *See* Ct. Ex. 12. Contrary to Defendants' assertion, the "panic attack"—which the Court noted was "not that unusual," Tr. 3033:11—does not contribute to an "inescapable inference" that the ultimate verdict rendered was a compromise. Any problem was resolved with a 10-15 minute break, and there was no further indication of a juror similarly feeling panicked. *See* Tr. 3032:22-23 (giving jury break). Nor is there any indication that the panic attack was induced by a need to compromise; the jurors had spent a full day in a windowless room at that point. The jury even decided to go back to work after the break. *See* Tr. 3034:4. There is simply no reason to infer that the "panic attack" contributed in any way to a compromise verdict, particularly given the lack of any other indicia of compromise. The Defendants' arguments to the contrary border on the frivolous.

### b. Defendants' Renewed Inconsistent Verdict Claim

To the extent Defendants argue that "fundamental inconsistencies" in the jury's verdict demonstrate a compromise, their motion is a transparent attempt to sneak an argument that they have already waived in through the back door. As the Court has explained, Defendants agreed to jury instructions and a verdict form that required the jury to consider Plaintiff's claims for fraudulent transfer under the Bankruptcy Code and fraudulent conveyance under New York law completely separately. When the jury decided the two claims differently, Defendants intentionally forewent raising the possibility of inconsistent verdicts until immediately after the jury had been dismissed, making it impossible to allow the jury to resolve any alleged inconsistency—a task that the Court has every confidence the jury could readily have performed. The Court denied Defendants' oral motion for a mistrial after the jury had been dismissed, Tr.

3066:1-5, and issued a further order detailing the reasons for that denial, *see* Order Mar. 4, 2015 (Dkt. No. 325). In a footnote, Defendants suggest that waiver should not bar consideration of their inconsistent-verdict claim because the waiver rule applies only to what Defendants call "pure inconsistent-verdict claims," which they state are cases where the "jury might have been able to reconcile its verdict had it been given the chance." Def. Mem. at 34 n.15 (Dkt. No. 409). Contrary to Defendants' suggestions, even if it were necessary to "fix" the verdict, there was no reason why the jury that heard this case could not have done so. The notion that the jury was "troubled," as Defendants put it, is fanciful at best and, in the Court's judgment, contrary to fact. Moreover, because much of Defendants' argument that the verdict was a compromise depends on the notion that the verdict was inconsistent, their argument here becomes entirely circular: the jury was "troubled" because they returned an inconsistent verdict, but could not fix their inconsistent verdict because they were "troubled." This argument does not hold water.

To permit a party that waived its objection to an inconsistent verdict by failing to timely raise to later make the same argument under the guise of alleging a "compromise verdict" would undermine the Second Circuit's clear waiver rule for inconsistent verdict claims. Furthermore, it was Defendants' position at the charging conference that the Bankruptcy Code claim for fraudulent transfers and the New York law claim for fraudulent conveyances required separate instructions and separate answers on the verdict form—an argument that implied the possibility that the jury could reach different verdicts on the two claims. Defendants state in their brief that the "jury instructions and verdict form were not incorrect, but rather that the jury simply failed to apply them correctly and in a logical manner." Def. Mem. at 34 n.15 (Dkt. No. 409). To later claim that such a verdict was evidence of an impermissible compromise is, intentionally or unintentionally, to rig the game, setting in motion ahead of time a potential way out of an unfavorable verdict. The Court finds the argument unconvincing, and not an accurate description of what occurred at trial.

Defendants' citation to *Schaafsma v. Morin Vt. Corp.*, 802 F.2d 629, 634-35 (2d Cir. 1986), does not change the waiver analysis. *Schaafsma* involved an inconsistency between

interrogatory answers on the verdict sheet and the general verdict. *See id.* at 634. Even though the terms of Federal Rule of Civil Procedure 49(b) "make it the responsibility of a trial judge to resolve the inconsistency even when no objection is made," *Schaafsma*, 802 F.2d at 634 (internal quotation marks omitted), the most that can be said here is that Rule 49(b) simply does not apply here, because the jury's response to the verdict form's question regarding liability for fraudulent conveyances under New York law was not a general verdict question to be compared to its answers to special verdict questions regarding fraudulent transfers under the Bankruptcy Code. The verdict form made clear that the jury was to answer the New York-law question regardless of its answers to the federal-law questions, even though further analysis of federal-law liability was cut off if the jury did not find insolvency under the federal definition. It would be unreasonable, and untrue, to now cast Questions 1-3 on the verdict form as interrogatories leading toward a general verdict on the New York-law claim in Question 7. Such a reading is directly contrary to the parties' agreed understanding when considering the verdict form. And even if, as Defendants argue based on *Denny v. Ford Motor Co.*, 42 F.3d 106, 111 (2d Cir. 1994), waiver principles are applied on a case-by-case basis when inconsistent verdicts are involved—a dubious statement, given the Second Circuit's more recent statement that "[i]t is well established that a party waives its objection to any inconsistency in a jury verdict if it fails to object to the verdict prior to the excusing of the jury," *Kosmynka v. Polaris Indus., Inc.*, 462 F.3d 74, 83 (2d Cir. 2006)—the Court finds that this would be a poor case for relieving Defendants of the effects of waiver, given their strategic choice not to bring up the possibility of an inconsistent verdict until immediately after the jury was dismissed. *See discussion supra* at 38. Even *Denny* states that, if a defendant can see an inconsistency and knows that it will result in judgment for its opponent, "it is hard to see why the defendant should be allowed to sit by silently and yet be granted a new trial" after the judgment. *Denny*, 42 F.3d at 111.

None of Defendants' asserted grounds for finding a compromise verdict—a "close question" of liability, "difficult" deliberations, and an inconsistent verdict—supports their assertion that the jury impermissibility compromised. Their motion is legally insufficient, and

much of their argument is at odds with the record. The Court finds no grounds for granting a new trial on this basis.

### IX.   Individual Defendants' Motion for Judgment as a Matter of Law

Defendants Michael Legge, Todd Ogaard, Ron Thayer, Howard Kaplan, Lee Brown, Michael Ryan, Dennis Sadlowski, and the Estate of Justin D'Atri (the "Individual Defendants") have also moved for judgment as a matter of law on the claims against them. The jury assessed no damages against these Defendants, and they have raised their motion in case the Court granted a new trial in response to the motion by Defendants Ira Rennert, The Renco Group, and the Trustees of the Rennert Trusts. *See* Def. Mem. at 1 (Dkt. No. 403). Because the Court herein denies the motion for a new trial, the Court denies the Individual Defendants' motion as moot.

### X.   Plaintiff's Motion for Prejudgment Interest

The Court now turns to Plaintiff's motion under Federal Rule of Civil Procedure 59(e) to alter or amend the judgment in order to impose a rate of prejudgment interest "at or closer to" nine percent per annum, and to begin the accumulation of prejudgment interest as of July 2, 2000. On March 16, 2015, the Court granted prejudgment interest at a rate of six percent per annum to begin from August 2, 2001, which was less than the nine percent Plaintiff had requested but more than the rate proposed by Defendants, which would have been equal to the federal statutory rate of postjudgment interest (roughly 0.25%). The Court assumes familiarity with its reasoning in the March 16, 2015 order. *See* Dkt. No. 342

Under Rule 59(e), a court may alter or amend a judgment "to correct a clear error of law or prevent manifest injustice." *ING Global v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 96 (2d Cir. 2014). Plaintiff asserts that two errors in the Court's March 16, 2015 Order should be corrected. First, he contends that interest should begin to run from July 2, 2000, as the date the Debtors stopped paying interest on the Notes. Second, he states that the prejudgment interest should more closely reflect the actual yield on corporate bonds with similar risk

profiles—that is, domestic semi-annual B-rated corporate bonds—in the same time frame. The Court does not find either argument convincing.

### 1. The Date to Begin Interest

Taking up first Plaintiff's argument about the starting date for interest, the Court concludes that Plaintiff does not offer an adequate explanation as to why the date when Debtors first ceased paying interest on the Notes is the correct date to begin prejudgment interest. As the Court stated in the March 16, 2015 Order, Plaintiff's right of recovery arose from the bankruptcy filing. *See* Order at 10 (Dkt. No. 342); *In re Nelson Co.*, 117 B.R. 813, 818 (Bankr. E.D. Pa. 1990). Regardless of whether the funds recovered here ultimately compensate the bondholders as creditors of the corporation, what is at issue in this action is those damages arising from the Debtors' bankruptcy. MagCorp's and Renco Metals's failure to pay interest due to the bondholders before they went bankrupt is a different claim, and the damages resulting from those missed payments are not at issue in this action. To fix prejudgment interest based on that earlier date, which is not based on the Debtors' bankruptcy, would stretch the concept of prejudgment interest past its breaking point, and convert it into additional recovery of damages. It is more appropriate to fix prejudgment interest from the date that Plaintiff's claims arose.

### 2. The Amount of Prejudgment Interest

Plaintiff also moves the Court to increase the prejudgment interest rate to reflect the average B-rated bond yields in the relevant period. The Court notes that Plaintiff had the opportunity to raise this argument before judgment, and did not do so. Regardless, the Court would not amend the rate of prejudgment interest even if this argument were not waived.

The Court does not agree with Plaintiff that the average "Yield to Worst" for B-rated domestic corporate bonds represents the appropriate rate for prejudgment interest. Basing prejudgment interest on actual interest rates that individual investors might have hypothetically earned—for example, by investing the money in bonds similar to those offered by the debtors— injects a "needless variable" into the question of prejudgment interest. *See Indep. Bulk Transp., Inc. v. Vessel Morania Abaco*, 676 F.2d 23, 27 (2d Cir. 1982). The Second Circuit has stated

that prevailing parties are entitled to "income which the monetary damages would have earned, and that should be measured by interest on short-term, risk-free obligations." *Id.*; *accord McCoy v. Goldberg*, 810 F. Supp. 539, 547 (S.D.N.Y. 1993). In the absence of specific evidence from Plaintiff on what this rate of return would be, the Court at least believes that the risk-based rate of return on B-rated corporate bonds overstates it.

Furthermore, Plaintiff's argument that using comparable B-rated bonds sufficiently takes into account the risk of such investments only further proves that such rates cannot reliably used to determine prejudgment interest. Plaintiff states that such bonds have default rates of less than two percent, and make no mention of how such rates might affect the overall anticipated rate of return. *See* Pl. Reply Mem. at 12. The exhibits that Plaintiff has provided state that "over a five-year period a portfolio of B-rated issuers defaulted at a 26.5% average rate between 1983 and 2010." *See* Dkt. No. 410-7 (Ex. D at 60). To be sure, Plaintiff has presented a Moody's report indicating that the speculative-grade default rate in 2010 ended at 3.2%, although the report also called that rate "below average."[8] The Court does not cite these materials in an effort to determine which is more accurate and should prevail, but rather to reinforce the notion that using the return rate on speculative-grade investments is a variable that need not form part of the prejudgment interest rate.

Plaintiff's argument that increasing the interest rate will necessarily inure to the benefit of unsecured creditors proves too much. Plaintiff has not presented evidence or argument that even recovery of the full amount of damages plus recovery of all interest requested will fully compensate the Debtors' creditors. If the Court were guided solely by considerations of restoring to unsecured creditors all of the harm done, it could theoretically do so by imposing an absurdly high interest rate, which would make up for any shortfall in recovery otherwise available. But doing so would contravene the purpose of postjudgment interest, which is not to create additional recovery based on the "underlying laws," Pl. Mem. at 7, but simply to

---

[8] *See Corporate Default and Recovery Rates, 1920-2010*, Moody's Investor Service, Feb. 28, 2011, at 1-2, *available at* http://efinance.org.cn/cn/FEben/Corporate%20Default%20and%20Recovery%20Rates,1920-2010.pdf.

compensate Plaintiffs for the lost time-value of money *in the damages award.  See, e.g.*, *Kassis v. Teachers' Ins. & Annuity Ass'n*, 13 A.D.3d 165, 165 (N.Y. App. Div. 2004).  The equities may make prejudgment interest inappropriate if a defendant acted innocently.  *See Wickham Contracting Co. v. Local Union No. 3, Int'l Bhd. of Elec. Workers, AFL-CIO*, 955 F.2d 831, 834 (2d Cir. 1992).  However, it does not follow that the Court has equitable discretion to amplify an award of prejudgment interest to compensate creditors in ways untethered to the lost time-value of their investments.  For the same reason, the Court continues to believe that secondary investors' lack of legitimate expectation in interim use of the invested funds counsels against the full nine percent statutory award.

Plaintiff further suggests that considering the secondary purchase of Debtors' bonds when setting the rate of prejudgment interest risks undercompensating original noteholders.  *See, e.g.* Pl. Mem. At 6 (Dkt. No. 408).  As the Court noted in its original decision on prejudgment interest, "some portion of the current bondholders who stand to recover are not the original bondholders who were deprived of the use of their funds."  Dkt. No. 342 at 7.  This was one equitable factor guiding the Court's analysis, and the Court weighed the existence of both original and secondary noteholders in its equitable analysis of the appropriate prejudgment interest rate.  The Court does not consider the existence of secondary noteholders dispositive, and believes that the equities would be served by the six percent rate regardless of whether the debt were held entirely by original noteholders or not.  In a case such as this one where both original and secondary noteholders are involved, weighing the equities requires the Court to consider the class of individuals who stand to recover as a whole, and determining a rate that best serves competing equitable interests.  The coexistence of both types of noteholders tugs in separate directions when the equities are weighed, and the Court concludes that the six percent figure is the best accommodation of these competing interests.

Finally, Plaintiff's argument that prejudgment interest should be higher relies, at least in part, on the notion that Defendants are "bad actors."  *See* Pl. Mem. at 12 ("[T]here is no reason to protect [Defendants] against the consequences of their misconduct."); Pl. Reply Mem. at 14

("Defendants should not benefit unfairly from the use of other people's money."); *id.* at 14-15 (discussing interest rates Defendants "would have to pay to borrow the money that was *wrongfully taken*"). Prejudgment interest is compensatory, not punitive. *See O'Quinn v. N.Y. Univ. Med. Ctr.*, 933 F. Supp. 341, 344 (S.D.N.Y. 1996). Again, that equitable considerations may factor in to the prejudgment interest award does not give the Court leeway to convert prejudgment interest into a form of punishment.

The Court notes that Defendants have suggested that the Court could reconsider and adjust the amount of prejudgment interest downward if it "chooses to reconsider" the interest rate determination. *See* Def. Mem. at 9. Because the Defendants have not raised a motion of their own to reconsider the rate of prejudgment interest, the Court declines to do so based on Defendants' suggestion (which would have been untimely at the time it was made). Even so, the Court wishes briefly to address Defendants' suggestion that *In re Palermo*, 739 F.3d 99 (2d Cir. 2014), left open the question of whether New York or federal law governs prejudgment interest under 11 U.S.C. § 544(b). Regardless of whether the briefing in *Palermo* contested the district court's authority to award prejudgment interest under the New York statute,[9] the opinion expressly considered the matter:

> The question of whether prejudgment interest should be awarded in an avoidance and recovery action brought under federal bankruptcy law is an open one in our Court. Many of the courts in this Circuit look to the source of the law underlying plaintiff's claims: claims that arise out of federal law are governed by federal rules, claims arising out of state law are governed by state rules. ... *We agree this is the proper framework for the analysis.*

*Palermo*, 739 F.3d at 107 (emphasis added) (citations omitted). To the extent that *Palermo* suggested that a federal award for violation of 11 U.S.C. § 550(a) would *also* be permissible, *see Palermo*, 739 F.3d at 107 n.5, it clearly did not say that such a decision was the *only* permissible alternative. Furthermore, insofar as the summary order in *Goldman Sachs Execution &*

---

[9] In fact, it appears that the Defendant-Appellant in *Palermo* implicitly *conceded* that New York law could apply. *See* Appellant's Reply Brief at 28, *In re Palermo*, 739 F.3d 99 (2d Cir. 2014), 2012 WL 820464, at *28.

*Clearing, L.P. v. Official Unsecured Creditors' Comm. of Bayou Grp., LLC,* 491 F. App'x 201, 206 (2d Cir. 2012), appears to be the contrary, the Court finds it better to apply the reasoning of the later-decided *Palermo*. At any rate, prejudgment interest is discretionary under federal law as well. *See N.Y. Marine & Gen. Ins. Co. v. Tradeline (L.L.C.),* 266 F.3d 112, 131 (2d Cir. 2001). While the Court based some of its reasoning around the New York statutory rate in the March 16, 2015 Order, the Court's discretion would similarly be guided to fix the six percent, non-compounding interest rate under federal law.

XI.    **Conclusion**

For the foregoing reasons, the motion by Defendants The Renco Group, Ira Rennert, and the Trustees of the Rennert Trust for judgment as a matter of law is GRANTED with respect to Plaintiff's claims for unjust enrichment and punitive damages, and DENIED in all other respects. The same Defendants' motion for a new trial is DENIED. The remaining Defendants' motion for judgment as a matter of law is DENIED as moot. Plaintiff's motion to alter or amend the judgment to increase the amount of prejudgment interest is DENIED.

Because the Trustees of the Rennert Trust were liable only for Plaintiff's unjust enrichment claim, the Clerk is requested to amend the judgment to indicate that Plaintiff shall take nothing from Defendant Trustees of the Rennert Trust. The Clerk is requested to further amend the judgment to remove any punitive damages award. The judgment shall otherwise remain the same in all respects.

This resolves Docket Nos. 402, 407, and 408. The Clerk is requested to terminate the case.

SO ORDERED.

Dated:  Aug. 19 , 2015
       New York, New York

_____
ALISON J. NATHAN
United States District Judge